IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ              )(
      Plaintiff              )(
                       )(
VS.                          )(    CIVIL ACTION NO.
                       )(    7:24-cv-00132
GOCHA ALLEN RAMIREZ,          )(
ALEXANDRIA LYNN BARRERA,       )(
RENE FUENTES, and STARR        )(
COUNTY, TEXAS                 )(
      Defendants             )(

_____

ORAL AND VIDEOTAPED DEPOSITION OF
ESMERALDA NAVARRO MUNIZ
MARCH 25, 2025

_____

      ORAL AND VIDEOTAPED DEPOSITION OF ESMERALDA

NAVARRO MUNIZ, produced as a witness at the instance of

the PLAINTIFF, taken in the above-styled and numbered

cause on MARCH 25, 2025, between the hours of

12:08 p.m. and 5:01 p.m., reported stenographically by

DONNA McCOWN, Certified Court Reporter No. 6625, in and

for the State of Texas, at Garza Martinez, PLLC, 202

East Sprague Street, Edinburg, Texas, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                              d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:12  1    officers -- some investigators that would call them on

13:12  2    almost every other case.  It all depends.

13:12  3        Q.  And that was during the investigation you would

13:12  4    call?

13:12  5        A.  Oh, on -- particularly on this -- oh, yeah.

13:13  6    Yeah, throughout the investigation --

13:13  7        Q.  The investigation.

13:13  8        A.  -- of whatever case.

13:13  9        Q.  Of whatever case?

13:13 10        A.  Yes.

13:13 11        Q.  And did you often call a particular ADA or the

13:13 12    general number if you had a question?

13:13 13        A.  It was whoever answered.  Like a lot of the

13:13 14    times, Judy Solis, we would hardly ever talk to her

13:13 15    because she didn't -- she wouldn't answer, or who

13:13 16    was the other one?

13:13 17             Abel, he would -- sometimes we would talk

13:13 18    to him.  But the person that would always, always,

13:13 19    always, and always answer was Alex Barrera.

13:13 20        Q.  Okay.  And how -- how would you --

13:13 21        A.  I'm sorry.

13:13 22        Q.  I'm sorry.

13:13 23        A.  We would never call Gocha directly.

13:13 24        Q.  How would you reach out to the DA's office?  By

13:14 25    phone?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:21  1   I'm not mistaken.  And that's when the miscarriage

13:21  2   happened.

13:21  3        Q.  So when -- you said the hospital reported it?

13:21  4        A.  Yes, ma'am.

13:21  5        Q.  Who at the hospital reported it?

13:21  6        A.  I don't know.  I'm not sure who the officer

13:21  7   made contact.  I'm assuming with the doctor on-call and

13:21  8   the nurses.  And I'm not sure if it was directly the

13:21  9   ones from the ER or the -- the maternity ward.

13:21 10        Q.  Okay.  I'm going to show you confidential -- it

13:22 11   says Confidential Exhibit No. 1.

13:22 12             MS. JARIT:  We're going to mark this

13:22 13   Exhibit 6, Plaintiff's Exhibit 6.  Thank you.

13:22 14        Q.  Do you recognize this document?

13:22 15        A.  Yes, ma'am.

13:22 16        Q.  Okay.  This document was provided by defendants

13:23 17   in discovery.  It is not Bates-stamped, but it is

13:23 18   labeled "Confidential Exhibit No. 1."

13:23 19        A.  Oh, I think I have two.

13:23 20        Q.  Oh, you have two copies?

13:23 21        A.  Yes.

13:23 22        Q.  Okay.  I'll take one back.

13:23 23             Who -- who wrote this -- this report?

13:23 24        A.  Ranell Rosa.

13:23 25        Q.  And do you see on the bottom right-hand corner

Electronically signed by Donna McCown (101-253-986-8079)                d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:26 1      Q.   And then are you also aware that Investigator

13:26 2  Aguirre also spoke to Martha Torres that same day?

13:26 3      A.   Yes, ma'am.

13:26 4      Q.   And do you know -- were you told about that

13:26 5  conversation that he had with her?

13:26 6      A.   Briefly, because he -- I asked him to write a

13:26 7  supplement report on that.

13:26 8      Q.   Why did you ask him to write a supplement

13:26 9  report?

13:26 10     A.   Because he was the one that had conducted that

13:26 11 investigation -- I mean that interview.  I'm sorry.

13:26 12     Q.   Okay.

13:26 13     A.   So I said, "You go ahead and type up that

13:26 14 interview because you know exactly, you know, what you

13:26 15 asked and what she told you."

13:26 16     Q.   And was it your understanding that she was the

13:26 17 one who reported the case to police?

13:26 18          MR. NAVARRO:  I'm sorry, who is "she"?

13:26 19     Q.   I'm sorry.  Was it your understanding that

13:26 20 Martha Torres was the one who called the police?

13:26 21     A.   I believe so, reading this report, yes, ma'am.

13:27 22     Q.   And was it your understanding also that she

13:27 23 thought she had to report the incident because it was a

13:27 24 crime?

13:27 25     A.   I believe so, ma'am, yes.  Because they stated

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:27  1    the Texas Abortion Restriction Law there on the report

13:27  2    on the narrative, so I'm assuming.

13:27  3        Q.   And it says --

13:27  4        A.   Yes.  I'm sorry, yes, ma'am.  I was going to

13:27  5    read the same -- that sentence.

13:27  6        Q.   And the report says "Texas Abortion Law SB 8,"

13:27  7    correct?

13:27  8        A.   Correct, ma'am.

13:27  9        Q.   And so at the time, did -- did you also believe

13:27 10    that it was a crime under SB 8?

13:27 11        A.   I'm going to have to be very honest with you.

13:27 12    I -- when I asked my supervisors what they wanted me to

13:27 13    do with this case and what was I supposed to do with

13:27 14    this and that it had happened in the Rio Grande City

13:28 15    jurisdiction, they themselves had no answers for me.

13:28 16    And that is why they said, "Seek out advice with the

13:28 17    County, the district attorney's office."

13:28 18        Q.   Had the district attorneys talked to them about

13:28 19    the case before handing it to you?

13:28 20        A.   I'm not sure about that, ma'am.

13:28 21        Q.   Earlier, you referred to Ms. Gonzalez having a

13:28 22    miscarriage.  Why -- why do -- did you call it a

13:28 23    miscarriage?

13:28 24        A.   Well -- I don't know.  I just called it a

13:28 25    miscarriage.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

13:33  1      A.  Well, they told me interview all the parties
13:33  2  involved.  And normally we would always interview every
13:33  3  party involved in whatever crime.
13:33  4      Q.  When you say "they," who are you referring to?
13:34  5      A.  My sergeant and my captain.
13:34  6      Q.  Do you recall that the doctor said that under
13:34  7  the law, she, meaning Ms. Gonzalez, cannot induce an
13:34  8  abortion after six weeks?
13:34  9      A.  Yes.
13:34 10      Q.  How did you -- strike that.
13:34 11          Was that statement surprising to you?
13:34 12      A.  Yes, ma'am, because I was not familiar with any
13:34 13  of that.
13:34 14      Q.  Okay.  You were not familiar with --
13:34 15      A.  With the laws of abortion or how many months or
13:34 16  weeks or...
13:34 17      Q.  So did you understand that statement to be true
13:34 18  at the time, that -- that she could not have induced an
13:34 19  abortion?
13:34 20      A.  No, I didn't know if it was true or not.  I
13:34 21  just -- he said it, and I went ahead and -- and put it
13:35 22  in -- on my report.
13:35 23      Q.  And he also said he believed he had to report
13:35 24  the incident to police as well, correct?
13:35 25      A.  Yes, ma'am, I believe so.

Electronically signed by Donna McCown (101-253-986-8079)                d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:35  1        Q.  And was that surprising to you?

13:35  2        A.  Yes.  Yes, ma'am.  All of this was very

13:35  3   surprising to me because I didn't know -- I didn't

13:35  4   know -- I heard about "My body, my choice" a lot, and

13:35  5   then I get this.  I was just confused myself.  Like I

13:35  6   said, I didn't even know.

13:35  7        Q.  Yeah.  When you say, "Ny body, my choice," what

13:35  8   do you mean by that?

13:35  9        A.  Well, I hear a lot of how females are entitled

13:35  10  to, you know, discontinue a pregnancy if they wish to.

13:35  11  And when this was brought forth, I didn't know.  I

13:35  12  didn't know if what the doctor said was true.

13:35  13             I didn't know if -- you know.  So that's

13:36  14  why -- that's why I seeked legal -- not legal, I'm

13:36  15  sorry.  That's why I seeked advice from my supervisors,

13:36  16  and then my supervisors, in turn, I'm assuming -- I'm

13:36  17  assuming they too didn't have an answer for me, and

13:36  18  that's how we ended up at the DA's office.

13:36  19       Q.  So you were surprised that the office was

13:36  20  investigating this in light of the right of a woman to

13:36  21  have an abortion at the time; is that correct?

13:36  22       A.  That's correct, ma'am.

13:36  23       Q.  Okay.  And you -- do you recall obtaining

13:36  24  subpoenas for Ms. Gonzalez's medical records in this

13:36  25  case?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:44  1      A.  At this point, I -- I had questions.

13:44  2      Q.  You had questions.  What questions?

13:44  3      A.  I wasn't sure how to follow through with this,

13:44  4  like I said, because I wasn't aware of -- of laws of

13:44  5  abortion or miscarriages or -- it was just I had never

13:44  6  handled anything like that.

13:44  7      Q.  Yeah.  So you were unsure about how the law

13:44  8  applied to the facts.  Is that what you're saying?

13:44  9      A.  Yes, ma'am.

13:44 10      Q.  You didn't have -- after this interrogation,

13:45 11  you basically understood the facts, what the facts

13:45 12  were.

13:45 13      A.  After -- after this -- after the interview

13:45 14  with -- with Lizelle, I discussed with the captain and

13:45 15  the sergeant, and then they were the ones that said,

13:45 16  "Okay.  Put the case together and send it to the DA's

13:45 17  office."

13:45 18          So I called Alex Barrera, let her know,

13:45 19  "This is what I have as -- as far as what the doctor

13:45 20  said, what she said.  This is what" -- "Okay.  Excuse

13:45 21  me.  Put it together and turn it in, and I'm going to

13:45 22  present it to the grand jury."

13:45 23      Q.  Okay.  When was that conversation?

13:45 24      A.  If not this day, days after this day, yes,

13:45 25  ma'am.  And I'm -- I'm not sure when the case was

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:03  1              So ADA Barrera says that she had missed a

14:03  2      call from the sheriff's office about this case and

14:03  3      learned that you had spoken to ADA Villarreal.

14:04  4          A.  I never spoke to Abel Villarreal.

14:04  5          Q.  You did not?

14:04  6          A.  It was probably one of our administrators.

14:04  7          Q.  So when you say "administrators," who would

14:04  8      that be?

14:04  9          A.  Maybe Captain Fuentes or Carlos Delgado.  They

14:04 10      have -- they have a better relationship with Abel --

14:04 11      with Abel Villarreal.

14:04 12          Q.  So someone higher up would have spoken to him

14:04 13      with this question --

14:04 14          A.  Yes.

14:04 15          Q.  -- about --

14:04 16          A.  Even before I even called Alex, because

14:04 17      apparently, they had already called Abel Villarreal.

14:04 18      Somebody had.

14:04 19          Q.  And do you recall speaking to ADA Barrera with

14:04 20      Captain Fuentes about the case at one point?

14:05 21          A.  If I'm not mistaken, this is the day that I was

14:05 22      handed the report that we called that I had said that

14:05 23      we were all -- they said, "Call the DA's office."  This

14:05 24      is the day.

14:05 25          Q.  And so on that day is when you called.  And do

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:41  1      A.  No, ma'am.

14:41  2      Q.  Do you know what a capias is?

14:42  3      A.  The -- the arrest warrant?

14:42  4      Q.  Were you provided a capias as well?

14:42  5      A.  I don't remember what I pulled out from the

14:42  6  envelope.  I believe I did sign it.  I signed the

14:42  7  return that I had executed.  And that's when I opened

14:42  8  it in front of her, and I told her, "This is what the

14:42  9  DA's office is bringing before you."

14:42 10      Q.  How did you go about arresting Ms. Gonzalez?

14:42 11      A.  Well, I went to go -- when I got the envelope,

14:42 12  I went to my sergeant Aguirre and Captain Fuentes,

14:42 13  said, "This is what" -- we call him Trini, Trinidad

14:42 14  Lopez.  Said, "This is what Trini gave me."

14:42 15              He's like, "Okay.  Well, now go look for

14:42 16  her."

14:42 17              Okay.  I started calling her.  I went to

14:42 18  her house.  So all six of us started looking for her,

14:42 19  because they said, "Well, now go look for her and bring

14:43 20  her."

14:43 21              Okay.  So we did.  We started looking for

14:43 22  her.  I don't remember where exactly.  I think it was

14:43 23  somewhere on Alvarez Road, maybe -- I don't remember

14:43 24  where exactly it happened.  But that's where we saw

14:43 25  her.  I believe I was on the phone with her.  I don't

Electronically signed by Donna McCown (101-253-986-8079)          d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:43  1   remember the details.

14:43  2          Oh, maybe they're here.  And that's how --

14:43  3   we met up with her.  And she was nervous.  She was -- I

14:43  4   said, "Well, I have this envelope."

14:43  5          Tell me -- I believe she was like, "Are

14:43  6   you going to arrest me," blah blah.

14:43  7          I said -- just like they told me, I told

14:43  8   her, like, "They gave me this envelope.  You need to go

14:43  9   with me to the sheriff's office, and that's where we're

14:43  10   going to open it together.  Like I'm going to open it

14:43  11   and then I'll tell you there."

14:43  12          So she calls her mom.  We drive to the

14:43  13   sheriff's office.  Once we get to the sheriff's office,

14:44  14   that's when I open the envelope.  And I pulled out the

14:44  15   paperwork, and I said, "This is what it is."  We're

14:44  16   reading it together.  And I read it to her.

14:44  17     Q.  How many officers were involved in the arrest?

14:44  18     A.  I don't remember.  In the arrest when we

14:44  19   detained her or the arrest?

14:44  20     Q.  In the detain -- when you found her and

14:44  21   detained her.

14:44  22     A.  I think it was maybe three of us or -- I was

14:44  23   with someone, and then maybe another unit.  I don't

14:44  24   recall.  All of us were out there, because some were at

14:44  25   her house in -- I don't know where she lives, wherever

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755      McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)      d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:44  1    she lives, Fronton or -- I don't remember, Falcon

14:44  2    Heights.

14:44  3              And then some were over here on the west

14:44  4    side of town looking for her.  She was saying, "I'm

14:44  5    over here.  I'm over there."  So it was something like

14:45  6    that.  I don't recall exactly.

14:45  7              So when we got to her, it was me and

14:45  8    whoever I was driving with.  I don't remember if it was

14:45  9    Investigator Ivan Lopez or with Juan Guerra and maybe

14:45 10    one more unit.  I don't remember.

14:45 11         Q.  So it was more than one car, though?

14:45 12         A.  Yes.  Yes.

14:45 13         Q.  And they were marked cars?

14:45 14         A.  I don't -- one of them for sure.  I don't

14:45 15    remember if we had the ghost units at that time or we

14:45 16    had the regular patrol -- regular CID units.

14:45 17         Q.  Did they have dash cams?

14:45 18         A.  No, they don't have dash cams.

14:45 19         Q.  Okay.  Were you wearing a body cam?

14:45 20         A.  No, I was not wearing a body cam.

14:45 21         Q.  What car was she transported in to the

14:45 22    sheriff's office?

14:45 23         A.  No.  She drove herself.

14:45 24         Q.  Oh, she drove herself?

14:45 25         A.  Yeah, she drove herself.  I said, "The paper is

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:45  1    for you to go with me to the sheriff's office."  Like I
14:46  2    didn't want to say, "Oh, you're arrested," because I
14:46  3    didn't know myself if she was to be arrested or not be
14:46  4    arrested.  Like I didn't know what was going to be
14:46  5    inside those papers.
14:46  6              So I said, "I don't know if you're going
14:46  7    to be arrested," or "I don't know what they sent me.
14:46  8    They just gave me this."  So she drove herself to the
14:46  9    sheriff's office.
14:46 10        Q.  Were you in touch with the DA's office during
14:46 11    this arrest?
14:46 12        A.  I don't remember if I was.  Maybe afterwards
14:46 13    for sure, but not -- I don't remember if during.
14:46 14        Q.  Is it unusual that they told you to go find
14:46 15    someone and bring them back to the office but you
14:46 16    didn't know what was going to happen?
14:46 17        A.  Yes.  Yes, because normally, it's -- it's -- if
14:46 18    it was an indictment, they could have served themselves
14:46 19    as investigators.
14:46 20        Q.  Why didn't they serve it themselves?
14:46 21        A.  I don't know, ma'am.
14:46 22        Q.  Was anyone riding with her in her car?
14:47 23        A.  I -- when we were driving to the office?
14:47 24        Q.  Yes.
14:47 25        A.  I drove with her.  She was crying.  She was

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:47 1   nervous.  I said, "I'll drive with you."  Like I just

14:47 2   wanted her calm, relaxed.  I didn't want her to -- and

14:47 3   then I got in trouble for that.

14:47 4           They said, "You shouldn't have driven with

14:47 5   her.  What if she, you know, would have taken off to

14:47 6   Mexico with you?"  I just thought it was -- she seemed

14:47 7   scared, nervous, crying.

14:47 8           I said, "I'll even drive with you, like

14:47 9   let's go to the sheriff's office, and we'll open the

14:47 10  envelope together, like, you know, just relax."  I

14:47 11  mean, I said, "Everything is going to be okay.  Don't

14:47 12  worry."

14:47 13          And we -- and she said, "Yes," and I drove

14:47 14  with her.  She was on the phone with her mother.

14:47 15  Q.  And would you say that that was not typical of

14:47 16  how an arrest usually takes place?

14:47 17  A.  Correct.  Well, she was not under arrest at

14:47 18  that time.

14:47 19  Q.  Were you aware that the -- that she had been

14:48 20  charged with murder then?

14:48 21  A.  When I was -- when I was driving with her to

14:48 22  the --

14:48 23  Q.  Yes.

14:48 24  A.  I was just wondering what was in that envelope.

14:48 25  Q.  Yeah.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:48 1        A.  I wasn't sure.  I wasn't -- in the back of my

14:48 2  mind, I said, "Well, if they want her, I'm pretty sure

14:48 3  they charged her."  But I didn't know -- like I said,

14:48 4  it was the first time dealing with an indictment.  I

14:48 5  didn't know if it was a murder charge or no --

14:48 6  something that was going to say "no charge," but I had

14:48 7  to tell her at the sheriff's office.

14:48 8            No one told me it could be that it's no

14:48 9  charges, but you have to tell her at the sheriff's

14:48 10  office.  Like no one told me anything like that.  I

14:48 11  didn't know.

14:48 12        Q.  Did you write an arrest report?

14:48 13        A.  No.  It's just what's here.

14:48 14        Q.  Okay.  Did you tell her that she had to go with

14:48 15  you to the sheriff's office?

14:49 16        A.  Yes.  I said, "Well, you have to go," because

14:49 17  they told me bring her in and open this.

14:49 18        Q.  And "they" meaning the DA's office?

14:49 19        A.  The DA's office, yes, ma'am.  And she was very

14:49 20  compliant.  She at no point said, "I'm not going,"

14:49 21  or -- or never gave me attitude, never gave me

14:49 22  resistance as far as, "No, I'm not going.  I'm not

14:49 23  going to go with you.  Come with me."  Never.  She

14:49 24  was -- she was just the nicest girl.

14:49 25        Q.  After her arrest, after she was brought to the

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:49 1     office and you read her the indictment, and then she

14:49 2     was detained, correct?

14:49 3          A.  Then she was arrested for the --

14:49 4          Q.  Then she was actually arrested and jailed and

14:49 5     booked into jail at that point --

14:49 6          A.  Yes, ma'am.

14:49 7          Q.  -- correct?

14:49 8          A.  Yes, ma'am.

14:49 9          Q.  Who -- who did the booking into the jail?

14:49 10         A.  I don't know who books them at the jail, but I

14:49 11    walked her to the jail.

14:49 12         Q.  You walked her to the jail.  Did you speak to

14:50 13    anyone in your office to inform them that you had

14:50 14    arrested her?

14:50 15         A.  Well, all of the -- the sergeant, the captain,

14:50 16    and the investigators that were looking for her all

14:50 17    knew by then that I already had her in the office.

14:50 18         Q.  Was Sheriff Fuentes aware that she had been

14:50 19    arrested?

14:50 20         A.  Yes.  Yes, ma'am.

14:50 21         Q.  How -- why would he have been made aware?

14:50 22         A.  Because the -- like I said, the captain,

14:50 23    there's that message that, okay, this person has been

14:50 24    arrested, this person has been -- like they inform him

14:50 25    of everything that happens in the office.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:50  1      Q.  In the WhatsApp group?

14:50  2      A.  In the -- they have that WhatsApp group.  And

14:50  3  then we took her to the office, so I'm sure they told

14:50  4  them, "Hey, you know, she's already here."  Like I

14:50  5  said, it was on the message too.

14:50  6      Q.  So he gets -- he gets informed basically about

14:51  7  like every major step in an investigation, correct?

14:51  8      A.  And just a simple report from patrol too, yes,

14:51  9  ma'am.  They have that chat group.

14:51  10     Q.  Had you ever heard of anyone being arrested for

14:51  11  an abortion before?

14:51  12     A.  No, ma'am.

14:51  13     Q.  Did it seem surprising to you that she had been

14:51  14  charged based on an abortion?

14:51  15     A.  Yes, ma'am.

14:51  16     Q.  Do you know how bond is set, for bond?

14:51  17     A.  No, ma'am.

14:51  18     Q.  So you mentioned you brought her -- you walked

14:51  19  her over to the jail.  Is that the sheriff -- the Starr

14:51  20  County Jail?

14:51  21     A.  Yes.  It's -- they're attached together.  So we

14:51  22  just walk from -- come out one door into the other.

14:51  23     Q.  It's attached to the sheriff's office?

14:51  24     A.  Yes.  Yes, ma'am.

14:51  25     Q.  Does the sheriff's office run the jail?  Like

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:19  1          A.  Correct.

16:19  2          Q.  All right.  I mean, all you had was Exhibit 6.

16:19  3          A.  That's correct, sir.

16:20  4          Q.  All right.  So whatever brief summary you --

16:20  5     y'all had, it was pretty brief.

16:20  6          A.  That's right.

16:20  7          Q.  Correct?  Is that a fair statement?

16:20  8          A.  Yes, sir.

16:20  9          Q.  And -- and then she says, "I learned from

16:20  10    talking to them" -- apparently you and Captain

16:20  11    Fuentes -- "that their questions to Abel Villarreal" --

16:20  12    which had happened before, right -- "had to do with

16:20  13    whether an unborn child was an individual for purposes

16:20  14    of the homicide statute."

16:20  15                Does -- does that sound accurate, that

16:20  16    there was a question about that?

16:20  17          A.  About the individual?

16:20  18          Q.  That the call had to do with whether an unborn

16:20  19    child was an individual for purposes of the homicide

16:20  20    statute.

16:20  21          A.  Yes, sir.

16:20  22          Q.  Okay.  Does -- does that sound about right to

16:21  23    you as far as what that conversation was about?

16:21  24          A.  Yes.  Yes, sir.

16:21  25          Q.  So if you turn to 19.01 of Exhibit --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

16:21  1    Defendants' Exhibit 4, and it's types of criminal

16:21  2    homicide.  Do you see that?

16:21  3        A.  Yes, sir.

16:21  4        Q.  And it -- and under Subsection A says, "A

16:21  5    person commits criminal homicide if he intentionally,

16:21  6    knowingly, or recklessly, or with criminal negligence

16:21  7    causes the death of an individual."

16:21  8        A.  Yes, sir.

16:21  9        Q.  Right?  So does it appear to you that this

16:21 10    question about whether a fetus is an individual, this

16:22 11    is what y'all are talking about?

16:22 12        A.  Uh-huh.  Yes, sir.

16:22 13        Q.  Right?  And that's the legal question on the

16:22 14    table, is it not?

16:22 15        A.  Yes, sir.

16:22 16        Q.  Okay.  And she says here, "Their questions had

16:22 17    to do with whether an unborn child was an individual

16:22 18    and also what kind of charge would apply given the

16:22 19    facts they had."

16:22 20             And that's correct, right?  That's --

16:22 21    that's what everybody was wondering.

16:22 22        A.  Correct.

16:22 23        Q.  All right.  And then she says, "They then told

16:22 24    me that ADA Villarreal had advised that individual" --

16:22 25    in quotes -- "included an unborn child under the Penal

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:22  1   Code."

16:22  2               Do you recall that discussion?

16:22  3     A.  I don't remember.  But I do remember, like I

16:23  4   said, because someone else had already called.  I don't

16:23  5   remember if -- I don't remember if he said yes or no or

16:23  6   she said yes or no.  I don't remember.

16:23  7     Q.  Okay.  But it's still around the same --

16:23  8     A.  It's in the same --

16:23  9     Q.  -- the same question, right?

16:23 10     A.  Yes.

16:23 11     Q.  And then apparently, according to her,

16:23 12   Villarreal had advised that "individual" did -- was --

16:23 13   included an unborn child as the definition of an

16:23 14   individual, correct?

16:23 15     A.  Yes.

16:23 16     Q.  And then she says, "While they told me this, I

16:23 17   was simultaneously looking for the definition of an

16:23 18   individual on my phone."  Right?

16:23 19     A.  Yes, sir.

16:23 20     Q.  And she said, "I did confirm that under Texas

16:24 21   Penal Code Section 1.07, subsection 26, the definition

16:24 22   of an individual included an unborn child at every

16:24 23   state of gestation from fertilization until birth."

16:24 24              Do you recall that discussion?

16:24 25     A.  Yes, sir.

16:24  1      Q.  All right.  So did you come away from that

16:24  2  conversation thinking that an individual -- that the

16:24  3  definition of an individual under Chapter 19.01 did

16:24  4  include a fetus?

16:24  5      A.  Yes, sir.

16:24  6      Q.  All right.  Did that -- did that answer that

16:24  7  part of the question in your mind?

16:24  8      A.  That what we were calling her for, yes.

16:24  9      Q.  All right.  And then she says, "I also looked

16:24 10  up the homicide statute to confirm it included the term

16:25 11  'individual.'"  Okay?  And we just went over that.  It

16:25 12  does include the term "individual," right?

16:25 13      A.  Yes, sir.

16:25 14      Q.  All right.  And then she says, "All the

16:25 15  elements were met."  All right?

16:25 16      A.  Yes, sir.

16:25 17      Q.  But then she goes on to say, "I was a bit

16:25 18  surprised to learn that the term 'individual' included

16:25 19  an unborn child, but that is what the statute says."

16:25 20          That's a correct statement by her, is it

16:25 21  not?

16:25 22      A.  Yes, sir.

16:25 23      Q.  That -- that she was surprised, but that's what

16:25 24  the statute says.  And if I -- I mean, I can drag this

16:25 25  depo out and walk you through the definition of

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

16:30  1     report.

16:30  2                 MS. JARIT:  Objection.

16:30  3          A.  I don't know, sir.  I wouldn't know.  I don't

16:30  4     think so.

16:30  5          Q.  Let's -- let me --

16:31  6          A.  For sure not on mine.

16:31  7          Q.  Okay.  Let's leave it at that.  For sure not on

16:31  8     yours there's no reference to 19.06.

16:31  9                 Were you the lead investigator on this

16:31 10     case?

16:31 11          A.  Yes, I was, sir.

16:31 12          Q.  Do you have any -- you had never worked a file

16:31 13     like this before, right?

16:31 14          A.  No, sir.

16:31 15          Q.  You had never worked a murder case before?

16:31 16          A.  No, sir.

16:31 17          Q.  All right.  And had you received any kind of

16:31 18     training on murder investigations?

16:31 19          A.  Like I said, we had been sent to a training,

16:31 20     but I don't -- I don't recall if it was after or before

16:31 21     this happened.

16:31 22          Q.  Let me ask you some questions about your

16:32 23     training since you mentioned training.  Are you still a

16:32 24     peace officer?

16:32 25          A.  As far as I know, they were going to keep my

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:51  1        Q.  All right.  You're under the impression that he
16:51  2    never worked on --
16:51  3                MS. HARRIS:  Objection, calls for
16:51  4    speculation.
16:51  5                MS. JARIT:  Objection --
16:51  6        Q.  -- on those, do you know?
16:51  7                MS. JARIT:  -- asked and answered.
16:51  8        A.  No, sir.  Not on the phones.  I don't know.
16:51  9        Q.  All right.  Okay.  So we've talked a lot about
16:51 10    Alex Barrera.  And it sounds like Gocha Ramirez, as far
16:51 11    as you're concerned, is not in the mix at all.
16:51 12                MS. JARIT:  Objection, vague.
16:51 13                MS. HARRIS:  Objection.
16:52 14        Q.  Is that right?  Do you have any information
16:52 15    about --
16:52 16                MS. HARRIS:  Calls for speculation.
16:52 17                THE COURT REPORTER:  Okay.  Wait a minute.
16:52 18    I can't do --
16:52 19                MR. NAVARRO:  Yeah.  I'm talking -- let me
16:52 20    finish my question before you jump up and down.
16:52 21        Q.  Do you have any -- I mean, I haven't heard you
16:52 22    talk about Gocha Ramirez or contact with Gocha Ramirez
16:52 23    that you had.
16:52 24        A.  No, sir, because I never had contact with him.
16:52 25    He's not, I don't believe, mentioned on our report as

Electronically signed by Donna McCown (101-253-986-8079)                                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:52 1    far as me speaking to him or anything like that.

16:52 2    Q. All right. And other than the WhatsApp

16:52 3    communications through other chain of command people,

16:52 4    you -- the same answer for you with the sheriff, right?

16:52 5    You don't have any direct communications with the

16:52 6    sheriff about --

16:52 7         MS. HARRIS: Objection, misstates --

16:52 8    Q. -- about these events; is that right?

16:52 9    A. That's correct, sir.

16:52 10         THE COURT REPORTER: If you'll take a

16:52 11   breath and let her talk, then I can get all three of

16:52 12   you.

16:53 13         MR. NAVARRO: You know, I talk kind of

16:53 14   slow, and so it gives people too much chance to get

16:53 15   ahead of me.

16:53 16   Q. When you -- when you were talking with your

16:53 17   sergeant and captain, did y'all also talk about SB 8?

16:53 18   Did you look up SB 8?

16:53 19   A. I don't remember.

16:53 20   Q. Do you remember that SB 8 is referenced in that

16:53 21   initial report?

16:53 22   A. Yes, sir.

16:53 23   Q. So did that cause you to look up SB 8 and

16:53 24   figure out what that's all about?

16:53 25   A. I'm sure I did, but I don't -- I don't

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**