```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                      McALLEN DIVISION

LIZELLE GONZALEZ                  )(
        Plaintiff                 )(
                                  )(
VS.                               )(   CIVIL ACTION NO.
                                  )(   7:24-cv-00132
GOCHA ALLEN RAMIREZ,              )(
ALEXANDRIA LYNN BARRERA,          )(
RENE FUENTES, and STARR           )(
COUNTY, TEXAS                     )(
        Defendants                )(
```

_____

ORAL AND VIDEOTAPED DEPOSITION OF
RAFAEL AGUIRRE
MAY 1, 2025
_____

ORAL AND VIDEOTAPED DEPOSITION OF RAFAEL AGUIRRE, produced as a witness at the instance of the PLAINTIFF, taken in the above-styled and numbered cause on MAY 1, 2025, between the hours of 10:02 a.m. and 3:33 p.m., reported stenographically by DONNA McCOWN, Certified Court Reporter No. 6625, in and for the State of Texas, at Bryant & Stingley, Inc., 701 East Harrison, Suite 200, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755**       **McAllen (956) 618-2366**

```
11:22  1    correct?
11:22  2         A.   Okay.
11:22  3         Q.   Do you know Ms. Gonzalez?
11:22  4         A.   Other than the case, no.
11:22  5         Q.   Do you know any of Ms. Gonzalez's family
11:22  6    members?
11:22  7         A.   No.
11:22  8         Q.   Do you know Ismael Herrera?
11:22  9         A.   No.
11:22 10         Q.   What was your involvement in Ms. Gonzalez's
11:22 11    case?
11:22 12         A.   I assisted Investigator Muniz on the case.
11:23 13         Q.   And what did that assistance look like?
11:23 14         A.   It consisted of sitting in with her doing
11:23 15    interviews.
11:23 16         Q.   You didn't sit in on all the interviews, right?
11:23 17         A.   No, I did not.
11:23 18         Q.   Why is that?
11:23 19         A.   I don't remember why.
11:23 20         Q.   What was your role compared to Investigator
11:23 21    Muniz on the case?
11:23 22         A.   I was the -- I was an assistant investigator.
11:23 23         Q.   And is it fair to call her the lead
11:23 24    investigator?
11:23 25         A.   Yes.
```

```
11:23  1          Q.  But you were still her supervisor at the time,
11:23  2     right?
11:23  3          A.  Yes.
11:23  4          Q.  So who -- who was making the decisions between
11:23  5     the two of y'all?
11:23  6          A.  The lead investigator, Muniz.
11:24  7          Q.  But she would ask you questions?
11:24  8          A.  It would be discussed.  It would be -- we were
11:24  9     aware of what was going on.
11:24 10          Q.  How did the sheriff's office investigation into
11:24 11     Ms. Gonzalez begin?
11:24 12          A.  It began with the report from the hospital, I
11:24 13     believe.
11:24 14          Q.  Can you tell me about that?
11:24 15          A.  That's all I know.  It was a report from the
11:24 16     hospital.
11:24 17          Q.  Who from the hospital reported the case?
11:24 18          A.  I don't know who specific.
11:24 19          Q.  Did you interview Ms. Torres, Martha Torres?
11:24 20          A.  Yes, I did.
11:24 21          Q.  Did she make the report from the hospital?
11:24 22          A.  I don't know.  I don't know if it was her or
11:24 23     not.
11:24 24          Q.  Who did you learn about the case from first?
11:25 25          A.  I cannot remember.  It's -- it happened during
```

```
11:25  1   the day, so I don't know who specifically said that
11:25  2   there was a case at the hospital.
11:25  3        Q.  Do you know what -- was it in the morning or
11:25  4   the afternoon?
11:25  5        A.  I don't recall.
11:25  6        Q.  Investigator Ranell Rosa from the sheriff's
11:25  7   office first spoke to Martha Torres, correct?
11:25  8        A.  I wouldn't know.
11:25  9        Q.  Did you talk to Mr. Rosa about this case?
11:25 10        A.  I'm pretty sure I did.
11:25 11        Q.  And why are you pretty sure?
11:25 12        A.  Because he was there.  We were all there during
11:25 13   that time.  It was a weekday, I think, and we were all
11:26 14   working.
11:26 15        Q.  Inside the sheriff's office?
11:26 16        A.  Yes.
11:26 17        Q.  So did you first learn about it from a patrol
11:26 18   report or from someone else?
11:26 19        A.  I don't recall specifically.
11:26 20             MS. HARRIS:  Can I have Plaintiff's
11:26 21   Exhibit 6, please.
11:26 22        Q.  So this has been previously marked as
11:27 23   Plaintiff's Exhibit 6.  Do you recognize this document?
11:27 24        A.  Yes.
11:27 25        Q.  What is it?
```

```
14:43  1    an arrest warrant?
14:43  2         A.   I don't remember anything like that.
14:43  3         Q.   Was there -- so were you aware of when
14:44  4    Ms. Gonzalez was arrested?
14:44  5         A.   Yes, I was.
14:44  6         Q.   And what were you aware of?
14:44  7         A.   That I was part of the arrest team.
14:44  8         Q.   Can you tell me about that.
14:44  9         A.   I believe that the arrest was effected at a
14:44 10    parking lot, and that's about how much -- how much I
14:44 11    can remember.
14:44 12         Q.   What was that parking lot?
14:44 13         A.   I think it was Hospital Road in Rio Grande.
14:45 14         Q.   And how did you know Ms. Gonzalez would be
14:45 15    there?
14:45 16         A.   I do not recall the details, but I think the
14:45 17    vehicle, her vehicle.
14:45 18         Q.   So you -- you recognized her vehicle?
14:45 19         A.   It should be somewhere in the arrest report.  I
14:45 20    don't recall specific -- I know that I was there, and
14:45 21    she was taken into custody.  But specific as to how we
14:45 22    got there, I don't -- I don't remember.
14:45 23         Q.   And do -- are arrest reports always made after
14:45 24    an arrest?
14:45 25         A.   Yes.
```

15:14 1   captain about this case?
15:14 2       A.  More than likely, yes.
15:14 3       Q.  And did you ever text Sheriff Fuentes about
15:14 4   this case?
15:14 5       A.  No, ma'am.  I would have no reason to text the
15:14 6   sheriff about this case.
15:14 7       Q.  Have you ever spoken to the district attorney
15:15 8   about this case?
15:15 9       A.  Not me specifically, no.
15:15 10      Q.  Do you know anyone else who has spoken to the
15:15 11  district attorney about this case?
15:15 12      A.  I wouldn't know, ma'am.
15:15 13          MS. HARRIS:  Okay.  I don't have anything
15:15 14  else.  I think we can pass the witness.
15:15 15          MS. ALBIN:  Okay.
15:15 16                    EXAMINATION
15:15 17  BY MS. ALBIN:
15:15 18      Q.  Investigator Aguirre, have you ever gotten a
15:15 19  report of a death of an individual and decided not to
15:15 20  investigate?
15:15 21      A.  Yes.
15:15 22      Q.  When was that?
15:15 23      A.  It's in certain cases where we know -- not that
15:15 24  we know, but we have reason to believe it will be
15:15 25  natural cause.  Deaths like elderly.

```
15:17  1         Q.  Did the sheriff ever call and tell you to take
15:17  2    any actions in this case?
15:17  3         A.  No, he did not.
15:17  4         Q.  Did he ever e-mail you or send you any kind of
15:17  5    message or communication directing you on how to
15:17  6    investigate this case?
15:17  7         A.  No, he did not.
15:17  8         Q.  Did the sheriff sit in on any interviews that
15:17  9    you're aware of?
15:17 10         A.  No.
15:17 11         Q.  And I think you testified that you've never
15:17 12    talked to DA Ramirez about the case, correct?
15:17 13         A.  I didn't.
15:17 14         Q.  I'm sorry?
15:17 15         A.  I didn't.
15:17 16         Q.  You did not talk to him about this case?
15:17 17         A.  I did not talk to Mr. Ramirez.
15:17 18         Q.  Did DA Ramirez come to the hospital when you
15:17 19    were doing those initial interviews?
15:17 20         A.  No, he did not.
15:17 21         Q.  What about ADA Barrera?  Was she there?
15:17 22         A.  No, she was not there.
15:17 23         Q.  All right.  Was it just investigators who were
15:17 24    there at the hospital initially?
15:17 25         A.  It was myself and Captain Fuentes.
```

```
15:17  1         Q.  All right.  And was there ever an interview
15:18  2   that ADA Barrera sat in on with you?
15:18  3         A.  No.
15:18  4         Q.  What about DA Ramirez?
15:18  5         A.  No.
15:18  6         Q.  Did the sheriff ever reach out and communicate
15:18  7   in some way to you that you had to investigate this
15:18  8   case?
15:18  9         A.  No, they did not.
15:18 10         Q.  Did the district attorney ever communicate to
15:18 11   you in some way that you needed to investigate this
15:18 12   case?
15:18 13         A.  No, he did not.
15:18 14         Q.  And what about ADA Barrera?
15:18 15         A.  To a certain extent.  Not to tell us to
15:18 16   investigate, but like assisting us with questions that
15:18 17   we asked her.
15:18 18         Q.  All right.  And those questions that you asked
15:18 19   her were about the change in the law and what you
15:18 20   should do in light of that, correct?
15:18 21         A.  It was presenting to her the facts of what
15:18 22   happened and how to proceed.
15:18 23         Q.  Okay.  Did ADA Barrera tell you that she wanted
15:19 24   you to conduct the investigation in a particular way?
15:19 25         A.  No, she would not tell us that.
```

| | | |
|---|---|---|
| 15:19 1 | Q. | Why wouldn't she tell you that? |
| 15:19 2 | A. | Because she's not in our chain of command. |
| 15:19 3 | Q. | That's not her job to do that, is it? |
| 15:19 4 | A. | No, that's not her job. |
| 15:19 5 | Q. | And she didn't do that in this case, did she? |
| 15:19 6 | A. | No, she did not. |

15:19 7    Q.  And what about the DA?  Did he direct you to
15:19 8  investigate the case in a particular manner?
15:19 9    A.  No.  No, he did not.
15:19 10   Q.  Based on the information that you gathered, and
15:19 11 we've looked at some of those summaries today, did you
15:19 12 conclude at any point that Ms. Herrera had
15:19 13 intentionally caused the death of an individual?
15:19 14   A.  Yes.
15:19 15   Q.  You were asked some questions about Exhibit 40
15:19 16 several times today.  This is the investigative report
15:19 17 that you prepared.  And have you prepared these as a
15:20 18 lead investigator?
15:20 19   A.  No.  This was a supplement report.
15:20 20   Q.  Exhibit 40 was a supplement report.  But have
15:20 21 you prepared an investigative report where you were
15:20 22 the -- created the lead?
15:20 23   A.  In my cases, yes.
15:20 24   Q.  All right.  And does the district attorney --
15:20 25 District Attorney Ramirez specifically, does he tell

15:20  1   you what offense to put in that box where we see
15:20  2   "murder" on Exhibit 40?
15:20  3        A.  No.  No, they do not.
15:20  4        Q.  All right.  What about ADA Barrera?
15:20  5        A.  No.
15:20  6        Q.  How about Sheriff Fuentes?  Does he tell you
15:20  7   what offense to put in the investigative report?
15:20  8        A.  No, he does not.
15:20  9        Q.  Prior to this, had you ever investigated a case
15:20 10   that involved the death of an unborn child?
15:20 11        A.  No.
15:20 12        Q.  And since this case, have you ever investigated
15:20 13   the death of an unborn child?
15:20 14        A.  No, I have not.
15:20 15        Q.  And based on your time in the sheriff's office,
15:21 16   do you think that the sheriff has a policy of requiring
15:21 17   investigators to look into abortion cases?
15:21 18        A.  I'm not aware of any policy.
15:21 19        Q.  And you've never been directed to go
15:21 20   investigate and look for abortion cases, have you?
15:21 21        A.  No, ma'am.
15:21 22        Q.  Do you know of any agreement with the Starr
15:21 23   County Memorial Hospital and the sheriff's office
15:21 24   requiring investigators to look into reported
15:21 25   abortions?

```
15:21  1          A.  I'm not aware of any policy.
15:21  2          Q.  And you've never been sent out to the hospital
15:21  3   on any other case to investigate an abortion besides
15:21  4   Ms. Herrera's case, correct?
15:21  5          A.  No, I have not.
15:21  6          Q.  You talked about in some cases that are
15:21  7   straightforward it goes -- the investigators go
15:21  8   straight to an arrest rather than having the grand jury
15:21  9   look at the case.  Do you recall that?
15:22 10          A.  Yes, I testified to that.
15:22 11          Q.  And is the grand jury review an additional
15:22 12   precaution for cases that are less straightforward?
15:22 13          A.  Yes.
15:22 14          Q.  So isn't it true that in this case,
15:22 15   Ms. Herrera's case had that additional precautionary
15:22 16   step of being reviewed by a grand jury?
15:22 17          A.  Yes.
15:22 18          Q.  You mentioned earlier that you have attended
15:22 19   some college and I think studied the law a little bit.
15:22 20   Have you gone to law school?
15:22 21          A.  I have not.
15:22 22          Q.  And those classes that were about the law, how
15:22 23   long ago did you take those?
15:22 24          A.  I do not remember.
15:22 25          Q.  What was the focus the -- let me ask this:  Was
```

```
15:22  1    there any particular aspect of the law that you were
15:23  2    studying for college?
15:23  3         A.   No, I don't -- I don't remember.  It was a long
15:23  4    time ago.
15:23  5         Q.   Okay.  Looking at Exhibit 40 again, it's got
15:23  6    Ms. Herrera's name, date of birth, and an address on
15:23  7    here.  Do you see that?
15:23  8         A.   Yes, it does.
15:23  9         Q.   All right.  And also above that, it says
15:23 10    "victim."  Do you see that?
15:23 11         A.   Yes, I do.
15:23 12         Q.   And was Jasiel Herrera Ms. Herrera's son?
15:23 13         A.   That was the name of the -- of the unborn
15:23 14    child.
15:23 15         Q.   All right.  And they were able to determine
15:23 16    that it was a boy, correct?
15:23 17         A.   Yes.
15:23 18         Q.   All right.  The address here, 30 Robin Lane,
15:23 19    Falcon Heights, are you familiar with that address?
15:23 20         A.   Only if it's written here.  I do not know
15:23 21    exactly where it is.
15:23 22         Q.   Okay.  And did you ever come to learn in the
15:23 23    investigation that that was the location where
15:24 24    Ms. Herrera consumed the drugs that caused the death of
15:24 25    an individual?
```

```
15:24  1        A.  I do not recall specifically.  I don't know --
15:24  2   I think it was Ms. Muniz that would have determined
15:24  3   that, not me.
15:24  4        Q.  Did you have an idea about whether she used the
15:24  5   drugs that caused the death of an individual at the
15:24  6   hospital or somewhere else?
15:24  7        A.  Oh, somewhere else.
15:24  8        Q.  All right.  And could that have been her home?
15:24  9        A.  It could have been.
15:24 10        Q.  And if it were --
15:24 11             MS. JARIT:  Objection, form.
15:24 12        Q.  If it were her home, is that the reason that it
15:24 13   would have fallen under the jurisdiction of the
15:24 14   sheriff's office and not the police department that
15:24 15   reported to the hospital?
15:24 16        A.  That would be one of the reasons why the Rio PD
15:24 17   called us out on that day, on the 11th of January.
15:24 18        Q.  All right.  And is that normal in the sense
15:24 19   that if you have, say, a victim of an assault who's
15:24 20   treated at the hospital, the fact that they're treated
15:24 21   at the hospital doesn't make that offense fall within
15:25 22   the jurisdiction of where the hospital is at, right?
15:25 23        A.  No, it does not.
15:25 24        Q.  Okay.  The determining factor is where the
15:25 25   offense would have occurred?
```

A. The offense occurred, yes.

Q. All right. Do you recall Investigator Muniz ever telling you, "We can't continue with this investigation"?

A. I don't remember her saying that.

Q. Do you remember ever being in a conversation with the district attorney's office where Investigator Muniz said to ADA Barrera, "You can't prosecute this case," or something to that effect?

A. I wouldn't remember.

Q. Okay. Did ADA Barrera tell you to interview Ms. Torres?

A. No.

Q. Did anybody from the district attorney's office reach out prior to you going to the hospital and beginning the investigation and tell you who you needed to talk to first?

MS. JARIT: Objection, compound question.

Q. Did you understand my question, sir?

A. Can you rephrase that, please?

Q. Sure.

MS. ALBIN: Court reporter, do you mind reading that back, please.

(Requested portion was read back.)

A. I don't remember.

```
15:28  1         A.  Yes.
15:28  2         Q.  And did that include a person, even an unborn
15:28  3    person?
15:28  4         A.  Yes.
15:28  5         Q.  All right.  And was this definition
15:28  6    something -- this definition from the Penal Code
15:28  7    something that you ever discussed with Investigator
15:28  8    Muniz?
15:28  9         A.  Yes.
15:28 10         Q.  So you do recall having conversations
15:28 11    specifically about sections of the Penal Code related
15:28 12    to this case?
15:28 13         A.  Some of them, yes.
15:28 14         Q.  All right.  And the ones you remember were
15:28 15    about the definition of an individual, correct?
15:28 16         A.  Yes.
15:29 17                 MS. ALBIN:  Pass the witness.
15:29 18                         EXAMINATION
15:29 19    BY MS. HARRIS:
15:29 20         Q.  Mr. Aguirre, you just testified, and correct me
15:29 21    if I'm wrong, that your understanding of this case when
15:29 22    it came in was that it was about the death of an
15:29 23    individual; is that correct?
15:29 24         A.  Yes.
15:29 25         Q.  What gave you that impression?
```

```
15:29  1        A.   That there was the death of an individual?  We
15:29  2   were called to the hospital because a -- an unborn
15:29  3   child had been deceased at the hospital, and the
15:30  4   initial information was that the mother had caused
15:30  5   the -- the death.
15:30  6        Q.   Prior -- prior to birth, correct?
15:30  7        A.   Yes.
15:30  8        Q.   So what -- what made that different than any
15:30  9   other abortion?
15:30 10        A.   It isn't.  It's an abortion.  It's -- it's the
15:30 11   death of an individual.
15:30 12        Q.   Okay.  And did you ask the DA's office whether
15:30 13   a fetus was an individual under the law?
15:30 14        A.   I don't recall asking that question
15:30 15   specifically.
15:30 16        Q.   Do you remember discussing that with the DA's
15:30 17   office?
15:30 18        A.   I do not remember specifically.  I know that I
15:30 19   looked up the definition myself.
15:30 20        Q.   And are you -- did you decide on your own that
15:30 21   it was an individual under the law?
15:30 22        A.   If that's what the Texas Penal Code said.
15:31 23        Q.   Did you discuss the definition of "individual"
15:31 24   with anyone else?
15:31 25        A.   I believe that we discussed it with Ms. Muniz.
```

| | |
|---|---|
| 15:31 | Ms. Muniz was part of the discussion. |
| 15:31 | Q.  And who else? |
| 15:31 | A.  I don't recall who else it would be. |
| 15:31 | Q.  But you know that you discussed it with -- or |
| 15:31 | do you know that you discussed it with the DA's office? |
| 15:31 | A.  It must have been at one point or another. |
| 15:31 | That's part of my notes.  And I note that's what I did |
| 15:31 | that day.  I wrote it down for self -- my self note to |
| 15:31 | actually look up the definition of "individual." |
| 15:31 | Q.  Did you -- do you usually take notes about your |
| 15:31 | conversation with the DA's office? |
| 15:32 | A.  No, I don't. |
| 15:32 | Q.  So just because there aren't notes of your |
| 15:32 | meetings with the DA's office, that doesn't mean they |
| 15:32 | didn't happen, correct? |
| 15:32 | MS. ALBIN:  Is that a question?  Okay. |
| 15:32 | A.  We had meetings with the -- with the DA's |
| 15:32 | office, with Ms. -- I don't know if it was Ms. Barrera |
| 15:32 | or Mr. Villarreal, but -- I don't recall specifically |
| 15:32 | who.  But, yeah, in those meetings, I don't take notes. |
| 15:32 | It was just conversation.  I take notes when it's a |
| 15:32 | witness. |
| 15:32 | Q.  Did you ever look up Section 19.06 of the |
| 15:32 | homicide statute? |
| 15:32 | A.  If I did, I would not be able to tell you if I |