```
         IN THE UNITED STATES DISTRICT COURT
         FOR THE SOUTHERN DISTRICT OF TEXAS
                   McALLEN DIVISION

LIZELLE GONZALEZ                  )(
         Plaintiff                )(
                                  )(
VS.                               )(   CIVIL ACTION NO.
                                  )(   7:24-cv-00132
GOCHA ALLEN RAMIREZ,              )(
ALEXANDRIA LYNN BARRERA,          )(
RENE FUENTES, and STARR           )(
COUNTY, TEXAS                     )(
         Defendants               )(
```

_____

ORAL AND VIDEOTAPED DEPOSITION OF
LENARD FUENTES
MAY 2, 2025

_____

ORAL AND VIDEOTAPED DEPOSITION OF LENARD FUENTES, produced as a witness at the instance of the PLAINTIFF, taken in the above-styled and numbered cause on MAY 2, 2025, between the hours of 10:04 a.m. and 4:07 p.m., reported stenographically by DONNA McCOWN, Certified Court Reporter No. 6625, in and for the State of Texas, at Bryant & Stingley, Inc., 701 East Harrison, Suite 200, Harlingen, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755**          **McAllen (956) 618-2366**

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 10:51 | 1  | A.  Yes, it would have been that same day.               |
| 10:51 | 2  | Q.  Yeah.  I don't need a time, Lenard.  Don't           |
| 10:51 | 3  | worry about that.                                        |
| 10:51 | 4  | A.  I don't remember who I sent or how I sent it.        |
| 10:51 | 5  | I know who I sent.  But when I sent them or when I told  |
| 10:52 | 6  | them, I just don't -- I can't give you a definite        |
| 10:52 | 7  | answer on that.  I'm sorry.                              |
| 10:52 | 8  | Q.  That's fine.  And when you say, "I sent Esmer        |
| 10:52 | 9  | to talk to -- to him," what -- or to them, who did you   |
| 10:52 | 10 | send Esmer to speak with?                                |
| 10:52 | 11 | A.  With him and with Martha Torres, I believe.          |
| 10:52 | 12 | Q.  Okay.  And did she go?                               |
| 10:52 | 13 | A.  Yes.                                                 |
| 10:52 | 14 | Q.  Okay.  Why did you send Esmer?                       |
| 10:52 | 15 | A.  Because she was the one that was in the office       |
| 10:52 | 16 | at that time, I believe.                                 |
| 10:52 | 17 | Q.  Okay.  Was she -- other than her being in the        |
| 10:52 | 18 | office, was there any other reason why she was assigned  |
| 10:52 | 19 | to this case?                                            |
| 10:52 | 20 | A.  No, ma'am.                                           |
| 10:52 | 21 | Q.  Okay.  Did -- you didn't take into account the       |
| 10:52 | 22 | fact that it was, you know, an abortion, sensitive       |
| 10:52 | 23 | female matter, so you just -- you used a female          |
| 10:52 | 24 | investigator?                                            |
| 10:52 | 25 | A.  No, ma'am.  I mean, we -- we assign sexual           |

11:15  1      Q.  Okay.
11:15  2      A.  And I'll be very honest with you.  I didn't
11:15  3  know what we were dealing with.  That's why we decided
11:15  4  to call the DA's office.
11:15  5      Q.  Okay.  Well, I'm going to go back to that time.
11:15  6  You know, Deputy Rosa gives you a call and says, you
11:15  7  know, "We've got this going on.  I had a report.  This
11:15  8  nurse thinks it's SB 8.  I don't know what to do
11:15  9  with" -- and, again, I'm just summarizing.
11:16 10            Did -- trying -- I'm trying to figure out
11:16 11  how to rephrase this question.  Did you at any point
11:16 12  read Deputy Rosa's narrative?
11:16 13      A.  No, ma'am.  This is the first time I read it.
11:16 14      Q.  Okay.  Well, you -- you looked at it, and I
11:16 15  want to state here, if you'll follow along, the second
11:16 16  paragraph.  Ranell Rosa, "I later spoke with Starr
11:16 17  County Memorial Hospital charge nurse Martha Torres.
11:16 18  Martha stated she wishes to document a report in
11:16 19  regards to Texas abortion restriction law."  Do you see
11:16 20  that?
11:16 21      A.  Uh-huh.
11:16 22      Q.  Okay.  I'm going to skip a little bit to go
11:17 23  down.  A couple of lines later, it says, "Lizelle later
11:17 24  stated to the physician she had inserted an unknown
11:17 25  pill into her vaginal cavity which she purchased in the

```
12:32  1   Martha Torres.  Is there anything that you recall from
12:32  2   the interview that Investigator Aguirre -- that is not
12:32  3   in Investigator Aguirre's report?
12:32  4        A.  Not that I'm aware of, ma'am.
12:33  5        Q.  And how did you -- from an investigative
12:33  6   standpoint, after speaking with Martha Torres, what
12:33  7   were your impressions about this investigation?
12:33  8        A.  Still confused about it, ma'am.
12:33  9        Q.  Okay.
12:33 10        A.  You know.
12:33 11        Q.  So can you -- can you tell me what was your
12:33 12   confusion at that time?
12:33 13        A.  The -- whether if it was considered a fetus or
12:33 14   if it was considered a person.
12:33 15        Q.  And why would that have mattered?
12:34 16        A.  Because of the way the law was reading, right,
12:34 17   or the way -- not the law was reading, but what was
12:34 18   going on in the media, what I would hear.  Not what I
12:34 19   was reading.
12:34 20             My understanding was that in a case, if it
12:34 21   was a fetus, you were okay with the abortion.  You were
12:34 22   okay with inducing it.  You're okay with that.  But if
12:34 23   it was considered a child or a person already, then you
12:34 24   may have some issues, right?
12:34 25             So that's where I didn't know -- I
```

```
12:34  1   couldn't distinguish what was what.  I didn't know.
12:34  2   That's why the clarification we needed from the DA's
12:34  3   office.
12:34  4       Q.  And just to kind of further clarify your
12:34  5   answer.  This is from a legal or law enforcement
12:34  6   standpoint, not from a religious or moral standpoint,
12:34  7   correct?
12:34  8       A.  Yes.  And this is my -- my standpoint on it,
12:34  9   right?
12:34 10       Q.  Right.
12:34 11       A.  As far as with my work experience or
12:34 12   whatever --
12:34 13       Q.  And that's why I want to limit it --
12:34 14       A.  -- I just want to know.
12:34 15       Q.  -- to work, right?  I know there was a lot
12:35 16   going on at the time with regard to a change in the
12:35 17   law.  There was a lot of people on one side or the
12:35 18   other.
12:35 19              And based on your response, it was kind of
12:35 20   like, well, it depends how the fetus is defined.  And I
12:35 21   want to just be clear that your response has to do with
12:35 22   the legal definition --
12:35 23       A.  Yes.
12:35 24       Q.  -- the law enforcement definition?
12:35 25       A.  Yes.
```

12:35  1   Q. Okay. Now, you said that you knew if it was
12:35  2   characterized as fetus -- as a fetus, this was an
12:35  3   abortion?
12:35  4   A. Well, no, not that I knew. What I meant to
12:35  5   say, like it's -- that that's what I had heard, right?
12:35  6   If I said I knew, let me rephrase that.
12:35  7   Q. No, no problems.
12:35  8   A. It's just that that was kind of like my
12:35  9   understanding of what I had been seeing on the news and
12:35 10   hearing from what they were proposing for the new laws
12:35 11   and stuff like that.
12:35 12   Q. And at that time, you knew that the new law was
12:35 13   a proposal, correct?
12:35 14           MS. ALBIN: Objection. That's not what he
12:35 15   testified to.
12:35 16           MS. GARZA: This is a new question.
12:35 17   A. I wasn't sure.
12:35 18           MS. ALBIN: Well, that wasn't a question.
12:36 19   That was a statement.
12:36 20   Q. I asked, you knew that this was a proposed new
12:36 21   law, correct?
12:36 22   A. I wasn't sure of where it stood.
12:36 23   Q. So at the time -- in January of 2022, were you
12:36 24   uncertain as to whether an abortion was legal in Texas?
12:36 25   A. Yes.

| | | |
|---|---|---|
| 12:36 | 1 | Q. Was the DA's office able to give you a |
| 12:36 | 2 | clarification as to whether abortion was legal in |
| 12:36 | 3 | Texas -- |
| 12:36 | 4 | A. During -- |
| 12:36 | 5 | Q. -- during this investigation? |
| 12:36 | 6 | A. During the investigation, I don't know.  During |
| 12:36 | 7 | the call, again, they asked us to gather the |
| 12:36 | 8 | information, submit it, and they would review it. |
| 12:36 | 9 | And at the end, they would look at it, and |
| 12:36 | 10 | if there was something, then something would come out. |
| 12:36 | 11 | If there wasn't anything, then they would let us know. |
| 12:37 | 12 | But for the most part, we were just, "Here you go. |
| 12:37 | 13 | Here's all the information.  We don't know." |
| 12:37 | 14 | Q. What did you -- as an investigator -- actually, |
| 12:37 | 15 | we haven't even gotten to your experience, but you |
| 12:37 | 16 | worked as an investigator prior to being captain? |
| 12:37 | 17 | A. Yes, I did. |
| 12:37 | 18 | Q. Okay.  How long have you been with the |
| 12:37 | 19 | sheriff's office? |
| 12:37 | 20 | A. I started back in '94.  I left in '99 for about |
| 12:37 | 21 | six months, came back in 2000.  So if you include |
| 12:37 | 22 | those -- those two, close to 30 years.  31 years maybe. |
| 12:37 | 23 | Q. That's like right after high school, right? |
| 12:37 | 24 | A. I was 19 when I started at the jail. |
| 12:37 | 25 | Q. Okay.  And during your 30 years, you worked -- |

15:03 1   on the case.
15:03 2       Q.  I believe you testified earlier that there was
15:03 3   confusion as to the charge in this case.  Is that
15:03 4   another reason why it would be necessary to brief with
15:03 5   the DA's office?
15:03 6       A.  Confusion on my part.
15:03 7       Q.  Was Esmer confused?
15:03 8       A.  I'm not sure.
15:03 9           MS. ALBIN:  Thank you.  Objection, calls
15:03 10  for speculation about whether or not Esmer was
15:03 11  confused.
15:03 12      A.  I don't know.
15:03 13      Q.  Was Esmer confused at the outset?
15:03 14          MS. ALBIN:  Objection, calls for
15:03 15  speculation.
15:03 16      A.  What do you mean by "the outset"?
15:03 17      Q.  Well, I think you testified earlier that in the
15:03 18  beginning everyone was confused about -- everyone in
15:03 19  your CID was confused as to what to do with this, so
15:03 20  you called -- you, the department, called the DA's
15:03 21  office.
15:03 22      A.  Yes.
15:03 23      Q.  Okay.
15:03 24      A.  But through me.
15:03 25      Q.  Through you?

```
15:03  1         A.  Because I told them.
15:03  2         Q.  Correct.  At any point in the investigation,
15:03  3   was Esmer no longer confused about how to proceed with
15:03  4   this investigation?
15:03  5              MS. ALBIN:  Objection, calls for
15:03  6   speculation.
15:03  7         A.  Never told me anything.
15:04  8         Q.  Did she ever come to you and say, "I got it.  I
15:04  9   got it, Captain.  We're going forward"?
15:04 10         A.  No.
15:04 11         Q.  "I'm solid on this"?
15:04 12         A.  No.
15:04 13         Q.  Did she ever give you any reason to believe
15:04 14   that she was unsure about charging Lizelle with murder?
15:04 15         A.  No.
15:04 16         Q.  What about during those -- I believe earlier
15:04 17   you testified that during -- not a meeting, but during
15:04 18   the time when y'all were in the CID room together, you
15:04 19   know, that they were looking at the code and you were
15:04 20   kind of looking at each other with just a little bit of
15:04 21   confusion and that was why it was necessary to reach
15:04 22   out to the DA's office.  Is that still your testimony?
15:04 23              MS. ALBIN:  Objection.  That was never his
15:04 24   testimony.  Misstates the previous testimony given by
15:04 25   this witness.  It's an improper question.
```

```
15:04  1         A.   Can you ask the question?
15:04  2         Q.   Did you testify earlier that you and the CID
15:04  3    investigators were confused about -- about this case in
15:04  4    the beginning?
15:04  5         A.   Myself and Esmer and Aguirre, we were like,
15:05  6    "Okay.  So what do we do?"
15:05  7         Q.   And that's when -- I'm sorry.
15:05  8         A.   "You know what?  Let's -- let's call the DA's
15:05  9    office.  Let's get them involved, because, you know,
15:05 10    we -- we need -- we need them to look at this."
15:05 11         Q.   Okay.  And so my question is, at any time prior
15:05 12    to the file being turned over to the DA's office, did
15:05 13    either Esmer or Aguirre come to you and say, "There's
15:05 14    no more confusion, boss.  We got it"?
15:05 15         A.   No.
15:05 16         Q.   When this case was turned over to the DA's
15:05 17    office, is it your understanding that there was still
15:05 18    confusion as to how to proceed with this case?
15:05 19         A.   Well --
15:05 20              MS. ALBIN:  Objection, vague.
15:05 21              THE WITNESS:  I'm sorry.
15:05 22              MS. ALBIN:  That's okay.  It's vague.
15:05 23         A.   I don't -- I wouldn't say that there was
15:05 24    confusion anymore, because the -- the idea was just get
15:05 25    the information and turn it in.
```

```
15:18  1   County Sheriff's Department did their duty
15:18  2   investigating the incident brought to their attention
15:18  3   by the reporting hospital.  To ignore the incident
15:18  4   would have been a dereliction of their duty."
15:18  5              Do you agree with that statement?
15:18  6        A.   Yes, ma'am.
15:18  7        Q.   And he also goes on to say that what
15:18  8   Ms. Gonzalez -- Herrera at the time -- did was not a
15:18  9   crime.  Do you agree with that?
15:18 10        A.   If he puts it out like that, he's the DA, then,
15:18 11   yeah, I would agree with him.
15:18 12        Q.   Okay.  If there was not a crime, would the
15:18 13   sheriff's office have any authority to investigate?
15:18 14        A.   If there was not a crime?  Yeah.  We still have
15:19 15   to investigate to figure out if there was a crime.
15:19 16        Q.   To determine whether a crime was committed?
15:19 17        A.   Yes.
15:19 18        Q.   Okay.  Did you receive any e-mails from the
15:19 19   press concerning Lizelle's arrest?
15:19 20        A.   I think I did.  I just didn't pay attention to
15:19 21   them.  I just deleted them or whatever.  It was a crazy
15:19 22   weekend.
15:19 23        Q.   Did you forward them to Major --
15:19 24        A.   No.
15:19 25        Q.   -- or just ignore?
```

| | | |
|---|---|---|
| 15:29 | 1 | this witness. Go ahead. |
| 15:30 | 2 | Q. All right. Did you have any discussions with |
| 15:30 | 3 | your investigators about the definition of an |
| 15:30 | 4 | individual for the purposes of the homicide statute? |
| 15:30 | 5 | A. No, ma'am. |
| 15:30 | 6 | Q. And, Lenard, to the best of your recollection, |
| 15:30 | 7 | have we discussed all of the conversations that you had |
| 15:30 | 8 | with ADA Barrera pertaining to Lizelle's investigation? |
| 15:30 | 9 | A. Yes. |
| 15:30 | 10 | Q. Did you have any conversations with ADA Barrera |
| 15:30 | 11 | following her -- following the indictment? |
| 15:30 | 12 | A. I don't believe so. |
| 15:30 | 13 | Q. Okay. Did you have any conversations with |
| 15:30 | 14 | anyone at the DA's office following Lizelle's arrest? |
| 15:30 | 15 | A. No, ma'am. |
| 15:30 | 16 | Q. How often did you personally update the DA's |
| 15:31 | 17 | office about the investigation? |
| 15:31 | 18 | A. None. It was always done by the investigator. |
| 15:31 | 19 | Q. How many conversations did you have with DA |
| 15:31 | 20 | Ramirez during the investigation? |
| 15:31 | 21 | A. Zero. |
| 15:31 | 22 | Q. Okay. All right. We've testified about your |
| 15:31 | 23 | county-issued cellular device? |
| 15:31 | 24 | A. Yes. |
| 15:31 | 25 | Q. And you said that's the only one you use for |