```
               IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                       McALLEN DIVISION

LIZELLE GONZALEZ                )(
        Plaintiff               )(
                                )(
VS.                             )(   CIVIL ACTION NO.
                                )(   7:24-cv-00132
GOCHA ALLEN RAMIREZ,            )(
ALEXANDRIA LYNN BARRERA,        )(
RENE FUENTES, and STARR         )(
COUNTY, TEXAS                   )(
        Defendants              )(
```

---

ORAL AND VIDEOTAPED DEPOSITION OF
ABEL VILLARREAL
MARCH 12, 2025

---

ORAL AND VIDEOTAPED DEPOSITION OF ABEL VILLARREAL, produced as a witness at the instance of the PLAINTIFF, taken in the above-styled and numbered cause on MARCH 12, 2025, between the hours of 10:10 a.m. and 3:50 p.m., reported stenographically by DONNA McCOWN, Certified Court Reporter No. 6625, in and for the State of Texas, at Garza Martinez, PLLC, 202 East Sprague Street, Edinburg, Texas, pursuant to the Federal Rules of Civil Procedure and any provisions stated on the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755            McAllen (956) 618-2366**

```
13:00  1   do, for example, if it's missing -- if I don't think
13:00  2   it's specific enough or -- or stuff like that, then --
13:00  3   then I have, yes.
13:00  4        Q.  Okay.  And would you say those are more, like,
13:00  5   formal kind of technical problems, or is there -- is
13:00  6   there ever like a legal problem underlying for a reason
13:00  7   not to subpoena something?
13:00  8        A.  Yes, there was -- there's been times --
13:00  9             THE COURT REPORTER:  Kelly, did you --
13:00 10             MS. ALBIN:  Yes.
13:00 11             THE COURT REPORTER:  Can you say it again?
13:00 12             MS. ALBIN:  I objected, but you can
13:00 13   answer.
13:00 14        A.  I've -- I've refused to sign some subpoenas
13:00 15   where they're requesting phone records, because even
13:00 16   though you can get subscriber information through
13:00 17   subpoenas, under Texas law, you need a search warrant
13:00 18   to get phone records, and some officers don't know
13:01 19   that, so they've sent over requests for subpoenas, and
13:01 20   in that situation, I declined.
13:01 21        Q.  Okay.  In that -- in that situation, would you
13:01 22   have a conversation with the officer to explain why you
13:01 23   declined it?
13:01 24        A.  No.  In those situations, usually, I have -- I
13:01 25   tell the investigators that we have -- because they're
```

13:01  1   kind of -- a lot of the times they're like the middle
13:01  2   people, so I just tell them, "Hey, explain to this
13:01  3   agency and make sure you get the word around that they
13:01  4   can't be requesting these type of subpoenas for that."
13:01  5              MS. KOVEL:  Okay.  All right.  Kelly, have
13:01  6   you received the e-mail?
13:01  7              MS. CORNING:  In one second.  Sorry.
13:01  8        Q.  Okay.  And once you have signed the
13:01  9   application, you said you don't actually give it to
13:01 10   the -- does a judge have to sign it or a clerk?
13:01 11        A.  It depends.  If it's an in-county subpoena,
13:01 12   that means that it's going to served within the county,
13:01 13   a judge does not have to sign it, and it just has to
13:02 14   get filed with the clerks, and they have to issue the
13:02 15   subpoena, which they stamp-file it.
13:02 16              If it's an out-of-county subpoena, then
13:02 17   the district judge of that grand jury has to sign it,
13:02 18   so we sign the application.  It goes to the district
13:02 19   judge.  If they sign off on it, then the district clerk
13:02 20   stamps the subpoena and it goes out.
13:02 21        Q.  Okay.  Would you appear before the judge in
13:02 22   that circumstance, or is it sort of an automatic
13:02 23   process?
13:02 24        A.  No.  It's just the subpoena itself or the
13:02 25   application goes to the judge's office.  We don't

| | | |
|---|---|---|
| 13:02 | 1 | appear before them. |
| 13:02 | 2 |         MS. KOVEL: All right.  Kelly, let me know |
| 13:02 | 3 | when you have the e-mail. |
| 13:02 | 4 |         THE COURT REPORTER: Say it again. |
| 13:02 | 5 |         MS. KOVEL: I said Kelly, let me know -- |
| 13:02 | 6 |         THE COURT REPORTER: I mean I missed hers. |
| 13:02 | 7 |         MS. ALBIN: Yes, I have them. |
| 13:02 | 8 |         MS. KOVEL: Thank you. |

    Q.  Okay. So we're calling the one, Exhibit 1 that's marked --

        MS. GARZA: -- 6, yes.

    Q.  So starting with the Exhibit No. 1, which is marked at the bottom Confidential Exhibit No. 6. Do you see this document?

    A.  Yes, ma'am.

    Q.  And do you recognize this copy?

    A.  That is my signature. I don't remember this particular one. I remember the other one, but this one I don't remember.

    Q.  Okay. So by "the other one," you're referring to Plaintiff's Exhibit 2, which is marked at the bottom Confidential Exhibit No. 7. Am I correct?

    A.  Yes. That one -- that one -- I remember that one. I don't remember this subpoena, but that is my signature.

```
13:03  1        Q.  Okay.  And tell me what you remember about
13:03  2   Plaintiff's Exhibit 2.
13:03  3        A.  This is the one that says "Confidential No. 7"?
13:03  4        Q.  Correct.
13:03  5        A.  I remember that -- that for this one, the
13:03  6   sheriff's department had requested a subpoena for the
13:03  7   medical records because they were asking for advice,
13:03  8   and we didn't have nearly enough facts to make any
13:03  9   determination on the case.
13:03 10        Q.  Okay.  So let's back up a little bit.  This --
13:03 11   this is a grand jury subpoena regarding medical records
13:04 12   of our client Lizelle Herrera, correct?
13:04 13        A.  Uh-huh.
13:04 14        Q.  Now she's Gonzalez.  Okay?
13:04 15        A.  Yes, ma'am.
13:04 16        Q.  And you said this is -- this is a request for
13:04 17   medical records.  The front of it says "Starr County
13:04 18   Memorial Hospital," correct?
13:04 19        A.  Yes, ma'am.
13:04 20        Q.  Okay.  When did you first hear about the
13:04 21   incident involving our client Lizelle Herrera?
13:04 22        A.  Must have been the same day this subpoena was
13:04 23   filed, I would assume, around that time.
13:04 24        Q.  And who notified you about it?  Who contacted
13:04 25   you first?
```

13:04  1      A.   The investigator that contacted me I believe
13:04  2   was Esmer Muniz.  I believe she called me.
13:04  3      Q.   Muniz?
13:04  4      A.   Muniz, yes.
13:04  5      Q.   She called you on your cell phone?
13:04  6      A.   I don't believe it was my cell phone.  I think
13:04  7   it was my -- my office phone, because I remember I was
13:04  8   in my office working on something.  And I don't know if
13:04  9   they just called to see who was there or what, but I do
13:05 10   remember that I answered the phone in my office, so I
13:05 11   want to say it was the landline there at the office.
13:05 12      Q.   Okay.
13:05 13      A.   Yeah.
13:05 14      Q.   And who is Esmeralda Muniz?
13:05 15      A.   She's a former investigator with the sheriff's
13:05 16   department.  She -- she's recently retired.
13:05 17      Q.   Okay.  Did you know her at the -- now, this is
13:05 18   around January 2022, correct?
13:05 19      A.   Yes.
13:05 20      Q.   And did you know her at that time?
13:05 21      A.   Yes.
13:05 22      Q.   Had you done work with -- with cases -- have
13:05 23   you worked on cases with her previously?
13:05 24      A.   Yes, ma'am.
13:05 25      Q.   Okay.  Do you know if she called you directly?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:05  1       A.   What do you mean directly?
13:05  2       Q.   Do you have a direct line in the DA's office
13:05  3  for your desk phone?
13:05  4       A.   No.  No, ma'am.
13:05  5       Q.   Okay.  Is there just one phone number and
13:05  6  whoever answers answers?
13:05  7       A.   So the way it works is the entire county has a
13:05  8  phone number, and it goes to a centralized -- kind of
13:05  9  like an operator.  And then from there, they send you
13:05 10  to the departments.
13:05 11            So there they would forward the phone call
13:06 12  to the front desk there at the DA's office, and then
13:06 13  from there, they would get transferred to whoever
13:06 14  they're looking for there at the DA's office.
13:06 15       Q.   Okay.  So do you know if Investigator Muniz was
13:06 16  asking for you by name?
13:06 17       A.   I'm not sure, ma'am.
13:06 18       Q.   Okay.  And do you remember what she said to you
13:06 19  on that phone conversation?
13:06 20       A.   I remember the -- I guess the gist of what she
13:06 21  told me, because it was a while back, but it wasn't a
13:06 22  long conversation.  She had -- she had advised me that
13:06 23  they -- I guess the Starr County Hospital -- or Starr
13:06 24  County Memorial Hospital had contacted the sheriff's
13:06 25  department, something about them being concerned or

```
13:06  1    somebody in their department.  I don't know if it was
13:06  2    an attorney or somebody was concerned that they hadn't
13:06  3    reported something to law enforcement.
13:06  4              Apparently -- what I remember is that
13:06  5    there was a female that had gone in a few days before,
13:07  6    and I don't know if they had to pump her stomach or
13:07  7    something like that, that she had ingested some --
13:07  8    something.  They had treated her.  She had left.  And
13:07  9    then she came back.
13:07 10              What stood out that -- what they told me
13:07 11    was that when she came back that the baby -- or there
13:07 12    was -- oh, sorry.  At the beginning that she was
13:07 13    pregnant, that's one of the details they had told me
13:07 14    the first time she went.  When she was -- when she came
13:07 15    back the second time that the baby was sticking out of
13:07 16    her.
13:07 17              And when I asked, "What do you mean the
13:07 18    baby was sticking out of her," they said, "That's all
13:07 19    they told us.  They didn't give us any more details
13:07 20    other than that."  So they're asking, "Well, you know,
13:07 21    do we have a case here?"
13:07 22              I told them, "That's not nearly enough
13:07 23    information for me to make the determination was the
13:07 24    baby born alive?  Were they not?"  They didn't -- they
13:07 25    didn't know.
```

13:07  1       Q.  Okay.  So stepping back, it sounds like
13:08  2   Investigator Muniz was talking about the case more
13:08  3   generally and not at that time specifically about
13:08  4   medical records?
13:08  5       A.  Not -- not at that moment.
13:08  6       Q.  Okay.
13:08  7       A.  Yeah.
13:08  8       Q.  So was she asking, you said, "Do we have a case
13:08  9   here?"  She asked you that?
13:08 10       A.  Yeah.  She was confused because she was like --
13:08 11   like basically, like, you know, "This is all we have
13:08 12   right now.  Like is there a case here because of the
13:08 13   baby?"
13:08 14               And my question was, "Well, was the baby
13:08 15   born?  Under what condition was it born?"
13:08 16               And I remember her telling me that she
13:08 17   didn't know because that all the hospital did was the
13:08 18   initial report, and then after that, they refused to
13:08 19   give any information, that basically their position was
13:08 20   that they had complied with their duties to report, and
13:08 21   after that, they shut down.
13:08 22               I do remember asking if there was an
13:08 23   autopsy to see if the child had been born alive, under
13:08 24   what conditions if it was born.  I remember being told
13:08 25   that the -- that the body of the child, embryo, I mean,

| | |
|---|---|
| 13:09  1 | had been cremated.  So there was no autopsy.  There's |
| 13:09  2 | no nothing to go on there. |
| 13:09  3 | So basically, that's when they asked for |
| 13:09  4 | the grand jury subpoena for the medical records, |
| 13:09  5 | because they were trying to figure out what happened |
| 13:09  6 | here and if there's any actionable crime that happened, |
| 13:09  7 | because there was -- there was some possibilities, |
| 13:09  8 | depending on what the circumstances were, but not |
| 13:09  9 | enough solid facts to -- to know anything for sure. |
| 13:09 10 | Q.  Okay.  So did you convey to Investigator Muniz |
| 13:09 11 | that conclusion that you just drew, that there was a |
| 13:09 12 | possibility that there could be a crime? |
| 13:09 13 | A.  No.  What I -- what I told her was that I |
| 13:09 14 | didn't have enough facts to make a determination.  And |
| 13:09 15 | that's when she asked for the grand jury subpoena for |
| 13:09 16 | the medical record. |
| 13:09 17 | Q.  Okay.  Did anyone use the term "abortion" or |
| 13:09 18 | the word "abortion" -- |
| 13:09 19 | A.  No, ma'am. |
| 13:10 20 | Q.  -- in that time? |
| 13:10 21 | A.  No, ma'am. |
| 13:10 22 | Q.  Okay.  And when you -- you said she had |
| 13:10 23 | ingested something, did Investigator Muniz say what |
| 13:10 24 | that -- what that thing was at that time in that |
| 13:10 25 | conversation? |

15:42  1  bonus if she presented this case to the grand jury?
15:42  2     A.  No, ma'am.  That never happens.
15:42  3     Q.  In your experience, do ADAs supervise the Starr
15:42  4  County Sheriff's Office investigators while they're
15:42  5  conducting their investigations?
15:42  6     A.  No, ma'am.  They have their own chain of
15:42  7  command.  They don't report to us.
15:42  8     Q.  Are you aware of any agreement between the
15:42  9  district attorney's office that you work for and the
15:42 10  Starr County hospital to prosecute abortion cases?
15:43 11     A.  No, ma'am.
15:43 12     Q.  And as you sit here today, do you even know, in
15:43 13  fact, whether Ms. Herrera had an abortion or not?
15:43 14     A.  I don't.  I -- I never reviewed the medical
15:43 15  records or the reports.  So I -- to this day, I still
15:43 16  don't know what actually happened in this case.
15:43 17     Q.  Does DA Ramirez require the ADAs to consult
15:43 18  with him prior to the ADAs presenting a case to the
15:43 19  grand jury?
15:43 20     A.  No, ma'am.
15:43 21     Q.  Do you believe there was a conspiracy amongst
15:43 22  anyone in the DA's office to prosecute Ms. Herrera?
15:43 23     A.  No, ma'am.
15:43 24           MS. KOVEL:  Objection.  I'm sorry.  Can I
15:43 25  put an objection on the record?

Gocha Allen Ramirez
District Attorney

April 10, 2022

RELEASE

Yesterday afternoon, I reached out to counsel for Ms. Lizelle Herrera to advise him that my office will be filing a motion dismissing the indictment against Ms. Herrera Monday, April 11, 2022. In reviewing applicable Texas law, it is clear that Ms. Herrera cannot and should not be prosecuted for the allegation against her.

In reviewing this case, it is clear that the Starr County Sheriff's Department did their duty in investigating the incident brought to their attention by the reporting hospital. To ignore the incident would have been a dereliction of their duty. Prosecutorial discretion rests with the District Attorney's office, and in the State of Texas a prosecutor's oath is to do justice. Following that oath, the only correct outcome to this matter is to immediately dismiss the indictment against Ms. Herrera.

Although with this dismissal Ms. Herrera will not face prosecution for this incident, it is clear to me that the events leading up to this indictment have taken a toll on Ms. Herrera and her family. To ignore this fact would be shortsighted. The issues surrounding this matter are clearly contentious, however based on Texas law and the facts presented, it is not a criminal matter.

Going forward, my office will continue to communicate with counsel for Ms. Herrera in order to bring this matter to a close. It is my hope that with the dismissal of this case it is made clear that Ms. Herrera did not commit a criminal act under the laws of the State of Texas.

Respectfully,

*Gocha Allen Ramirez*
Gocha Allen Ramirez
229th Judicial District Attorney

