1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ            ) (
      Plaintiff            ) (
                       ) (
VS.                        ) (    CIVIL ACTION NO.
                       ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,       ) (
ALEXANDRIA LYNN BARRERA,    ) (
RENE FUENTES, and STARR     ) (
COUNTY, TEXAS              ) (
      Defendants            ) (

_____

ORAL AND VIDEOTAPED DEPOSITION OF
GOCHA ALLEN RAMIREZ
APRIL 7, 2025

_____

      ORAL AND VIDEOTAPED DEPOSITION OF GOCHA ALLEN

RAMIREZ, produced as a witness at the instance of the

PLAINTIFF, taken in the above-styled and numbered cause

on APRIL 7, 2025, between the hours of 10:08 a.m. and

5:26 p.m., reported stenographically by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at Bryant & Stingley, Inc., 701 East

Harrison, Suite 200, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:26  1      A.  No, sir.

13:26  2      Q.  -- to the sheriff's office?

13:26  3           Have you ever given insight to your team

13:26  4  about a legal question related to a sheriff's office

13:26  5  investigation?

13:26  6      A.  Not that I remember.

13:26  7      Q.  Okay.  And, lastly, how do you work with the

13:26  8  Starr County Memorial Hospital?

13:26  9      A.  I don't work with them at all.

13:26 10      Q.  How does your office work with the Starr County

13:26 11  Memorial Hospital?

13:26 12      A.  As far as I know, we don't work with them at

13:26 13  all.

13:26 14      Q.  Have you ever provided guidance to hospital

13:26 15  employees about when to report certain conduct?

13:26 16      A.  If we don't work with them at all, that would

13:26 17  make that question moot.  No.

13:26 18      Q.  Okay.  Have you ever attended meetings at the

13:26 19  hospital?

13:26 20      A.  I attended a meeting about a month ago where

13:26 21  there were -- a group of SANE nurses were giving a

13:26 22  presentation on their availability to do SANE exams in

13:27 23  Starr County instead of having to do them outside of

13:27 24  Starr County.

13:27 25           A SANE exam is a sexual assault exam.  And

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:27 1   so I attended that presentation, and that presentation

13:27 2   was at the hospital.

13:27 3        Q.  Have you attended other presentations at the

13:27 4   hospital?

13:27 5        A.  No, sir.

13:27 6        Q.  Have you given other presentations at the

13:27 7   hospital?

13:27 8        A.  I've never given a presentation at a hospital.

13:27 9        Q.  Has anyone on your team given a presentation at

13:27 10  the hospital?

13:27 11       A.  I -- no.  The presentation was given by the

13:27 12  SANE nurses.  That's the only one that I can think of

13:27 13  in the last five years.

13:27 14       Q.  Have you provided written guidance to any

13:27 15  hospital or hospital staff?

13:27 16       A.  No, sir.

13:27 17       Q.  Have you posted on the Internet any guidance

13:27 18  for hospital employees and staff?

13:27 19       A.  No, sir.

13:27 20       Q.  Was Ms. Gonzalez's case discussed at the

13:27 21  meeting at the hospital you just referred to?

13:27 22       A.  No.  No, no.  This was -- this was a

13:28 23  presentation about SANE exams.  SANE exams involve

13:28 24  sexual assaults of children.  So no, her case was

13:28 25  not -- this was a presentation to a large group of

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

150

13:28  1    people, not just hospital personnel.

13:28  2         Q.  Uh-huh.  Who was at this presentation?

13:28  3         A.  I don't know.  It was like 40 people.

13:28  4         Q.  Anyone else from your office at this?

13:28  5         A.  Yes.  Alex was there, Abel was there, I was

13:28  6    there, I think an investigator was there.  We're all

13:28  7    interested in SANE exams because of the number of

13:28  8    sexual assaults of children that we have.

13:28  9              And this was a group that was starting to

13:28  10   work -- or has started to work in Starr County

13:28  11   providing 24-7 access to sexual assault examinations of

13:28  12   children or of adults if they're sexually assaulted.

13:28  13        Q.  I understand that you're saying the

13:29  14   presentation was not about Ms. Gonzalez's case.  Did

13:29  15   anybody discuss Ms. Gonzalez's case --

13:29  16        A.  Not that I know of.

13:29  17        Q.  -- at the hospital?

13:29  18        A.  This was just a few weeks ago.

13:29  19        Q.  And then maybe stepping back, I just wanted to

13:29  20   tie one loop.  Have you ever instructed a member of

13:29  21   your team to present a case to a grand jury?

13:29  22        A.  Instructed them?  No, I don't think so.  I've

13:29  23   suggested -- usually I just suggest that they pull out

13:29  24   cases and present them to grand juries.  And sometimes

13:29  25   I am advised which cases they're going to present.  And

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:53  1          A.  No, sir.

13:53  2          Q.  Have you discussed this message with

13:53  3      Ms. Barrera?

13:53  4          A.  No, sir.

13:53  5          Q.  Did you ever discuss this message with

13:53  6      Ms. Barrera?

13:53  7          A.  No, I didn't.  I didn't know this message

13:53  8      existed.

13:53  9          Q.  Did you -- were you made aware of the content

13:53  10     of this message?

13:54  11         A.  How could I be aware of the content if I didn't

13:54  12     know it existed?

13:54  13         Q.  Were you told, Mr. Ramirez, "The sheriff's

13:54  14     office has just asked us about a 20-week abortion"?

13:54  15         A.  No, sir.

13:54  16         Q.  Did Ms. Barrera say, "I have an abortion case,"

13:54  17     sir?

13:54  18         A.  No.  I think at one point -- but I think it was

13:54  19     in February.  On this date, no, she did not.

13:54  20         Q.  So she never discussed with you that the

13:54  21     sheriff's office reached out about an abortion?

13:54  22         A.  Not that I remember, no.

13:54  23         Q.  Okay.  And you see there is a message shortly

13:54  24     after.  Ms. Barrera says, "Give me a second."

13:54  25                 And then Ms. Muniz responds later in the

Electronically signed by Donna McCown (101-253-986-8079)                              d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:54  1    day, "Alex, I came and took pictures of the ashes of

13:54  2    the baby because it's been cremated already.  Do I

13:54  3    allow the funeral home to give the mom the ashes?"

13:54  4        A.  I see that.

13:54  5        Q.  Is that a legal question?

13:54  6        A.  I don't know.  It could be, yes.

13:55  7        Q.  How?

13:55  8        A.  "Do I allow the funeral home to give the mom

13:55  9    the ashes?"  I don't -- I don't know if that's a

13:55 10    legal -- doesn't sound like a legal question.

13:55 11        Q.  Do you often -- does your staff often receive

13:55 12    messages seeking guidance from the sheriff's office?

13:55 13        A.  No, not often.

13:55 14        Q.  Okay.  Have you read Ms. Barrera's responses to

13:55 15    her interrogatories?

13:55 16        A.  No, I have not.

13:55 17        Q.  If I represent to you that Ms. Barrera says

13:55 18    someone called Abel first, do you have any reason to

13:55 19    disagree with that statement?

13:55 20        A.  No, I don't.

13:55 21        Q.  Do you know it to be true?

13:55 22        A.  No, I don't.

13:55 23        Q.  Did Mr. Villarreal tell you, "Mr. Ramirez,

13:55 24    someone from the sheriff's office called me about an

13:55 25    abortion case"?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:55  1      A.  No, he never has told me that.  But I don't --
13:55  2  I don't disbelieve Ms. Barrera.
13:56  3      Q.  And if I told you that Mr. Villarreal does not
13:56  4  remember that conversation happening, would that change
13:56  5  your --
13:56  6      A.  No, because Ms. Barrera doesn't lie about --
13:56  7  she's never lied to me about anything.  So, you know,
13:56  8  Mr. Villarreal doesn't remember, he doesn't remember.
13:56  9  But if Alex said that that happened, then I believe
13:56 10  her.
13:56 11      Q.  And did Mr. Villarreal tell you anything about
13:56 12  the conversation?
13:56 13      A.  No.  I didn't -- I didn't know about this
13:56 14  conversation.
13:56 15      Q.  He didn't tell you that the conversation
13:56 16  happened?
13:56 17      A.  No, sir.
13:56 18      Q.  Did anyone at the sheriff's office speak to you
13:56 19  about an abortion case?
13:56 20      A.  No.
13:56 21      Q.  Did you speak with Sheriff Fuentes about the
13:56 22  case?
13:56 23      A.  No, sir.  And you're talking about this time
13:56 24  period, right, more or less?
13:56 25      Q.  Yes, I'm talking about January 2022.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:56  1          A.  Okay.  No.

13:56  2          Q.  Nobody else at the sheriff's office spoke to

13:57  3     you?

13:57  4          A.  No, nobody ever spoke to me about this case.

13:57  5          Q.  Did -- do you know if anyone on your staff

13:57  6     spoke with the Rio Grande City Police Department about

13:57  7     this case?

13:57  8          A.  I don't know.

13:57  9          Q.  So in January of 2022, your testimony is nobody

13:57 10     mentioned an abortion case?

13:57 11          A.  On January 11th of 2022?

13:57 12          Q.  Any time in January of 2022, the month.

13:57 13          A.  Nobody mentioned to me?

13:57 14          Q.  Yes.

13:57 15          A.  No, I can't -- I can't say whether they did or

13:57 16     not.

13:57 17          Q.  Because you do not recall?

13:57 18          A.  I don't recall.

13:57 19          Q.  Okay.  Is it your testimony that they did not?

13:57 20          A.  No.  My testimony is I don't recall whether

13:57 21     somebody -- one of the ADAs mentioned it to me in

13:57 22     passing or I heard something about it at the office.  I

13:57 23     don't recall, and especially in January of 2022.

13:57 24          Q.  When did you first hear about this case?

13:57 25          A.  I don't -- I don't know when I first heard

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:58 1    about it because I don't recall.  I know that I got a

13:58 2    message about the case from Alex in February, but I

13:58 3    don't recall talking to anybody about it in January.

13:58 4        Q.  Had you heard about the case before you

13:58 5    received that message from Ms. Barrera?

13:58 6        A.  I don't know.  I don't remember.

13:58 7        Q.  Do you know if your team was assisting the

13:58 8    sheriff's office in any way in January of 2022?

13:58 9        A.  I don't think -- when you say my team, who do

13:58 10   you mean?

13:58 11       Q.  I mean your assistant district attorneys.

13:58 12       A.  If they were assisting the sheriff's office in

13:58 13   what capacity?

13:58 14       Q.  Any capacity.

13:58 15       A.  I don't know.

13:58 16       Q.  Were they in communication with the sheriff's

13:58 17   office about this case?

13:58 18       A.  I don't know.  It appears from the text

13:58 19   messages that they were in communication.  If this is

13:58 20   from Ms. Muniz and from Alex, it appears that they were

13:58 21   in communication.

13:58 22       Q.  Is that surprising to you?

13:59 23       A.  No.

13:59 24       Q.  Why is it not surprising to you?

13:59 25       A.  Because we communicate.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:22  1    well.

14:22  2        Q.  That in January 2022, it was illegal to have an

14:22  3    abortion in the state of Texas.

14:22  4        A.  No.  My understanding, it was not illegal.

14:22  5        Q.  When did Ms. Gonzalez's investigation become a

14:23  6    murder investigation?

14:23  7        A.  I don't know.

14:23  8        Q.  What else did you hear about the investigation?

14:23  9        A.  Not much.  I really didn't hear much about the

14:23  10   investigation at all.  I had heard talk about a dead

14:23  11   baby and drugs being used that resulted in the death of

14:23  12   a baby, but that's basically -- I don't even know

14:23  13   who -- where I heard that from.  Probably just talk in

14:23  14   the office.  But I didn't really know anything about

14:23  15   the case.

14:23  16       Q.  When did you hear talk about a dead baby?

14:23  17       A.  I don't know.  I know -- you know, at some

14:23  18   point I heard that.

14:23  19       Q.  And what was your reaction to talk about a dead

14:23  20   baby?

14:23  21       A.  I had no reaction.

14:23  22       Q.  Was the talk that you heard that your staff was

14:23  23   working on a case?

14:23  24       A.  No.  No.  That something had happened.

14:23  25       Q.  And did you say to anybody, "What are you

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:36 1      A.  I remember the words "dead baby" being used

14:36 2   earlier on.  And she told me she was going to present

14:36 3   the case to the grand jury.  I knew that it was a case

14:36 4   involving this quote/unquote dead baby that I had heard

14:37 5   about before.

14:37 6           And I remember us discussing the -- I

14:37 7   thought it was an ingestion of some drugs.  I didn't

14:37 8   know what had -- I really didn't know the facts.  But I

14:37 9   do remember drugs being discussed also.

14:37 10     Q.  When you say "the case," what do you mean?

14:37 11     A.  The -- the case against Ms. Herrera.  The file

14:37 12  that had been turned in by the sheriff's department on

14:37 13  the Herrera investigation.

14:37 14     Q.  Did you see that file?

14:37 15     A.  Not until after she had been indicted and

14:37 16  arrested.

14:37 17     Q.  Was it your understanding that a file had in

14:37 18  fact been turned in?

14:37 19     A.  I didn't know.  I assumed it had because in

14:37 20  order for Ms. Barrera to present the case, she would

14:37 21  normally need a file.

14:37 22     Q.  In order for you to suggest that she present

14:37 23  the case, would you have needed the file?

14:37 24     A.  No.

14:37 25     Q.  Why not?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:37 1      A.  Because I wasn't going to present.

14:37 2      Q.  Were you surprised to receive a message about

14:38 3  abortion case?

14:38 4      A.  No.  Not -- not -- because like -- I think I

14:38 5  already said this before.  I had already heard about a

14:38 6  case involving a dead baby.  So I wasn't surprised to

14:38 7  receive this message at all.

14:38 8      Q.  Had your office ever prosecuted an abortion

14:38 9  case before?

14:38 10     A.  No.

14:38 11     Q.  Had you ever prosecuted an abortion case

14:38 12 before?

14:38 13     A.  No.

14:38 14     Q.  Had Ms. Barrera ever prosecuted an abortion

14:38 15 case before?

14:38 16     A.  Not that I know of.

14:38 17     Q.  What did you expect would happen after

14:38 18 Ms. Barrera presented this case to a grand jury?

14:38 19     A.  I don't know, because I didn't know the facts.

14:38 20 I didn't have any anticipation of what would happen.

14:38 21     Q.  Why --

14:38 22     A.  I wasn't there.

14:38 23     Q.  Why tell her to present the case without the

14:38 24 facts?

14:38 25     A.  Because I -- I didn't need to know the facts.

Electronically signed by Donna McCown (101-253-986-8079)                d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:51  1        Q.  What facts would you have needed?

14:51  2        A.  Well, depends on what the charges were going to

14:51  3   be.  But we would need more facts for any charge,

14:51  4   because, I mean, this was February the 1st of '22.  I

14:51  5   don't think we had seen anything in writing from the

14:51  6   sheriff's department in the form of a formal report,

14:51  7   the medical records.

14:51  8             I don't think Ms. Barrera had a clear

14:51  9   picture of what had happened at all.  So that's -- I'm

14:52 10   assuming that's what we discussed.  There was no clear

14:52 11   picture of what had happened.

14:52 12             And we just needed the sheriff's

14:52 13   department to do what they do, finish their

14:52 14   investigation, turn in the file, and then we could

14:52 15   decide whether to present it to a grand jury or not.

14:52 16        Q.  Did you tell Ms. Barrera what facts were

14:52 17   missing?

14:52 18        A.  No.  I think most of the facts were missing at

14:52 19   this date.  I didn't tell her what facts were missing.

14:52 20   But if it was on February 1st, almost all the facts

14:52 21   were missing, because we hadn't seen anything on that

14:52 22   case.  The way I understand it, from what I understand,

14:52 23   we had not seen anything at all.

14:52 24        Q.  And was it your understanding that the

14:52 25   sheriff's office investigation was complete?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:52 1          A.  Not on February the 1st.

14:52 2          Q.  So what are -- what is Ms. Barrera telling

14:53 3     Ms. Muniz to submit?

14:53 4          A.  The file whenever she's --

14:53 5          Q.  The file --

14:53 6          A.  -- done.

14:53 7          Q.  The file is what?

14:53 8          A.  It's all of the reports, the medical records,

14:53 9     the interviews, everything that should be in an

14:53 10    investigative file.  And I don't believe that was

14:53 11    turned in until -- I don't know.  I think it was over a

14:53 12    month later.

14:53 13         Q.  So what would have happened if the file had

14:53 14    been presented and incomplete?

14:53 15         A.  I don't know.  Hopefully, we would have caught

14:53 16    it, and we would have asked for whatever was missing.

14:53 17    But that's what ultimately and -- would have happened

14:53 18    if we lived in a perfect world.  We would have known

14:53 19    that something was missing and asked that we get it.

14:53 20         Q.  What if the file was incomplete not because it

14:53 21    lacked a body camera video or something but because

14:54 22    material evidence was missing from the elements of the

14:54 23    offense?

14:54 24         A.  Then, you know, what would have happened

14:54 25    normally is we would have advised that something was

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:54  1    missing.

14:54  2        Q.  Would you have sent it back to the sheriff's

14:54  3    office for further investigation?

14:54  4        A.  I don't know if we would have sent it back.  We

14:54  5    might have asked for more investigation.

14:54  6        Q.  And when the sheriff's office needs to

14:54  7    supplement, do they have to resubmit --

14:54  8        A.  No.

14:54  9        Q.  -- a prosecution packet?

14:54  10       A.  No.  They just -- they just submit supplements.

14:54  11   If they need to supplement, they'll just submit the

14:54  12   supplement.

14:54  13       Q.  Did Ms. Barrera tell you that she was pursuing

14:54  14   a murder charge?

14:54  15       A.  No, she did not.

14:54  16       Q.  Did she tell you that she did not know what

14:54  17   charge she was pursuing?

14:54  18       A.  I don't remember her telling me that either.

14:54  19       Q.  Did you know what the sheriff's office was

14:54  20   investigating the incident as?

14:54  21       A.  No, I don't, because that would have been -- I

14:54  22   would have needed to have spoken to an investigator or

14:55  23   seen the file.

14:55  24       Q.  Did you tell Ms. Barrera, "I'm going to need to

14:55  25   see the file again"?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:55 1          A.  No.

14:55 2          Q.  Did you tell her, "I'm going to need to talk to

14:55 3    you about this case again"?

14:55 4          A.  When?

14:55 5          Q.  On February 1st.

14:55 6          A.  I don't remember telling her that.  I don't

14:55 7    really remember what the conversation was about except

14:55 8    that we didn't have enough facts.

14:55 9          Q.  Uh-huh.  So it is your testimony that you

14:55 10   definitively did not have the facts to support probable

14:55 11   cause for a murder charge?

14:55 12         A.  We didn't have a file.  So you can't have a

14:55 13   case without a file.  In other words, Ms. Barrera

14:55 14   couldn't go to a grand jury on February the 2nd after

14:55 15   this conversation without a file, without a report,

14:55 16   without medical records, and present it to a grand jury

14:56 17   for their consideration.

14:56 18              The file I don't believe was turned in

14:56 19   until at least a month later.  So we had nothing except

14:56 20   what had been orally told to Ms. Barrera or

14:56 21   Mr. Villarreal.

14:56 22         Q.  How did you know you would be out of town when

14:56 23   you discussed the case on February 1st?

14:56 24         A.  Because we had already set -- well, I don't

14:56 25   know if that's when I told her we were going to be out

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:56 1    of town.  I told her I was going to be out of town
14:56 2    whenever -- right before she presented the case to the
14:56 3    grand jury.  And I don't know when that was.
14:56 4                   But we had already had settings for grand
14:56 5    jury in Jim Hogg.  We know in advance, a month in
14:56 6    advance when we're going to have grand jury in Jim
14:56 7    Hogg.  And we know a month in advance, more or less,
14:56 8    when we're going to have grand jury in Starr County.
14:56 9    And it just so happened that those grand juries were on
14:56 10   the same day.  We have a grand jury in each county.
14:56 11        Q.  Why was your presence in the county relevant to
14:56 12   this conversation?
14:56 13        A.  Because I wasn't going to be there.
14:57 14        Q.  Where?
14:57 15        A.  In Starr.
14:57 16        Q.  For what?
14:57 17        A.  For a grand jury.
14:57 18        Q.  Is your understanding that you were scheduling
14:57 19   a grand jury presentation of this case on February 1st?
14:57 20        A.  No, no, no.  No, no.  I don't understand your
14:57 21   question.  I don't know that we talked about
14:57 22   presentation to a grand jury on February -- we talked
14:57 23   about getting more facts for a grand jury.
14:57 24                   But I don't know that we had set this case
14:57 25   for presentation to a grand jury on February the 1st.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:57  1    I don't think it was presented to a grand jury until --
14:57  2    until March, but I could be wrong.
14:57  3        Q.  How could you know you were going to be
14:57  4    unavailable during the grand jury presentation date if
14:57  5    the plan was not to present the case to a grand jury?
14:57  6        A.  I don't understand your question.  When --
14:57  7    these -- I don't know that this is the same
14:57  8    conversation that we're talking about.
14:57  9            In other words, the conversation we're
14:57 10    having here with Ms. Barrera is -- she says, "Okay.
14:58 11    Just spoke to Gocha.  Just submit for grand jury
14:58 12    review."  We didn't have a date certain that we were
14:58 13    going to present this case to a grand jury at that
14:58 14    time.
14:58 15            Later on, after the file was turned in,
14:58 16    when Ms. Barrera decided to present it to a Starr
14:58 17    County grand jury is when I knew that I was not going
14:58 18    to be present.  Not on the 1st of February.  That would
14:58 19    have been later in time.
14:58 20        Q.  What facts did Ms. Barrera learn after
14:58 21    February 1st that closed the gap on probable cause?
14:58 22        A.  I don't know.  You'd have to ask her.
14:58 23        Q.  Are you aware of any facts that Ms. Barrera
14:58 24    learned that closed the gap on probable cause?
14:58 25        A.  No, I'm not aware of what facts Ms. Barrera

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:01  1          A.  Yes.

15:01  2          Q.  -- the February 1st conversation?

15:01  3          A.  I'm -- yes.

15:01  4          Q.  And what did Ms. Barrera tell you she had

15:01  5     learned since February 1st?

15:01  6          A.  I don't remember what she told me she had

15:01  7     learned, if anything.

15:01  8          Q.  Do you remember that she had acquired new

15:01  9     facts?

15:01 10          A.  I don't know that she told me she had acquired

15:01 11     new facts.

15:01 12          Q.  So what did she -- what was your conversation

15:01 13     about?

15:01 14          A.  About her presenting the case to the grand

15:01 15     jury.

15:01 16          Q.  And what was the case?

15:01 17          A.  Ms. Herrera's case.

15:01 18          Q.  What was Ms. Herrera's case?

15:01 19          A.  It involved a dead baby.  That's all I knew.

15:01 20          Q.  Did you know that she was presenting a murder

15:02 21     charge to the grand jury?

15:02 22          A.  I don't know that she presented a murder

15:02 23     charge.  I don't know that she did that.  I know she

15:02 24     presented the case to the grand jury.  That's all I can

15:02 25     tell you.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:03  1        A.  No.  No, I didn't.  That was not something that

15:03  2   interested me.

15:03  3        Q.  Your understanding was that abortion was legal

15:03  4   in the state of Texas?

15:03  5        A.  Yes, sir.

15:03  6        Q.  So if an abortion case was presented to a grand

15:03  7   jury, what did you expect would happen?

15:03  8        A.  Well, it depended on the facts.  Like as I told

15:03  9   you earlier, I don't know whether or not -- I didn't

15:03  10  know at the time whether or not the case involved a

15:03  11  botched abortion where the baby was born alive and then

15:03  12  died.  In that case, I don't know what would have

15:03  13  happened.  I don't know if that's been presented

15:03  14  before.  It may have been.  My impression was that the

15:03  15  baby was -- there was a dead baby, not that it was a

15:04  16  fetus.

15:04  17        Q.  Did you ask Ms. Barrera these questions?

15:04  18        A.  No, I did not.

15:04  19        Q.  Why not?

15:04  20        A.  Because I didn't think I needed to ask her

15:04  21  those questions.  I actually was much more interested

15:04  22  in the case that was being presented in Jim Hogg

15:04  23  County.

15:04  24        Q.  What were the potential consequences for

15:04  25  Ms. Gonzalez of an indictment in this case?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:52  1    committed a criminal act by assisting Becky Rocha with

15:52  2    obtaining an abortion, correct?

15:52  3        A.   I don't know what you're talking about.

15:52  4        Q.   What conversations did you have with

15:52  5    Ms. Barrera after that second conversation where you

15:52  6    told her to present to the grand jury?

15:52  7        A.   The next time I spoke to her was after

15:53  8    Ms. Herrera had been arrested.

15:53  9        Q.   Did you help her prepare for the grand jury

15:53 10    presentation?

15:53 11        A.   No.

15:53 12        Q.   And did you ever review the prosecution packet?

15:53 13        A.   After -- after Ms. -- I'm sorry.

15:53 14        Q.   Before the indictment, did you ever review the

15:53 15    prosecution packet?

15:53 16        A.   No, sir.

15:53 17        Q.   Ms. Barrera presented the charge alone?

15:53 18        A.   I -- I believe she did, but I -- I can't say

15:53 19    for sure, because I wasn't there.

15:53 20        Q.   Where were you when the case was presented?

15:53 21        A.   I was in Hebbronville, Jim Hogg County.

15:53 22        Q.   You were working on that day?

15:53 23        A.   Yes, sir.

15:53 24        Q.   After the grand jury true billed the

15:53 25    indictment, Ms. Barrera drafted the indictment; is that

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

226

15:53  1    correct?

15:53  2       A.  I -- I believe she did.

15:53  3       Q.  Who helped her draft the indictment?

15:53  4       A.  I don't know.

15:53  5       Q.  I'd like to introduce Plaintiff's previously

15:54  6    introduced Exhibit 17, the indictment.

15:54  7               MR. NAVARRO:  17?

15:54  8               MR. DONATTI:  This is Plaintiff's

15:54  9    Exhibit 17.

15:54 10       Q.  This indictment was signed on March 30th, 2022.

15:54 11    The indictment nowhere mentions the crime of homicide,

15:54 12    correct?

15:54 13       A.  Not the word "homicide," no.

15:54 14       Q.  The indictment instead says that the Defendant,

15:54 15    Ms. Lizelle Herrera, then and there intentionally and

15:54 16    knowingly caused the death of an individual J.A.H. by

15:55 17    self-induced abortion; is that correct?

15:55 18       A.  That's correct.

15:55 19       Q.  Did you assist in preparing this indictment?

15:55 20       A.  I did not.

15:55 21       Q.  Did you review this indictment before it was

15:55 22    submitted?

15:55 23       A.  I did not.

15:55 24       Q.  Did you approve of this indictment?

15:55 25       A.  No, sir.

Electronically signed by Donna McCown (101-253-986-8079)    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:01  1    already docketed in the court.  So I don't know what

16:01  2    case he was talking about.

16:01  3        Q.  So later that day, Mr. Villarreal sends you a

16:01  4    message with an attachment.  Do you know what that

16:01  5    attachment is?

16:01  6        A.  No, but I think you're mistaken.  It's not

16:01  7    later in that day.  It's the next day.

16:01  8        Q.  Oh, you're so right.  The next day

16:01  9    Mr. Villarreal sends you an attachment.  Do you know

16:01 10    what the attachment is?

16:01 11        A.  I can't -- I can't see it.  From here I can't.

16:01 12    If it was zoom -- if it was a little bit bigger, I

16:01 13    might be able to tell you what the attachment is.

16:01 14        Q.  And the next message is Mr. Villarreal saying,

16:01 15    "It's going to get political real quick."  Do you --

16:01 16        A.  Yes.

16:01 17        Q.  -- see that message?

16:01 18        A.  Yes.

16:01 19        Q.  What was he referring to there?

16:01 20        A.  I think he was -- I think he was referring to

16:01 21    Lizelle's case.

16:01 22        Q.  And what did he mean when he said it was going

16:01 23    to get political real quick?

16:01 24        A.  I guess because it involved an abortion.

16:01 25        Q.  Why is that political?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:01  1          A.  I just think the topic is very political.  I
16:01  2     think everybody knows that.
16:01  3          Q.  Did you agree that it was going to get
16:02  4     political real quick?
16:02  5          A.  I don't know if I did.  Let me see.  I don't
16:02  6     think I sent anything saying that I agreed.
16:02  7          Q.  And, in fact, the next eight messages are all
16:02  8     in a row from Mr. Villarreal --
16:02  9          A.  Right.
16:02 10          Q.  -- spanning two days?
16:02 11          A.  Yes, sir.
16:02 12          Q.  Would Mr. Villarreal have been receiving
16:02 13     responses to these messages he was sending you?
16:02 14          A.  No, not necessarily.
16:02 15          Q.  What was he referring in the next message on
16:02 16     April 8th, 2022, at 9:49 p.m. when he said, "Clarissa
16:02 17     sent me that"?  Who is Clarissa?
16:02 18          A.  She is a blogger.  I think he was referring to
16:02 19     a blogger who goes by the name of La Pistolera.  She
16:02 20     has a blog.  I think it's Valleywide now.  And whatever
16:03 21     he is referencing I guess was sent from her.  I'm
16:03 22     assuming it's her.
16:03 23          Q.  Great.  And on the next page, page 198.
16:03 24          A.  Okay.
16:03 25          Q.  The middle message, Mr. Villarreal texts you,

Electronically signed by Donna McCown (101-253-986-8079)                d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:03  1     and he says, "Yes, I agree."  What is he agreeing with?

16:03  2         A.  I don't know.  It's possible that we spoke on

16:03  3     the phone, because I don't see any messages from me, so

16:03  4     it would have been maybe a telephone conference.  I'm

16:03  5     not sure.

16:03  6         Q.  So you would have spoken to him on the phone

16:03  7     and then he would have texted you after that phone

16:03  8     call?  Is that a yes --

16:03  9         A.  I don't know.  I shouldn't guess.  But

16:03 10     that's -- that's my -- if I had agreed on text, you

16:03 11     have that.

16:03 12         Q.  Did you delete messages between you and

16:03 13     Mr. Villarreal?

16:03 14         A.  No, sir.

16:03 15         Q.  And then the next message, Mr. Villarreal says,

16:03 16     "As written, the homicide statutes do not apply."  Do

16:03 17     you see that?

16:03 18         A.  Oh, yes.

16:03 19         Q.  Do you agree?

16:03 20         A.  Yeah.  That was on the 9th.  That I know was

16:04 21     the Saturday that I had picked up the file, and there

16:04 22     was all kinds of -- it was a firestorm about the

16:04 23     indictment and the arrest.  And we were all trying to

16:04 24     figure out what was going on.

16:04 25                    And he obviously had looked at the statute

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

16:04  1    and was telling me that the homicide statute did not

16:04  2    apply to the case.

16:04  3        Q.  On the next page, 199, Mr. Villarreal texts

16:04  4    you, "That's interesting."  What is he referring to

16:04  5    here?

16:04  6        A.  Oh, I think he's referring to his prior text

16:04  7    where he says, "Even anti-abortion organizations are

16:04  8    supporting the decision."  And then he says, "That's

16:04  9    interesting."  Which, I mean, at that point in time, I

16:04 10    wasn't really replying to a lot of his texts because I

16:04 11    was busy trying to figure out how we were going to fix

16:05 12    this.

16:05 13        Q.  Okay.  On the next page, on page 200,

16:05 14    Mr. Villarreal says, "It's going to be okay.  It's

16:05 15    going to be okay.  We just need to let a week or two

16:05 16    pass."

16:05 17        A.  Yes.

16:05 18        Q.  Did you agree with him?

16:05 19        A.  I don't know.  I think he was trying to

16:05 20    reassure me that everything would be all right.  We

16:05 21    were all very, very down about what had happened, and

16:05 22    we were all down about the mistake that had been made.

16:05 23            And I think he was just trying to be a

16:05 24    friend at that point saying, you know, basically all

16:05 25    things will pass and this will pass too and we will be

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:08  1          A.  I don't know.

16:08  2          Q.  When did you decide to dismiss the case?

16:08  3          A.  The same day, that Saturday, the same day that

16:08  4     I picked up the file and we found out about 19.06.

16:08  5          Q.  So Ms. -- Ms. Gonzalez is arrested on

16:08  6     April 7th.

16:08  7          A.  Okay.

16:08  8          Q.  You picked up the file.  And did you decide to

16:08  9     dismiss the indictment after reading through the file?

16:08  10         A.  Yes.  I picked up the file on Saturday, I

16:08  11    believe it was April 9th, Saturday morning.  I think

16:08  12    you have a text to that effect.  And I started looking

16:08  13    at the file.

16:08  14               And as I was looking at the file, I

16:08  15    started getting phone calls and messages that

16:09  16    ultimately convinced me that I needed to dismiss the

16:09  17    indictment.

16:09  18         Q.  Did you decide to issue a press release before

16:09  19    deciding to dismiss the indictment?

16:09  20         A.  No.  I think I had thought about issuing a

16:09  21    press release, but I decided to issue a press release

16:09  22    for sure after I read the file and it was made aware of

16:09  23    19.06 and realized that we had made a mistake.  That's

16:09  24    when I ultimately decided I needed to do something

16:09  25    quickly.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:13 1      A.  Right.

16:13 2      Q.  So that was April 9th.  On April 10th, you meet

16:13 3  with Ms. Gonzalez?

16:13 4      A.  I did.  The next day was a Sunday.

16:13 5      Q.  You met in your office?

16:13 6      A.  In my office.

16:13 7      Q.  What exactly did you say to Ms. Gonzalez?

16:13 8      A.  I don't know exactly what I said.  I can

16:13 9  summarize what I said, but I don't know word for word

16:13 10  exactly what I said.

16:13 11     Q.  What -- can you characterize what you said?

16:13 12     A.  Yes.  I basically met with her and her attorney

16:13 13  and her -- I believe it was her mom and her stepdad or

16:13 14  her dad and her stepmom -- I'm not sure which -- and

16:14 15  her.  And I apologized to her.

16:14 16          I told her basically that we had made a

16:14 17  mistake and that I was going to put out a press release

16:14 18  indicating that we had made a mistake and that I was

16:14 19  going to dismiss the case ASAP.

16:14 20     Q.  What was the mistake?

16:14 21     A.  The mistake was her being indicted.

16:14 22     Q.  Why do you call it a mistake?

16:14 23     A.  Because she should not have been indicted.

16:14 24     Q.  Who made the mistake?

16:14 25     A.  The grand jury.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

240

16:14  1          Q.  Is it the grand jury's responsibility to decide

16:14  2     what the law is?

16:14  3          A.  No, no.  It's the DA's office responsibility to

16:14  4     decide what the law is.

16:14  5          Q.  Is it the grand jury's responsibility to see

16:14  6     that justice is done?

16:14  7          A.  It's the DA's office, the prosecutor's office

16:14  8     to make sure that justice is done.

16:14  9          Q.  Is it the DA's office to determine whether

16:14  10    probable cause exists?

16:14  11         A.  That could be either the DA's office or a grand

16:15  12    jury.  Actually, a grand jury is the ultimate

16:15  13    decisionmaker on probable cause on an indictment.

16:15  14         Q.  Do you hold the grand jury responsible for

16:15  15    Ms. Gonzalez's indictment?

16:15  16         A.  No, I don't.

16:15  17         Q.  Who do you hold responsible for Ms. --

16:15  18         A.  We made the mistake.

16:15  19         Q.  So I'd like to show you what was previously

16:15  20    introduced as Plaintiff's Exhibit 4.  While we sort --

16:15  21    strike that.

16:15  22              MR. NAVARRO:  What's the number on this?

16:15  23    4?

16:15  24         Q.  I'm showing you what has previously been marked

16:15  25    as Plaintiff's Exhibit 4.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:25 1    well, they weren't even really involved with the case.

16:25 2    So I'm sure they found out about the dismissal.  I

16:25 3    don't remember telling them specifically about the

16:25 4    dismissal.

16:25 5        Q.  Did you discuss what had gone wrong with your

16:25 6    team?

16:25 7        A.  No.  That discussion happened on Saturday

16:25 8    the 9th and what -- you know, what I discovered had

16:25 9    gone wrong is that we just didn't know about 19.06.

16:25 10       Q.  So you discovered that you didn't see 19.06 and

16:25 11   that was the entirety of the issue?

16:25 12       A.  I discovered that -- actually, it appeared that

16:25 13   none of us were aware of 19.06.  I don't know that

16:25 14   Alfredo was actually involved in this, because Alfredo

16:25 15   was fairly new.  But I know that -- that nobody knew

16:26 16   about 19.06 until Saturday the 9th.

16:26 17       Q.  Did you speak to the grand jury panel after --

16:26 18       A.  No, sir.

16:26 19       Q.  Okay.  I'd like to bring back what has

16:26 20   previously been marked as Exhibit 23.

16:26 21               (Discussion)

16:26 22       Q.  In fact, we've already seen this one.  Here you

16:26 23   go.

16:26 24       A.  Thank you.

16:27 25               MR. NAVARRO:  This is 23?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:44  1          A.   Okay.

16:44  2          Q.   -- it says, "As for the findings of fact, I

16:45  3     have no dispute with the wording of findings Nos. 1, 2,

16:45  4     3, 4, 5, 6, 8, 9, and 10."  And you request a change to

16:45  5     No. 7.

16:45  6          A.   Okay.

16:45  7          Q.   This concerns the singular and plural as we

16:45  8     just described.

16:45  9          A.   Okay.  Yes, sir.

16:45 10          Q.   Why didn't you request a similar change with

16:45 11     the other findings where plural ADAs are spoken about?

16:45 12          A.   I probably didn't catch it.  And I'm assuming

16:45 13     Mr. Hackett didn't catch it either, because I think he

16:45 14     agreed to it right away.

16:45 15          Q.   Okay.  Next e-mail, Mr. Hackett agrees to the

16:45 16     change --

16:45 17          A.   Okay.

16:45 18          Q.   -- or, rather, five days later.

16:45 19          A.   Okay.

16:45 20          Q.   And then you respond and say, "I'd like to

16:45 21     change No. 4."

16:45 22          A.   Yes.  And what was happening, of course, is, as

16:45 23     we were exchanging these e-mails, I would reread the

16:46 24     proposed findings of fact, and I would find something

16:46 25     else that I wanted changed.  And I was learning very

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:46 1  quickly that I could at least make these requests.

16:46 2          And then I don't know if he was sending

16:46 3  them on to the panel.  I know that Mr. Hackett was not

16:46 4  the one making these decisions, because he would always

16:46 5  have to get back to me.  And he would -- it was very

16:46 6  clear that he had to consult with somebody, and I'm

16:46 7  assuming it was the panel chair.

16:46 8      Q.  And on No. 4, your request was to remove the

16:46 9  language concerning abortion.  And you say, "I

16:46 10 respectfully contend that the, quote, self-induced

16:46 11 abortion language is inflammatory."  What do you mean

16:46 12 by that?

16:46 13     A.  Because abortion was such a contentious -- is

16:46 14 such a contentious issue, was a contentious issue then.

16:46 15 And as I state further down in my e-mail, we were

16:46 16 getting -- at the very beginning, we were getting

16:47 17 hundreds of e-mails, some of them threatening, some of

16:47 18 them basically just asking me to -- to make it right.

16:47 19         I received a package at my office with

16:47 20 coat hangars in it.  I was worried about what I was

16:47 21 going to get into in my private mailbox at home.  In

16:47 22 fact, when I saw the lawsuit that was filed by you

16:47 23 guys, you actually put my home address on that lawsuit

16:47 24 on the original petition, which bothered me a lot,

16:47 25 because I was -- I was being threatened.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

16:47  1          And I think Alex was getting some of those

16:47  2  threats also.  And that was surprising to me.  Because

16:47  3  I'm a democrat.  And I was just shocked at the level of

16:48  4  vitriol that was coming from people who just didn't

16:48  5  understand that a mistake had been made, who were -- in

16:48  6  fact, the -- the professor who filed the grievance

16:48  7  against me, Ms. Grossman -- who I don't know, doesn't

16:48  8  even live in the jurisdiction -- she basically in her

16:48  9  grievance said that I had indicted Ms. Gonzalez for

16:48  10  political or personal reasons.

16:48  11         And that struck me as being so

16:48  12  presumptuous, because she didn't know me.  And if she

16:48  13  knew me and -- or she knew Ms. Barrera, it would be

16:48  14  clear to her that a mistake had been made and it had

16:48  15  not been for political or personal reasons.

16:48  16         So putting abortion back into a finding of

16:48  17  facts was, I believe, not necessary and was just going

16:49  18  to result in more threats, more vitriol, and endanger

16:49  19  not only me and my family, but Alex and her family, and

16:49  20  people at the office.

16:49  21     Q.  Abortion had been present in this case from the

16:49  22  beginning?

16:49  23     A.  Abortion had been present in the case from the

16:49  24  beginning.  And it was something that was very

16:49  25  contentious.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:49 1      Q.  And Ms. Gonzalez didn't put abortion into the

16:49 2  case.

16:49 3      A.  No, I'm not saying she did.  I've never blamed

16:49 4  Ms. Gonzalez for what happened.  Not once have I blamed

16:49 5  Ms. Gonzalez.  Ms. Gonzalez was a victim.  But by the

16:49 6  same token, I know that this was a mistake.  It was not

16:49 7  done intentionally.

16:49 8          And, quite honestly, the allegations that

16:49 9  were made in your original petition were, in my

16:49 10  opinion, just crazy, unfounded allegations.  The

16:50 11  allegations of conspiracy, the allegations that we

16:50 12  conspired to do this to Ms. Herrera when I know and

16:50 13  Alex knows, we all know that this was a mistake.

16:50 14          And a lot of times, the simplest

16:50 15  explanation is the correct explanation.  And in this

16:50 16  case, the simplest explanation is it was a mistake and

16:50 17  that's the correct explanation.

16:50 18          So I was concerned about putting language

16:50 19  like this in a findings of fact.  And I think

16:50 20  Mr. Hackett agreed with me, or whoever made the

16:50 21  ultimate decision to remove that language agreed with

16:50 22  me.  Sorry for the long-winded answer.

16:50 23      Q.  That's okay.  I think maybe we can break for a

16:50 24  bit.

16:50 25      A.  Well, I'd like to also point out something

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:50 1    before we break for a little bit, because this I think

16:50 2    is real important.

16:50 3              In the same exhibit that you're talking

16:51 4    about, if you go up to the message -- the e-mail that I

16:51 5    sent him on January the 19th at 11:47 where I ask

16:51 6    for -- to change some of the language.  And I ask --

16:51 7    and I tell him basically that I wanted the proposed

16:51 8    language removed because the language that they were

16:51 9    trying to put in made it sound like I knew about 19.06

16:51 10   and that my assistant knew about 19.06 and purposely

16:51 11   ignored the statute.  That's in my e-mail, the one that

16:51 12   you've failed to mention on this exhibit.

16:51 13             And I believe Mr. Hackett agreed with me.

16:51 14   And he modified the language, because I did tell him

16:51 15   that neither one of us was aware of 19.06.

16:51 16   Q.  Thank you.

16:51 17   A.  You're welcome.

16:51 18             MR. NAVARRO:  This Exhibit 38 that you

16:51 19   handed me --

16:51 20             MR. DONATTI:  Yes.

16:52 21             MR. NAVARRO:  -- that is Bates-marked

16:52 22   Defendants' 197 through 2000 --

16:52 23             MR. DONATTI:  Are we still on the record?

16:52 24             MR. NAVARRO:  Yes, on the record. -- under

16:52 25   optional completeness on your exhibit, I would ask that

Electronically signed by Donna McCown (101-253-986-8079)                d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:52  1    you go back to the production packet that we gave you,

16:52  2    because the exhibit includes -- the Outlook e-mails

16:52  3    start at 194, 195 --

16:52  4                MS. JOHNSON:  Let's go off record.

16:52  5                MR. NAVARRO:  -- 196.

16:52  6                MR. DONATTI:  I don't understand.

16:52  7                MR. NAVARRO:  Well, the exhibit is

16:52  8    incomplete.  So when he tells you this is incomplete,

16:52  9    it is incomplete.  And that this -- I was concerned

16:52 10    that we hadn't produced this to you, but you have these

16:52 11    additional pages.

16:52 12                THE WITNESS:  Yes.

16:52 13                MR. NAVARRO:  So I would ask that the

16:52 14    exhibit be complete under the rule of optional

16:53 15    completeness.

16:53 16                MR. DONATTI:  So what I will tell you is,

16:53 17    yes, the grievance file was shared with us.  The

16:53 18    grievance file does not contain the earlier exchange

16:53 19    about the original proposed findings of fact or the

16:53 20    earlier exchange about disagreements as to the earlier

16:53 21    proposed findings of fact.

16:53 22                That exhibit is hundreds of pages, so we

16:53 23    excerpted it so that we could go over the materials

16:53 24    that you provided.  But I stand by what I said, that

16:53 25    this does not include what Mr. Ramirez was referring to

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:53  1      specifically.

16:53  2                  MR. NAVARRO:  Well, I do want him to read

16:53  3      and sign his depo.  So we'll go -- make sure he goes

16:53  4      through it.  But, I mean, you're right, the exhibit is

16:53  5      345 pages.

16:53  6                  MR. DONATTI:  Yes.

16:53  7                  MR. NAVARRO:  So I just wanted to make

16:53  8      sure, there are some pages that are -- appear to be

16:53  9      ahead of this one Exhibit 38.

16:53 10                  MR. DONATTI:  I represent we extracted the

16:54 11      entire thread at issue here.

16:54 12                  MR. NAVARRO:  But that's not what the

16:54 13      exhibit reflects.  It's not the entire thread.

16:54 14                  MS. JOHNSON:  I'm sorry.  May we go off

16:54 15      the record?  And I want to make sure we get this right

16:54 16      for you, Ric, so it's not an issue, that we can do

16:54 17      that.

16:54 18                  MR. NAVARRO:  I'm sorry, what?

16:54 19                  MS. JOHNSON:  May we go off the record

16:54 20      because of time?

16:54 21                  MR. NAVARRO:  Yeah, that's fine.

16:54 22                  (Brief recess)

17:08 23          Q.  We are returning from the short break.

17:08 24      Mr. Ramirez, did you speak with your attorney over the

17:08 25      break?

17:08  1          A.  I did.

17:08  2          Q.  Did you speak with anybody else?

17:08  3          A.  No.

17:08  4          Q.  Did you send messages to anybody else?

17:08  5          A.  No.

17:08  6          Q.  Why did you plead guilty to the grievance

17:08  7     findings?

17:08  8          A.  I didn't plead guilty.

17:08  9          Q.  Why did you agree to the findings of facts?

17:08  10         A.  I agreed to the findings of fact because I was

17:08  11    told by the investigator that I had two options:  I

17:08  12    could enter into an agreement on the findings of fact,

17:09  13    or if I didn't come to an agreement on the findings of

17:09  14    fact, I would -- the next step would be a trial in

17:09  15    Starr County.

17:09  16         Q.  You didn't want to go to trial?

17:09  17         A.  I did not want to go to trial.  That would have

17:09  18    been a total disruption of my office.

17:09  19         Q.  It would have been a destruction because you

17:09  20    would have had to --

17:09  21         A.  Not a destruction, a disruption.

17:09  22         Q.  It would have been a disruption because you

17:09  23    would have had to air out what happened in this case?

17:09  24         A.  No.  It would have been a disruption because it

17:09  25    would have continued the grievance procedure.  I would

**BRYANT & STINGLEY, INC.**

**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

17:09 1    have had to prepare for trial.  I would have had to put

17:09 2    all my energy into defending myself in a trial over a

17:09 3    period of months, if not a year.

17:09 4                Whereas, if I agreed to a findings of fact

17:09 5    and a judgment, which I did, that would end it at that

17:09 6    point, and I would serve out whatever sanction was

17:10 7    issued, and it would be over with, which it is.  It was

17:10 8    the right decision to make for the office and for me

17:10 9    personally also.

17:10 10        Q.  You agree that you failed to refrain --

17:10 11        A.  Can I see the exhibit?

17:10 12        Q.  Of course.

17:10 13             (Discussion).

17:10 14        Q.  You agree that you failed to refrain from

17:10 15    prosecuting a charge that was known not to be supported

17:10 16    by probable cause, correct?

17:10 17        A.  That is the fifth finding of fact.

17:10 18        Q.  And you still agreed to that?

17:10 19        A.  That we present -- that she was indicted for a

17:10 20    charge that was later known not to be supported by

17:11 21    probable cause -- that was not supported by probable

17:11 22    cause?  Yes.

17:11 23        Q.  You knew that the charge was not supported by

17:11 24    probable cause on February 1st, correct?

17:11 25        A.  No, I did not.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

17:11 1    Q.  You told Ms. Barrera, "We do not have enough

17:11 2    evidence here" on February 1st; is that correct?

17:11 3    A.  No, I did not.

17:11 4    Q.  The next --

17:11 5    A.  In fact, where it says that I failed to

17:11 6    respond -- refrain from prosecuting a charge that was

17:11 7    known, I don't know who they're talking about that it

17:11 8    was known, because I made it very clear to Mr. Hackett,

17:11 9    and the e-mails reflect that I made it clear to

17:11 10   Mr. Hackett that neither Ms. Barrera or myself were

17:11 11   aware of 19.06, and neither was Mr. Villarreal.

17:11 12   Q.  And No. 8.

17:11 13   A.  Okay.

17:11 14   Q.  What were the violations of disciplinary rules

17:11 15   by your assistant district attorneys?

17:11 16   A.  No, no.  It's -- the violation of the

17:11 17   disciplinary rules I'm assuming was the presentation of

17:11 18   the case to a grand jury.  The failure to take remedial

17:12 19   action, I didn't understand that, because that finding

17:12 20   that I failed to take remedial action or mitigate

17:12 21   consequences, their -- their take -- the grievance

17:12 22   committee's take on that was that remedial action would

17:12 23   have been to discipline Ms. Barrera.

17:12 24          My understanding of that was that

17:12 25   Ms. Barrera was not going to -- my discipline --

17:12  1    disciplining Ms. Barrera was not going to remedy the

17:12  2    situation.  Remedial action in my opinion is action

17:12  3    that would correct the situation.

17:12  4              But I agreed to that finding of fact

17:12  5    because that was their interpretation that I had --

17:12  6    should have sanctioned or somehow disciplined

17:12  7    Ms. Barrera and I failed to do that.

17:12  8    Q.  No. 10, it says In connection with the

17:13  9    investigation made the basis of this disciplinary

17:13  10   matter, respondent, you, Mr. Ramirez, knowingly made a

17:13  11   false statement of material fact in your written

17:13  12   response to the complaint.  What was the false

17:13  13   statement of material fact?

17:13  14   A.  It was in the written -- my first written

17:13  15   response to the grievance.  I put in that response that

17:13  16   I was not aware of any of the facts of the case.  And

17:13  17   then when we had the actual investigatory hearing, I

17:13  18   told them that I had been briefed on some of the facts

17:13  19   by Ms. Barrera, which I had been.

17:13  20             So Mr. -- I told Mr. Hackett that -- he

17:13  21   said, Well -- he said, "It's not that big a deal."  He

17:13  22   said, "Your initial response to the grievance was not

17:13  23   under oath, and it's more of a technical issue, because

17:13  24   you've put down in your original answer that you had

17:14  25   not been briefed on any of the facts," when, in fact, I

17:14  1    had been briefed on some of the facts.

17:14  2        Q.  And you agreed to these findings of fact,

17:14  3    correct?

17:14  4        A.  I agreed to -- to these findings of fact to

17:14  5    resolve the case, yes, I did.

17:14  6        Q.  In fact, you negotiated back and forth on the

17:14  7    language to be used.

17:14  8        A.  I negotiated?

17:14  9        Q.  Correct.

17:14 10        A.  I negotiated on everything, including the --

17:14 11    the fees and expenses.  Even that was negotiated.

17:14 12        Q.  So going back to the aftermath of the -- well,

17:14 13    let's go back to early April of 2022.  Who else did you

17:14 14    talk to that we haven't discussed yet about the arrest

17:14 15    of Lizelle Gonzalez?

17:14 16        A.  Besides my family, I don't -- and the people

17:14 17    that we've discussed, I can't think of anybody else

17:15 18    that I discussed it with.

17:15 19        Q.  You spoke to Rosita Rocha about the arrest of

17:15 20    Lizelle Gonzalez?

17:15 21        A.  I don't remember talking to her about the

17:15 22    arrest of Lizelle Gonzalez.

17:15 23        Q.  What is your relationship with Ms. Rocha?

17:15 24        A.  She's also an acquaintance.  I know her.  She

17:15 25    used to work at the sheriff's department when I first

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

2020

*Gocha*

RAMIREZ
FOR 229TH DISTRICT ATTORNEY

## *To the Residents of*
# STARR ★ JIM HOGG ★ DUVAL

On March 3, 2020, the residents of the 229th Judicial District will decide by their vote as to whether they want to keep the status quo in our District Attorney's office or whether you are ready for a new era. As your new DA, I will take office with very specific changes. This is my platform.

### 1. I WILL RESTORE HONOR AND INTEGRITY TO THE DA's OFFICE

The DA's job is to prosecute crime regardless of political affiliation of the accused or the victim. I will remove the "politics" from decision making in the District Attorney's office. No person will be subject to investigation, harassment or prosecution merely because of their political affiliation. The public loses faith in the integrity of our justice system if politics is the source of the outcome. That practice ends on my watch.

### 2. I WILL WORK CLOSELY WITH ALL LAW-ENFORCEMENT AGENCIES IN ALL 3 COUNTIES

I will work closely with all our different law-enforcement agencies to prosecute crime in our communities. All 3 Counties will receive the attention and cooperation needed by their respective agencies. I will eliminate any current feuding and/or distrust that exists between law-enforcement and the District Attorney's office. No County in the 229th should be treated differently than any other when it comes to the DA's attention. Teamwork, not division, is the key to effective law-enforcement. Interagency trust in the District Attorney's office, in all 3 Counties, is paramount.

### 3. I WILL END THE MISUSE AND ABUSE OF CHAPTER 59 FORFEITURE FUNDS AND UNWARRANTED FORFEITURE PRACTICES

Drug forfeiture funds should not be abused or misused by the DA's office. The current practice of inappropriately seizing and confiscating property NOT CONNECTED TO ILLEGAL ACTIVITY WILL END. And drug forfeiture funds will be strictly used for the purposes for which they were designed. The practice of seizing everything in sight will end. The use of Chapter 59 forfeiture funds will be transparent, as it should be. Today, we know nothing about this fund or how the money is being spent. And employees of the DA's office and seizing agencies will be strictly prohibited from "ending up" with ownership of property that has been seized.

### 4. I WILL IMPLEMENT A MORE PROGRESSIVE APPROACH TO PROSECUTION OF NON-VIOLENT DRUG OFFENDERS

I will implement an approach to the prosecution of 1st time, small quantity, non-violent drug offenders. My approach would allow these offenders the opportunity to get their lives back on track. It is important that when a violent crime is committed, such as murders, assaults and sex crimes involving children, that the perpetrators be severely punished. But, many times, it is necessary to recognize that not everyone needs punishment that forever alters their life and future prospects. What many charged with these minor offenses need is help, rehabilitation and a second chance at life.

### 5. I WILL MAKE THE VICTIMS AND THEIR FAMILIES A PRIORITY

Until I declared my candidacy, the families of victims of violent crimes were, many times ignored and/or disrespected. Victims and their families will, once again, be treated with respect and dignity. And they will become a priority during my tenure.

### 6. LET THE CONCEPT OF TEAMWORK BACK INTO THE DA's OFFICE

I will bring transparency and the concept of "teamwork" back into the DA's office. The turnover of employees in the DA's office, because of the dark atmosphere present today, is concerning. My door will always be open to my employees and Assistants. The practice of giving "special deals" to certain individuals will end. This type of selective prosecution is demoralizing to staff that work so hard to prepare cases for prosecution. And it is contrary to the very definition of what a prosecutor's job is..."to see that justice is done". CCP ART 2.01. The foundation of justice will no longer be compromised by politics.

### 7. I WILL BUILD PARTNERSHIPS

I will build strong partnerships with other entities, both public and private, in our communities. People in our communities who work towards helping those in need will be assisted and not punished, regardless of who they support politically. New partnerships will be established to assist victims and their families. Through education, engagement and partnership, law-enforcement's presence in our communities will be strengthened and faith in our justice system restored.

### 8. I WILL BE A WORKING DISTRICT ATTORNEY

I will be committed to being present in the District Attorney's office on a consistent and regular basis and accessible to all our constituents. I will actively assist my staff with the duties and responsibilities of a D.A., including being in the Courtroom for Docket Call and trying cases. I will get into the Courtroom and try cases. That is what I do. I will be a litigator first and an Administrator second. Not just during an election cycle but throughout my tenure.

Over the course of the next 5 months, I will expand on each of my platform points. I will stay positive, civil and point out the changes I wish to implement. I will not engage in the "politics of personal destruction" nor will I give credence to those who do, whether they support me or not. On March 3, 2020 you will make your choice and I will respect it.

MORE OF THE SAME... OR A NEW ERA IN LAW-ENFORCEMENT IN STARR, JIM HOGG AND DUVAL COUNTIES. THE CHOICE WILL BE YOURS

Sincerely

*Gocha*

Gocha A. Ramirez | The People's D.A.
For 229th District Attorney
www.gocharamirez.com
Email: info@gocharamirez.com

🐦 📘 📷

Political Ad'v't Paid for by The Gocha Allen Ramirez for District Attorney of the 229th Judicial District Campaign. Dr. Norberto Cantú, Jr., Treasurer. 506 East 2nd Street - Rio Grande City, TX 78582



Plaintiff

EXHIBIT NO. 29

4-7-25

## Feds reinstate funding for Starr Co. HIDTA task force

The Monitor (McAllen, Texas)

December 15, 2020 Tuesday

Copyright 2020 The Monitor

Distributed by Tribune Content Agency

**Section:** STATE AND REGIONAL NEWS

**Length:** 952 words

**Byline:** Berenice Garcia, The Monitor, McAllen, Texas

# Body

Dec. 15—After suspending funding for the Starr County High Intensity Drug Trafficking Area task force in June, South Texas HIDTA agreed to reinstate funding beginning next month.

The South Texas HIDTA executive board voted to reinstate the funding during a board meeting in San Antonio on Dec. 9, during which incoming 229th District Attorney Gocha Ramirez, incoming Assistant District Attorney Abel Villarreal Jr. and incoming HIDTA Commander Manuel Marroquin successfully made their case to the board to have funding restored.

The reinstatement of the funds will coincide when Ramirez takes office as the new 229th district attorney, an office which prosecutes cases for Starr, Duval and Jim Hogg counties.

The 229th District Attorney's Office oversees the Starr County HIDTA task force which consists of law enforcement officers from different agencies throughout the county such as the Rio Grande City Police Department and the Starr County Sheriff's Office.

Ramirez explained that work on re-establishing the task force began before it was actually suspended.

In May, Ramirez said a friend who was a member of the HIDTA executive board, told him the board was considering defunding the program in Starr County and had apparently been looking at the task force since 2017.

"There's been some terrible mismanagement, they're obviously not fulfilling their mission, there's some serious issues with HIDTA and so they're thinking about just doing away with HIDTA," Ramirez said he was told.

But because there would be change in administration with Ramirez's election, the board only suspended funds and stated they would reassess the suspension after Dec. 31.

About a week after, Ramirez said he met with members of the executive board, the HIDTA commander in Hidalgo County and his assistant, and also with the executive director of South Texas HIDTA, Tony Garcia.

"They started, basically, going through a very long laundry list of things that HIDTA was doing wrong in Starr County or ... things that they should have been doing but they were not doing," Ramirez said. "A lot of it involved the fact that they were just not doing what they were designed to do — they were picking low-hanging fruit, they were making up numbers, they were using their cellphones for private business and personal use, they were misusing HIDTA vehicles, (and) they had built in their overtime into their salaries, which freaks me out completely because there's no incentive to do overtime if it's built into your salary."

Plaintiff
EXHIBIT NO. 30
4-7-25
Donna McCown

In response to those allegations, current 229th District Attorney Omar Escobar Jr. said the only thing that was brought up to his attention was the issue of statistics.

"The HIDTA initiative wanted more arrests and wanted more persons identified," Escobar said, referring to people involved in drug trafficking organizations.

"In the end, all of the grant funding is about stats," Escobar said. "It's about how many people you arrest and not just how many people you arrest but how many people you identify."

And that had became an issue for the Starr County task force, Escobar acknowledged.

"There had been a drop off of numbers in the past two years, I'll admit that," Escobar said.

For that, he credited the increased presence of state and federal law enforcement agencies along the border.

"If you catch something on the river and Border Patrol hands over the case, because that's what usually happens, Border Patrol would go and arrest somebody and, rather than the feds take the case, they would turn over the body of the person and the marijuana or the drugs over to the HIDTA task force," Escobar explained. "And the HIDTA task force would consider it a statistic. But up there, in San Antonio, they'd say 'Well, that's not really a statistic ... because Border Patrol took it down."

He added, "Most of the stats that were coming in were from Border Patrol and, remember, the aerostats also had an effect on drug trafficking in Starr County."

"Did it eliminate it? No. But those aerostats are watching, whenever they're up, they're watching the entire border," Escobar said.

He reiterated that HIDTA wanted not just isolated drug arrests but that those arrests be tied to drug trafficking organizations.

"It became somewhat more difficult to be able to tie these people into drug trafficking organizations and that's really what HIDTA wants," Escobar said. "If you get a drug seizure, they really want you to tie it into some organization. It can't just be some individual."

With the reinstatement of the program, Escobar said Ramirez's administration must have made assurances regarding those statistics.

"I think in the end, to get anything back, that's what it's going to come down to," Escobar said. "It sounds to me like representations were made that more people would be arrested and that there's going to be more members of drug trafficking organizations identified."

Ramirez said that in addition to putting together the strategic plan, he also implemented a policy and procedures manual to address the employees of the district attorney's office and also all the issues that were damaging the task force, such as the use of informants, the payment of informants, the use of vehicles, and the alleged failure to cooperate with federal agencies.

During a Starr County Commissioners Court meeting on Monday, Villarreal, the incoming first assistant district attorney, said U.S. Customs and Border Protection, the National Guard, Border Patrol, the Drug Enforcement Administration, and the Department of Homeland Security would be assigning full-time members to the task force.

___ (c)2020 The Monitor (McAllen, Texas) Visit The Monitor (McAllen, Texas) at _www.themonitor.com_ Distributed by Tribune Content Agency, LLC.

## Classification

Feds reinstate funding for Starr Co. HIDTA task force

**Language:** ENGLISH

**Publication-Type:** Newspaper

**Journal Code:** MC

**Acc-No:** 20201215-MC-Feds-reinstate-funding-for-Starr-Co-HIDTA-task-force-1215

**Subject:** PUBLIC PROSECUTORS (91%); BOARDS OF DIRECTORS (90%); CRIME, LAW ENFORCEMENT & CORRECTIONS (90%); NEGATIVE NEWS (90%); CONTROLLED SUBSTANCES CRIME (89%); NARCOTICS ENFORCEMENT (89%); ARRESTS (78%); DRUG TRAFFICKING (78%); SHERIFFS (78%); ASSOCIATIONS & ORGANIZATIONS (77%); EXECUTIVES (77%); TALKS & MEETINGS (77%); POLICE FORCES (74%); GRANTS & GIFTS (73%); NEGATIVE BUSINESS NEWS (70%); LAW ENFORCEMENT (69%); WAGES & SALARIES (63%)

**Industry:** PUBLIC PROSECUTORS (91%); MOBILE & CELLULAR TELEPHONES (50%)

**Geographic:** MCALLEN, TX, USA (90%); SAN ANTONIO, TX, USA (79%); TEXAS, USA (94%)

**Load-Date:** December 15, 2020

---

End of Document

## _Escobares officials' arrests politically motivated, defendant claims_

The Monitor (McAllen, TX)

9 October 2021

Copyright 2021
Distributed by Newsbank, Inc. All Rights Reserved

**Section:** LOCAL NEWS

**Length:** 1077 words

**Byline:** Valerie Gonzalez, THE MONITOR



# Body

Two city employees were arrested in Escobares a week ago after a grand jury indicted them on forgery charges, and one of the defendants believes the investigation has political undertones, a claim the district attorney called "laughable."

Lauro Ramirez, the fire chief in Escobares, and Lynette Montemayor, the city secretary, were indicted Sept. 24 by a grand jury in Starr County. The two are married, but currently separated, Ramirez said.

Ramirez is facing five counts of forgery related to official forms that were used to show proof of the purchase of a 2001 Chevrolet vehicle on May 25, according to the indictment.

The court records show Ramirez was accused of providing false information and illegally signing the name of a seller, Sonia T. Diaz, on a Starr County affidavit of fact form, as well as providing false information on an assignment of title for a motor vehicle sold on May 25, and providing false information and illegally signing the name of Diaz on an application for Texas title and/or registration.

Montemayor was only charged with providing false information as a notary public on the affidavit of fact.

Starr County District Attorney Gocha Allen Ramirez released a statement following their arrests in which he mentioned the charges and their official titles as fire chief and city secretary for Ramirez and Montemayor, respectively.

"Identifying, investigating, and prosecuting public corruption in our communities, in partnership with federal and state law-enforcement, continues to be a priority of the 229th Judicial District Attorney's Office," his statement read.

The district attorney said the investigation sprung from an unrelated probe in March, but declined to explain whether the charges were related to their duties in office.

"The fact that they're public servants and that from the press release there may have been some involvement with the city or at least in their capacity as public servants, I think that's pretty clear from the press release," the DA told The Monitor on Wednesday,

Although many defendants usually abstain from speaking about their cases so early in the judicial process, Lauro Ramirez also spoke to The Monitor and said the vehicle he claimed to be his own was purchased privately, not as a city vehicle.

The prosecution has yet to provide court records or discovery to defense attorneys. However, details from a police report obtained by The Monitor match the date, vehicle description and vehicle VIN number listed on the indictment.

Escobares officials' arrests politically motivated, defendant claims

According to the police report, around 9 p.m. on May 22, a 2001 Chevrolet pick-up truck was abandoned after a suspicious entourage of three vehicles, including the pickup truck, were spotted driving in northern Escobares on Docker Road. A police officer was dispatched that way after a report of migrants damaging a fence line and property nearby at North San Julian Road.

The officer stated the vehicle slowed down as they approached the Docker and San Julian intersection. The two vehicles traveling behind the Chevrolet pickup truck stopped before reaching the intersection and turned back, heading west on Docker; meanwhile, the driver of the pickup truck was parked across the road, pointing north and south, and blocking traffic.

Although the officer approached the truck, an eyewitness said the driver fled into the brush. Police seized the truck and filed the report for the abandoned vehicle.

Lauro Ramirez told The Monitor he purchased the vehicle through a verbal agreement, claimed the truck a few days later and paid the fee to get the truck released to him.

"This is where everything went sideways," Lauro Ramirez said.

Four months later, a grand jury determined probable cause existed in the charges alleged against him and his wife.

Initially, Lauro Ramirez hired Daniel Garcia as his defense attorney. Before the indictment, Garcia said he spoke to the DA's office through the lead assistant district attorney, Abel Villarreal.

Villarreal represented former Escobares City Secretary Rosario Ramirez, who was terminated and later replaced by Lauro Ramirez's wife, Lynette Montemayor.

"The way it works here in Starr County, it's a small community. It's not like in Hidalgo where they have 40 attorneys. Pretty much, they all interact over cases," Garcia told The Monitor on Thursday. "Has he [Villarreal] been involved with the case? Yes. Is he still on? I don't know. Is there other attorneys involved? I don't know."

Garcia represents Lynette Montemayor, and said he preferred not to comment on the case at this point.

Most recently, Ramirez took on another attorney, former DA Omar Escobar Jr., believing the situation is fraught with politics.

"I won't endorse somebody like them," Lauro Ramirez said, referring to the sitting district attorney and his political supporters. "So, I'm in the way."

Escobar defended his client's claims.

"I think Mr. Lauro Ramirez and Ms. Lynette Montemayor have every right to be both concerned and highly suspicious of the deep political undertones in the case," Escobar said via a statement shared with The Monitor. "Abel Villarreal has been intimately involved in this case from the start. Up until last week, Abel Villarreal has been handling this particular matter with defense attorney Daniel Garcia. Any claim otherwise is simply a lie."

The sitting district attorney, Gocha Allen Ramirez, refuted the claim when he spoke to The Monitor on Wednesday. He confirmed Villarreal spoke to Garcia several times prior to the indictment when Ramirez was out of the office.

"That's a ridiculous accusation. It's laughable, because I'm the one who is in charge of this investigation," the DA said. "I am the one who is in charge of this case. I have been at the forefront of all of this. Abel is my first assistant. Abel does what I tell him to do. So, when Mr. Ramirez, because Abel may have had a couple of discussions with Mr. Garcia and Mr. Garcia was his attorney, when Mr. Ramirez concludes that somehow it's political, that's a very convenient veil to hide behind, especially when you've committed a felony."

"All I can tell you is that the evidence against Mr. Ramirez is very strong. I can tell you that much."

Both Lauro Ramirez and Montemayor remain employed with the city, Mayor Ivan Escobar said.

Garcia said an arraignment on the indictment is tentatively scheduled in the coming weeks.

------------

Editor's note: This story's headline was updated to correct the number of defendants making the claim.

# Classification

**Language:** ENGLISH

**Subject:** ARRESTS (92%); NEGATIVE NEWS (92%); GRAND JURY (91%); INDICTMENTS (91%); CITY GOVERNMENT (90%); COUNTERFEITING & FORGERY (90%); FALSE STATEMENTS (90%); LAWYERS (90%); PRESS RELEASES (90%); PUBLIC PROSECUTORS (90%); CIVIL SERVICES (89%); CRIME, LAW ENFORCEMENT & CORRECTIONS (89%); CRIMINAL OFFENSES (89%); INVESTIGATIONS (89%); LAW COURTS & TRIBUNALS (89%); LAW ENFORCEMENT (89%); COUNTY GOVERNMENT (78%); CRIMINAL INVESTIGATIONS (78%); NEGATIVE MISC NEWS (78%); POLITICAL CORRUPTION (78%); US STATE GOVERNMENT (78%); NOTARIES (77%); ABANDONED VEHICLES (75%); CORRUPTION (73%)

**Industry:** LAWYERS (90%); PUBLIC PROSECUTORS (90%); MOTOR VEHICLES (89%); VEHICLE TITLES (78%); NOTARIES (77%)

**Geographic:** MCALLEN, TX, USA (73%); TEXAS, USA (79%)

**Load-Date:** October 10, 2021

**End of Document**

# 229th Judicial District Attorney's Office

## STARR ★ JIM HOGG ★ DUVAL

# Gocha Allen Ramirez
## District Attorney



Plaintiff

EXHIBIT NO. 32

4-7-25

Donna McCown

April 21, 2022

**Open Records Division**
Office of the Attorney General
P.O. Box 12548
Austin, Texas 78711

Re: Request for Open Records Letter Ruling; Information Requests for Records Relating to
Lizelle Herrera; 22-CR-61

To the Open Records Division of the Texas Attorney General's Office,

This is a request for an open records letter ruling for multiple requests for information received
by the 229th Judicial District Attorney's Office. The multiple requests are attached to this
request, and follow the indictment, arrest, and dismissal of the charge of murder for a self-
induced abortion. My office has attached the relevant documentation requested for your review.

The first issue and exception that my office claims in not releasing this information is that the
requested documents or videos, including reports written by law enforcement, contain medical
records and detailed accounts of medical procedures and discussions involving Lizelle Herrera
and medical personnel. We contend that these documents are protected from public disclosure
under Texas Government Code § 552.002(d), Texas Occupation Code § 159.002 and HIPPA.

Moreover, a number of documents in the constructive possession of the 229th Judicial District
Attorney's Office were produced to the Starr County Grand Jury subject to a Grand Jury
Subpoena Duces Tecum. Because these records were in response to actions taken by the 229th
Judicial District Attorney's Office as agents of the Grand Jury, disclosure of these documents fall
outside of the purview of the Open Records Act since the Grand Jury is deemed an extension of
the judiciary. *See* Open Records Decision No. 513 (1988); *see also* Texas Code of Criminal
Procedure Article 20A.202(b).

Additional information sought is the identity of the prosecutor who presented this matter before
the Grand Jury. No document exists that contains this requested information, and my office
contends that disclosing the details of a grand jury proceeding would violate Texas Code of
Criminal Procedure Article 20A.202(a) in which such proceedings are secret.

Lastly, requests for information includes the request for communications between the 229th
District Attorney's Office and the Starr County Sheriff's Office, and communications within the
District Attorney's Office. In regards to the matter involving Lizelle Herrera, all communications
requested for are subject to attorney-client privilege and work-product. Moreover, some of these
same communications involve the request for grand jury subpoenas to the District Attorney's
Office as agents of the Grand Jury and include medical and personal information of Lizelle
Herrera that is not subject to public disclosure for reasons previously stated.

Duval County District Attorney's Office
P.O. Drawer 1061, San Diego Tx. 78384
(361) 279-6220

Starr County District Attorney's Office
401 N.Britton Ave.STE. 417, Rio Grande City Tx. 78582
(956) 716-4800

Jim Hogg County District Attorney's Office
P.O. Box 340, Hebbronville Tx. 78361
(361) 527-4056

DEFENDANTS 000228

We have enclosed a USB drive containing all the items referred to in this request for Open Records Letter Ruling. The applicable requests for information by the different parties are contained in the file titled "Email Requests for Information".

Additionally, my office has released the indictment against Lizelle Herrera in cause number 22-CR-61 to all requestors, together with its accompanying capias and dismissal if so requested. Moreover, my office has disclosed the names of the Grand Jurors to requestors who have requested this information. *See* Open Records Decision No. 433 (1986). Lastly, my office has notified requestors of any information requested by them that resulted in no responsive documents or items from our office.

If you have any questions, please feel free to contact my office at (956)716-4800 or email First Assistant Abel Villarreal, Jr. at abel.villarreal@da.co.starr.tx.us. All correspondence may be mailed to the 229th District Attorney's Office, 401 N. Britton Ave., STE. 417, Rio Grande City, TX 78582

Respectfully,

*Gocha Allen Ramirez*
Gocha Allen Ramirez
229th Judicial District Attorney

DEFENDANTS 000229



From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

I didn't know that case was set

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/7/2022 10:06:46 AM(UTC-5) | |

Status: Read
Platform:

4/7/2022 9:57:52 AM(UTC-5)

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Attachments:

Title: IMG_6140.heic
Size: 132954
File name: ~/Library/SMS/Attachments/c8/08/at_0_8198ABBD-4221-4C17-BF58-20D67D299289/IMG_6140.heic
Path: https://p37-content.icloud.com/MF8F6246D115999CC0F4FCD09B94F7858B24A74ACAA1F08BFFA8840BDA4DFE77A.C01USI\60
~/Library/SMS/Attachments/c8/08/at_0_8198ABBD-4221-4C17-BF5B-20D67D299289/IMG_6140.heic

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | | |

Status: Read
Platform:

4/8/2022 9:48:10 PM(UTC-5)



From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

It's gonna get political real quick

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | | |

Status: Read
Platform:

4/8/2022 9:48:20 PM(UTC-5)



Plaintiff
EXHIBIT NO. 33
4-7-25
Donna McCown

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Clarissa sent me that

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | | |

Status: Read
Platform:

4/8/2022 9:49:19 PM(UTC-5)



From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Attachments:

Title: IMG_6141.heic
Size: 114844
File name: ~/Library/SMS/Attachments/16/06/at_0_6FCCDB5A-8A09-4033-927C-CFA1BFC51CC5/IMG_6141.heic
Path: https://p41-
content.icloud.com/MFBF8246D115999CC0F4FCD09B94F7858B24A74ACAA1F08BF
FA8B406DA48FE77A.C01USN00
~/Library/SMS/Attachments/16/06/at_0_6FCCDB5A-8A09-4033-
927C-CFA1BFC51CC5/IMG_6141.heic

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | | |

Status: Read
Platform:

4/8/2022 9:56:38 PM(UTC-5)



From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Apparently AOC shared it

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | | |

Status: Read
Platform:

4/8/2022 9:56:50 PM(UTC-5)

197

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Attachments:



Title: IMG_6154.heic
Size: 42860
File name: ~/Library/SMS/Attachments/d2/02/at_0_81DEE573-B4EC-4729-8E6F-
03738E527B05/IMG_6154.heic
Path: https://p36-
content.icloud.com/MF8F8246D115099CC0F4FCD09B94F7858B24A74ACAA1F08BF
FA68406DA4BFE77A.C01USN00
~/Library/SMS/Attachments/d2/02/at_0_81DEE573-B4EC-4729-
8E6F-03738E527B05/IMG_6154.heic

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 4:23:25 PM(UTC-5) | |

Status: Read
Platform:

4/9/2022 4:21:45 PM(UTC-5)

---

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Yes I agree

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 5:18:59 PM(UTC-5) | |

Status: Read
Platform:

4/9/2022 5:16:29 PM(UTC-5)

---

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

As written the homicide statutes do not apply

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 5:18:59 PM(UTC-5) | |

Status: Read
Platform:

4/9/2022 5:16:54 PM(UTC-5)

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Even anti abortion organizations are supporting the decision

Attachments:



Title: IMG_6210.heic
Size: 90528
File name: ~/Library/SMS/Attachments/b0/00/at_0_43D39599-2D53-44BD-A496-96658951B1F8/IMG_6210.heic
Path: https://p54-content.icloud.com/MF8F8246D115999CC0F4FCD09B94F7658B24A74ACAA1F08BFFA8B406DA4BFE77A.C01USIN00
~/Library/SMS/Attachments/b0/00/at_0_43D39599-2D53-44BD-A496-96658951B1F8/IMG_6210.heic

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/10/2022 5:45:15 PM(UTC-5) | |

Status: Read
Platform:

4/10/2022 5:44:59 PM(UTC-5)

---

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

That's interesting

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/10/2022 5:45:15 PM(UTC-5) | |

Status: Read
Platform:

4/10/2022 5:45:06 PM(UTC-5)

---

From: +19568445148 Ramirez (owner)

Yea. It's been a very interesting week overall. It's not going to be easy walking into our office tomorrow. But, once again, I thank you for all your help Abel. You helped me more than you know today

Priority: Normal
Status: Sent
Platform:

4/10/2022 5:49:31 PM(UTC-5)

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

It's gonna be okay. We just need to let a week or two pass

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/10/2022 5:50:40 PM(UTC-5) | |

Status: Read
Platform:

4/10/2022 5:50:23 PM(UTC-5)



From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Attachments:

Title: IMG_6227.jpeg
Size: 552229
File name: ~/Library/SMS/Attachments/ec/12/at_0_6FD7043F-4593-4C3F-A413-BF9AFA72876C/IMG_6227.jpeg
Path: https://p53-content.icloud.com/MF8F6246D115999CC0F4FCD09B94F78S8824A74ACAA1F086FFA8B406DA4BFE77A.C01USN00
~/Library/SMS/Attachments/ec/12/at_0_6FD7043F-4593-4C3F-A413-BF9AFA72876C/IMG_6227.jpeg

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/12/2022 6:54:49 AM(UTC-5) | |

Status: Read
Platform:

4/11/2022 10:53:49 PM(UTC-5)

From: +19568445148 Ramirez (owner)

Was Lauro fired also?

Priority: Normal
Status: Sent
Platform:

4/12/2022 7:19:04 AM(UTC-5)

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

I haven't received confirmation yet on him

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/12/202 2 7:20:06 AM(UTC -5) | |

Status: Read
Platform:

4/12/2022 7:19:31 AM(UTC-5)

---

From: +19568445148 Ramirez (owner)

Whenever you have time, would you please get into the office Facebook and remove all the comments about Ms. Herrera on the posts that don't have anything to do with her? They even hit the posts about Crime Victims

Priority: Normal
Status: Sent
Platform:

4/12/2022 7:23:59 AM(UTC-5)

---

From: +19568445148 Ramirez (owner)

https://apple.news/AaNG3XwLcRkWJz9viC7AYHw

Attachments:



Title: F1FF8B73-32A1-4B09-AFF3-113802B32263.7A74FF87-ED3E-4F1B-97FD-
25983E39AA98.pluginPayloadAttachment
Size: 1048084
File name: ~/Library/SMS/Attachments/d6/06/at_0_9E949F27-3E7C-4767-A9D2-
AA10EB127A04/F1FF8B73-32A1-4B09-AFF3-113802B32263.7A74FF87-ED3E-4F1B-
97FD-25983E39AA98.pluginPayloadAttachment
~/Library/SMS/Attachments/d6/06/at_0_9E949F27-3E7C-4767-A9D2-
AA10EB127A04/F1FF8B73-32A1-4B09-AFF3-
113802B32263.7A74FF87-ED3E-4F1B-97FD-
25983E39AA98.pluginPayloadAttachment

Priority: Normal
Status: Sent
Platform:

4/13/2022 1:10:03 PM(UTC-5)

---

From: +19568445148 Ramirez (owner)

Zoom

Priority: Normal
Status: Sent
Platform:

4/13/2022 2:56:12 PM(UTC-5)

201

From: +15562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

Logging in

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/13/202 2 2:58:20 PM(UTC -5) | |

Status: Read

Platform:

4/13/2022 2:56:23 PM(UTC-5)

From: +19568445012 Judy Solis
To: +19568445148 Ramirez (owner)

I'm on it

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/7/2022 2:11:48 PM(UTC-5) | |

Status: Read
Platform:

4/7/2022 2:11:39 PM(UTC-5)

From: +19568445148 Ramirez (owner)

https://apple.news/AaNG3XwLcRkWJz9viC7AYHw

Attachments:



Title: 210E7656-785A-45E4-96DE-A712977F656E.6076F5C7-62E6-4EC5-BF63-31D73AE3AD60.pluginPayloadAttachment
Size: 1048084
File name: ~/Library/SMS/Attachments/25/05/at_0_F27D9A31-ED66-4D5D-BEBC-D45C216BB0AB/210E7656-785A-45E4-96DE-A712977F656E.6076F5C7-62E6-4EC5-BF63-31D73AE3AD60.pluginPayloadAttachment
~/Library/SMS/Attachments/25/05/at_0_F27D9A31-ED66-4D5D-BEBC-D45C216BB0AB/210E7656-785A-45E4-96DE-A712977F656E.6076F5C7-62E6-4EC5-BF63-31D73AE3AD60.pluginPayloadAttachment

Priority: Normal
Status: Sent
Platform:

4/13/2022 8:53:18 AM(UTC-5)

From: +19568445148 Ramirez (owner)

Good morning Judy. Please call me when you have time. Thanks

Priority: Normal
Status: Sent
Platform:

4/21/2022 7:19:27 AM(UTC-5)

| # | | Deleted | * |
|---|---|---|---|



Plaintiff
EXHIBIT NO. 34
4-7-25
Donna McCown

From: +19568445148 Ramirez (owner)

We've obviously stirred up a hornet's nest with the Herrera indictment. So I would like to meet with you guys to discuss the press release I intend to release Monday. I'll be in McA this morning. Let me know when you're available to meet

Priority: Normal
Status: Sent
Platform:

4/9/2022 7:54:35 AM(UTC-5)

From: +19564374054 Alexandria Barrera
To: +19568445148 Ramirez (owner)

I can call in, I'll be in McAllen all day getting stuff ready for my shower tomorrow.

I'm available whenever to call in.

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 8:09:48 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 8:09:44 AM(UTC-5)



Plaintiff
EXHIBIT NO. 35
4-7-25
Donna McCown

From: +19567772099 Alfredo Garcia
To: +19568445148 Ramirez (owner)

I'll be on the road to Houston but will be available via phone as long as I have service.

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 8:39:12 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 8:18:08 AM(UTC-5)

From: +19568449912 Judy Solis
To: +19568445148 Ramirez (owner)

I'm available anytime before 2

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 9:14:23 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 9:12:40 AM(UTC-5)

From: +19562226041 Abel Villareal
To: +19568445148 Ramirez (owner)

I'm available in the afternoon

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 9:26:07 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 9:25:17 AM(UTC-5)

From: +19568445148 Ramirez (owner)

Thanks guys. I just picked up the file. Let me review it and then I'll get back to you. I'm getting some pretty heavy emails from all over the nation. And NBC just reached out for comment

Priority: Normal
Status: Sent
Platform:

4/9/2022 9:29:09 AM(UTC-5)

59

From: +19568449912 Judy Solis
To: +19568445148 Ramirez (owner)

Are you at the office boss?

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 9:46:49 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 9:46:29 AM(UTC-5)

From: +19568445148 Ramirez (owner)

No Judy. I just picked up the file. Don't worry about it. Let me review the file and put together a press release.

Priority: Normal
Status: Sent
Platform:

4/9/2022 9:48:42 AM(UTC-5)

From: +19568449912 Judy Solis
To: +19568445148 Ramirez (owner)

Ok

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 9:51:22 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 9:50:58 AM(UTC-5)

From: +19568445148 Ramirez (owner)

I'm trying to find where in the Code the definition of an "individual " includes an unborn child. Can anyone help me out

Priority: Normal
Status: Sent
Platform:

4/9/2022 10:24:54 AM(UTC-5)

60

From: +19564374054 Alexandria Barrera
To: +19568445148 Ramirez (owner)

It's under definitions

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 10:25:46 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 10:25:34 AM(UTC-5)

From: +19564374054 Alexandria Barrera
To: +19568445148 Ramirez (owner)

1.07 (26)

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 10:26:00 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 10:26:00 AM(UTC-5)

From: +19568445148 Ramirez (owner)

Ok. Thanks

Priority: Normal
Status: Sent
Platform:

4/9/2022 10:26:06 AM(UTC-5)

61

From: +19565733883 Rene Fuentes
To: +19568445148 Ramirez (owner)

https://www.anjournal.com/opinion/palacios-story

Attachments:

Title: 8D1687D8-8FE6-4E38-9142-FDCC6C0C2180.pluginPayloadAttachment
Size: 1150
File name: ~/Library/SMS/Attachments/b8/08/at_0_452CBA3E-ECE5-40A3-BA26-
17C1C0521300/8D1687D8-8FE6-4E38-9142-FDCC6C0C2180.pluginPayloadAttachment
~/Library/SMS/Attachments/b8/08/at_0_452CBA3E-ECE5-40A3-BA26-
17C1C0521300/8D1687D8-8FE6-4E38-9142-
FDCC6C0C2180.pluginPayloadAttachment



Title: D013578F-CF06-4E29-8D96-93D7B588FD89.pluginPayloadAttachment
Size: 32170
File name: ~/Library/SMS/Attachments/b9/09/at_1_452CBA3E-ECE5-40A3-BA26-
17C1C0521300/D013578F-CF06-4E29-8D96-93D7B588FD89.pluginPayloadAttachment
~/Library/SMS/Attachments/b9/09/at_1_452CBA3E-ECE5-40A3-BA26-
17C1C0521300/D013578F-CF06-4E29-8D96-
93D7B588FD89.pluginPayloadAttachment

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 3/2/2022 9:00:37 PM(UTC-6) | |

Status: Read
Platform:

3/2/2022 8:44:55 PM(UTC-6)

---

From: +19568445148 Ramirez (owner)

Good morning Sheriff. Did Ms. Herrera bond out? It seems that we've stirred up a hornet's nest and we're all getting semi threatening emails

Priority: Normal
Status: Sent
Platform:

4/9/2022 7:50:46 AM(UTC-5)

---

From: +19565733883 Rene Fuentes
To: +19568445148 Ramirez (owner)

No she's still in custody

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 8:53:08 AM(UTC-5) | |

Status: Read
Platform:

4/9/2022 8:52:55 AM(UTC-5)



Plaintiff
EXHIBIT NO. 36
4-7-25
Donna McCown

327

From: +19565733883 Rene Fuentes
To: +19568445148 Ramirez (owner)

Bond has posted for Lizelle Herrera, by Romeo Gonzalez, also family hired calixtro
Villarreal. She should be out in the next 15 minutes or so,

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022<br>4:16:33<br>PM(UTC-5) | |

Status: Read
Platform:

4/9/2022 4:13:11 PM(UTC-5)

From: +19568445148 Ramirez (owner)

Ok. Thanks

Priority: Normal
Status: Sent
Platform:

4/9/2022 4:16:43 PM(UTC-5)

From: +19565733883 Rene Fuentes
To: +19568445148 Ramirez (owner)

Yes sir, thx

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022<br>4:18:15<br>PM(UTC<br>-5) | |

Status: Read
Platform:

4/9/2022 4:17:03 PM(UTC-5)

From: +19565733883 Rene Fuentes
To: +19568445148 Ramirez (owner)

Attachments:

Title: 0b6afca5-72ad-4482-bfd8-12595281dfb3.heic
Size: 85731
File name: ~/Library/SMS/Attachments/ce/14/at_0_B91E734C-08B5-420E-86E7-
1C3B8131CDC8/0b6afca5-72ad-4482-bfd8-12595281dfb3.heic
Path: https://p49-
content.icloud.com/MSA33AAABDDB05996CBC154DEC49C4FC5C75294996962A08
83E137CA031B766D0.C01USN00
~/Library/SMS/Attachments/ce/14/at_0_B91E734C-08B5-420E-
86E7-1C3B8131CDC8/0b6afca5-72ad-4482-bfd8-12595281dfb3.heic

Priority: Normal

| Participant | Delivered | Read | Played |
|---|---|---|---|
| +19568445148 Ramirez | | 4/9/2022 5:10:56 PM(UTC-5) | |

Status: Read
Platform:

4/9/2022 5:07:22 PM(UTC-5)

STATE OF TEXAS              §
                           §
HIDALGO COUNTY             §

## AFFIDAVIT OF BECKY ANN ROCHA

BEFORE ME, the undersigned notary public on this day personally appeared BECKY ANN ROCHA known to me, and first being duly sworn according to law upon her oath deposed and stated as follows:

"My name is Becky Ann Rocha. I am over 18 years of age. I have never been convicted of a crime or moral turpitude or a felony. I am of sound mind and am capable of making this affidavit. I am fully competent to testify to the matters stated herein. I have personal knowledge of the facts stated herein.

I am in possession of certain text messages between myself and Gocha A. Ramirez which I have provided to the attorneys for Lizelle Gonzalez and are attached hereto as Exhibit "A". At the time of the messages, Gocha A. Ramirez's phone number was (956) 844-5148 and my number was (956) 257-5225. The individual identified in the messages as "Alana Rmrz" is Gocha Allen Ramirez with the above-referenced number. I affirm that screen shots of text messages on Exhibit "A" are true and accurate representations of the conversations I had via text with Gocha A. Ramirez on April 12, 2022, as indicated in the messages. I affirm that the messages have not been altered or manipulated in any way since the time I received them.

I am providing this information of my own free will. No one has forced me or promised me anything to provide this information."

Further Affiant sayeth not.

Signed this the 29th day of January 2025.

Plaintiff
EXHIBIT NO. 37
4-7-25
Donna McCown

Becky Ann Rocha

SWORN TO AND SUBSCRIBED TO before me, the undersigned authority, on this the 29th day of January 2025.

Notary Public in and for
The State of Texas













4:07
Alana Rmrz
Good morning. I really hope ur doing ok with all that backlash ur probably getting.. take a deep breath
4/12/22, 10:11AM
Thank you. It's very possible that my career is over. But I will continue to move forward. I've been blessed with 43 years of work. If it ends because of this then so be it. Thank you for your support Becky
Ur welcome. Best of luck
Hey Gocha. I'm here if u need to talk. I still consider u my friend.. k. Take care. Everything will work out. Don't worry
Send message
0 / 8192

1:22
Alana Rmrz
4/12/22, 3:56PM
Thank you. I will take you up on that after my trial next week. I need someone to talk to
What?? They're taking u to court?!!! U serious now?
4/12/22, 4:16PM
No my friend. It's a Sexual Assault of a Child case. Unrelated
Ufff u scared me there for awhile. But ok. Good luck on that 1. But yea, I'm here when ur ready to talk. Have a great day
4/12/22, 4:19PM
Send message
0 / 8192

1:22
Try to start rehabilitating my reputation
4/12/22, 4:19PM
U have a great reputation Gocha. But this case with that lady messed u up.. but don't give up. U've worked too hard. There must be a solution
U think u made the RIGHT decision?
4/12/22, 4:21PM
I mean in regard to her inducing her own abortion? It's like taking a life isn't it? I don't know the details, just what I heard on the news
4/12/22, 4:23PM
I should never have indicted her. Because it's not Murder
Send message
0 / 8192

3:07
Alana Rmrz
Gocha. But this case with that lady messed u up.. but don't give up. U've worked too hard. There must be a solution
U think u made the RIGHT decision?
I mean in regard to her inducing her own abortion? It's like taking a life isn't it? I don't know the details, just what I heard on the news
I should never have indicted her. Because it's not Murder in Texas. Actually I wasn't even in town when one of my assistant's presented the case. But I'm the boss so I need to take the fallout. I'm not going to blame my Assistant
0 / 8192

1:23
The news said that u were unavailable to comment. Why do u say u "shouldn't have indicted her"? U regret ur decision? U think she's in her right?
4/12/22, 4:28PM
I know u have ur plate full right now, n that, ur mind is racing at 100 mph, but like I said, I'll b here to hear u out.
4/12/22, 4:30PM
I'm not commenting because she hasn't commented. And she doesn't want to. No le conviene. Believe me. This is not her first.
4/12/22, 4:31PM
So then why do u feel u shouldn't have indicted her? I think I need to research law
Send message
0 / 8192

4:10
Alana Rmrz
I know u have ur plate full right now, n that, ur mind is racing at 100 mph, but like I said, I'll b here to hear u out
I'm not commenting because she hasn't commented. And she doesnt want to. No le conviene. Believe me. This is not her first.
So then why do u feel u shouldn't have indicted her? I think I need to research law to understand how it works. Altho I've learned so much from u over the years. N I thank u for that
So she's not obligated to say anything regarding the case? Neither aren't you? Won't that
0 / 8192

EXHIBIT A







3:07
Alana Rmrz
So then why do u feel u shouldn't have indicted her? I think I need to research law to understand how it works. Altho I've learned so much from u over the years. N I thank u for that
So she's not obligated to say anything regarding the case? Neither aren't you? Won't that make YOU look "bad"?
Send message
0 / 8192

3:40
26m
Edit
G
Gocha A Ramirez
message
call
video
pay
Contact Photo & Poster
mobile
(956) 844-5148
FaceTime
Notes
Send Message
Share Contact
Recents

3:39
Alana Rmrz
+1 956-844-5148
Mobile
Voice call +1 (956) 844-5148
Video call +1 (956) 844-5148
Message +1 (956) 844-5148

 Outlook

RE: Case No. 202202571; Grossman/Ramirez

From  Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
Date  Tue 1/23/2024 1:42 PM
To    Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>

📎 1 attachments (132 KB)
Agreed Probated Suspension (v4).pdf;

You don't often get email from clayton.hackett@texasbar.com. Learn why this is important

Good afternoon Mr. Ramirez,

Please see attached, where #10 includes "in his written response to the complaint" which may be a little clearer insofar as "grievance" could be interpreted broadly. I also added a "the" in #9 before "Office of the Chief Disciplinary Counsel".

-ch

From: Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>
Sent: Tuesday, January 23, 2024 1:31 PM
To: Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
Subject: Re: Case No. 202202571; Grossman/Ramirez

Good afternoon Mr. Hackett. As per our discussion earlier today, I am respectfully requesting that the language of Finding of Fact #10 be modified to read "In connection with the investigation made the basis of this disciplinary matter, Respondent knowingly made a false statement of material fact in his written response to the grievance". Thanks. GAR

From: Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
Sent: Friday, January 19, 2024 12:08 PM
To: Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>
Subject: RE: Case No. 202202571; Grossman/Ramirez



You don't often get email from clayton.hackett@texasbar.com. Learn why this is important

Thank you for following up and for the call just now. I can agree to #5 as "Respondent failed to refrain..." and track the rule language. Please see attached.
Thank you, -ch

From: Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>
Sent: Friday, January 19, 2024 11:47 AM
To: Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
Subject: Re: Case No. 202202571; Grossman/Ramirez

Good morning Mr. Hackett. I am in receipt of the modified Findings of Fact. I am concerned about the language in #5. Unless the panel has concluded that the ADA was not truthful during

DEFENDANTS 000197

her testimony when she said that she wasn't aware of 19.06, wouldn't a more accurate finding be that "Respondent failed to refrain..."? Or language to the effect that we "failed to refrain from prosecuting a charge that was not supported by probable cause"?
The proposed language makes a finding that my ADA's and I knew about 19.06 and purposely ignored the statute. I just need clarification on whether that is the finding of the panel or whether we can modify the language to read "Respondent and attorneys under Respondent's supervision failed to refrain from prosecuting a charge that was clearly not supported by probable cause". Thank you. GAR

**From:** Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
**Sent:** Friday, January 19, 2024 10:31 AM
**To:** Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>
**Subject:** RE: Case No. 202202571; Grossman/Ramirez

You don't often get email from clayton.hackett@texasbar.com. Learn why this is important

Good morning Mr. Ramirez. Thank you for the email. Please see attached, which removes the victim's name and the word abortion, but does identify Penal Code 19.06. Please let me know if you have further questions or wish to discuss.
Thank you,
-ch

**From:** Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>
**Sent:** Thursday, January 18, 2024 9:32 AM
**To:** Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
**Subject:** Re: Case No. 202202571; Grossman/Ramirez

Good morning Mr. Hackett. As per our conversation yesterday, I am respectfully requesting a modification of the language in Finding of Fact #4. I would request that it read as follows

4. Assistant District Attorneys under Respondents supervision sought to pursue criminal homicide charges against an individual for an act clearly not criminal by definition.

I am requesting this modification so as not to publish the victims name and , once again, bring her unwanted publicity for my mistake. I see no logical reason to publish her name again. In addition, the language concerning "abortion" I believe to be unnecessary. After my acts for which I am being sanctioned, my office and I received hundreds of "hate" emails and correspondence, including threats against both myself and my staff. I respectfully contend that the "self induced abortion" language is inflammatory and will subject both myself and my office to additional threats of harm. And my proposed modification clearly sets out the same violation without the language that I believe will result in more threats to the safety of myself and my staff.

Thank you in advance for your consideration of the requested modification. Sincerely, Gocha Allen Ramirez

**From:** Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
**Sent:** Wednesday, January 17, 2024 3:46 PM
**To:** Garlaw2 <garlaw2@aol.com>
**Cc:** Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>
**Subject:** RE: Case No. 202202571; Grossman/Ramirez

You don't often get email from clayton.hackett@texasbar.com. Learn why this is important

DEFENDANTS 000198

Good afternoon Mr. Ramirez,

Thank you for getting back with me quicker than I'd anticipated, and no need to apologize for the length of your correspondence. I do not have the authority for a two month probated suspension; the best that I can do at this time is a one year fully probated suspension. Please see attached proposed judgment to that effect. I have incorporated your requested change to finding of fact #7, and reduced attorney's fees. My understanding is that an agreed judgment at this stage would result in only the Judgment becoming public record. My understanding is in the event of a judgment by an evidentiary panel, more of the file would be subject to public disclosure.

Please let me know if you have further questions or wish to discuss.

Thank you,

**B. Clayton Hackett**
Assistant Disciplinary Counsel
State Bar of Texas, Office of the Chief Disciplinary Counsel
San Antonio Region
**PLEASE NOTE OUR NEW ADDRESS, BELOW:**
**9311 San Pedro Avenue, Suite 1000**
**San Antonio, Texas 78216**
(210) 208-6600 (Phone)
(210) 208-6677 (Fax)
clayton.hackett@texasbar.com

---

**From:** Garlaw2 <garlaw2@aol.com>
**Sent:** Friday, January 12, 2024 11:41 AM
**To:** Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>
**Subject:** Case No. 202202571; Grossman/Ramirez

You don't often get email from garlaw2@aol.com. Learn why this is important

Good morning Mr. Hackett. As I represented to you in our last telephone conversation, I do not agree with the panel's recommendation for sanction in the above-referenced matter.
Having said that, I am interested in entering into an agreed resolution of this matter. While I continue to maintain that a public reprimand would be an appropriate sanction pursuant to Sec.15.06 (A) (3), my understanding is that this sanction cannot be considered. In spite of this understanding, I would respectfully request that the panel and/or you first reconsider this option. If, after review of the facts and Sec. 15.06 (A) (3), the sanction of a public reprimand cannot be reconsidered, then my proposal for sanction is as follows:

A. A two (2) month fully probated suspension beginning April 1, 2024 and ending May 31, 2024;

B. Attorney's fees and expenses in the amount of $500.

As for the findings of fact, I have no dispute with the wording of findings #'s 1,2,3,4,5,6,8,9, and 10. I would respectfully request that the wording of #7 be changed to read that " Respondent knowingly permitted the conduct of the Assistant District Attorney under his direct supervision". I believe that only one (1) wrongful act is necessary to support this particular finding. And I do not believe that any evidence was discovered during the investigation to support a finding that I

DEFENDANTS 000199

"ordered or encouraged" the conduct of the Assistant DA. And this may or not be pertinent but the findings read " Respondent and Assistant DA's" (plural). I don't know that more than one assistant was found to be involved the prosecution besides myself.

I am respectfully requesting the above stated options of sanction with the assumption that the panel and you have fully considered all the mitigating factors listed in Sec. 15.09 (C) (2), including subsections (a), (b), (d) (g) and (l).

As I represented to you in our last conversation, my main concern is not so much personal as I have been practicing almost 45 years , all the while in good standing with the State Bar. My main concern, as a public servant, is trying to maintain the credibility. of this office moving forward from this unfortunate matter. I fully understand that this is not the concern of the State Bar during this type of inquiry and that the Bar must scrutinize only the alleged misconduct in reaching a decision. Obviously whatever agreed resolution is finally entered into, along with any requisite conditions ordered, will be fully followed by me.

The only question I have is whether or not the FULL record, including the investigative file forwarded to you, will also be public record. In view of the Attorney General's opinion and so as to mitigate further damage to the victim, I am hopeful that only the final Agreed Judgement will be made available to the public, if requested.

And I hope that the length of this correspondence is not out of line.


Sincerely,

Gocha Allen Ramirez

 Outlook

**202202571 - Grossman - Ramirez - Subpoena**

**From** Jill Budd <Jill.Budd@TEXASBAR.COM>
**Date** Fri 7/1/2022 12:15 PM
**To** Eduardo Romero <er@romeropllc.com>
**Cc** Clayton Hackett <Clayton.Hackett@TEXASBAR.COM>; Gocha Ramirez <gocha.ramirez@da.co.starr.tx.us>

📎 1 attachments (181 KB)
Communication Records Subpoena.pdf;

Mr. Romero,

Attached please find a subpoena for Frost Bank records, related to the above matter, that requires your approval for issuance. Please review, sign, date and return to me at your earliest opportunity.

All parties are copied on this email.

Sincerely,

*Jill Budd*
*Legal Assistant*
*Office of the Chief Disciplinary Counsel*
*State Bar of Texas*
*San Antonio Regional Office*
*711 Navarro, Suite 750*
*San Antonio, TX 78205*
*Office (210) 208-6632*
*Fax (210) 208-6625*
*Email jill.budd@texasbar.com*


Plaintiff
EXHIBIT NO. 39
4-7-25
Donna McCown

DEFENDANTS 000076