# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF TEXAS
### MCALLEN DIVISION

| | | |
|---|---|---|
| **LIZELLE GONZALEZ** | § | |
| *Plaintiff* | § | |
| | § | |
| **vs.** | § | **CIVIL ACTION 7:24-CV-00132** |
| | § | |
| **GOCHA ALLEN RAMIREZ, et al.** | § | **JURY DEMANDED** |
| *Defendants* | § | |

## PLAINTIFF'S OMNIBUS RESPONSE IN OPPOSITION TO
## DEFENDANTS' MOTIONS FOR SUMMARY JUDGMENT

========================================================================

I. Cecilia Garza
Texas Bar No. 24041627
USDTX Federal Admission No.: 578825
Garza Martinez, PLLC
202 E. Sprague Street
Edinburg, Texas 78539
Telephone No.: 956-335-4900
Telecopier No.: 956-338-5700
cecilia@garzamartinezlaw.com
*Attorney in charge for Plaintiff*

Lauren Alicia Johnson
DC Bar No.: 1011382*
American Civil Liberties Union Foundation
915 15th Street NW
Washington DC 20005
Telephone No.: 202-731-5567
ljohnson@aclu.org
* Admitted *pro hac vice*

David A. Donatti
Texas Bar No. 24097612
USDTX Federal Admission No.: 33771067
American Civil Liberties Union of Texas
P.O. Box 12905
Austin, TX 78711-2905
Telephone No.: 713-942-8146
Facsimile: 713-942-8966
ddonatti@aclutx.org

*Counsel for Plaintiff*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ ii

INTRODUCTION ........................................................................................................... 1

STATEMENT OF FACTS ................................................................................................. 2

    I.   Defendants jointly investigated and prosecuted Plaintiff Lizelle Gonzalez for murder. .................................................................................................................... 2

    II.  Defendants' version of events is demonstrably contradicted by the record. .............. 18

LEGAL STANDARD ...................................................................................................... 22

SUMMARY OF THE ARGUMENT ................................................................................... 23

ARGUMENT ................................................................................................................ 24

    I.   Defendants' motions for summary judgment fail because there are numerous disputed issues of material fact that directly bear on the immunity assertions. .......... 24

    II.  Defendants Ramirez and Barrera are not entitled to absolute immunity because they acted beyond the scope of their prosecutorial function. ........................ 26

        A. Defendant Barrera's conduct falls outside the scope of absolute immunity. ............................................................................................... 29

        B. Defendant Ramirez's conduct falls outside the scope of absolute immunity. ............................................................................................... 34

    III.  Defendants Ramirez, Barrera, and Fuentes are not entitled to qualified immunity because they violated Plaintiff's clearly established constitutional rights. .................................................................................................................. 38

        A. Defendants violated Ms. Gonzalez's clearly established right to be free from false arrest. ...................................................................................... 39

        B. Defendants violated Ms. Gonzalez's clearly established right to be free from being unlawfully charged with a crime. ........................................... 46

        C. Defendants violated Ms. Gonzalez's clearly established right to be free of a conspiracy to violate her civil rights. ................................................ 55

        D. Qualified immunity should not be applied at all to the facts of this case. ....... 55

    IV.  Alternatively, this Court should delay resolution of the Defendants' motions for summary judgment because Plaintiff is entitled to outstanding discovery. .......... 57

V.  As this litigation is only at the immunity phase of bifurcated discovery, all other issues are premature for this Court's consideration............................................. 58

CONCLUSION AND PRAYER ............................................................................................ 58

## TABLE OF AUTHORITIES

### CASES

*Adickes v. S. H. Kress & Co.*,
    398 U.S. 144 (1970).............................................................................................. 22

*Albright v. Oliver*,
    510 U.S. 266 (1994).............................................................................................. 54

*Anderson v. Creighton*,
    483 U.S. 635 (1987).............................................................................................. 56

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986)........................................................................................ 22, 23

*Armstrong v. Ashley*,
    60 F.4th 262 (5th Cir. 2023) .................................................................... 48, 49, 50

*Arnold v. Williams*,
    979 F.3d 262 (5th Cir. 2020) ................................................................................ 39

*Ashcroft v. al-Kidd*,
    563 U.S. 731 (2011).............................................................................................. 38

*Bakutis v. Dean*,
    129 F.4th 299 (5th Cir. 2025) .............................................................................. 38

*Barr v. Abrams*,
    810 F.2d 358 (2d Cir. 1987).................................................................................. 29

*Bokor v. Hattox*,
    No. CIV.A. 4:03-CV-426-Y, 2004 WL 2468917 (N.D. Tex. Nov. 3, 2004), *aff'd*, 205
    F. App'x 293 (5th Cir. 2006) ................................................................................ 28

*Brown v. State*,
    303 S.W.3d 310 (Tex. App. 2009)........................................................................ 40

*Buckley v. Fitzsimmons*,
    509 U.S. 259 (1993)........................................................................................ passim

*Buehler v. City of Austin/Austin Police Dep't.*,
    824 F.3d 548 (5th Cir. 2016) ................................................................................ 45

*Burns v. Reed,*
　　500 U.S. 478 (1991) ........................................................................... passim

*Castellano v. Fragozo,*
　　352 F.3d 939 (5th Cir. 2003) ............................................................ 47, 54

*Celotex Corp. v. Catrett,*
　　477 U.S. 317 (1986) ......................................................................... 21, 22

*Cole v. Carson,*
　　802 F.3d 752 (5th Cir. 2015) ........................................................ 48, 52, 54

*Cook v. City of Tyler,*
　　No. 6:17-CV-00333-RWS, 2018 WL 4473110 (E.D. Tex. Sept. 18, 2018) ......................... 29

*County of Sacramento v. Lewis,*
　　523 U.S. 833 (1998) ................................................................................. 52

*Cousin v. Small,*
　　325 F.3d 627 (5th Cir. 2003) ............................................................ 28, 34

*Crescent Towing and Salvage Co. v. M/V Anax,*
　　40 F.3d 741 (5th Cir. 1944) ........................................................................... 22

*Cuadra v. Hous. Indep. Sch. Dist.,*
　　626 F.3d 808 (5th Cir. 2010) ........................................................................... 43

*Deville v. Marcantel,*
　　567 F.3d 156 (5th Cir. 2009) ........................................................................... 44

*Dobbs v. Jackson Women's Health Org.,*
　　597 U.S. 215 (2022) ................................................................................. 8

*Doe v. Taylor Ind. Sch. Dist.,*
　　15 F.3d 443, (5th Cir. 1994) ........................................................................... 39

*Eguia v. State,*
　　288 S.W.3d 1 (Tex. App. 2008) ........................................................................... 40

*F.D.I.C. v. McFarland,*
　　243 F.3d 876 (5th Cir. 2001) ........................................................................... 47

*Flores v. State,*
　　245 S.W.3d 432 (Tex. Crim. App. 2008) ........................................................................... 40

*Forrester v. White,*
　　484 U.S. 219 (1988) ........................................................................... 26

*Franks v. Delaware*,
438 U.S. 154 (1978) ........................................................................................ 44

*Freeman v. Gore*,
483 F.3d 404 (5th Cir. 2007) ...................................................................... 39, 40

*Green v. Thomas*,
129 F.4th 877 (5th Cir. 2025) ........................................................................ 39

*Green v. Thomas*,
734 F. Supp. 3d 532 (S.D. Miss. 2024), *aff'd in part, rev'd in part*, 129 F.4th 877
(5th Cir. 2025).................................................................................................. 55

*Guerra v. Castillo*,
82 F.4th 278 (5th Cir. 2023) ......................................................................... 44

*Hale v. Townley*,
45 F.3d 1914 (5th Cir. 1995) ........................................................................ 55

*Heien v. North Carolina*,
574 U.S. 54 (2014)......................................................................................... 39

*Henley v. Payne*,
945 F.3d 1320 (11th Cir. 2019) .................................................................... 39

*Hoggard v. Rhodes*,
141 S.Ct. 2421 (2021)............................................................................... 56, 57

*Honore v. Douglas*,
833 F.2d 565 (5th Cir. 1987) ........................................................................ 22

*Hoog-Watson v. Guadalupe Cty.*,
591 F.3d 431 (5th Cir. 2009) ........................................................................ 27

*Imbler v. Pachtman*,
424 U.S. 409 (1976)............................................................................. 27, 32, 34

*In re Bonvillian Marine Serv., Inc.*,
19 F.4th 787 (5th Cir. 2021) ......................................................................... 49

*Int'l Shortstop, Inc. v. Rally's, Inc.*,
939 F.2d 1257 (5th Cir. 1991) ...................................................................... 57

*Jacobs v. Nat'l Drug Intel. Ctr.*,
548 F.3d 375 (5th Cir. 2008) ........................................................................ 49

*James v. Tex. Collin Cnty.*,
535 F.3d 365 (5th Cir. 2008) ........................................................................ 38

*Jarvis v. Roberts,*
    489 F. Supp. 924 (W.D. Tex. 1980)................................................................ 29

*Jennings v. Patton,*
    644 F.3d 297, (5th Cir. 2011) ...................................................................... 43

*Johnston v. City of Houston, Tex.,*
    14 F.3d 1056, (5th Cir. 1994) ...................................................................... 38

*Kiss. v. State,*
    316 S.W.3d 665 (Tex. App. 2009)................................................................ 40

*Krim v. BancTexas Grp., Inc.,*
    989 F.2d 1435 (5th Cir. 1993) ...................................................................... 57

*Latiolais v. Cravins,*
    484 F.App'x 983 (5th Cir. 2012) .................................................................. 55

*Lawrence v. State,*
    240 S.W.3d 912 (Tex. Crim. App. 2007)...................................................... 40

*Limone v. Condon,*
    372 F.3d 39, (1st Cir. 2004).......................................................................... 52

*Loupe v. O'Bannon,*
    824 F.3d 534 (5th Cir. 2016) .................................................................. 26, 27

*Mangieri v. Clifton,*
    29 F.3d 1012 (5th Cir. 1994) ........................................................................ 39

*Melton v. Phillips,*
    875 F.3d 256 (5th Cir. 2017) ........................................................................ 44

*Morgan v. Chapman,*
    629 F. Supp. 3d 616 (S.D. Tex. 2022) .......................................................... 53

*Morrison v. City of Baton Rouge,*
    761 F.2d 242 (5th Cir. 1985) ........................................................................ 34

*O'Neal v. Mississippi Bd. of Nursing,*
    113 F.3d 62 (5th Cir. 1997) .......................................................................... 26

*Ontiveros v. City of Rosenberg, Tex.,*
    564 F.3d 379 (5th Cir. 2009) ........................................................................ 22

*Orr v. Copeland,*
    844 F.3d 484 (5th Cir. 2016) ........................................................................ 25

*Palmer v. Johnson*,
    193 F.3d 346 (5th Cir. 1999) ........................................................... 22

*Reichle v. Howards*,
    566 U.S. 658 (2012) ...................................................................... 38

*Reyna v. Wilson*,
    143 S. Ct. 425 (2022) .................................................................... 44

*Roe v. Wade*,
    410 U.S. 113 (1973) ........................................................................ 8

*Rogers v. Jarrett*,
    63 F.4th 971 (5th Cir. 2023) ......................................................... 56

*Sanders v. English*,
    950 F.2d 1152 (5th Cir. 1992) ....................................................... 47

*Santander v. Salazar*,
    133 F.4th 471 (5th Cir. 2025) ....................................................... 48

*See also United States v. Lara-Velasquez*,
    919 F.2d 946 (5th Cir. 1990) ........................................................ 45

*Singleton v. Cannizzaro*,
    956 F.3d 773 (5th Cir. 2020) ........................................................ 27

*Soldal v. Cook Cty.*,
    506 U.S. 56 (1992) ........................................................................ 46

*Spivey v. Robertson*,
    197 F.3d 772 (5th Cir. 1999) .................................................. 33, 36

*State v. Hunter*,
    606 S.W.3d 836 (Tex. App. 2020) ................................................. 41

*State v. Hunter*,
    624 S.W.3d 589 (Tex. Crim. App. 2021) ........................................ 41

*Stem v. Gomez*,
    813 F.3d 205 (5th Cir. 2016) ........................................................ 38

*Terwilliger v. Reyna*,
    4 F.4th 270 (5th Cir. 2021) ................................................ 33, 36, 44

*Thomas v. Kiperman*,
    846 F.2d 1009 (5th Cir. 1988) ...................................................... 46

*Thompson v. Clark*,
    596 U.S. 36 (2022) ................................................................................................ 47, 48

*Tolan v. Cotton*,
    572 U.S. 650 (2014) ................................................................................ 22, 26, 38, 51

*United States v. Moreno*,
    185 F.3d 465 (5th Cir. 1999) ............................................................................... 45

*Villarreal v. City of Laredo, Texas*,
    94 F.4th 374 (5th Cir. 2024) ................................................................................. 39

*Villarreal v. City of Laredo, Texas*,
    134 F.4th 273 (5th Cir. 2025) ............................................................................... 56

*Wearry v. Foster*,
    33 F.4th 260 (5th Cir. 2022) ........................................................................... 27, 28

*Wearry v. Foster*,
    52 F.4th 258 (5th Cir. 2022) ................................................................................. 56

*Wilson v. Stroman*,
    33 F.4th 202 (5th Cir.) ............................................................................... 44, 45, 46

*Winfrey v. Rogers*,
    901 F.3d 483 (5th Cir. 2018) ............................................................................... 44

*Wooten v. Roach*,
    964 F.3d 395 (5th Cir. 2020) ......................................................................... 26, 36

*Ziglar v. Abbasi*,
    582 U.S. 120 (2017) ............................................................................................. 56

## STATUTES

42 U.S.C. § 1983 ............................................................................................................ 38

Tex. Health & Safety Code § 171.206(b)(1) ................................................................. 41

Tex. Health & Safety Code § 171.207 .......................................................................... 41

Tex. Penal Code § 19.06 ........................................................................... 33, 40, 41, 50

## OTHER AUTHORITIES

Alexander A. Reinert,
    *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 207 (2023) .................... 56

Jani Maselli Wood,
    *O'Connors Tex. Crim. Offenses & Defenses*, Ch. 2-A § 2 (2024 ed.) ................................. 41

U.S. Const. amend. XIV, § 1 ........................................................................... 51

**RULES**

Fed. R. Civ. P. 56 ............................................................................... 21, 23, 25

Texas Disciplinary Rules of Professional Conduct 1.06(b)(2) ...................... 13

Texas Disciplinary Rules of Professional Conduct 1.11(c) .......................... 13

## INTRODUCTION

A founding principle of our legal system is that the government may not concoct charges and arrest someone for conduct that is not a crime. Yet deposition testimony and documentary evidence obtained during discovery establish just that: District Attorney (DA) Gocha Allen Ramirez, Assistant District Attorney (ADA) Alexandria Barrera, and Sheriff Rene Fuentes all worked together throughout the investigation and prosecution of Ms. Gonzalez, resulting in her wrongful indictment and arrest for murder even though Texas law explicitly forbids such a charge. Discovery obtained in this case strengthens Plaintiff's claims, revealing that Sheriff Fuentes ordered his investigators to contact the District Attorney's Office for help and guidance necessary to carry out the criminal investigation of Ms. Gonzalez. ADA Barrera gave specific directions to the Sheriff's office investigators about what evidence to collect and provided legal advice critical for the investigation to proceed. And DA Ramirez supervised the homicide investigation of Ms. Gonzalez's abortion, directing ADA Barrera to pursue criminal charges by presenting the case to the grand jury while knowing that no probable cause existed. Though Defendants continue to disclaim all responsibility, the deposition testimony and documentary evidence contradict the Defendants' story at every turn. Ignoring this evidence, Defendants seek to wash their hands of accountability by asserting they are entitled to absolute and/or qualified immunity. But these doctrines do not apply to the prosecutors' misconduct during the investigation, and where all three Defendants violated Ms. Gonzalez's clearly established constitutional rights. What's more, the Parties present conflicting narratives that expose the existence of numerous disputed issues of material fact central to the immunity claims. Accordingly, Defendants' motions for summary judgment should be denied.

1

## STATEMENT OF FACTS

I. **Defendants jointly investigated and prosecuted Plaintiff Lizelle Gonzalez for murder.**

On January 11, 2022, hospital personnel reported Ms. Gonzalez's abortion to law enforcement. From that day forward, the Starr County Sheriff's Office (SCSO) and the Starr County District Attorney's (DA's) Office worked together to unlawfully investigate, charge, and ultimately arrest Ms. Gonzalez for murder. Yet Ms. Gonzalez committed no crime. DA Ramirez, ADA Barrera, and Sheriff Fuentes were each personally involved in these efforts. DA Ramirez even admitted to the Texas Bar Grievance Committee in a signed agreed judgment of probated suspension that he and his office had improperly "pursue[d] criminal homicide charges" against Ms. Gonzalez for acts that were "clearly not criminal." ECF 79-21 at 67-71 (Agreed Judgment of Probated Suspension).[1]

Plaintiff Lizelle Gonzalez was treated at Starr County Memorial Hospital from January 7 to 10, 2022, after using medication to self-induce an abortion. ECF 79-6 at 2 (Inv. Muniz Investigation Report). When Ms. Gonzalez was discharged on January 10, Nurse Martha Torres warned her that "in these types of cases there's always an investigation." ECF 91-19 (G. Gonzalez Dep. 44:6-17). Indeed, on January 11, Nurse Torres called 911 to report Ms. Gonzalez's abortion to law enforcement and a Rio Grande City Police Officer responded to the scene. ECF 79-5 (Officer Rosa Report). The case was quickly transferred to the Starr County Sheriff's Office and at 1:40 p.m. Patrol Officer Ranell Rosa spoke to Nurse Torres who explained to him that their "administrators" directed hospital staff to report these incidents

---

[1] Throughout this brief, Plaintiff cites to the exhibits filed with Defendants' motions for summary judgment. ECF 79-1 to 79-27, 81-1 to 81-28, 88-1 to 88-28. Evidence referenced by Plaintiff that was not filed by Defendants in an exhibit to their motions for summary judgment has been filed as an exhibit to this brief. ECF 91-1 to ECF 91-30. A summary of these exhibits is included in the Declaration filed with this brief. ECF 91-31.

because, she said, abortions could now be considered murder due to a "change in the law." *Id.*; ECF 79-13 at 3:30-44 (BWC of Officer Rosa).

That same day, Officer Rosa called Captain Lenard Fuentes who immediately recognized that the investigation concerned the right to an abortion that had consumed Texas news. ECF 91-28 (L. Fuentes Dep. 72:8-11). Captain Fuentes said to himself, "Okay. Here we go." *Id.* (L. Fuentes Dep at 58:2-7). From the beginning, Captain Fuentes and his next in command, Sergeant Rafael Aguirre, knew this was a "big case" that was going to "grab community attention" and require "extra scrutiny." *Id.* (L. Fuentes Dep. 65:11-13); ECF 91-27 (Aguirre Dep. 110:10-11). They also "had [their] doubts" about what criminal charge would apply. ECF 91-27 (Aguirre Dep. 152:13-17).

Captain Fuentes assigned the investigation to Investigator Esmeralda Muniz and instructed her to "[m]ake sure you call the DA's office on this one." ECF 91-22 (Muniz Dep. 58:16-20). Investigator Muniz was confused about why the Sheriff's Office would be investigating Ms. Gonzalez's abortion as a crime because she knew that women had the right to decide whether to terminate a pregnancy. ECF 91-22 (Muniz Dep. 117:21-24). At 2:49 p.m., she texted ADA Barrera to inform her that the Sheriff's Office needed "guidance" concerning a report of a mother who "self induced" by taking medication to "abort" her fetus. ECF 79-21 at 26 (Texts between Barrera and Muniz).

Investigator Muniz and Captain Fuentes had a conversation with ADA Barrera over speakerphone on January 11, 2022, because they "had legal questions" as to "whether this case presented criminal conduct" and to find out if "abortion was illegal." ECF 91-22 (Muniz Dep. 157:7-158:5); ECF 91-28 (L. Fuentes Dep. 59:7-11). This guidance from the DA's office was necessary for the investigators to "do [their] job, to make sure that [they] make a case," and to

ensure that "all the elements are there for a crime." ECF 91-27 (Aguirre Dep. 52:3-13). During

this call, Investigator Muniz told ADA Barrera that "there had been a female that had shown up

to the hospital and had taken some medication to induce an abortion." ECF 91-23 (Barrera Dep.

85:4-9, 94:24- 95:2). ADA Barrera instructed Investigator Muniz to "bring in people, interview

people." ECF 91-22 (Muniz Dep. 59:19-22). Based on her conversation with ADA Barrera, it

was clear to Investigator Muniz that "right off the bat" the DA's office was "already

contemplating [] murder" as the charge. ECF 91-22 (Muniz Dep. 85:20-22); ECF 91-1 at 2

(Notes of Inv. Muniz) ("DAs want to charge her").

Investigator Muniz had read Section 19.06 of the Penal Code, which specifically prohibits

charging a pregnant woman with a homicide for conduct that causes the death of her own fetus.

ECF 91-22 (Muniz Dep. 118:7-119:23). She alerted Sergeant Aguirre and Captain Fuentes to this

section and believed it was brought to the attention of ADA Barrera during their phone call on

January 11th. *Id.* (Muniz Dep. 118:7-120:11, 157:17-158:14). ADA Barrera responded that they

were "going to look into it." *Id.* (Muniz Dep. 158:11). Had ADA Barrera told Investigator Muniz

that Ms. Gonzalez did not commit a crime, Investigator Muniz would not have proceeded with

the investigation. *Id.* (Muniz Dep. 115:10-17). ADA Barrera denies that she was aware of

Section 19.06 at the time. ECF 91-23 (Barrera Dep. 124:4-8; 157:14-17). Rather, she maintains

that she relied upon ADA Abel Villarreal's prior conversation with someone in the Sheriff's

office about whether a fetus could be considered an "individual" for the purpose of the homicide

statute. *Id.* (Barrera Dep. 123:7-16). No other witness, including ADA Villarreal, could

corroborate ADA Barrera's testimony. ECF 91-21 (Villarreal Dep. 120:6-13, 131:2-11).

Throughout the criminal investigation of Ms. Gonzalez, both ADA Barrera and ADA

Villarreal were First Assistants and reported directly to DA Ramirez. ECF 91-23 (Barrera Dep.

7:9-23, 9:5-8); ECF 91-21 (Villarreal Dep. 12:12-18, 33:7-10); ECF 91-11 at 2-3 (Affidavit of B. Garza). A long-time co-worker observed that ADA Barrera and ADA Villarreal would compete to "secure big cases and build their reputation within the office." ECF 91-11 at 4 (Affidavit of B. Garza). ADA Barrera considered Ms. Gonzalez's investigation and prosecution to be a "big case" that "could set her apart." *Id.*

Sheriff Fuentes was told about the criminal investigation into Ms. Gonzalez's abortion from the outset and was continuously kept "in the loop" as it progressed. ECF 91-28 (L. Fuentes Dep. 133:19-20); ECF 91-30 (R. Fuentes Dep. 21:21-24); ECF 91-18 at 3 (R. Fuentes Response to Interrogatories) ("I was aware that my investigators were working on a complaint."). As soon as he was informed, the Sheriff directed Captain Fuentes to involve the DA's office in the investigation and make sure they knew what was going on. ECF 91-28 (L. Fuentes Dep. 129:3-6). Captain Fuentes responded, "[W]e've already talked to Alex [Barrera], so we already know what we need to do." ECF 91-28 (L. Fuentes Dep. 133:13-18). He assured the Sheriff that the DA's office was "on board" and was "going to help us with this case." ECF 91-28 (L. Fuentes Dep. 131:3-9, 228:24-229:2). Although Sheriff Fuentes did not believe Ms. Gonzalez had committed murder by having an abortion, he encouraged his staff to follow the DA's instructions and proceed with the investigation. ECF 91-30 (R. Fuentes Dep. 82:20-23). Sheriff Fuentes explained that if there is a disagreement about what charge should apply, the DA's office has the final say. ECF 91-30 (R. Fuentes Dep. 84:6-23).

DA Ramirez was told about the investigation of Ms. Gonzalez in January 2022 and knew that it centered on a medication-induced abortion. ECF 91-24 (Ramirez Dep. 191:6-192:7). Consistent with his office's practices, as well as county policies, he received updates about the case throughout the investigation. *See, e.g.*, ECF 79-21 at 32 (Texts between Muniz and

Barrera); ECF 79-21 at 76 (Texts between Barrera and Ramirez); ECF 91-11 at 3 (Affidavit of B. Garza); ECF 91-25 (R. Rocha Dep. 7:22-24). As head of the DA's Office, DA Ramirez supervises all the prosecutions occurring in the office and gets briefed on the prosecutions of major crimes. ECF 91-29 (Solis Dep. 38:11-19). The ADAs report to him "no matter what." ECF 91-21 (Villarreal Dep. 63:8). DA Ramirez also made coordination between the DA's Office and Sheriff's Office a platform of his campaign, vowing to be aware of every major investigation. ECF 79-22 at 43 (Ramirez Campaign Platform); ECF 91-3 at 5:23-5:45 (Ramirez Campaign Video) ("I will be on top of every major investigation in our district. I will personally make sure that I understand where that investigation stands, that I understand what steps are being taken in that investigation.").

The Sheriff's Office policies also direct investigators to address any questions of law to the DA's office. ECF 91-12 (Sheriff's Office Policies and Procedures Manual, Policy No. 7.04). Pursuant to these policies, investigators would regularly call the DA's office with questions and seek legal advice concerning their investigations, often on a daily basis. ECF 91-21 (Villarreal Dep. 103:17-104:3). Investigators were instructed to contact the DA's office to determine the charge in "99.9 percent" of all serious cases. ECF 91-22 (Muniz Dep. 46:13-17). And it was "typical" for attorneys in the DA's office to "guide" investigators in the Sheriff's Office on how to write their investigation reports. ECF 91-11 at 3 (Affidavit of B. Garza).

On either January 11 or 12, ADA Barrera discussed Ms. Gonzalez's abortion with Bernice Garza, who worked at the DA's office for many years as the Crime Victims Unit Coordinator. *Id.* at 1-2. ADA Barrera told Ms. Garza that she had spoken directly to one of Ms. Gonzalez's treating physicians and two other employees at Starr County Memorial Hospital. *Id.* at 2. Eager to pursue a criminal prosecution, ADA Barrera alleged to Ms. Garza that Ms.

Gonzalez intentionally self-induced her abortion because the baby was not her husband's child, claimed that Ms. Gonzalez had received cosmetic surgery during the pregnancy, and noted that Ms. Gonzalez had a medical background, so ADA Barrera thought she would know what medication to take. *Id.* ADA Barrera was unsure, however, whether the victim of the crime would be the fetus or the father, and asked Ms. Garza to research this legal question. *Id.* Ms. Garza referred to the Texas statutes regarding the rights of crime victims and informed ADA Barrera that she thought the biological father would be considered the victim. *Id.*

From the earliest stages of the investigation, ADA Barrera provided directions and legal advice to the Sheriff's Office regarding Ms. Gonzalez's investigation. For example, ADA Barrera directed Investigator Muniz and Sergeant Aguirre to interview the person who provided the medication to Ms. Gonzalez, to go to the funeral home to take pictures of the ashes of the fetus, to allow the funeral home to release the ashes to Ms. Gonzalez, and to obtain a subpoena for Ms. Gonzalez's medical records. ECF 79-21 at 26-28 (Texts between Barrera and Muniz); ECF 79-21 at 21, 24 (Texts between Barrera and Aguirre). ADA Barrera was so involved with the intricacies of the investigation that she was invited to join the interview of one of the hospital doctors. ECF 79-21 at 27 (Texts between Barrera and Muniz). This involvement was consistent with ADA Barrera's standard practice as it was "typical" for her to tell Sheriff's Office investigators what evidence to collect and which witnesses to interview. ECF 91-11 at 3 (Affidavit of B. Garza).

Investigator Muniz also coordinated with ADA Villarreal to obtain subpoenas for Ms. Gonzalez's medical records from Starr County Memorial Hospital and from her OB/GYN's office. ECF 79-9 (Subpoena for Medical Records from OB/GYN); ECF 79-10 (Application for Subpoena for Medical Records from OB/GYN); ECF 79-11 (Application and Subpoena for

Medical Records from Hospital). As part of the procedure to obtain these subpoenas, Investigator Muniz needed to give the DA's office a "rundown as to what's going on and why [she] need[ed]" the subpoenas as part of her investigation. ECF 91-21 (Villarreal Dep. 109:10-13). When ADA Villarreal approved the subpoenas for Ms. Gonzalez's medical records, he knew that *Roe v. Wade*[2] was still the law. ECF 91-21 (Villarreal Dep. 184:3-6).

ADA Barrera had "multiple meetings" with the Sheriff's Office investigators throughout Ms. Gonzalez's investigation. ECF 91-27 (Aguirre Dep. 99:17-18). At one such meeting, at 2 p.m. on January 18, 2022, Sergeant Aguirre, Investigator Muniz, and ADA Barrera met so the investigators could "lay out what [the Sheriff's Office] had so far and to see how to proceed with this case." ECF 79-21 at 21-24 (Texts between Barrera and Aguirre); ECF 91-27 (Aguirre Dep. 101:15-16); ECF 91-23 (Barrera Dep. 100:20-101:4). Following this meeting, ADA Barrera texted Sergeant Aguirre at 2:47 p.m. telling him to "hold off" on getting an arrest warrant and instructing him to instead "gather everything we can." ECF 79-21 at 24 (Texts between Barrera and Aguirre).

At the time of the investigation, there were only four ADAs working at the DA's Office. ECF 91-29 (Solis Dep. 20:18-20). The ADAs often had informal conversations over lunch about cases they were working on, particularly if "it's a defendant that we know." ECF 91-29 (Solis Dep. 38:1-5). Thus, throughout the investigation of Ms. Gonzalez, Bernice Garza "witnessed and was aware of ADA Barrera frequently sharing information about the investigation" with ADA Villarreal and DA Ramirez. ECF 91-11 at 2-3 (Affidavit of B. Garza). Ms. Garza heard "multiple conversations" between ADA Barrera and DA Ramirez concerning the evidence that had been

---

[2] *Roe v. Wade*, 410 U.S. 113 (1973); overruled by *Dobbs v. Jackson Women's Health Org.*, 597 U.S. 215 (2022).

collected during the investigation of Ms. Gonzalez. *Id.* at 3. DA Ramirez repeatedly asked ADA Barrera "if there was enough legal basis and evidence to prosecute this case," and ADA Barrera "assure[d] him that there was." *Id.* Ms. Garza also asked ADA Barrera if she was sure there was a legal basis for the charge, putting aside whether she personally felt that what happened was wrong. *Id*. ADA Barrera assured Ms. Garza that there was a legal basis to prosecute. *Id.* ADA Barrera thus pursued a criminal charge even though, according to Investigator Muniz, she was aware of the clear language of Section 19.06. *See* ECF 91-22 (Muniz Dep. 118:7-120:9, 157:17-158:11).

The investigation continued, and on January 31, 2022, Investigator Muniz and Sergeant Aguirre had Ms. Gonzalez come to the Sheriff's Office to interrogate her about her abortion. ECF 79-6 at 11; ECF 91-2 at 1-3 (Excerpts of Interrogation). At the end of this interrogation, Investigator Muniz told Ms. Gonzalez that she was going to meet with the DA's office. ECF 91-2 at 3. Investigator Muniz felt she needed additional guidance from the DA's office at this point because she was "personally not ready to just go and charge [Ms. Gonzalez] with -- with murder." ECF 91-22 (Muniz Dep. 81:8-15). Captain Fuentes also did not believe there was probable cause that a crime had been committed. ECF 91-29 (L. Fuentes Dep. 185:21-24). Sergeant Aguirre did research indicating that the facts did not "fit" the elements of homicide and told Investigator Muniz to "Call Alex." ECF 91-23 (Muniz Dep. 140:20-23). The Captain and Sergeant instructed her: "Make sure you call the DA's office and get the charge – the correct one." ECF 91-22 (Muniz Dep. 140:19-20). Thus, right after the Sheriff's Office interrogated Ms. Gonzalez, Investigator Muniz texted ADA Barrera asking her, "when can we meet to discuss everything I have on the abortion case?" ECF 79-21 at 29 (Texts between Barrera and Muniz). ADA Barrera responded that she would be free the next day. *Id.* at 30.

At around 2 p.m. on February 1, 2022, Investigator Muniz met with ADA Barrera and told her "everything" about the investigation. ECF 91-22 (Muniz Dep. 83:10-11); ECF 79-21 at 31 (Texts between Barrera and Muniz). At 3 p.m., ADA Barrera texted DA Ramirez: "Sir can you let me know when you have time to speak. Abortion case." ECF 79-21 at 76 (Texts between Ramirez and Barrera). Shortly afterward, ADA Barrera and DA Ramirez met to discuss the investigation of Ms. Gonzalez and whether to present it to the grand jury. ECF 91-23 (Barrera Dep. 120:22-25-121:1-4). ADA Barrera discussed the facts of the investigation with DA Ramirez, including that the death of the fetus was caused by a medication abortion. *Id.* (Barrera Dep. 120:14-20). She informed him that the Sheriff's Office asked whether they should proceed with an arrest warrant or whether the case should be turned in for grand jury consideration. ECF 91-23 (Barrera Dep. 72:15-19).

DA Ramirez did not believe they had enough facts to charge Ms. Gonzalez with "anything" but nonetheless "decided to submit for grand jury review." ECF 91-23 (Barrera Dep. 72:15-24, 119:21-120:20); ECF 91-24 (Ramirez Dep. 208:8-15). He was aware that ADA Barrera would be presenting the case as a homicide despite knowing that obtaining an abortion was protected under *Roe v. Wade*. ECF 91-23 (Barrera Dep. 133:11-13); ECF 91-24 (Ramirez Dep. 222:18-19). DA Ramirez also knew that abortion was not a crime because, in the past, he not only urged Ms. Becky Rocha, with whom he had an extramarital affair, to get an abortion after she became pregnant with his child, but he also paid for the procedure. ECF 91-25 (R. Rocha Dep. 136:18-25); ECF 91-26 (B. Rocha Dep. 21:15-21). Notwithstanding his own role in Ms. Becky Rocha's prior abortion, he directed ADA Barrera to present Ms. Gonzalez's abortion to the grand jury.

ADA Barrera texted Investigator Muniz at 3:17 p.m. on February 1: "So spoke to Gocha. Just submit for Grand jury review. No arrest warrant." ECF 79-21 at 32 (Texts between Barrera and Muniz). She also instructed Investigator Muniz to submit the case to the prosecutor's office with "murder" listed as the charge on her investigation report. ECF 91-22 (Muniz Dep. 81:16-25) Muniz explained: "This charge came from the DA's office." *Id.* (Muniz Dep. 83:17-18). Although ADA Barrera claims she believed that abortion could be charged as murder, she now admits she was aware that *Roe v. Wade* was still good law and had never heard of a doctor or pregnant person being charged with a crime for either performing or having an abortion. ECF 91-23 (Barrera Dep. 122:3-6, 124:18-25). To make sure she was assigned Ms. Gonzalez's case, ADA Barrera instructed Investigator Muniz about how and where to turn over the "prosecution packet" so that she personally received it when Investigator Muniz dropped it off at the DA's office on March 17, 2022. ECF 91-4 at 9-13 (Texts between Barrera and Muniz); ECF 91-22 (Muniz Dep. 98:2-9).

ADA Barrera presented the case to the grand jury on March 25, 2022. ECF 79-1 (Indictment) (indictment signed March 30, 2022); ECF 91-23 (Barrera Dep. 189:14). In her view, her role at the grand jury was to present the facts and "the charging options," laying out the different charges that might apply. *Id.* (Barrera Dep. 51:3-4, 71:24, 72:1-3). As part of this obligation, in prosecuting Ms. Gonzalez, ADA Barrera had the responsibility to know the law, convey it accurately to the grand jury, and only present cases that meet the elements of the crime. *Id.* (Barrera Dep. 56:1-3, 67:2-4, 242:17-25, 243:1-2). ADA Barrera failed to fulfill her prosecutorial obligations and presented Ms. Gonzalez's case to the grand jury while omitting Section 19.06, resulting in a murder indictment. ECF 79-1 (Indictment); ECF 91-4 at 17 (Texts

11

between Barrera and Muniz). She admits that the case should never have been presented to a grand jury. ECF 91-23 (Barrera Dep. 110:12-19, 138:2-5).

ADA Barrera drafted the indictment, which was filed with the court on March 30, automatically triggering the issuance of an arrest warrant. ECF 91-23 (Barrera Dep. 144:14-23); ECF 91-21 (Villarreal Dep. 160:23-25, 161:1-22); ECF 79-14 (Capias). On April 2, just a few days later, DA Ramirez messaged the entire DA office on WhatsApp to express his gratitude for their hard work, recognizing that "The next few weeks are going to be grueling." ECF 91-5 at 1 (WhatsApp Message from Ramirez).

Soon after the indictment was issued but before the arrest of Ms. Gonzalez, individuals in the community learned about the indictment and "expressed concern." ECF 91-11 at 4 (Affidavit of B. Garza). DA Ramirez received calls "from attorneys outside the office to say that the charge was wrong and express that Ms. Gonzalez should not be arrested." *Id*. He told Ms. Garza that although he too was concerned, people would understand once the "full facts of the case came out." *Id.*

On April 7, 2022, Trinidad Lopez, an investigator at the District Attorney's Office who reports to DA Ramirez, gave Investigator Muniz a closed envelope containing the sealed indictment and directed her to find Ms. Gonzalez, bring her back to the Sheriff's Office, and read to her what was contained in the envelope. ECF 91-22 (Muniz Dep. 54:13-25, 55:1-10, 56:1-5); ECF 91-21 (Villarreal Dep. 79:6-7); ECF 91-29 (Solis Dep. 20:24-25, 21:1-5). Pursuant to this command, several Sheriff's officers went searching for Ms. Gonzalez and located her to bring her in. ECF 91-22 (Muniz Dep. 103:11-25, 104:1-4). When Investigator Muniz told Ms. Gonzalez that she had to go to the Sheriff's Office, Ms. Gonzalez started to cry. *Id.* (Muniz Dep. 106:25, 107:1-7). Investigator Muniz felt badly for her and sat in Ms. Gonzalez's passenger seat

while Ms. Gonzalez drove to the Sheriff's Office. *Id.* (Muniz Dep. 107:1-3). Upon arrival,

Investigator Muniz informed Ms. Gonzalez of the true reason she was required to go to the

Sheriff's Office: she had been indicted for murder. *Id.* (Muniz Dep. 108:25, 109:1-11). Ms.

Gonzalez was booked into the Starr County Jail. *Id.* Even though ADA Barrera did not believe

Ms. Gonzalez was a flight risk, bail was set at $500,000, the highest bail set in Starr County that

year.[3] ECF 79-14 (Capias); ECF 79-21 at 24 (Texts between Barrera and Aguirre). At 1:07 p.m.,

Investigator Muniz texted ADA Barrera to inform her of Ms. Gonzalez's arrest. ECF 91-4 at 18

(Texts between Barrera and Muniz). While incarcerated, Ms. Gonzalez suffered a panic attack

requiring hospitalization. ECF 91-19 (G. Gonzalez Dep. 27:13-15).

Sometime prior to the arrest, Ms. Gonzalez's then-husband Ismael Herrera retained Judith

Solis, an Assistant District Attorney in the Starr County DA's Office, to represent him in his

divorce proceedings against Ms. Gonzalez. ECF 91-29 (Solis Dep. 106:1-6). At the time of her

representation of Mr. Herrera, Ms. Solis reported to ADA Barrera. ECF 91-29 (Solis Dep. 15:5-

11). At 1:45 p.m. on April 7th, less than 40 minutes after ADA Barrera was informed of Ms.

Gonzalez's arrest, Ms. Solis filed Mr. Herrera's petition for divorce, citing "adultery" as

grounds. ECF 91-6 at 1 (Petition for Divorce). At 2:11 p.m., just 26 minutes after this filing,

ADA Solis texted DA Ramirez, "I'm on it." ECF 79-22 at 59 (Texts between Ramirez and

Solis). Despite the prohibitions contained in Texas Disciplinary Rules of Professional Conduct

1.06(b)(2) and 1.11(c), ADA Solis maintains that her representation of Mr. Herrera in a contested

divorce while she served as an ADA in the office prosecuting his then-wife was not a conflict of

interest. ECF 91-29 (Solis Dep. 118:21-25, 119:1-10).

---

[3] *See* Texas Bail Proceedings and Public Safety Report System, https://baildashboard.txcourts.gov/.

13

While Ms. Gonzalez was incarcerated, DA Ramirez called Ms. Becky Rocha's sister, Ms. Rosita Rocha, a confidante with whom he also had a long-time extramarital affair. ECF 91-25 (R. Rocha Dep. 6:11-19, 144:7-12). DA Ramirez and Ms. Rosita Rocha had been friends for 40 years; they first met in 1984 when she was just 18 years old and working at the Sheriff's Office while he was an ADA in Starr County. *Id.* (R. Rocha Dep. 6:8-10, 26:6-22 124:16-125-13). Throughout this friendship, they would contact each other "very often" and he would discuss his work. *Id.* (R. Rocha Dep. 126:1-4, 127:2-3). During one such call in April of 2022, DA Ramirez told Ms. Rosita Rocha about Ms. Gonzalez's arrest and inquired into how Ms. Rosita Rocha had "felt psychologically" when she had an abortion years before. *Id*. (R. Rocha Dep. 6:14-15). She replied that "The laws have not changed," pointing out "You should know. Becky went through one with your child." *Id.* (R. Rocha Dep. 7:15-16, 139:5-12). She implored him to "Get [Ms. Gonzalez] out as soon as possible." *Id.* (R. Rocha Dep. 141:1-9). DA Ramirez told her that ADA Villarreal and ADA Barrera were "on top of everything, and they're advising [DA Ramirez] of everything that's going on." *Id.* (R. Rocha Dep. 7:22-24). Ms. Gonzalez remained detained at the Jail.

On April 8, Ms. Gonzalez's stepfather Raul Garza, who had a long-time friendship with DA Ramirez, called the DA asking what he could do to help his stepdaughter. ECF 91-19 (G. Gonzalez Dep. 42:15-20). DA Ramirez told him he would have never charged Ms. Gonzalez if he had known she was Raul Garza's stepdaughter and that he should hire Calixtro Villarreal, who was a criminal defense attorney he "could work with." *Id.* (G. Gonzalez Dep. 43:1-6, 18-23); ECF 91:20 (L. Gonzalez Dep. 28:18-25, 29:1-12). Ms. Gonzalez's family then hired Calixtro Villarreal. ECF 91-19 (G. Gonzalez Dep. 42:10-12).

Ms. Gonzalez's arrest sparked headlines, and the Sheriff's Office and DA's Office began receiving press inquiries concerning the indictment and arrest of Ms. Gonzalez. *See, e.g.*, ECF 91-7 (Emails from the press). After consulting with Sheriff Fuentes, Major Carlos Delgado responded to one of the press inquiries at 8:16 p.m. on April 8, stating that Ms. Gonzalez was arrested for murder for a "self-induced abortion" and that her case remained under investigation. *Id.* at 3.; ECF 91-30 (R. Fuentes Dep. 45:20-25, 46:1-8). On April 9, the DA and ADAs also began receiving emails from the public alerting them that the murder charge was unlawful. *See, e.g.*, ECF 91-8 at 1 ("Abortions are not criminalized under the Texas Penal Code on Homicide or in SB8. You are illegally detaining her AND imposing excessive bail[.]"); *Id.* at 2 ("The charge against her – murder, allegedly – is unconstitutional."); *Id.* at 3 ("Self-inducing an abortion is not a crime in Texas. There is no criminal statute that allows for this arrest or prosecution."). Ms. Gonzalez remained detained.

On April 9 at 7:50 a.m., DA Ramirez texted Sheriff Fuentes about Ms. Gonzalez's case, saying "we've stirred up a hornets nest" and asking whether Ms. Gonzalez was still incarcerated. ECF 79-22 at 64 (Texts between Ramirez and R. Fuentes). The Sheriff responded that she was still in custody. *Id.* at 64. At 7:54 a.m., DA Ramirez also sent a group text to the ADAs stating, "We've obviously stirred up a hornet's nest with the [Gonzalez] indictment" and asking to "meet with you guys to discuss the press release I intend to release Monday." ECF 79-22 at 60 (Texts between Ramirez and all ADAs). ADA Barrera, ADA Solis, ADA Villarreal, and ADA Alfredo Garcia all responded with their availability and without asking any questions about Ms. Gonzalez's indictment. *Id.* at 60-61. That morning, DA Ramirez picked up Ms. Gonzalez's file. *Id.* at 59-60; ECF 91-21 (Villarreal Dep. 154:4-25). Ms. Gonzalez remained incarcerated until around 4 p.m., when she bonded out, with Sheriff Fuentes personally approving the bond posted

by a bail bond company. ECF 79-22 at 65 (Texts between Ramirez and R. Fuentes); ECF 91-30

(R. Fuentes Dep. 116:1-4); ECF 79-12 (Inmate Release Form). The DA's Office continued

receiving emails pointing out the unlawfulness of the murder charge and urging that it be

dismissed. ECF 91-8 at 7-11 (Emails from the Public).

By the afternoon of April 9th, more attorneys from both within and outside of the DA's

office joined the chorus proclaiming that Ms. Gonzalez's prosecution was unlawful. At 5:11

p.m., a local attorney, Brandy Voss, texted DA Ramirez a picture of Section 19.06. ECF 79-24 at

3. At 5:16 p.m., ADA Villarreal texted DA Ramirez: "As written the homicide statutes do not

apply." ECF 79-22 at 54 (Text between Ramirez and Villarreal). And at 6:21 p.m., former ADA

Hilda Garza texted DA Ramirez asking, "Did prosecutor presenting the case to grand jury look at

Penal Code 19.06[?]" ECF 79-24 at 5 (Text between Ramirez and H. Garza).

On April 10th, DA Ramirez issued a press release on the DA's Office Facebook page

stating: "In reviewing the applicable Texas law, it is clear that Ms. [Gonzalez] cannot and should

not be prosecuted for the allegation against her." ECF 79-20 at 12 (Press Release from Ramirez).

The release defended the criminal investigation, however, maintaining "it is clear that the Starr

County Sheriff's Department did their duty in investigating the incident brought to their attention

by the reporting hospital." *Id.* DA Ramirez filed a motion to dismiss the criminal case on April

11, selecting "The evidence is insufficient" and "Other: In the interest of Justice" as grounds, and

a judge dismissed the indictment later that morning. ECF 79-21 at 51 (Motion to Dismiss and

Order). ADA Villarreal sent a text to DA Ramirez letting him know that Texas Right to Life

issued a press release criticizing the charge. ECF 91-9 (Texts between Ramirez and Villarreal).

The release emphasized that Texas laws "clearly prohibit criminal charges for pregnant women"

and that their organization "opposes public prosecutors going outside of the bounds of Texas' prudent and carefully crafted policies." *Id.*

DA Ramirez made contemporaneous statements to friends and family, personally admitting he had wrongly charged Ms. Gonzalez with murder and worrying that he could lose his job because of it. ECF 79-21 at 73 (Texts between Ramirez and B. Rocha) ("It's very possible that my career is over . . . . I should have never indicted her. Because it's not Murder in Texas."); ECF 91-10 (Text between R. Ramirez and I. Ramirez) ("I fucked up Isaac."); ECF 91-11 at 4 (Affidavit of B. Garza) ("I fucked up."). Ramirez affirmed that if errors are made in the presentation of a case to the grand jury, "the buck should stop with me." ECF 91-24 (Ramirez Dep. 139:13-25). After the indictment was dismissed, DA Ramirez invited Ms. Gonzalez to his office for a meeting during which he "apologized a lot," admitting his wrongdoing to Plaintiff herself and becoming very "emotional." ECF 91-19 (G. Gonzalez Dep. 31:19-22, 32:1, 32:7-8); ECF 91-20 (L. Gonzalez Dep. 18:7-12). Following this meeting, DA Ramirez told Ms. Garza that "everything is going to be ok. They assured me they would not sue, and I believe them." ECF 91-11 at 4 (Affidavit of B. Garza).

Even though the Texas penal code is clear that a pregnant woman cannot be charged with a crime for her abortion, both Captain Fuentes and Sergeant Aguirre maintain to this day that if they were to receive another report of an abortion, they would proceed with a criminal investigation in exactly the same manner. ECF 91-28 (L. Fuentes Dep. 168:23-170:2); ECF 91-27 (Aguirre Dep. 160:17-161:8). Indeed, following the dismissal of Ms. Gonzalez's indictment, the Sheriff's Office did not hold any staff meetings concerning Ms. Gonzalez's investigation and did not update any of their procedures or policies regarding investigating abortions. ECF 91-30 (R. Fuentes 121:8-14). Captain Fuentes acknowledged that even after what happened with the

17

investigation and prosecution of Ms. Gonzalez, he has still "not read the law" as of May 2025 and does not "know what the law states right now." ECF 91-28 (L. Fuentes Dep. 169:25-170:2).

DA Ramirez was investigated and sanctioned by the Texas State Bar Grievance Committee for his misconduct. On January 24, 2024, DA Ramirez entered into an agreed judgment of probated suspension in which he admitted that: 1) ADAs under his supervision pursued criminal homicide charges against Ms. Gonzalez for "acts clearly not criminal" pursuant to Texas Penal Code Section 19.06; 2) he "failed to refrain from prosecuting a charge that was known not to be supported by probable cause"; 3) he was "consulted" by an ADA prior to the case being presented to the grand jury; 4) he "knowingly permitted" the conduct of the ADA under his supervision; 5) he knew that the ADAs had violated the disciplinary rules and "knowingly failed" to take remedial action to avoid or mitigate the consequences of such misconduct; and 6) that he knowingly made false statements in his response to the Grievance complaint by denying that he was aware of the case prior to its presentment to the grand jury. ECF 79-21 at 67-71 (Agreed Judgment of Probated Suspension).

## II.    Defendants' version of events is demonstrably contradicted by the record.

Defendants each take the position that they played no role in the criminal investigation, decision to charge, or arrest of Ms. Gonzalez. ECF 79 at 9 (Def. Ramirez's Mot. Summ. J.); ECF 81 at 10 (Def. Barrera's Mot. Summ. J.); ECF 88 at 9 (Def. Fuentes's Mot. Summ. J.). The record contains significant evidence that contradicts their narrative.

For example, DA Ramirez claimed that "none of the staff or ADAs were involved in the investigation." ECF 91-24 (Ramirez Dep. 157:5-6). He specifically asserted that the ADAs did not "field investigatory questions from the sheriff's office" or "tell the sheriff's office what steps to take." *Id.* (Ramirez Dep. 157:13-21). ADA Barrera asserted that DA Ramirez has "never gotten involved" in any of her cases, ECF 91-23 (Barrera Dep. 51:11-13), and insisted that

"[n]obody was working on that case at our office." *Id.* (Barrera Dep. 102:12). She likewise insisted that she was "not sure what law enforcement does within their own, you know, departments," *Id.* (Barrera Dep. 127:24-25). In response to interrogatories asking about their roles in Ms. Gonzalez's case, both DA Ramirez and ADA Barrera swore: "Investigation, None. Arrest, None." ECF 91-16 at 3 (Barrera Response to Interrogatories); ECF 91-17 at 3 (Ramirez Response to Interrogatories). And Sheriff Fuentes maintained that "the only thing" the investigators did was "document...everything and present[] the case to" the DA's office. ECF 91-30 (R. Fuentes Dep. 24:21-23). Yet, as discussed above, documentary evidence, deposition testimony from other witnesses, and Defendants' own electronic messages directly contradict these accounts. *See, e.g.*, ECF 91-29 (Solis Dep. 38:11-19); ECF 91-21 (Villarreal Dep. 63:8); ECF 91-27 (Aguirre Dep. 95:20-96:10); ECF 91-28 (L. Fuentes Dep. 59:7-11, 133:13-18) ECF 91-30 (R. Fuentes Dep. 22:15-23:5); ECF 79-21 at 21-25 (Texts between Barrera and Aguirre); ECF 79-21 at 26-32 (Texts between Barrera and Muniz).

The findings in the Agreed Judgement of Probated Suspension, which DA Ramirez swore to and helped draft, also contradict his testimony. ECF 91-15 at 10-11 (Grievance Committee Exchanges); ECF 91-24, (Ramirez Dep. 274:2-11, 260:9-11) ("[W]e actually went back and forth for almost a month, maybe three weeks, negotiating language,"). In his response to the grievance complaint, DA Ramirez claimed he "had never seen the file," and did not know the facts of the case. ECF 91-15 at 4, 7 (Grievance Committee Exchanges). But in the Agreed Judgement of Probated Suspension, DA Ramirez admitted that he was, in fact, "consulted by an Assistant District Attorney prior to the matter being presented to the Grand Jury" and that he "knowingly made a false statement of material fact in his written response to the complaint." ECF 79-21 at 67-68 (Agreed Judgment of Probated Suspension).

DA Ramirez's testimony downplaying his close relationships with Ms. Becky Rocha and Ms. Rosita Rocha and denying involvement with Ms. Becky Rocha's prior abortion is likewise contradicted by the record. DA Ramirez characterized Ms. Becky Rocha as merely an "acquaintance," saying "I don't have a relationship with her, no," and insisting the relationship was never "a romantic" one. ECF 91-24 (Ramirez Dep. 252:6-10). His text messages tell a different story. *See e.g.*, ECF 91-14 at 1 (Text between B. Rocha and Ramirez) ("I surely do miss you. . . . I really do amor. I know that you're not convinced but I believe that we were made for each other. It's not a coincidence that we've known each other forever. Since you were 17."). *See also id.* at 2 (Photo of Ramirez and B. Rocha).

His denial of his personal involvement with Ms. Becky Rocha's abortion is contradicted by the independent testimony of two witnesses. *Compare* ECF 91-24 (Ramirez Dep. 224:25, 225:1-2) (Q. "[Y]ou do not consider yourself as having committed a criminal act by assisting Becky Rocha with obtaining an abortion, correct? A. I don't know what you're talking about.") *with* ECF 91-25 (R. Rocha Dep. 136:18-24) ("It was Gocha's child, and Gocha had asked Becky not to have -- not to have the child. Was he married?  Yes.  And did he pay for the abortion? Yes."); ECF 91-26 (B. Rocha Dep. 21:18-21) ("[H]e told me that I had to have – get – I mean, he didn't tell me like straight out to have an abortion, but he told that me that I could – we couldn't have that baby because of his career."); ECF 91-25 (R. Gocha Dep. at 137:3-5) (after the procedure, "Gocha was waiting for us outside, and he, you know, hugged her, told her everything would be okay. He took us to Red Lobster.").

And his testimony denying a close relationship with Ms. Rosita Rocha, ECF 91-24 (Ramirez Dep. 274:24), is belied by texts establishing that they had a decades-long friendship during which he confided in her about his work and family and regularly solicited sex and drugs

from her. *See, e.g.*, ECF 91-13 at 11 (Texts between R. Rocha and Ramirez) ("How much is a small bag of coke? I just wanted enough to put on your big nipples while we fuck" "20 baby."). For four decades, DA Ramirez engaged in extensive communications with Ms. Rosita Rocha, some of which are attached. *See also id*. at 2-10. Although Ramirez testified that he never invited Ms. Rosita Rocha to his office, his texts show otherwise. *Compare* ECF 91-24 (Ramirez Dep. 275:6-7) ("Q. You have invited Ms. Rocha to your office? A. No.") *with* ECF 91-13 at 1 ("I'd have to sneak you into the Courthouse now unless you have a place . . Let's fuck").

Lastly, discovery reveals that DA Ramirez deleted text messages related to Ms. Gonzalez's case, ECF 91-24 (Ramirez Dep. 116:4-5), and that several messages on ADA Barrera's phone were deleted after this Court specifically ruled that these texts must be produced. On January 10, 2025, this Court ordered that Defendants' text messages were subject to discovery. ECF 64 (January 10, 2025 Hr'g Tr. at 11, 19-20). The morning of Defendant Barrera's deposition, Defendants produced a Cellebrite report for Defendant Barrera's phone. The report uncovered numerous relevant text messages labeled "user deleted," including messages between ADA Barrera, SCSO, and DA's Office investigators about the Gonzalez case that had not been previously produced. ECF 79-21 at 24 (Texts between Barrera and Aguirre); ECF 79-21 at 41 (Texts between B. Garza and Barrera). Defendant Barrera claimed not to remember deleting these texts but when asked "is there anyone else who deleted them, to your knowledge, other than you?" she said, "[n]o. I mean, I would have deleted them." ECF 91-23 (Barrera Dep. 152:20-153:1). The messages were deleted on February 24, 2025, one month prior to her deposition and after the Court ordered that her text messages were subject to discovery.

## LEGAL STANDARD

Summary judgment is appropriate only where "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). The burden rests with the moving party to demonstrate "the absence of a genuine issue as to any material fact," with all evidence construed in the light most favorable to the nonmoving party. *Adickes v. S. H. Kress & Co*., 398 U.S. 144, 157 (1970); *Tolan v. Cotton*, 572 U.S. 650, 651 (2014) ("The evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor."). Because questions of fact are reserved for the jury, "[i]t is not the function of the trial judge, in ruling on a motion for summary judgment, to weigh evidence, assess credibility, or determine the most reasonable inference to be drawn from the evidence." *Honore v. Douglas*, 833 F.2d 565, 567 (5th Cir. 1987). To prevail on a motion for summary judgment, the defendant must submit evidence that negates a material element of the plaintiff's claim or demonstrate that the plaintiff has no evidence to support an essential element of her claim. *See Crescent Towing and Salvage Co. v. M/V Anax*, 40 F.3d 741, 744 (5th Cir. 1944).

If there are disputed issues of material fact concerning the application of absolute or qualified immunity, a motion for summary judgment should be denied. *Palmer v. Johnson*, 193 F.3d 346, 351 (5th Cir. 1999). And unlike a legal ruling on the application of qualified and absolute immunity, a denial of summary judgment due to the existence of disputed material facts is not immediately appealable. *Id*. ("[I]f the district court concludes that the summary judgment record raises a genuine issue of material fact with respect to whether the defense of qualified immunity is applicable, then that decision is not immediately appealable[.]").

"To negate a defense of qualified immunity and avoid summary judgment, the plaintiff need not present 'absolute proof.'" *Ontiveros v. City of Rosenberg, Tex.*, 564 F.3d 379, 382 (5th

Cir. 2009). The plaintiff solely needs to present material facts, or those "that might affect the outcome of the suit." *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986). If a "reasonable jury could return a verdict for the nonmoving party" there is a "genuine" dispute that would preclude summary judgement. *Id.* at 248.

## SUMMARY OF THE ARGUMENT

Summary judgment is wholly improper here, where Plaintiff and Defendants present diametrically opposed accounts of what transpired during the criminal investigation, prosecution, and arrest of Ms. Gonzalez. The lack of consensus on essentially every fact makes this Court's inquiry concerning the legal questions impossible. For this reason alone, the Court should deny Defendants' Motions for Summary Judgment.

Should this Court determine otherwise, the facts adduced during limited discovery, taken in the light most favorable to Plaintiff, establish that DA Ramirez, ADA Barrera, and Sheriff Fuentes acted together to investigate, charge, and arrest Ms. Gonzalez for murder, knowing that there was no probable cause to do so. Because DA Ramirez and ADA Barrera acted in an investigatory capacity by providing legal advice and directions about how to conduct the investigation, and because their involvement occurred when there was no probable cause, they are not entitled to absolute prosecutorial immunity. In addition, DA Ramirez, ADA Barrera, and Sheriff Fuentes all acted to drive Ms. Gonzalez's arrest and charging without probable cause. Their conduct violated Ms. Gonzalez's clearly established rights to be free from false arrest and malicious prosecution. Accordingly, Defendants are not entitled to qualified immunity.

Alternatively, pursuant to Rule 56(d), this Court should delay resolution of the Defendants' Motions for Summary Judgment given the outstanding discovery disputes that would shed additional light on Plaintiff's claims.

**ARGUMENT**

I.   **Defendants' motions for summary judgment fail because there are numerous disputed issues of material fact that directly bear on the immunity assertions.**

The Parties present diametrically opposed accounts of what occurred. Defendants each claim that they had nothing to do with investigating, charging, or arresting Ms. Gonzalez, relying predominantly on their own deposition testimony in which they deny responsibility. *See, e.g.*, ECF 79 at 10 (Def. Ramirez's Mot. Summ. J.); ECF 81 at 10 (Def. Barrera's Mot. Summ. J.); ECF 88 at 9 (Def. Fuentes's Mot. Summ. J.). Plaintiff alleges that all three Defendants personally played a key role in her unlawful investigation, arrest, and prosecution, relying in large part on the deposition testimony of non-party witnesses who have first-hand knowledge of the Defendants' conduct as well as numerous inconsistencies in the Defendants' own testimony. *See supra.* Plaintiff's account is supported by documentary evidence including texts, WhatsApp messages, and contemporaneously made investigator notes, all of which directly contradict the Defendants' self-serving narrative. *See, e.g.*, ECF 79-21 at 21-25 (Texts between Barrera and Aguirre); ECF 79-21 at 26-32 (Texts between Barrera and Muniz); ECF 91-1 at 1-2 (Notes of Inv. Muniz).

As discussed above, the Defendants' deposition testimony stands in stark contrast with the rest of the evidence. These disputed facts require an assessment of the Defendants' credibility, since their narrative rises and falls based on their own testimony. This is improper on summary judgment. And as revealed through discovery, their credibility is questionable. For example, DA Ramirez attempts to distance himself from the Agreed Judgement of Probated Suspension that he agreed to and meticulously edited. ECF 91-24 (Ramirez Dep. 270:6-18). But the DA cannot have it both ways. Either he lied when admitting to misconduct to resolve the grievance, or he lied during his deposition in this case. DA Ramirez's credibility is further

undermined by his testimony downplaying his relationships with long-time paramours Becky and Rosita Rocha, who provided damning testimony concerning his knowledge that abortion was not a crime despite his decision to investigate and prosecute Ms. Gonzalez for murder. ECF 91-25 (R. Rocha Dep. 136:18-24); ECF 91-26 (B. Rocha Dep. 21:18-21). Multiple text messages directly contradict his testimony, further revealing DA Ramirez's willingness to bend the truth when it suits him. Assessing his credibility must be determined by the factfinder.

Critically, the disputed facts are material to the Defendants' assertions of both absolute and qualified immunity. As discussed below, application of absolute immunity depends on the roles DA Ramirez and ADA Barrera played in the criminal investigation and prosecution of Ms. Gonzalez. *See* discussion, *infra*, Part III. And qualified immunity turns on whether Defendants each played a role in causing a constitutional violation. *See* discussion, *infra*, Part IV. Both of these inquiries require a factfinder to wade through the conflicting testimony and make credibility determinations to determine whether and how the Defendants caused Plaintiff's injuries. Because that inquiry is not proper on summary judgment, the Defendants' motions necessarily fail.

Defendants' focus on Plaintiff's alleged lack of personal, first-hand knowledge about the inner workings of the Sheriff's and DA's Offices misses the mark. Of course, Defendants possess more information about their investigation, about which Ms. Gonzalez was never privy to. That is why, on summary judgment, the Court "should review the record as a whole," *Orr v. Copeland*, 844 F.3d 484, 490 (5th Cir. 2016), including all evidence adduced during discovery, to determine whether "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56. A contrary approach would make engaging in discovery prior to summary judgment meaningless.

Because summary judgment can only be granted when there are no material facts in dispute concerning the legal questions presented to the court, Defendants' motions for summary judgment fail at the outset. *Tolan*, 572 U.S. at 656. The Court's inquiry should end here.

## II. Defendants Ramirez and Barrera are not entitled to absolute immunity because they acted beyond the scope of their prosecutorial function.

Defendants Ramirez and Barrera are not entitled to absolute prosecutorial immunity. Evidence in the record establishes that they were each involved well beyond the traditional advocatory functions of a prosecutor: they directed the Sheriff's officers to take specific investigatory actions and provided legal advice urging the investigation to continue the investigation and submit a charge lacking probable cause, all outside the judicial phase of the criminal process.

Absolute immunity is granted "quite sparingly" because it "denies a person whose federal rights have been violated by a government official any type of remedy, regardless of the conduct." *O'Neal v. Mississippi Bd. of Nursing*, 113 F.3d 62, 65 (5th Cir. 1997) (quoting *Forrester v. White*, 484 U.S. 219, 224 (1988)). The "actions of a prosecutor are not absolutely immune [in Section 1983 suits for damages] merely because they are performed by a prosecutor." *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993); *see also Wooten v. Roach*, 964 F.3d 395, 407 (5th Cir. 2020) ("[I]mmunity is not automatic."); *Loupe v. O'Bannon*, 824 F.3d 534, 538-39 (5th Cir. 2016). Individual prosecutors' conduct is only protected under absolute immunity when their "actions [...] are connected with the prosecutor's role in judicial proceedings, not every litigation-inducing conduct." *Burns v. Reed*, 500 U.S. 478, 494 (1991). Thus, courts must analyze the facts of each case to determine if the prosecutor's actions are "intimately associated with the judicial phase of the criminal process." *Imbler v. Pachtman*, 424

U.S. 409, 430 (1976). Only then may a prosecutor benefit from absolute immunity for "act[ing] within the scope of his prosecutorial duties." *Id.* at 420.

The mere fact that certain conduct is "integral" to a prosecutor's job or serves a "vital public function" does not render it immune. *Buckley,* 509 U.S. at 278. Likewise, it is insufficient that the conduct is related "in some way" to the decision to prosecute; the action must be "closely associated with the judicial process" to be shielded by the immunity doctrine. *Burns,* 500 U.S. at 495. Courts recognize various categories of functions that are not protected under absolute immunity. Here, Defendants' activities fall within three such categories.

*First*, absolute immunity is not available when a prosecutor is performing an investigative function and thus acting more akin to a detective or police officer. *See Hoog-Watson v. Guadalupe Cty.*, 591 F.3d 431, 438 (5th Cir. 2009); *Wearry v. Foster*, 33 F.4th 260, 263 (5th Cir. 2022) ("When a prosecutor joins police in the initial gathering of evidence in the field, he acts outside his quasi-judicial role as an advocate; instead he acts only in an investigatory role for which absolute immunity is not warranted."). "[I]nformation-gathering is more analogous to investigative police work than advocatory conduct." *Singleton v. Cannizzaro*, 956 F.3d 773, 783 (5th Cir. 2020).

*Second*, "prosecutors are not entitled to absolute immunity for their action in giving legal advice to the police." *Buckley*, 509 U.S. at 271; *see also Loupe*, 824 F.3d at 540 ("[t]he mere rendering of legal advice [to law enforcement] is not so closely connected to the judicial process that litigation concerning that advice would interfere with it.") (internal citation omitted). Instead, prosecutors are only accorded qualified immunity for providing such advice. As the Supreme Court noted, it would be "incongruous to allow prosecutors to be absolutely immune

from liability for giving advice to the police, but to allow police officers only qualified immunity for following the advice." *Burns*, 500 U.S. at 495.

*Third*, a "prosecutor neither is, nor should consider himself to be, an advocate before he has probable cause to have anyone arrested." *Buckley*, 509 U.S. at 274. *Buckley* set forth this test in the context of distinguishing between "the advocate's role in evaluating evidence and interviewing witnesses as he prepares for trial, on the one hand, and the detective's role in searching for the clues and corroboration that might give him probable cause to recommend that a suspect be arrested, on the other hand." *Id.* at 273. While there is no bright line rule, "the existence of probable cause with respect to a particular suspect is a significant factor to be used in evaluating" whether a prosecutor's conduct is advocatory, rather than investigative. *Cousin v. Small*, 325 F.3d 627, 633 (5th Cir. 2003). Even if the "prosecutors later called a grand jury to consider the evidence [their] work produced [, that] does not retroactively transform that work from the administrative into the prosecutorial." *Buckley*, 509 U.S. at 275-76; *see also id.* at 274 n.5 ("Of course, a determination of probable cause does not guarantee a prosecutor absolute immunity from liability for all actions taken afterwards.").

Absolute immunity is an affirmative defense, with the initial burden of proof on the prosecutor asserting it.[4] *Burns*, 500 U.S. at 486 (the prosecutor "bears the burden of showing that such immunity is justified for the function in question"); *Bokor v. Hattox*, No. CIV.A. 4:03-CV-426-Y, 2004 WL 2468917, at *3 (N.D. Tex. Nov. 3, 2004), *aff'd*, 205 F. App'x 293 (5th Cir. 2006) (prosecutor bears the burden of demonstrating that the plaintiff's claims arise from "those

---

[4] Both Ramirez and Barrera's briefs confusingly imply that it is Plaintiff's burden to "show that the immunity defense is not available." ECF 79 at 18 (Def. Ramirez's Mot. Summ. J.); ECF 81 at 18 (Def. Barrera's Mot. Summ. J.). But this is only true of *qualified*, and not *absolute* immunity. *See Wearry v. Foster*, 33 F.4th 260, 269 (5th Cir. 2022) (noting that *Cousin v. Small*, 325 F.3d 627 (2003) "erred in imposing the burden of proof on the plaintiff.").

prosecutorial activities intimately associated with the judicial phase of the criminal process")

(quoting *Barr v. Abrams*, 810 F.2d 358, 361 (2d Cir. 1987)); *see also Cook v. City of Tyler*, No.

6:17-CV-00333-RWS, 2018 WL 4473110, at *12 (E.D. Tex. Sept. 18, 2018) ("For summary

judgment purposes, the Fifth Circuit has consistently held that the defendant who pleads the

affirmative defense of absolute immunity bears the burden of proving that the conduct at issue is

protected."). Defendants can meet their burden to assert absolute immunity *only* if they can

establish that the plaintiff could prove no set of facts entitling them to recover damages. *Jarvis v.

Roberts*, 489 F. Supp. 924, 928 (W.D. Tex. 1980). As detailed below, even at this stage of

incomplete discovery, Plaintiff has set forth competent summary judgment evidence that

consistently shows the opposite: that the prosecutor Defendants' conduct was not associated with

the judicial phase of the criminal process, and therefore not entitled to absolute immunity.

Defendants have failed to meet their burden for summary judgment on absolute immunity.

### A. Defendant Barrera's conduct falls outside the scope of absolute immunity.

Defendant Barrera's motion characterizes her involvement in Plaintiff's criminal case as

"presenting the case to the grand jury and responding to a few questions from investigators."

ECF 81 at 20 (Def. Barrera's Mot. Summ. J.). But deposition testimony and evidence in the

record tell a dramatically different story. Because she saw Ms. Gonzalez's prosecution as a

potential "big case" that "could set her apart," ECF 91-11 at 4 (Affidavit of B. Garza), ADA

Barrera worked closely with the Sheriff's Office at nearly every stage of the investigation.

ADA Barrera directed the Sheriff's staff while they investigated Ms. Gonzalez's conduct.

On January 11, 2022, day one of the Sheriff's Office investigation, Sheriff's Office Investigator

Muniz texted Defendant Barrera about a case involving abortion pills. ECF 79-21 at 26 (Texts

between Muniz and Barrera). Investigator Muniz put it plainly -- "[w]e need guidance please."

*Id*. From that point on, ADA Barrera provided detailed guidance for the investigation. First, she directed Investigator Muniz to "take pictures of the ashes" and allow the funeral home to send the fetus's ashes to Plaintiff. *Id.* at 27. The next day, Investigator Muniz invited Defendant Barrera to sit in on her interview of Dr. Lozano, who had treated Ms. Gonzalez at the hospital. When Defendant Barrera said she could not make it, Investigator Muniz thanked Defendant Barrera "for always being a txt/phone call away." *Id.* at 29. Defendant Barrera spoke separately with Dr. Lozano and two other hospital employees about the investigation. ECF 91-11 at 2 (Affidavit of B. Garza). ADA Barrera also told Investigator Muniz to obtain subpoenas for Ms. Gonzalez's medical records. ECF 79-21 at 28 (Texts between Barrera and Muniz).

On January 18, 2022, ADA Barrera met with Investigator Rafael Aguirre "to discuss a case involving an abortion" ECF 79-21 at 21 (Texts between Barrera and Aguirre). The same day, she continued directing his investigation, texting, "[l]et's talk to that lady that gave her the drugs first. Interview her." *Id*. at 24. Investigator Muniz wrote in a note about the investigation of Ms. Gonzalez dated January 27, 2022: "will staff with DAs." ECF 91-1 at 1 (Notes of Inv. Muniz). Ms. Barrera testified that she was familiar with the phrase, which meant "[t]hey'll talk to a prosecutor about their investigation on a case." ECF 91-23 (Barrera Dep. 79:11-12). ADA Barrera met with Investigator Muniz on February 1, 2022, to "discuss everything [Investigator Muniz had] on the abortion case." ECF 79-21 at 29 (Texts between Barrera and Muniz). According to ADA Barrera's then-supervisee, ADA Barrera "spoke often with the Sheriff's Office about this investigation" because they were "getting information for her." ECF 91-11 at 3 (Affidavit of B. Garza). Plaintiff's summary judgment evidence clearly establishes that ADA Barrera's role was more akin to information-gathering or investigation, which falls outside of

prosecutorial function. Accordingly, ADA Barrera is not entitled to absolute immunity, and her motion for summary judgment must fail.

Beyond advising the Sheriff's Office staff about what steps they should take to investigate Ms. Gonzalez, ADA Barrera provided legal advice throughout the investigation. On day one of the investigation, Investigator Muniz, ADA Barrera, Investigator Aguirre, and Captain Lenard Fuentes spoke over speakerphone. ECF 91-22 (Muniz Dep. 155:11-16); ECF 91-29 (L. Fuentes Dep. 59:9-21); ECF 91-23 (Barrera Dep. 85:13-18). While Investigator Muniz and Captain Fuentes testified that on this call they asked ADA Barrera a variety of legal questions, including "how to classify" Plaintiff's conduct and whether abortion was illegal, ECF 91-22 (Muniz Dep. 89:19-24, 90:3-5); ECF 91-28 (L. Fuentes Dep. 59:7-11), ADA Barrera claims that they discussed a more technical topic: she only "confirmed […] the legal definition of 'individual'" under Texas Penal Code § 19.01. ECF 91-23 (Barrera Dep. 94:8-21). Whatever the *substance* of the advice, however, ADA Barrera provided legal advice to law enforcement, without which the investigation would not have continued.

Subsequently, ADA Barrera directed DA's Office Crime Victims Coordinator Bernice Garza to research who would be the appropriate victim for Plaintiff's alleged conduct under Texas law. ECF 91-11 at 2 (Affidavit of B. Garza). ADA Barrera then directed Investigator Muniz, "[w]hen you submit the case, the charge is murder." ECF 91-22 (Muniz Dep. 81:20-25, 82:2-7). Once the DA's Office determined that the investigation was complete, and Investigator Muniz was preparing the case file to submit to the DA's Office for grand jury presentation, ADA Barrera insisted "[o]kay but I need it before to review it." ECF 91-4 at 8 (Texts between Barrera and Muniz). Prior to the grand jury, she met at least twice with DA Ramirez to discuss the facts of the case, and he directed her to proceed with the grand jury presentation. ECF 91-24 (Ramirez

Dep. 216:15-18, 193:5-15); ECF 91-23 (Barrera Dep. 103:15-21); ECF 79-21 at 32 (Texts between Barrera and Muniz).

The Sheriff and his staff all testified during their depositions that receiving legal advice from the DA's office was their regular practice. *See, e.g.,* ECF 91-30 (R. Fuentes Dep. 26:6-9, 46:21-24, 47:1-2, 72:22-25, 73:1-4) ("[I]t's a procedure that any time it's a big – there's a crime like that to contact the DA's office, because they are the prosecutor. They're attorneys, and they'll give legal advice"); ECF 91-28 (L. Fuentes Dep. 66:2-4, 124:4-7, 176:10-13) ("Q. Is cooperation and coordination between your office and the DA's office essential to investigate crimes? A. Yes."); ECF 91-22 (Muniz Dep. 46:13-17, 51:15-16) ("A: If there's more serious charges, we would – again, like I said, we would conduct – we would consult with our supervisors, and our supervisors would tell us 99.9 percent of the time, 'Contact the DA's office for advice.'").

The prosecutors at the District Attorney's Office also acknowledged that they frequently provide legal advice to the Sheriff's Office. *See, e.g.,* ECF 91-23 (Barrera Dep. 77:8-11) ("Q. Does the Starr County Sheriff Office ask the DA's office for help identifying what – what Penal Code sections could apply to a situation? A. Yes, they – they – they do."). DA Ramirez even admitted that ADA Barrera provided legal advice to the Sheriff's Office concerning Ms. Gonzalez's investigation. ECF 91-24 (Ramirez Dep. 169:2-3) ("So that's her giving legal advice to Ms. Muniz."); *Id.* at 176:15 ("You know, we can give legal advice"); *Id.* at 203:15-24 ("That's basically legal advice to the investigator telling him we need all the facts. [...]And that's basically the legal advice that Ms. Barrera was giving the investigator.").

The Supreme Court has stated clearly that "[a]dvising the police in the investigative phase of a criminal case is not so 'intimately associated with the judicial phase of the criminal

process' that it qualifies for absolute prosecutorial immunity." *Burns*, 500 U.S. at 480 (quoting *Imbler*); *see also Buckley*, 509 U.S. at 271. Despite *Burns*, Defendant Barrera asserts that *Terwilliger v. Reyna* and *Spivey v. Robertson* entitle her to immunity. ECF 81 at 22 (Def. Barrera's Mot. Summ. J.). But her brief incorrectly interprets the holdings of *Terwilliger* and *Spivey*. Both cases explicitly acknowledge the general rule of *Burns* but propose an exception that is not applicable here: absolute immunity only protects prosecutors when they are writing or "suggesting legal conclusions" for a probable cause affidavit to support an arrest warrant. *Terwilliger v. Reyna*, 4 F.4th 270, 280 (5th Cir. 2021). *See also Spivey v. Robertson*, 197 F.3d 772, 776 (5th Cir. 1999). The language ADA Barrera cites from *Terwilliger* pertains only to liability for "furnish[ing] the factual basis for the offense criteria used in the probable cause affidavits." 4 F.4th at 280. These cases are consistent with the general rule and do not stand for the proposition that *all* legal advice to investigators is shielded by immunity—nor could they suggest otherwise, as then the holdings would upend well-settled Supreme Court law. Indeed, *Terwilliger* echoed that "a prosecutor's absolute immunity does not extend to 'advising the police in the investigative phase of a criminal case.'" *Terwilliger*, 4 F.4th at 280 (citing *Burns*). Plaintiff's claims here center on ADA Barrera's close involvement with the investigative phase of the case; as in *Terwilliger*, she "was constantly in touch as the investigation proceeded." 4 F.4th at 281. She was, throughout the investigation, "always … a txt/phone call away." ECF 79-21 at 29 (Texts between Barrera and Muniz).

Finally, all of ADA Barrera's actions occurred before probable cause to arrest or indict Ms. Gonzalez existed. Indeed, since the law specifically exempted Ms. Gonzalez's conduct from criminal prosecution, the investigation yielded no facts from which probable cause *could* have ripened. *See* Tex. Penal Code § 19.06. Even setting that aside, the conduct previously described

all took place before the grand jury convened, before any charges were filed with a court, and before Ms. Gonzalez was arrested. ADA Barrera surely knew that probable cause did not exist when she texted Aguirre to "hold off" on arresting Ms. Gonzalez so they could gather more evidence. ECF 79-21 at 24 (Texts between Barrera and Aguirre). Under the rubrics of *Buckley* and *Cousin*, the timing strongly supports a finding that her actions are not protected by absolute prosecutorial immunity. *See Buckley*, 509 U.S. at 274; *Cousin*, 325 F.3d at 632.

### B. Defendant Ramirez's conduct falls outside the scope of absolute immunity.

DA Ramirez asserts that he is protected by absolute prosecutorial immunity because he did not speak directly with Sheriff's Office investigators, "did not present the case to the grand jury," and "was not even in Starr County" when the grand jury presentation occurred. ECF 79 at 16 (Def. Ramirez's Mot. Summ. J.). Further, Defendant Ramirez argues that "directing ADA Barrera to use the grand jury process" and meeting with her at least twice during the ongoing investigation were actions "intimately associated with the judicial phase of the criminal process." ECF 79 at 22 (Def. Ramirez's Mot. Summ. J.); (citing *Imbler*, 424 U.S. at 430). But DA Ramirez was more involved in the investigative phase than his motion would allow, and there are genuine issues of material fact as to whether his conduct falls into the limited scope of absolute immunity. As the record reveals, DA Ramirez's actions occurred during and in furtherance of the investigation, and, as he admits, when there was no probable cause. *See Burns*, 500 U.S. at 495; *Buckley,* 509 U.S. at 274.

Defendant's reliance on the grand jury—based on his testimony that he merely instructed Defendant Barrera to present the case to the grand jury—does not give him *Imbler*'s protection. *Imbler* concerns absolute immunity for conduct *during* grand jury proceedings, not acts undisputedly *prior* to grand jury presentation. *See, e.g.*, *Morrison v. City of Baton Rouge*, 761

F.2d 242, 246-48 (5th Cir. 1985) (absolute immunity granted where "[t]he only specific allegations against [District Attorney] Brown concern the manner of his presentation of evidence to the grand jury"). Plaintiff has not alleged that the prosecutor-Defendants are liable for any conduct *during* the grand jury proceedings. Instead, Plaintiff's claims concern both before and after the grand jury proceedings.

DA Ramirez had a conversation with Ms. Rosita Rocha during which he admitted that he had been aware of the investigation while it was going on. ECF 91-25 (R. Rocha Dep. at 7:22-24) ("'Yes, Rosie. Abel and -- and Alexandria [Barrera] are on top of everything, and they're advising everything that's going on.'"). Indeed, DA Ramirez held at least two meetings with ADA Barrera during the investigation to "discuss what evidence had been collected in this investigation" and to "ask ADA Barrera if there was enough legal basis to prosecute this case." ECF 91-11 at 3 (Affidavit of B. Garza). In the meeting on February 1, 2022, Defendant Ramirez directed ADA Barrera to instruct Investigator Muniz that the investigative facts should be presented to a grand jury—even though he testified that he then understood there was no probable cause to indict Ms. Gonzalez. ECF 79-21 at 76 (Texts between Ramirez and Barrera); ECF 79-21 at 32 (Texts between Barrera and Muniz); ECF 91-24 (Ramirez Dep. 152:1-3) ("Okay. So spoke to Gocha. Just submit for Grand jury review. No arrest warrant."). There is more to the story than the patchwork of partially deleted text messages reveals. Defendant Ramirez himself admits that the February 1st conversation was not the first time he learned of Plaintiff's case. ECF 91-24 (Ramirez Dep. 191:10-12).

DA Ramirez prided himself on working closely with law enforcement during their investigations. He emphasized in his campaign for election, "I will work closely with law enforcement to ensure that the integrity of their investigations remains intact." ECF 91-3 at 5:00-

35

5:15 (Ramirez Campaign Video). Depositions of the Sheriff's Office employees confirm that DA Ramirez was often looped into their work. ECF 91-28 (L. Fuentes Dep. 68:13-15, 124:2-4, 176:10-13) (Q. Did you have multiple conversations with the DA's office regarding Lizelle's investigation? A. I know I had one for sure…. Q. if you need to contact the DA's office, you will contact DA Ramirez directly? A: For the most part…. Q. Is cooperation and coordination between your office and the DA's office essential to investigate crimes? A. Yes."). This testimony is consistent with the Grievance Oversight Committee's disciplinary finding—which Defendant Ramirez edited and agreed to—that "[r]espondent [Ramirez] was consulted by an Assistant District Attorney prior to the matter being presented to the Grand Jury [and] [r]espondent knowingly permitted the conduct of the Assistant District Attorney under his direct supervision." ECF 79-21 at 68 (Agreed Judgment of Probated Suspension).

All this evidence shows that DA Ramirez was "personally involved in the investigation"—and thus is not entitled to absolute immunity. *Wooten v. Roach*, 964 F.3d 395, 410 (5th Cir. 2020) (finding a District Attorney shielded by absolute immunity where Plaintiff failed to allege *any* specific actions that he took in her investigation). Indeed, DA Ramirez's investigative activities are more akin to those at issue in *Terwilliger*, where the Fifth Circuit found that a prosecutor was not entitled to absolute immunity where the he "was constantly in touch as the investigation proceeded … yet still decided to approve a global arrest warrant for EIOCA, impl[ying] that he 'exercised judgment going to the truth or falsity of the evidence.'" *Terwilliger*, 4 F.4th at 281, citing *Spivey*, 197 F.3d at 775. Defendant Ramirez's attempt to stretch absolute immunity to cover his actions during the investigation is "too much, since almost any action by a prosecutor could be said to be in some way related to the ultimate decision whether to prosecute." *Burns*, 500 U.S. at 480.

Mr. Ramirez's participation in the investigation of Ms. Gonzalez also occurred before any probable cause existed to arrest or charge her, as he admitted. *See, e.g.,* ECF 91-24 (Ramirez Dep. at 208:11-15) ("But if this was on February the 1st of 2022, we definitely didn't have enough facts. So that's what the discussion would have been about. Q. What didn't you have enough facts about? A. To charge anything."); ECF 79-21 at 68 (Agreed Judgment of Probated Suspension) ("failed to refrain from prosecuting a charge that was not supported by probable cause."). Despite his acknowledgment that the investigation had yielded no facts that would support probable cause, the record indicates that it was *his* decision to direct the Sheriff's Office to submit the murder charge and for ADA Barrera to present it to the grand jury. ECF 79-21 at 85 (Texts between Barrera and Muniz, Feb. 1, 2022) ("So spoke to Gocha. Just submit for Grand jury review. No arrest warrant.").

Indeed, after Ms. Gonzalez's arrest, DA Ramirez expressly took responsibility for her prosecution during multiple conversations. He personally met with the Plaintiff and apologized to her. (G. Gonzalez Dep. 32:1, 31:19-22); (L. Gonzalez Dep. 18:9-12). After the case was dismissed, he exchanged text messages with Ms. Becky Rocha, stating "It's very possible that my career is over . . . . I should have never indicted her. Because it's not Murder in Texas." ECF 79-21 at 73 (Texts between Ramirez and B. Rocha). *See also* ECF 91-10 (Text between R. Ramirez and I. Ramirez) ("I fucked up Isaac."); ECF 91-11 (Affidavit of B. Garza) ("I fucked up."). In his negotiated settlement with the Grievance Committee, District Attorney Ramirez expressly agreed "that we failed to refrain from prosecuting a charge that was not supported by probable cause." ECF 79-21 at 68 (Agreed Judgment of Probated Suspension).  DA Ramirez has since attempted to distance himself from the investigation—including in a false statement to the Grievance Committee that was itself a basis for sanction—but his account is disputed, and his

efforts rise, or fall, based on his diminished credibility. His account does not satisfy his burden on summary judgment.

### III.    Defendants Ramirez, Barrera, and Fuentes are not entitled to qualified immunity because they violated Plaintiff's clearly established constitutional rights.

Defendants' actions epitomize the very misconduct that 42 U.S.C. 1983 claims are meant to redress: government officials knowingly and maliciously abusing their power to concoct charges and violate a person's constitutional rights. Defendants assert qualified immunity to avoid liability for their misconduct. But qualified immunity only applies to Section 1983 claims if the government actor lacked notice that their conduct violated the Constitution or if the government actor was wholly uninvolved in the underlying constitutional violation. Here, in contrast, Plaintiff's rights were clearly established, and the Defendants' personal conduct caused the violations. Therefore, they are not entitled to qualified immunity.

A government official is not entitled to qualified immunity if the plaintiff has alleged that her clearly established constitutional right was violated. *Tolan*, 572 U.S. at 656. A right is clearly established when it is "sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Bakutis v. Dean*, 129 F.4th 299, 303 (5th Cir. 2025) (citing *Reichle v. Howards*, 566 U.S. 658, 664 (2012)). Courts "do not require a case directly on point, but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). "Summary judgment is inappropriate unless plaintiff's version of the violations does not implicate clearly established law." *Johnston v. City of Houston, Tex.*, 14 F.3d 1056, 1061 (5th Cir. 1994).

In addition to clearly established law, "[w]hen a government official is sued under Section 1983, the plaintiff must allege that the official 'was either personally involved in the deprivation or that his wrongful actions were causally connected' to it." *Stem v. Gomez*, 813 F.3d

38

205, 210 (5th Cir. 2016) (quoting *James v. Tex. Collin Cnty.*, 535 F.3d 365, 373 (5th Cir. 2008)).

While a supervisor "is not personally liable for his subordinate's action in which he had no

involvement," *James*, 535 F.3d at 373, an official is personally liable for the conduct of his

subordinates if "the official, by action or inaction, demonstrates a deliberate indifference to

[Plaintiff's] constitutional rights," *Doe v. Taylor Ind. Sch. Dist.*, 15 F.3d 443, 454 (5th Cir.

1994). *See also Henley v. Payne*, 945 F.3d 1320, 1331 (11th Cir. 2019) (holding one way of

proving the causal connection for a supervisor is to show that the supervisor's policy or custom

results in deliberate indifference to constitutional rights).

### A. Defendants violated Ms. Gonzalez's clearly established right to be free from false arrest.

"It is hard to imagine a right more clearly established" than the Fourth Amendment.

*Green v. Thomas*, 129 F.4th 877, 884 (5th Cir. 2025). "The right to be free from arrest without

probable cause is a clearly established constitutional right." *Mangieri v. Clifton*, 29 F.3d 1012,

1016 (5th Cir. 1994). To make out a false arrest constitutional violation, Plaintiff must show that

she was arrested without probable cause. *Arnold v. Williams*, 979 F.3d 262, 269 (5th Cir. 2020).

A finding of probable cause requires a "reasonable belief that [a suspect's] conduct matched the

elements of a" criminal violation. *Villarreal v. City of Laredo, Texas*, 94 F.4th 374, 387 (5th Cir.

2024). Reasonable belief is an objective inquiry that does not examine "the subjective

understanding of the particular officer involved." *Heien v. North Carolina*, 574 U.S. 54, 66

(2014). This ensures that "an officer can gain no Fourth Amendment advantage through a sloppy

study of the laws he is duty-bound to enforce." *Id*. at 67. Instead, the question turns on whether

an objectively reasonable actor would believe there was probable cause of a crime. *Freeman v.

Gore*, 483 F.3d 404, 415 (5th Cir. 2007).

### i.    There was no probable cause to arrest Ms. Gonzalez.

Defendants do not dispute that there was no probable cause for Ms. Gonzalez's arrest.
From the very start of the investigation, all Defendants knew that the case concerned an
allegation that Ms. Gonzalez took medication to cause an abortion of her own fetus. ECF 91-23
(Barrera Dep. 85:4-9, 94:24- 95:2); ECF 91-30 (R. Fuentes Dep. 82:20-23); ECF 91-24 (Ramirez
Dep. 191:12-192:7). It is undisputed that this conduct is not a crime. Tex. Penal Code § 19.06.
Indeed, all three Defendants testified that Ms. Gonzalez did not commit any crime. ECF 91-23
(Barrera Dep. 171:16-21); ECF 91-30 (R. Fuentes Dep. 82:20-23); ECF 79-21 at 67-71 (Agreed
Judgment of Probated Suspension). DA Ramirez further admitted to the lack of probable cause in
his press release, in his motion to dismiss, and in his sworn agreed judgment with the State Bar.
ECF 79-20 at 12 (Press Release from Ramirez); ECF 79-21 at 51 (Motion to Dismiss and Order);
ECF 79-21 at 67-71 (Agreed Judgment of Probated Suspension).

Defendants nonetheless claim they are entitled to qualified immunity because they were
mistakenly unaware of Section 19.06. Setting aside the credibility of these assertions, the inquiry
concerning the existence of probable cause is objective and does not turn on whether the
defendants *knew* the homicide statute did not apply. *Freeman*, 483 F.3d at 415. In *Freeman*, the
Fifth Circuit emphasized that where, like here, a criminal statute excepts a person's alleged
conduct, no reasonable actor could believe that there is probable cause for a crime. *Id.* (denying
qualified immunity to arrest for interference with public duties where the statute "clearly and
plainly excepts from the reach of the statute" the conduct alleged).

Texas Penal Code § 19.06 "clearly and plainly" excepts Ms. Gonzalez's conduct from the
homicide statutes. The text of the short statute speaks for itself, and multiple Texas courts have
unequivocally held that this provision prohibits the prosecution of the pregnant person for her

own conduct that causes harm to her fetus. *See Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007); *Flores v. State*, 245 S.W.3d 432, 436 (Tex. Crim. App. 2008); *Eguia v. State*, 288 S.W.3d 1, 13 (Tex. App. 2008); *Brown v. State*, 303 S.W.3d 310, 318 n.7 (Tex. App. 2009); *Kiss. v. State*, 316 S.W.3d 665, 669 (Tex. App. 2009); *State v. Hunter*, 606 S.W.3d 836, 843 (Tex. App. 2020); *State v. Hunter*, 624 S.W.3d 589, 589 (Tex. Crim. App. 2021) (Keller, J., concurring in the refusal to grant discretionary review). Indeed, *O'Connor's*, a treatise relied on by DA Ramirez and ADA Barrera to conduct legal research, states in its discussion of the elements of murder that an "unborn child will not qualify as a murder victim" when the charged conduct is "committed by the unborn child's mother." Jani Maselli Wood, *O'Connors Tex. Crim. Offenses & Defenses*, Ch. 2-A § 2 (2024 ed.) (citing Tex. Penal Code § 19.06); ECF 91-23 (Barrera Dep. 31:2-3); ECF 91-24 (Ramirez Dep. 129:21-130:5). ADA Barrera even conceded that she "should have known" about Section 19.06 of the Texas Penal Code. ECF 91-23 (Barrera Dep. 189:15-16).

Texas's criminal and civil abortion laws are consistent on this score. The Legislature's then-recent enactment of Senate Bill 8 reflected Texas's long-held public policy that a pregnant person could not be punished for their own abortion. *See, e.g.*, Tex. Health & Safety Code § 171.206(b)(1) (noting that S.B. 8 did not authorize a "cause of action against or the prosecution of a woman on whom an abortion is performed or induced"); *id.* at § 171.207 ("No enforcement of this subchapter, and no enforcement of Chapters 19 [Homicide] and 22 [Assault], Penal Code, in response to violations of this subchapter, may be taken or threatened by this state, a political subdivision, a district or county attorney, or an executive or administrative officer or employee of this state or a political subdivision against any person."). In short, no reasonable actor would have believed that there was probable cause to arrest Ms. Gonzalez for her abortion.

Even though the lack of probable cause is an objective question, deposition testimony and documentary evidence reveal that all three Defendants *subjectively* knew that there was no probable cause to conduct an arrest of Ms. Gonzalez, contradicting Defendants' claims to the contrary. Defendants Ramirez and Fuentes testified that they knew there was no probable cause to charge Ms. Gonzalez with any crime prior to her arrest. ECF 91-24 (Ramirez Dep. 208:14-15); ECF 91-30 (R. Fuentes Dep. 82:20-23); ECF 79-21 at 68 (Agreed Judgment of Probated Suspension). DA Ramirez also knew abortion was not a crime because he had paid for one. ECF 91-25 (R. Rocha Dep. 136:18-24). Investigator Muniz testified that Section 19.06 was brought to ADA Barrera's attention early in the investigation. ECF 91-22 (Muniz Dep. 118:7-120:9, 157:17-158:5). Multiple attorneys and the public knew that such a charge was unlawful. *See e.g.*, ECF 91-11 at 4 (Affidavit of B. Garza); ECF 91-8 (Emails from the public). And after Ms. Gonzalez's indictment but before her arrest, attorneys in the community contacted DA Ramirez to alert him to the indictment's lack of probable cause. ECF 91-11 at 4 (Affidavit of B. Garza). At the very least, there is a genuine issue of material fact that the Defendants all subjectively knew that there was no probable cause for Ms. Gonzalez's arrest yet proceeded anyway.

### ii.  Defendants caused Ms. Gonzalez to be arrested.

All three Defendants personally took action that led to Ms. Gonzalez's arrest. ADA Barrera directed the Sheriff's officers to conduct a criminal investigation of Ms. Gonzalez and instructed the Sheriff's officers to classify the crime as murder in their reports. ECF 91-22 (Muniz Dep. 59:19-22; 81:16-25). DA Ramirez consulted with ADA Barrera about the criminal investigation and directed her to present Ms. Gonzalez's case to the grand jury. ECF 91-23 (Barrera Dep. 72:15-24, 74:2-3, 117:4-14, 120:7-20); ECF 91-24 (Ramirez Dep. 208:14-15). ADA Barrera then drafted and filed the indictment, which triggered the issuance of an arrest

warrant. ECF 91-23 (Barrera Dep. 144:14-23); ECF 91-21 (Villarreal Dep. 160:23-161:22). A DA's office investigator who reports directly to DA Ramirez ordered the Sheriff's office to arrest Ms. Gonzalez. ECF 91-22 (Muniz Dep. 54:13-25, 55:1-10, 56:1-5); ECF 91-21 (Villarreal Dep. 79:6-7); ECF 91-29 (Solis Dep. 21:4). Sheriff Fuentes directed his staff to involve the DA's office in the criminal investigation of Ms. Gonzalez and instructed them to follow the District Attorney's instructions even though he did not believe that Ms. Gonzalez had committed a crime. (L. Fuentes Dep. 129:3-6); ECF 91-30 (R. Fuentes Dep. 82:20-23). That Defendants did not personally arrest Ms. Gonzalez is of no moment. But for the conduct of each of the Defendants, Ms. Gonzalez's investigation would not have proceeded, and she would not have been arrested.

DA Ramirez and Sheriff Fuentes are also personally liable as supervisors because they were aware of their subordinates' conduct and, by both action and inaction, they demonstrated deliberate indifference to their employees violating Ms. Gonzalez's constitutional rights. DA Ramirez conceded in his probated suspension that he was aware that ADA Barrera was pursuing an indictment not supported by probable cause and did nothing to stop it. ECF 79-21 at 67-71 (Agreed Judgment of Probated Suspension). Likewise, Sheriff Fuentes knew that his office was investigating Ms. Gonzalez's abortion even though he believed that no crime had occurred. ECF 91-28 (L. Fuentes Dep. 134:19-20); ECF 91-30 (R. Fuentes Dep. 21:21-24, 82:20-23). Such "deliberate indifference" to the violation of Ms. Gonzalez's constitutional rights renders them personally liable for her arrest.

### iii.  The independent intermediary doctrine does not apply

"'[I]f *facts supporting an arrest* are placed before an independent intermediary such as a magistrate or grand jury, the intermediary's decision breaks the chain of causation' for the Fourth Amendment violation." *Jennings v. Patton*, 644 F.3d 297, 300-01 (5th Cir. 2011)

(emphasis added) (quoting *Cuadra v. Hous. Indep. Sch. Dist.*, 626 F.3d 808, 813 (5th Cir.

2010)). But "if the plaintiff shows that 'the deliberations of that intermediary were in some way

tainted by the actions of the defendant,'" the independent intermediary doctrine does not apply.

*Wilson v. Stroman*, 33 F.4th 202, 208 (5th Cir.), *cert. denied sub nom. Reyna v. Wilson*, 143 S.

Ct. 425 (2022) (quoting *Deville v. Marcantel*, 567 F.3d 156, 170 (5th Cir. 2009)).

A grand jury's deliberations are tainted if an officer makes a material omission before the

grand jury. *Stroman*, 33 F.4th at 210. Only a properly secured grand jury indictment, i.e. one

where all material information is present, will shield a defendant from liability for false arrest.

*See id.* at 209-10 ("[A] plaintiff need only show that the deliberations of the intermediary were

tainted such that the . . . intermediary . . . did not have 'all the facts' before it necessary to render

an independent determination of probable cause.") (quoting *Winfrey v. Rogers*, 901 F.3d 483,

497 (5th Cir. 2018). "To determine taint, the essential inquiry is whether 'there remains

sufficient content . . . to support a finding of probable cause' *after* the 'material that is the subject

of the alleged falsity or reckless disregard is set to one side.'" *Terwilliger*, 4 F.4th at 281-82

(quoting *Franks v. Delaware*, 438 U.S. 154, 171-72 (1978)).

 Defendants can taint an indictment even if they are not in the grand jury room. *Stroman*,

33 F.4th at 210. Plaintiff need only show that the grand jury was "in some way *tainted* by the

actions of the defendant." *Id.* at 208. Accordingly, an officer taints the grand jury deliberations,

for example, if they "helped prepare the [presentation] by providing information for use in it"

and the information provided is false or incomplete. *Terwilliger*, 4 F.4th at 283 (quoting *Melton

v. Phillips*, 875 F.3d 256, 263 (5th Cir. 2017)). *Cf. Guerra v. Castillo*, 82 F.4th 278, 288 (5th Cir.

2023) (police chief was not entitled to qualified immunity where he was the "'driving force'

behind the conspiracy," was continually updated about investigations that revealed no

criminality, and "knew probable cause did not exist to arrest [the plaintiff], but, acting contrary to that information, pushed subordinates to file false affidavits with the purpose of having [the plaintiff] fired, humiliated, and arrested without probable cause").

While some Fifth Circuit cases have held that a defendant must knowingly taint the grand jury proceeding, *see Buehler v. City of Austin/Austin Police Dep't*., 824 F.3d 548, 555 (5th Cir. 2016), the Fifth Circuit in *Stroman* questioned whether recklessness was the more appropriate *mens rea* since this standard applies concerning tainted warrant affidavits. *Stroman*, 33 F.4th at 211-12 ("An officer can be liable under *Franks* for . . . *recklessly* including a material . . . omission. . . . [N]othing in this court's precedent suggests that . . . magistrates and grand juries are treated differently.") (citation modified). The *Stroman* court held that the plaintiff needed to only establish that the defendants had recklessly tainted a grand jury since it was convened following a recklessly obtained warrant. *Id.* at 212. Even if held to a knowing *mens rea*, knowledge can be shown if the defendant "deliberately closed her eyes to what would otherwise have been obvious to her." *United States v. Moreno*, 185 F.3d 465, 476 & n.6 (5th Cir. 1999) (holding that such a finding is appropriate where "a defendant claims a lack of guilty knowledge and the proof at trial supports an inference of deliberate indifference") (citation omitted). *See also United States v. Lara-Velasquez*, 919 F.2d 946, 951 (5th Cir. 1990) (explaining that "defendant's charade of ignorance" can be "circumstantial proof of guilty knowledge"). Regardless of which *mens rea* is the proper standard, Plaintiff has at least established a genuine issue of material fact as to whether the Defendants knowingly tainted the grand jury, and therefore whether they should be cloaked by its decision.

The independent intermediary doctrine does not apply to Ms. Gonzalez's false arrest claim because all three Defendants knowingly tainted the grand jury deliberations. ADA Barrera

45

tainted the grand jury by knowingly omitting a material portion of the law, leading directly to a murder charge for conduct that is not a crime. ECF 91-23 (Barrera Dep. 187:21-189:16); ECF 91-22 (Muniz Dep. 118:7-120:9, 157:17-158:11). DA Ramirez tainted the grand jury by directing ADA Barrera to present to the grand jury, knowing that she would be pursuing a murder charge despite the absence of probable cause for any crime. ECF 91-23 (Barrera Dep. 72:15-24, 74:2-3, 117:4-14, 120:7-20, 133:11-13); ECF 91-24 (Ramirez Dep. 208:14-15); ECF 79-21 at 67-71 (Agreed Judgment of Probated Suspension). Notably, in agreeing that he violated Texas Disciplinary Rules of Professional Conduct 3.09, DA Ramirez conceded that the grand jury had been tainted because this rule is not violated unless "the prosecutor believes that material inculpatory information presented to the grand jury was false." Texas Disciplinary Rules of Professional Conduct, comment 2 to Rule 3.09. Finally, Sheriff Fuentes tainted the grand jury when he directed his investigators to follow whatever the DA's Office told them to do, even though he too did not believe that Ms. Gonzalez had committed a crime. ECF 91-28 (L. Fuentes Dep. 129:3-6); ECF 91-30 (R. Fuentes 82:20-23, 84:6-23). The investigative reports created by his office were then integral to securing the faulty indictment. The grand jury was therefore knowingly tainted "in some way" by the conduct of each Defendant. *Stroman*, 33 F.4th at 208. The independent intermediary doctrine does not apply.

### B. Defendants violated Ms. Gonzalez's clearly established right to be free from being unlawfully charged with a crime.

Claims alleging that a person was unlawfully charged with a crime can brought under 42 U.S.C. § 1983 as a violation of the Fourth or Fourteenth Amendments. *Thomas v. Kiperman*, 846 F.2d 1009, 1011 (5th Cir. 1988) ("Claims of false arrest, false imprisonment, and malicious prosecution involve the guarantees of the fourth and fourteenth amendments when the individual complains of an arrest, detention, and prosecution without probable cause."). *See also Soldal v.*

*Cook Cty.,* 506 U.S. 56, 70 (1992) ("Certain wrongs affect more than a single right and, accordingly, can implicate more than one of the Constitution's commands."). Where a claim concerns a prosecution without probable cause, the claim may be brought as a malicious prosecution claim under the Fourth Amendment. *Thompson v. Clark*, 596 U.S. 36, 39 (2022). Where the claim concerns an unlawful prosecution outside of the search and seizure context, and where the government's conduct violates due process, it may be brought as a violation of the due process clause of the Fourteenth Amendment. *Sanders v. English*, 950 F.2d 1152, 1163 (5th Cir. 1992) (explaining that the Fourteenth Amendment protects people against "bad faith or malicious prosecution"). *See also Castellano v. Fragozo*, 352 F.3d 939, 955, 958 (5th Cir. 2003) (finding "contention that the manufacturing of evidence and knowing use of perjured testimony" was cognizable as a violation of due process under the Fourteenth Amendment). Plaintiff brings both claims.

Preliminarily, Defendants allege that Plaintiff's malicious prosecution claim is improper because, they contend, the Fifth Circuit did not recognize a Fourteenth Amendment malicious prosecution violation at the time of the criminal investigation and prosecution of Ms. Gonzalez. Defendants are attempting to relitigate this legal issue, which they previously raised in their motions to dismiss and which this Court rejected when it found that Plaintiffs had properly pled constitutional violations in her complaint. None of the discovery obtained since this Court's ruling changes the legal analysis. This issue, therefore, is improperly raised. *F.D.I.C. v. McFarland*, 243 F.3d 876, 884 (5th Cir. 2001) ("Under the 'law of the case' doctrine, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation.") (internal quotation omitted). In any event, Defendants overlook that *Thompson v. Clark* – the Supreme Court opinion clearly establishing a malicious

47

prosecution claim under the Fourth Amendment – was decided prior to the arrest of Ms. Gonzalez. Defendants also ignore the fact that it has always been clearly established, under the due process clause of the Fourteenth Amendment, that the government cannot frame someone for a crime they did not commit. *Cole v. Carson*, 802 F.3d 752, 773 (5th Cir. 2015). Plaintiff has therefore demonstrated that Defendants violated her clearly established constitutional rights under both the Fourth and Fourteenth Amendments.

### i.    Defendants violated Ms. Gonzalez's clearly established Fourth Amendment right to be free from malicious prosecution.

The Supreme Court clarified on April 4, 2022, that the Fourth Amendment protects people against malicious prosecution where the harm that results is a seizure without probable cause. *Thompson*, 596 U.S. at 42. To make out a Fourth Amendment malicious prosecution claim, the Plaintiff must show that (1) Defendants continued the original criminal proceedings, (2) the prosecution terminated in Ms. Gonzalez favor, (3) there was no probable cause to prosecute her, (4) Defendants were motivated by malice, and (5) Ms. Gonzalez suffered damages. *See Armstrong v. Ashley*, 60 F.4th 262, 279 (5th Cir. 2023).

Given *Thompson*, the right to be free from malicious prosecution was clearly established no later than April 4, 2022. But after April 4, 2022, Defendants continued to prosecute Ms. Gonzalez without probable cause even though the Supreme Court left no doubt that doing so violated the Constitution. As a result of Defendants' continued prosecution, Ms. Gonzalez was arrested on April 7, 2022, in violation of her Fourth Amendment rights. The right was therefore clearly established at the time of the constitutional violation.

Though a panel of the Fifth Circuit in *Santander v. Salazar,* 133 F.4th 471, 482 (5th Cir. 2025) affirmed the denial of a malicious prosecution claim because, despite *Thompson*, "the elements" of a malicious prosecution claim had not been established until *Armstrong* in 2023,

48

qualified immunity turns on whether *the right* is clearly established, not on whether *the elements* of its violation are fixed. *Thompson* held as much, affirming a malicious prosecution claim by reversing elements incorrectly required by the Second Circuit. *Thompson*, 596 U.S. at 49. *Armstrong* did too. While expressly reinstating the elements applicable to malicious prosecution claims that long predated *Thompson,* it then applied those elements to conduct that predated it. *Armstrong*, 60 F. 4th at 279 (holding that the plaintiff's malicious prosecution claim failed regardless of which elements applied). Pursuant to the rule of orderliness, *Armstrong*'s earlier analysis and *Thompson* at the Supreme Court clearly established the right to be free from malicious prosecution. *See In re Bonvillian Marine Serv., Inc.*, 19 F.4th 787, 792 (5th Cir. 2021) ("'It is a well-settled Fifth Circuit rule of orderliness that one panel of our court may not overturn another panel's decision, absent an intervening change in the law, such as by a statutory amendment, or the Supreme Court, or our *en banc* court.'") (quoting *Jacobs v. Nat'l Drug Intel. Ctr.*, 548 F.3d 375, 378 (5th Cir. 2008)). Nonetheless, Plaintiff's malicious prosecution claim survives summary judgment regardless of the elements to be considered.

 *First*, after the *Thompson* decision on April 4th, Defendants continued to prosecute Ms. Gonzalez and did not dismiss the indictment. Instead, on April 5th, a capias was issued and sent to the Sheriff's Office's. ECF 79-14. On April 7th, a DA investigator who reports directly to DA Ramirez directed Investigator Muniz to arrest Ms. Gonzalez. ECF 91-22 (Muniz Dep. 54:13-25, 55:1-10, 56:1-5); ECF 91-21 (Villarreal Dep. 79:6-7); ECF 91-29 (Solis Dep. 21:4) Investigator Muniz, along with several other sheriff's department employees, arrested Ms. Gonzalez on the 7th. ECF 91-22 (Muniz Dep. 103:11-25, 104:1-4, 108:7, 25. 109:1-11). DA Ramirez, ADA Barerra, and Sheriff Fuentes were aware of Ms. Gonzalez's arrest. ECF 91-25 (R. Rocha Dep. 6:11-19, 144:7-12); ECF 91-4 at 18 (Texts between Barrera and Muniz); ECF 91:22 (Muniz Dep.

109:18-20). And Ms. Gonzalez remained incarcerated until April 9th, when Sheriff Fuentes personally approved the bond for Ms. Gonzalez's release. ECF 79-22 at 65 (Texts between Ramirez and R. Fuentes); ECF 91-30 (R. Fuentes Dep. 116:1-4); ECF 79-12 (Inmate Release Form). It was not until April 11th that the charge against Ms. Gonzalez was dismissed. ECF 79-21 at 51 (Motion to Dismiss and Order). All Defendants were thus involved in continuing the prosecution of Ms. Gonzalez after April 4th.

*Second*, the prosecution against Ms. Gonzalez was dismissed in her favor. On April 11th, the court granted the DA's own motion to dismiss the indictment based on a lack of evidence. ECF 79-21 at 51 (Motion to Dismiss and Order). And in his press release, DA Ramirez conceded that "In reviewing applicable Texas law, it is clear that Ms. Herrera cannot and should not be prosecuted for the allegation against her." ECF 79-20 at 12 (Press Release from Ramirez).

*Third*, as explained above, it is undisputed that there was no probable cause to initiate criminal proceedings because of the clear statutory exception that specifically stated Ms. Gonzalez's conduct was not homicide. Tex. Penal Code § 19.06; *supra* Section IV.A.i.

*Fourth*, Defendants were motivated by malice. Malice can be shown when a criminal proceeding was initiated without probable cause and for a purpose other than bringing the defendant to justice. *Armstrong*, 60 F.4th at 278. Because all of the Defendants believed there was no probable cause to charge or arrest Ms. Gonzalez for homicide, their conduct necessarily was motivated by some other purpose than to bring Ms. Gonzalez to justice. This is borne out by the evidence. Sheriff Fuentes did not believe Ms. Gonzalez had committed a homicide yet allowed the prosecution to continue because the DA's Office wanted to pursue it. ECF 91-30 (R. Fuentes Dep. 82:20-23, 84:6-23). ADA Barrera pursued the prosecution of Ms. Gonzalez to further her career in the District Attorney's office and one-up her office rival by bringing the

first, groundbreaking homicide prosecution of an abortion. ECF 91-11 at 4 (Affidavit of B. Garza). And DA Ramirez did not believe Ms. Gonzalez could be charged with "anything" but pursued the prosecution anyway based on his personal opinions about the alleged facts. ECF 91-23 (Barrera Dep. 72:15-24, 74:2-3, 117:4-14, 120:7-20); ECF 91-24 (Ramirez Dep. 208:14-15); ECF 91-11 at 4 (Affidavit of B. Garza) (although Ramirez "expressed concern" about the legality of the prosecution, he "expressed that once the full facts of the case come out, because of how upsetting they were, people would understand"); ECF 79-21 at 73 (B. Rocha Texts) ("Believe me. This is not [Lizelle's] first."). The evidence also strongly suggests that he was at least partially motivated to pursue the prosecution and arrest of Ms. Gonzalez to help ADA Solis in her representation of Ms. Gonzalez's then-husband in his divorce proceeding. ECF 91-6 at 2 (Petition for Divorce); ECF 79-22 at 59 (Texts between Ramirez and Solis). Drawing "all justifiable inferences" in Plaintiff's favor, *Tolan*, 572 U.S. at 651, Plaintiff has more than adequately established at least a genuine issue of material fact concerning the existence of malice.

*Fifth*, Ms. Gonzalez was harmed by the Defendants' actions. She was incarcerated for several days, during which time she had to be hospitalized for acute anxiety caused by her unlawful arrest. ECF 91-19 (G. Gonzalez Dep. 27:13-15). The highly publicized indictment and arrest has permanently affected her standing in the community. ECF 7 (Am. Compl. 4.18). But for Defendants' conduct, Plaintiff would not have suffered these harms.

In sum, because Plaintiff has established that Defendants violated her clearly established right to be free from malicious prosecution, Defendants are not entitled to qualified immunity on this claim.

**ii. Defendants violated Ms. Gonzalez's clearly established Fourteenth Amendment right to be free from being framed for a crime.**

The Fourteenth Amendment provides that no State shall "deprive any person of life, liberty, or property, without due process of law[.]" U.S. Const. amend. XIV, § 1. The due process clause of the Fourteenth Amendment is violated by executive action "when it 'can properly be characterized as arbitrary, or conscience shocking, in a constitutional sense.'" *County of Sacramento v. Lewis*, 523 U.S. 833, 847 (1998) (citation modified). To state a claim for a violation of the due process clause, a plaintiff must allege "conduct that violates the decencies of civilized conduct; conduct that is so brutal and offensive that it [does] not comport with traditional ideas of fair play and decency; conduct that interferes with rights implicit in the concept of ordered liberty; and conduct that is so egregious, so outrageous, that it may fairly be said to shock the contemporary conscience." *Cole*, 802 F.3d at 771-72 (citation modified).

Since at least 2010, it has been clearly established that, in accordance with the Fourteenth Amendment, "'no reasonable law enforcement officer would have thought it permissible to frame somebody for a crime he or she did not commit.'" *Id.* at 773 (quoting *Limone v. Condon*, 372 F.3d 39, 50 (1st Cir. 2004)). Such conduct is "undoubtedly shocking to the conscience and no conceivable state interest justifies the deprivations imposed." *Id*. The harm caused by this due process violation is distinct from that caused by a seizure following false arrest since "being framed and falsely charged brings inevitable damage to the person's reputation, especially where, as here, the crime is a felony involving the threat of violence." *Id.* at 772. The "[d]eliberate framing of a person by the state offends the most strongly held values of our nation" and therefore amounts to a Fourteenth Amendment due process violation. *Id.*

For example, in *Cole*, officers conspired to give false statements to investigators with the "aim" to "prosecute and arrest Ryan Cole for . . . an offense that each of them knew he did not

52

commit." *Id.* at 763, 774. Cole was "indicted by a grand jury for that offense, based again on the officers' statements." *Id.* at 763-64. Such conduct, the Fifth Circuit held, clearly violated due process under the Fourteenth Amendment. *Id.* at 773. In *Morgan v. Chapman*, this Court similarly held that an officer violated the plaintiff's due process right against being framed for a crime he did not commit by omitting evidence that showed that plaintiff's actions fell within a statutory exception. 629 F. Supp. 3d 616, 638 (S.D. Tex. 2022). There, the lead investigator created a "knowingly inaccurate report," which was the "catalyst" for the plaintiff's indictment, arrest, and prosecution. *Id.* Such conduct, this Court recognized, was intolerable under the Constitution. *Id.*

Here, Defendants were aware that Ms. Gonzalez fell within a statutory exception and had therefore committed no crime. Yet from the day that the hospital reported Ms. Gonzalez to law enforcement, the DA's office sought to obtain a murder charge. Because a proper presentation of the law and facts to the grand jury could not have led to such a charge, Defendants' only way to accomplish their objectives was to frame Ms. Gonzalez by manipulating the evidence and law. To do so, ADA Barrera became intimately involved in the investigation, directing the Sheriff's officers about what evidence to gather with an eye toward what she could use in her grand jury presentation. ECF 79-21 at 24, 26-28 (Texts between Barrera and Muniz); ECF 79-21 at 21, 24 (Texts between Barrera and Aguirre). She directed the Sheriff's officers to draft a knowingly inaccurate investigative report by instructing them to list "murder" as the applicable crime even though the elements were not met. ECF 91-22 (Muniz Dep. 81:16-25, 83:17-18). By doing so, she curated and manipulated the evidence to suit her goal to obtain an unlawful grand jury indictment. Throughout this investigation, Sheriff Fuentes was kept "in the loop." ECF 91-28 (L. Fuentes Dep. 134:19-20); ECF 91-30 (R. Fuentes Dep. 21:21-24). Although he believed Ms.

Gonzalez had not committed homicide, he personally gave directions to his subordinates that furthered the prosecution. ECF 91-28 (L. Fuentes Dep. 129:3-6); ECF 91-30 (R. Fuentes Dep. 82:20-23).

Prior to her presentation, both ADA Barrera and DA Ramirez decided to pursue an indictment despite knowing abortion was not a crime and that there was no probable cause. ECF 91-23 (Barrera Dep. 72:15-24, 74:2-3, 117:4-14, 120:7-20); ECF 91-24 (Ramirez Dep. 208:14-15). Multiple people raised concerns about the legality of the prosecution, and Section 19.06 was brought to ADA Barrera's attention. Yet at the direction of DA Ramirez, ADA Barrera ran through several red lights to pursue her goal, culminating in her material omission of instructing the grand jury with Section 19.06. Such conduct – concocting a charge where no crime has been committed – "offends the most strongly held values of our nation" and therefore shocks the conscience, violating due process. *Cole*, 802 F.3d at 772. Like in *Cole* and *Morgan*, Defendants violated Ms. Gonzalez's clearly established right to not be framed for a crime she did not commit.

Defendants' reliance on *Albright* to argue that Plaintiff's Fourteenth Amendment claim must be dismissed is misplaced because "*Albright* did not speak to the Fourteenth Amendment beyond eschewing reliance upon substantive due process to create a requirement of probable cause to initiate a prosecution." *Castellano*, 352 F.3d at 948. Contrary to Defendants' argument, none of the five opinions that make up *Albright*'s plurality rejected the principle that "the Due Process Clause of the Fourteenth Amendment constrains the power of state governments to accuse a citizen of an infamous crime." *Albright v. Oliver*, 510 U.S. 266, 316 (1994) (Stevens, J., dissenting). Here, Defendants framed Ms. Gonzalez for a crime she did not commit and are therefore not entitled to qualified immunity.

### C. Defendants violated Ms. Gonzalez's clearly established right to be free of a conspiracy to violate her civil rights.

"A conspiracy may be charged under section 1983 as the legal mechanism through which to impose liability on all of the defendants without regard to who committed the particular act[.]" *Latiolais v. Cravins*, 484 F.App'x 983, 989 (5th Cir. 2012) (quoting *Hale v. Townley*, 45 F.3d 1914, 1920 (5th Cir. 1995)). To establish a conspiracy to violate a constitutional right, Plaintiff must present "evidence that the defendants acted jointly and that some overt act that was done in furtherance of the conspiracy resulted in the deprivation of a constitutional right." *Id.*

As explained above, the underlying constitutional violations were clearly established. Accordingly, in asserting qualified immunity concerning the conspiracy claim, Defendants allege that Plaintiff has failed to make out a conspiracy claim, denying their involvement in her investigation and prosecution. But as detailed repeatedly above, the evidence shows that Defendants worked together in furtherance of each constitutional violation. From the very beginning, Sheriff Fuentes instructed his team to coordinate with the DA's Office for help with the investigation into Ms. Gonzalez's abortion. Investigator Muniz and ADA Barrera jointly investigated Ms. Gonzalez. DA Ramirez supervised the investigation and directed ADA Barrera to present the case to the grand jury. And an investigator who reported to DA Ramirez ordered the officers to conduct Ms. Gonzalez's arrest. The three Defendants thus worked in concert to wrongly charge and arrest Ms. Gonzalez. Plaintiff has more than sufficiently established a conspiracy to survive summary judgment.

### D. Qualified immunity should not be applied at all to the facts of this case.

Plaintiff has overcome the Defendants' claims to qualified immunity. Alternatively, that Defendants could be shielded from liability for their patently unlawful conduct demonstrates the very reason that qualified immunity has been subject to intense criticism and debate. The

doctrine lacks a textual basis, subverts the purpose of Section 1983, and undermines public policy. *See Green v. Thomas*, 734 F. Supp. 3d 532, 560-68 (S.D. Miss. 2024), *aff'd in part, rev'd in part*, 129 F.4th 877 (5th Cir. 2025) (summarizing "compelling critiques" of qualified immunity); *see also Ziglar v. Abbasi*, 582 U.S. 120, 158-59 (2017) (Thomas, J., concurring) (citing *Anderson v. Creighton*, 483 U.S. 635, 645 (1987)) ("In the decisions following *Pierson*, we have 'completely reformulated qualified immunity along principles not at all embodied in the common law.'"). What's more, recent scholarship has revealed that the original text of Section 1983 expressly disclaimed immunity defenses, opening the door for the doctrine's reevaluation. Alexander A. Reinert, *Qualified Immunity's Flawed Foundation*, 111 Cal. L. Rev. 201, 207 (2023). *See also Rogers v. Jarrett*, 63 F.4th 971, 980-81 (5th Cir. 2023) (Willett, J., concurring) (explaining that this scholarship demonstrates that qualified immunity "brazenly contradicts" the text of 42 U.S.C. § 1983). As Justice Thomas recognized, today "qualified immunity jurisprudence stands on shaky ground." *Hoggard v. Rhodes*, 141 S.Ct. 2421 (2021) (Thomas, J., respecting the denial of certiorari). This court should decline to apply the doctrine given its flawed foundation.

Even if qualified immunity remains a viable doctrine for Section 1983 claims, it was intended to apply only to split-second decisions and not to conduct that takes place over weeks or months. Qualified immunity may be sensible where "officers are forced to make split-second decisions, often with imperfect information and under potentially deadly or dangerous circumstances." *Villarreal v. City of Laredo, Texas*, 134 F.4th 273, 277 (5th Cir. 2025), *petition for cert. filed*, No. 25-29 (U.S. July 7, 2025) (Oldham, J., concurring). However, when an officer has "spent several months plotting" and has the opportunity "to consult counsel, and to investigate all the facts," the rationale behind the immunity doctrines falls apart. *Id*. (internal

citations and quotations omitted); *see also Wearry v. Foster*, 52 F.4th 258, 260 (5th Cir. 2022) (Ho, J., concurring in denial of rehearing en banc) (contrasting police officers who "engaged in a split-second, good-faith effort to protect innocent lives against an active shooter" with officers who "deliberately" coerce false testimony to secure a conviction); *Rhodes*, 141 S. Ct. at 2422 (contrasting those "who have time to make calculated choices about enacting or enforcing unconstitutional policies," with officers making split-second decisions). Applying the immunity doctrines to the facts of Ms. Gonzalez's investigation and prosecution, where Defendants conspired for months to deprive her of her constitutional rights, would set a dangerous precedent and is at odds with the rationales justifying the immunity doctrine for Section 1983 claims.

**IV.    Alternatively, this Court should delay resolution of the Defendants' motions for summary judgment because Plaintiff is entitled to outstanding discovery.**

Motions for summary judgment should be considered only after all discovery related to the issues raised has concluded. Pursuant to Rule 56(d), "[w]here the party opposing the summary judgment informs the court that its diligent efforts to obtain evidence from the moving party have been unsuccessful, a continuance of a motion for summary judgment for purposes of discovery should be granted almost as a matter of course.'" *Int'l Shortstop, Inc. v. Rally's, Inc.*, 939 F.2d 1257, 1267 (5th Cir. 1991) (internal citations omitted). To obtain the continuance, the requesting party must merely indicate "why [they] need[] additional discovery and how the additional discovery will create a genuine issue of material fact." *Krim v. BancTexas Grp., Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993) (emphasis omitted).

On July 10, 2025, Plaintiff filed a motion for such a continuance pursuant to Rule 56 in light of Defense Counsel's persistent refusal to conduct an adequate search of Defendant Sheriff Fuentes's phone. ECF 82. As Plaintiff explained in that motion, the missing ESI is directly relevant to fully establishing Sheriff Fuentes's involvement in and knowledge of the criminal

investigation into Ms. Gonzalez's abortion, as well as providing additional evidence that the Sheriff's Office conducted the investigation at the DA Office's direction. *Id.* Indeed, it was only after Defense Counsel conducted a Cellebrite extraction of DA Ramirez and ADA Barrera's phones that critical text messages were found and disclosed, revealing their true involvement in the criminal investigation of Ms. Gonzalez. Because the still missing ESI is materially relevant to all three Defendants' motions for summary judgment, if the Court is inclined to grant any part of Defendants' motion, this Court should instead grant Plaintiff's request for a continuance pursuant to Rule 56(d).

## V.    As this litigation is only at the immunity phase of bifurcated discovery, all other issues are premature for this Court's consideration.

On July 24, 2024, this Court ordered the parties to engage in a bifurcated discovery process. ECF 45 (July 24, 2024 Hr'g Tr. at 50). This Court ordered the parties to only seek discovery on the question of absolute and qualified immunity, not on the merits of Ms. Gonzalez's claims. *Id*. Pursuant to this order, Plaintiff has only had the opportunity to fully develop her claims related to Defendants' assertions of absolute and qualified immunity. Accordingly, any other issues are not properly before this Court.[5]

### CONCLUSION AND PRAYER

In light of the numerous disputed issues of material fact that are central to the questions of absolute and qualified immunity, Plaintiff requests that this Court deny Defendants' Motions for Summary Judgment.

Plaintiff requests oral argument on Defendants' Motions for Summary Judgment.

---

[5] Should this Court grant Defendants' motions for summary judgment, the case must be remanded for discovery concerning Plaintiff's claims alleging liability under *Monell* and respondeat superior.

Plaintiff finally requests that this Court deny Defendants' passing call to stay discovery.

Respectfully Submitted,

By: _____

I. Cecilia Garza
TX State Bar No. 24041627
USDTX Federal Admission No.: 578825
202 E. Sprague Street
Edinburg, Texas 78539
Telephone No.: 956-335-4900
Telecopier No.: 956-338-5700
cecilia@garzamartinezlaw.com
*Attorney in charge for Plaintiff*

Veronica Sepulveda Martinez
TX State Bar No. 24081144
USDTX Federal Admission No.: 3048499
202 E. Sprague Street
Edinburg, Texas 78539
Telephone No.: 956-335-4900
Telecopier No.: 956-338-5700
veronica@garzamartinezlaw.com

Lauren Alicia Johnson
DC Bar No.: 1011382*
American Civil Liberties Union Foundation
915 15th Street NW
Washington DC 20005
Telephone No.: 202-731-5567
ljohnson@aclu.org

Nancy Rosenbloom,
NY Bar No.  2168425*
Mariana Kovel
NY Bar No.: 4512000*
Elizabeth Cheryl Jarit
NY Bar No.: 5005020*
Kiera Adelaide Goddu
NY Bar No.: 6185656**
June Gersh
NY Bar No.: 6194971**
American Civil Liberties Union Foundation

59

125 Broad St.
New York, NY 10004
Telephone No:  202-393-4930
nrosenbloom@aclu.org
mkovel@aclu.org
ljarit@aclu.org
kgoddu@aclu.org
agersh@aclu.org

David A. Donatti
Texas Bar No. 24097612
Adriana Piñon
Texas Bar No. 24089768
Ashley Harris
Texas Bar No.: 24123238
Sarah F. Corning
Texas Bar No. 24144442*
American Civil Liberties Union of Texas
P.O. Box 12905
Austin, TX 78711-2905
Telephone No.: 713-942-8146
Facsimile: 713-942-8966
ddonatti@aclutx.org
apinon@aclutx.org
aharris@aclutx.org
scorning@aclutx.org

**ATTORNEYS FOR PLAINTIFF**

\*       Admitted *pro hac vice*
\*\*      P*ro hac vice* admission pending


## CERTIFICATE OF COMPLIANCE WITH PAGE COUNT

I hereby certify that the page count for this brief complies with the page limit requirements set

forth in this Court's order dated July 16, 2025.


I. Cecilia Garza

**CERTIFICATE OF SERVICE**

I hereby certify that on this 12th day of August, 2025, a copy of the foregoing was filed

electronically with the Clerk of Court using the CM/ECF system, and that service to all counsel

will be provided through the CM/ECF system.

_____
        I. Cecilia Garza