IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
MCALLEN DIVISION

| | | |
|---|---|---|
| LIZELLE GONZALEZ<br>Plaintiff | §<br>§<br>§ | |
| vs. | §<br>§ | CIVIL ACTION 7:24-CV-00132 |
| GOCHA ALLEN RAMIREZ, et al.<br>Defendants | §<br>§<br>§ | |

### AFFIDAVIT OF BERNICE GARZA

I, Bernice Garza, declare and state the following:

1. I am over 18 years of age. I am of sound mind and am capable of making this affidavit. I am fully competent to testify to the matters stated herein. I have personal knowledge of the facts stated herein.

2. I was the Crime Victims Unit Coordinator in the Office of the 229th Judicial District Attorney from 2015 to March 2018 and then again from January 2021 to December 2022, including during the time period when Lizelle Gonzalez, formerly known as Lizelle Herrera, was under investigation and later prosecuted for a self-induced abortion.

3. My job role included managing everything related to victims, including educating victims on their rights and about the Texas legal system, and accompanying them to court. I also ran the 229th Crime Victims Center located in Roma, Texas.

4. I worked closely with Assistant District Attorney Alexandria Barrera because she supervised the Crime Victims Unit. I also worked closely with District Attorney Gocha Ramirez; we had known each other for many years as friends, as well as colleagues. I was often a sounding board for him at work. I spent most of my time working in the District

Attorney's main office located inside the Starr County Courthouse, so I regularly spoke with ADA Barrera and DA Ramirez in person. I often spoke to ADA Barrera daily. I also regularly messaged DA Ramirez, ADA Barrera, and other DA employees on WhatsApp.

5. I first heard about the investigation of Ms. Gonzalez in January 2022, when ADA Barrera called me and said there had been an issue at the hospital with a mother who had tried to kill a baby by abortion. I believe the incident at the hospital happened either the same day or the day before that ADA Barrera called me. During that conversation, ADA Barrera told me that she had spoken directly to Dr. Lozano and two other employees of the Starr County hospital. I remember being shocked at some of the details that ADA Barrera shared, including that the mother wanted to kill her baby because the baby was not her husband's child. She also noted that the mother had gotten cosmetic surgery while she was pregnant, and that the self-induced abortion was intentional. ADA Barrera also mentioned that the mother had a medical background, and she knew what medication to take to trigger an abortion.

6. During that phone call and soon afterwards, ADA Barrera expressed to me that she was unsure whether the victim of the crime would be considered the baby or the father. My job at the District Attorney's office involved me reaching out to victims of a crime, such as the family of a murder victim. ADA Barrera told me that she needed me to research who the victim would be under state law. I referred to the Texas statute regarding the rights of crime victims and informed ADA Barrera that the statute indicated that the biological father would be considered the victim.

7. After learning about Ms. Gonzalez's investigation, I witnessed and was aware of ADA Barrera frequently sharing information about the investigation with myself, Assistant

District Attorney Abel Villareal, and DA Ramirez. I observed conversations in the office where the case was discussed.

8. Before the case was presented to the Grand Jury, I heard multiple conversations between ADA Barrera and DA Ramirez discussing what evidence had been collected in this investigation. I repeatedly heard DA Ramirez ask ADA Barrera if there was enough legal basis and evidence to prosecute this case, and I heard ADA Barrera assure him that there was. I personally also asked ADA Barrera if she was sure that the case had a legal basis, even if we personally felt that what happened was wrong. She assured me that there was a legal basis.

9. I am also aware that ADA Barrera spoke often with the Sheriff's Office about this investigation because she repeatedly mentioned that she needed to get in contact with the investigators on the case because they were getting information for her. In criminal investigations, it was typical for ADA Barrera to tell the Sheriff's Office investigators what evidence they needed to collect and what witnesses they needed to interview. It was also typical for the District Attorney's office to guide the Sheriff's Office on how to write police reports. ADA Barrera and ADA Villarreal also conducted yearly seminars for local law enforcement agencies of the judicial district, including the Starr County Sheriff's Office, to provide training on how to write case reports.

10. I was usually made aware of upcoming grand jury indictments because my job involved updating victims about the status of a case. However, when Ms. Gonzalez was indicted, I was not made aware of it. This was very unusual.

11. DA Ramirez was working in another county on the day that ADA Barrera presented the case to the grand jury. He was not out of office. During my time at the DA's office,

attorneys were able to communicate with DA Ramirez when he was in another county. It is common for attorneys to communicate with DA Ramirez via email or phone if he is not present in the office. It would have been typical for DA Ramirez to be informed that the case was going to the Grand Jury and that an indictment was returned for a case this significant. It was surprising to me that DA Ramirez was not at the office the day this case was presented to the Grand Jury.

12. Soon after the indictment was issued, but before Ms. Gonzalez was arrested, people outside of the District Attorney's office learned about the indictment and expressed concern. I recall DA Ramirez receiving calls from attorneys outside the office to say that the charge was wrong and express that Ms. Gonzalez should not be arrested. I spoke to DA Ramirez about these calls, and although he expressed concern, DA Ramirez expressed that once the full facts of the case came out, because of how upsetting they were, people would understand.

13. I was able to observe competition between ADA Barrera and ADA Villarreal to secure big cases and build their reputation within the office. Based on my conversations with ADA Barrera, I know she considered this to be a big case, and a case that could set her apart.

14. After Ms. Gonzalez was arrested and the public attention came, DA Ramirez said, referring to himself, that "I fucked up."

15. After Ms. Gonzalez was released and DA Ramirez met with her and her lawyer, he told me "everything is going to be ok. They assured me they wouldn't sue, and I believe them. We're going to issue an apology statement."

Signed this the 16th day of July 2025.

<205> <205>
<205> <205>
<205> <205>

<205> <205>
<205> <205>

<205>
<205>

<205>

<205>

<205>

<205>

<205>
<205>

<205>
<205>
<205>
<205>
<205>
<205>
<205>

<205>
<205>

<205>
<205>

<205>

<205>

<205>
<205>
<205>

<205>
<205>

<205>
<205>
<205>
<205>

<205>
<205>

<205>

<205>

<205>

<205>
<205>

<205>

<205>
<205>

<205>

<205>
<205>
<205>

<205>
<205>

<205>

<205>

<205>
<205>

<205>

<205>
<205>

<205>

<205>

<205>
<205>
<205>

<205>

<205>

<205>
<205>
<205>
<205>
<205>

<205>
<205>
<205>

<205>
<205>

<205>



Bernice Garza

SWORN TO AND SUBSCRIBED TO before me, the undersigned authority, on this the 16th day of July 2025.

Notary Public in and for
The State of Texas

[Notary seal: ALYSSA ALVARADO, NOTARY PUBLIC, STATE OF TEXAS, ID 134566631, EXP. 09-20-2027]

PLAINTIFF 00355