```
              IN THE UNITED STATES DISTRICT COURT
             FOR THE SOUTHERN DISTRICT OF TEXAS
                     McALLEN DIVISION

LIZELLE GONZALEZ              ) (
         Plaintiff            ) (
                              ) (
VS.                           ) (   CIVIL ACTION NO.
                              ) (   7:24-cv-00132
GOCHA ALLEN RAMIREZ,          ) (
ALEXANDRIA LYNN BARRERA,      ) (
RENE FUENTES, and STARR       ) (
COUNTY, TEXAS                 ) (
         Defendants           ) (
```

_____


ORAL AND VIDEOTAPED DEPOSITION OF
ABEL VILLARREAL
MARCH 12, 2025

_____


ORAL AND VIDEOTAPED DEPOSITION OF ABEL

VILLARREAL, produced as a witness at the instance of

the PLAINTIFF, taken in the above-styled and numbered

cause on MARCH 12, 2025, between the hours of

10:10 a.m. and 3:50 p.m., reported stenographically by

DONNA McCOWN, Certified Court Reporter No. 6625, in and

for the State of Texas, at Garza Martinez, PLLC, 202

East Sprague Street, Edinburg, Texas, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached therein.


**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

```
                     APPEARANCES
COUNSEL FOR PLAINTIFF:
     I. CECILIA GARZA
     GARZA MARTINEZ, PLLC
     202 East Sprague Street
     Edinburg, Texas  78539

     MARIANA (MOLLY) KOVEL
     AMERICAN CIVIL LIBERTIES UNION
     SENIOR STAFF ATTORNEY
     125 Broad Street, 18th Floor
     New York, NY  10004

     SARAH CORNING
     AMERICAN CIVIL LIBERTIES UNION TEXAS
     Staff Attorney
     P.O. Box 8306
     Houston, Texas  77288

     LIZ JARIT, via Zoom
     AMERICAN CIVIL LIBERTIES UNION
     SENIOR STARR ATTORNEY
     125 Broad Street, 18th Floor
     New York, NY  10004

     DAVID A. DONATTI, via Zoom
     AMERICAN CIVIL LIBERTIES UNION OF TEXAS
     P.O. Box 12905
     Austin, Texas  78711-2905
     LAUREN JOHNSON, via Zoom
     AMERICAN CIVIL LIBERTIES UNION
     915 15th Street NW
     Washington, DC  20005

     JUNE (ANNIE) GERSH, via Zoom
     AMERICAN CIVIL LIBERTIES UNION
     125 Broad Street
     New York, New York  10004
COUNSEL FOR DEFENDANTS:
     KELLY R. ALBIN, via Zoom
     DENTON NAVARRO RODRIGUEZ BERNAL
     SANTEE & ZECH, P.C.
     549 Egret Bay Boulevard, Suite 200
     League City, Texas  77573
```

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

1      ALSO PRESENT:
           David Saldana, Videographer
2          Emily Mensing, via Zoom
           Jorge Cruz, III
3
                         INDEX
4
                                                    PAGE
5     Appearances ..................................    2

6     ABEL VILLARREAL
      Examination by Ms. Kovel .......................   4
7     Examination by Ms. Albin ...................... 208
      Examination by Ms. Kovel ...................... 213
8     Examination by Ms. Albin ...................... 216

9     Errata Sheet/Signature Page ................... 218

10    Reporter's Certificate ........................ 220

11    Attached to the end of the transcript:  Stipulations

12                       EXHIBITS

13    NUMBER  DESCRIPTION                             PAGE

14       1    Subpoena .............................. 110

15       2    Subpoena .............................. 110

16       3    Defendant Barrera's Objections and
              Responses to Plaintiff's Phase One
17            Interrogatories ....................... 129

18       4    Press Release ......................... 206

19

20

21

22

23

24

25

                      BRYANT & STINGLEY, INC.
      Harlingen (956) 428-0755        McAllen (956) 618-2366

4

| | | |
|---|---|---|
| 10:10 | 1 | THE VIDEOGRAPHER:  It is March 12, 2025. |
| 10:10 | 2 | This is the deposition of Abel Villarreal.  It is |
| 10:10 | 3 | 10:10 a.m.  We are on the record. |
| 10:11 | 4 | (The witness was sworn.) |
| 10:11 | 5 | THE COURT REPORTER:  Okay.  And for the |
| 10:11 | 6 | record, would you like to state some stipulations, |
| 10:11 | 7 | Ms. Albin? |
| 10:11 | 8 | MS. ALBIN:  Yes, we would.  The parties |
| 10:11 | 9 | have agreed that we will abide by the time set in the |
| 10:11 | 10 | Federal Rules for deposition of any witness.  Even if |
| 10:11 | 11 | this witness is recalled during a second discovery in |
| 10:11 | 12 | this case, we will still not exceed the time under the |
| 10:11 | 13 | rules for one witness. |
| 10:11 | 14 | MS. KOVEL:  Okay.  Anything else, Kelly? |
| 10:11 | 15 | MS. ALBIN:  That's it. |
| 10:11 | 16 | ABEL VILLARREAL, |
| 10:11 | 17 | having been duly sworn, testified as follows: |
| 10:11 | 18 | EXAMINATION |
| 10:11 | 19 | BY MS. KOVEL: |
| 10:11 | 20 | Q.  Good morning, Mr. Villarreal. |
| 10:11 | 21 | A.  Good morning. |
| 10:11 | 22 | Q.  My name is Molly, as I already said, Kovel. |
| 10:11 | 23 | I'm an attorney with the American Civil Liberties |
| 10:11 | 24 | Union, and I just want to go over a few kind of |
| 10:11 | 25 | preliminaries -- |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

10:15  1              THE WITNESS:  I apologize.

10:15  2         Q.  So my question was did you review any

10:15  3    documents, and your answer was?

10:15  4         A.  No.  Just the subpoena.

10:15  5         Q.  And by "subpoena," you're talking about the one

10:15  6    that required you to be here today?

10:15  7         A.  Yes, ma'am.  I needed to get the address to

10:16  8    come here.

10:16  9         Q.  Okay.  So did you speak with anyone else other

10:16 10    than Kelly about the deposition today?

10:16 11         A.  No, ma'am.

10:16 12         Q.  Did you --

10:16 13         A.  Oh, actually, no.  I did tell my boss Gocha

10:16 14    Ramirez that I wasn't going to be able to go to work

10:16 15    because I had gotten subpoenaed to testify here today.

10:16 16         Q.  Okay.  And when did you tell him that?

10:16 17         A.  Monday, I believe it was.

10:16 18         Q.  Did Mr. Ramirez discuss the deposition with

10:16 19    you?

10:16 20         A.  No, ma'am.

10:16 21         Q.  Okay.  Monday is what day?  I'm sorry.  The

10:16 22    10th?

10:16 23              MS. GARZA:  10th.

10:16 24         Q.  Okay.  Monday the 10th you think?

10:16 25         A.  If it was -- if that's the one from this week,

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:16  1    yes.

10:16  2        Q.  Okay.  And have you read any materials from

10:17  3    this case previously?

10:17  4        A.  No.  Other than general news articles that

10:17  5    popped up.

10:17  6        Q.  And when was that that you read those articles?

10:17  7        A.  When they recently had come out.  I don't

10:17  8    remember when -- when all this started.

10:17  9        Q.  Okay.  When -- when all this started, you mean

10:17 10    around the time that Lizelle Gonzalez Herrera was

10:17 11    arrested, or do you mean around the time that we filed

10:17 12    this lawsuit?

10:17 13        A.  Both.

10:17 14        Q.  Okay.

10:17 15        A.  And -- and I think on -- not so much when the

10:17 16    lawsuit was filed.  It wasn't so much reading.  I

10:17 17    remember seeing something very general about, I think,

10:17 18    some attorneys had a press conference or something like

10:17 19    that after the suit had been filed, but it was

10:17 20    something brief.  It wasn't very detailed.

10:17 21        Q.  Okay.  Did you read the compliant that was

10:17 22    filed in this case?

10:17 23        A.  No, ma'am.

10:17 24        Q.  And do you know who the defendants are in this

10:18 25    case?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:18  1          A.  I believe it is Gocha Ramirez, the district

10:18  2    attorney; Alexandria Barrera, one of the prosecutors;

10:18  3    and I want to say, I don't know, I had heard that the

10:18  4    sheriff's department.  I'm not too sure.

10:18  5          Q.  Okay.  And the sheriff's department, by

10:18  6    "sheriff's department," you're talking about the Starr

10:18  7    County Sheriff?

10:18  8          A.  Yes, ma'am.  That's my understanding.

10:18  9          Q.  Okay.  And the Starr County Sheriff is Rene

10:18  10   Fuentes; is that correct?

10:18  11         A.  That's correct, ma'am.

10:18  12         Q.  Do you know Rene Fuentes?

10:18  13         A.  I do.

10:18  14         Q.  And how long have you known Sheriff Fuentes?

10:18  15         A.  Must have been since I started prosecuting back

10:18  16   in 2015.

10:18  17         Q.  Okay.  Was he the elected sheriff back then?

10:18  18         A.  He was.

10:18  19         Q.  Okay.  Do you know Lizelle Gonzalez?

10:18  20         A.  I don't know her personally -- I know that her

10:19  21   family are family friends with my mom's side of the

10:19  22   family.

10:19  23         Q.  May I ask your mother's name just --

10:19  24         A.  Brendaly Guerrero.

10:19  25         Q.  Okay.  And where does she live?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:19  1        A.  In Roma, Texas.  Well, actually, it's
10:19  2    Escobares, Texas.
10:19  3        Q.  Okay.  Thank you.  Did you say her -- just help
10:19  4    me out here.  Her family is friends with your mom's
10:19  5    family, basically?
10:19  6        A.  Yes.  Going back a while, like --
10:19  7        Q.  Okay.  I understand it's a small community and
10:19  8    people know each other.
10:19  9        A.  Yes, ma'am.  Yes, ma'am.
10:19 10        Q.  Okay.  What is your current title and
10:19 11    occupation?
10:19 12        A.  Well, I'm one of the two first assistant
10:19 13    district attorneys for the 229th Judicial District.
10:19 14    I'm also the city attorney for the City of Roma.
10:19 15        Q.  Okay.  You said first assistant DA?
10:20 16        A.  First assistant district attorney.  I'm one of
10:20 17    two.
10:20 18        Q.  Okay.  Is the other one Ms. Barrera?
10:20 19        A.  That's correct.
10:20 20        Q.  Okay.  And let's go back a little bit.  Okay?
10:20 21    Where -- what year did you graduate high school?
10:20 22        A.  2009.
10:20 23        Q.  Okay.  And what did you do after you graduated?
10:20 24        A.  I went -- well, that summer, I worked in the
10:20 25    district clerk's office for a little bit, and then I

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:20 1    started going to undergrad in the University of Texas

10:20 2    Pan American here in Edinburg.  And then after that,

10:20 3    once I graduated, I went to law school.

10:20 4        Q.  Okay.  How many years did you attend college?

10:20 5        A.  I would say two, two and a half in undergrad,

10:20 6    and then I graduated, and then two and a half of law

10:21 7    school.

10:21 8        Q.  Okay.  So what year did you graduate from law

10:21 9    school?

10:21 10       A.  2014.

10:21 11       Q.  Okay.  And where did you attend law school?

10:21 12       A.  Texas Tech University.

10:21 13       Q.  Where is that located?

10:21 14       A.  Lubbock, Texas.

10:21 15       Q.  Okay.  Was that -- when you graduated in 2014,

10:21 16   is that like May, June 2014 or --

10:21 17       A.  December 2014.

10:21 18       Q.  Okay.  And then you took the Texas Bar exam?

10:21 19       A.  Yes, ma'am.

10:21 20       Q.  When were you admitted to the Bar?

10:21 21       A.  The exact date I don't know.

10:21 22       Q.  Okay.

10:21 23       A.  It was the first bar that happened after

10:21 24   December.  Must have been March, April, May.

10:21 25       Q.  2015?

Electronically signed by Donna McCown (101-253-986-8079)                0ec5b6c3-b289-499c-aba2-aef5c373844b

10:21  1          A.  Correct.

10:21  2          Q.  Okay.

10:21  3          A.  And I was working with a partial bar license.

10:21  4   I had started working the summer of 2014 before I

10:21  5   graduated, and then while I waited, I still had my

10:21  6   partial bar license, so I was already working at the

10:21  7   DA's office by the time I -- well, not working.  I was

10:21  8   practicing at the DA's office until I got admitted.

10:21  9          Q.  Okay.  During law school at Texas Tech, did

10:22 10   you -- did you have internships or jobs?

10:22 11          A.  No.  I mean, I worked whenever I had a chance

10:22 12   on breaks and stuff for the district clerk's office

10:22 13   just to make some money while I was in law school, but

10:22 14   that wasn't very much.

10:22 15          Q.  Okay.  And when you say "district clerk," what

10:22 16   are you referring to?

10:22 17          A.  The Starr County District Clerk's Office.

10:22 18          Q.  Okay.  Forgive me if I am a Yankee who doesn't

10:22 19   understand all the Texas, you know, organizations,

10:22 20   so...

10:22 21          A.  Yes, ma'am.

10:22 22          Q.  You know, it's a little different down here, so

10:22 23   I might ask you some --

10:22 24          A.  Not a problem.

10:22 25          Q.  -- basic Texas procedure and, you know,

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

10:39 1      A.  I was appointed by the Roma city council.

10:39 2      Q.  What does that job entail?

10:39 3      A.  Giving -- giving legal advice to the city --

10:39 4  city council members, city administration.  Drafting

10:39 5  legal documents as needed, attending city council

10:39 6  meetings.

10:39 7      Q.  And again, this is primarily taking place

10:39 8  outside of the 8:00-to-5:00 DA hours?

10:39 9      A.  Yes, ma'am.

10:39 10      Q.  Okay.  Do you represent the City of Roma in --

10:40 11  in court, like in litigation?

10:40 12      A.  If -- if they were -- if there was a lawsuit

10:40 13  filed against them, I would be one of the attorneys.

10:40 14  Usually, what happens is they have the Texas -- it's an

10:40 15  association.  They have an insurance, TML insurance

10:40 16  that kicks in, and usually TML attorneys come in and

10:40 17  represent the City, but I would still be included in

10:40 18  the litigation as city attorney.

10:40 19      Q.  Have you ever run for office?

10:40 20      A.  No.  Well, I ran for democratic precinct chair

10:40 21  when I was -- when I had graduated -- in between

10:40 22  graduating from -- from undergrad and going to law

10:40 23  school, there was a time where I was just waiting to go

10:40 24  to -- to law school, because I graduated in December on

10:40 25  both.  So -- I think I graduated in December on both.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:40  1          So I was essentially waiting, so I ran for
10:41  2   democratic precinct chair.  I mean, it's not a public
10:41  3   office technically, but, you know.
10:41  4        Q.  I understand.  And what -- what is the precinct
10:41  5   which you would have been chair of?
10:41  6        A.  Starr County Precinct 3.
10:41  7        Q.  Okay.  You mentioned earlier that you had done
10:41  8   some work in elections.  Was that Starr County
10:41  9   elections?
10:41 10        A.  Yes.  So I -- the one -- it's not that I had
10:41 11   done work in that particular incident that I testified.
10:41 12   It was more that I was a poll watcher for that
10:41 13   particular election.
10:41 14        Q.  And have you served as a poll watcher in
10:41 15   multiple -- in other elections?
10:41 16        A.  Yes, ma'am.
10:41 17        Q.  How often would you say you do that?
10:41 18        A.  I haven't done it in a while.
10:41 19        Q.  Okay.
10:41 20        A.  But, I mean, probably 20 -- in 2016 -- I mean,
10:41 21   I couldn't tell you.  I know it was -- it was multiple
10:42 22   times.
10:42 23        Q.  Okay.
10:42 24        A.  But how many times exactly, I don't know.
10:42 25        Q.  Okay.  Is that paid work?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:42 1       A.  No.  It's volunteer.

10:42 2       Q.  Were you always assigned to the same precinct

10:42 3   or district?

10:42 4       A.  No, ma'am.

10:42 5       Q.  So you've -- you've done it in multiple

10:42 6   districts and precincts?

10:42 7       A.  Yes, ma'am.

10:42 8       Q.  Okay.  And you have served as the city attorney

10:42 9   for Roma from your appointment in 2021 through the

10:42 10  present?

10:42 11      A.  Yes, ma'am.

10:42 12      Q.  Okay.  Have you had any other paid work other

10:42 13  than working for the DA, having your private law

10:42 14  clients, and working for the -- working as a city

10:42 15  attorney in Roma since you graduated from law school?

10:43 16      A.  I don't believe so.

10:43 17      Q.  Okay.  And just to clarify, I realize I didn't

10:43 18  ask earlier, your role as city attorney, that is paid

10:43 19  work, correct?

10:43 20      A.  That is paid work, yes.

10:43 21      Q.  Okay.  But it's not a 9:00-to-5:00 or

10:43 22  8:00-to-5:00?

10:43 23      A.  Correct.

10:43 24      Q.  Okay.  It's as needed?  Is it by the hour?

10:43 25      A.  No.  It's a contractual basis.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

| | | |
|---|---|---|
| 10:43 | 1 | Q. Okay. |
| 10:43 | 2 | A. It's more of a flat fee. |
| 10:43 | 3 | Q. Okay. |
| 10:43 | 4 | A. Basically, what we did is we got how much they |
| 10:43 | 5 | were spending in legal fees in the past, and I cut |
| 10:43 | 6 | that, because I wanted to save money for the City. |
| 10:43 | 7 | Q. Okay. And when did you become the first |
| 10:43 | 8 | assistant or one of the first assistant -- |
| 10:43 | 9 | A. When Mr. Ramirez took office in, I believe, |
| 10:43 | 10 | January 2021. |
| 10:43 | 11 | Q. Now, that is the time that you returned -- |
| 10:43 | 12 | A. Yes. |
| 10:43 | 13 | Q. -- to the DA's -- you okay? |
| 10:43 | 14 | A. Yes. |
| 10:43 | 15 | Q. Okay. That's the time you returned after your |
| 10:43 | 16 | time away? |
| 10:44 | 17 | A. Yes, ma'am. |
| 10:44 | 18 | Q. Did you -- or did you know Mr. Ramirez before |
| 10:44 | 19 | that time, before you started working there? |
| 10:44 | 20 | A. Yes. He was practicing defense attorney and a |
| 10:44 | 21 | member of the Starr County Bar, so I -- I had -- we had |
| 10:44 | 22 | had trials against each other. We had practiced |
| 10:44 | 23 | against each other while I was working under Omar |
| 10:44 | 24 | Escobar. And then as defense attorneys, we knew each |
| 10:44 | 25 | other as well. |

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:44  1       Q.  Okay.  Did you ever have -- when you were a

10:44  2  defense attorney, did you ever have cases together as

10:44  3  well --

10:44  4       A.  No, ma'am.

10:44  5       Q.  -- like on the same side?

10:44  6       A.  No, ma'am.

10:44  7       Q.  Did you campaign or help campaign for

10:44  8  Mr. Ramirez?

10:44  9       A.  Yes, ma'am.

10:44 10       Q.  And did he ask you to do that, or you -- was it

10:44 11  your idea?  Do you remember?

10:44 12       A.  No.  I was one of the ones that begged him to

10:44 13  run.

10:44 14       Q.  Okay.  Do you remember around what time he was

10:44 15  thinking about doing that?

10:44 16       A.  I think we started -- well, I started asking

10:45 17  him in around 2019, I would say, 2018, 2019, kind of

10:45 18  around that time frame.

10:45 19       Q.  Okay.  And who was his opponent in that race in

10:45 20  2020?

10:45 21       A.  Omar Escobar.

10:45 22       Q.  Okay.  When you resigned in 2017, can you

10:45 23  summarize the problems that you had with the way the

10:45 24  office was run?

10:45 25           MS. ALBIN:  Objection, relevance.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:45  1      A.  Yeah.  So I just had very fundamental

10:45  2   differences with the district attorney at the time,

10:45  3   which was Omar Escobar.  I felt that he was distrusted

10:45  4   by our local, state, and federal law enforcement.

10:45  5          I know there was some -- something about

10:46  6   the way he treated the prosecutors and how he treated

10:46  7   law enforcement just didn't sit well with everybody

10:46  8   because of certain actions he took.  I felt that he was

10:46  9   prejudicing the state on certain criminal

10:46 10   investigations that were occurring that were pretty

10:46 11   high-profile cases.

10:46 12          The way that he -- he treated the office,

10:46 13   he used it for -- I felt that he was trying to target

10:46 14   people that he politically disagreed with in order to

10:46 15   get them to either back down or to get his way, and I

10:46 16   fundamentally disagreed with that.

10:46 17      Q.  Did you ever publically make any statements

10:46 18   about that or --

10:46 19      A.  Yes.

10:46 20      Q.  Okay.  In what context or forms?

10:46 21      A.  I put it on Facebook.  I put it -- during

10:47 22   campaign rallies, I was very vocal about it.

10:47 23      Q.  Okay.

10:47 24      A.  I was probably one of the most vocal people

10:47 25   about it.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

10:47  1          Q.   Okay.  And when you say "campaign rallies,"
10:47  2    you're talking about Mr. Ramirez's campaign?
10:47  3          A.   Yes, ma'am.
10:47  4          Q.   Which I -- I think it was fall 2020, right, if
10:47  5    he took office January 2021?
10:47  6          A.   Yes, ma'am.
10:47  7          Q.   Okay.  What was your role in that campaign?
10:47  8          A.   I mean, as far as supporting him?
10:47  9          Q.   Did you have a title or --
10:47 10          A.   No title.
10:47 11          Q.   Okay.  And were you compensated for working on
10:47 12    that campaign?
10:47 13          A.   No, ma'am.
10:47 14          Q.   Okay.
10:47 15          A.   In fact, I wasn't compensated for that,
10:47 16    which -- which I didn't want -- want to be or need to
10:47 17    be, but after that, it was difficult to transition from
10:47 18    that campaign to going into the DA's office since two
10:47 19    things happened:  the pandemic, and we needed -- I
10:47 20    needed to wind down my business in order to take the
10:48 21    office, so that time period was kind of difficult.
10:48 22          Q.   And when you say "wind down your business," you
10:48 23    mean you had a bunch of private clients?
10:48 24          A.   Correct.
10:48 25          Q.   And you had to either terminate them or --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

11:17  1                    (Brief recess)

11:34  2         Q.  All right.  Welcome back.  So we were talking

11:34  3    about the staff at the DA's office, and I'd like to

11:34  4    talk a little bit about sort of within those categories

11:34  5    whether there's, you know, a sort of formal structure

11:34  6    for supervision and chain of command.  Okay?

11:34  7                    So you are the first assistant district

11:34  8    attorney for -- and -- and most of your work is

11:34  9    administrative work or in the administrative

11:34 10    categories.  Is that fair to say?  Am I understanding

11:35 11    that correctly?

11:35 12         A.  Yes.

11:35 13         Q.  Okay.  And do you directly supervise any of the

11:35 14    other ADAs?

11:35 15         A.  I mean, technically, yes, the other two, the --

11:35 16    well, three:  Roxanna from the other counties and then

11:35 17    Judy Solis and Alfredo Garcia, I guess.

11:35 18         Q.  Okay.  Before I forget, Ms. Solis and

11:35 19    Mr. Garcia and Ms. Ramirez, are they all full-time

11:35 20    ADAs, or they -- or do they also have a part-time sort

11:35 21    of staff there?

11:35 22         A.  What do you mean part-time?  Like do they only

11:35 23    work part-time, or are they full-time ADAs?

11:35 24         Q.  Yes.

11:35 25         A.  They're full-time ADAs.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

| | | |
|---|---|---|
| 11:35 | 1 | Q.  Okay. |
| 11:35 | 2 | A.  Yes. |
| 11:35 | 3 | Q.  So when you say technically you supervise them, |
| 11:36 | 4 | are you their only supervisor, or is Ms. Barrera also |
| 11:36 | 5 | their supervisor? |
| 11:36 | 6 | A.  So I say technically because Mr. Ramirez is |
| 11:36 | 7 | the -- obviously the superior or supervisor.  He's |
| 11:36 | 8 | elected.  We all report to him no matter what.  If he's |
| 11:36 | 9 | not around, either myself or Alex are -- are the ones |
| 11:36 | 10 | that supervise them together. |
| 11:36 | 11 | Q.  Okay.  And how does that work in practice?  If |
| 11:36 | 12 | you and Alex -- or Ms. Barrera are both in the office |
| 11:36 | 13 | the same day and Ms. Solis had a question, would there |
| 11:36 | 14 | be one person she would go to first or -- for any |
| 11:36 | 15 | particular reason? |
| 11:36 | 16 | MS. ALBIN:  Objection, form. |
| 11:36 | 17 | Go ahead. |
| 11:36 | 18 | A.  It depends on -- on the question.  Usually, if |
| 11:36 | 19 | it's dealing with their docket, they go and ask -- Judy |
| 11:36 | 20 | would ask Alex, since they're in the same court.  And |
| 11:37 | 21 | Alfredo usually asks me since, you know, there with me. |
| 11:37 | 22 | A lot of times, if they -- if they need |
| 11:37 | 23 | guidance or something, they go to either one of us |
| 11:37 | 24 | because they -- they always ask us for advice on |
| 11:37 | 25 | certain cases. |

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

11:37 1      Q.  Okay.  And how is most of that communication

11:37 2  conducted?  Is it mostly in person?  Is it mostly

11:37 3  through e-mail or a text message?

11:37 4      A.  It's mostly in person.

11:37 5      Q.  Okay.  Do you have a case management system at

11:37 6  the DA's office?

11:37 7      A.  We do.

11:37 8      Q.  What's it called?

11:37 9      A.  Judicial.

11:37 10     Q.  And is that something that is specific to the

11:37 11 Starr County or 229th District DA, or is that like a

11:37 12 statewide system that you just have an accountant?

11:37 13     A.  So we don't own the program.  We just pay the

11:37 14 license.  The software, I don't know who else uses it,

11:37 15 but --

11:37 16     Q.  Okay.

11:38 17     A.  -- but it's -- in our counties, it's only used

11:38 18 by the DA's office.

11:38 19     Q.  Okay.  Does -- do you input information into

11:38 20 that, or is that something that's more a legal

11:38 21 assistant or admin job?

11:38 22     A.  Anything that's -- usually, the scanned

11:38 23 documents, photos, and everything is inputted by the --

11:38 24 by the legal assistants.

11:38 25     Q.  And does that software keep track of the court

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:38  1    dates for individual cases?

11:38  2        A.  Usually, if the legal assistants put it in

11:38  3    there, it will -- it will have the court dates in

11:38  4    there, yes.

11:38  5        Q.  Okay.  Do you have an office computer?

11:39  6        A.  I do.

11:39  7        Q.  And is this your personal -- assigned to you

11:39  8    specifically?

11:39  9        A.  A desktop, yes.

11:39  10       Q.  It's a desktop?  Do you also have a laptop?

11:39  11       A.  I do.

11:39  12       Q.  And is that your personal laptop, or is it --

11:39  13       A.  It's a DA's office laptop.

11:39  14       Q.  Okay.  Which one do you use more often?

11:39  15       A.  The desktop.

11:39  16       Q.  Okay.  Do you use, like, the Windows platform

11:39  17   and tools on that laptop?

11:39  18       A.  Yes, ma'am.

11:39  19       Q.  Okay.  And do you use Outlook as an e-mail

11:39  20   platform client?

11:39  21       A.  Yes, ma'am.

11:39  22       Q.  Okay.  You also use Outlook for calendaring?

11:39  23       A.  No.

11:39  24       Q.  How do you keep track of your personal

11:39  25   calendar, like your -- your own calendar?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

11:39  1          MS. ALBIN:  Objection, relevance.

11:39  2          Go ahead.

11:39  3      A.  Usually, I mean, as far as cases are concerned,

11:40  4  or in what sense?

11:40  5      Q.  Cases.

11:40  6      A.  Cases.  It's -- ours is pretty predictable

11:40  7  because it's -- we just go based on the dockets.  So if

11:40  8  I have one case on the docket that didn't plea out, I

11:40  9  don't seem to be on the docket the following time we're

11:40  10  there.  It's not like other courts where we have

11:40  11  different dockets depending on the date.

11:40  12          So it's a lot more predictable to know

11:40  13  that next time the court is there, if the case was

11:40  14  there this -- this week, next month it's going to be

11:40  15  there again.  So we usually have that month to work on

11:40  16  it.  And we have the dockets to help us prepare for

11:40  17  that, so we don't have to calendar each case ourselves.

11:40  18      Q.  Okay.  And if you have a meeting, let's say, in

11:40  19  your role as the city attorney, like your meeting

11:40  20  tonight, how do you keep track of when that meeting is?

11:40  21      A.  The city secretary sends an e-mail invitation

11:40  22  that -- kind of like an e-vite to the city council

11:41  23  meeting, and the e-mail automatically reminds you,

11:41  24  like, "Hey, just a reminder.  There's a meeting coming

11:41  25  up," yeah.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:52 1        Q.  Okay.  Would you put an indictment in the paper
11:52 2    file?
11:52 3        A.  Yes, ma'am.
11:52 4        Q.  And would you put subpoenas in the paper file
11:52 5    as well?
11:52 6        A.  Many times, yes.
11:52 7        Q.  Okay.  What do you consider a prosecution
11:52 8    packet?  Let's talk about that.  What do you mean by
11:52 9    that?
11:52 10       A.  A prosecution packet is what law enforcement
11:52 11   turns into the DA's office in order for us to open our
11:52 12   case at the DA level.
11:52 13       Q.  As a matter of course, is that usually turned
11:53 14   over before an arrest is made?
11:53 15       A.  I mean, it's on a case-by-case basis.
11:53 16       Q.  Okay.  Does that include an arrest report of
11:53 17   some kind?
11:53 18       A.  An arrest report or investigatory report.
11:53 19       Q.  You guys receive cases from a variety of law
11:53 20   enforcement agencies, right?
11:53 21       A.  Yes, ma'am.
11:53 22       Q.  And does the prosecution packet sort of vary
11:53 23   depending on the agencies, or do different agencies do
11:53 24   it slightly differently?
11:53 25       A.  Yes and no.  We try to keep a checklist of

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:53 1   things that our investigators or legal assistants look

11:53 2   out for when they're bringing them in, because we want

11:53 3   to make sure that it's complete.

11:54 4          So we try to keep uniformity, especially

11:54 5   recently with some of the court of criminal appeals

11:54 6   decisions that have come down.  Want to make sure that

11:54 7   all the prosecution packets come in with the proper

11:54 8   documentation and nothing is missing.

11:54 9     Q.  Okay.  And who checks for that?

11:54 10     A.  We have some legal assistants and some

11:54 11   investigators.

11:54 12     Q.  You say the prosecution packet is turned over

11:54 13   at the beginning.  Is there -- what would you call that

11:54 14   phase, the beginning?  Is it initiation or --

11:54 15     A.  Intake.

11:54 16     Q.  Intake.  Thank you.  And is there a specific

11:54 17   individual assigned to intake within the office, or is

11:54 18   it depending on who's available?

11:54 19     A.  So it's kind of a two-step process now, because

11:54 20   the way it was before wasn't working.  So when we came

11:54 21   in, we -- we assigned the investigators that were there

11:55 22   at the courthouse in the -- in the first floor, we

11:55 23   assigned them to review the prosecution packets, and

11:55 24   they do have a legal assistant that's down there that

11:55 25   also assists with that.

11:55  1          Once they pretty much go through
11:55  2   everything and make sure that there's nothing missing,
11:55  3   photographs or anything like that, if it's complete,
11:55  4   then they bring the file or the prosecution packet over
11:55  5   to two clerks that are kind of like -- we call them the
11:55  6   intake department there on the -- on the third floor
11:55  7   with the DA's office, and they -- they do the actual
11:55  8   file.  Open up the files, scan everything into
11:55  9   Judicial, open the file up in Judicial.
11:55 10       Q.  So that's -- that answers a question that I
11:55 11   had.  So when you talk about Judicial Dialogue, you
11:55 12   said that the documents were scanned in.
11:55 13          So the idea is, in general, the whole
11:55 14   prosecution packet gets scanned into that system?
11:55 15       A.  Yes, ma'am.
11:55 16       Q.  Okay.  Are the -- are the investigators
11:56 17   supervised by any particular person?  Is there a sort
11:56 18   of lead investigator?
11:56 19       A.  There -- there is a chief investigator and an
11:56 20   assistant chief investigator, and then for the HIDTA
11:56 21   task force, there's a HIDTA commander.
11:56 22       Q.  Who is currently the chief investigator?
11:56 23       A.  The chief investigator is Trinidad Lopez.
11:56 24       Q.  And do you know is that a male or female?
11:56 25       A.  Male.

11:56 1     Q.   Male.  Do you know how long Mr. -- or

11:56 2    Investigator Lopez has been the chief?

11:56 3     A.   Since we came in in 2021.

11:56 4     Q.   Okay.

11:56 5     A.   In January 2021.

11:56 6     Q.   And who does Investigator Lopez report to?

11:56 7     A.   He reports to Alex and myself and Mr. Ramirez.

11:56 8     Q.   Who is the assistant chief investigator?

11:56 9     A.   Ricardo Saenz.

11:57 10    Q.   And was he also there when you came in 2021?

11:57 11    A.   He came in a little bit after.  I believe he

11:57 12  was working in the pipelines.

11:57 13    Q.   Okay.  So within that investigator office, you

11:57 14  said on the -- on the first floor?

11:57 15    A.   Yes.

11:57 16    Q.   Okay.  If an investigator had a question, they

11:57 17  would first go to those two people, or would they go to

11:57 18  the DA's office?

11:57 19    A.   They usually go to those -- those two people.

11:57 20    Q.   Okay.  Do you have occasion to communicate

11:57 21  using text messages with investigators?

11:57 22    A.   From time to time, yes.

11:57 23    Q.   And do they also use e-mail, the investigators?

11:58 24    A.   They have e-mails, yes.

11:58 25    Q.   Okay.  So if you had an individual matter, you

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

11:58  1    know, something is happening on a case, I just want to

11:58  2    clarify, you would use WhatsApp or messages to

11:58  3    communicate about work?

11:58  4                MS. ALBIN:  Objection, form.

11:58  5        A.  Can you repeat the question?  I'm sorry.

11:58  6        Q.  Sure.  You also mentioned using WhatsApp, the

11:58  7    application, right?  And you said that was for general

11:58  8    office announcements.  So do you also use WhatsApp ever

11:58  9    to communicate one on one with a DA's office staff

11:58  10   member?

11:58  11       A.  I believe so, yes.  Yes.

11:58  12       Q.  Does the office or County, as far as you know,

11:58  13   have document retention policies?

11:58  14       A.  Not that I'm aware of, ma'am.  I'm not sure.

11:58  15       Q.  Okay.  And is there a central, like, IT office

11:59  16   for the County?

11:59  17       A.  Yes, ma'am.

11:59  18       Q.  Are you aware if the County e-mail system is

11:59  19   backed up?

11:59  20       A.  I don't know.

11:59  21       Q.  Okay.  Does the County have access to your

11:59  22   phone in any way?  Is there sort of a County

11:59  23   application that tracks you or -- or, you know, reads

11:59  24   your e-mails, if you know?

11:59  25       A.  No, ma'am.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

11:59  1      Q.  Okay.  And do you have a practice of deleting

11:59  2  your work e-mails?

11:59  3      A.  No, ma'am.

11:59  4      Q.  Do you save them into folders?  Do you leave

11:59  5  them in the inbox?  Where do you keep them once you've

11:59  6  read an e-mail?

11:59  7      A.  Primarily, I leave them in the inbox.  I have

11:59  8  created folders.  For example, whenever we request for,

11:59  9  like, employment applications and stuff, I create

11:59 10  folders for applications that are coming in so I can

12:00 11  later on either print them or review them, stuff like

12:00 12  that.  But other than that, they stay in the inbox.

12:00 13      Q.  Okay.  So your -- your testimony is you don't

12:00 14  delete e-mails, in general?

12:00 15      A.  Correct.

12:00 16      Q.  Okay.  What would give you cause to delete an

12:00 17  e-mail?

12:00 18          MS. ALBIN:  Objection --

12:00 19      A.  When, for example, they send us an e-mail or an

12:00 20  alert that a certain e-mail that a lot of people got in

12:00 21  the County --

12:00 22          MS. CORNING:  Kelly.

12:00 23          MS. KOVEL:  Kelly.  I'm so sorry, Kelly.

12:00 24          MS. ALBIN:  Sorry.  I couldn't hear the

12:00 25  last part of what you asked in that question.  Did you

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

| | | |
|---|---|---|
| 12:00 | 1 | say what would give you pause to delete an e-mail? |
| 12:00 | 2 | MS. KOVEL: Cause. Cause. |
| 12:00 | 3 | MS. ALBIN: Okay. So I, yeah, object to |
| 12:00 | 4 | the form of the question. |
| 12:00 | 5 | Go ahead. |
| 12:00 | 6 | A. IT usually warns us about e-mails that could |
| 12:00 | 7 | have viruses that people will have, or if something |
| 12:00 | 8 | looks suspicious to me that has suspicious links, I |
| 12:00 | 9 | would delete it and then send it over to IT, which |
| 12:01 | 10 | usually every single time I've done that it's been a |
| 12:01 | 11 | virus or something. |
| 12:01 | 12 | Q. I understand. Did you search your laptop or |
| 12:01 | 13 | desktop or phone for any records related to this case? |
| 12:01 | 14 | A. No, ma'am. |
| 12:01 | 15 | Q. And did you -- |
| 12:01 | 16 | THE COURT REPORTER: Okay. Did you say |
| 12:01 | 17 | something, Kelly? |
| 12:01 | 18 | MS. KOVEL: Kelly? |
| 12:01 | 19 | MS. ALBIN: I did. Sorry. I object. |
| 12:01 | 20 | But go ahead. |
| 12:01 | 21 | Q. Okay. |
| 12:01 | 22 | A. No, ma'am. |
| 12:01 | 23 | Q. No. Did you receive an instruction from anyone |
| 12:01 | 24 | to preserve evidence or documents related to this case? |
| 12:01 | 25 | A. No, ma'am. |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

12:25  1           MS. KOVEL:  No.  I didn't say that.  I

12:25  2     said credibility might come into question if every

12:25  3     other case is done this way and suddenly this case is

12:25  4     done that way.  That was an example I was giving, for

12:25  5     instance.

12:25  6           MS. ALBIN:  Okay.  Well, again, I'll say

12:25  7     what I said before.  I think this is -- these questions

12:25  8     are not related to the question of immunity or we're

12:25  9     way outside the scope of that.  I've tried to give

12:25 10     latitude to give background on the witness so you can

12:26 11     understand what he is --

12:26 12           MS. KOVEL:  Okay.  Kelly, let's take a

12:26 13     break.  Okay?  Do you -- let me ask -- let's -- let's

12:26 14     go on break.

12:26 15           (Brief recess)

12:46 16       Q.  Okay.  The -- just -- okay.  Sorry.

12:47 17           How much time of the day do you spend in

12:47 18     the office versus in court?

12:47 19       A.  The majority in court -- I mean, like I said,

12:47 20     it really depends on when we have dockets, which is --

12:47 21     an actual day is probably like three -- in Starr County

12:47 22     at least itself, three days out of the month, three to

12:47 23     four days.

12:47 24           Sometimes we have it twice a month if --

12:47 25     depending on when it falls, but primarily, it's in the

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

12:47 1    office, and by "the office," I mean -- I mean we're

12:47 2    running around a lot of times talking, you know, going

12:47 3    to presentations or this or that.  I mean, we're always

12:47 4    on the -- on the run.

12:47 5        Q.  Okay.  I understand that there's different kind

12:47 6    of intake streams from HIDTA and, you know, other --

12:48 7    other different law enforcement agencies.

12:48 8              Is there a particular sort of manner in

12:48 9    which homicide cases are tracked or followed within

12:48 10   your office?

12:48 11       A.  A particular way, no.  It's all the same

12:48 12   process.

12:48 13       Q.  Okay.  You said that you would do -- maybe

12:48 14   have, like, a special practice for capital murders

12:48 15   where you might go to a magistration?

12:48 16       A.  Not that I've done that.

12:48 17       Q.  Okay.

12:48 18       A.  When there was -- I know at least one capital

12:48 19   murder that the County Court at Law was magistrating

12:48 20   it.  It was a pretty serious capital murder case, so I

12:48 21   attended that.

12:48 22       Q.  Okay.

12:48 23       A.  Because -- that one in particular because we

12:48 24   were recommending no bond on that one.

12:48 25       Q.  Okay.  So in a case like that where there's a

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

12:48   1    lot of -- where there's sort of very serious charges,

12:48   2    would your office ever know about that case before you

12:48   3    received the prosecution packet?

12:48   4        A.  A lot of --

12:48   5              MS. ALBIN:  Objection.

12:48   6        Q.  Go ahead.

12:49   7        A.  A lot of times.

12:49   8        Q.  And how would you find out about a high-profile

12:49   9    case?

12:49   10             MS. ALBIN:  Objection, form.

12:49   11       A.  I mean, we can find out either by -- sometimes,

12:49   12   it's weird that the news sometimes finds out before we

12:49   13   do.  And we -- you know, we see the news and say, "Oh,

12:49   14   wow, something has happened," or sometimes we get calls

12:49   15   from law enforcement agencies asking for advice.  You

12:49   16   know, that tends to be the case.

12:49   17       Q.  And when a law enforcement agency asks for

12:49   18   advice, do you -- are you referencing legal advice or

12:49   19   what kind of advice?

12:49   20       A.  Legal advice.

12:49   21       Q.  Investigative advice?

12:49   22       A.  No.  Legal advice.

12:49   23       Q.  Okay.  How often would you say that that

12:49   24   happens on average?

12:49   25       A.  On a daily basis, it could happen four or five,

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

12:49  1    ten times.  I get calls sometimes at 3:00, 4:00, 5:00

12:50  2    in the morning.  I mean, it's just constant -- constant

12:50  3    phone calls.

12:50  4        Q.  Okay.  And are you getting phone calls from

12:50  5    individual law enforcement officers?

12:50  6        A.  Yes, ma'am.

12:50  7        Q.  Okay.  Do you ever go out to a scene while it's

12:50  8    still being investigated?

12:50  9        A.  I have in the past, and it's usually on the

12:50  10   homicide cases.  Once everything is cleared, I like to

12:50  11   go see the scene so I can understand the evidence

12:50  12   later, since those tend to be 100 percent trials.

12:50  13             So I have done it from time to time on

12:50  14   homicide cases, but we make sure the whole scene is

12:50  15   clear and everything.  We don't want to be walking

12:50  16   through an active crime scene.

12:50  17       Q.  Okay.  And is there a -- from the perspective

12:50  18   of, like, a high profile case, is there an instance

12:50  19   where that case might be investigated by the sheriff's

12:51  20   office versus the local police department?  Like is

12:51  21   there a reason why a matter might be handled by one

12:51  22   versus the other?

12:51  23       A.  I mean, there's a lot of areas in a county that

12:51  24   do not fall under -- do not fall under a municipality.

12:51  25   So that -- those naturally go to the -- to the County.

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

12:51 1    Sometimes, depending on who reports something, they

12:51 2    might report it to the sheriff's department first, and

12:51 3    maybe they could probably open up something at the --

12:51 4    at the sheriff's department since they have

12:51 5    jurisdiction throughout the entire county.  So I would

12:51 6    say it's primarily based on those two factors.

12:51 7       Q.  So it's the -- it's the location of the

12:51 8    incident that gives rise to the criminal charges?

12:51 9    That's mainly the determination?

12:51 10      A.  Well, it's a jurisdictional issue.  So, for

12:51 11   example, Rio Grande City Police Department wouldn't

12:51 12   have jurisdiction to investigate something that didn't

12:51 13   happen within their jurisdiction.

12:52 14            Starr County Sheriff's Department does

12:52 15   have jurisdiction in the entire county, since they

12:52 16   cover the entire county.  So if something happens

12:52 17   outside of a municipality, then automatically it's the

12:52 18   sheriff's department.  Anything else, it could be that

12:52 19   they choose to investigate, or if it gets called in to

12:52 20   them.

12:52 21            Let's say somebody calls the sheriff's

12:52 22   department to report something, then they can get

12:52 23   activated and start investigating it, or if it gets

12:52 24   called into the municipality, then they get -- so

12:52 25   that -- they have dual jurisdiction in that situation.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

12:52  1          Q.  Okay.  If the sheriff's office wanted to
12:52  2    procure a search warrant, do they work with your office
12:52  3    to do that?
12:52  4          A.  It depends.  A lot of the times they don't.
12:52  5          Q.  Okay.
12:52  6          A.  Sometimes they do.  It really depends on the
12:52  7    situation.  The grand majority of the time they don't.
12:52  8          Q.  So they could go directly to a judge to procure
12:52  9    that without having an attorney there?
12:52 10          A.  Oh, yes.  They don't -- they don't need us.
12:53 11    Sometimes they just have us review it, and that's --
12:53 12    and I'm saying sometimes.  It's not very common, but
12:53 13    sometimes they just have us review it to make sure that
12:53 14    legally it's -- it's okay.
12:53 15          Q.  Okay.  And what about a subpoena?
12:53 16          A.  Subpoena, they have to go through our office,
12:53 17    because an attorney has to sign a grand jury subpoena
12:53 18    request.  So that's part of the -- that's part of the
12:53 19    grand jury process.
12:53 20          Q.  Are there other kinds of subpoenas that happen
12:53 21    in the investigative stage of a case that are issued
12:53 22    during the investigative stage of a case that are not
12:53 23    grand jury subpoenas?
12:53 24          A.  No, ma'am.
12:53 25          Q.  And how would you as a -- as a first ADA, how

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

12:53 1    would you find out that a law enforcement agency needed

12:53 2    or wanted a grand jury subpoena?

12:53 3         A.  If they needed one, they would contact --

12:53 4              THE COURT REPORTER:  Okay.  Kelly, did

12:53 5    you --

12:53 6              MS. ALBIN:  Yes.  I objected to form.

12:53 7         A.  If they needed one, they would contact our

12:54 8    office and let us know, "Hey, we need a grand jury

12:54 9    subpoena."

12:54 10        Q.  Okay.  Is there any kind of electronic system

12:54 11   that's used to, like, request them or fill them out

12:54 12   ahead of time?

12:54 13        A.  No, ma'am.

12:54 14        Q.  Okay.  If you find out that someone wants a

12:54 15   grand jury subpoena and you're -- you're going to take

12:54 16   it on, what do you do next?  What is the first thing

12:54 17   you do?

12:54 18        A.  I don't understand.

12:54 19        Q.  Do you have a template that you're filling out?

12:54 20   Do you start from a clean Word document?  Like how do

12:54 21   you -- how do you get that started?

12:54 22        A.  So it depends.  Like if it comes to me -- if it

12:54 23   comes to me, the request comes to me, I tell a legal

12:54 24   assistant or one of the intake clerks to prepare the

12:54 25   subpoena.

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

12:54  1          And then they bring it for my signature.

12:54  2    After that, they take care of forwarding it to -- it's

12:54  3    more of an administrative thing.  They just take care

12:54  4    of it getting filed with the clerk's office and then

12:54  5    sent over to the agency.

12:55  6          If it goes through one of our

12:55  7    investigators, because sometimes they contact our

12:55  8    investigators for assistance if we're busy.  If they

12:55  9    can't get ahold of a prosecutor, then the investigators

12:55 10    may -- may help prepare the subpoena and then show it

12:55 11    to us to make sure it's done properly, and then we sign

12:55 12    off on it, and then they forward it to the

12:55 13    investigative agency.

12:55 14       Q.  Okay.  Do you typically -- withdrawn.

12:55 15          How many grand jury subpoenas would you

12:55 16    say you signed or assist in requesting every week.

12:55 17       A.  I mean, I don't request them.  But in response

12:55 18    to a week, it's -- it's kind of difficult, because

12:55 19    there's sometimes we might not have any.  I know, for

12:55 20    example, yesterday I signed off on one or two of them.

12:55 21    It's just -- it's on an as-needed basis.

12:55 22       Q.  Okay.  Are those subpoenas generally for

12:56 23    witnesses to testify at a grand jury, or are they for

12:56 24    records?

12:56 25       A.  The grand majority of the time it's for

12:56  1    records.

12:56  2        Q.  Okay.  And when you're doing that review of the

12:56  3    proposed subpoena, do you ask what kind of case it's

12:56  4    for?

12:56  5        A.  Usually, it would say there what type of

12:56  6    investigation or who's conducting the investigation.

12:56  7    You can usually tell what type of case it is based on

12:56  8    what they're requesting, if it's financial documents or

12:56  9    what it is that they're requesting.

12:56  10            If they contact us directly -- and I say

12:56  11   we, us, the prosecutor, they might give us a quick

12:56  12   little rundown as to what's going on and why they need

12:56  13   it, or sometimes they just contact the investigators,

12:56  14   and they prepare it, and we sign off on it at that

12:56  15   stage.

12:56  16       Q.  Okay.  I am going to introduce an exhibit, I

12:57  17   think both as one exhibit, right?

12:57  18            MS. KOVEL:  So we're going to e-mail you,

12:57  19   Kelly, so you have it in front of you.  Sorry.  They

12:57  20   are --

12:57  21            MS. CORNING:  That's one of them.  Here is

12:57  22   the other.

12:57  23            MS. GARZA:  You're going to mark them same

12:57  24   Exhibit 1, or are you going to mark them separately?

12:57  25            MS. KOVEL:  I guess we can mark them

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:58  1    separately but introduce them together if that's okay

12:58  2    with you.

12:58  3                    So these are not Bates-stamped, Kelly.

12:58  4    They are labeled Confidential Exhibit 6 and 7, and I

12:58  5    believe that stamp comes with the original presentation

12:58  6    of confidential records from back last spring, summer.

12:58  7    Do we have a copy for the witness?

12:58  8                    MS. CORNING:  Yes.

12:58  9                    MS. KOVEL:  Okay.  Did you get them to

12:58 10    Kelly?

12:58 11                    MS. CORNING:  I'm e-mailing them right

12:58 12    now.

12:58 13                    MR. KOVEL:  Okay.  Yeah.  E-mail them to

12:58 14    her before you give them to me.

12:59 15        Q.  So these are going to be marked as Exhibits 1

12:59 16    and 2, plaintiffs.  And yeah, take your time reviewing

12:59 17    those documents, Mr. Villarreal.

12:59 18        A.  Okay.

12:59 19        Q.  Okay.  Sorry.  We want to make sure Kelly has a

12:59 20    copy before.

12:59 21                    Let me ask before you -- before -- since

12:59 22    Kelly is waiting, have you ever decided not to sign a

13:00 23    grand jury subpoena or not to proceed with that

13:00 24    application?

13:00 25        A.  When I have seen corrections that I wanted to

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:00  1    do, for example, if it's missing -- if I don't think

13:00  2    it's specific enough or -- or stuff like that, then --

13:00  3    then I have, yes.

13:00  4        Q.  Okay.  And would you say those are more, like,

13:00  5    formal kind of technical problems, or is there -- is

13:00  6    there ever like a legal problem underlying for a reason

13:00  7    not to subpoena something?

13:00  8        A.  Yes, there was -- there's been times --

13:00  9            THE COURT REPORTER:  Kelly, did you --

13:00 10            MS. ALBIN:  Yes.

13:00 11            THE COURT REPORTER:  Can you say it again?

13:00 12            MS. ALBIN:  I objected, but you can

13:00 13    answer.

13:00 14        A.  I've -- I've refused to sign some subpoenas

13:00 15    where they're requesting phone records, because even

13:00 16    though you can get subscriber information through

13:00 17    subpoenas, under Texas law, you need a search warrant

13:00 18    to get phone records, and some officers don't know

13:01 19    that, so they've sent over requests for subpoenas, and

13:01 20    in that situation, I declined.

13:01 21        Q.  Okay.  In that -- in that situation, would you

13:01 22    have a conversation with the officer to explain why you

13:01 23    declined it?

13:01 24        A.  No.  In those situations, usually, I have -- I

13:01 25    tell the investigators that we have -- because they're

Electronically signed by Donna McCown (101-253-986-8079)                                0ec5b6c3-b289-499c-aba2-aef5c373844b

13:01  1   kind of -- a lot of the times they're like the middle
13:01  2   people, so I just tell them, "Hey, explain to this
13:01  3   agency and make sure you get the word around that they
13:01  4   can't be requesting these type of subpoenas for that."
13:01  5            MS. KOVEL:  Okay.  All right.  Kelly, have
13:01  6   you received the e-mail?
13:01  7            MS. CORNING:  In one second.  Sorry.
13:01  8       Q.  Okay.  And once you have signed the
13:01  9   application, you said you don't actually give it to
13:01 10   the -- does a judge have to sign it or a clerk?
13:01 11       A.  It depends.  If it's an in-county subpoena,
13:01 12   that means that it's going to served within the county,
13:01 13   a judge does not have to sign it, and it just has to
13:02 14   get filed with the clerks, and they have to issue the
13:02 15   subpoena, which they stamp-file it.
13:02 16            If it's an out-of-county subpoena, then
13:02 17   the district judge of that grand jury has to sign it,
13:02 18   so we sign the application.  It goes to the district
13:02 19   judge.  If they sign off on it, then the district clerk
13:02 20   stamps the subpoena and it goes out.
13:02 21       Q.  Okay.  Would you appear before the judge in
13:02 22   that circumstance, or is it sort of an automatic
13:02 23   process?
13:02 24       A.  No.  It's just the subpoena itself or the
13:02 25   application goes to the judge's office.  We don't

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

113

13:02 1   appear before them.

13:02 2           MS. KOVEL:  All right.  Kelly, let me know

13:02 3   when you have the e-mail.

13:02 4           THE COURT REPORTER:  Say it again.

13:02 5           MS. KOVEL:  I said Kelly, let me know --

13:02 6           THE COURT REPORTER:  I mean I missed hers.

13:02 7           MS. ALBIN:  Yes, I have them.

13:02 8           MS. KOVEL:  Thank you.

13:02 9       Q.  Okay.  So we're calling the one, Exhibit 1

13:02 10  that's marked --

13:02 11          MS. GARZA:  -- 6, yes.

13:02 12      Q.  So starting with the Exhibit No. 1, which is

13:02 13  marked at the bottom Confidential Exhibit No. 6.  Do

13:03 14  you see this document?

13:03 15      A.  Yes, ma'am.

13:03 16      Q.  And do you recognize this copy?

13:03 17      A.  That is my signature.  I don't remember this

13:03 18  particular one.  I remember the other one, but this one

13:03 19  I don't remember.

13:03 20      Q.  Okay.  So by "the other one," you're referring

13:03 21  to Plaintiff's Exhibit 2, which is marked at the bottom

13:03 22  Confidential Exhibit No. 7.  Am I correct?

13:03 23      A.  Yes.  That one -- that one -- I remember that

13:03 24  one.  I don't remember this subpoena, but that is my

13:03 25  signature.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:03 1      Q.   Okay.  And tell me what you remember about

13:03 2  Plaintiff's Exhibit 2.

13:03 3      A.   This is the one that says "Confidential No. 7"?

13:03 4      Q.   Correct.

13:03 5      A.   I remember that -- that for this one, the

13:03 6  sheriff's department had requested a subpoena for the

13:03 7  medical records because they were asking for advice,

13:03 8  and we didn't have nearly enough facts to make any

13:03 9  determination on the case.

13:03 10     Q.   Okay.  So let's back up a little bit.  This --

13:03 11  this is a grand jury subpoena regarding medical records

13:04 12  of our client Lizelle Herrera, correct?

13:04 13     A.   Uh-huh.

13:04 14     Q.   Now she's Gonzalez.  Okay?

13:04 15     A.   Yes, ma'am.

13:04 16     Q.   And you said this is -- this is a request for

13:04 17  medical records.  The front of it says "Starr County

13:04 18  Memorial Hospital," correct?

13:04 19     A.   Yes, ma'am.

13:04 20     Q.   Okay.  When did you first hear about the

13:04 21  incident involving our client Lizelle Herrera?

13:04 22     A.   Must have been the same day this subpoena was

13:04 23  filed, I would assume, around that time.

13:04 24     Q.   And who notified you about it?  Who contacted

13:04 25  you first?

Electronically signed by Donna McCown (101-253-986-8079)                0ec5b6c3-b289-499c-aba2-aef5c373844b

13:04 1          A.  The investigator that contacted me I believe

13:04 2     was Esmer Muniz.  I believe she called me.

13:04 3          Q.  Muniz?

13:04 4          A.  Muniz, yes.

13:04 5          Q.  She called you on your cell phone?

13:04 6          A.  I don't believe it was my cell phone.  I think

13:04 7     it was my -- my office phone, because I remember I was

13:04 8     in my office working on something.  And I don't know if

13:04 9     they just called to see who was there or what, but I do

13:05 10    remember that I answered the phone in my office, so I

13:05 11    want to say it was the landline there at the office.

13:05 12         Q.  Okay.

13:05 13         A.  Yeah.

13:05 14         Q.  And who is Esmeralda Muniz?

13:05 15         A.  She's a former investigator with the sheriff's

13:05 16    department.  She -- she's recently retired.

13:05 17         Q.  Okay.  Did you know her at the -- now, this is

13:05 18    around January 2022, correct?

13:05 19         A.  Yes.

13:05 20         Q.  And did you know her at that time?

13:05 21         A.  Yes.

13:05 22         Q.  Had you done work with -- with cases -- have

13:05 23    you worked on cases with her previously?

13:05 24         A.  Yes, ma'am.

13:05 25         Q.  Okay.  Do you know if she called you directly?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:05  1        A.  What do you mean directly?

13:05  2        Q.  Do you have a direct line in the DA's office

13:05  3   for your desk phone?

13:05  4        A.  No.  No, ma'am.

13:05  5        Q.  Okay.  Is there just one phone number and

13:05  6   whoever answers answers?

13:05  7        A.  So the way it works is the entire county has a

13:05  8   phone number, and it goes to a centralized -- kind of

13:05  9   like an operator.  And then from there, they send you

13:05 10   to the departments.

13:05 11             So there they would forward the phone call

13:06 12   to the front desk there at the DA's office, and then

13:06 13   from there, they would get transferred to whoever

13:06 14   they're looking for there at the DA's office.

13:06 15        Q.  Okay.  So do you know if Investigator Muniz was

13:06 16   asking for you by name?

13:06 17        A.  I'm not sure, ma'am.

13:06 18        Q.  Okay.  And do you remember what she said to you

13:06 19   on that phone conversation?

13:06 20        A.  I remember the -- I guess the gist of what she

13:06 21   told me, because it was a while back, but it wasn't a

13:06 22   long conversation.  She had -- she had advised me that

13:06 23   they -- I guess the Starr County Hospital -- or Starr

13:06 24   County Memorial Hospital had contacted the sheriff's

13:06 25   department, something about them being concerned or

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:06 1  somebody in their department.  I don't know if it was

13:06 2  an attorney or somebody was concerned that they hadn't

13:06 3  reported something to law enforcement.

13:06 4          Apparently -- what I remember is that

13:06 5  there was a female that had gone in a few days before,

13:07 6  and I don't know if they had to pump her stomach or

13:07 7  something like that, that she had ingested some --

13:07 8  something.  They had treated her.  She had left.  And

13:07 9  then she came back.

13:07 10          What stood out that -- what they told me

13:07 11  was that when she came back that the baby -- or there

13:07 12  was -- oh, sorry.  At the beginning that she was

13:07 13  pregnant, that's one of the details they had told me

13:07 14  the first time she went.  When she was -- when she came

13:07 15  back the second time that the baby was sticking out of

13:07 16  her.

13:07 17          And when I asked, "What do you mean the

13:07 18  baby was sticking out of her," they said, "That's all

13:07 19  they told us.  They didn't give us any more details

13:07 20  other than that."  So they're asking, "Well, you know,

13:07 21  do we have a case here?"

13:07 22          I told them, "That's not nearly enough

13:07 23  information for me to make the determination was the

13:07 24  baby born alive?  Were they not?"  They didn't -- they

13:07 25  didn't know.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:07 1      Q.  Okay.  So stepping back, it sounds like

13:08 2  Investigator Muniz was talking about the case more

13:08 3  generally and not at that time specifically about

13:08 4  medical records?

13:08 5      A.  Not -- not at that moment.

13:08 6      Q.  Okay.

13:08 7      A.  Yeah.

13:08 8      Q.  So was she asking, you said, "Do we have a case

13:08 9  here?"  She asked you that?

13:08 10      A.  Yeah.  She was confused because she was like --

13:08 11  like basically, like, you know, "This is all we have

13:08 12  right now.  Like is there a case here because of the

13:08 13  baby?"

13:08 14           And my question was, "Well, was the baby

13:08 15  born?  Under what condition was it born?"

13:08 16           And I remember her telling me that she

13:08 17  didn't know because that all the hospital did was the

13:08 18  initial report, and then after that, they refused to

13:08 19  give any information, that basically their position was

13:08 20  that they had complied with their duties to report, and

13:08 21  after that, they shut down.

13:08 22           I do remember asking if there was an

13:08 23  autopsy to see if the child had been born alive, under

13:08 24  what conditions if it was born.  I remember being told

13:08 25  that the -- that the body of the child, embryo, I mean,

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:09  1    had been cremated.  So there was no autopsy.  There's

13:09  2    no nothing to go on there.

13:09  3              So basically, that's when they asked for

13:09  4    the grand jury subpoena for the medical records,

13:09  5    because they were trying to figure out what happened

13:09  6    here and if there's any actionable crime that happened,

13:09  7    because there was -- there was some possibilities,

13:09  8    depending on what the circumstances were, but not

13:09  9    enough solid facts to -- to know anything for sure.

13:09  10   Q.  Okay.  So did you convey to Investigator Muniz

13:09  11   that conclusion that you just drew, that there was a

13:09  12   possibility that there could be a crime?

13:09  13   A.  No.  What I -- what I told her was that I

13:09  14   didn't have enough facts to make a determination.  And

13:09  15   that's when she asked for the grand jury subpoena for

13:09  16   the medical record.

13:09  17   Q.  Okay.  Did anyone use the term "abortion" or

13:09  18   the word "abortion" --

13:09  19   A.  No, ma'am.

13:10  20   Q.  -- in that time?

13:10  21   A.  No, ma'am.

13:10  22   Q.  Okay.  And when you -- you said she had

13:10  23   ingested something, did Investigator Muniz say what

13:10  24   that -- what that thing was at that time in that

13:10  25   conversation?

Electronically signed by Donna McCown (101-253-986-8079)                              0ec5b6c3-b289-499c-aba2-aef5c373844b

13:10  1      A.  No.  I don't think she knew what she had

13:10  2  ingested.

13:10  3      Q.  Okay.

13:10  4      A.  I think all she knew was that they had treated

13:10  5  her for something she had ingested.

13:10  6      Q.  Okay.  And did Investigator Muniz at that time

13:10  7  ask you whether an unborn child is an individual under

13:10  8  the Penal Code?

13:10  9      A.  I don't remember, ma'am, to be honest with you.

13:10 10      Q.  Okay.  Did you conduct any legal research in

13:10 11  the course of this call or afterwards in response to

13:10 12  the call?

13:10 13      A.  In response to that call, no, ma'am.

13:10 14      Q.  During the call, did you look anything up?

13:10 15      A.  No, ma'am.

13:10 16      Q.  Had you ever worked on a prosecution before

13:10 17  that involved the death of an unborn child?

13:10 18      A.  No, ma'am.

13:10 19      Q.  And since that time, have you ever worked on a

13:10 20  prosecution that involved the death of an unborn child?

13:11 21      A.  No, ma'am.

13:11 22      Q.  Have you ever -- have you ever worked on any

13:11 23  other cases that involved an unborn child as a victim,

13:11 24  you know, through an assault, for instance?

13:11 25      A.  I'm sure I've prosecuted individuals for

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:11 1    assaulting pregnant women, yes, but -- probably at

13:11 2    various times.

13:11 3        Q.  Okay.  And do you remember conducting any legal

13:11 4    research in the course of those prosecutions?

13:11 5        A.  Legal research, no, but probably just looking

13:11 6    up the elements of the assault, what degree it would be

13:11 7    depending on that assault.  I believe -- I don't know,

13:11 8    because, again, those are not regular situations.

13:11 9            I believe there -- there may be instances

13:11 10   of that where a regular assault may be upgraded due to

13:12 11   the fact that a woman is pregnant, but I would need to

13:12 12   look it up.

13:12 13       Q.  Okay.  And do you know -- do you remember

13:12 14   approximately how long that call with Investigator

13:12 15   Muniz lasted?

13:12 16       A.  It wasn't very long.  It was a handful of

13:12 17   minutes.

13:12 18       Q.  Okay.  But you remember it sitting here today?

13:12 19       A.  I do.

13:12 20       Q.  And it was -- is that because it was memorable?

13:12 21           MS. ALBIN:  Object.

13:12 22           Go ahead.

13:12 23       A.  It was different.  That's for sure.  But the

13:12 24   reason I remember it was because once I -- you know,

13:12 25   once the whole story broke out that she had been

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:12  1      indicted, I had to go back and remember that

13:12  2      conversation.  So once that happened, it kind of just

13:12  3      sticks with you because of how everything --

13:12  4          Q.  Okay.  So it sounds like at the end of that

13:13  5      conversation, there was a sort of conclusion that you

13:13  6      would need more information, correct?

13:13  7          A.  Yes, ma'am.

13:13  8          Q.  And that you -- you believe that the best way

13:13  9      to get that information would be through Lizelle's

13:13  10     medical records, correct?

13:13  11         A.  No.  That's what the sheriff's department

13:13  12     requested in order to get the facts.  In other words, I

13:13  13     just told them I didn't -- I didn't have enough to be

13:13  14     able to give them advice, and then they requested the

13:13  15     medical records.

13:13  16         Q.  Okay.  Do -- and when you say they requested

13:13  17     them, you're talking about the subpoenas that are

13:13  18     Exhibits 1 and 2?

13:13  19         A.  Yes.  Again, I remember -- I'm sure -- I'm sure

13:13  20     I signed this one, since -- the one marked Exhibit 6 on

13:13  21     here.  I'm sure I signed it because that's my

13:13  22     signature.  I don't remember why this one was

13:13  23     requested, but I do remember the hospital and why that

13:13  24     one was requested.

13:13  25         Q.  Okay.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                              0ec5b6c3-b289-499c-aba2-aef5c373844b

13:13  1      A.  I'm sure -- I'm sure at the time I knew, but
13:13  2   right now, I can't remember.
13:13  3      Q.  That's fine.  So do you know how --
13:13  4   approximately how soon after that call -- after that
13:14  5   phone call you received this request for a subpoena?
13:14  6      A.  It was during the call.
13:14  7      Q.  Okay.  Do you -- do you mean that she e-mailed
13:14  8   you during the call?
13:14  9      A.  No.  She requested it over the call.
13:14 10      Q.  Okay.  And so what -- what steps did you take
13:14 11   after that?
13:14 12      A.  That's when we go to the legal assistants and
13:14 13   tell them, "Hey, they're requesting a subpoena.  Can
13:14 14   you draw it up?"  They draw it up.  I sign it, give it
13:14 15   back to them, and they send it to the agency.
13:14 16      Q.  So how do you know what to put on the subpoena?
13:14 17      A.  Because she told me.
13:14 18      Q.  So she told you -- I'm just looking at the
13:14 19   second page of Plaintiff's Exhibit 2, which is, again,
13:14 20   No. 7.
13:14 21      A.  Right.
13:14 22      Q.  Sorry.  There's a lot of information on this
13:14 23   grand jury subpoena.  So there's, for instance, in the
13:14 24   middle paragraph, our client's name, date of birth, and
13:14 25   then the dates that she was in the hospital.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:15  1              So would that have been drafted by you,
13:15  2      that part of the --
13:15  3          A.  No.  This subpoena was not drafted by me.  I
13:15  4      did sign it, and -- and we never draft subpoenas.
13:15  5      Usually, it's the legal assistants that draft
13:15  6      subpoenas.
13:15  7          Q.  Okay.
13:15  8          A.  I don't remember if she gave me this one,
13:15  9      because I -- I don't remember her giving me the name,
13:15 10      to be honest with you.  And usually, during -- during
13:15 11      those types of calls, they never give us names of
13:15 12      people that they're investigating.
13:15 13              So I don't know if maybe the legal
13:15 14      assistants called them and got the details from them,
13:15 15      but I don't remember getting the name from -- from her.
13:15 16          Q.  Okay.
13:15 17          A.  So I don't know -- I don't know how we obtained
13:15 18      the information, whether they gave it to me or they
13:15 19      gave it to the legal assistant.
13:15 20          Q.  So essentially, the call ends.
13:15 21          A.  Yes, ma'am.
13:15 22          Q.  And you didn't draft this.
13:15 23          A.  Correct.
13:15 24          Q.  The next thing you know, there's a legal
13:15 25      assistant giving it to you for signature?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:15  1          A.  Yes, ma'am.

13:15  2          Q.  Okay.  Do you know which legal assistant it

13:15  3    was?

13:15  4          A.  I don't remember, no.

13:15  5          Q.  Do you know which legal assistants would have

13:16  6    been working in the office in January 2022 in that

13:16  7    capacity?

13:16  8          A.  Shoot.  I mean, considering we've had some

13:16  9    changes.  We have maybe two or three people potentially

13:16 10    that are still there that --

13:16 11          Q.  Okay.

13:16 12          A.  -- I could think of.

13:16 13          Q.  Do you know when they draft these, do they --

13:16 14    do they draft them on Microsoft Word?

13:16 15          A.  Yes, ma'am.

13:16 16          Q.  Do they use a template as a starting point?

13:16 17          A.  Yes, ma'am.

13:16 18          Q.  Do they sign -- I mean -- withdrawn.

13:16 19              Do they save a copy of the draft that they

13:16 20    create?

13:16 21          A.  I'm not sure.

13:16 22          Q.  Okay.  You receive this in a hard copy to sign?

13:16 23          A.  Yes, ma'am.

13:16 24          Q.  Do you receive multiple copies?

13:16 25          A.  No, ma'am.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:16  1      Q.  Do you know if this goes into Judicial --

13:16  2  Judicial Dialogue?

13:16  3      A.  It would go into Judicial Dialogue when they

13:17  4  would turn it in with the prosecution packet.  So

13:17  5  usually the -- the investigative agency would make it

13:17  6  part of their prosecution packet.

13:17  7      Q.  Okay.  Based on these documents, can you

13:17  8  tell -- could you surmise what day that phone call

13:17  9  happened?

13:17 10      A.  I'm thinking it's the 12th, because I do

13:17 11  recall -- I do recall them saying that this event or

13:17 12  these events happened a few days before, and if -- if

13:17 13  we're talking about January 7th through the 10th they

13:17 14  were requesting, if that was the last day, just

13:17 15  assuming here, that would make sense that it would be

13:17 16  the 12th if it was a few days before that that she was

13:17 17  at the hospital.

13:17 18      Q.  Okay.

13:17 19      A.  So that's just -- I mean just a guess based on

13:17 20  all the facts that I know.

13:18 21      Q.  Once they're signed, how are they transmitted

13:18 22  back to the investigator?

13:18 23      A.  Sometimes they just come and pick them up.

13:18 24      Q.  Okay.  Do you know if Investigator Muniz came

13:18 25  and picked these up?

Electronically signed by Donna McCown (101-253-986-8079)            0ec5b6c3-b289-499c-aba2-aef5c373844b

13:18 1     A.  I have no idea.

13:18 2     Q.  And after you signed these, did you discuss the

13:18 3 call with Investigator Muniz or any of the information

13:18 4 you learned in that call with anyone?

13:18 5     A.  No, ma'am.

13:18 6     Q.  Okay.  Did Investigator Muniz call you any

13:18 7 other occasions regarding this case?

13:18 8     A.  I know there was -- there was two different

13:18 9 occasions.  There was one, that initial phone call.

13:18 10 The second -- the second phone call was just to --

13:18 11 because they were going to look into whether the child

13:19 12 had been cremated or not.

13:19 13          And I do remember the second phone call

13:19 14 was just to inform me that the child had, in fact, been

13:19 15 cremated and they were going to be pending the medical

13:19 16 records that they had already requested the subpoena

13:19 17 for.  That was -- that one was a short call.

13:19 18     Q.  Okay.  Do you recall approximately how soon

13:19 19 after you signed these requests?

13:19 20     A.  I don't know.

13:19 21     Q.  Was it a matter of weeks or days?

13:19 22     A.  Oh, no.  It must have been either the same day,

13:19 23 if not the next day, but I'm assuming it probably was

13:19 24 the same day.

13:19 25     Q.  Okay.  What was your reaction when you learned

13:19  1    that the -- that the fetus had been cremated?

13:19  2              MS. ALBIN:  Objection.  Hold on.  He's not

13:19  3    referred to -- he said "child" or "body."  He's never

13:20  4    used the phrase "fetus."

13:20  5        Q.  Okay.  What was your reaction when you learned

13:20  6    about the cremation?  How's that?

13:20  7        A.  I mean, it was just one of those FYI things.  I

13:20  8    mean, I really didn't have a reaction.  I just told

13:20  9    them okay.  I mean, it didn't -- it didn't add anything

13:20 10    to the case.

13:20 11              There was -- it didn't -- in other words,

13:20 12    that doesn't help in making a determination if

13:20 13    something happened or not happened that was illegal.

13:20 14    So like legally speaking, it didn't change anything.

13:20 15        Q.  Okay.  And did you remember any other

13:20 16    discussion other than -- on that second call other than

13:20 17    the fact of the cremation and the fact that they were

13:20 18    still waiting for the records?

13:20 19        A.  I'm sorry.  Could you repeat the question?

13:20 20        Q.  Do you remember any other discussion on that

13:20 21    call other than the fact of the cremation and the fact

13:20 22    of the request for medical records was then pending?

13:20 23        A.  No, ma'am.

13:20 24        Q.  Thank you.  Do you know if Investigator Muniz

13:21 25    said anything about going to the funeral home or

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:21  1    crematorium?

13:21  2        A.  I don't recall that, ma'am.

13:21  3        Q.  Okay.  Did you have any other conversations

13:21  4    with Investigator Muniz after the second phone call

13:21  5    regarding the events or facts of this case?

13:21  6        A.  No, ma'am.

13:21  7        Q.  Okay.  We're going to introduce another

13:21  8    exhibit.  It's also not -- it's also not Bates-stamped

13:21  9    because it's a document from this litigation.

13:21  10            MS. KOVEL:  You -- I'll look for it and

13:22  11   you send it to Kelly.

13:22  12            Kelly, for your information, this document

13:22  13   is Defendant Alexandria Barrera's Objections and

13:22  14   Responses to Plaintiff's Phase One Interrogatories.

13:22  15   And you should be receiving it by e-mail in a little

13:22  16   bit.

13:22  17            Are we marking this as Plaintiff's

13:22  18   Exhibit 3?

13:22  19       Q.  I will ask you, Mr. Villarreal, if you could

13:22  20   turn to page 4 while your attorney is waiting for the

13:22  21   exhibit e-mail.  And go ahead and read the

13:22  22   Interrogatory No. 5 that's on that page, and you can

13:22  23   skip the objections, unless you're interested, and then

13:22  24   your response, please.

13:22  25       A.  You want me to read it to myself?

13:22  1         Q.  Yes, please.

13:23  2              MS. KOVEL:  Kelly, did you receive the

13:23  3    exhibit?

13:23  4              MS. ALBIN:  There, it is.

13:24  5         A.  Okay.

13:24  6         Q.  Okay.  I won't ask you if you've -- well, I

13:24  7    will.  I'm assuming you have not seen this before; is

13:24  8    that correct?

13:24  9         A.  That's correct.

13:24  10        Q.  Okay.  This is the response -- official

13:24  11   response from your colleague Ms. Barrera to

13:24  12   interrogatories that were posed by us, plaintiff's

13:24  13   counsel.

13:24  14        A.  Yes, ma'am.

13:24  15        Q.  And -- and as you see, your name is mentioned

13:24  16   in this interrogatory response.

13:24  17        A.  Uh-huh.

13:24  18        Q.  Specifically, just to summarize for the record,

13:24  19   it says that the sheriff's office spoke to Ms. Barrera

13:24  20   and said that they had spoken to you, specifically that

13:24  21   they had asked you whether an unborn child was an

13:25  22   individual for purposes of the homicide statute and

13:25  23   also what kind of charge would apply.

13:25  24              And I would like to ask you if you recall

13:25  25   that conversation with Investigator Muniz or anyone

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:25  1    else at the sheriff's department.
13:25  2         A.  I don't recall that portion of the
13:25  3    conversation, ma'am.
13:25  4         Q.  Okay.  Did you ever discuss this sequence of
13:25  5    events with Ms. Barrera in -- you know, in the last six
13:25  6    months?
13:25  7         A.  No, ma'am.
13:25  8         Q.  Okay.  Do you recall ever looking up whether
13:25  9    the word "individual" within the Penal Code included an
13:25 10    unborn child?
13:25 11         A.  I don't recall looking that up, no, ma'am.
13:25 12         Q.  Okay.  If you were sitting here today and you
13:25 13    wanted to know what the Penal Code defined as an
13:26 14    individual, would you use Lexis, Google, or something
13:26 15    else?
13:26 16         A.  Lexis.
13:26 17         Q.  Okay.  And would your -- based on your
13:26 18    understanding of the account -- I understand completely
13:26 19    if you don't know, but based on your understanding of
13:26 20    your account, would that search be saved within your
13:26 21    account as the -- you know, as having occurred?
13:26 22         A.  I don't know.
13:26 23         Q.  If you search for something in Lexis, is it
13:26 24    your general practice to print it out?
13:26 25         A.  Not always, no.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:26  1      Q.  Okay.  What would determine -- what would be a

13:26  2  factor that made you want to print something versus --

13:26  3      A.  Usually -- usually I print something out if

13:26  4  we're in trial and I need to have something handy and

13:26  5  maybe give copies to opposing counsel and the judge,

13:26  6  but primarily, we keep it -- it's just there on Lexis.

13:26  7      Q.  Okay.  So do you have any -- just -- just to

13:27  8  wrap this up, do you have any idea what Ms. Barrera's

13:27  9  response is referring to here?

13:27 10      A.  No, ma'am.

13:27 11            MS. ALBIN:  Objection.

13:27 12      Q.  No?

13:27 13      A.  No.  I mean, I don't remember that

13:27 14  conversation.  Whether it happened or not, I don't

13:27 15  know, but I don't -- I don't recall that conversation,

13:27 16  at least not that portion that they're -- that they're

13:27 17  talking about.

13:27 18      Q.  Okay.  So you didn't communicate with

13:27 19  Investigator Muniz after the second phone call, to your

13:27 20  recollection?

13:27 21      A.  Yes.  To my recollection, I didn't.

13:27 22      Q.  And you wouldn't have documented that phone

13:27 23  call in any notes or --

13:27 24      A.  No, ma'am.

13:27 25      Q.  -- phone log?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:27 1    A.  No, ma'am.

13:27 2    Q.  Okay.  And when was the next time you heard

13:27 3  anything about the events underlying this case?

13:27 4    A.  I was at an Easter event helping out one of the

13:28 5  local constables for -- for a community event, and all

13:28 6  of a sudden, I started seeing that there was news

13:28 7  breaking out of this Lizelle Gonzalez, or I think at

13:28 8  that time she was Herrera, being indicted on an

13:28 9  abortion case.  I think that was the headline.  That

13:28 10  was the next time I heard anything about this case.

13:28 11    Q.  Okay.  Are you aware that Ms. -- that Lizelle

13:28 12  Herrera Gonzalez was indicted from a grand jury that

13:28 13  convened in March?

13:28 14    A.  I was made aware of that later.

13:28 15    Q.  Okay.  Do you know where you were in the last

13:28 16  week of March 2022?

13:28 17    A.  Where I was?

13:28 18    Q.  Uh-huh.

13:28 19    A.  I mean, can you specify?  Like I was at work --

13:29 20    Q.  Were you out of the country?  Were you --

13:29 21    A.  No, no, no.  I was at work.  Yes.

13:29 22    Q.  Okay.  And was the -- is there -- so --

13:29 23  withdrawn.

13:29 24        You mentioned two different grand juries

13:29 25  that meet, depending on the district court --

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:29  1          A.  Uh-huh.

13:29  2          Q.  -- in Starr County, correct?

13:29  3          A.  Correct.

13:29  4          Q.  So if a grand jury is meeting for the first six

13:29  5      months regarding 229 -- right?  That's the 229th

13:29  6      District Grand Jury, is that what it's called?

13:29  7          A.  Yes.

13:29  8          Q.  Okay.  Would that -- that would be sort of

13:29  9      under your, you know, operation, correct, as that --

13:29  10     because that's the district court that you supervise?

13:29  11         A.  No, ma'am.  The district court dockets are

13:30  12     entirely different than grand jury.

13:30  13         Q.  Okay.

13:30  14         A.  Grand jury --

13:30  15         Q.  So sorry.

13:30  16         A.  Yeah.  No, no.  Grand jury is -- is pretty much

13:30  17     all the prosecutors present to the -- to the grand

13:30  18     juries.  It doesn't matter what court they're in.  It's

13:30  19     just -- it's the grand jury sitting at that time for

13:30  20     general purposes.

13:30  21                 So, you know, Alex and Judy, even though

13:30  22     they're in the 381st, they can present in the 229th and

13:30  23     vice versa.  So it's not under anybody's purview.  It's

13:30  24     just everybody presents to that grand jury.

13:30  25         Q.  Okay.  Without giving me any information about

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:49 1    conversation?

13:49 2         A.  Yes.  He was trying to figure out himself what

13:49 3    was happening.  He asked me if Alex had presented the

13:49 4    case or if I had presented it.  I told him I didn't

13:49 5    even know we had it, but he -- basically, we were

13:49 6    trying to figure out what was happening because we -- I

13:49 7    think we were in the dark on it.

13:49 8         Q.  Did you have concerns about the case?

13:49 9              MS. ALBIN:  Objection, vague.

13:49 10        A.  Not that I had concerns.  It's just that I

13:49 11   didn't know anything about -- other than what -- what I

13:49 12   had been told by -- by Esmer, I didn't really have any

13:49 13   facts.

13:49 14             So I didn't -- I didn't know one way or

13:49 15   another.  I just knew that it was making the news, and

13:49 16   usually, when that happens, people start reaching out

13:49 17   to us for questions as far as the media, and if I

13:49 18   didn't have -- if I didn't know what was happening,

13:49 19   then I didn't know how to respond.

13:49 20        Q.  Okay.  Let me ask you a little bit about the

13:49 21   policies about media.  Promise it won't be too long,

13:50 22   Kelly.

13:50 23             Do you have a central kind of system for

13:50 24   fielding requests from the media?

13:50 25        A.  Not a policy.  They usually reach out to either

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:50 1    me or to Mr. Ramirez.

13:50 2        Q.  Would they reach out to you directly?

13:50 3        A.  Yes.

13:50 4        Q.  Okay.  And are you empowered to make statements

13:50 5    to the media without first consulting Mr. Ramirez?

13:50 6        A.  No.  No.  Usually, I consult with Mr. Ramirez.

13:50 7        Q.  Okay.  Is there, you know, a director of

13:50 8    comms -- communications or public relations in the

13:50 9    office?

13:50 10       A.  I wish, but no.

13:50 11       Q.  The office -- you said something about social

13:50 12   media.  I believe the office has a Facebook account; is

13:50 13   that correct?

13:50 14       A.  That's correct.

13:50 15       Q.  Do you know who runs that account?

13:50 16       A.  I have access to it, and Alex has access to it.

13:50 17       Q.  Does DA Ramirez have access to it?

13:50 18       A.  No.

13:51 19       Q.  And so how often do you, you know, have

13:51 20   occasion to look at that account or interact with it?

13:51 21       A.  Not very common.  Usually, my interaction with

13:51 22   it is whenever we do press releases.

13:51 23       Q.  Okay.  What would -- what would make you want

13:51 24   to do a press release, what kind of event?

13:51 25       A.  Usually, it would be for major convictions.

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:51  1    Any trials we have where we have major convictions, we

13:51  2    usually put those out there.

13:51  3        Q.  Okay.  Would you draft the press release?

13:51  4        A.  It depends.  Sometimes I draft them, sometimes

13:51  5    Alex -- Alex drafts them.  It just depends.

13:51  6        Q.  And once you drafted them, do you give them to

13:51  7    DA Ramirez to approve?

13:51  8        A.  Yes, ma'am.

13:51  9        Q.  Does he typically edit those press releases?

13:51 10        A.  He has in the past.

13:51 11        Q.  Are those press releases saved on the -- on

13:51 12    your computer at any place?

13:51 13        A.  I'm sure -- I'm sure they are at one point, but

13:52 14    they're not organized in any way.  They're just there

13:52 15    in either desktop or -- there's no specific folder just

13:52 16    for press releases.

13:52 17        Q.  Okay.  Does the DA's office have a cloud

13:52 18    computing system where you save documents to a sort of

13:52 19    shared server?

13:52 20        A.  We do have a server, yes.

13:52 21        Q.  Okay.  So when you save a document from, like,

13:52 22    let's say you wrote a brief, it would -- it wouldn't

13:52 23    just be saved on your desktop.  It would also be saved

13:52 24    somewhere?

13:52 25        A.  No.  The way the server works is you have to

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:52 1    specifically save it on the server in order to be on

13:52 2    there.

13:52 3        Q.  Okay.

13:52 4        A.  Especially, because we deal with a lot of

13:52 5    delicate information.  We don't want just anybody

13:52 6    having access.

13:52 7        Q.  Did you do any research about this case after

13:52 8    you talked to DA Ramirez?

13:52 9        A.  Sorry.

13:52 10       Q.  Go ahead.

13:52 11       A.  Yes.  I remember we started trying to figure

13:52 12   out what the general facts were.  I mean, again, I

13:53 13   still don't know what the -- what the facts are, the

13:53 14   actual facts of this case are, but we were trying to

13:53 15   figure out the general legality of it, trying to -- it

13:53 16   was -- it was more like trying to get the answer as

13:53 17   quickly as possible to figure out what was happening.

13:53 18            So I do remember trying to figure out what

13:53 19   the legality of these are.  I think some of it we were

13:53 20   basing it on facts that were presented by the media.

13:53 21   So it was just a lot of assumption.  So I do remember

13:53 22   Mr. Ramirez mentioned that he was going to go look for

13:53 23   the file to review it himself, because we needed to get

13:53 24   the facts straightened up.

13:53 25       Q.  And where was that file located?  Do you know?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:53 1      A.  At the DA's office.

13:53 2      Q.  Physically where do the case files live at the

13:53 3  DA's office?

13:53 4      A.  It depends.  So there's file cabinets where --

13:53 5  where cases are usually at.  And if a prosecutor is

13:54 6  working on the case, sometimes they have them in their

13:54 7  office, I mean, yeah.

13:54 8      Q.  Okay.  But again, going back to my original

13:54 9  question about the sort of vertical case assignments,

13:54 10  you don't have a case that you -- you keep that file

13:54 11  for the entirety of the case --

13:54 12      A.  No, not for entirety of the case, no.

13:54 13      Q.  -- centralized?

13:54 14      A.  Yes, ma'am.

13:54 15      Q.  For the reason that you can cover for each

13:54 16  other too in court if you need to.

13:54 17      A.  Well, the main reason is because before we did

13:54 18  that, a lot of files got lost.  So we wanted to make

13:54 19  sure -- this was in the previous administration, so we

13:54 20  wanted to make sure that pretty much our legal

13:54 21  assistants have permission to go and take our files,

13:54 22  even if they're on our desk, because some of the

13:54 23  attorneys historically have wanted to say, "Well, this

13:54 24  is my file.  I want to keep it here," and then sooner

13:54 25  or later things got lost.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:54  1          Obviously, we have our Judicial, but --

13:54  2    but we try to keep them as centralized as possible.

13:54  3          Q.  So what steps did you take when you were doing

13:54  4    research, do you remember, after you talked to DA

13:54  5    Ramirez?

13:54  6          A.  I remember I was having difficulty getting

13:55  7    access to -- to the Internet because of the location

13:55  8    that I was at the time.  At that Easter event, I wasn't

13:55  9    getting a lot of good cell service, so I kept trying to

13:55 10    use Lexis, and I was having issues.  I was trying to

13:55 11    use Safari, Google, anything, but I was having issues

13:55 12    getting Internet access over there.

13:55 13          Q.  Did you leave the event?

13:55 14          A.  Yes.

13:55 15          Q.  And where did you go?

13:55 16          A.  To my house.

13:55 17          Q.  Did you conduct additional research from your

13:55 18    house?

13:55 19          A.  By the time I got there -- well, no.  I don't

13:55 20    remember at what point.  I know there was a point where

13:55 21    Gocha had mentioned, "Hey, they just sent me this.  Can

13:55 22    you check it out?"  And it was a statute.  I think it

13:55 23    was Section 19 in there and talking about the -- the

13:55 24    affirmative defense, and I reviewed it, and, you know,

13:56 25    that was -- that was it.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:56  1     Q.  What did you do after you reviewed it?

13:56  2     A.  So I didn't do anything, because he had told me

13:56  3   that he was going to head to the office and grab it.

13:56  4   And after that, he was more than anything keeping me

13:56  5   updated so that I can know what's happening, but I know

13:56  6   that he reviewed the file.

13:56  7              He told me right away, you know, "I

13:56  8   need -- this case needs to be dismissed.  I'm going to

13:56  9   dismiss it."  I know he made that determination during

13:56 10   that same weekend.  I don't know -- I don't remember if

13:56 11   it was that same day or -- or -- but I know it was a

13:56 12   very quick decision for him.

13:56 13              And then I think there was a point where

13:56 14   he had mentioned that he was going to try to meet with

13:56 15   the family of the -- of Lizelle.

13:56 16     Q.  You mentioned the term "affirmative defense."

13:57 17   Where do you -- where do you sort of -- how did you

13:57 18   decide to use that term?  What made you decide to use

13:57 19   that term?

13:57 20     A.  Well, I mean, that's kind of what I would

13:57 21   characterize it as an affirmative defense.  Usually,

13:57 22   there's crimes and then there's defenses to that crime

13:57 23   where the crime wouldn't apply if certain facts

13:57 24   happened.  That's an affirmative defense.  I mean,

13:57 25   that's my understanding.  I mean, maybe I'm using the

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:57  1    wrong term, but --

13:57  2        Q.  Do you know if DA Ramirez called it that --

13:57  3        A.  No.

13:57  4        Q.  -- when he spoke to you on the phone?

13:57  5        A.  No, no.  I'm using that term right now, but no.

13:57  6        Q.  Okay.

13:57  7        A.  That term had never been used.

13:57  8        Q.  And did you go into the office on that weekend?

13:57  9        A.  No, ma'am.

13:57 10        Q.  Okay.  Did you e-mail Mr. Ramirez on that

13:57 11    weekend?

13:57 12        A.  Not that I recall.

13:57 13        Q.  Did you text message Mr. Ramirez on that

13:57 14    weekend?

13:57 15        A.  I believe, yes, because I believe we were

13:58 16    messaging, because that's when I remember -- I think --

13:58 17    I think he had -- that's when he was communicating some

13:58 18    stuff via text message, but it wasn't a whole lot, but

13:58 19    I know there was some messaging.

13:58 20        Q.  To the best of your recollection, would that

13:58 21    have been on WhatsApp or messages?

13:58 22        A.  Oh, I don't know.

13:58 23        Q.  Okay.  Have you ever received WhatsApp messages

13:58 24    from DA Ramirez?

13:58 25        A.  He usually doesn't use WhatsApp.  The only time

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:58 1     he uses WhatsApp is for the office stuff, like the

13:58 2     big -- the broadcast stuff, but he usually uses regular

13:58 3     text message.

13:58 4         Q.  Okay.  And would you have access to those text

13:58 5     messages now?

13:58 6         A.  No.

13:58 7         Q.  And why is that?

13:58 8         A.  Because I don't back up my text messages, and I

13:58 9     have a new cell phone.

13:58 10        Q.  Okay.  What happened to your old cell phone?

13:58 11        A.  I traded it in for this cell phone.

13:58 12        Q.  Fair enough.  Okay.  Did you at any time during

13:58 13    that weekend from the moment you heard about the news

13:59 14    articles talk to ADA Barrera?

13:59 15        A.  I don't recall.  I'm sure probably I did over

13:59 16    the phone, but I don't remember, to be honest with you.

13:59 17        Q.  Okay.

13:59 18        A.  Oh, you said after the news releases, right?

13:59 19        Q.  Yes.

13:59 20        A.  Yeah.  After -- yeah.  I'm sure I did, but I

13:59 21    don't remember the nature of the conversation.

13:59 22        Q.  Do you believe that you talked about this case?

13:59 23        A.  I'm not sure.  I'm not sure, to be honest with

13:59 24    you.

13:59 25        Q.  Okay.  Do you spend time with DA -- ADA Barrera

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

13:59  1    outside of the office socially?

13:59  2        A.  No, no.

13:59  3        Q.  No?  Okay.  So she wasn't at your Easter event,

13:59  4    for instance?

13:59  5        A.  No, no.

13:59  6        Q.  Okay.

13:59  7        A.  The Easter event was in the western most part

13:59  8    of the county.  That's far from where she lives.

13:59  9        Q.  Okay.  And as far as you know, did DA Ramirez

13:59 10    meet with Lizelle and her family?

14:00 11        A.  That's my understanding.

14:00 12        Q.  Okay.  Did you ever -- were you around the

14:00 13    office during that meeting or at any time?

14:00 14        A.  No, ma'am.

14:00 15        Q.  Did DA Ramirez talk to you about that meeting

14:00 16    after it occurred?

14:00 17        A.  Just the fact that he had had the conversation,

14:00 18    that meeting with them.

14:00 19        Q.  Okay.  And Lizelle's criminal case was

14:00 20    dismissed, correct?

14:00 21        A.  That's my understanding.

14:00 22        Q.  Okay.  Did you have any involvement in the

14:00 23    dismissal proceedings or the, you know, drafting of any

14:00 24    dismissal documents?

14:00 25        A.  No, ma'am.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

14:00  1      Q.  When an indictment order is issued, is the next

14:00  2  step in the sort of general process to get an arrest

14:00  3  warrant?

14:00  4      A.  So first, obviously, one thing is for it to be

14:01  5  true billed, then the next thing is for the indictment

14:01  6  to be signed.  After that, it has to be assigned to a

14:01  7  court.  Once it's assigned to a court, that -- that

14:01  8  indictment goes over to the district judge.

14:01  9           The district judge reviews the indictment

14:01 10  if it was assigned to his court.  Usually, he -- they

14:01 11  initial the back of the indictment where the bonds are.

14:01 12  If they approve the bonds or they want to change the

14:01 13  bonds, that's their determination.

14:01 14           If there's no bond there, usually that

14:01 15  means that either the -- the charge was upgraded or

14:01 16  that person has not been arrested.  So at that point,

14:01 17  they assign a bond.

14:01 18      Q.  So they would assign a bond before the arrest?

14:01 19      A.  Well, it's more of a -- at that point, more of

14:01 20  a suggestion until -- because they have to get

14:01 21  magistrated in order for the bond to be effective.

14:01 22      Q.  Okay.

14:01 23      A.  So technically speaking, it's more of a

14:01 24  suggested bond at that point.  But then once they get

14:02 25  arrested, they need to get arraigned and all that.

Electronically signed by Donna McCown (101-253-986-8079)                                    0ec5b6c3-b289-499c-aba2-aef5c373844b

14:02  1    Once they do that, then the case would go over to the

14:02  2    district clerk's office, which would automatically

14:02  3    issue the capias if -- if they hadn't -- if there's

14:02  4    like a bond either increase or -- of if they hadn't

14:02  5    been arrested for the charge --

14:02  6        Q.  Okay.

14:02  7        A.  -- or if it had been upgraded, they show a

14:02  8    capias for that -- for that case.

14:02  9        Q.  And is the ADA or a district attorney's office

14:02  10   lawyer present for the district judge making those

14:02  11   determinations and, you know, referring it to the

14:02  12   district clerk?

14:02  13       A.  No, ma'am.

14:02  14       Q.  So is it the district judge that makes the

14:02  15   decision to arrest someone?

14:02  16       A.  I don't understand.  What do you mean?

14:02  17       Q.  Well, I mean, who -- who makes that -- that

14:02  18   decision to conduct an arrest?

14:02  19       A.  It's not a decision to make an arrest.  It's if

14:02  20   they haven't been arrested or if the charges are

14:02  21   upgraded, then it's an automatic thing where -- where

14:03  22   they issue a capias.

14:03  23       Q.  And where does the capias go physically from

14:03  24   the clerk?

14:03  25       A.  Usually, they try to send it over to the agency

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:03  1    that -- where the case has originated from, or they

14:03  2    just send it over to the sheriff's department so they

14:03  3    can put it into NCIC.

14:03  4        Q.  Okay.  Are you familiar with the press release

14:03  5    that was issued by the office after this arrest?

14:03  6        A.  I'm sure I've seen it.  I just don't remember

14:04  7    it.

14:04  8        Q.  Okay.  Did you have anything to do with

14:04  9    drafting it?

14:04  10       A.  I don't remember.

14:04  11       Q.  Okay.  Did you ever talk to Investigator Muniz

14:04  12   about this case after Lizelle was arrested?

14:04  13       A.  I don't believe so.

14:04  14       Q.  And did you ever receive e-mails from the

14:04  15   public about this case after the arrest?

14:04  16       A.  Yes.  We got a lot of threatening e-mails, a

14:04  17   lot of pretty ugly stuff.  We also got FOIA requests.

14:04  18   We got a bunch of -- it was -- it was just -- I think

14:04  19   they were getting our e-mails from the County website,

14:04  20   so they were just spamming our -- and threatening us

14:04  21   through e-mail.

14:04  22       Q.  Were there specific threats of violence?

14:05  23       A.  I believe so at the time.  I'm having a hard

14:05  24   time remembering specific, but I remember they were

14:05  25   concerning.  I think at that time even Gocha was

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

163

14:05 1    getting stuff at his personal home, if I remember

14:05 2    correctly.

14:05 3        Q.  And did you ever discuss these e-mails from the

14:05 4    public with Mr. Ramirez?

14:05 5        A.  Oh, yes, because they were concerning.

14:05 6        Q.  What was -- what was the content of those

14:05 7    discussions?

14:05 8        A.  It was just the fact that they were happening,

14:05 9    but we both agreed that, I mean, barring something

14:05 10   credible, that we just had to continue our work.

14:05 11            MS. KOVEL:  How long have we been going?

14:05 12            MS. CORNING:  I think it's been about an

14:05 13   hour since the last break.  Do we need to break for

14:05 14   lunch?

14:05 15            MS. KOVEL:  Yeah.  Should we take a break

14:05 16   for lunch?  Do you want to take a break for lunch?

14:05 17            THE WITNESS:  I'm fine to keep going.

14:05 18            MS. KOVEL:  I'm not sure how much longer I

14:05 19   have.  Let's go off the record for now.

14:06 20            (Brief recess)

14:31 21       Q.  Okay.  So going back to the weekend after

14:31 22   the -- when you were at the event, Easter event I

14:31 23   believe you said, correct?

14:31 24       A.  Yes.

14:31 25       Q.  And at what point in that day did Mr. Ramirez

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:54  1              Go ahead if you know what that means.
14:54  2       A.  I mean, social media, sometimes local news pops
14:54  3  up, and, you know, if it's of interest, then I read it
14:55  4  there.  Every once in a while, I log onto CNN and see
14:55  5  what's going on there.
14:55  6              But, you know, like I said earlier, it's
14:55  7  usually real depressing, so I get enough of that from
14:55  8  work.
14:55  9       Q.  And who in the office, if anyone, was
14:55 10  responsible for overseeing -- or responsible for
14:55 11  checking in on legal -- updates to the law?
14:55 12              MS. ALBIN:  Objection --
14:55 13       Q.  Let me re-ask that.  That wasn't a very good
14:55 14  question.  I agree, Kelly.  I object.
14:55 15              Does the DA's office have a director of
14:55 16  training?
14:55 17       A.  No.
14:55 18       Q.  Okay.  Does the Texas Bar require continuing
14:55 19  legal education credits?
14:55 20       A.  They do.
14:55 21       Q.  And does anyone at the DA's office track
14:55 22  whether the ADAs are compliant with their CLE credits?
14:55 23       A.  We usually don't have to, because we go to
14:56 24  enough CLEs where for sure all the CLEs are covered.
14:56 25       Q.  And where do you attend CLEs?

14:56  1    A.   The -- again, it depends on who you are or what

14:56  2    type of crime you're getting paid out of.  The border

14:56  3    prosecution unit has three different attorneys:

14:56  4    myself, Alex, and at one point it was Alfredo, then we

14:56  5    switched him out with Judy.

14:56  6         The border prosecution unit usually has

14:56  7    two trainings that are two days long.  One of them is a

14:56  8    regional training, which is region three, which is

14:56  9    about two to three days usually.  Another one is a

14:56 10    yearly training, which is about three to four days.  I

14:56 11    think usually, like, three days.

14:56 12         And then we also sometimes go to the TDCAA

14:56 13    annual conferences.  And then on occasion, we also send

14:56 14    people to more specialized CLEs, which is either

14:57 15    violent crimes or -- or very specialized CLEs,

14:57 16    depending on what comes up.

14:57 17    Q.   And would you say that that's -- or that sort

14:57 18    of general list of CLEs is how you personally stay kind

14:57 19    of abreast of changes in the law?

14:57 20    A.   Yes, ma'am.

14:57 21    Q.   Do you have any other sources for learning

14:57 22    about developments in the law that pertain to your

14:57 23    practice?

14:57 24    A.   No.

14:57 25    Q.   And do you know what SB 8 is?

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

14:57 1          A.  I heard about it after news broke of all this.

14:57 2     I didn't know about it -- I didn't know what that was,

14:57 3     and to be honest with you, I don't have a really good

14:57 4     understanding of it.  I just know kind of the general

14:57 5     gist of what was put out there.

14:57 6          Q.  So when you say news broke about all this, you

14:57 7     mean the news about Lizelle?

14:57 8          A.  Yes, ma'am.

14:57 9          Q.  So -- okay.  Were you aware of Roe v. Wade,

14:57 10    what -- what that means?

14:57 11         A.  Yes, ma'am.  When --

14:57 12         Q.  When did you learn about that?

14:57 13              MS. ALBIN:  I'm going to object as to the

14:57 14    relevance of Roe v. Wade for this prosecutor.

14:58 15              MS. KOVEL:  I think it's relevant to -- I

14:58 16    mean, you want me to -- I think it's pretty relevant

14:58 17    about the awareness of the state of the law within the

14:58 18    DA's office.

14:58 19              MS. ALBIN:  You understand that he's

14:58 20    not -- doesn't -- he's a criminal prosecutor, though,

14:58 21    not -- he doesn't -- I mean, I stated my objection.

14:58 22    He -- he can answer, but I don't think it's relevant

14:58 23    whether or not he knows about Roe v. Wade.

14:58 24              But go ahead, if you know.

14:58 25         A.  Yes.

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

14:58 1      Q.  Yes.  Did you learn about it in law school?

14:58 2      A.  Actually learned about it first in undergrad.

14:58 3      Q.  Okay.  And as of January 2022, were you aware

14:58 4  that Roe v. Wade was still good law, still the law of

14:58 5  the land?

14:58 6      A.  That was my understanding.

14:58 7      Q.  Did you follow the news when Roe v. Wade was

14:58 8  overturned?

14:58 9      A.  I did.  I got -- I remember I got a CNN alert

14:59 10  on that one.

14:59 11      Q.  In any of the trainings that you attended, did

14:59 12  you ever hear about any questions about criminally

14:59 13  prosecuting abortions?

14:59 14      A.  No, ma'am.

14:59 15      Q.  Did you ever attend trainings about the

14:59 16  homicide statutes within the Penal law?

14:59 17      A.  Trainings about the homicide statutes?

14:59 18      Q.  Yes.

14:59 19      A.  No.  There's -- I don't -- I'm not aware of any

14:59 20  such trainings specifically on homicide statutes, but

14:59 21  no.

14:59 22      Q.  Do you -- do you train other individuals,

14:59 23  either attorneys or not, within the office?

14:59 24      A.  No.  I'm not certified to be training anybody.

15:00 25      Q.  Okay.  Okay.  Just a few more, and then I'm

Electronically signed by Donna McCown (101-253-986-8079)                              0ec5b6c3-b289-499c-aba2-aef5c373844b

15:00 1    going to break really quickly to make sure I'm not

15:00 2    missing anything.  Okay?

15:00 3              So just to be clear on that last question,

15:00 4    the DA's office, do they conduct legal trainings or

15:00 5    other trainings within the office?

15:00 6        A.  If you're asking within the office excluding

15:00 7    every other office, no.  We go to trainings --

15:00 8        Q.  Right.

15:00 9        A.  -- at these conferences.

15:00 10        Q.  Okay.  What kind of training did you receive

15:00 11    when you began working there?

15:01 12        A.  At the DA's office?

15:01 13        Q.  Yes.

15:01 14        A.  There is a crash -- kind of like crash course

15:01 15    called -- I mean, we know it as baby prosecutor school,

15:01 16    but back then it was in Austin, Texas.

15:01 17              I went to it, but honestly, it was a waste

15:01 18    of time, because 99 percent of the prosecutors that are

15:01 19    starting out, they're usually starting out with

15:01 20    misdemeanors and DWI cases.  So a lot of what they

15:01 21    talked about didn't apply, because they -- they were

15:01 22    focusing more on the masses that were there.

15:01 23        Q.  So you never worked on misdemeanor cases like

15:01 24    that as a prosecutor?

15:01 25        A.  As a -- as a -- I mean, I've pled cases down to

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

15:01 1    a misdemeanor, and then sometimes when -- when officers

15:01 2    call and ask, you know, it might involve a misdemeanor

15:01 3    question, but I've never been a county attorney, so

15:01 4    I've never prosecuted misdemeanors, per se, as

15:01 5    exclusively.

15:01 6        Q.  Okay.  So do you know -- would you -- sorry.

15:02 7    Let me try to figure out how to ask this.

15:02 8             Do you know -- it sounded like there's a

15:02 9    variety of ways that you are assigned cases or that you

15:02 10   accept cases as your own.  So do you know how Lizelle's

15:02 11   case was assigned after the sheriff's department handed

15:02 12   it over?

15:02 13       A.  I have no idea, no.

15:02 14       Q.  Okay.  As far as you understand the system

15:03 15   within your office, would you say this was

15:03 16   Ms. Barrera's case?

15:03 17            MS. ALBIN:  Objection, vague.

15:03 18       A.  I don't know.

15:03 19       Q.  Do you know if any other attorneys besides

15:03 20   Ms. Barrera worked on Lizelle's case, indictment and

15:03 21   prosecution and arrest?

15:03 22       A.  Not that I'm aware of, no.

15:03 23       Q.  And what about, like, legal assistants or

15:03 24   clerks or investigators?

15:03 25       A.  No.  I mean, aside from the subpoena, which I

Electronically signed by Donna McCown (101-253-986-8079)                    0ec5b6c3-b289-499c-aba2-aef5c373844b

15:03  1    have no idea which clerk prepared it, but no.

15:03  2        Q.  Okay.  Do you know why Ms. Barrera was promoted

15:04  3    to be another first ADA?

15:04  4        A.  I think there's a variety of reasons, but

15:04  5    mostly me and her tend to be -- aside from Gocha

15:04  6    himself, we tend to be the only prosecutors that can

15:04  7    actually try cases.  The other prosecutors are a little

15:04  8    green on that end.

15:04  9            So pretty much on the prosecution side,

15:04 10    Gocha relies on both of us equally on the prosecution

15:04 11    of cases.

15:04 12        Q.  Did he ever discuss her promotion with you

15:04 13    before she was promoted?

15:04 14        A.  When it happened, yes.

15:04 15        Q.  Did you feel like your -- I'll withdraw.

15:04 16            And at -- on the day that -- or withdrawn.

15:05 17            Did anyone tell you that Ms. Barrera had

15:05 18    presented Lizelle's case or was going to present

15:05 19    Lizelle's case to the grand jury?

15:05 20        A.  That was going to, no.  I didn't realize we --

15:05 21    like I said, I didn't even realize there was a

15:05 22    prosecution packet or that we had anything to it, so

15:05 23    that discussion never got back to my ears.

15:05 24            I don't remember how I heard that Alex had

15:05 25    presented it, but I didn't find out anything about the

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                        McALLEN DIVISION
LIZELLE GONZALEZ                   ) (
        Plaintiff                  ) (
                                   ) (
VS.                                ) (    CIVIL ACTION NO.
                                   ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,               ) (
ALEXANDRIA LYNN BARRERA,           ) (
RENE FUENTES, and STARR            ) (
COUNTY, TEXAS                      ) (
        Defendants                 ) (
```

                    REPORTER'S CERTIFICATE

          I, DONNA McCOWN, Certified Court Reporter,
certify that the witness, ABEL VILLARREAL, was duly
sworn by me, and that the deposition transcript is a
true and correct record of the testimony given by the
witness on MARCH 12, 2025, and that the deposition was
reported by me in stenograph and was subsequently
transcribed under my supervision.

          Pursuant to Federal Rule 30(e)(2), a review of
the transcript was requested.
          I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

          WITNESS MY HAND on this the _____ day
_____, 2025.


          _____
          DONNA McCOWN, Texas CSR 6625
          Expiration Date:  01-31-26
          Bryant & Stingley, Inc., CRN No. 41
          P.O. Box 3420
          Harlingen, Texas  78551
          (956) 428-0755

                    **BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**