1

```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                   McALLEN DIVISION

LIZELLE GONZALEZ           ) (
        Plaintiff          ) (
                           ) (
VS.                        ) (    CIVIL ACTION NO.
                           ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,       ) (
ALEXANDRIA LYNN BARRERA,   ) (
RENE FUENTES, and STARR    ) (
COUNTY, TEXAS              ) (
        Defendants         ) (
```

_____


              ORAL AND VIDEOTAPED DEPOSITION OF
                   ESMERALDA NAVARRO MUNIZ
                      MARCH 25, 2025

_____



          ORAL AND VIDEOTAPED DEPOSITION OF ESMERALDA

NAVARRO MUNIZ, produced as a witness at the instance of

the PLAINTIFF, taken in the above-styled and numbered

cause on MARCH 25, 2025, between the hours of

12:08 p.m. and 5:01 p.m., reported stenographically by

DONNA McCOWN, Certified Court Reporter No. 6625, in and

for the State of Texas, at Garza Martinez, PLLC, 202

East Sprague Street, Edinburg, Texas, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached therein.


**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

                        APPEARANCES
COUNSEL FOR PLAINTIFF:
     I. CECILIA GARZA
     GARZA MARTINEZ, PLLC
     202 East Sprague Street
     Edinburg, Texas  78539

     ElIZABETH JARIT
     AMERICAN CIVIL LIBERTIES UNION
     SENIOR STARR ATTORNEY
     125 Broad Street, 18th Floor
     New York, NY  10004

     ASHLEY HARRIS
     AMERICAN CIVIL LIBERTIES UNION TEXAS
     Staff Attorney
     P.O. Box 8306
     Houston, Texas  77288

     MARIANA (MOLLY) KOVEL, via Zoom
     AMERICAN CIVIL LIBERTIES UNION
     SENIOR STAFF ATTORNEY
     125 Broad Street, 18th Floor
     New York, NY  10004

     SARAH CORNING, via Zoom
     AMERICAN CIVIL LIBERTIES UNION TEXAS
     Staff Attorney
     P.O. Box 8306
     Houston, Texas  77288

     DAVID A. DONATTI, via Zoom
     AMERICAN CIVIL LIBERTIES UNION OF TEXAS
     P.O. Box 12905
     Austin, Texas  78711-2905
     LAUREN JOHNSON, via Zoom
     AMERICAN CIVIL LIBERTIES UNION
     915 15th Street NW
     Washington, DC  20005

     JUNE (ANNIE) GERSH, via Zoom
     NANCY ROSENBLOOM, via Zoom
     KIERA GODDU, via Zoom
     AMERICAN CIVIL LIBERTIES UNION
     125 Broad Street
     New York, New York  10004

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

3

1    COUNSEL FOR DEFENDANTS:

2        RICARDO J. NAVARRO
         DENTON NAVARRO RODRIGUEZ BERNAL
3        SANTEE & ZECH, P.C.
         701 East Harrison Avenue, Suite 100
4        League City, Texas  78550

5    ALSO PRESENT:
         David Saldana, Videographer
6        Emily Mensing, via Zoom
         Jorge Cruz, III
7        Lizelle Gonzalez, via Zoom
         Alexandria Barrera, via Zoom

8
                        INDEX

9
                                                    PAGE
10   Appearances ...................................  2

11   ESMERALDA NAVARRO MUNIZ
     Examination by Ms. Jarit .......................  5
12   Examination by Mr. Navarro ..................... 147
     Examination by Ms. Jarit ....................... 200
13
     Errata Sheet/Signature Page .................... 205
14
     Reporter's Certificate ........................ 207
15
     Attached to the end of the transcript:  Stipulations
16

17

18

19

20

21

22

23

24

25

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

4

```
 1                        EXHIBITS

 2     NUMBER   DESCRIPTION                          PAGE

 3        5    Starr County Sheriff's Office Policy Book   47

 4        6    Police Report ..........................  63

 5        7    Investigative Report ...................  70

 6        8    Transcript of Interview of Ms. Herrera ..  80

 7        9    Handwritten Notes ...................... 120

 8       10    Handwritten Notes ...................... 120

 9       11    Handwritten Notes ...................... 120

10       12    Brady Compliance Form .................. 142

11       D4    Texas Penal Code Chapter 19 ............ 154

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

5

| | |
|---|---|
| 12:09 1 | THE VIDEOGRAPHER:  It is March 25, 2025. |
| 12:09 2 | This is the deposition of Esmeralda Navarro Muniz.  It |
| 12:09 3 | is 12:08 p.m.  We are on the record. |
| 12:09 4 | ESMERALDA NAVARRO MUNIZ, |
| 12:09 5 | having been duly sworn, testified as follows: |
| 12:09 6 | EXAMINATION |
| 12:09 7 | BY MS. JARIT: |
| 12:09 8 | Q.  Okay.  Good afternoon, Ms. Muniz.  Is that -- |
| 12:09 9 | that's how you pronounce your name? |
| 12:09 10 | A.  Yes.  Yes, ma'am. |
| 12:09 11 | Q.  My name is Elizabeth Jarit.  I am an attorney |
| 12:09 12 | representing Plaintiff Lizelle Gonzalez in her civil |
| 12:09 13 | suit that's being brought against District Attorney, |
| 12:09 14 | Gocha Allen Ramirez, Assistant District Attorney |
| 12:09 15 | Alexandria Barrera, Sheriff Rene Fuentes, and Starr |
| 12:09 16 | County.  Do you understand that? |
| 12:09 17 | A.  Yes, ma'am. |
| 12:09 18 | MS. JARIT:  Do you want to introduce |
| 12:09 19 | yourself or -- |
| 12:09 20 | MR. NAVARRO:  Do I want to do what? |
| 12:09 21 | MS. JARIT:  No, nothing. |
| 12:09 22 | Q.  So during this deposition you must answer -- |
| 12:09 23 | answer truthfully to the best of your ability.  Do you |
| 12:09 24 | understand that? |
| 12:09 25 | A.  Yes, ma'am. |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

12:52  1    it and start writing all their notes in there, typing

12:52  2    all their notes.

12:52  3         Q.  So you would say an investigation is open at

12:52  4    the time it comes into dispatch or --

12:52  5         A.  No.  When the officer gets there.  Because the

12:52  6    officer himself will do a little investigation as far

12:52  7    as who -- who did this, who, when, what, where.

12:52  8         Q.  So the patrol officer you're talking about?

12:52  9         A.  The patrol officer, yes.

12:52 10         Q.  So when the patrol officer writes or does their

12:52 11    investigation, writes their initial report, that's when

12:52 12    a case is open?

12:52 13         A.  Yes, ma'am.  Because there's times that those

12:52 14    reports don't even come to investigations because they,

12:52 15    in turn -- they themselves, patrol deputies, open

12:52 16    the -- the arrest warrant or conduct an arrest in the

12:52 17    field, so those never come to us.

12:52 18         Q.  Why -- why would it come -- come to you instead

12:53 19    of staying with the patrol officer?

12:53 20         A.  Let's say in a domestic violence, if the person

12:53 21    is no longer there, and plain and simple, if the

12:53 22    officer was lazy and didn't type up the report, the

12:53 23    arrest warrant, it's going to come to us.

12:53 24         Q.  How does the sheriff's department learn about

12:53 25    cases to investigate?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

12:53 1    A.  How?  Like when the officer goes to the call?

12:53 2    Q.  No.  How -- like even before, how do -- how do

12:53 3  calls come into dispatch?  Like can it be anyone who

12:53 4  calls into dispatch?

12:53 5    A.  Anyone -- anyone that calls for -- that calls

12:53 6  dispatch for -- for a call for service requesting an

12:53 7  officer to go.

12:53 8    Q.  And those calls go the -- do any -- is there

12:53 9  any time that a local police department will respond

12:53 10  initially?

12:53 11    A.  In their jurisdiction.

12:54 12    Q.  In their jurisdiction.  What jurisdiction does

12:54 13  the sheriff's office have?

12:54 14    A.  Well, the entire county except within those

12:54 15  little municipalities.

12:54 16    Q.  Okay.

12:54 17    A.  Which is in La Grulla, there's a municipality

12:54 18  there; Rio Grande; Escobares; and Roma.

12:54 19    Q.  So the call comes into dispatch, it's one of

12:54 20  those jurisdictions, would it go back to the --

12:54 21    A.  Yeah, they get transferred to the city.

12:54 22    Q.  Transferred.  And then a local municipal

12:54 23  officer would be the first person to investigate?

12:54 24    A.  To take the call, yes.  We wouldn't even show

12:54 25  up.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

12:54  1        Q.  And then when would that police officer contact
12:54  2   the sheriff's department about that case?
12:54  3        A.  When would what?
12:54  4        Q.  When would the local municipal officer contact
12:54  5   the sheriff's department about the case?
12:54  6        A.  If -- if something -- if -- the only way that
12:55  7   the municipality would contact the sheriff's office
12:55  8   would be if any of the parties or the crime occurred
12:55  9   within our jurisdiction.
12:55 10        Q.  So if the parties or crime was all within the
12:55 11   municipal --
12:55 12        A.  It should have been --
12:55 13        Q.  -- it would stay there?
12:55 14        A.  Stay in the municipality, yes, ma'am.
12:55 15        Q.  Did the sheriff's office ever get calls about
12:55 16   crimes not from dispatch?
12:55 17        A.  No.  All of them come through either 911 or the
12:55 18   landline.
12:55 19        Q.  Does every call get passed onto patrol to
12:55 20   follow up on?
12:55 21        A.  Yes.
12:55 22        Q.  And then it goes to the sergeant to determine
12:55 23   whether or not there needs to be further investigation?
12:56 24        A.  If they pick up a report and then the sergeant
12:56 25   on patrol approves the report, it's the sergeant of

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

12:56 1    investigations that makes the determination for an

12:56 2    investigation or not.

12:56 3         Q.  Sergeant of investigations --

12:56 4         A.  Yes, ma'am.

12:56 5         Q.  -- makes that determination?

12:56 6         A.  Yes, ma'am.

12:56 7         Q.  Does that sergeant of investigation ever

12:56 8    consult with anyone to determine whether an

12:56 9    investigation should go forward?

12:56 10        A.  I don't know if he ever consulted with anyone.

12:56 11   But he'd always pick up a stack that big and then just

12:56 12   issue out reports.

12:56 13        Q.  Did investigators have specialties about what

12:56 14   kinds of cases they would investigate?

12:56 15        A.  No.  No, ma'am.  It would all just --

12:56 16   whatever -- the luck of the draw, whatever you got is

12:56 17   what you would get.

12:56 18        Q.  How -- how would the office decide when to

12:56 19   close an investigation?

12:56 20        A.  If -- well, it all depend on the -- on the

12:57 21   crime.  I know there was a sexual assault that was

12:57 22   open, even though the subject had gone to Mexico.

12:57 23   There's a warrant for that person.

12:57 24             Because there was -- that one kept -- was

12:57 25   open.  When there's an arrest, you close with an

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

12:57 1    arrest, or if you don't have enough evidence, you close

12:57 2    with not enough.

12:57 3        Q.  And how would you make that determination?

12:57 4        A.  Again, we would consult with our -- with our

12:57 5    supervisors for that.

12:57 6        Q.  Who would determine what the charge would be in

12:57 7    the investigation?

12:57 8        A.  At the -- in the investigation, when it was

12:57 9    very obvious, for example, a harassment, a theft, a

12:57 10   burglary, assault, we would go through the Penal Code.

12:57 11   And if it fits the crime, well, then, that's the

12:57 12   classification.

12:57 13            If there's more serious charges, we

12:58 14   would -- again, like I said, we would conduct -- we

12:58 15   would consult with our supervisors, and our supervisors

12:58 16   would tell us 99.9 percent of the time, "Contact the

12:58 17   DA's office for advice."

12:58 18       Q.  Okay.  And that was when you weren't sure, you

12:58 19   could contact the DA's office?

12:58 20       A.  Yes, ma'am.

12:58 21       Q.  Did you have any other resources besides the

12:58 22   Penal Code that you'd use to make these decisions?

12:58 23       A.  No, just the Texas Penal Code.

12:58 24       Q.  Did you have access to, like, Lexis?

12:58 25       A.  No.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

| | | |
|---|---|---|
| 12:58 | 1 | Q. Or Westlaw? |
| 12:58 | 2 | A. No. |
| 12:58 | 3 | Q. I'm going to show you -- this is very big. |
| 12:58 | 4 | This is the Starr County Sheriff's Office. It was |
| 12:58 | 5 | provided to us in discovery. It's Bates-stamp |
| 12:58 | 6 | L Gonzalez 426 all the way through 925. This is a |
| 12:58 | 7 | copy. Mark it as Exhibit 5. Give you a copy. |
| 12:59 | 8 | So you mentioned that you were provided |
| 12:59 | 9 | with the -- the policy book. Does this look like the |
| 12:59 | 10 | policy book that you are familiar with? |
| 12:59 | 11 | A. Oh, this is the policy book? |
| 12:59 | 12 | Q. Yes. |
| 12:59 | 13 | A. They gave you this? |
| 12:59 | 14 | Q. It was provided to us by the defendants. |
| 13:00 | 15 | A. These people don't work there. |
| 13:00 | 16 | Q. Don't work there anymore or ever? |
| 13:00 | 17 | A. Chief Guillermo Pena retired; Captain Romero |
| 13:00 | 18 | Ramirez left the department; Letty Alanis left the |
| 13:00 | 19 | department; Janie Grigsby left the department. The |
| 13:00 | 20 | only one, Captain Larry Fuentes, and he's chief right |
| 13:00 | 21 | now. |
| 13:00 | 22 | Q. So I'm sorry. You're looking at -- can you say |
| 13:00 | 23 | which page you're looking at? |
| 13:00 | 24 | A. The third page. One, two, three. |
| 13:00 | 25 | Q. Okay. And were you -- were you issued a |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:00 1   different version of -- a more recent version of the

13:00 2   book?

13:00 3        A.  I'm pretty sure it's the same one.  I just -- I

13:01 4   never -- I never seen it this big.  I know there was

13:01 5   one there by the copier, but it was a little binder.

13:01 6        Q.  Okay.

13:01 7        A.  I didn't know it was this big.

13:01 8        Q.  And you said --

13:01 9             MR. NAVARRO:  Single-sided pages.

13:01 10             MS. JARIT:  Yes.  Maybe it was

13:01 11   double-sided.

13:01 12             THE WITNESS:  Yeah.

13:01 13             MR. NAVARRO:  They're blank on the back

13:01 14   side.

13:01 15        Q.  And you said you -- you didn't have to sign

13:01 16   anything about --

13:01 17        A.  I don't remember signing anything.

13:01 18        Q.  But the policy book, you're -- you're aware

13:01 19   that it sets out --

13:01 20        A.  Yes, it's --

13:01 21        Q.  -- policies for employees --

13:01 22        A.  Yes, ma'am.

13:01 23        Q.  Policies for employees about they should -- how

13:01 24   they should conduct themselves in their positions,

13:01 25   correct?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

49

13:01  1          A.  Yes, ma'am.

13:01  2          Q.  And it was important to follow the policies in

13:01  3     the book as an employee?

13:01  4          A.  Yes, ma'am.

13:01  5          Q.  And, generally, did you follow the policies in

13:01  6     the book -- that were in the book?

13:01  7          A.  Yes, ma'am, except those times that I was

13:01  8     written up.

13:01  9          Q.  That you were late.

13:02 10              And did other -- your colleagues follow

13:02 11     the policies in the -- in the policy book as well?

13:02 12          A.  Yes, ma'am.

13:02 13          Q.  Can you turn -- well, are you familiar with the

13:02 14     canons of police ethics that are contained in the book?

13:02 15          A.  In this?

13:02 16          Q.  Yes.  Can you turn to page 8 -- I'm sorry, 489.

13:02 17              MR. NAVARRO:  And you're referencing the

13:02 18     Bates numbers, right?

13:02 19              MS. JARIT:  The Bates number, that's

13:02 20     correct.

13:02 21              MR. NAVARRO:  That's the numbers on the

13:02 22     bottom right-hand corner.

13:02 23              THE WITNESS:  Yes.

13:02 24              MR. NAVARRO:  Those were put there by the

13:02 25     lawyers.  Okay?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

50

13:02  1                    THE WITNESS:  Okay.  Where it says "open

13:02  2      file."

13:02  3                    MR. NAVARRO:  That's the one she's

13:02  4      referring to --

13:02  5                    MS. JARIT:  Yes.

13:02  6                    MR. NAVARRO:  -- go by the numbers on the

13:02  7      bottom right-hand corner.

13:02  8                    THE WITNESS:  Yes, sir.

13:02  9        Q.  So one of the canons, it says, Article 2,

13:03 10      Limitations of Authority, and it discusses a duty to

13:03 11      know the bounds of your authority in enforcing the law.

13:03 12      You can read it if you -- take your time.

13:03 13        A.  Article 2?

13:03 14        Q.  Yeah.  Article 2.

13:03 15        A.  Yes, ma'am.

13:04 16        Q.  Okay.  So that canon imparts the bounds of your

13:04 17      authority as a -- as a sheriff's officer.  What did you

13:04 18      do to make sure that you complied with this canon when

13:04 19      you were employed there?

13:04 20        A.  Well, I always try to always gather the

13:04 21      information for each case, like I said.  When I was not

13:04 22      sure, I always asked questions, always asked my

13:04 23      supervisor for -- for guidance.

13:04 24                    He had 20-plus years, the sergeant, so he

13:04 25      had worked in another department as a supervisor as

**BRYANT & STINGLEY, INC.**

**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:04  1    well, ranking officer in the other department.  So we
13:04  2    would always -- we, and I say myself and the other
13:04  3    investigators, would always reach out to him for --
13:04  4    just to make sure we were always doing the right thing.
13:04  5         Q.  We're going to now turn to L 788 -- I'm sorry,
13:05  6    L Gonzalez 788.  That's the Bates number.  So this is
13:05  7    from Policy No. 7.04 concerning criminal
13:06  8    investigations.
13:06  9              And about two-thirds down, it says,
13:06  10   "During investigations, planning sessions, or pretrial
13:06  11   stages, any questions of law or criminal procedure are
13:06  12   addressed to the prosecuting attorney."
13:06  13             Did you follow this policy as a sheriff's
13:06  14   officer?
13:06  15        A.  Yes.  That -- we would consult with the DA's
13:06  16   office, yes, ma'am.
13:06  17        Q.  And you would consult with them about any
13:06  18   questions of law that -- that you had concerning an
13:06  19   investigation?
13:06  20        A.  Yes, ma'am.
13:06  21        Q.  And would that include about whether certain
13:06  22   set of facts fit a crime?
13:06  23        A.  That's correct, ma'am.
13:06  24        Q.  How are decisions made about -- you can put
13:07  25   that away if you'd like for now.  Thank you.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:07  1        A.   Yes, ma'am.

13:07  2        Q.   How are decisions made about arresting someone?

13:07  3        A.   In-house.

13:07  4        Q.   In-house.

13:07  5        A.   Like I said, we would -- if it fit the crime

13:07  6    and the elements were there, then either patrol would

13:07  7    open the arrest warrant or arrest onsite, or we would

13:07  8    prepare the arrest warrant after our investigation and

13:07  9    admit all the elements of the crime.  When we were not

13:07 10    sure, that's when we would take it up to the DA's

13:07 11    office.

13:07 12        Q.   An arrest can be made if there's probable

13:07 13    cause, correct?

13:07 14        A.   Correct.

13:07 15        Q.   What is probable cause?

13:07 16        A.   Probable cause would be enough evidence to fit

13:07 17    that crime for that arrest.

13:07 18        Q.   Once you determine there's probable cause,

13:08 19    would you typically arrest immediately or seek an

13:08 20    arrest immediately?

13:08 21        A.   No.  We still go through the process and then

13:08 22    bring it up to our -- we always brought it up to the

13:08 23    sergeant, present it to the sergeant before doing

13:08 24    anything.

13:08 25        Q.   If you thought there was probable cause and

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:08  1  presented that to the sergeant and the sergeant also

13:08  2  thought there was probable cause, would you then seek

13:08  3  an arrest warrant?

13:08  4       A.  Seek the arrest warrant, yes, ma'am.

13:08  5       Q.  You wouldn't need to go to the DA's office in

13:08  6  those circumstances?

13:08  7       A.  No, unless it was like a more severe case.

13:08  8       Q.  Why would you need to go to the DA's office in

13:08  9  a more severe case?

13:08 10       A.  If we didn't understand or didn't -- if -- if

13:08 11  the arrest would be iffy, like, "Oh, are you sure?

13:08 12  Does it fit the elements," or "Just gather the

13:08 13  information and submit it."  That's what they would

13:08 14  tell us.  There's some sexual assaults that they would

13:08 15  say, "Just gather the information and submit it as

13:08 16  well."

13:08 17       Q.  When would they tell you that?

13:08 18       A.  When we only had, for example, the interview of

13:09 19  the child, 4- or 5-year-old of sexual assault, then I

13:09 20  would present everything.  But that was the only piece

13:09 21  of evidence that we had, then the sergeant and the

13:09 22  captain would say, "You know what?  Just call the DA's

13:09 23  office.  Make sure."

13:09 24       Q.  Okay.  But if it was clear that there was

13:09 25  probable cause and the sergeant agreed, you would not

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

| | | |
|---|---|---|
| 13:09 | 1 | need to seek -- go to the DA's office, correct? |
| 13:09 | 2 | A.  Correct. |
| 13:09 | 3 | Q.  How would you get an arrest warrant?  How would |
| 13:09 | 4 | the County get one? |
| 13:09 | 5 | A.  We have a template.  We type out the arrest |
| 13:09 | 6 | warrant with the probable cause and then have a JP -- a |
| 13:09 | 7 | justice of the peace sign it. |
| 13:09 | 8 | Q.  Do you need to have an attorney assist you with |
| 13:09 | 9 | that at all? |
| 13:09 | 10 | A.  No.  No, ma'am. |
| 13:09 | 11 | Q.  What role does the -- do sheriff's office -- |
| 13:10 | 12 | sheriff's officers play in securing an indictment? |
| 13:10 | 13 | A.  The sheriff's office -- the day -- I'm going to |
| 13:10 | 14 | say the day they handed me this indictment, it was |
| 13:10 | 15 | Trinidad Lopez.  He called me, said, "Come pick it |
| 13:10 | 16 | up" -- "come pick up an indictment." |
| 13:10 | 17 | So I had never handled one, so I said, |
| 13:10 | 18 | "What am I going to do?"  And he said, "Come pick it |
| 13:10 | 19 | up.  Don't open it until you have the person in the |
| 13:10 | 20 | office."  Those were my instructions.  So that was the |
| 13:10 | 21 | very first time I had dealt with an indictment. |
| 13:10 | 22 | Q.  So the first time you dealt with an indictment |
| 13:10 | 23 | it was just handed to you? |
| 13:10 | 24 | A.  Yes, ma'am. |
| 13:10 | 25 | Q.  And what were you told about it? |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

55

13:10  1          A.  "Don't open it until you have the person in
13:10  2     your office" -- "at the sheriff's office in front of
13:10  3     you."  So I didn't.
13:10  4          Q.  Okay.
13:10  5          A.  So then I took it to my -- that's exactly what
13:10  6     I told my sergeant.  I said, "Well, this is what was
13:10  7     handed to me.  I don't know."  And to the captain.
13:10  8                And, "Okay.  Let's go and look for her and
13:11  9     then bring her here.  We'll open it here."  That's what
13:11 10     we did.
13:11 11          Q.  You're talking about this indictment --
13:11 12          A.  Yeah.
13:11 13          Q.  -- in Ms. Gonzalez's case?
13:11 14          A.  Yes.  It's the only indictment I've ever
13:11 15     handled.
13:11 16          Q.  It's the only indictment you've ever handled
13:11 17     was in this case?
13:11 18          A.  Yes, ma'am.
13:11 19          Q.  How -- how did you learn about the indictment?
13:11 20          A.  Trinidad Lopez called me.
13:11 21                MR. NAVARRO:  I'm sorry.  What was the
13:11 22     name?
13:11 23          A.  Trinidad Lopez.  He's an investigator for the
13:11 24     DA's office.
13:11 25          Q.  Uh-huh.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:11 1      A.  He gave me an envelope.  He called me to the

13:11 2  courthouse.  That's where they're at.  I went, he gave

13:11 3  me an envelope, said, "Don't open it until you have the

13:11 4  person in front of you at the sheriff's office."  I

13:11 5  said okay.

13:11 6      Q.  Who typically communicates about indictments to

13:11 7  the sheriff's office, generally?  Not in this case,

13:11 8  just generally.

13:11 9      A.  Like who would advise the sheriff about it?

13:11 10     Q.  Who would tell the investigators that an

13:11 11  indictment had been returned in one of their

13:11 12  investigations?

13:11 13     A.  I'm assuming that was the process, because

13:12 14  that's how it -- that's how this one went.  They called

13:12 15  me, and then I went -- I picked it up, went to the

13:12 16  sheriff's office.  I told my sergeant, "This is what

13:12 17  Trini just gave me."

13:12 18     Q.  Uh-huh.  Okay.  As your role as -- as a

13:12 19  sheriff's investigator, would you say you work closely

13:12 20  with the district attorney's office?

13:12 21     A.  We would call them a lot, yes.

13:12 22     Q.  How often would you call them?

13:12 23     A.  I don't know.  Two, three times a month.

13:12 24     Q.  And --

13:12 25     A.  And that was just me.  There were some

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:12  1    officers -- some investigators that would call them on

13:12  2    almost every other case.  It all depends.

13:12  3        Q.  And that was during the investigation you would

13:12  4    call?

13:12  5        A.  Oh, on -- particularly on this -- oh, yeah.

13:13  6    Yeah, throughout the investigation --

13:13  7        Q.  The investigation.

13:13  8        A.  -- of whatever case.

13:13  9        Q.  Of whatever case?

13:13 10        A.  Yes.

13:13 11        Q.  And did you often call a particular ADA or the

13:13 12    general number if you had a question?

13:13 13        A.  It was whoever answered.  Like a lot of the

13:13 14    times, Judy Solis, we would hardly ever talk to her

13:13 15    because she didn't -- she wouldn't answer, or who

13:13 16    was the other one?

13:13 17              Abel, he would -- sometimes we would talk

13:13 18    to him.  But the person that would always, always,

13:13 19    always, and always answer was Alex Barrera.

13:13 20        Q.  Okay.  And how -- how would you --

13:13 21        A.  I'm sorry.

13:13 22        Q.  I'm sorry.

13:13 23        A.  We would never call Gocha directly.

13:13 24        Q.  How would you reach out to the DA's office?  By

13:14 25    phone?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

58

13:14  1          A.  By phone.

13:14  2          Q.  And that would be your sheriff's-provided

13:14  3     phone, sheriff's office provided --

13:14  4          A.  No.  From the office.  From the office.

13:14  5          Q.  Just a physical phone?

13:14  6          A.  From --

13:14  7          Q.  Landline?

13:14  8          A.  Yes, ma'am.

13:14  9          Q.  To the DA's office landline usually?

13:14  10         A.  Yeah.  Yes, ma'am.  Sometimes -- well, if we

13:14  11    were out in the field, from the cell phones.  But

13:14  12    normally, we would -- if we were at the office, we

13:14  13    would use the phone.

13:14  14         Q.  And at what point in the investigation would

13:14  15    you typically first call the DA's office?

13:14  16         A.  We would call the DA's office -- for -- for

13:14  17    instance, in this case, when I got it, when they gave

13:14  18    me the case, already the sergeant and the captain said,

13:14  19    "We gave you this case.  Make sure you call the DA's

13:15  20    office on this one."

13:15  21         Q.  Do you know why they said that?

13:15  22         A.  So I called Alex.  I said, "This is what I

13:15  23    have," went through the process of interviewing people.

13:15  24         Q.  Okay.  Let's -- let's turn to that.  So you

13:15  25    were given the case by the sergeant and the captain you

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:15 1    said?

13:15 2        A.  Yes, ma'am.

13:15 3        Q.  Was that unusual that the captain was giving

13:15 4    you the case as well?

13:15 5        A.  Well, he would also sometimes review the

13:15 6    reports when the sergeant wasn't in.  But that day the

13:15 7    sergeant was there, because he was the one that gave us

13:15 8    the reports, and then he came in as well with that one.

13:15 9              From the very beginning I said, "Why are

13:15 10   we" -- "why are we handling it if it happened at the

13:15 11   hospital?"  From the very beginning.

13:16 12             "Well, we already have it, so it's yours."

13:16 13             And a lot of the times, they would use

13:16 14   that card of "You're the female.  You take this case.

13:16 15   You're the female.  You take this other case.  Because

13:16 16   you're a female, you're going to take it."  So I'm

13:16 17   assuming because I was a female, this case came to me.

13:16 18             And they said, "Reach out to the DA's

13:16 19   office."  So I called Alex.  I said, "This is what I

13:16 20   have."  I only had a police report.

13:16 21             And they said, "Okay.  Well, then go ahead

13:16 22   and do" -- "bring in people, interview people."  So

13:16 23   that's exactly what I did.  I interviewed the doctors,

13:16 24   the nurses, the hospital staff.  I remember -- who else

13:16 25   I interviewed.  And then I prepared -- like I was told,

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:16  1    "Prepare the case.  Send it to the DA's office."  And I
13:17  2    submitted the case to the DA's office.
13:17  3                Alex presented it to a grand jury.  And I
13:17  4    was -- that was -- I didn't know what was -- had
13:17  5    transpired in the -- when that case was presented to
13:17  6    grand jury.  I didn't go in there.  I didn't talk to
13:17  7    the grand jury.  I didn't -- nothing.  It was the ADAs.
13:17  8                And I believe days later is when I
13:17  9    received the call saying, "Hey, come pick up" -- just
13:17  10   like that, "Hey, come pick up the envelope."
13:17  11               "The envelope?"
13:17  12               "Well, just come pick up an envelope."
13:17  13               "Okay, I'm on my way."
13:17  14               And, "This is an indictment.  Don't open
13:17  15   it.  It's sealed.  Don't open it until you have the
13:17  16   person in front of you in the office."
13:17  17               "Okay."
13:17  18       Q.  So let's go back a bit.  You said you were,
13:17  19   like, confused why you were -- why the sheriff's office
13:17  20   had the case because it happened at the hospital.  Is
13:17  21   that because the hospital was in Rio Grande City,
13:18  22   right?
13:18  23       A.  Yes, ma'am.
13:18  24       Q.  And so usually, the municipal officers would
13:18  25   handle it, correct?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

61

13:18 1      A.  Yes, ma'am.  And just to go a little bit deeper

13:18 2  into that, she was staying at her grandma's house,

13:18 3  which is also Rio Grande City jurisdiction.

13:18 4      Q.  So from your perspective, all the events took

13:18 5  place in Rio Grande City --

13:18 6      A.  Yes --

13:18 7      Q.  -- jurisdiction?

13:18 8      A.  -- ma'am.

13:18 9      Q.  What did you take it to mean when you were told

13:18 10  to make sure to call the DA's office when you were

13:18 11  given the file -- or the -- the report?

13:18 12      A.  I was assuming just because of the fact that

13:18 13  none of them, I'm sure, even with their 20-plus years,

13:18 14  had ever dealt with something like that.

13:18 15      Q.  And so you spoke to ADA Barrera before you took

13:18 16  any investigation steps?

13:18 17      A.  I would need to look through my notes.  I

13:18 18  didn't do that because I'm -- I'm going to go into that

13:19 19  a little bit too.

13:19 20          Because I retired October 31st of last

13:19 21  year, I don't have access to none of that.  And I

13:19 22  received a phone call last -- I want to say a week and

13:19 23  a half ago from the chief, Fuentes, Larry Fuentes.  And

13:19 24  he was like, "I don't know if you need an attorney to

13:19 25  represent you or not, but the County is not

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:19 1 representing you.  You're on your own because you're

13:19 2 retired."

13:19 3           I said, "Well, I already have an

13:19 4 appointment," which was today.

13:19 5           He's like, "Well, I don't know what else

13:19 6 to tell you."  So I didn't have -- I don't -- I didn't

13:19 7 go through my stuff.

13:19 8     Q.  Uh-huh.

13:19 9     A.  I wish I was a little bit more prepared.

13:19 10    Q.  No.  It's okay.  I'm -- don't worry about it.

13:20 11 So when you received the assignment to investigate the

13:20 12 case, what was your understanding of how it came to the

13:20 13 sheriff's office?

13:20 14    A.  Through the hospital.

13:20 15    Q.  Through the hospital.  So what does that mean?

13:20 16    A.  The hospital had reported -- the hospital had

13:20 17 reported the female going into the emergency with I

13:20 18 believe -- I believe with labor pains.

13:20 19           And when she was checked, I want to say,

13:20 20 if my memory serves me correct, that the doctor had, I

13:20 21 believe, pulled out a medicine from her vaginal cavity.

13:20 22 She had said she had used that.  And then she was sent

13:21 23 home.

13:21 24           And then it was after that that she had

13:21 25 come back for the second time, I believe, bleeding, if

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:45  1    submitted.  There's supposed to be, like, a submission

13:46  2    form stamped by the DA's office.  That's the day that

13:46  3    the case was submitted.

13:46  4        Q.  What -- what's a submission form?  Can you

13:46  5    describe it?

13:46  6        A.  It's a cover page that comes with this report.

13:46  7    It's supposed to have this report, the investigative

13:46  8    report, the offense report, a criminal history report,

13:46  9    and that all the evidence of the case submitted --

13:46  10   attached, and everything is marked off, and that gets

13:46  11   stamped at the DA's office, and that's a receipt that

13:46  12   we turned in the report --

13:46  13       Q.  Okay.

13:46  14       A.  -- the case.

13:46  15       Q.  During the interrogation, Ms. Gonzalez said

13:46  16   that she had heard that information had been kind of

13:47  17   like leaked out?

13:47  18       A.  Yes, she told me that.

13:47  19       Q.  Do you recall that?

13:47  20       A.  Yes, ma'am.  She was very concerned about that.

13:47  21   I brought it up to my -- my supervisors and turned to

13:47  22   Major Delgado that sits on the administrative side,

13:47  23   because she was very concerned about that, that someone

13:47  24   was, I don't know if, like, talking or saying or --

13:47  25   that someone else other than just us knew about her

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:47  1    case.

13:47  2        Q.  And she thought it was her sister-in-law Irma

13:47  3    Gomez.  Do you recall that?

13:47  4        A.  She -- yeah, she gave me some names of which I

13:47  5    went ahead and advised administration of that.

13:47  6        Q.  And what did -- you said you spoke to Carlos

13:47  7    Delgado about --

13:47  8        A.  Yes --

13:47  9        Q.  -- it?

13:47  10       A.  -- and to Rafael Aguirre.

13:47  11       Q.  Aguirre?

13:47  12       A.  Captain Fuentes and Carlos Delgado.

13:48  13       Q.  And what did they say to you about it?

13:48  14       A.  That they would take care of it.

13:48  15       Q.  They were going to take care of it.  Did you do

13:48  16   any follow-up investigation into that?

13:48  17       A.  Not -- not into that.  My thing was this, and

13:48  18   admin was going to take care of -- because we didn't

13:48  19   know where -- she thought it was her sister-in-law, and

13:48  20   I'm not -- I don't remember what -- if there was, like,

13:48  21   an association with somebody from work.  I don't

13:48  22   remember.

13:48  23            But there was -- she -- she had told me

13:48  24   the day of the interview, and I -- and I -- and I told

13:48  25   her, "I'm going to report this, and I'm going to make

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:48  1    it known to my supervisors in administration about your

13:48  2    concern."

13:48  3        Q.  So at the end of the interview, you told

13:48  4    Lizelle that you were going to meet with the district

13:48  5    attorney's office; is that correct?

13:49  6            If you can't recall, I have a -- this is

13:49  7    the transcript of Ms. Gonzalez's interrogation.  It's

13:49  8    Bates-numbered L Gonzalez 17 through 99.  We can mark

13:49  9    it as Exhibit No. 8.

13:49  10           You can turn to the last two pages there.

13:49  11   If you want to read it, you can.

13:50  12           MR. NAVARRO:  I'm sorry.  What was the

13:50  13   page reference?

13:50  14           MS. JARIT:  It's the last two pages, so

13:50  15   it's pages --

13:50  16           MR. NAVARRO:  That you tagged?

13:50  17           MS. JARIT:  -- 80 -- let's see.

13:50  18           MR. NAVARRO:  It's got a yellow-blue tag

13:50  19   on it.

13:50  20           MS. JARIT:  Here.  Here's one that's

13:50  21   clean.  I'll take that one.

13:50  22           MR. NAVARRO:  I already wrote on it.

13:50  23           MS. JARIT:  Okay.  That's fine.

13:50  24           MR. NAVARRO:  What page are you referring

13:50  25   to?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

| | | |
|---|---|---|
| 13:50 | 1 | MS. HARRIS:  It's on page 81, 81 to 82. |
| 13:50 | 2 | MR. NAVARRO:  81? |
| 13:50 | 3 | MS. JARIT:  No, no.  98 to 99. |
| 13:50 | 4 | Q.  Okay.  So I'll give you a minute. |
| 13:51 | 5 | A.  I was on another page. |
| 13:51 | 6 | Q.  Sure.  No problem.  Take your time. |
| 13:51 | 7 | A.  Yes. |
| 13:51 | 8 | Q.  Okay.  So do you recall telling Ms. Gonzalez |
| 13:51 | 9 | you were going to meet with the DA's office at the end |
| 13:51 | 10 | of the interrogation? |
| 13:51 | 11 | A.  Yes, ma'am. |
| 13:51 | 12 | Q.  Why did you say that? |
| 13:51 | 13 | A.  Like I said, because I needed guidance with |
| 13:51 | 14 | this.  I was -- I was -- I personally was not ready to |
| 13:51 | 15 | just go and charge her with -- with murder. |
| 13:51 | 16 | Q.  Uh-huh.  Throughout, like, on -- on your own |
| 13:51 | 17 | report, it said the charge was murder.  Was that the |
| 13:51 | 18 | charge that you came up with on your own? |
| 13:51 | 19 | A.  No, ma'am. |
| 13:51 | 20 | Q.  Did someone tell you to put murder down? |
| 13:51 | 21 | A.  Yes, ma'am. |
| 13:51 | 22 | Q.  Who told you? |
| 13:51 | 23 | A.  The DA's office. |
| 13:52 | 24 | Q.  Who at the DA's office? |
| 13:52 | 25 | A.  The ADA Alex Barrera. |

Electronically signed by Donna McCown (101-253-986-8079)                                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:52 1     Q.  And when did she tell you that?

13:52 2     A.  When I was -- when the -- when this had to be

13:52 3  turned in to her, it had to have an offense here.  So

13:52 4  after all this was -- all the interviews were

13:52 5  conducted, this murder offense charge was then told to

13:52 6  me by her, "When you submit the case, the charge is

13:52 7  murder."

13:52 8     Q.  Okay.

13:52 9     A.  Yeah, that's -- that's how we came to that

13:52 10  charge.

13:52 11     Q.  So following this interview, you said you spoke

13:52 12  to ADA Barrera at the DA's office?

13:52 13     A.  Yes, ma'am.

13:52 14     Q.  Was that on the phone or in person?

13:52 15     A.  I don't recall.  I did make a trip there in

13:53 16  person before I turned this in, but I don't remember if

13:53 17  it was -- it was after this, but I don't remember if it

13:53 18  was in person or -- or by phone.  But I did make a trip

13:53 19  over there before I turned it in.

13:53 20     Q.  You made a trip over there in regards to this

13:53 21  case?

13:53 22     A.  To this case.

13:53 23     Q.  When was that?

13:53 24     A.  I don't remember.

13:53 25     Q.  Who did you meet with?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:53  1        A.   With her.

13:53  2        Q.   And that was during the investigation?

13:53  3        A.   Towards the conclusion of the investigation

13:53  4   when I was prepping the case to be turned in.

13:53  5        Q.   Was it before her interrogation?

13:53  6        A.   No.  I'm pretty sure it was after all of the

13:53  7   interviews that -- that were conducted.

13:53  8        Q.   And why did you go to meet with her there?

13:53  9        A.   To discuss everything I had.

13:53 10        Q.   And what did you tell her?

13:53 11        A.   Every -- everything from the report to all the

13:53 12   interviews to the doctors' interviews, the nurses', all

13:54 13   the interviews that had been conducted, what we had.

13:54 14             And that's -- I don't remember if that's

13:54 15   when they told me use this charge or I was told later,

13:54 16   but it was before -- before I had to turn it in, that

13:54 17   was the charge they gave me.  This charge came from the

13:54 18   DA's office.

13:54 19        Q.   And what was the purpose of going there to meet

13:54 20   with her?

13:54 21        A.   As we do with other cases, to discuss a case

13:54 22   when we need guidance.

13:54 23        Q.   And what kind of -- did you ask her whether you

13:54 24   should be continuing to interview other people or

13:54 25   collecting other evidence?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:54  1        A.  Well, at this point, we had already interviewed

13:54  2   everyone from the hospital, the doctors, the nurses,

13:54  3   Griselle -- or Lizelle, I'm sorry.  And at this point,

13:54  4   I don't think there was anybody else to be interviewed,

13:55  5   so that's when we -- that's when I was ready to take it

13:55  6   to her for review.

13:55  7        Q.  And did she provide any legal guidance about

13:55  8   the charge, for example?

13:55  9        A.  Well, usual -- I don't remember if she did or

13:55 10   not.  But I do remember her telling me this was the

13:55 11   charge as in other cases where they would tell us,

13:55 12   "Yes, go ahead with aggravated sexual assault"; "No, it

13:55 13   doesn't meet the sexual assault."

13:55 14             So I do remember -- I don't remember her

13:55 15   telling me anything else, just that that was the charge

13:55 16   for this case, and that's how the case got turned over

13:55 17   to them when it got turned in with -- with the offense

13:55 18   of -- of murder.

13:55 19        Q.  Okay.

13:55 20        A.  Yes, ma'am.

13:55 21        Q.  Okay.  So when you received the case, you were

13:56 22   told to immediately contact the DA's office about it.

13:56 23   Was that unusual?

13:56 24        A.  A little bit unusual, but not so much, because

13:56 25   usually when they, the lieutenant or the sergeant, are

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:56  1    not familiar with the charge or if they can or can't,
13:56  2    usually with sexual assaults, they would always tell
13:56  3    us, "Just call the DA's office.  Call the DA's office."
13:56  4    That's their answer for everything there if you have a
13:56  5    question.
13:56  6              "Hey, this is -- I have this case."
13:56  7              "Call the DA's office and get guidance."
13:56  8              So not too much unusual.  But for right
13:56  9    off the bat, like I'm assuming they just didn't know
13:56 10    what -- how to go about -- as I didn't either, how to
13:56 11    go about with something like this.
13:57 12        Q.  And so you -- when you first got it, you did
13:57 13    call the DA's office?
13:57 14        A.  Yes.
13:57 15        Q.  And you spoke to ADA Barrera, and she provided
13:57 16    you guidance about what to do --
13:57 17        A.  Yes.
13:57 18        Q.  -- for your investigation?
13:57 19              Can you tell me again --
13:57 20        A.  And right off -- right off the bat then was
13:57 21    already contemplating the murder, but that they had to,
13:57 22    of course, look into, I guess, more laws.
13:57 23        Q.  Okay.
13:57 24        A.  And that's when I began all my investigation --
13:57 25    well, interviews and gathering the information for the

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:57 1    case.

13:57 2    Q.  So right then in that conversation, she -- she

13:57 3    said it could be murder?

13:57 4    A.  It could -- it could, yes.

13:57 5    Q.  But --

13:57 6    A.  It wasn't until I sent everything in or that I

13:57 7    spoke -- that before I turned everything in that I got

13:57 8    the -- the murder charge and to be submitted to -- that

13:57 9    she was going to present it to grand jury, which she

13:57 10   did.  And then after that, that's when I received the

13:57 11   call for the folder, the sealed envelope.

13:58 12   Q.  During that call, did you -- was she already

13:58 13   familiar with the facts of the case?

13:58 14   A.  I don't remember.

13:58 15   Q.  Did you tell her about the facts that you knew

13:58 16   at the time?

13:58 17   A.  Yes.  When I called, I only had this, the very

13:58 18   first time.

13:58 19   Q.  "This" meaning the exhibit -- just for the

13:58 20   record --

13:58 21   A.  Yes, ma'am.

13:58 22   Q.  -- Exhibit No. 6, which is --

13:58 23   A.  Is the only thing I had when I called her.

13:58 24          MR. NAVARRO:  What's the number on that

13:58 25   one?

Electronically signed by Donna McCown (101-253-986-8079)                                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:58  1          THE WITNESS:  Exhibit No. 6.

13:58  2          MR. NAVARRO:  Okay.

13:58  3      A.  Yes.  And that's when you're brainstorming

13:58  4  there.  "Okay.  This is what we got.  They gave me this

13:58  5  case.  They told me to call you."

13:58  6          "Okay.  Well, yeah.  It could be.  It

13:58  7  could not be.  We need to look into it.  I don't know,"

13:58  8  right?

13:58  9          "Okay.  Well, just go ahead and proceed

13:59 10  with, you know, your normal investigation."  So I bring

13:59 11  everybody in and do the interviews and so forth.  I

13:59 12  couldn't take pictures of -- of the fetus.  It had

13:59 13  already been cremated.  So I took pictures of the

13:59 14  cremation.

13:59 15          And then after that, all the interviews

13:59 16  and everything, and then I get back to her and say,

13:59 17  "Okay.  This is all I've got, all the interviews.  This

13:59 18  is what they said.  This is what" -- "Okay.  Bring --

13:59 19  well, that's when -- "bring it because I need to read

13:59 20  it."

13:59 21          "Okay.  Yeah.  You know what?  We can go

13:59 22  with murder."

13:59 23          Okay.  I go back.  I prepare it for

13:59 24  submission with murder.  And -- and she was going to

13:59 25  present it the -- to the grand jury.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

13:59  1          Q.  Okay.  You -- we talked earlier -- actually,

14:00  2     can I have Barrera Interrogatory No. 5 -- or, I'm

14:00  3     sorry, the responses.  This is a document previously

14:00  4     admitted in -- in a different deposition.  It's

14:00  5     Plaintiff's Exhibit No. 3.  This was provided by

14:00  6     Defendant Alexandria Barrera as part of the litigation,

14:01  7     this lawsuit.

14:01  8                I'm going to turn to Interrogatory No. 5.

14:01  9     It's on page 4.

14:01 10                MR. NAVARRO:  Are you -- is this an

14:01 11     exhibit?

14:01 12                MS. JARIT:  It was already admitted at the

14:01 13     deposition for Abel Villarreal, so we don't -- I don't

14:01 14     think we need to mark it again.

14:01 15                MR. NAVARRO:  Oh, I see.

14:01 16                MS. JARIT:  Yeah.

14:01 17                MR. NAVARRO:  Okay.  So this is Exhibit 3

14:01 18     of the deposition sequence?

14:01 19                MS. JARIT:  Right, exactly.

14:01 20                MR. NAVARRO:  Okay.  Got it.  I missed

14:01 21     that part.

14:01 22          Q.  These are answers provided by ADA Barrera.  Let

14:03 23     me know when you're done.

14:03 24          A.  Yes.

14:03 25          Q.  You can -- you can keep that for now.

Electronically signed by Donna McCown (101-253-986-8079)                d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:03 1          So ADA Barrera says that she had missed a

14:03 2   call from the sheriff's office about this case and

14:03 3   learned that you had spoken to ADA Villarreal.

14:04 4       A.  I never spoke to Abel Villarreal.

14:04 5       Q.  You did not?

14:04 6       A.  It was probably one of our administrators.

14:04 7       Q.  So when you say "administrators," who would

14:04 8   that be?

14:04 9       A.  Maybe Captain Fuentes or Carlos Delgado.  They

14:04 10  have -- they have a better relationship with Abel --

14:04 11  with Abel Villarreal.

14:04 12      Q.  So someone higher up would have spoken to him

14:04 13  with this question --

14:04 14      A.  Yes.

14:04 15      Q.  -- about --

14:04 16      A.  Even before I even called Alex, because

14:04 17  apparently, they had already called Abel Villarreal.

14:04 18  Somebody had.

14:04 19      Q.  And do you recall speaking to ADA Barrera with

14:04 20  Captain Fuentes about the case at one point?

14:05 21      A.  If I'm not mistaken, this is the day that I was

14:05 22  handed the report that we called that I had said that

14:05 23  we were all -- they said, "Call the DA's office."  This

14:05 24  is the day.

14:05 25      Q.  And so on that day is when you called.  And do

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

90

14:05 1    you recall during that conversation talking about the

14:05 2    murder statute?

14:05 3        A.  I personally don't recall asking, "Hey, is this

14:05 4    a murder?"  But I know the captain wanted to know how

14:05 5    to classify it.

14:05 6        Q.  And so during that call, it was the captain

14:05 7    asking?

14:05 8        A.  It was on speaker, yes, ma'am.

14:05 9        Q.  It was on speaker.  So you and Captain Fuentes

14:05 10   were in a room together -- oh, I'm sorry.

14:05 11       A.  We were still all in the same room where all

14:05 12   the investigators are at, but by my desk was the

14:06 13   sergeant and the captain when they issued the report

14:06 14   that -- that they said, "Call the DA's office."  So

14:06 15   that's when I dialed.

14:06 16       Q.  So when you called the DA's office, they were

14:06 17   there?  They were present for that call?

14:06 18       A.  Yes.  Yes, ma'am.

14:06 19       Q.  And the captain and sergeant, what did they

14:06 20   tell ADA Barrera during that call?

14:06 21       A.  It was all we had was -- all we had was this to

14:06 22   go by, so --

14:06 23            MR. NAVARRO:  "This" is?

14:06 24       A.  The police report, Exhibit 6.  The police

14:06 25   report, Exhibit 6.  That's all we had at that time of

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:06  1    the phone call.  So this was what we were telling

14:06  2    Barrera.

14:06  3                We were telling her there's a deputy

14:06  4    responded to the hospital, everything that's on the

14:07  5    police report.

14:07  6        Q.  And ADA Barrera said you should proceed with

14:07  7    the investigation?

14:07  8        A.  Yeah, to do the -- yeah, to proceed with the

14:07  9    investigation, yes.

14:07 10        Q.  And at that time, she said it -- it might be

14:07 11    murder?

14:07 12        A.  It could be.

14:07 13        Q.  Would the sergeant and Captain Fuentes have

14:07 14    told the sheriff about this conversation?

14:07 15        A.  Yes, ma'am.

14:07 16        Q.  Is that because it was a -- like a major case?

14:07 17        A.  One, because it was a major; and, two, because

14:07 18    all -- all the cases that -- or all the calls and cases

14:08 19    that come in, I know that administration has its own

14:08 20    briefings where they get told everything that's

14:08 21    happening.

14:08 22                There's a group message that sergeants

14:08 23    from patrol have with administration.  So it's a matter

14:08 24    of waking up in the morning and reading all the

14:08 25    messages to see that everything that happened that

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:08 1    night or that afternoon or that morning.  And then

14:08 2    they -- they brief among themselves.  So, yeah, yes,

14:08 3    ma'am, that he knows.

14:08 4                   MS. JARIT:  Okay.  Can I have Exhibits 1

14:08 5    and 2.

14:09 6       Q.  Okay.  I'm showing you -- these are exhibits

14:09 7    previously admitted at a different deposition.  They're

14:09 8    Plaintiff's Exhibits 1 and 2.  So you -- you previously

14:09 9    talked about getting the medical records for

14:09 10   Ms. Gonzalez in this case, correct?

14:09 11      A.  Yes, ma'am.

14:09 12      Q.  And so do you recognize these subpoenas?

14:09 13      A.  Yes, ma'am.

14:10 14      Q.  Okay.  Do -- do you remember obtaining these

14:10 15   subpoenas in this case?

14:10 16      A.  I don't remember, but -- I don't remember.  I

14:10 17   don't know how they were delivered to the doctor or the

14:10 18   hospital.  One for the hospital, one for the doctor,

14:10 19   right?  Yes.

14:10 20      Q.  On both of these subpoenas it directs the

14:11 21   person to provide the documents to yourself; is that

14:11 22   correct?

14:11 23      A.  I remember I pick -- I want to say I picked

14:11 24   them up.  I picked up the paperwork from the hospital

14:11 25   and from the doctor's office.  But you see, we only

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                              d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:11 1    send out an e-mail saying, I need a subpoena for

14:11 2    so-and-so for these medical records of this day, of

14:11 3    this day, this day.  And then I guess this is what they

14:11 4    type up.

14:11 5        Q.  So who do you send that e-mail to?

14:11 6        A.  We send it to Cynthia Garcia.  She's, I guess,

14:11 7    the administrative assistant there.

14:11 8        Q.  And then what happens?

14:11 9        A.  I guess she in turn gives it to them and

14:11 10   they -- they do the subpoena.

14:11 11       Q.  By "them," meaning the ADA?

14:11 12       A.  The ADAs.

14:11 13       Q.  So did you speak to ADA Villarreal about these

14:12 14   subpoenas?

14:12 15       A.  I don't remember.

14:12 16       Q.  Would -- would it have been typical to speak to

14:12 17   the ADA in the case about the subpoena before they're

14:12 18   issued?

14:12 19       A.  In other instances, maybe.  But I don't recall,

14:12 20   ma'am.  I do recall requesting the -- the e-mail, or I

14:12 21   do remember picking up the -- the paperwork at the

14:12 22   hospital and the -- and the clinic, because I went to

14:12 23   the clinic.  I went to the hospital.  But I don't

14:12 24   remember.

14:12 25       Q.  Who decided that --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:12  1          A.  For the subpoena?

14:12  2          Q.  I'll finish.  Who decided to get the medical

14:12  3    records, that they were necessary for the

14:12  4    investigation?

14:12  5          A.  My supervisor said, "I suggest you submit a

14:13  6    request for subpoena for medical records for the

14:13  7    hospital and for the clinic."

14:13  8          Q.  Your supervisor meaning Sergeant Aguirre?

14:13  9          A.  Aguirre.

14:13 10          Q.  And so you just e-mailed the -- the DA's e-mail

14:13 11    address and they took it from there?

14:13 12          A.  They took it -- yeah, they took care of it,

14:13 13    yes, ma'am.

14:13 14          Q.  Do you know who served the subpoena?

14:13 15          A.  I don't remember if it -- I don't remember,

14:13 16    ma'am.  I don't remember if it was me or maybe someone

14:13 17    else.  I really don't remember.

14:13 18          Q.  Could it have -- typically, are subpoenas

14:13 19    served by the sheriff's office or by investigators at

14:13 20    the DA's office?

14:13 21          A.  Well, because I've had subpoenas in the past

14:13 22    where I would serve for another -- but on this, I don't

14:13 23    remember if I picked them up and served them or -- or

14:13 24    someone else did and then I just picked up the

14:14 25    paperwork.  I don't remember.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:14 1      Q.  Okay.  Do you recall speaking to ADA Villarreal

14:14 2  about the case?

14:14 3      A.  I don't remember.

14:14 4      Q.  And you say -- strike that.

14:14 5           Were you ever -- did you ever have a

14:14 6  conversation with anyone at the sheriff's office about

14:14 7  the definition of "individual" in the Penal Code?

14:14 8      A.  No.

14:14 9      Q.  Did you ever have a conversation with anyone at

14:14 10  the ADA's office about the definition of "individual"

14:14 11  under the Penal Code?

14:14 12      A.  No, but I was reading on the -- on Alex

14:14 13  Barrera's paper here that she was searching for the

14:14 14  word "individual."

14:14 15      Q.  But you don't know -- you never had a

14:15 16  conversation about that with her?

14:15 17      A.  No.  You see, a lot of the times, ma'am, even

14:15 18  though we would be the lead investigators, if they

14:15 19  had -- especially Mr. Villarreal, if they have a

14:15 20  question, they wouldn't call the lead investigator

14:15 21  directly.  They would call Carlos Delgado or -- or

14:15 22  Captain Fuentes, Leonard Fuentes.

14:15 23      Q.  Okay.

14:15 24      A.  And then they would come and ask us, "Hey,

14:15 25  where are you in this case," or "Did you do this?  Did

Electronically signed by Donna McCown (101-253-986-8079)             d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:15  1   you do that?"  But it was because it was coming -- but
14:15  2   they would never call us directly.
14:15  3       Q.  And so is that because, like, legal decisions
14:15  4   were made by your superiors and the ADA's office
14:15  5   together?
14:15  6       A.  Yes, ma'am.
14:15  7       Q.  And then you were told then what to do based on
14:15  8   those conversations?
14:15  9       A.  Yes, ma'am.
14:16 10            MS. JARIT:  Should we take a break maybe?
14:16 11   Why don't we take a break.
14:16 12            THE WITNESS:  Okay.
14:16 13            (Brief recess)
14:33 14       Q.  So we were just talking about Ms. Gonzalez's
14:34 15   interrogation.  And afterwards, you said you called ADA
14:34 16   Barrera about the investigation.  Do you recall -- did
14:34 17   you discuss with ADA Barrera whether to -- to arrest
14:34 18   Ms. Gonzalez at that point?
14:34 19       A.  Yes.  I believe I asked if we were going to do
14:34 20   an arrest or no arrest or they were going to do the
14:34 21   arrest and what was the charge.  I believe that's when
14:34 22   she told me for me to just turn it in to the DA's
14:34 23   office for grand jury.
14:34 24       Q.  Okay.  And how do you prepare your
14:34 25   investigation to turn it over to the DA's office?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:34 1      A.  We gather the offense report, which is this

14:34 2  one, our investigative report, everybody's interviews

14:35 3  or anything -- the evidence that was collected and so

14:35 4  forth.

14:35 5          We -- we run a criminal history on the

14:35 6  defendant at this time, which was Ms. Lizelle Herrera,

14:35 7  and we attach that to the report, any photos.  And

14:35 8  there's that receipt that I was telling you.  That

14:35 9  cover sheet goes on top of this.

14:35 10          There's two, one the DA's office stays

14:35 11  with, the other one gets returned to the folder.  They

14:35 12  stamp it and date it, and that's how I turn it in.

14:35 13      Q.  And do you e-mail it or physically --

14:35 14      A.  No.  Physically take it.

14:35 15      Q.  You physically take it to the DA's office?

14:35 16      A.  To the DA's office.

14:35 17      Q.  And who do you give it to?

14:35 18      A.  There's a -- at the downstairs office, there's

14:35 19  a -- there's an office like this where you turn in

14:35 20  cases with -- I don't remember who was there at that

14:36 21  time.  I believe it was -- in that office was Rick

14:36 22  Saenz, Trini Lopez, maybe Natividad Gonzalez.  I'm not

14:36 23  sure if he had already left or not.  And that's where

14:36 24  we would turn in the cases to.

14:36 25      Q.  And do you know what happens to that packet

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:36  1    after it's turned in?

14:36  2        A.  They stamp it.  They take it to -- they take it

14:36  3    upstairs to the -- like in this case, in this

14:36  4    particular case, I said, "Well, Alex knows about this

14:36  5    case and is waiting for this particular case."

14:36  6              So they stamped it, and I'm assuming they

14:36  7    took it to her, and that's when she presented the case

14:36  8    to grand jury.  I don't know when it was -- I don't

14:36  9    remember when it was presented, though.

14:36 10        Q.  So it was your understanding that Alex wanted

14:36 11    the case once it was turned in?

14:36 12        A.  Yes.

14:36 13        Q.  And is that because she told you that over --

14:37 14    when?

14:37 15        A.  Because she was going to present it to the --

14:37 16    to grand jury.

14:37 17        Q.  She told you that she wanted to present it to

14:37 18    the grand jury?

14:37 19        A.   I don't remember how exactly that happened, but

14:37 20    I do know that she was the one that presented, because

14:37 21    I was called out -- the day that they presented the

14:37 22    case to the grand jury, I sat outside the courtroom, or

14:37 23    wherever they meet, on the bench while she went in

14:37 24    there and presented the -- the case.

14:37 25        Q.  So you were subpoenaed to testify potentially

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:37 1     for the grand jury?

14:37 2          A.  Potentially, but I didn't get to go in there.

14:37 3          Q.  But you -- they didn't call you to go in?

14:37 4          A.  Right.

14:37 5          Q.  Okay.  Before turning the -- the packet over to

14:37 6     the DA's office, you mentioned that you took pictures

14:37 7     of the cremations?

14:37 8          A.  Yes, ma'am.

14:37 9          Q.  So you were -- you were the investigator who

14:37 10    went to the crematory as part of the investigation?

14:37 11         A.  I went to -- my supervisors wanted an autopsy

14:38 12    on the fetus, but the fetus had already been collected

14:38 13    by Rodriguez Funeral Home.  And as per -- I believe the

14:38 14    mother had said that they wanted the baby cremated, I'm

14:38 15    assuming, because that's what happened.

14:38 16              So what I did was I met Rodriguez Funeral

14:38 17    Home employees at Rodriguez Funeral Home and took the

14:38 18    pictures there.

14:38 19         Q.  When you say your supervisors, who are you

14:38 20    talking about?

14:38 21         A.  Aguirre and Fuentes.

14:38 22         Q.  And Fuentes you said?

14:38 23         A.  Captain.

14:38 24         Q.  Captain Fuentes.  Did you have a subpoena or a

14:38 25    search warrant for the remains?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:38  1       A.   No.   No, ma'am, I don't believe so.

14:38  2       Q.   Okay.

14:38  3       A.   When I advised them that it was too late, that

14:38  4    we couldn't send the fetus to an autopsy, they were

14:38  5    like, "Well, just go take pictures."  So that's why I

14:39  6    waited and took the pictures pretty late.  I waited

14:39  7    at -- in Escobares for Rodriguez Funeral Home.

14:39  8       Q.   Okay.  Who served you -- who served the

14:39  9    subpoena on you for the grand jury?

14:39  10      A.   It must have been the investigators from the

14:39  11   DA's office.

14:39  12      Q.   How many investigators does the DA's office

14:39  13   have?

14:39  14      A.   I'm not sure, ma'am.  Maybe -- I'm not sure.

14:39  15      Q.   Like --

14:39  16      A.   Four, five, maybe.

14:39  17      Q.   Okay.  Do you know them?

14:39  18      A.   I know some of them through work.

14:39  19      Q.   Through work?

14:39  20      A.   Yes.  All of them through work.

14:39  21      Q.   Did you consult with anyone in the DA's office

14:39  22   to prepare for the grand jury?

14:39  23      A.   No.

14:39  24      Q.   Did you talk to ADA Barrera?  Don't tell -- you

14:39  25   don't have to tell me what you were going to testify

Electronically signed by Donna McCown (101-253-986-8079)                              d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:39  1    to, but did you talk to ADA Barrera before the grand

14:40  2    jury about what you would say?

14:40  3         A.  I don't remember.  Maybe.  I'm not sure.

14:40  4         Q.  Did you discuss with her the definition of

14:40  5    "individual" as it relates to homicide?

14:40  6         A.  I don't remember.

14:40  7         Q.  So you had previously said that once the

14:40  8    indictment came down, they gave it to you like a

14:40  9    sealed -- in a sealed envelope?

14:40 10         A.  Yes, ma'am.

14:40 11         Q.  Correct?

14:40 12         A.  Yes, ma'am.

14:40 13         Q.  Who is "they" again?

14:40 14         A.  It was Trinidad Lopez that handed me the

14:40 15    envelope.  He's the one that called me, "Come over to

14:40 16    the courthouse.  I have a sealed indictment.  Do you

14:40 17    even know what that is?"

14:40 18                And I said, "No.  I know what it is, but

14:40 19    I've never -- I've never handled one."

14:40 20                So I went over there.  And he said, "This

14:40 21    is what a sealed indictment is."  And he gave me a --

14:41 22    like a manila folder, but it was an envelope, that

14:41 23    color -- that color, more or less.  And he said, "Don't

14:41 24    open it until you have the person in front of you at

14:41 25    the sheriff's office."

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:41  1        Q.  So this was the first time you'd ever been

14:41  2   given a sealed indictment --

14:41  3        A.  Yes, ma'am.

14:41  4        Q.  -- in your career?

14:41  5        A.  Yes, ma'am.

14:41  6        Q.  Why did they give it to you?

14:41  7        A.  I don't know, ma'am.

14:41  8        Q.  Were you instructed to arrest Ms. Gonzalez?

14:41  9        A.  To bring her into the sheriff's office.  That's

14:41 10   what he told me.

14:41 11        Q.  And who's "he"?  I'm sorry.

14:41 12        A.  Trinidad Lopez.  He said, "Bring her in, and

14:41 13   then in front of her you open the envelope."

14:41 14        Q.  And he works for the --

14:41 15        A.  The DA's office.

14:41 16        Q.  The DA's office?

14:41 17        A.  An investigator there.

14:41 18        Q.  An investigator?

14:41 19        A.  Yes, ma'am.

14:41 20        Q.  Do you know who instructed him to give you

14:41 21   the --

14:41 22        A.  No, ma'am.

14:41 23        Q.  -- indictment?

14:41 24            Do you know who instructed him to tell you

14:41 25   to arrest Ms. Gonzalez?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:41  1        A.  No, ma'am.

14:41  2        Q.  Do you know what a capias is?

14:42  3        A.  The -- the arrest warrant?

14:42  4        Q.  Were you provided a capias as well?

14:42  5        A.  I don't remember what I pulled out from the

14:42  6    envelope.  I believe I did sign it.  I signed the

14:42  7    return that I had executed.  And that's when I opened

14:42  8    it in front of her, and I told her, "This is what the

14:42  9    DA's office is bringing before you."

14:42  10       Q.  How did you go about arresting Ms. Gonzalez?

14:42  11       A.  Well, I went to go -- when I got the envelope,

14:42  12   I went to my sergeant Aguirre and Captain Fuentes,

14:42  13   said, "This is what" -- we call him Trini, Trinidad

14:42  14   Lopez.  Said, "This is what Trini gave me."

14:42  15              He's like, "Okay.  Well, now go look for

14:42  16   her."

14:42  17              Okay.  I started calling her.  I went to

14:42  18   her house.  So all six of us started looking for her,

14:42  19   because they said, "Well, now go look for her and bring

14:43  20   her."

14:43  21              Okay.  So we did.  We started looking for

14:43  22   her.  I don't remember where exactly.  I think it was

14:43  23   somewhere on Alvarez Road, maybe -- I don't remember

14:43  24   where exactly it happened.  But that's where we saw

14:43  25   her.  I believe I was on the phone with her.  I don't

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:43 1    remember the details.

14:43 2            Oh, maybe they're here.  And that's how --

14:43 3    we met up with her.  And she was nervous.  She was -- I

14:43 4    said, "Well, I have this envelope."

14:43 5            Tell me -- I believe she was like, "Are

14:43 6    you going to arrest me," blah blah.

14:43 7            I said -- just like they told me, I told

14:43 8    her, like, "They gave me this envelope.  You need to go

14:43 9    with me to the sheriff's office, and that's where we're

14:43 10   going to open it together.  Like I'm going to open it

14:43 11   and then I'll tell you there."

14:43 12           So she calls her mom.  We drive to the

14:43 13   sheriff's office.  Once we get to the sheriff's office,

14:44 14   that's when I open the envelope.  And I pulled out the

14:44 15   paperwork, and I said, "This is what it is."  We're

14:44 16   reading it together.  And I read it to her.

14:44 17      Q.  How many officers were involved in the arrest?

14:44 18      A.  I don't remember.  In the arrest when we

14:44 19   detained her or the arrest?

14:44 20      Q.  In the detain -- when you found her and

14:44 21   detained her.

14:44 22      A.  I think it was maybe three of us or -- I was

14:44 23   with someone, and then maybe another unit.  I don't

14:44 24   recall.  All of us were out there, because some were at

14:44 25   her house in -- I don't know where she lives, wherever

**BRYANT & STINGLEY, INC.**

**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:44  1    she lives, Fronton or -- I don't remember, Falcon

14:44  2    Heights.

14:44  3              And then some were over here on the west

14:44  4    side of town looking for her.  She was saying, "I'm

14:44  5    over here.  I'm over there."  So it was something like

14:45  6    that.  I don't recall exactly.

14:45  7              So when we got to her, it was me and

14:45  8    whoever I was driving with.  I don't remember if it was

14:45  9    Investigator Ivan Lopez or with Juan Guerra and maybe

14:45 10    one more unit.  I don't remember.

14:45 11        Q.  So it was more than one car, though?

14:45 12        A.  Yes.  Yes.

14:45 13        Q.  And they were marked cars?

14:45 14        A.  I don't -- one of them for sure.  I don't

14:45 15    remember if we had the ghost units at that time or we

14:45 16    had the regular patrol -- regular CID units.

14:45 17        Q.  Did they have dash cams?

14:45 18        A.  No, they don't have dash cams.

14:45 19        Q.  Okay.  Were you wearing a body cam?

14:45 20        A.  No, I was not wearing a body cam.

14:45 21        Q.  What car was she transported in to the

14:45 22    sheriff's office?

14:45 23        A.  No.  She drove herself.

14:45 24        Q.  Oh, she drove herself?

14:45 25        A.  Yeah, she drove herself.  I said, "The paper is

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:45  1     for you to go with me to the sheriff's office."  Like I
14:46  2     didn't want to say, "Oh, you're arrested," because I
14:46  3     didn't know myself if she was to be arrested or not be
14:46  4     arrested.  Like I didn't know what was going to be
14:46  5     inside those papers.
14:46  6               So I said, "I don't know if you're going
14:46  7     to be arrested," or "I don't know what they sent me.
14:46  8     They just gave me this."  So she drove herself to the
14:46  9     sheriff's office.
14:46 10     Q.  Were you in touch with the DA's office during
14:46 11     this arrest?
14:46 12     A.  I don't remember if I was.  Maybe afterwards
14:46 13     for sure, but not -- I don't remember if during.
14:46 14     Q.  Is it unusual that they told you to go find
14:46 15     someone and bring them back to the office but you
14:46 16     didn't know what was going to happen?
14:46 17     A.  Yes.  Yes, because normally, it's -- it's -- if
14:46 18     it was an indictment, they could have served themselves
14:46 19     as investigators.
14:46 20     Q.  Why didn't they serve it themselves?
14:46 21     A.  I don't know, ma'am.
14:46 22     Q.  Was anyone riding with her in her car?
14:47 23     A.  I -- when we were driving to the office?
14:47 24     Q.  Yes.
14:47 25     A.  I drove with her.  She was crying.  She was

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:47 1    nervous.  I said, "I'll drive with you."  Like I just

14:47 2    wanted her calm, relaxed.  I didn't want her to -- and

14:47 3    then I got in trouble for that.

14:47 4             They said, "You shouldn't have driven with

14:47 5    her.  What if she, you know, would have taken off to

14:47 6    Mexico with you?"  I just thought it was -- she seemed

14:47 7    scared, nervous, crying.

14:47 8             I said, "I'll even drive with you, like

14:47 9    let's go to the sheriff's office, and we'll open the

14:47 10   envelope together, like, you know, just relax."  I

14:47 11   mean, I said, "Everything is going to be okay.  Don't

14:47 12   worry."

14:47 13            And we -- and she said, "Yes," and I drove

14:47 14   with her.  She was on the phone with her mother.

14:47 15   Q.  And would you say that that was not typical of

14:47 16   how an arrest usually takes place?

14:47 17   A.  Correct.  Well, she was not under arrest at

14:47 18   that time.

14:47 19   Q.  Were you aware that the -- that she had been

14:48 20   charged with murder then?

14:48 21   A.  When I was -- when I was driving with her to

14:48 22   the --

14:48 23   Q.  Yes.

14:48 24   A.  I was just wondering what was in that envelope.

14:48 25   Q.  Yeah.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:48 1      A.  I wasn't sure.  I wasn't -- in the back of my
14:48 2  mind, I said, "Well, if they want her, I'm pretty sure
14:48 3  they charged her."  But I didn't know -- like I said,
14:48 4  it was the first time dealing with an indictment.  I
14:48 5  didn't know if it was a murder charge or no --
14:48 6  something that was going to say "no charge," but I had
14:48 7  to tell her at the sheriff's office.
14:48 8           No one told me it could be that it's no
14:48 9  charges, but you have to tell her at the sheriff's
14:48 10  office.  Like no one told me anything like that.  I
14:48 11  didn't know.
14:48 12      Q.  Did you write an arrest report?
14:48 13      A.  No.  It's just what's here.
14:48 14      Q.  Okay.  Did you tell her that she had to go with
14:48 15  you to the sheriff's office?
14:49 16      A.  Yes.  I said, "Well, you have to go," because
14:49 17  they told me bring her in and open this.
14:49 18      Q.  And "they" meaning the DA's office?
14:49 19      A.  The DA's office, yes, ma'am.  And she was very
14:49 20  compliant.  She at no point said, "I'm not going,"
14:49 21  or -- or never gave me attitude, never gave me
14:49 22  resistance as far as, "No, I'm not going.  I'm not
14:49 23  going to go with you.  Come with me."  Never.  She
14:49 24  was -- she was just the nicest girl.
14:49 25      Q.  After her arrest, after she was brought to the

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:49  1    office and you read her the indictment, and then she

14:49  2    was detained, correct?

14:49  3        A.  Then she was arrested for the --

14:49  4        Q.  Then she was actually arrested and jailed and

14:49  5    booked into jail at that point --

14:49  6        A.  Yes, ma'am.

14:49  7        Q.  -- correct?

14:49  8        A.  Yes, ma'am.

14:49  9        Q.  Who -- who did the booking into the jail?

14:49  10       A.  I don't know who books them at the jail, but I

14:49  11   walked her to the jail.

14:50  12       Q.  You walked her to the jail.  Did you speak to

14:50  13   anyone in your office to inform them that you had

14:50  14   arrested her?

14:50  15       A.  Well, all of the -- the sergeant, the captain,

14:50  16   and the investigators that were looking for her all

14:50  17   knew by then that I already had her in the office.

14:50  18       Q.  Was Sheriff Fuentes aware that she had been

14:50  19   arrested?

14:50  20       A.  Yes.  Yes, ma'am.

14:50  21       Q.  How -- why would he have been made aware?

14:50  22       A.  Because the -- like I said, the captain,

14:50  23   there's that message that, okay, this person has been

14:50  24   arrested, this person has been -- like they inform him

14:50  25   of everything that happens in the office.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:50  1      Q.  In the WhatsApp group?

14:50  2      A.  In the -- they have that WhatsApp group.  And

14:50  3  then we took her to the office, so I'm sure they told

14:50  4  them, "Hey, you know, she's already here."  Like I

14:50  5  said, it was on the message too.

14:50  6      Q.  So he gets -- he gets informed basically about

14:51  7  like every major step in an investigation, correct?

14:51  8      A.  And just a simple report from patrol too, yes,

14:51  9  ma'am.  They have that chat group.

14:51  10     Q.  Had you ever heard of anyone being arrested for

14:51  11  an abortion before?

14:51  12     A.  No, ma'am.

14:51  13     Q.  Did it seem surprising to you that she had been

14:51  14  charged based on an abortion?

14:51  15     A.  Yes, ma'am.

14:51  16     Q.  Do you know how bond is set, for bond?

14:51  17     A.  No, ma'am.

14:51  18     Q.  So you mentioned you brought her -- you walked

14:51  19  her over to the jail.  Is that the sheriff -- the Starr

14:51  20  County Jail?

14:51  21     A.  Yes.  It's -- they're attached together.  So we

14:51  22  just walk from -- come out one door into the other.

14:51  23     Q.  It's attached to the sheriff's office?

14:51  24     A.  Yes.  Yes, ma'am.

14:51  25     Q.  Does the sheriff's office run the jail?  Like

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:52  1    who run -- who runs the jail?

14:52  2        A.  The chief administrator, which is chief

14:52  3    administrator -- Jail Administrator Molina, and it's

14:52  4    under Larry Fuentes, the chief.

14:52  5        Q.  Okay.  Part of the sheriff's office, though?

14:52  6        A.  Yes.

14:52  7        Q.  It's a different part than the criminal

14:52  8    investigation part?

14:52  9        A.  Right, correct.

14:52 10        Q.  Are you familiar with how bail gets posted and

14:52 11    how someone is released from jail?

14:52 12        A.  Well, I know that you get seen by a judge, bail

14:52 13    gets posted.  And if you meet bail, you can -- you can

14:52 14    get released.

14:52 15        Q.  Is Sheriff Fuentes normally involved in

14:52 16    approving the bonds for people who are released?

14:52 17        A.  I believe so, ma'am.  I'm not sure.  Because I

14:52 18    know I -- I don't know.  I think that there's like a

14:53 19    certain limit on a bond that he has to, like, sign off

14:53 20    on or something.

14:53 21        Q.  Okay.  Do you know where -- whether DA Ramirez

14:53 22    discussed Ms. Gonzalez's incarceration with anyone at

14:53 23    the sheriff's office?

14:53 24        A.  I wouldn't know, ma'am.

14:53 25        Q.  Are you aware now that the charges against

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:53  1    Ms. Gonzalez were dismissed?

14:53  2        A.  Yes, ma'am.

14:53  3        Q.  When did you find out about that dismissal?

14:53  4        A.  Well, they put out -- the DA's office put out

14:53  5    a -- like something on Facebook saying -- and prior

14:53  6    to -- like before, days before, maybe a day, they had

14:53  7    gone in -- administration -- our administration captain

14:53  8    and my sergeant had said, "Just so you know -- just so

14:54  9    you know, the case was dismissed by the DA's office."

14:54  10   I said okay.

14:54  11       Q.  Do you know how they were informed?

14:54  12       A.  No, ma'am.

14:54  13       Q.  What was your reaction when you learned that it

14:54  14   was dismissed?

14:54  15       A.  It was dismissed.  I was like, poor girl.

14:54  16       Q.  What was the --

14:54  17       A.  I'm sorry.

14:54  18       Q.  Oh, no, it's okay.  Feel free to take a drink.

14:54  19       A.  Yes.

14:54  20       Q.  What was the, like, public reaction to

14:54  21   Ms. Gonzalez's arrest?

14:54  22       A.  I don't -- I don't remember.  I didn't read any

14:55  23   comments or anything like that.  I do remember one day

14:55  24   the captain and the sergeant saying, "They were --

14:55  25   we're going to have some protesters in the lobby or

14:55  1    outside."  I never saw anybody, to be honest.

14:55  2        Q.  Did you read the press release that DA Ramirez

14:55  3    had issued?

14:55  4        A.  No.

14:55  5        Q.  You didn't read it?

14:55  6        A.  I did see it, because it browsed on my feed on

14:55  7    Facebook, but I didn't read it.

14:55  8        Q.  Okay.  Do you -- do you know why the DA

14:55  9    dismissed the charge?

14:55 10        A.  No, ma'am.

14:55 11        Q.  The indictment?

14:55 12        A.  And like I said earlier, a lot of the times

14:55 13    they wouldn't call us directly to tell us anything.

14:55 14    It's just they just assume that on the level of the

14:55 15    DA's office and our administration, as long as they

14:55 16    were on the same page, it didn't matter if we knew or

14:55 17    not.

14:55 18        Q.  When you're talking about levels -- you know,

14:55 19    you were saying like the captain and the sergeant would

14:56 20    kind of talk to the ADAs.  Would then the A -- the DA,

14:56 21    Ramirez, would he talk directly to Fuentes then?

14:56 22        A.  Yes.

14:56 23        Q.  Sheriff Fuentes, I'm sorry.

14:56 24        A.  Yes.

14:56 25        Q.  Okay.  In the press release that DA Ramirez

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

14:56 1    issued, he wrote, "In reviewing this case, it is clear

14:56 2    that the Starr County Sheriff's Department did their

14:56 3    duty in investigating the incident brought to their

14:56 4    attention by the reporting hospital.  To ignore the

14:56 5    incident would have been a dereliction of their duty."

14:56 6                    Knowing what you know now, do you agree

14:56 7    that you should have been investigating the incident?

14:56 8        A.  I don't think so.  And to begin with, I just

14:56 9    think that all -- the municipality would have been the

14:56 10   one taking over lead on this from the very beginning.

14:57 11       Q.  Did you learn -- did you ever learn it was

14:57 12   dismissed because it didn't meet the elements of the

14:57 13   crime?

14:57 14       A.  Like I said, all they said was it was

14:57 15   dismissed, and I didn't read on the article they

14:57 16   posted.

14:57 17       Q.  Going back to that you thought it should stay

14:57 18   with the municipality, why do you think it came to the

14:57 19   sheriff's office?

14:57 20       A.  Because of the address she has, which is our --

14:57 21   our jurisdiction.

14:57 22       Q.  Where she lived?

14:57 23       A.  Uh-huh.  Falcon Heights.

14:57 24       Q.  Even though --

14:57 25       A.  Even though she was at her grandma's, which

14:57 1     was -- I'm assuming that is the only -- the only

14:57 2     reason.

14:57 3         Q.  Okay.  Did you receive e-mails from the press

14:57 4     concerning the case, Ms. Gonzalez's case?

14:58 5         A.  I don't remember.  I do remember receiving

14:58 6     e-mails even -- since my e-mail was the one on -- on

14:58 7     the -- when I was doing public relations, a lot of them

14:58 8     still had it.  So a lot of the open record requests,

14:58 9     but I would forward those directly to Carlos Delgado.

14:58 10        Q.  So during investigation you -- you spoke to ADA

14:58 11    Barrera several times, and she said, you know, could be

14:58 12    murder, continue the investigation, go forth.  If she

14:58 13    had said that it wasn't murder, would you have stopped

14:58 14    the investigation?

14:58 15        A.  Yes.  Yes, because like I said earlier, it

14:59 16    was -- I didn't even know why we had the report to

14:59 17    begin with.

14:59 18        Q.  You talked a little bit about the WhatsApp that

14:59 19    you have.  Do you have one with the DA's office?

14:59 20        A.  We didn't.  Investigations didn't.  I don't

14:59 21    know if administration or the brass did.

14:59 22        Q.  And, again, Sheriff Fuentes, he's in the admin

14:59 23    WhatsApp group; is that correct?

14:59 24        A.  Yes, with all the sergeants and him.  And that

14:59 25    includes patrol sergeants, the sergeant from

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:59  1    investigation, and the lieutenant, the captain, the

14:59  2    chief, and the major.

14:59  3        Q.  Is he in any other WhatsApp groups or just the

14:59  4    one?

14:59  5        A.  He's on ours too with CID.  And it was the

14:59  6    sergeant, all of CID, the captain on that one too.

15:00  7        Q.  And do you know if the DAs have, like,

15:00  8    work-issued cell phones?

15:00  9        A.  I think they do.

15:00  10        Q.  Okay.  Do you recall your office ever providing

15:00  11    you with information about SB 8?

15:00  12        A.  No.  I think what we did was amongst us

15:00  13    investigators.  I think we Googled, like, what it was.

15:00  14        Q.  And did you do that during this investigation?

15:00  15        A.  For this investigation.

15:00  16        Q.  For this one?

15:00  17        A.  Yes.

15:00  18        Q.  And what did you understand that it was?

15:01  19        A.  To be honest, I read it then, and then I never

15:01  20    read it again.

15:01  21        Q.  Did you believe that it allowed for new

15:01  22    criminal charges?

15:01  23        A.  I -- I don't remember.

15:01  24        Q.  Prior to her investigation, though, you hadn't

15:01  25    heard of it -- about it?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:01  1          A.  No.

15:01  2          Q.  But you were familiar with the constitutional

15:01  3     right to an abortion at the time?

15:01  4          A.  Well, because -- yes, I -- I -- like I said, I

15:01  5     would read on, like, "By body, my choice."  And so I

15:01  6     was -- when I saw this, I was -- I never thought this

15:01  7     would come all this way.

15:01  8          Q.  And are you familiar that the right came from a

15:01  9     case called Roe v. Wade?  Have you heard of that case?

15:01 10          A.  I must have read it -- that when this was going

15:01 11     on.

15:01 12          Q.  And were you aware that at the time in January

15:02 13     of 2022 that that was still good law, that case, that

15:02 14     there was still that right to an abortion?

15:02 15          A.  No, I -- I don't remember, ma'am.

15:02 16          Q.  Did you ever express to anyone at the DA's

15:02 17     office your concern about this case and about the

15:02 18     murder charge?

15:02 19          A.  No.  Just to my sergeant when we would discuss

15:02 20     it.  He'd say, "Where are you at with this?"

15:02 21               I -- and at the very beginning when I

15:02 22     said, "Why is it ours?  Why are we investigating?"  And

15:02 23     I even made the comment, "I thought it was -- I thought

15:02 24     it was my body, my choice."

15:02 25               And, "No.  You're getting this case, so

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:02  1    take care of it."

15:02  2        Q.  How did he respond to that, those concerns?

15:02  3        A.  "No.  You're getting this case.  Take care of

15:03  4    it."

15:03  5        Q.  Just do it?

15:03  6        A.  Uh-huh.  Yes, ma'am.

15:03  7        Q.  Are -- are you aware of Penal Code 19.06 in the

15:03  8    Texas Penal Code?

15:03  9        A.  Not off the top of my head.

15:03 10        Q.  If I told you that it -- that statute says that

15:03 11    a pregnant person can't be charged with murder

15:03 12    concerning conduct against her own unborn child, does

15:03 13    that sound accurate to you?

15:03 14        A.  Uh-huh.  Yes, ma'am.

15:03 15        Q.  Were you aware of that Penal Code during this

15:03 16    investigation?

15:03 17        A.  Well, when they gave me this, that's the first

15:03 18    thing I went to, the Penal Code.

15:03 19        Q.  And then so did you read that when you went to

15:03 20    the Penal Code, did --

15:03 21        A.  Yes.

15:03 22        Q.  -- you read that section?

15:03 23        A.  Yes, and so did the sergeant.  The sergeant

15:03 24    looked up that Penal Code, and if it fit this element,

15:04 25    if it fit this, if it fit that.  And all that was

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:04 1    searched up by the sergeant, that he was the one that

15:04 2    always -- would always search up everything for us.

15:04 3        Q.  And so when you got the case, you went to the

15:04 4    Penal Code, you saw this section in particular saying

15:04 5    that the pregnant person could not be charged?

15:04 6        A.  Right.  Yes, ma'am.  I told the sergeant

15:04 7    Aguirre --

15:04 8        Q.  You told the sergeant?

15:04 9        A.  He said, "Oh, yeah, it's there."

15:04 10       Q.  And what -- what did he say?

15:04 11       A.  Just for me to continue, prepare, and turn it

15:04 12   in to the DA's office.

15:04 13       Q.  So the sergeant was aware of this --

15:04 14       A.  Yes.

15:04 15       Q.  -- section?

15:04 16       A.  And so was the captain.

15:04 17       Q.  And the captain was aware.  How was the captain

15:04 18   aware?

15:04 19       A.  Because he was on top of all this.  Always,

15:04 20   "Where are you at?  What does it say?  What does the

15:04 21   book say?  What does the Penal Code say?  What did the

15:04 22   DA's office say?  What are you doing now?  What's

15:04 23   next?"

15:04 24       Q.  Did anyone mention this section to anyone at

15:04 25   the DA's office, the 19.06?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:05 1      A.  I'm pretty sure we -- I'm pretty sure we did at

15:05 2  one point or another.

15:05 3      Q.  Who is "we"?

15:05 4      A.  Whether it was myself or the sergeant Aguirre,

15:05 5  captain.  Like I said, they -- they communicate even if

15:05 6  I wasn't there.  So I'm pretty sure at one point,

15:05 7  because it was brought up.

15:05 8      Q.  Would that be to ADA Barrera?

15:05 9      A.  To ADA Barrera or if any other investigators

15:05 10  spoke to -- or admin spoke to Abel Villarreal or -- or

15:05 11  the DA's office, but that was discussed.

15:05 12      Q.  Okay.  We're almost done.

15:05 13      A.  Okay.

15:05 14      Q.  I'm almost done.

15:06 15      A.  Okay.

15:06 16      Q.  Okay.  Going to hand you some notes.  We're

15:06 17  going to mark them as Plaintiff's Exhibit No. 9 and --

15:06 18  we're going to do three -- 9, 10, and 11.

15:06 19          So these were provided to us in discovery

15:06 20  by the defendants.  They're not Bates-stamped.  You can

15:06 21  take a look.  You don't have to read them all now, if

15:06 22  you want.  We'll get into it.

15:08 23      A.  Yes, ma'am.

15:08 24      Q.  Do you recognize these notes?

15:08 25      A.  Yes, ma'am.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:08  1          Q.  Okay.  Do you recognize the handwriting?

15:08  2          A.  Yes, ma'am.

15:08  3          Q.  Whose handwriting is it?

15:08  4          A.  That's my handwriting.

15:08  5          Q.  In all three exhibits?

15:08  6          A.  Yes, ma'am.

15:08  7          Q.  Okay.  So you took these notes as part of the

15:08  8  case?

15:08  9          A.  Yes, ma'am.

15:08 10          Q.  Okay.  And part of Ms. Gonzalez's case, to be

15:08 11  clear, right?

15:08 12          A.  Yes, ma'am.

15:08 13          Q.  And are these notes a record of events that

15:08 14  occurred during the investigation?

15:08 15          A.  Yes, ma'am.

15:08 16          Q.  And were they kept, like, as part of your job

15:08 17  as a sheriff's investigator?

15:08 18          A.  Yes, ma'am.

15:08 19          Q.  And was that a regular practice to keep notes

15:08 20  as part of your --

15:08 21          A.  Yes, ma'am.

15:08 22          Q.  -- investigation?

15:08 23              Were they made, like, close to when that

15:09 24  fact was perceived or part of your memory, the notes?

15:09 25          A.  Yes, ma'am.  I always try and date them.  Some

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:09  1   are not dated, but I always try to date and time them.

15:09  2   So it's around that time, yes, ma'am.

15:09  3       Q.  And do they accurately reflect the knowledge

15:09  4   that you had at the time that you made them?

15:09  5       A.  Yes, ma'am.

15:09  6       Q.  Okay.  So let's go through some of them.  Okay.

15:09  7   Let's do the Post-its first, which is Exhibit No. 9.

15:09  8   I'm going to refer to them, like, sequentially.  So

15:09  9   there's six on the first page, which is left to right,

15:09 10   you know, one and -- one, two; the next line three,

15:09 11   four; the next line five-six, six being the last one on

15:09 12   the right.

15:09 13       A.  Uh-huh.

15:09 14       Q.  So the one that's dated 1-27, it's the fifth

15:10 15   one -- one, two, three, four, five -- bottom left

15:10 16   corner.

15:10 17       A.  Uh-huh.

15:10 18       Q.  In the corner, it says "11:15 a.m., 1-27-2022."

15:10 19       A.  Uh-huh.  Yes, ma'am.

15:10 20       Q.  Okay.

15:10 21           MR. NAVARRO:  I'm sorry, I lost you.

15:10 22           MS. JARIT:  Oh, sure.  Bottom left corner.

15:10 23   Yeah, that one.  On the bottom right corner of that,

15:10 24   like, Post-it, it has the date.

15:10 25           MR. NAVARRO:  Okay.

**BRYANT & STINGLEY, INC.**

**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:10  1      Q.  Okay.  So it says, "Search warrant house," and
15:10  2   then it says -- has the marks, you know, that mean the
15:10  3   same words above, so "Search warrant phone," correct?
15:10  4      A.  Yes, ma'am.
15:10  5      Q.  Did you obtain a search warrant in this case?
15:10  6      A.  I don't recall.  I don't remember.
15:10  7      Q.  And then after that, it says, "After interview
15:10  8   with susp," meaning suspect?
15:10  9      A.  Suspect, yes, ma'am.
15:10 10      Q.  It says, "Will staff with DAs"?
15:10 11      A.  Yes, ma'am.
15:10 12      Q.  Correct?  Yes.  What does that mean?
15:10 13      A.  That we consult with them to tell them
15:11 14   everything that we had.
15:11 15      Q.  And then it says, "Set up something for
15:11 16   Monday," correct, right below?
15:11 17      A.  Yes, ma'am.
15:11 18      Q.  Okay.  What discussions prompted this note?
15:11 19      A.  This was possibly -- I don't remember, but
15:11 20   possibly, because I would do this so that I wouldn't
15:11 21   forget, and I just didn't write who told me, but
15:11 22   someone would have suggested, "Hey, a search warrant
15:11 23   for the house, for the phone.  And after you do your
15:11 24   interview with the suspect, make sure you staff with
15:11 25   the DA's office and set up something for Monday."

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:26 1     know if that's when -- or whatever was turned in to the

15:26 2     DA's office is what I made him copies of, so I'm

15:26 3     assuming it's for that.

15:26 4         Q.  Okay.  Okay.  We're done with those notes, so

15:26 5     you can --

15:26 6         A.  Okay.  Yes, ma'am.

15:26 7         Q.  We're going to turn now to the -- the notes on

15:26 8     lined paper.  This is Exhibit No. 10, I believe.

15:26 9         A.  Yes, ma'am.

15:26 10        Q.  Yeah.  Okay.  So at the bottom of the first

15:26 11    page, it says, "New law after six weeks, but after six

15:26 12    weeks, she can stop medical assistance," I think is

15:26 13    what it says.  Do you see that in this box, this little

15:26 14    box?

15:26 15        A.  Oh, "New law, but after six weeks she can stop

15:26 16    medical."  Yeah, yes, ma'am.

15:26 17        Q.  Do you know what new law you were talking

15:26 18    about?

15:26 19        A.  No.  I was just phrasing what the doctor had

15:27 20    said.

15:27 21        Q.  Okay.  Why would -- was that relevant to your

15:27 22    investigation at the time?

15:27 23        A.  This is a -- this is somebody's -- this is

15:27 24    somebody's interview.

15:27 25        Q.  Yes.  These are your notes, correct?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:27 1      A.  Yes.

15:27 2      Q.  Okay.

15:27 3      A.  Let me see who -- whose interview is this.

15:27 4  This is one of the doctors.  And when I walked in --

15:27 5  well, when we walked in, the conversation struck before

15:27 6  I even introduced myself like I usually do and get

15:27 7  their information.  Someone else was with me in this

15:27 8  interview, and I don't remember.

15:27 9           That's why I started here like this with

15:27 10  no information to the date and the time.  So these --

15:28 11  these notes are all what was said to me.

15:28 12      Q.  Uh-huh.  During the interview with the doctor?

15:28 13      A.  Yeah.  I don't know which doctor it was,

15:28 14  though.

15:28 15      Q.  Okay.

15:28 16      A.  Or -- or a nurse maybe.

15:28 17      Q.  If I told you that you interviewed Dr. Lozano

15:28 18  on that date, would that --

15:28 19      A.  Maybe this is --

15:28 20      Q.  -- be accurate?

15:28 21      A.  Maybe this is Dr. Lozano.

15:28 22      Q.  Let's turn to the fifth page -- one, two,

15:28 23  three, four, five.  At the top, it says, "Penal Code

15:28 24  107"?

15:28 25      A.  Oh, wait a minute.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:28 1      Q.  Maybe the one before.

15:28 2      A.  Went too far.  Yeah, I got it.

15:28 3      Q.  Okay.  "Penal Code 107, fetus any point of

15:29 4  conception."  Does that look accurate?

15:29 5      A.  Yes.  Yes.  This is the other doctor's.

15:29 6      Q.  Why did you write that?

15:29 7      A.  Let me see if he mentioned something like that.

15:29 8  Because all these notes is as I'm doing the interview,

15:29 9  so I'm writing down everything they're -- they're

15:29 10  saying.

15:29 11      Q.  So one of the -- you think one of the people

15:29 12  you interviewed said that?

15:29 13      A.  Possibly, or someone that was there.

15:30 14      Q.  Could it have possibly been notes made while

15:30 15  speaking to a colleague at the DA's office or the

15:30 16  sheriff's office?

15:30 17      A.  No, I wouldn't have written on the -- on these.

15:30 18      Q.  On the notepad?

15:30 19      A.  Right.  Not -- not -- these are all notes where

15:30 20  I started the interview.  This is all hand -- until I

15:30 21  come to a -- I don't know, because it could have ended

15:30 22  here.  I'm not sure, ma'am.

15:30 23      Q.  Okay.  Would you have written it like

15:31 24  immediately after you perceived the conversation, this

15:31 25  note down?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:31 1     A.  This one here?  No.  I'm sure I would have

15:31 2  wrote it while we were in the interview.

15:31 3     Q.  At the -- at the time that --

15:31 4     A.  At the time that it -- uh-huh.

15:31 5     Q.  That the person was speaking that you're

15:31 6  writing it down.

15:31 7          Later on down the page, it says -- it's

15:31 8  dated 1-19-2022, and it says, "Somebody" -- has an

15:31 9  arrow, "Somebody revealing info."  Do you see that in

15:31 10  the middle of the page?

15:31 11     A.  Yes.  That -- that was the concern that

15:31 12  Ms. Herrera had.

15:31 13     Q.  So you interviewed Ms. -- Ms. -- Ms. Herrera,

15:31 14  Ms. Gonzalez on the 31st, correct?

15:31 15     A.  I believe so.

15:31 16     Q.  And this note was on the 19th?

15:31 17     A.  Yeah, we had -- I believe we had spoken.  She

15:32 18  had already -- when we went to the interview, she had

15:32 19  already told me about, yes --

15:32 20     Q.  So --

15:32 21     A.  -- about somebody, like administration already

15:32 22  knew this.

15:32 23     Q.  So you had spoken to --

15:32 24     A.  I -- I'm sorry.  Go ahead.

15:32 25     Q.  No.  You go ahead.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:32  1          A.   And I believe that I even brought it up to --

15:32  2   to the CPS worker, who I believe brought it up to her

15:32  3   supervisor about somebody leaking information.  "Sunday

15:32  4   called Daisy."

15:32  5               I gave -- I guess "Sister-in-law called

15:32  6   Mom.  Could it say.  Won't work -- don't work."  Yeah,

15:32  7   I'm assuming that's what -- that's where that's coming

15:32  8   from, because she had already told me that.

15:32  9          Q.   So you had spoken to Ms. Gonzalez before her

15:32 10   interrogation at some point?

15:32 11          A.   I believe when I called her to come in maybe.

15:32 12          Q.   Okay.

15:32 13          A.   Yes.

15:33 14          Q.   So you had called her before and made, like, a

15:33 15   date for her to come in?

15:33 16          A.   Yes.

15:33 17          Q.   When was that?

15:33 18          A.   I don't remember.  I don't know if it's here.

15:33 19   I -- I don't remember, ma'am.

15:33 20          Q.   Okay.  Now we're going to go to the last group

15:33 21   of -- of notes, so that would be Exhibit, I think, 11.

15:33 22   When -- they're yellow in real life, yellow lined

15:33 23   paper.  Just on the last page, who is Deputy Eloy

15:33 24   Garza, it says?  Do you see that?

15:33 25          A.   This one?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:33  1      Q.  Yes.  On -- do you see -- says, "son-in-law,
15:33  2  "dad GF," arrow, "Deputy Eloy Garza."  Is that --
15:34  3      A.  He was one of --
15:34  4      Q.  -- accurate?
15:34  5      A.  -- the deputies there, yes, ma'am.
15:34  6      Q.  He's one of the deputies at the sheriff's
15:34  7  office?
15:34  8      A.  Yes, ma'am.
15:34  9          MR. NAVARRO:  What -- what page are you
15:34 10  on?
15:34 11          MS. JARIT:  The last page of the yellow
15:34 12  notes.
15:34 13          MR. NAVARRO:  Of the yellow notes?
15:34 14          MS. JARIT:  They're -- yes, it's that one.
15:34 15      Q.  How is that relevant to the investigation?
15:34 16      A.  This is -- I think this is her interview.  She
15:34 17  gave me that information.
15:34 18      Q.  Oh, okay.
15:34 19      A.  Yes.  Yes, this is where I started.  And she
15:34 20  gave me this information thinking that it could
15:34 21  possibly come from there that the information was being
15:34 22  talked about.
15:34 23      Q.  Okay.
15:34 24      A.  So that's the information I gave my
15:34 25  administration, that deputy's name.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

140

15:34  1          Q.   Okay.  You said throughout the investigation

15:35  2     you were given directions by your superiors on the

15:35  3     case, correct?

15:35  4          A.   Yes, ma'am.

15:35  5          Q.   And that was the captain and the sergeant,

15:35  6     correct?

15:35  7          A.   Correct.

15:35  8          Q.   Who was giving you more directions?

15:35  9          A.   The sergeant.

15:35  10         Q.   And in what situations would they give you

15:35  11    direction?

15:35  12         A.   From the very beginning when I started, when I

15:35  13    asked those questions.  And then after that, it was --

15:35  14    I did all the -- well, the interviews that I conducted,

15:35  15    then he conducted one, and Investigator Guerra

15:35  16    conducted another interview.

15:35  17                   And then after that, it was what -- "Did

15:35  18    you call the DA's office?"  "What charge are you going

15:35  19    with?  Make sure you call the DA's office and get the

15:35  20    charge -- the correct one."  Sergeant Aguirre would

15:36  21    search up.  "This doesn't fit this.  It says this.  It

15:36  22    says that.  Call Alex.  Make sure, make sure, make

15:36  23    sure."

15:36  24         Q.   Uh-huh.

15:36  25         A.   And that's exactly what I did.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:36  1          Q.   Okay.  You said the sheriff was in the WhatsApp

15:36  2     group with the investigators as well, right?

15:36  3          A.   Yes.

15:36  4          Q.   Would he have learned about Ms. Gonzalez's case

15:36  5     initially that way or a different way?

15:36  6          A.   No, because the sheriff came into the group

15:36  7     message not a very -- not too long ago.  But he would

15:36  8     have learned because the other messages have been in

15:36  9     place -- the other groups have been in place for a long

15:36 10     time.

15:36 11          Q.   And he would have learned in those other groups

15:36 12     about it?

15:36 13          A.   Yes, in his administrative -- administration

15:36 14     group.

15:36 15          Q.   Administration group.  And can you remind me

15:36 16     who -- who is administration, when you say --

15:36 17          A.   The sheriff, the chief, the major, the captain,

15:37 18     and the lieutenant.  That's administration.

15:37 19          Q.   Okay.  Were your supervise -- superiors also

15:37 20     concerned that this wasn't murder?

15:37 21          A.   Aguirre -- oh, they really didn't know.  Like

15:37 22     if I have to say yes or no, I would say maybe yeah,

15:37 23     they were a little bit concerned.  That's why we had to

15:37 24     go through the DA's office and get guidance.

15:37 25          Q.   And that was to -- to make sure, right?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:37  1    A.  To make sure.

15:37  2    Q.  And to present them with all the facts, the

15:37  3  DA's office, ADA Barrera, and for her to make an

15:37  4  assessment, correct?

15:37  5    A.  Correct.

15:38  6        MS. JARIT:  Should we take, like, maybe a

15:38  7  ten-minute break.  I just want to make sure I've asked

15:38  8  all my questions.  Okay?

15:38  9        THE WITNESS:  Yes.

15:38 10        (Brief recess)

15:45 11    Q.  Okay.  Did you -- do you know what a Brady

15:45 12  compliance form is?

15:45 13    A.  We started submitting those with our case --

15:46 14  I'm not sure -- I don't remember why they said we had

15:46 15  to do it, though.

15:46 16    Q.  Okay.  Let me show you -- I'm going to show you

15:46 17  this.  We're going to mark it Plaintiff's Exhibit

15:46 18  No. 12.  This is a document provided to us in discovery

15:46 19  by defense -- by the defense.

15:46 20        It's labeled Defendant's 215.  That is the

15:46 21  Bates stamp on the bottom.  Do you see that this is a

15:46 22  Brady compliance form --

15:46 23    A.  Yes, ma'am.

15:46 24    Q.  -- is that accurate?

15:46 25        And do you see your signature on it?

Electronically signed by Donna McCown (101-253-986-8079)                d8926af7-3042-4ca4-8dc3-4a969ae61d90

15:59  1     you submitted the case file?

15:59  2          A.  Yes, sir.

15:59  3          Q.  Okay.  And then you did testify about being

15:59  4     instructed to -- after the indictment came down, to --

15:59  5     to go find Ms. Gonzalez and bring her to the sheriff's

15:59  6     office?

15:59  7          A.  Yes, sir.

15:59  8          Q.  Okay.  But all of that happens after the

15:59  9     indictment has come out?

15:59 10          A.  Correct.

15:59 11          Q.  All right.  Now, the other thing that you had

15:59 12     indicated was that at some point, it sounded to me like

15:59 13     it was early on after you got the investigation, that

15:59 14     you did some Google search on the law.  Did I hear that

15:59 15     correctly?

15:59 16          A.  Yes, sir.

15:59 17          Q.  All right.  And that you came across the Penal

16:00 18     Code section called 19.06?

16:00 19          A.  I believe so.  And that's what the sergeant and

16:00 20     I had -- were reading.  He did a lot of the searching.

16:00 21          Q.  Which sergeant?

16:00 22          A.  Sergeant Aguirre.

16:00 23          Q.  Aguirre?  Okay.

16:00 24          A.  He did a lot of the searching for -- in this

16:00 25     case, like a lot of the searching on the -- to get the

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

16:00 1  Penal Code, to get what laws were in place or not in
16:00 2  place.  So we -- that's who I would have discussions or
16:00 3  like I would go to for when I would get stuck with
16:00 4  something, or he would tell me, like, for instance,
16:00 5  that, that was on the report.  We checked it out.  Like
16:00 6  I said, off the top of my head, I don't remember word
16:00 7  by word, but yes.
16:00 8      Q.  Okay.  So do you remember actually talking with
16:00 9  Sergeant Aguirre or reading 19.06?
16:00 10     A.  I don't remember doing it, but I'm pretty sure
16:00 11 I -- I did.
16:03 12             MR. NAVARRO:  Can we mark this as whatever
13  the next exhibit is.
14             THE COURT REPORTER:  We're on 13.
15             MS. JARIT:  Should this be the number -- a
16  defendant's exhibit number?  We've been doing
17  plaintiff's exhibits and defendants' exhibits, I think,
18  so it may be a different number.
19             MR. NAVARRO:  Okay.  I wasn't sure if
20  y'all were just marking them consecutively through the
21  exhibits, but I'll do it however you want.
22             MS. JARIT:  Yes.  I don't -- I just don't
23  know what number you were on on defendants' side.
24  There were some --
25             MS. NAVARRO:  Yeah.  And I haven't been

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

1    doing these, so...

2              THE COURT REPORTER:  Can we go off the

3    record?

16:03  4              MS. JARIT:  Yeah.

16:03  5              (Brief recess)

16:03  6       Q.  Okay.  So I've been -- I've handed you what's

16:03  7    been marked Defendants' Exhibit No. 4.  And this is

16:03  8    just a printout of the law, Chapter 19 of the Texas

16:03  9    Penal Code.  Okay?  Are you familiar with Chapter 19 of

16:03  10   the Penal Code?

16:03  11      A.  Not familiar familiar, but yes, I'm familiar

16:03  12   with the Texas Penal Code.

16:03  13      Q.  Okay.  Have you heard it referred to as the --

16:03  14   the criminal homicide statute?

16:03  15      A.  Yes, sir.

16:03  16      Q.  Okay.  So if you look at 19.01 on the second

16:03  17   page there, do you see there the prescription of what

16:03  18   constitutes criminal homicide?

16:03  19      A.  Yes, sir.

16:03  20      Q.  All right.  And -- and would you have looked at

16:04  21   this law when you were at the beginning stages of the

16:04  22   investigation and talking to your sergeant?

16:04  23      A.  Yes.

16:04  24      Q.  Okay.  Would you have discussed with the

16:04  25   sergeant like what con -- you know, what the elements

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:04   1    of a charge like this would be?

16:04   2         A.   With the sergeant and the captain.

16:04   3         Q.   And the captain.  And that's captain who now?

16:04   4         A.   Fuentes.

16:04   5         Q.   Fuentes.  So was DA Ramirez involved in that

16:04   6    conversation?

16:04   7         A.   No.

16:04   8         Q.   Okay.

16:04   9         A.   No, sir.

16:04  10         Q.   Was ADA Barrera involved in that conversation?

16:04  11         A.   Yes, sir.  That's when the conversation took

16:04  12    place when we were -- when I first got the offense

16:04  13    report, when we started looking at -- at the Penal Code

16:04  14    when -- it was like a -- the phone call was on speaker

16:05  15    when we were with Barrera, and that's when we started

16:05  16    looking into -- into this when they said it could be.

16:05  17         Q.   Okay.  So Barrera didn't come over and talk to

16:05  18    you --

16:05  19         A.   No.  It was --

16:05  20         Q.   -- it --

16:05  21         A.   -- via telephone.

16:05  22         Q.   Via telephone call?

16:05  23         A.   Yes, sir.

16:05  24         Q.   And you're saying that this started at the

16:05  25    early stages of the investigation?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:05   1          A.   The day I got assigned the report.

16:05   2          Q.   Okay.  And -- and the day that you got it

16:05   3    assigned would have been?

16:05   4          A.   Not the day on the report, no, sir.  Maybe -- I

16:05   5    don't know, because -- maybe a day after or -- oh,

16:05   6    wait, because it was in the morning.  Let me see.  Hold

16:05   7    on.  Oh, it was in the afternoon.  Maybe that -- that

16:05   8    evening or in the following day in the morning maybe

16:05   9    when I got it assigned.

16:05  10          Q.   After it had been assigned to you, your -- your

16:05  11    testimony is that you would have had a -- along with

16:05  12    your sergeant and your captain, a phone conference with

16:06  13    the ADA Barrera?

16:06  14          A.   Yes, sir.

16:06  15          Q.   All right.  And that the discussion would have

16:06  16    been the Chapter 19, the homicide statute?

16:06  17          A.   A possibility, yes, sir.

16:06  18          Q.   A possibility.  Okay.  So there was questions

16:06  19    about it?

16:06  20          A.   Yes, sir.

16:06  21          Q.   All right.  And do you know if you all

16:06  22    specifically looked at, at that time, the section at

16:06  23    the very end of this chapter called 19.06 that says,

16:06  24    "This chapter does not apply to the death of an unborn

16:06  25    child if the conduct charged is, No. 1, committed" --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:06  1    "conduct committed by the mother of the unborn child"?

16:06  2    Did you look at that?

16:06  3        A.  I want to say we did.  That is why --

16:07  4        Q.  Okay.

16:07  5        A.  That's why I had all those questions and wanted

16:07  6    guidance.

16:07  7        Q.  So your recollection today is that at the very

16:07  8    beginning stages of the investigation, you were talking

16:07  9    to your sergeant and your captain.  Y'all had legal

16:07  10   questions, right, about --

16:07  11       A.  Yeah.

16:07  12       Q.  -- whether this case presented a criminal

16:07  13   conduct case, right --

16:07  14       A.  Yes.

16:07  15       Q.  -- under Chapter 19?

16:07  16       A.  Yes, sir.

16:07  17       Q.  And you're saying you Googled it and you came

16:07  18   across Chapter 19 -- I mean Section 19.06 of that

16:07  19   chapter?

16:07  20       A.  Yes, sir.

16:07  21       Q.  And that this was -- I'm sorry.  I don't mean

16:07  22   to cut you off.

16:07  23       A.  And we grabbed our Texas Penal Code.

16:07  24       Q.  And you found it.  And is it also -- is that a

16:07  25   yes?  I'm sorry.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:07 1      A.  Yes, sir.

16:07 2      Q.  And in -- and your testimony is that on the

16:07 3  phone that this was brought to the attention of Alex

16:07 4  Barrera?

16:07 5      A.  Yes, sir.

16:07 6      Q.  All right.  Do you recall her saying anything

16:08 7  about it or telling you, "uh-oh.  This is not going to

16:08 8  work," or what -- what is your recollection of that?

16:08 9      A.  No, sir.  I remember her saying that they were

16:08 10 going to also, like I said -- like I told her, they

16:08 11 were going to look into it and for me to proceed with

16:08 12 the investigation as far as interviewing the people

16:08 13 involved in the -- in the -- in the report, the

16:08 14 doctors, the nurses.

16:08 15          Because I -- I don't think any of us, for

16:08 16 that matter, like I -- like I was telling her, like

16:08 17 knew what we had.  That's why we couldn't -- we

16:08 18 contacted the DA's office for this.

16:08 19     Q.  Okay.  Well, does this -- does this

16:08 20 Section 19.06, does it seem pretty clear to you that it

16:08 21 would apply to the -- an unborn child that -- the death

16:09 22 of an unborn child belonging to a mother?

16:09 23     A.  Yes, sir.

16:09 24     Q.  Okay.  Is there anything complicated about that

16:09 25 at all?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:09 1    A.  No, sir.

16:09 2    Q.  Okay.  Where in your report does it say that

16:09 3    there's a concern about 19.06?

16:09 4    A.  Not on my report.  That's when -- on my report,

16:09 5    all it's -- all my report has, the investigative

16:09 6    report, are the facts, which is the interviews that I

16:09 7    conducted, the interview the sergeant conducted, the

16:09 8    interview Guerra conducted, whatever evidence was

16:09 9    collected, the pictures of the -- of the cremation.

16:09 10   The investigative report is not going to have my

16:09 11   concerns or my opinions.

16:09 12   Q.  Okay.  Why not?

16:09 13   A.  Because that's just what -- the information

16:10 14   that has been collected for the case.

16:10 15   Q.  Okay.  You had testified earlier that when you

16:10 16   first talked to -- in this first communication with

16:10 17   Alex Barrera about these questions --

16:10 18   A.  Yes.

16:10 19   Q.  -- that you were basically also told just do

16:10 20   what you normally do as far as the investigating,

16:10 21   right?

16:10 22   A.  Right.

16:10 23   Q.  And what you normally do is what you did, which

16:10 24   is you went and found witnesses and you corrected --

16:10 25   collected evidence, you took testimony, right?

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

16:10 1      A.  Correct.

16:10 2      Q.  You pulled in documents, right?

16:10 3      A.  Correct.

16:10 4      Q.  You assembled all the facts?

16:10 5      A.  Correct.

16:10 6      Q.  Okay.  And -- and what I'm hearing you say is

16:10 7  that as you were doing that, you were already aware of

16:10 8  Section 19.06?

16:10 9      A.  That's correct, sir.

16:10 10      Q.  Okay.  And between that -- that meeting at the

16:11 11  beginning on the telephone consultation on it, when was

16:11 12  the next time that you talked to Alex Barrera?

16:11 13      A.  I don't remember.

16:11 14      Q.  Okay.

16:11 15      A.  But --

16:11 16      Q.  In going through these notes, do these notes

16:11 17  trigger -- this is Exhibit 9, 10, 11.  As I read these

16:11 18  notes and as I listen to your answers to the questions,

16:11 19  I mean, these are -- these are notes that occurred

16:11 20  during the course of the investigation, right?

16:11 21      A.  Yes.  Yes, sir.

16:11 22      Q.  I don't see anything in these notes reflecting

16:11 23  communications with Alex Barrera.

16:11 24            MS. JARIT:  Objection.

16:11 25      A.  No, sir.

Electronically signed by Donna McCown (101-253-986-8079)                    d8926af7-3042-4ca4-8dc3-4a969ae61d90

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                   McALLEN DIVISION
LIZELLE GONZALEZ                )(
        Plaintiff               )(
                                )(
VS.                             )(    CIVIL ACTION NO.
                                )(    7:24-cv-00132
GOCHA ALLEN RAMIREZ,            )(
ALEXANDRIA LYNN BARRERA,        )(
RENE FUENTES, and STARR         )(
COUNTY, TEXAS                   )(
        Defendants              )(
```

REPORTER'S CERTIFICATE

I, DONNA McCOWN, Certified Court Reporter,
certify that the witness, ESMERALDA NAVARRO MUNIZ, was
duly sworn by me, and that the deposition transcript is
a true and correct record of the testimony given by the
witness on MARCH 25, 2025, and that the deposition was
reported by me in stenograph and was subsequently
transcribed under my supervision.

Pursuant to Federal Rule 30(e)(2), a review of
the transcript was requested.
I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

WITNESS MY HAND on this the _____ day
_____, 2025.


_____
DONNA McCOWN, Texas CSR 6625
Expiration Date:  01-31-26
Bryant & Stingley, Inc., CRN No. 41
P.O. Box 3420
Harlingen, Texas  78551
(956) 428-0755

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**