```
             IN THE UNITED STATES DISTRICT COURT
            FOR THE SOUTHERN DISTRICT OF TEXAS
                     McALLEN DIVISION

LIZELLE GONZALEZ              ) (
          Plaintiff          ) (
                             ) (
VS.                          ) (    CIVIL ACTION NO.
                             ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,         ) (
ALEXANDRIA LYNN BARRERA,     ) (
RENE FUENTES, and STARR      ) (
COUNTY, TEXAS                ) (
          Defendants         ) (
```

_____

             ORAL AND VIDEOTAPED DEPOSITION OF
                    ALEXANDRIA BARRERA
                 MARCH 27 and APRIL 4, 2025

_____


        ORAL AND VIDEOTAPED DEPOSITION OF ALEXANDRIA

BARRERA, produced as a witness at the instance of the

PLAINTIFF, taken in the above-styled and numbered cause

on MARCH 27, 2025, between the hours of 10:12 a.m. and

6:49 p.m., reported stenographically by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at Bryant & Stingley, Inc., 701 East

Harrison, Suite 200, Harlingen, Texas, and remotely in

Rio Grande City on APRIL 4, 2025, between the hours of

10:05 a.m. and 10:39 a.m., pursuant to the Federal

Rules of Civil Procedure and any provisions stated on

the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

                        APPEARANCES
        COUNSEL FOR PLAINTIFF:
               NANCY ROSENBLOOM
               KIERA GODDU
               AMERICAN CIVIL LIBERTIES UNION
               SENIOR LITIGATION ADVISOR
               125 Broad Street
               New York, New York  10004

               LAUREN JOHNSON
               AMERICAN CIVIL LIBERTIES UNION
               915 15th Street NW
               Washington, DC  20005

               ELIZABETH JARIT, via Zoom
               AMERICAN CIVIL LIBERTIES UNION
               SENIOR STARR ATTORNEY
               125 Broad Street, 18th Floor
               New York, NY  10004

               MARIANA (MOLLY) KOVEL, via Zoom
               AMERICAN CIVIL LIBERTIES UNION
               SENIOR STAFF ATTORNEY
               125 Broad Street, 18th Floor
               New York, NY  10004

               SARAH CORNING, via Zoom
               AMERICAN CIVIL LIBERTIES UNION TEXAS
               Staff Attorney
               P.O. Box 8306
               Houston, Texas  77288

               DAVID A. DONATTI, via Zoom
               AMERICAN CIVIL LIBERTIES UNION OF TEXAS
               P.O. Box 12905
               Austin, Texas  78711-2905

               JUNE (ANNIE) GERSH, via Zoom
               AMERICAN CIVIL LIBERTIES UNION
               125 Broad Street
               New York, New York  10004

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

1          I. CECILIA GARZA, via Zoom
           VERONICA SEPULVEDA MARTINEZ, via Zoom
2          GARZA MARTINEZ, PLLC
           202 East Sprague Street
3          Edinburg, Texas  78539

4

     COUNSEL FOR DEFENDANTS:
5

           KELLY R. ALBIN
6          RICARDO J. NAVARRO, via Zoom
           DENTON NAVARRO RODRIGUEZ BERNAL
7          SANTEE & ZECH, P.C.
           549 North Egret Bay Boulevard, Suite 200
8          League City, Texas  78550

9

     ALSO PRESENT:
10         David Saldana, Videographer
           Emily Mensing, via Zoom
11         Lizelle Gonzalez, via Zoom

12                         INDEX

13                                               PAGE
     Appearances ..................................  2
14
     ALEXANDRIA BARRERA
15   Examination by Ms. Rosenbloom ..................  5
     Examination by Ms. Albin ...................... 208
16   Examination by Ms. Johnson .................... 227

17   Errata Sheet/Signature Page ................... 247

18   Reporter's Certificate ........................ 249

19   Attached to the end of the transcript:  Stipulations

20

21

22

23

24

25

EXHIBITS

NUMBER  DESCRIPTION                                      PAGE

13    Job Posting, Criminal Investigator ......  43

14    List of Cases ..........................   61

15    Text Messages, Ms. Barrera and
      Mr. Aguirre ...........................   96

16    Text Messages, Ms. Barrera and Ms. Muniz 110

17    Indictment ............................. 133

18    TDCAA Update ........................... 140

19    Text Messages, Ms. Barrera and
      Bernice Garza .......................... 151

20    Text Messages, Ms. Barrera and Ms. Muniz 158

21    Motion to Dismiss ...................... 167

22    WhatsApp Messages ...................... 176

23    Text Messages, Ms. Barrera and
      Mr. Ramirez ........................... 179

24    Letter, Mr. Ramirez to Mr. Hackett ...... 186

25    E-mail Correspondence, Mr. Ramirez and
      Mr. Hackett ........................... 190

26    Agreed Judgment of Probated Suspension .. 193

27    Affidavit of Becky Ann Rocha ........... 199

28    Text Messages, Ms. Barrera and
      Mr. Ramirez ........................... 243

10:12 1          THE VIDEOGRAPHER:  It is March 27, 2025.
10:12 2   This is the deposition of Alexandria Barrera.  It is
10:13 3   10:12 a.m.  We are on the record.
10:13 4          (Witness was sworn.)
10:13 5          THE COURT REPORTER:  Okay.  Kelly, do you
10:13 6   need to put a stipulation on?
10:13 7          MS. ALBIN:  We want to read and sign.
10:13 8          THE COURT REPORTER:  Okay.  Thank you.
10:13 9          MS. ROSENBLOOM:  That's fine.
10:13 10          ALEXANDRIA BARRERA,
10:13 11   having been duly sworn, testified as follows:
10:13 12                    EXAMINATION
10:13 13   BY MS. ROSENBLOOM:
10:13 14      Q.  Okay.  I'm Nancy Rosenbloom.  I'm one of the
10:13 15   lawyers representing the plaintiff in this case,
10:13 16   Lizelle Gonzalez, who's formerly know as Lizelle
10:13 17   Herrera.
10:13 18          So if -- when I say "Lizelle Gonzalez" or
10:13 19   "Ms. Gonzalez," you should understand who I'm -- who I
10:13 20   mean, that that's the plaintiff.  Is that okay?
10:13 21      A.  Yes.
10:13 22      Q.  And just some logistics, which I'm sure you
10:13 23   know as a lawyer.  Our understanding is you will answer
10:13 24   truthfully to the best of your ability.  And please let
10:13 25   me know if you don't understand a question.  Okay?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

10:13  1          A.  Yes, ma'am, I will.

10:13  2          Q.  The court reporter will prepare a transcript of

10:13  3   everything that's said, so please make sure to provide

10:14  4   verbal responses rather than nodding or shaking your

10:14  5   head.  Do you understand that?

10:14  6          A.  I will, yes.

10:14  7          Q.  And if your attorney objects to a question, you

10:14  8   must still answer unless your attorney instructs you

10:14  9   not to answer.

10:14 10          A.  I understand.

10:14 11          Q.  You understand?  We can also take breaks, but

10:14 12   not if a question is pending.  And please let me know

10:14 13   if you need a break at any point.

10:14 14          A.  Thank you.

10:14 15          Q.  And if not, we'll try to take breaks every

10:14 16   hour, hour and a half.

10:14 17          A.  Okay.

10:14 18          Q.  Is there anything that would prevent you from

10:14 19   answering fully and truthfully today?

10:14 20          A.  No, ma'am.

10:14 21          Q.  On any medications that would interfere with

10:14 22   your ability to understand or answer questions

10:14 23   truthfully?

10:14 24          A.  No.

10:14 25          Q.  Have you been deposed before?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

10:14  1    A.  I have not.

10:14  2    Q.  And do you understand that you are under oath

10:14  3    and your answers are given under penalty of perjury?

10:14  4    A.  I do understand.

10:14  5    Q.  I have some background questions about your

10:15  6    career.  We received a copy of your resume as part of

10:15  7    the document production.  Is that still current?

10:15  8    A.  Yes.

10:15  9    Q.  Okay.  That will make it go faster.  Thank you.

10:15  10   Your current job title is first assistant district

10:15  11   attorney at the Starr County District Attorney Office;

10:15  12   is that correct?

10:15  13   A.  Yes, ma'am.

10:15  14   Q.  When did you receive that title?

10:15  15   A.  I don't recall exactly the month, but I believe

10:15  16   it was sometime in 2022.

10:15  17   Q.  Okay.  And what does the -- that title entail?

10:15  18   What's different about it than being a line district

10:15  19   attorney?

10:15  20   A.  You're more of a -- you have more of a

10:15  21   supervisory role.  If the district attorney is out or

10:15  22   is not available, then you are essentially the one to

10:15  23   make the executive decision if he is not available.

10:16  24   Q.  Okay.  Does that title come with a higher

10:16  25   salary?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

10:16 1        A.  Yes, it does.

10:16 2        Q.  And how long have you been with the Starr

10:16 3    County DA's office, since what year?

10:16 4        A.  In what capacity?

10:16 5        Q.  All together.  In your current -- in your

10:16 6    current job you told me, and before that when did you

10:16 7    join the office?

10:16 8        A.  Well, I started back with the Starr County

10:16 9    District Attorney's Office in 2013.

10:16 10       Q.  Okay.  As an ADA?

10:16 11       A.  No.  As a legal assistant after I graduated

10:16 12   from Texas State University.  I graduated in December

10:16 13   of 2012, and so I could not apply into any law school

10:16 14   programs, since they usually start in the fall.  And so

10:17 15   I -- that spring semester I got a job at the Starr

10:17 16   County DA's office in January of 2013.

10:17 17       Q.  And then after law school, when did you return

10:17 18   to the office?

10:17 19       A.  Well, I believe during law school I went and I

10:17 20   clerked there during law school after my first year.

10:17 21       Q.  Uh-huh.

10:17 22       A.  If I'm not mistaken.  And then I went back --

10:17 23   transferred, went back after I sat for the 2016 Bar

10:17 24   exam.

10:17 25       Q.  And you went back as an assistant district

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

10:17 1    attorney at that time?

10:17 2         A.  I went back not as an assistant DA.  It was

10:17 3    still as a law clerk with a supervision license at the

10:18 4    time because I was pending my Bar results.

10:18 5         Q.  Okay.  Thank you.  Who is your supervisor in

10:18 6    the office now?

10:18 7         A.  That would be my boss Mr. Gocha Allen Ramirez,

10:18 8    the current DA.

10:18 9         Q.  Okay.  And it's a -- it's a fairly small

10:18 10   office, isn't it?  How -- how many lawyers do -- do you

10:18 11   have there?

10:18 12        A.  So at the Rio Grande City office?

10:18 13        Q.  Yes.

10:18 14        A.  We have Mr. Ramirez, Alfredo Garcia, Judith

10:18 15   Solis, Abel Villarreal, and myself.

10:18 16        Q.  Okay.

10:18 17        A.  So five.

10:18 18        Q.  So is Mr. Ramirez directly involved in

10:18 19   supervising your work?

10:18 20        A.  No.

10:18 21        Q.  Do you check in with him regularly?

10:18 22        A.  I check in sometimes if it's regarding staff,

10:18 23   sometimes regarding cases, but I wouldn't say

10:18 24   regularly.

10:19 25        Q.  Okay.  What types of cases would you check with

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

10:19 1    him on before taking a major step, for example?

10:19 2        MS. ALBIN:  Objection, vague.

10:19 3        A.  I don't know if it's before taking a major

10:19 4    step.  I've -- just inform him of cases that he might

10:19 5    need to be aware of.

10:19 6        Q.  Okay.  And -- and what types of cases might he

10:19 7    need to be aware of?

10:19 8        A.  For example, yesterday or the day before

10:19 9    yesterday, the former city secretary of Rio Grande City

10:19 10   was arrested, so the department that was in charge of

10:19 11   that case had come to me to review an arrest warrant.

10:19 12        And I just let him know that there was

10:19 13   probably going to be an arrest and he should probably

10:19 14   be prepared for any statements he may need to give.

10:19 15        Q.  Okay.

10:19 16        A.  Just so that he's aware.  As a first assistant

10:19 17   DA, I feel that it's one of my duties to let him know

10:19 18   so that he's aware if anybody reaches out.

10:20 19        Q.  Does he -- do you make him aware of all major

10:20 20   felony cases that the office is handling?

10:20 21        A.  Not all major felony cases.

10:20 22        Q.  Homicides?

10:20 23        A.  I would -- I would.

10:20 24        Q.  And is -- is that -- do you have a good working

10:20 25   relationship with Mr. Ramirez?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

11

10:20 1   A.  I do.

10:20 2   Q.  And has all this supervisory involvement been

10:20 3 the same since early 2022?

10:20 4      MS. ALBIN:  Objection, vague.

10:20 5   A.  What do you -- what do you mean?

10:20 6   Q.  You described checking in with him about

10:20 7 certain cases, letting him know about certain things

10:20 8 but not all things.  Correct me if I'm wrong.  And has

10:20 9 that been true since early 2022 when the incident

10:20 10 involved in this case occurred?

10:20 11   A.  Yes, and before that when he started as DA.

10:21 12   Q.  Do you -- tell me the scope of your

10:21 13 responsibilities as first assistant DA.

10:21 14   A.  So I am tasked with overseeing what we have as

10:21 15 the crime victims unit.  And that entails a

10:21 16 coordinator -- a crime victims coordinator and four

10:21 17 advocates -- four to five advocates, crime victim

10:21 18 advocates.  So I am tasked with overseeing that

10:21 19 division.

10:21 20    I am also tasked with any grant writing

10:21 21 that has to do with that division as well as the border

10:21 22 prosecution grant.  I am also tasked with that --

10:21 23 overseeing that grant along with ADA Abel Villarreal.

10:21 24    I'm also tasked with assisting our other

10:22 25 assistant district attorneys with any questions they

Electronically signed by Donna McCown (101-253-986-8079)        ea909b08-9585-4819-a64a-b40fd23a510b

10:22  1    might have, any assistance they might have and

10:22  2    overseeing, you know, staff, trying to take care of

10:22  3    staff issues if it doesn't need to get to Mr. Ramirez

10:22  4    and he doesn't need to be bothered with that.

10:22  5              And then all of the other basic duties as

10:22  6    a prosecutor, which is handling cases at grand jury,

10:22  7    criminal dockets, meeting with victims, coordinating

10:22  8    meetings with witnesses for trial prep, assisting law

10:22  9    enforcement, trials, pretrial hearings, handling civil

10:23 10    forfeiture cases, and appeals.

10:23 11       Q.  Thank you.  Who -- who are your direct reports?

10:23 12    Who reports to you directly?

10:23 13       A.  Well, the crime victims coordinator directs to

10:23 14    me directly -- or reports to me directly.

10:23 15       Q.  Anybody else?

10:23 16       A.  Directly, no.  Just -- that would just be the

10:23 17    only one.

10:23 18       Q.  Do you have any supervisory responsibilities

10:23 19    over the DA office investigative staff?

10:23 20       A.  In -- supervisory responsibilities as in what?

10:23 21       Q.  Are you their supervisor?  Do they go to you

10:23 22    for advice?  Do you check their work occasionally or

10:23 23    look at their files or consult with them?

10:23 24              MS. ALBIN:  Objection, vague.

10:23 25       A.  And this is DA investigators?

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

11:40  1    way you are to the people you supervise?

11:40  2        A.  Yes.  He has an open-door policy.

11:40  3        Q.  Okay.  And do you talk regularly with

11:40  4    Mr. Villarreal about cases?

11:40  5        A.  Not really.

11:40  6        Q.  Okay.  Do you ever talk with him to discuss the

11:40  7    progress of the cases that you're each assigned?

11:40  8        A.  No.

11:40  9        Q.  Do you ever talk with him about specific cases

11:40 10    that you're working on together?

11:40 11        A.  I mean, if we're working on it together at the

11:41 12    time, yes.

11:41 13        Q.  And if you're working on a case with someone,

11:41 14    let's say you're first chair and they're second chair

11:41 15    for a trial, that's an example, how would you update

11:41 16    each other on the case progress?  Is it mostly

11:41 17    conversations?  Is it e-mails?  Is it text messages?

11:41 18        A.  It's mostly in-person conversation when we're

11:41 19    prepping for the trial.  We're usually together in --

11:41 20    in an office.

11:41 21        Q.  Okay.  And how do attorneys generally

11:41 22    collaborate in your office?  Would that be the same

11:41 23    answer, or are there other ways you communicate to

11:41 24    collaborate on matters?

11:41 25                MS. ALBIN:  Objection, vague.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

11:41  1          A.  I mean, we just hop onto somebody's office and

11:41  2     talk.

11:41  3          Q.  Do all the attorneys work in person in the

11:41  4     office?

11:41  5          A.  In person?

11:42  6          Q.  As opposed to remotely working from home.

11:42  7          A.  Yes, everybody is in person.

11:42  8          Q.  Every day?

11:42  9          A.  Pretty much every day, yeah.

11:42 10          Q.  And who would -- who would an ADA go to if they

11:42 11     had a question or issue with their case?

11:42 12               MS. ALBIN:  Objection, vague.

11:42 13          A.  They would either, I'm assuming, go to ADA Abel

11:42 14     Villarreal or myself if they had a question.

11:42 15          Q.  Okay.  What if there's a conflict between two

11:42 16     attorneys on how to proceed in a case?  Who would

11:42 17     resolve that conflict?

11:42 18               MS. ALBIN:  Objection, vague.

11:42 19          A.  I mean, at that point, we would either staff it

11:42 20     with Mr. Ramirez and I guess make a collective

11:42 21     decision, but that's never really happened.

11:42 22          Q.  Okay.  You've never had an instance where

11:42 23     there's been a strategy disagreement or whether to

11:43 24     charge or not charge something?

11:43 25          A.  Where there's been three of us and there's a

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

11:43 1    dispute, Abel and I -- ADA Villarreal and I are

11:43 2    assisting somebody?

11:43 3        Q.  Uh-huh.

11:43 4        A.  There might have been.

11:43 5        Q.  But if two of the other ADAs disagree about a

11:43 6    strategy issue, let's say, they would go to you or

11:43 7    Mr. Villarreal?

11:43 8        A.  Yes.

11:43 9        Q.  How are charging decisions made in your office?

11:43 10            MS. ALBIN:  Objection, vague.

11:43 11       A.  I mean, it's up to the prosecutor that has the

11:43 12   case at the time.

11:43 13       Q.  And who makes the final call on what charges to

11:43 14   bring against someone?

11:43 15       A.  The prosecutor handling the case.

11:43 16       Q.  Are there any instances where you as a

11:44 17   supervisor --

11:44 18       A.  Well, let me --

11:44 19       Q.  Okay.

11:44 20       A.  Let me clarify on that.

11:44 21       Q.  Okay.

11:44 22       A.  It depends, the final charge, because if it's

11:44 23   presented to a grand jury, then the grand jury makes

11:44 24   final decision on what to charge.

11:44 25       Q.  And who makes, in your office, the final

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

51

| | | |
|---|---|---|
| 11:44 | 1 | decision on what to present to the grand jury, what |
| 11:44 | 2 | types of charging options? |
| 11:44 | 3 | A.  Typically, the prosecutor handling the case |
| 11:44 | 4 | will present the grand jury with the charging options. |
| 11:44 | 5 | Q.  And does Mr. Ramirez ever get involved in |
| 11:44 | 6 | deciding on charging options if it's a grand jury case? |
| 11:44 | 7 | A.  Like that he himself gets involved? |
| 11:44 | 8 | Q.  Yes. |
| 11:44 | 9 | A.  Or that we get him involved? |
| 11:44 | 10 | Q.  Either way. |
| 11:44 | 11 | A.  He's never gotten involved and told me what to |
| 11:44 | 12 | do in any of my cases as far as like it being a |
| 11:45 | 13 | directive, but I have gone to him for advice. |
| 11:45 | 14 | Q.  Do other -- do the other lawyers in the office |
| 11:45 | 15 | do the same sometimes, ask him for advice on charging? |
| 11:45 | 16 | A.  I'm -- |
| 11:45 | 17 | MS. ALBIN:  Objection, calls for |
| 11:45 | 18 | speculation. |
| 11:45 | 19 | A.  I'm not sure what they do. |
| 11:45 | 20 | Q.  And when Mr. Ramirez is away or out of the |
| 11:45 | 21 | office, does he stay in touch with the office?  Is he |
| 11:45 | 22 | reachable? |
| 11:45 | 23 | MS. ALBIN:  Objection, vague. |
| 11:45 | 24 | A.  I mean, if he's on vacation, I -- usually he |
| 11:45 | 25 | is, but... |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

11:45  1      Q.  What if he's just out of town on work business,

11:45  2   not physically in the office, are you able to reach

11:45  3   him?

11:45  4              MS. ALBIN:  Objection, vague.

11:45  5      A.  If I call him and he answers.  If he's busy,

11:45  6   then he'll get back to me later.

11:46  7      Q.  Okay.  And if he's unavailable, who's

11:46  8   responsible for final decision-making in the office if

11:46  9   anything needs decision-making?

11:46  10     A.  That would either be ADA Abel Villarreal or

11:46  11  myself.

11:46  12     Q.  In terms of your own practice, how many felony

11:46  13  cases do you typically work on at a -- at one time?

11:46  14     A.  I wouldn't have a number, but typical practice,

11:46  15  I mean, can't -- I can't choose how many I -- I work

11:46  16  on.  It's just basically the caseload that I'm given

11:46  17  based on how indictments are coming down.

11:46  18              And they're assigned the courts.  I'm

11:46  19  mostly in the 381st District Court, but I do sometimes

11:46  20  have cases that are prosecuted in the 229th Judicial

11:47  21  District Court.

11:47  22     Q.  So would a typical caseload, you know, today be

11:47  23  a dozen cases, 20 cases, 50 cases for you?  Just a

11:47  24  ballpark.  Felonies I'm asking about.

11:47  25     A.  Um-hum.  I would say 50 at least.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

11:47  1          Q.   Okay.  And how do the cases get assigned to
11:47  2    different prosecutors?
11:47  3                MS. ALBIN:  Hold on.  I'm going to object
11:47  4    to this as being irrelevant to the question of
11:47  5    immunity, which is -- so far today, I don't think
11:47  6    you've asked a single question about the actual
11:47  7    incident.  And in the phase one discovery, that's what
11:47  8    the court has limited us to is --
11:47  9                MS. JOHNSON:  I'm going to ask if we can
11:47 10    go off the record and have this conversation, because
11:47 11    this is a speaking objection.  If we can just go off
11:47 12    the record with regard to that.
11:48 13                (Brief recess)
11:58 14          Q.   How are cases assigned in your office?
11:58 15          A.   When?
11:58 16          Q.   When any case comes into the office, how is it
11:59 17    decided which prosecutor will be in charge of that
11:59 18    case?
11:59 19          A.   Well, it depends what stage of -- what stage of
11:59 20    the case you're asking about.
11:59 21          Q.   Let's say -- let's talk specifically about
11:59 22    cases that have been -- that are being investigated by
11:59 23    a law enforcement agency and they contact the district
11:59 24    attorney's office.  How is it decided who's responsible
11:59 25    for each of those matters?

Electronically signed by Donna McCown (101-253-986-8079)                          ea909b08-9585-4819-a64a-b40fd23a510b

54

11:59  1        A.  Well, the case gets turned in by the law

11:59  2    enforcement agency.  It then gets submitted to our

11:59  3    intake department.  Our intake department usually will

11:59  4    give out cases to the prosecutors depending on how many

11:59  5    they can present and what type of cases they're able to

12:00  6    prepare for the grand jury, or the prosecutor can get

12:00  7    the case themselves.

12:00  8        Q.  And how would a prosecutor get the case

12:00  9    themselves?

12:00 10        A.  Defense attorney calls regarding the case.

12:00 11    They might want to try to work something out at the

12:00 12    pre-indictment stage of the case; if there's already

12:00 13    been contact with the law enforcement agency regarding

12:00 14    that case; if there's been contact with the victims in

12:00 15    a certain case.  Those are some examples.

12:00 16        Q.  Okay.  You talked about an intake department.

12:00 17    Who -- what are the job titles in the intake department

12:00 18    in your office?

12:00 19        A.  I don't know if they have a title, but they're

12:00 20    considered legal assistants.

12:00 21        Q.  Okay.  And do they -- just very briefly, what

12:00 22    do they do?  What's the scope of their work?

12:01 23        A.  To receive the prosecution packets, scan them

12:01 24    into our Judicial Dialog case management system, assign

12:01 25    it a DA case number, scan the documents in the file.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:01  1      Q.  Do they let somebody know that a new case has

12:01  2  come in?  Do they let any lawyers know about that?

12:01  3      A.  Occasionally they will, if the lawyer has asked

12:01  4  for a certain case or if the case is going to be turned

12:01  5  in.

12:01  6      Q.  Okay.  And do you have any kind of specialized

12:01  7  docket, certain type of cases that you usually do?

12:01  8      A.  Usually, for some reason I was the chosen one

12:01  9  to handle child sex cases.

12:01 10      Q.  Okay.  And I know that you're on the -- you

12:01 11  oversee the crime victims unit; is that right?  Is that

12:01 12  something you asked to do, or were you chosen for that?

12:02 13      A.  I was chosen for that.

12:02 14      Q.  Are there other DAs in the office who have

12:02 15  specialty areas?

12:02 16      A.  Abel.  Abel usually handles most of, like, the

12:02 17  HIDTA task force cases or investigations, so he'll

12:02 18  handle most of those.

12:02 19      Q.  Okay.  You spoke before about certain cases

12:02 20  that get worked out before they go much further and

12:02 21  other cases that don't go all the way through a full

12:02 22  prosecution.

12:02 23          What other criteria for deciding which

12:02 24  cases get prosecuted and which -- which don't by your

12:02 25  office?

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

12:02  1      A.  Well, the prosecutor reviews the file, and if

12:03  2  it meets the elements of a crime, then it gets

12:03  3  presented to a grand jury.

12:03  4      Q.  Okay.  Thank you.  Are you allowed to take on

12:03  5  private clients while serving as a district attorney?

12:03  6      A.  We are.

12:03  7      Q.  Okay.  And is there a conflicts policy in the

12:03  8  office?

12:03  9      A.  Usually you're supposed to try and -- and stay

12:03  10  clear from any conflicts, and your prosecutorial duties

12:03  11  are supposed to come before any private case -- or

12:03  12  before you take on any private cases, so -- but there's

12:03  13  no set, I guess, policy or procedure, if that's what

12:03  14  you're asking as to how to weed through conflicts.

12:04  15      Q.  Yes.  Is there any regular practice for

12:04  16  checking conflicts for people's private clients?

12:04  17           MS. ALBIN:  Objection, irrelevant.

12:04  18      A.  No, not that I know of.

12:04  19      Q.  Do the individual ADAs need the DA's permission

12:04  20  before accepting outside employment or taking private

12:04  21  clients?

12:04  22      A.  No.

12:04  23           MS. ALBIN:  Objection, irrelevant.

12:04  24      A.  No.

12:04  25      Q.  And I think you testified you do not have

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:04 1    private clients except for the occasional appointment;
12:04 2    is that right?
12:04 3        A.  I do sometimes get retained for some divorce
12:04 4    proceedings if they're not too -- if there isn't too
12:04 5    many things to litigate, because I am very busy with my
12:04 6    duties as a prosecutor.  So I will take on the
12:04 7    occasional divorce proceeding, ad litem cases I'm
12:04 8    assigned.
12:04 9        Q.  Are you aware that Abel Villarreal has a
12:05 10   private practice --
12:05 11       A.  Yes.
12:05 12       Q.  -- in addition?
12:05 13       A.  Yes, I am.
12:05 14       Q.  And also Judy Solis?
12:05 15       A.  I am.
12:05 16            MS. ALBIN:  Objection, irrelevant.
12:05 17       Q.  Okay.  Are you aware that your colleague Judy
12:05 18   Solis represented Ms. Gonzalez's ex-husband, Ismael
12:05 19   Herrera, in their divorce proceeding?
12:05 20       A.  I was made aware after the case was dismissed.
12:05 21       Q.  After which case was dismissed?
12:05 22       A.  Lizelle Herrera's case was dismissed.
12:05 23       Q.  The criminal prosecution?
12:05 24       A.  Yes, ma'am.
12:05 25       Q.  Okay.  Did you know or do you know now that

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

| | | |
|---|---|---|
| 12:05 | 1 | that divorce case was filed the same day as the charges |
| 12:05 | 2 | against Ms. Gonzalez? |
| 12:05 | 3 | A.  I did not know that then.  I do know that now. |
| 12:05 | 4 | Q.  When did you find that out? |
| 12:05 | 5 | A.  I believe it was after the dismissal and there |
| 12:06 | 6 | was public information requests regarding that. |
| 12:06 | 7 | Q.  Regarding the divorce case? |
| 12:06 | 8 | A.  Yes. |
| 12:06 | 9 | Q.  And did those public information requests come |
| 12:06 | 10 | to you? |
| 12:06 | 11 | A.  I believe they went -- no.  You know what?  I |
| 12:06 | 12 | believe I became aware of that issue once the whole |
| 12:06 | 13 | State Bar grievance started. |
| 12:06 | 14 | Q.  Okay.  Concerning the prosecution of -- |
| 12:06 | 15 | A.  Yes. |
| 12:06 | 16 | Q.  -- Ms. Gonzalez? |
| 12:06 | 17 | A.  Yes, yes. |
| 12:06 | 18 | Q.  Okay.  Do you know who made you aware of it? |
| 12:06 | 19 | A.  The committee. |
| 12:06 | 20 | Q.  How does the Starr County District Attorney |
| 12:07 | 21 | Office handle decisions about bond? |
| 12:07 | 22 | MS. ALBIN:  Objection, relevance. |
| 12:07 | 23 | Q.  Who -- who makes decisions about what bond to |
| 12:07 | 24 | request? |
| 12:07 | 25 | MS. ALBIN:  Same objection. |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

12:07 1    A.  Like at the initial stage of the case?

12:07 2    Q.  Yes.

12:07 3    A.  I mean, we don't typically request bonds at the

12:07 4  initial stage.  It's very rare.

12:07 5    Q.  Okay.  Does your office ever request bond?

12:07 6    A.  I know of one case where they requested a

12:07 7  no-bond one time several years ago.  But typically that

12:07 8  we request bonds at the very initial arrest stage?

12:07 9  It's not typical.

12:07 10    Q.  Okay.  How -- who -- who sets the bond if your

12:07 11  office does not make a request --

12:07 12              MS. ALBIN:  Objection --

12:07 13    Q.  -- after someone is arrested?

12:07 14              MS. ALBIN:  Sorry.  Objection, relevance.

12:07 15    A.  Whoever magistrates that individual at the

12:07 16  Starr County Jail.

12:07 17    Q.  And when you say "magistrate," what do you mean

12:08 18  by that?  Who?  The judges?

12:08 19    A.  Right.  A justice -- the magistrate, uh-huh.

12:08 20  Yes, ma'am.

12:08 21    Q.  Okay.  And when your office does make a request

12:08 22  for bond, let's say on a very serious felony, what

12:08 23  factors does your office consider?

12:08 24              MS. ALBIN:  Objection, vague.

12:08 25    A.  Well, I don't know what factors other

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:08  1    prosecutors have considered.  If I were to ask for a

12:08  2    bond, I would consider, like, the violent past history

12:08  3    of the offender or the violent -- the violence in

12:08  4    the -- in the crime, if there's any victims that can be

12:08  5    harmed.  That's what I would consider as a prosecutor.

12:09  6        Q.  You've prosecuted quite a few murder cases; is

12:09  7    that right?

12:09  8        A.  I have.

12:09  9        Q.  And how many of those went to trial?  Do you

12:09 10    remember?

12:09 11        A.  Are you talking about the list of cases I

12:09 12    disclosed?

12:09 13        Q.  Yes.

12:09 14        A.  I -- I don't remember how many of those went to

12:09 15    trial.  I know not all of them went to trial.  Off the

12:09 16    top of my head, I know not all of them, because I know

12:09 17    one passed away.

12:09 18        Q.  Okay.  And what was your role in those cases?

12:09 19    I can show you the list if you need it.  Just let me

12:09 20    know.

12:09 21        A.  If -- if you want my role in each case, I would

12:09 22    need the list.

12:09 23        Q.  Okay.  I mean, in general, were you -- was it

12:09 24    your case?  Were you first -- first chair or whatever

12:09 25    terminology you used?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:09 1      A.   No.   I just disclosed all -- all the cases that

12:09 2   I -- that I have worked on, whether it had been the

12:10 3   pre-indictment stage, the indicted stage, at a pretrial

12:10 4   hearing, at trial, on appeal.  But I can't say off the

12:10 5   top of my head without seeing the list -- I can't

12:10 6   recall if I worked a case from indictment to

12:10 7   postconviction on that list.

12:10 8      Q.   Okay.  I'd like to mark that list of cases as

12:10 9   Plaintiff's 14.  And I'm showing you that list that

12:10 10  your lawyers produced to us.  Of the 11 homicide cases

12:10 11  listed at the top, these are all cases you worked on?

12:10 12     A.   At some point or another, yes.

12:10 13     Q.   Okay.  And can you tell me in how many of these

12:10 14  you made the presentation to the grand jury?

12:11 15     A.   I made the presentation to the grand jury on

12:11 16  the State of Texas versus Phillip Henry Selvera, Jr.,

12:11 17  No. 4; No. 5, The State of Texas versus Sebastian

12:11 18  Torres; No. 6, The State of Texas versus Jose Luis

12:11 19  Garcia, Jr., and they were all co-defendants.

12:11 20     Q.   Okay.

12:11 21     A.   And those are the ones I remember presenting to

12:11 22  the grand jury.

12:11 23     Q.   Okay.

12:12 24     A.   There could have been another one or -- but

12:12 25  those are the ones I -- I remember.

12:12  1        Q.  In addition to the presentation in the case of

12:12  2    Lizelle Gonzalez; is that correct?

12:12  3        A.  Yes, but hers is not on this list.

12:12  4        Q.  Right.  Okay.  Are there any others that are

12:12  5    not on the list?

12:12  6        A.  Homicide cases?

12:12  7        Q.  Yes.

12:12  8        A.  They should have all been included in this

12:12  9    list, the homicide cases I've handled.

12:12  10       Q.  Thank you.  Does the Starr County DA office

12:12  11   have -- do -- conduct training for the ADAs?

12:12  12       A.  The office itself, no.

12:12  13       Q.  Okay.  Are there any guidelines regarding

12:12  14   homicide investigations in your office?

12:12  15       A.  Guidelines as part of the office, no.

12:12  16       Q.  Okay.  Any procedures, checklists, anything

12:13  17   like that specifically about homicide?

12:13  18       A.  No.

12:13  19       Q.  Okay.  Do you have access to the TDCAA charging

12:13  20   manual?

12:13  21       A.  Yes, I do.

12:13  22       Q.  And could you describe what that is?

12:13  23       A.  It's the language that we refer to when we

12:13  24   draft our indictments.

12:13  25       Q.  Okay.  Is there -- there guidance about

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:13  1    language to use for different charges --
12:13  2         A.  Yes, ma'am.
12:13  3         Q.  -- in that manual?  Okay.
12:13  4              And do you generally follow the guidance
12:13  5    in the manual?
12:13  6         A.  Generally, yes.
12:13  7         Q.  Okay.  Does it include guidance about language
12:13  8    for homicide charges?
12:13  9         A.  Yes.
12:13 10         Q.  Does it have anything in it about the law known
12:13 11    as SB 8?
12:13 12         A.  The charging manual?
12:14 13         Q.  Yeah.
12:14 14         A.  I -- I don't know.
12:14 15         Q.  Okay.  The -- without going into your entire
12:14 16    CLE history, what are the ways in which you stay
12:14 17    current on changes in the law?
12:14 18         A.  Well, there's, like, legislative updates from
12:14 19    TDCAA.  We sometimes -- it's every Friday that we get,
12:14 20    like, TDCAA summaries from cases or opinions that have
12:14 21    been handed down, and attend conferences.  But, I mean,
12:14 22    they don't update you on the law, per se, except for
12:15 23    maybe the legislative updates with TDCAA.
12:15 24         Q.  Are you expected to stay current with the --
12:15 25    the case law, the appellate case law in Texas

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:15  1    concerning criminal matters?

12:15  2        A.  I would say so.

12:15  3        Q.  Okay.  Have you attended any trainings about

12:15  4    prosecuting crimes involving medical incidents?

12:15  5        A.  No.

12:15  6        Q.  Have you attended any trainings about crimes

12:15  7    related to pregnancy?

12:15  8        A.  I mean, like crimes against women?

12:15  9        Q.  Uh-huh.

12:15  10       A.  Violent crime against women, like domestic

12:15  11   violence?  One time I attended the Crimes Against

12:15  12   Women, but I'm not -- I can't say off the top of my

12:15  13   head we discussed violence against pregnant women.  We

12:15  14   might have.

12:15  15       Q.  Okay.  Any trainings that you've been to

12:16  16   specifically concerning abortion?

12:16  17       A.  No.

12:16  18       Q.  Okay.  And do you -- you attend continuing

12:16  19   legal education training; is that right?

12:16  20       A.  Yes, ma'am.

12:16  21       Q.  Do you ever conduct those types of trainings

12:16  22   yourself?

12:16  23       A.  CLEs?

12:16  24       Q.  Yeah.

12:16  25       A.  No.  I'm not -- I'm not qualified to conduct

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:16  1    trainings for people to get CLE credit.

12:16  2        Q.  And do you do any informal trainings for your

12:16  3    own staff on matters of law?

12:16  4        A.  Like the DA staff?

12:16  5        Q.  Yeah.

12:16  6        A.  No.

12:16  7        Q.  Okay.  As an assistant district attorney, a law

12:16  8    enforcement officer, are you required to participate in

12:16  9    any other types of training other than legal training?

12:16 10            MS. ALBIN:  Objection.  I don't think she

12:16 11    testified she's a law enforcement officer.

12:16 12            MS. ROSENBLOOM:  Oh, sorry.  It was in the

12:16 13    job description.

12:16 14        Q.  But as an assistant district attorney, are you

12:17 15    required to participate in any other trainings?

12:17 16        A.  Like, for example, what type of trainings?

12:17 17        Q.  Anything.  Anything concerning how law

12:17 18    enforcement works or forensic evidence, anything like

12:17 19    that.

12:17 20            MS. ALBIN:  Objection, vague.

12:17 21        A.  Is it required?

12:17 22        Q.  Yes.

12:17 23        A.  Is that your question?  It's not required.

12:17 24        Q.  Okay.  Do you sometimes access trainings on

12:17 25    matters like that, like the role of law enforcement and

12:17 1    tools they use?

12:17 2         A.   No.   I mean, lately, I tried to access on my

12:17 3    own on TDCAA like mental health stuff to try to help

12:17 4    people with mental health issues, defendants that are

12:17 5    at the Starr County Jail, because we don't have a

12:17 6    mental health program.   So I on my own time will listen

12:17 7    to the mental health training that TDCAA uploaded.

12:17 8         Q.   Are you familiar with the Texas Disciplinary

12:18 9    Rules of Professional Conduct?

12:18 10        A.   Generally, yes.

12:18 11        Q.   And as a lawyer in Texas, are you expected to

12:18 12   follow those rules?

12:18 13        A.   Yes, ma'am.

12:18 14        Q.   As a prosecutor, you're expected to know the

12:18 15   elements of the offenses you're prosecuting; is that

12:18 16   right?

12:18 17        A.   That's an expectation, yes.

12:18 18        Q.   And if you're -- if you're -- don't have it in

12:18 19   your head, would you normally look it up?

12:18 20        A.   Yes.

12:18 21        Q.   Okay.   You have access to the Penal Code as a

12:18 22   district attorney?

12:18 23        A.   Yes.

12:18 24        Q.   How does the office decide which cases to

12:18 25   present to the grand jury?

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

12:18  1              MS. ALBIN:  Objection, relevance.

12:18  2        A.   The prosecutor will review the case, evaluate

12:19  3   it based on the evidence that's submitted, the law, and

12:19  4   it's either presented or rejected.

12:19  5        Q.   When you say it's either presented or rejected,

12:19  6   who -- who would be doing the rejecting?

12:19  7        A.   The prosecutor.

12:19  8        Q.   Okay.  Is -- are there any priorities in terms

12:19  9   of present -- when to present to the grand jury, like

12:19  10  people who've been sitting in custody for a while, for

12:19  11  example?

12:19  12       A.   Usually, we try to weed out -- well, we try to

12:19  13  pull -- or the intake department tries to pull out the

12:19  14  cases where individuals have been sitting in jail for

12:19  15  90 days or almost 90 days, but sometimes those

12:20  16  prosecution packets haven't been turned in.

12:20  17            So then it would be to follow up with the

12:20  18  ones that have been turned in, the prosecution packets

12:20  19  that have been turned in.

12:20  20       Q.   Okay.  And is it the ADAs who decide ultimately

12:20  21  when to present something to a grand jury?

12:20  22       A.   Yes.

12:20  23       Q.   How does the office decide which ADA is

12:20  24  responsible for each grand jury session?

12:20  25            MS. ALBIN:  Objection, vague.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755      McAllen (956) 618-2366**

12:20  1        A.  We're all responsible at every grand jury
12:20  2    session.
12:20  3        Q.  Okay.  So you don't trade off or have a
12:20  4    calendar, anything like that?
12:20  5        A.  No, ma'am.
12:20  6        Q.  We -- when you presented to the grand jury
12:20  7    about Lizelle Gonzalez, that was March 25th, 2022, did
12:21  8    you discuss with other members of your office which
12:21  9    cases should be presented that day?
12:21  10       A.  What other -- what other cases should be
12:21  11   presented?
12:21  12       Q.  That one and others.  Did you have any
12:21  13   discussions within the office about which cases you
12:21  14   would present that day?
12:21  15       A.  I only let Mr. Ramirez know that I was going to
12:21  16   be presenting Ms. Herrera's case to the grand jury.
12:21  17       Q.  Okay.  Was that the only one you presented that
12:21  18   day?
12:21  19       A.  No.
12:21  20       Q.  Have you ever decided not to sign a grand jury
12:21  21   subpoena that's requested by a law enforcement
12:21  22   official?
12:21  23            MS. ALBIN:  Objection, not relevant.
12:21  24       A.  I mean, sometimes there's been an occasion
12:22  25   where a law enforcement officer is trying to request

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:22  1    something that they can't get through a grand jury
12:22  2    subpoena.  It needs to be through another avenue such
12:22  3    as a warrant or something of that sort.
12:22  4                So that's an example of when I haven't
12:22  5    signed a subpoena, but I can't think of another --
12:22  6    another time off the top of my head.
12:22  7       Q.  Okay.  Are there some times when there's, you
12:22  8    know, just not enough facts to make a determination
12:22  9    about the case and you might decline to sign the
12:22 10    subpoena?
12:22 11       A.  That's never happened to me.
12:22 12       Q.  When -- I know you reviewed Mr. Villarreal's
12:22 13    deposition transcript.  He testified that the sheriff's
12:23 14    office requested a subpoena for medical records,
12:23 15    Plaintiff's Exhibit 2 -- which I can show you if you
12:23 16    want to see it -- but the DA didn't have enough --
12:23 17    nearly enough facts to make a determination about the
12:23 18    case, so it was declined.  Are you familiar with the
12:23 19    subpoena he was talking about there?
12:23 20       A.  For this case?
12:23 21       Q.  I'm showing you what's previously been marked
12:24 22    Plaintiff's Exhibit 2, and turn to a page -- third page
12:24 23    in the packet.  This was a subpoena for records from
12:24 24    the Starr County Memorial Hospital, a grand jury
12:24 25    subpoena, signed by Mr. Villarreal.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:24  1    A.  Right.

12:24  2    Q.  And filed January 12th, 2022.  Are you familiar

12:24  3  with this subpoena related to the case of Ms. Gonzalez?

12:24  4    A.  I'm familiar with the subpoena, or I've seen it

12:24  5  before.

12:24  6    Q.  Okay.  Do you know if Mr. Villarreal felt like

12:24  7  there were enough facts to warrant signing the

12:24  8  subpoena?

12:24  9         MS. ALBIN:  Objection, calls for

12:24  10  speculation.

12:24  11    A.  Well, I read his deposition, but I -- I don't

12:25  12  know any -- I think your question was that he didn't

12:25  13  sign the subpoena, but he did sign this subpoena.

12:25  14    Q.  Okay.  He did sign this one, and he said

12:25  15  that -- I believe he testified that the sheriff's

12:25  16  office requested a subpoena for medical records, and he

12:25  17  signed it, but the DA's office didn't have enough facts

12:25  18  to decide about whether to prosecute the case or not.

12:25  19    A.  Right.

12:25  20    Q.  Do you remember that?

12:25  21    A.  That's why he signed it, because they needed

12:25  22  more facts about what had happened.  And I don't want

12:25  23  to assume, but I'm guessing he thought by signing it

12:25  24  that the record would illustrate more evidence.

12:25  25    Q.  Okay.  And -- I think we're done with that one

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:26  1    for now.  Have you ever decided not to present a case

12:26  2    to a grand jury that might have otherwise been because

12:26  3    of a lack of evidence or something didn't meet the

12:26  4    elements of a crime?

12:26  5         A.  Yes.  There has been cases.

12:26  6         Q.  Okay.  And what were the reasons -- without

12:26  7    going into too much detail, what were the types of

12:26  8    reasons?  I mentioned a few, but I'd like to hear from

12:26  9    you.

12:26  10              MS. ALBIN:  Objection, vague.

12:26  11        A.  For example, it doesn't meet the threshold for

12:26  12   felony prosecution, statute of limitations has expired,

12:26  13   the complaining witness does not want to proceed.

12:26  14        Q.  Okay.  Are there ever cases -- have you had

12:26  15   cases that you did not present to a grand jury because

12:26  16   you didn't think it merited prosecution?

12:26  17              MS. ALBIN:  Objection, vague.

12:26  18        Q.  There was -- there was no crime, in other

12:26  19   words, that was provable?

12:26  20              MS. ALBIN:  Objection, vague.

12:26  21        A.  Like I mentioned, the only time I've dismissed

12:27  22   is when it doesn't meet the threshold for a felony

12:27  23   prosecution.

12:27  24        Q.  Okay.  Now, when you present a case to the

12:27  25   grand jury, do you present them with an option -- with

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:27  1    options of different charges they might use, they might

12:27  2    consider?

12:27  3        A.  Yes, I've done that.

12:27  4        Q.  Okay.  You mentioned that you had told

12:27  5    Mr. Ramirez that you were going to present the case

12:27  6    against Lizelle Gonzalez, is that right, before --

12:27  7    before doing so?

12:27  8        A.  I believe I did tell him that I was going to

12:27  9    present it at that grand jury con -- conveyance, yes.

12:27 10        Q.  Did he tell you not to?

12:27 11        A.  No.

12:27 12        Q.  Did he know what the case was about?

12:28 13            MS. ALBIN:  Objection, calls for

12:28 14    speculation.

12:28 15        A.  I let him know briefly the facts and that the

12:28 16    case had been submitted and that the sheriff's office

12:28 17    was asking whether they proceed with an arrest warrant

12:28 18    or just turn it in as an investigation for grand jury

12:28 19    consideration.

12:28 20        Q.  And in the case of -- against Ms. Gonzalez,

12:28 21    that was one that you submitted for grand jury

12:28 22    consideration; is that right?

12:28 23        A.  Mr. Ramirez let me know just to submit it to

12:28 24    the grand jury, let the grand jury decide.

12:28 25        Q.  If you've presented a case to the grand jury,

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

12:28  1    if there's an indictment, do you continue to work on

12:28  2    that case normally?

12:28  3         A.   Sometimes I do.   Sometimes I don't.   It just

12:29  4    depends.

12:29  5         Q.   What types of things would it depend on?

12:29  6         A.   So like if it's a child sex case, sometimes I

12:29  7    will follow the case.   I'm trying not to do that now.

12:29  8    But that would really be the only time that I would

12:29  9    present the case and keep the prosecution of it, or if

12:29 10    the case were assigned to the 381st District Court.

12:29 11              Usually the prosecutor that presents it,

12:29 12    if you're already assigned to that court, just makes

12:29 13    more sense for that prosecutor to handle it since

12:29 14    they're already aware of, like, the initial facts of

12:29 15    the case.

12:29 16         Q.   Okay.   After the indictment was issued against

12:30 17    Ms. Gonzalez, did you ask to stay on that case?

12:30 18         A.   No.

12:30 19         Q.   Was it assigned to you?

12:30 20         A.   It didn't even get to that point.

12:30 21         Q.   Okay.   Earlier, you said when you told

12:30 22    Mr. Ramirez you were going to present her case to the

12:30 23    grand jury, he said just present it to the grand jury.

12:30 24    Why did he say that rather than have her arrested?

12:30 25              MS. ALBIN:   Objection, calls for

74

| | | |
|---|---|---|
| 12:30 | 1 | speculation of what Mr. Ramirez was thinking. |
| 12:30 | 2 | A. I'm not sure why he said to proceed with the |
| 12:30 | 3 | grand jury presentation instead of an arrest warrant. |
| 12:31 | 4 | MS. ROSENBLOOM: I think this is a good |
| 12:31 | 5 | time for a lunch break and looking at documents break. |
| 12:31 | 6 | So please go off the record. |
| 12:31 | 7 | (Lunch recess) |
| 14:25 | 8 | Q. Ms. Barrera, over the break, did you talk with |
| 14:25 | 9 | your attorney? |
| 14:25 | 10 | A. Yes. |
| 14:25 | 11 | Q. And during the previous short break we took, |
| 14:25 | 12 | did you also speak with your attorney? |
| 14:25 | 13 | A. I did. |
| 14:26 | 14 | Q. In your role at the DA's office, do you work |
| 14:26 | 15 | closely with the Starr County Sheriff's Office? |
| 14:26 | 16 | MS. ALBIN: Objection, vague. |
| 14:26 | 17 | A. In what sense? |
| 14:26 | 18 | Q. Would you say you coordinate and cooperate with |
| 14:26 | 19 | them? |
| 14:26 | 20 | A. Coordinate what exactly? |
| 14:26 | 21 | Q. Anything about investigating and prosecuting |
| 14:26 | 22 | crimes. |
| 14:26 | 23 | MS. ALBIN: Objection, vague. |
| 14:26 | 24 | A. Work together? |
| 14:26 | 25 | Q. Yes, work together. |

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:26  1     A.  Yes.  Yes, ma'am.

14:26  2     Q.  And I -- we noticed that on the district

14:26  3  attorney office Facebook page there are several

14:26  4  postings about thanking law enforcement agencies and

14:26  5  talking about collaborative efforts.  Is that -- do you

14:26  6  recall those?

14:26  7     A.  Collaborative efforts in the pursuit of

14:26  8  justice, yes.

14:26  9     Q.  Okay.  What is the jurisdiction of the Starr

14:27 10  County Sheriff's Office?

14:27 11     A.  It's my understanding that they have countywide

14:27 12  jurisdiction except for the cities that have their own

14:27 13  police departments.

14:27 14     Q.  And if a city has its own police department,

14:27 15  does the Starr County Sheriff's Office never get

14:27 16  involved?

14:27 17          MS. ALBIN:  Objection, calls for

14:27 18  speculation.

14:27 19     A.  I'm not sure.

14:27 20     Q.  Okay.  Does the DA's office have policies or

14:27 21  practices for working with the Starr County Sheriff's

14:27 22  Office or other law enforcement?

14:27 23          MS. ALBIN:  Objection, relevance.

14:27 24     A.  No policies and practices I'm aware of.

14:27 25     Q.  Does the sheriff's office -- I'm talking about

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

76

14:27  1    the Starr County Sheriff's Office now.

14:28  2        A.  Okay.

14:28  3        Q.  Do they need the district attorney's office for

14:28  4    subpoenas?

14:28  5             MS. ALBIN:  Objection, speculation.

14:28  6        A.  For grand jury subpoenas?

14:28  7        Q.  Any kind of subpoenas.

14:28  8             MS. ALBIN:  Same objection.

14:28  9        A.  I mean, they reach out to us for subpoenas,

14:28 10    yes.

14:28 11        Q.  Is it required that your office sign a

14:28 12    subpoena -- a grand jury subpoena?

14:28 13        A.  I don't know if it's required, but I don't -- I

14:28 14    don't know if there's another way under the criminal

14:28 15    code that they could access a grand jury subpoena.

14:28 16    There might be.  But the way I know of it is that they

14:28 17    request one from the district attorney's office.

14:28 18        Q.  Okay.  And what about the Starr County Sheriff

14:28 19    Office investigative subpoenas, can they issue their

14:28 20    own, or do they need your office's signature?

14:28 21        A.  I'm sorry.  Excuse me.  For what?

14:28 22        Q.  For an investigative subpoena, not a grand jury

14:28 23    subpoena, just any other subpoena.

14:28 24             MS. ALBIN:  Objection, speculation.

14:29 25        A.  Once a case is indicted or --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:29 1     Q.  During an investigation phase, before

14:29 2  indictment.

14:29 3          MS. ALBIN:  Objection, vague; calls for

14:29 4  speculation.

14:29 5     Q.  Does the sheriff's office ever issue subpoenas?

14:29 6     A.  No.  For investigations, it's a grand jury

14:29 7  subpoena.

14:29 8     Q.  Okay.  Does the Starr County Sheriff Office ask

14:29 9  the DA's office for help identifying what -- what Penal

14:29 10  Code sections could apply to a situation?

14:29 11     A.  Yes, they -- they -- they do.

14:29 12     Q.  And on your homicide cases, have you worked

14:29 13  with the Starr County Sheriff's Office before this

14:29 14  case?

14:29 15     A.  Yes, I have -- oh, before this case?

14:30 16     Q.  Let's take off the time parameter.  In other

14:30 17  cases -- in other homicide cases, have you worked with

14:30 18  the Starr County Sheriff's Office?

14:30 19     A.  Yes.

14:30 20     Q.  And when you work with them, does that involve

14:30 21  talking with people sometimes at the sheriff's office?

14:30 22     A.  Yes.

14:30 23     Q.  Does it involve giving them advice?

14:30 24          MS. ALBIN:  Objection, vague.

14:30 25     A.  Legal advice, yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:30  1      Q.   Investigative advice ever?

14:30  2           MS. ALBIN:   Objection, vague.

14:30  3      A.   Depends on the situation.

14:30  4      Q.   Okay.   The DA office Facebook page says your

14:30  5   office and the sheriff's office coordinate to

14:30  6   effectively investigate and charge crimes; is that

14:30  7   correct?

14:30  8      A.   Yes.

14:30  9           MS. ALBIN:   Objection, vague.

14:31 10      Q.   Mr. Villarreal said that law enforcement

14:31 11   agencies call your office constantly for legal advice.

14:31 12   Is that your experience as well?

14:31 13      A.   I get a few phone calls from law enforcement.

14:31 14      Q.   Every day?

14:31 15      A.   I can't say every day, but at least more than

14:31 16   three in a week.

14:31 17      Q.   Okay.   How many attorneys from your office

14:31 18   typically work on a murder case?

14:31 19      A.   Like on one, just one sole murder case?

14:31 20      Q.   Yes.

14:32 21      A.   How many attorneys would be assigned?

14:32 22      Q.   Yes, typically.

14:32 23      A.   Two to three.   At the very end of the case,

14:32 24   like when it goes to trial.

14:32 25      Q.   Okay.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

14:32 1      A.  I want to clarify that.

14:32 2      Q.  Uh-huh.  And before that, is it typically

14:32 3  one --

14:32 4      A.  One.

14:32 5      Q.  -- ADA?

14:32 6          Are you familiar with the term used by the

14:32 7  sheriff's office to staff with DAs?

14:32 8      A.  I've heard it.

14:32 9      Q.  What -- what is your understanding of what that

14:32 10  means?

14:32 11      A.  They'll talk to a prosecutor about their

14:32 12  investigation on a case.

14:32 13      Q.  And staffing on a case means -- means what?

14:32 14  Does it mean which lawyers are assigned to the case

14:32 15  from the DA's office?

14:32 16          MS. ALBIN:  Objection, speculation.

14:32 17      A.  Staffing the case?

14:32 18      Q.  Uh-huh.

14:32 19      A.  I mean, it just means talking to a prosecutor

14:33 20  at the DA's office.

14:33 21      Q.  Okay.  Have you prosecuted other cases related

14:33 22  to pregnancy?  Like earlier, you mentioned assaults on

14:33 23  women who --

14:33 24      A.  I had --

14:33 25      Q.  -- are pregnant.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

14:33 1    A.  I had a previous assault case where the victim

14:33 2   was a pregnant individual.

14:33 3    Q.  Uh-huh.  And in that case, if you recall, were

14:33 4   there charges against the pregnant woman herself?

14:33 5    A.  No.  Her husband beat her up.

14:33 6    Q.  And was the fetus, the baby, listed as a victim

14:33 7   in that case as well, as well as the woman?

14:33 8    A.  No.

14:33 9    Q.  What was the outcome of that case?

14:33 10    A.  I don't recall the outcome.  I just remember

14:33 11   handling a case like that.

14:34 12    Q.  Okay.  Have you prosecuted other cases where

14:34 13   the relevant incident occurred in a hospital?

14:34 14    A.  A relevant incident?

14:34 15    Q.  Where the incident at issue in the prosecution

14:34 16   occurred in the hospital, like a case where you

14:34 17   involved -- you needed medical records because

14:34 18   something happened in a hospital.

14:34 19    A.  When a victim is taken to the hospital and they

14:34 20   end up passing away at the hospital, yes, I request

14:34 21   medical records.

14:34 22    Q.  Okay.  So you have experience getting medical

14:34 23   records from hospitals?  Yes?

14:34 24    A.  In the past, yes.

14:34 25    Q.  Okay.  Do you ever have communications with the

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:34  1    Starr County Medical Center?

14:34  2        A.  The Starr County Medical Center?

14:35  3        Q.  Uh-huh.  Or Starr County, I'm sorry, Memorial

14:35  4    Hospital.

14:35  5        A.  No.

14:35  6        Q.  Is there any procedure or agreement between

14:35  7    your office and that hospital on what types of things

14:35  8    should be reported to law enforcement?

14:35  9        A.  No.

14:35  10       Q.  Do you know if the Starr County Medical

14:35  11   Center -- Starr County Hospital I'm just going to call

14:35  12   it, you know what I'm talking about.  Do you know if

14:35  13   they have any agreement with the Starr County Sheriff's

14:35  14   Office on what actions should be reported to law

14:35  15   enforcement?

14:35  16       A.  I wouldn't know if they have any agreement.

14:35  17       Q.  Okay.  Does the DA's office ever provide

14:35  18   guidance to that hospital or hospital employees on what

14:35  19   conduct to report as being possibly criminal?

14:35  20       A.  I have never provided guidance to anybody

14:35  21   regarding legal advice at the Starr County Memorial

14:35  22   Hospital.

14:35  23       Q.  Do you know if anybody else in your office has

14:36  24   done that?

14:36  25       A.  Not that I'm aware of.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

14:36  1    Q.  How does your office handle reports from that

14:36  2  hospital and other hospitals?

14:36  3            MS. ALBIN:  Objection, vague.

14:36  4    A.  I don't understand the question.  The reports

14:36  5  don't come to the DA's office.

14:36  6    Q.  So if you're contacted by law enforcement

14:36  7  because they received a report from a hospital about

14:36  8  possible criminal conduct, what does your office do

14:36  9  next?

14:36  10           MS. ALBIN:  Objection, vague.

14:36  11   A.  Well, I'm -- I don't know what the office would

14:36  12  do next.  I know what I would do next if they would

14:36  13  call me about possible criminal conduct at the -- that

14:36  14  somebody is trying to report.

14:36  15   Q.  And what would you do?

14:36  16   A.  I would tell them to just do what they

14:36  17  regularly do and investigate what's being reported.

14:36  18   Q.  Would you do legal research to assist the

14:37  19  hospital?

14:37  20           MS. ALBIN:  Objection, vague; calls for

14:37  21  speculation.

14:37  22   A.  I would not do legal research to assist the

14:37  23  hospital.  I don't assist the hospital.

14:37  24   Q.  Okay.  Have you ever -- in the course of this

14:37  25  job with the DA's office, have you ever had meetings at

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:37  1    Starr County Hospital?

14:37  2        A.  I recently do.  Last month -- I think it was

14:37  3    last month -- we had a meeting there with some SANE

14:37  4    forensic nurses that recently contracted with the

14:37  5    hospital.

14:37  6        Q.  Did they have anything to do with Lizelle

14:37  7    Gonzalez?

14:37  8        A.  No, ma'am.  It was the contract with sexual

14:37  9    assault nurse examiners that are going to start

14:37 10    examining Starr -- children in Starr County.

14:37 11        Q.  And what was your role in that meeting?

14:37 12        A.  To meet them, to meet the -- the new team of

14:37 13    SANE nurses that were going to be servicing children of

14:38 14    abuse in Starr County.

14:38 15        Q.  Okay.  When did you first hear about the

14:38 16    incident that happened with Lizelle Gonzalez?

14:38 17        A.  I first heard about it in -- I wouldn't be able

14:38 18    to tell you off the top of my head the exact day, but

14:38 19    it was around January of 2022.

14:38 20        Q.  Okay.  Were you at work on January 8th, 2022?

14:39 21        A.  I -- I don't know if I was at work that exact

14:39 22    date, January 8th, 2022.

14:39 23        Q.  If I told you that was the day that

14:39 24    Mr. Villarreal signed grand jury subpoenas for hospital

14:39 25    and doctor records regarding Lizelle Gonzalez, does

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:39  1    that help you remember whether you were at work that
14:39  2    day?
14:39  3         A.  No, I wouldn't be able to tell you if I was at
14:39  4    work that day or not.
14:39  5         Q.  Were you on vacation at the beginning of
14:39  6    January in 2022?
14:39  7                 MS. ALBIN:  Objection, relevance.
14:39  8         A.  I don't recall being on vacation.  I recall
14:39  9    getting sick in January of 2022 but not vacation.
14:39 10         Q.  Okay.  When you first learned about
14:40 11    Ms. Gonzalez and the abortion medication incident, who
14:40 12    did you learn about that from?
14:40 13         A.  Investigator Esmeralda Muniz.
14:40 14         Q.  Okay.  And what did you understand had
14:40 15    happened?
14:40 16         A.  I got a phone call.  I missed the phone call.
14:40 17    And when I called back, Investigator Muniz, she
14:40 18    explained to me that they had already spoken to ADA
14:40 19    Abel Villarreal and that he had informed them that they
14:40 20    could proceed with murder -- or a murder investigation.
14:40 21                 And then she went on to tell me brief --
14:40 22    briefly what had occurred at the hospital and the
14:41 23    reasoning behind ADA Villarreal's advice on the
14:41 24    homicide investigation.
14:41 25         Q.  And what was your understanding when talking

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

14:41 1    with Investigator Muniz about what actually had

14:41 2    happened?  What were the -- what were the facts as you

14:41 3    understood them?

14:41 4        A.  What I recall her telling me is that there had

14:41 5    been a female that had shown up to the hospital and had

14:41 6    taken some medication to induce an abortion; that it

14:41 7    had been stopped; she had been sent home; and then she

14:41 8    returned back to the hospital a second time; and the

14:42 9    baby had passed away.

14:42 10       Q.  Did you -- that same day, did you speak with

14:42 11   anyone else from the Starr County Sheriff's Office

14:42 12   other than Ms. Muniz?

14:42 13       A.  I believe Captain Leonard Fuentes might have

14:42 14   been on the call.  What I recall is that I was -- that

14:42 15   I was sort of like on a speakerphone when they were

14:42 16   talking to me.  And I do recall Captain Leonard Fuentes

14:42 17   interjecting in the call and saying that they had

14:42 18   spoken to ADA Abel Villarreal.

14:42 19       Q.  Okay.  Did Sheriff's Office Deputy Rosa contact

14:42 20   the DA's office that day to ask if a crime had been

14:42 21   committed?

14:42 22       A.  He did not contact me.  The missed call that I

14:42 23   had, if I remember correctly, was from Investigator

14:42 24   Muniz.

14:43 25       Q.  Okay.  Do you know if Deputy Rosa contacted

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:43  1     anybody at your office about this --

14:43  2         A.  I do --

14:43  3         Q.  -- incident?

14:43  4         A.  I do not know.

14:43  5         Q.  Okay.  You spoke about missing a call from the

14:43  6     sheriff's office and the call -- that call went to

14:43  7     Mr. Villarreal, is that right, when you weren't

14:43  8     available?

14:43  9         A.  Well, if I remember correctly, I had a missed

14:43 10     call on my cell phone.

14:43 11         Q.  Okay.

14:43 12         A.  I don't know where the call went to ADA Abel

14:44 13     Villarreal.

14:44 14         Q.  Okay.  And in January of 2022, you knew

14:44 15     Esmeralda Muniz; is that right?

14:44 16         A.  Yes, I did.

14:44 17         Q.  And you know that she's a former investigator

14:44 18     with the Starr County Sheriff's Office who's recently

14:44 19     retired; is that right?

14:44 20         A.  Yes, ma'am.

14:44 21         Q.  So she told you that she had spoken with

14:44 22     Mr. Villarreal about this incident; is that right?

14:44 23         A.  Yes.  From the missed call, I guess in the --

14:44 24     in the period in between the missed call to the time I

14:44 25     returned the phone call, during that period, they had

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:44 1    already spoken to ADA Abel Villarreal.

14:44 2        Q.  Okay.  Why did Ms. Muniz call you first as

14:44 3    opposed to another ADA?

14:44 4            MS. ALBIN:  Objection, calls for

14:44 5    speculation.

14:44 6        Q.  If you know.

14:44 7        A.  I'm not sure why she would call me first.

14:44 8        Q.  Did she often call you for advice about

14:44 9    investigations?

14:44 10       A.  She reached out to me for advice on

14:45 11   investigations, yes, ma'am.

14:45 12       Q.  Okay.  Do you know what the purpose of

14:45 13   Investigator Muniz's conversation with Villarreal was?

14:45 14           MS. ALBIN:  Objection, speculation.

14:45 15       A.  I do not know.

14:45 16       Q.  Okay.  And you testified that Mr. Villarreal

14:45 17   advised Muniz that based on her description of what

14:45 18   happened, this -- that this would fit the elements of

14:45 19   murder?

14:45 20       A.  Based on the preliminary facts that they had,

14:45 21   that they could possibly proceed on a murder

14:45 22   investigation.

14:45 23       Q.  And how did you know that was the advice he

14:45 24   gave?

14:45 25       A.  They directed me to homicide, and then they let

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:46 1    me know that ADA Villarreal had advised them that the

14:46 2    term "individual" under the Penal Code included the

14:46 3    term -- I believe -- off the top of my head, I can't --

14:46 4    I can't recite it, but the term "individual" included

14:46 5    the -- the term -- I believe it was fetus from

14:46 6    gestation to -- I can't recite it off the top of my

14:46 7    head right now.

14:46 8        Q.  Okay.

14:46 9        A.  But that it fit the elements, and that

14:46 10   "individual" fit the elements as the preliminary facts

14:46 11   were given to him.  That's what they told me.

14:46 12            And during that conversation, I did a

14:46 13   Google search of the Penal Code of the term

14:46 14   "individual."  I saw that it was, in fact, true what he

14:46 15   had advised them.

14:46 16       Q.  What was your -- you may have just answered

14:47 17   this, but what was your initial reaction when you heard

14:47 18   that this was the advice ADA Villarreal gave to Muniz?

14:47 19       A.  I was surprised.  But then again, I never had

14:47 20   to -- I -- in my experience as a prosecutor, I never

14:47 21   had to go and look up the term "individual."  But when

14:47 22   I looked up the term "individual" under the Penal Code,

14:47 23   I was surprised that it included that definition.

14:47 24       Q.  Do you know why he -- why Mr. Villarreal gave

14:47 25   inspector -- Investigator Muniz that advice that it

14:47 1    could be murder?

14:47 2            MS. ALBIN:  Objection, speculation.

14:47 3      A.  Well, I'm assuming because -- or because the

14:47 4    preliminary facts contained a fact about a baby passing

14:48 5    away at the hospital.

14:48 6      Q.  Okay.  When Esmer Muniz called you, did she --

14:48 7    do you remember if she used the word "abortion" or

14:48 8    "abortion medication"?

14:48 9      A.  She might have.  I don't recall if she used the

14:48 10   term "abortion medication."

14:48 11     Q.  At that point, did she know about Ms. Gonzalez

14:48 12   ingesting the medication misoprostol?

14:48 13     A.  I don't recall if she knew or told me about the

14:48 14   ingestation of the -- of the medication.

14:48 15     Q.  Okay.  Did you -- around this time, did you

14:49 16   talk with Abel Villarreal about the sheriff's office

14:49 17   question and his answer?

14:49 18     A.  I did not.

14:49 19     Q.  Why didn't he explain that Penal Code

14:49 20   Section 19.06 makes clear that Ms. Gonzalez could not

14:49 21   have committed a crime by seeking an abortion?

14:49 22            MS. ALBIN:  Objection, speculation as to

14:49 23   what Abel Villarreal knew.

14:49 24     A.  I don't know why he didn't let them know about

14:49 25   19.06 or if he knew about it.  I don't know.

Electronically signed by Donna McCown (101-253-986-8079)                                ea909b08-9585-4819-a64a-b40fd23a510b

14:49 1     Q.  Okay.  I think you also learned that

14:49 2  Investigator Muniz coordinated with ADA Villarreal to

14:49 3  get subpoenas for Ms. Gonzalez's medical records; is

14:49 4  that right?

14:49 5     A.  Yes.  I've seen the subpoenas, yes, ma'am.

14:49 6     Q.  Okay.  Why was this necessary to the

14:49 7  investigation?

14:49 8          MS. ALBIN:  Objection, calls for

14:49 9  speculation.

14:49 10    A.  I'm not sure of the conversation between

14:49 11 Investigator Muniz and ADA Villarreal and as to why

14:50 12 they felt they needed that.

14:50 13    Q.  Okay.  Knowing what you later learned about the

14:50 14 case, do you think the medical records were relevant to

14:50 15 the investigation?

14:50 16    A.  Yes.

14:50 17    Q.  Why -- why would they have been relevant?

14:50 18    A.  Because the doctor's documentation and the --

14:50 19 the information needed would be in those medical

14:50 20 records as to how everything happened.

14:50 21    Q.  Okay.  Are you aware that the original incident

14:50 22 report went to the Rio Grande police -- Rio Grande City

14:50 23 police?

14:50 24    A.  I am aware of it now.

14:50 25    Q.  Uh-huh.  Do you know why the county sheriff was

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:50  1    investigating this case as opposed to the Rio Grande

14:50  2    City police?

14:50  3        A.  I don't --

14:50  4            MS. ALBIN:  Objection, calls for

14:50  5    speculation.  And I don't think there's any testimony

14:51  6    that the sheriff was investigating the case.

14:51  7            THE COURT REPORTER:  That the sheriff

14:51  8    what?

14:51  9            MS. ALBIN:  Was investigating the case.

14:51  10       A.  I don't know, ma'am.

14:51  11       Q.  Okay.  I'm going to go back to the call you

14:51  12   said you thought was on speakerphone where Captain

14:51  13   Fuentes might have also been on the call.

14:51  14           So Investigator Muniz testified two days

14:51  15   ago at her deposition that there was a conversation on

14:51  16   speakerphone with you that she remembered very clearly,

14:51  17   and that Captain Fuentes and Sergeant Aguirre were both

14:51  18   on the call.  Do you remember Aguirre being there?

14:51  19       A.  I don't remember Sergeant Aguirre being on that

14:51  20   phone call.  But we were in two different locations.  I

14:51  21   don't know who was present when they were on the phone

14:51  22   call.

14:51  23       Q.  Okay.  And Ms. Muniz testified the other day

14:52  24   that the captain, Captain Fuentes, wanted to know how

14:52  25   to classify the incident because they were aware of

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:52 1    Section 19.06.  Do you remember him saying that?

14:52 2        A.  No, ma'am.

14:52 3        Q.  Do you know whether he was aware or not aware

14:52 4    at that time?

14:52 5        A.  19.06 was never mentioned in any of our

14:52 6    conversations.

14:52 7        Q.  And she also testified that all of the

14:52 8    investigators were in the room and they were near her

14:52 9    desk.  It was very early in the investigation.  Do you

14:52 10   remember other investigators being on the call or

14:52 11   listening to the call?

14:52 12       A.  The only two people I remember were Captain

14:52 13   Fuentes and Investigator Esmeralda Muniz.

14:52 14       Q.  Okay.  At that time, did you tell them to

14:52 15   continue the investigation?

14:53 16       A.  I believe that the phone call ended with them

14:53 17   knowing that they were going to proceed with the

14:53 18   investigation.  But as far as me telling them what to

14:53 19   do or any of that, that didn't come from me.  They had

14:53 20   already spoken to ADA Abel Villarreal.

14:53 21       Q.  Okay.  Did you tell the sheriff's office on

14:53 22   that phone call that it could be a murder charge?

14:53 23       A.  No.  They had already spoken to ADA Villarreal.

14:53 24   I confirmed that the term "individual" included the

14:53 25   term -- I believe it's fetus from gestation or any

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:53 1    stage from gestation to birth or something along those

14:53 2    lines.

14:53 3            I confirmed, because I was surprised at

14:53 4    that definition.  And when I confirmed, that was pretty

14:53 5    much the end of the conversation.

14:53 6        Q.  Okay.  So you didn't tell them to keep

14:54 7    investigating or don't keep investigating?

14:54 8        A.  No.

14:54 9        Q.  Okay.  Did you tell them you were uncertain at

14:54 10   all?

14:54 11       A.  No.  They gave me the Penal Code that ADA Abel

14:54 12   Villarreal had advised them about.  I looked at it, and

14:54 13   I confirmed that, yes, it did in fact include that

14:54 14   terminology.

14:54 15       Q.  And the reason you looked up the term

14:54 16   "individual" is because the term "individual" is in

14:54 17   the -- the homicide statute, Chapter 19; is that right?

14:54 18       A.  I believe it's in Chapter 1, in definitions one

14:54 19   point something, 1.07.  I can't recall the Penal Code

14:54 20   off the top of my head, but it's -- I think it's

14:54 21   Chapter 1.

14:54 22       Q.  Yeah, the definition is in 1.07, and is the

14:54 23   word used -- "individual," is that word used in the

14:54 24   homicide statute?

14:54 25       A.  Yes.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:54 1    Q.  Okay.  And is that why you looked at the

14:54 2    definition?

14:54 3    A.  They told me that Abel directed them to that

14:55 4    definition term.

14:55 5    Q.  Okay.

14:55 6    A.  Because it was included in the homicide

14:55 7    statute.

14:55 8    Q.  And during that phone call that you had with --

14:55 9    including Investigator Muniz and Captain Fuentes, did

14:55 10   you also look up -- did you look at Chapter 19, the

14:55 11   homicide chapter?

14:55 12   A.  I looked at homicide, 19.01 specifically, not

14:55 13   the chapter, just 19.01.  I saw -- I read the

14:55 14   definition again.  "Individual" was there.  And, sure

14:55 15   enough, that's when I jumped to Chapter 1 and read the

14:55 16   definition of "individual" and confirmed that what ADA

14:55 17   Villarreal had advised them on the legal definition of

14:55 18   "individual" was in fact true.

14:55 19   Q.  And at the time -- at that time you -- did you

14:56 20   read through the entire Chapter 19?

14:56 21   A.  No, ma'am.

14:56 22   Q.  Okay.  And you didn't read 19.06 at that time?

14:56 23   A.  I did not.

14:56 24   Q.  Okay.  Were you aware that the facts of this

14:56 25   possible case involved a self-induced abortion or

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:56  1    attempted abortion?

14:56  2         A.  Yes.

14:56  3         Q.  And that Ms. Gonzalez was the pregnant woman

14:56  4    who may have tried to terminate her own pregnancy?

14:56  5         A.  I don't know if I knew the name of the

14:56  6    individual at the very beginning of the case.

14:56  7         Q.  I think you were present on the Zoom for

14:56  8    Ms. Muniz's deposition on Tuesday.  You heard her

14:56  9    testify?

14:56 10         A.  Yes.

14:56 11         Q.  Okay.  And she stated that she and her

14:56 12    superiors knew about Section 19.06 and had some

14:56 13    concerns about what the charges would be and that they

14:57 14    called you for guidance.  Was that the phone call you

14:57 15    were just speaking about?

14:57 16              MS. ALBIN:  Objection to the

14:57 17    characterization of that testimony.

14:57 18         Q.  Did they call you for guidance?  Was that the

14:57 19    call on which they called you for guidance?

14:57 20         A.  It was the missed called that I had, and then

14:57 21    they had already spoken to ADA Villarreal.

14:57 22         Q.  Okay.  And when Ms. Muniz called you, what was

14:57 23    the purpose of that call if she had already spoken with

14:57 24    him?

14:57 25              MS. ALBIN:  Objection, calls for

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:57 1    speculation.

14:57 2        A.  No, that's not how it happened.

14:57 3        Q.  Oh, okay.

14:57 4        A.  Investigator Muniz called me, but I missed the

14:57 5    phone call.

14:57 6        Q.  Uh-huh.

14:57 7        A.  They spoke to ADA Villarreal, I guess, in the

14:57 8    interim.

14:57 9        Q.  Yes.

14:57 10       A.  Then I called back asking, you know, "Hey,

14:57 11   guys, what -- what did you need?"  And that's when they

14:57 12   advised me they had already spoken to ADA Villarreal.

14:57 13       Q.  Okay.  And did -- on that phone call, did

14:58 14   anyone from the sheriff's office mention Section 19.06?

14:58 15       A.  No, ma'am.

14:58 16           MS. ALBIN:  Objection, asked and answered.

14:58 17       Q.  Did they mention that they had concerns about

14:58 18   whether this was a homicide?

14:58 19       A.  No.

14:58 20           MS. ROSENBLOOM:  Okay.  I'm going to show

14:58 21   you -- we're going to mark these as Plaintiff's 15.

14:58 22   These are some pages printed out from the discovery

14:58 23   produced this morning, and these are pages 2 through 6.

14:59 24   I'm going to show a clean copy to the witness.  And,

14:59 25   Kelly, please let me know when you have them.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

14:59  1                    MS. ALBIN:  Who are they between?

14:59  2                    MS. ROSENBLOOM:  Oh, I'm sorry.

14:59  3                    THE WITNESS:  Rafael Aguirre.

14:59  4                    MS. ROSENBLOOM:  Aguirre and Ms. Barrera.

14:59  5                    MS. ALBIN:  Does she need to look at mine,

14:59  6      or is she --

14:59  7                    MS. ROSENBLOOM:  No, no.  That's a clean

14:59  8      copy.  Yes.  Thank you for asking.

14:59  9                    MS. ALBIN:  Okay.  I'm there.

14:59 10           Q.  Okay.  So these are printouts of some text

14:59 11      messages extracted from your phone.  Is that your

14:59 12      understanding?

14:59 13           A.  Yes, ma'am.

14:59 14           Q.  Okay.  And the first page, page labeled 2 --

14:59 15      these are not Bates-stamped, but they have numbers.

14:59 16      There's a text at the bottom from Sergeant Aguirre to

14:59 17      you saying, "Good morning, Mrs. Barrera.  This is

14:59 18      Investigator Rafael Aguirre with the Starr County

15:00 19      Sheriff's Office.  Would you be available today to

15:00 20      discuss a case involving an abortion?"

15:00 21                    Do you remember this set of texts?

15:00 22           A.  I don't remember them, but I -- I see them

15:00 23      here, yes.

15:00 24           Q.  Okay.  You see at the bottom of that one it

15:00 25      says, "Status: Read," and it says, "Message deleted

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

15:00  1    reason:  User deleted"?

15:00  2        A.  Yes.

15:00  3        Q.  And then it says, "Deletion date:  2-24-2025"?

15:00  4        A.  Yes, I see that.

15:00  5        Q.  Did you delete this series of messages on

15:00  6    February 24th of this year?

15:00  7        A.  I don't recall deleting these specific

15:00  8    messages, but I do see that it says "deleted."

15:00  9        Q.  Okay.  Might you have deleted them?

15:00 10        A.  Maybe they're from 2022 to clear up storage.

15:00 11    That's all I can think of.  But I don't remember

15:01 12    deleting these specific messages.

15:01 13        Q.  And looking at the date on the bottom right

15:01 14    corner of that first text is January 18th, 2022.  Was

15:01 15    that the first time you heard about the incident

15:01 16    involving Ms. Gonzalez?

15:01 17        A.  No.  I think that the phone call from

15:01 18    Investigator Muniz was prior to the 18th of January.

15:01 19        Q.  Okay.

15:01 20        A.  Yes.  I believe so.

15:01 21        Q.  If you look through all of these five pages,

15:01 22    they all say "User deleted."  Is that correct?

15:01 23        A.  I do see that.

15:01 24        Q.  And you don't recall deleting any of them?

15:01 25            MS. ALBIN:  Objection, asked and answered.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:01  1       A.  No, ma'am, I don't recall deleting any of them.

15:01  2       Q.  Okay.  And on page 4, Sergeant Aguirre had

15:02  3  asked if he could meet with you.  And you said, "Good

15:02  4  afternoon.  I'll be here all afternoon whenever you

15:02  5  want to come by."

15:02  6            And he then says he'll be there at 2:00.

15:02  7  Was this meeting going to be about Ms. Gonzalez?

15:02  8       A.  Well, he's asking about meeting with me about a

15:02  9  case involving an abortion, so I believe that, yeah, it

15:02 10  was about that case.

15:02 11       Q.  Okay.

15:02 12       A.  Or this case.

15:02 13       Q.  Okay.  Then if you look at page 5, which is

15:02 14  time-stamped that same day at 2:47 p.m.

15:02 15       A.  Uh-huh.  I see it.

15:02 16       Q.  The earlier one was at 12:28.  You say to

15:03 17  Sergeant Aguirre, "Rafael, let's hold off on" -- I

15:03 18  think that means "the" -- "arrest warrant.  Let's talk

15:03 19  to that lady that gave her the drugs first.  Interview

15:03 20  her."

15:03 21       A.  I see that.

15:03 22       Q.  Okay.  Why were you asking to hold off on an

15:03 23  arrest warrant?

15:03 24       A.  So that the investigation could be concluded

15:03 25  properly and everybody who was a potential witness

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:03  1    could be interviewed by law enforcement before the case

15:03  2    was turned over or there was any type of arrest.

15:03  3        Q.  Okay.  And in the very next text message,

15:03  4    you're saying, "I don't think she's a flight risk, so

15:03  5    let's gather everything we can before."  Does that

15:03  6    refer to Ms. Gonzalez?

15:03  7        A.  The suspect in the case, yes.

15:03  8        Q.  Okay.  Why did you want the sheriff's office to

15:04  9    interview the woman who gave her the drugs?

15:04 10            MS. ALBIN:  Objection, asked and answered.

15:04 11        A.  Well, one, she was a potential witness to the

15:04 12    case; and two, there was a concern of potential

15:04 13    additional crime being committed by this individual who

15:04 14    was supplying drugs.

15:04 15        Q.  Did you know what -- what drugs you -- what

15:04 16    drugs were you talking about?  Were you talking about

15:04 17    the abortion medication?

15:04 18        A.  The medication that they had informed me, yes,

15:04 19    about, uh-huh.

15:04 20        Q.  Okay.  So that day you had set up a time to

15:04 21    meet with Aguirre.  Did you have that meeting?

15:04 22        A.  I recall having a meeting with Investigator

15:04 23    Aguirre and Investigator Esmeralda Muniz both present

15:05 24    in my office.

15:05 25        Q.  Okay.  Was anybody else there?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

15:05  1        A.   No.

15:05  2        Q.   And what was discussed?

15:05  3        A.   The case.  The -- their investigation, what

15:05  4   they had done.

15:05  5        Q.   Do you remember what they told you they had

15:05  6   done so far?

15:05  7        A.   They informed me about the preliminary facts

15:05  8   again.  They informed me about the witnesses they had

15:05  9   interviewed and that they also had interviewed

15:05 10   Ms. Herrera as well and that basically they were at the

15:05 11   conclusion of the investigation and that they just

15:05 12   wanted to know whether they were going to proceed with

15:05 13   the arrest warrant or submit it as an investigation for

15:05 14   grand jury review.

15:05 15        Q.   At that point, did Gocha Ramirez already know

15:06 16   about this investigation?

15:06 17        A.   I don't believe he did.  Not that he knew

15:06 18   anything from me.  I don't think so.

15:06 19        Q.   Do you know when he learned about it?

15:06 20             MS. ALBIN:  Objection, speculation.

15:06 21        A.   I don't know when he learned about this case

15:06 22   exactly.  I wouldn't be able to tell you.

15:06 23        Q.   Okay.  Do you know if Mr. Ramirez directed the

15:06 24   sheriff's office to investigate?

15:06 25        A.   I don't know.  I don't believe so.

Electronically signed by Donna McCown (101-253-986-8079)                ea909b08-9585-4819-a64a-b40fd23a510b

15:06  1       Q.  Did he ask the sheriff's office to interview
15:06  2   anyone in particular about this incident?
15:06  3       A.  I don't know any conversations that he had with
15:06  4   the sheriff's office.  I wouldn't know about them.
15:06  5       Q.  Okay.  And who -- at this point, who was
15:06  6   working on the investigation from the sheriff's office?
15:06  7       A.  From what I understood was that Investigator
15:07  8   Muniz was lead and Investigator Aguirre was assisting
15:07  9   on the case, from that meeting.
15:07 10       Q.  And who was working on the case from your
15:07 11   office at that point?
15:07 12       A.  Nobody was working on that case at our office.
15:07 13       Q.  Okay.  Well, they were talking to you?
15:07 14       A.  Yes, but the case was not at our office.
15:07 15       Q.  Oh, I see.  It hadn't officially been --
15:07 16       A.  Correct.
15:07 17       Q.  -- referred over?
15:07 18            Okay.  Who was speaking with the sheriff's
15:07 19   office about the investigation other than you?
15:07 20   Anybody?
15:07 21            MS. ALBIN:  Objection, speculation.
15:07 22       A.  I wouldn't know, ma'am.
15:07 23       Q.  Okay.  And did you suggest any other witnesses
15:07 24   for the sheriff's office to interview other than the
15:07 25   woman who supplied the drug?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:07  1      A.  No.

15:07  2      Q.  Okay.  Did you suggest that they gather any

15:07  3  other information?

15:07  4      A.  No.

15:07  5      Q.  And -- and you -- you just stated that you

15:08  6  didn't tell Mr. Ramirez at this point about this

15:08  7  investigation.  Do you know if he learned about it from

15:08  8  anyone else?

15:08  9      A.  No.  I -- I stated I didn't know when he

15:08  10  learned about the investigation.

15:08  11     Q.  Okay.

15:08  12     A.  I did tell him about this meeting after the

15:08  13  meeting occurred.

15:08  14     Q.  Okay.  And what did you tell him?

15:08  15     A.  I told him that the sheriff's office had come

15:08  16  by, and that I basically gave him a general overview of

15:08  17  the case; that they were pretty much done with the

15:08  18  investigation; they had interviewed any potential

15:08  19  witnesses; and the case was ready to proceed to either

15:08  20  a grand jury -- for grand jury presentation or an

15:08  21  arrest warrant.  That's what I informed him about.

15:08  22     Q.  Was that fairly soon after the meeting?

15:09  23     A.  Yes, ma'am.

15:09  24     Q.  Do you know -- did you discuss with Mr. Ramirez

15:09  25  Section 19.06 of the Penal Code?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:09  1       A.   No.

15:09  2       Q.   Do you know if he did any legal research to

15:09  3   pull up the Penal Code about homicide and look at it?

15:09  4       A.   Right there and then?

15:09  5       Q.   Uh-huh.

15:09  6       A.   No, ma'am.

15:09  7       Q.   Do you know if he did that afterwards in

15:09  8   January?

15:09  9       A.   I wouldn't know.

15:09 10       Q.   Okay.  Do you know if anybody else in your

15:09 11   office did that in January?

15:09 12       A.   I wouldn't know if anybody else did that.

15:09 13       Q.   Okay.  Ms. Muniz testified on Tuesday that she

15:10 14   made a trip to your office in person before turning in

15:10 15   the case and that she made a trip over there.  She met

15:10 16   with you, and it was toward the conclusion of the

15:10 17   investigation.

15:10 18            She said she was pretty sure it was after

15:10 19   all of the interviews, and she went to the meeting to

15:10 20   discuss everything she had.  Do you remember that

15:10 21   meeting?

15:10 22       A.   It would have been this meeting that we're

15:10 23   talking about with Investigator Aguirre present.

15:10 24       Q.   Okay.  So Esmeralda Muniz was there as well?

15:10 25       A.   Yes.

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:10 1    Q.  Okay.

15:10 2    A.  They were both in my office.

15:10 3    Q.  At that meeting, did you tell them murder would

15:10 4    be the charge for this case?

15:10 5    A.  No.  They were bringing in the case as a murder

15:10 6    investigation -- or presenting it as a murder

15:10 7    investigation to the DA's office.

15:10 8    Q.  Did you discuss with the two of them, or either

15:10 9    of them, whether the elements of the homicide were all

15:10 10   met -- all met?

15:10 11   A.  No.  I believe that they had discussed that

15:10 12   with ADA Villarreal since the beginning of the case

15:11 13   about the evidence of homicide.

15:11 14   Q.  Did you discuss at that meeting whether there

15:11 15   was probable cause?

15:11 16   A.  No.  They just gave me a general overview of

15:11 17   everything they had done in the -- in their

15:11 18   investigation and that they were pretty much done with

15:11 19   the investigation at that point.

15:11 20   Q.  Did you have any other conversations with Muniz

15:11 21   or Aguirre before that meeting?

15:11 22           MS. ALBIN:  Objection, vague.

15:11 23   A.  Before that meeting?  Yes.

15:11 24   Q.  Yes.  About this case?

15:11 25   A.  Yes.

**BRYANT & STINGLEY, INC.**

**Harlingen (956) 428-0755         McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:11 1    Q.  Okay.  And were those text messages?  Phone

15:11 2    calls?  Both?

15:11 3    A.  Both, combination.  I don't know if I had phone

15:11 4    calls with Aguirre before this meeting, because I don't

15:11 5    remember talking to him in this case.  I just remember

15:12 6    the in-person meeting that he was present.

15:12 7            But with Investigator Muniz I did have

15:12 8    conversations via text and the initial phone call in

15:12 9    January.

15:12 10    Q.  We can get the exhibit if we need it, but you

15:12 11    might have heard us ask Ms. Muniz about notes she made

15:12 12    on some Post-it notes the other day.  Do you remember

15:12 13    that?

15:12 14    A.  I recall hearing that.

15:12 15    Q.  And on the notes she had written, "After

15:12 16    interview with suspect, will staff with DAs.  Set up

15:12 17    something for Monday."

15:12 18            In -- in the context of this case, what --

15:12 19    what did that mean, "Will staff with DAs"?

15:12 20            MS. ALBIN:  Objection, calls for

15:12 21    speculation.

15:12 22    A.  I don't know what she means by that.

15:12 23    Q.  Okay.  I'm trying to save time, but it's not

15:13 24    working.  I'm going to have to show you those notes.

15:13 25    A.  That's fine.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:13  1          Q.  So Plaintiff's Exhibit 9, previously marked.

15:13  2                  (Brief recess)

15:14  3          Q.  I am showing you what was previously marked

15:14  4   Plaintiff's Exhibit 9 from the deposition of Ms. Muniz.

15:14  5   And just for completeness, direct your attention to the

15:14  6   bottom left Post-it note, which is the one we just

15:14  7   talked about.

15:15  8                  I'm going to try this without an exhibit,

15:15  9   because it's a different page.  Another Post-it note

15:15 10   had the word ban, B-A-N, with a question mark and then

15:16 11   an arrow drawn and the word "homicide," an arrow drawn,

15:16 12   "manslaughter."

15:16 13                  And we asked -- do you know what Ms. Muniz

15:16 14   meant by that and what ban she might be referencing.

15:16 15                  MS. ALBIN:  Objection, speculation.

15:16 16          A.  No, ma'am, I don't remember.

15:16 17          Q.  Did any -- did you at any point tell the

15:16 18   sheriff's office that a ban made Ms. Gonzalez's conduct

15:16 19   murder?

15:16 20          A.  That a ban made it murder?

15:16 21          Q.  Yeah, that some kind of ban, maybe an abortion

15:16 22   ban or another ban?

15:16 23          A.  No.

15:16 24          Q.  Okay.  Also in Ms. Muniz's notes on the Post-it

15:16 25   notes there was written "arresting" with a question

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:16  1    mark.  "DAs want to charge her.  Grand jury," question

15:16  2    mark.  Did the DAs want to charge her at the point that

15:17  3    Ms. Muniz and Sergeant Aguirre started investigating?

15:17  4                MS. ALBIN:  Objection, calls for

15:17  5    speculation as to everybody other than this ADA.

15:17  6        A.  I'm not -- I'm not sure what anybody else

15:17  7    wanted to do when they started investigating the case.

15:17  8        Q.  Okay.  But you -- you hadn't given that advice

15:17  9    yet?

15:17  10       A.  No.

15:17  11       Q.  So Ms. Muniz also testified that her sergeant,

15:17  12   Aguirre, made sure that she called the district

15:17  13   attorney office throughout this investigation of

15:17  14   Ms. Gonzalez.

15:17  15                She testified that he would look things up

15:17  16   and say, "Call Alex, make sure, make sure."  Does that

15:17  17   refer to you as you understand it?

15:17  18                MS. ALBIN:  Objection, calls for

15:17  19   speculation.

15:17  20       A.  I don't know what Sergeant Aguirre did.

15:17  21       Q.  When she -- when she says, "Call Alex," is --

15:18  22   is there another Alex in your office?

15:18  23       A.  There is not.

15:18  24       Q.  Okay.  And do you sometimes go by Alex?

15:18  25       A.  I do.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:18  1    Q.  Okay.  When Ms. Muniz was asked why, she

15:18  2    testified that her supervisors were a little concerned

15:18  3    which is why they had to go through the DA's office to

15:18  4    make sure and for your office to have all the facts.

15:18  5    Is that what happened?

15:18  6                MS. ALBIN:  Objection, calls for

15:18  7    speculation; vague.

15:18  8    A.  I don't know what their concerns were.

15:18  9    Q.  When you spoke with them, were they trying to

15:18 10    make sure they had all the facts and make an

15:18 11    assessment?

15:18 12                MS. ALBIN:  Objection, speculation.

15:18 13    A.  When I spoke to them, they had already spoken

15:18 14    to ADA Villarreal initially.

15:18 15    Q.  Uh-huh.  And during your conversation, did they

15:18 16    say, "We want to make sure we have all the facts," or

15:18 17    something like that?

15:18 18    A.  No.  They just let me know what they had done

15:18 19    in their investigation.

15:19 20    Q.  Okay.  If you had told Investigator Muniz

15:19 21    during that phone call when you called her back -- if

15:19 22    you had told her a pregnant woman could not be charged

15:19 23    with murder for terminating her own pregnancy, what

15:19 24    would have happened to the investigation?

15:19 25                MS. ALBIN:  Objection, hypothetical; calls

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:19  1    for speculation.

15:19  2        A.  From the very beginning?  From the onset?

15:19  3        Q.  Yes.

15:19  4            MS. ALBIN:  Same objection.

15:19  5        A.  I don't know what the sheriff's office would

15:19  6    have done with their investigation.

15:19  7        Q.  Do you think it's likely they would have

15:19  8    stopped investigating if the DA's office had said, "No,

15:19  9    that's not -- that's not a crime"?

15:19 10        A.  I'm not sure if they would or they would not.

15:19 11    They don't -- they don't answer to me.

15:19 12        Q.  Okay.  One more question about that.  If you

15:20 13    had learned at that time, Ms. Barrera, that a pregnant

15:20 14    woman could not be charged with murder for terminating

15:20 15    her own pregnancy, would you have gone forward with

15:20 16    presenting the case to the grand jury?

15:20 17        A.  If I would have known about 19.06?

15:20 18        Q.  Yes.

15:20 19        A.  No.

15:20 20        Q.  Okay.  Now I'd like to show you some of the

15:20 21    text messages that were recently produced.  These are

15:20 22    between Ms. Muniz and Ms. Barrera, and they are pages

15:20 23    labeled 79 through 85.  These are the ones we don't

15:21 24    have a clean copy of so I'm going to ask you to look on

15:21 25    with your attorney.

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:21 1        A.  Do you want these back?

15:21 2        Q.  Sure.

15:21 3        A.  Or I don't know if the court reporter needs

15:21 4   them.

15:21 5        Q.  Yeah.  I'm going to give her her original or

15:21 6   she's going to come after me.

15:21 7             Okay.  I'm showing you a set of pages with

15:21 8   printed out text messages that have now been marked

15:21 9   Plaintiff's Exhibit 16.  These are text messages

15:21 10  produced as coming from your device, and they were

15:22 11  between you and Esmeralda Muniz.

15:22 12             So looking at the first page labeled 79,

15:22 13  this is dated January 11th, 2022.  We're going back in

15:22 14  time a little bit.

15:22 15       A.  Yes, ma'am.

15:22 16       Q.  And she is saying to you, "Hello.  If you have

15:22 17  a minute, we have a case we'd like to discuss with you.

15:22 18  A mother self-induced LA or on a 20-week fetus" -- hard

15:22 19  to know what that is -- but "putting some pills to

15:22 20  abort on her vagina.  We need guidance, please."

15:22 21             Do you remember receiving that text?

15:22 22       A.  Yes.

15:22 23       Q.  And looks like you responded -- well, the next

15:22 24  text that appears is from about 40 minutes later, and

15:22 25  you are responding saying, "Give me a second."  Why

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:23 1    were you asking her to give you a second?

15:23 2        A.  So if I remember correctly, she called me.  I

15:23 3    had the missed call.  I didn't answer, so that text

15:23 4    message was sent to me that they were trying to get

15:23 5    ahold of me.

15:23 6            I did not respond until almost 40 minutes

15:23 7    later.  I believe I was at home, and I believe I was

15:23 8    sick with COVID during the time.  So I was kind of in

15:23 9    and out of sleep, from what I recall.

15:23 10       Q.  Okay.  The next text message, the bottom one on

15:23 11   that page, is stamped 7:16 p.m. on the same date from

15:23 12   Ms. Muniz to you saying, "Alex, I came to take pictures

15:23 13   of the ashes of the baby because it's been cremated

15:23 14   already.  Do I allow the funeral home to give the mom

15:24 15   the ashes?"

15:24 16           And then on the next page, half a minute

15:24 17   later or so, you respond, "That's fine.  We will have a

15:24 18   death certificate, I'm assuming.  Take pictures of the

15:24 19   ashes."

15:24 20           Do you remember that exchange with her?

15:24 21       A.  Yes, I see it here.

15:24 22       Q.  She was asking for your guidance on what to do

15:24 23   about the ashes?

15:24 24       A.  I guess if -- for purposes of seizing evidence

15:24 25   for the investigation.  I'm assuming that's why she

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:24  1    reached out to me and asked me.

15:24  2         Q.  Okay.

15:24  3         A.  If we were going to need the ashes.

15:24  4         Q.  Okay.  And later down on page -- at the bottom

15:24  5    of page 80, the page labeled 80, this was the following

15:24  6    day, January 12th.  And her text to you says, "Good

15:24  7    morning.  Dr. Lozano is supposed to be coming in around

15:24  8    noon for an interview, and he told Captain he was going

15:25  9    to bring the entire file history on patient/suspect.

15:25 10    If he voluntarily wants to give me copies, do I get

15:25 11    them?  I don't know if you want to be here for the

15:25 12    interview."

15:25 13              And that is followed by your answer on the

15:25 14    next page saying, "I mean, you can so we can -- a

15:25 15    preliminary look at the documents but still need to GJ

15:25 16    subpoena them."

15:25 17              So right there you were giving her advice

15:25 18    on whether she should take copies of the medical

15:25 19    records regarding Ms. Gonzalez; is that right?

15:25 20         A.  That Dr. Lozano was going to take, yes.  But I

15:25 21    did tell her that they still need to go through a grand

15:25 22    jury subpoena.  And usually, we do that because it's

15:25 23    better practice for any case or any investigation

15:25 24    because they come attached with a business record

15:25 25    affidavit authenticating the documents.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:26  1     Q.  Okay.  And you -- yes, but she was asking you

15:26  2    should they accept those records from the doctor, and

15:26  3    you told her that was okay; is that right?

15:26  4     A.  I don't think I told her it was okay.  I just

15:26  5    said, "I mean, you can so you can have a preliminary

15:26  6    look at the docs."

15:26  7     Q.  Right.

15:26  8     A.  "But you still need to grand jury subpoena

15:26  9    them."

15:26 10     Q.  Okay.

15:26 11     A.  I left it up to her.

15:26 12     Q.  Okay.  At the top of the next page labeled 82,

15:26 13    Ms. Muniz on that same day is texting you saying, "It's

15:26 14    okay.  Thank you for always being a text/phone call

15:26 15    away."

15:26 16           Did you -- did you provide Ms. Muniz with

15:26 17    guidance on anything else regarding this investigation?

15:26 18           MS. ALBIN:  Objection, that misstates her

15:26 19    prior testimony.  It's vague.

15:27 20     A.  No.  Just whenever she came to meet with me

15:27 21    regarding the submission of the case, the prosecution

15:27 22    packet.

15:27 23     Q.  Okay.  But above that where she's thanking you

15:27 24    for always being a phone call or text away and you say

15:27 25    "Not a problem," do you know if she texted or called

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:27  1   you about anything else regarding the investigation?

15:27  2        A.  Prior to this?  I mean...

15:27  3        Q.  Or after.

15:27  4        A.  But you're -- you're talking about that

15:27  5   specific text message, so it would have been prior to

15:27  6   that text message as to why she's saying that.  But the

15:27  7   text message would be here.  That was all my

15:27  8   conversation I had with her via text.

15:27  9        Q.  Okay.

15:27 10        A.  Yeah.

15:27 11        Q.  Do you remember her calling you on the phone

15:27 12   and asking you for advice on any other evidence or

15:28 13   anything else in the case?

15:28 14        A.  Not evidence, just the initial conversation we

15:28 15   had on the phone when Captain Fuentes was there as

15:28 16   well.

15:28 17        Q.  Okay.  Looking at page 83, the next page --

15:28 18   sorry, starting on 82, it looks like Investigator Muniz

15:28 19   is asking you to meet to discuss everything she has on

15:28 20   the abortion case.

15:28 21        A.  I see.

15:28 22        Q.  And then you go ahead on the next page and --

15:28 23   and arrange a meeting with her.  Do you know if that

15:28 24   meeting happened?  This was January 31st, this text

15:28 25   conversation.  The meeting was supposed to happen the

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:28  1    next day, according to these text messages.

15:29  2         A.  She might have stopped by my office, yes.

15:29  3         Q.  Okay.  If you look at the next page, 84, that

15:29  4    is the following day, February 1st.  And Ms. Muniz is

15:29  5    saying, "Good afternoon.  Is now a good time, or let me

15:29  6    know when."

15:29  7              You respond, "Yes, you can come by."  And

15:29  8    you tell her where you are.

15:29  9              She says, "Okay.  See you in a bit."  Do

15:29  10   you remember if she came by that day?

15:29  11        A.  I don't remember if she came by or if I spoke

15:29  12   to her on the phone.

15:29  13        Q.  She -- on the top of the next page labeled 85,

15:29  14   she says, "I forgot to mention, I have a copy of the

15:29  15   cremation certificate with the baby's name."  And you

15:29  16   were not -- you said you didn't recall whether --

15:29  17   whether she actually came by that day?

15:29  18        A.  I don't know if she came by in person or if we

15:30  19   spoke over the phone.

15:30  20        Q.  Okay.  The very next text on page 85 is from

15:30  21   that same day but later, 5:48 p.m.  And you are texting

15:30  22   Ms. Muniz, and the text says, "Okay.  So spoke to

15:30  23   Gocha.  Just submit for grand jury review.  No arrest

15:30  24   warrant."

15:30  25        A.  Yes, I see that.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

15:30 1    Q.  Okay.  And is it correct what you said there,

15:30 2    that you had spoken with Mr. Ramirez?

15:30 3    A.  Yes.

15:30 4    Q.  And was he the one who decided to submit for

15:30 5    grand jury review, no arrest warrant?

15:30 6    A.  Yes.  And I want to clarify something.  Then

15:30 7    this is when I told him -- February 1st is when I told

15:30 8    Mr. Ramirez about the case.

15:30 9    Q.  Okay.

15:30 10   A.  Not -- not in January when I had the

15:30 11   conversation with Aguirre.  This is when I spoke to

15:31 12   him.

15:31 13   Q.  Did you speak to him in person in the office?

15:31 14   A.  I did.

15:31 15   Q.  Was Abel there?

15:31 16   A.  No.

15:31 17   Q.  Was Judy Solis there?

15:31 18   A.  No.

15:31 19   Q.  Any other assistant DAs in that conversation?

15:31 20   A.  No.

15:31 21   Q.  And the grand jury in this case was

15:31 22   originally -- sorry.  There was originally a grand jury

15:31 23   scheduled for February 18th at which you were going to

15:31 24   present the case, is that right, but Ms. Muniz was out

15:31 25   that day?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:31 1    A.  I don't know if this case was scheduled for the

15:31 2    18th.  I see here I advised her there was grand jury

15:31 3    the 18th, but I'm not sure if it was for this case or

15:31 4    another case.

15:31 5    Q.  Okay.  So this conversation, February 1st, that

15:31 6    was nearly two months before this case was presented to

15:31 7    the grand jury on March 25th.  How many other

15:31 8    conversations did you have with Mr. Ramirez about this

15:32 9    case before March 25th?

15:32 10   A.  Before March 25th?

15:32 11   Q.  Before the day you presented it to the grand

15:32 12   jury.

15:32 13   A.  I just remember that conversation with him

15:32 14   prior to grand jury.

15:32 15   Q.  And does that include telephone conversations

15:32 16   as well as in-person conversations when you say that?

15:32 17   A.  I don't remember, but I do remember that

15:32 18   specific meeting that we had prior to the grand jury.

15:33 19        MS. ROSENBLOOM:  Does anybody need a break

15:33 20   at this point --

15:33 21        THE WITNESS:  I'm okay.

15:33 22        MS. ROSENBLOOM:  -- or keep going for a

15:33 23   bit?  Okay.  Thanks.  Do you have the Villarreal

15:34 24   exhibit packet?

15:34 25        MS. ALBIN:  Oh, yeah.  No, I got it.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:34  1        Q.  I'm showing you what has earlier been marked
15:34  2   Plaintiff's Exhibit 3.  Okay.  Before I do that, I have
15:35  3   one more question to ask you about the meeting on
15:35  4   February 1st.
15:35  5             I think I asked you if any other ADAs were
15:35  6   present.  Was anyone else present at that meeting?
15:35  7        A.  The one where it was just exclusively between
15:35  8   me and Mr. Ramirez --
15:35  9        Q.  Yes.
15:35  10       A.  -- that I advised?
15:35  11            Not that I recall, no, there was no other
15:35  12   ADA.
15:35  13       Q.  Did he ask you any question in that meeting
15:35  14   about the basis for the charges and whether the
15:35  15   elements had been met?
15:35  16       A.  No.
15:35  17       Q.  Was it -- how long was that meeting,
15:35  18   approximately?
15:35  19       A.  I would probably say anywhere between
15:35  20   20 minutes at the most.
15:35  21       Q.  Okay.  What did you discuss in the meeting?
15:35  22       A.  I generally told him about the investigation,
15:35  23   that the sheriff's office had come over, or I had
15:35  24   spoken to them at that point and that they had let me
15:35  25   know that the investigation was completed and that they

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:36  1    wanted to know whether they were going to submit --
15:36  2    whether they should submit the case as an investigation
15:36  3    for grand jury review or proceed with an arrest
15:36  4    warrant.
15:36  5        Q.  Did he have any questions for you in that
15:36  6    meeting?
15:36  7        A.  I believe he did ask me whether she was a U.S.
15:36  8    citizen, and I said yes.  And then that's when he just
15:36  9    said, "No.  Like don't proceed with an arrest warrant.
15:36 10    Just -- let's just let a grand jury decide."
15:36 11        Q.  Did he explain why go to the grand jury rather
15:36 12    than an arrest warrant?
15:36 13        A.  No.
15:36 14        Q.  And at that time, he was aware that this was a
15:36 15    case involving a medication commonly used for abortion?
15:36 16            MS. ALBIN:  Objection, calls for
15:36 17    speculation.
15:36 18        Q.  Did you make him aware of that?
15:36 19        A.  I believe I did tell him about medication being
15:37 20    involved.
15:37 21        Q.  Okay.  Now I'm showing you what has been marked
15:37 22    as Plaintiff's Exhibit 3.  And these are your responses
15:37 23    to interrogatories served in this case.  I want to
15:37 24    direct your attention to your -- to Interrogatory No. 5
15:37 25    on page 4.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:37  1     A.  Okay.

15:37  2     Q.  In your response, this was -- I'm not going to

15:37  3  read the whole thing, but in your response, around the

15:37  4  middle, you're talking about confirming that Penal Code

15:38  5  1.07, the definition of an individual included an

15:38  6  unborn child at every stage of gestation, from

15:38  7  fertilization to birth.

15:38  8          After that, you say, "I also looked up the

15:38  9  homicide statute to confirm that it included the term

15:38 10  'individual.'  I did confirm back to them that what

15:38 11  they had been told was correct, all of the elements

15:38 12  were met."

15:38 13          So when you looked at the -- first of all,

15:38 14  is that statement still correct as you sit here today?

15:38 15     A.  Yes.

15:38 16     Q.  And when you say you looked up the homicide

15:38 17  statute, are you referring to Chapter 19 of the Penal

15:38 18  Code?

15:38 19     A.  I looked up 19.01, homicide.

15:38 20     Q.  When you confirmed that all the elements were

15:38 21  met, where were those elements listed?

15:38 22     A.  19.01.

15:38 23     Q.  In January of 2022, were you familiar with the

15:39 24  Supreme Court case Roe versus Wade establishing the

15:39 25  constitutional right of someone who's pregnant to

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                        ea909b08-9585-4819-a64a-b40fd23a510b

15:39  1  obtain an abortion?

15:39  2      A.  I mean, I was aware of it, yes, ma'am.

15:39  3      Q.  Okay.  Were you aware in January of 2022 that

15:39  4  Roe versus Wade was still good law, had not been

15:39  5  overruled?

15:39  6      A.  Yes.

15:39  7      Q.  Do you know -- are you familiar with SB 8 in

15:39  8  Texas?

15:39  9      A.  I remember hearing about it, but I -- I can't

15:39 10  say that I'm familiar with it.

15:39 11      Q.  Do you know from the -- there's a great deal of

15:39 12  publicity about the statute and media about it.  Were

15:39 13  you aware that that law only created a civil penalty

15:39 14  for people who performed or helped someone get an

15:39 15  abortion, not the pregnant woman?

15:39 16      A.  Honestly, I was -- I was not aware of what SB 8

15:40 17  all entailed.  I remember that the law was changing

15:40 18  every single day regarding that issue back in -- back

15:40 19  in that -- in 2022.

15:40 20      Q.  Did you know that SB 8 did not create any

15:40 21  criminal penalties?

15:40 22      A.  I'm not aware of what SB 8 entailed.

15:40 23      Q.  Have you had any -- any training about it, any

15:40 24  information given to the DA's office about SB 8?

15:40 25      A.  No.

15:40  1          Q.  Despite knowing about Roe versus Wade, you
15:40  2    advised the sheriff's office that an unborn child was
15:40  3    an individual for the homicide statute; is that
15:40  4    correct?
15:40  5                MS. ALBIN:  Objection, argumentative, and
15:40  6    misstates -- mischaracterizes her earlier testimony.
15:40  7          A.  I was not thinking about Roe v. Wade at the
15:40  8    time of my conversation with the Starr County Sheriff's
15:41  9    Office.  I looked up the homicide statute as they had
15:41 10    told me ADA Villarreal had advised them on, and I
15:41 11    looked up the term "individual," and I confirmed
15:41 12    that -- that those were the definitions.
15:41 13          Q.  Okay.  And you advised the sheriff's office
15:41 14    that you agreed with Villarreal that an unborn child
15:41 15    could be an individual for the homicide statute?
15:41 16          A.  Yes, because that's how it read.
15:41 17          Q.  Okay.  Did you advise them that the fetus or
15:41 18    the unborn child could be a victim in a charge against
15:41 19    a pregnant woman?
15:41 20          A.  We didn't discuss any of that.
15:41 21          Q.  When you were researching and looking into this
15:41 22    case and whether the facts could fit a murder charge,
15:41 23    who were you thinking of as the victim of the --
15:41 24                MS. ALBIN:  Objection --
15:42 25          Q.  -- homicide?

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:42  1          MS. ALBIN:  Sorry.  Objection,

15:42  2   mischaracterizes previous testimony.

15:42  3          A.   The victim, the baby.

15:42  4          Q.   And at the time, you've stated several times

15:42  5   you didn't know about 19.06 of the homicide statute

15:42  6   which creates an exemption to homicide specifically for

15:42  7   a pregnant woman's conduct; is that right?

15:42  8          A.   I did not know about it.  Yes, that's right.

15:42  9          Q.   If you knew Roe versus Wade was the law of the

15:42 10   land, why would you think abortion was a crime that

15:42 11   could be charged against a pregnant woman?

15:42 12          MS. ALBIN:  Objection, argumentative.

15:42 13          A.   Roe v. Wade never crossed my mind when I looked

15:42 14   at this case.  I looked at the facts as the way they

15:42 15   were submitted to the DA's office.  I looked at what I

15:42 16   believed to be the law under the Texas Penal Code, and

15:43 17   that's what I proceeded on.

15:43 18          Q.   Do you know of any doctor being charged with

15:43 19   murder in Texas for performing an abortion?

15:43 20          A.   I don't know, ma'am.

15:43 21          Q.   Okay.  Besides Ms. Gonzalez, have you heard of

15:43 22   any woman who sought an abortion or had an abortion

15:43 23   being charged with murder for their own abortion in

15:43 24   Texas?

15:43 25          A.   I don't recall.  No, I don't think so.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:43  1       Q.  Okay.  After your conversation with Mr. Ramirez
15:43  2  in which he -- sorry.  After your conversation with
15:43  3  him, did you speak with Ms. Muniz about whether to
15:43  4  obtain an arrest warrant for Ms. Gonzalez?
15:43  5       A.  Yes, I did advise her that -- just to go ahead
15:44  6  and submit the case for grand jury review.
15:44  7       Q.  Okay.  And did you advise her do not -- do not
15:44  8  arrest her at this time?
15:44  9       A.  Yeah.  That they didn't need to proceed with an
15:44 10  arrest warrant, that they could just submit the case
15:44 11  for grand jury review.
15:44 12       Q.  And at that point, did you believe there was
15:44 13  probable cause for a murder charge?
15:44 14       A.  Well, at that point, I didn't have the case
15:44 15  file yet.
15:44 16       Q.  So when you had the conversation with
15:44 17  Mr. Ramirez and he said, "Present it to the grand jury,
15:44 18  don't get an arrest warrant," you didn't have the case
15:44 19  yet?
15:44 20       A.  No.  They were just coming to let me know that
15:44 21  they were done with the investigation, or we had talked
15:44 22  about it on the phone that they were done with the
15:44 23  investigation at that point.  But they didn't turn in
15:44 24  the physical file at that point.
15:44 25       Q.  When did they turn in the physical file to your

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:45  1    office, if you remember?

15:45  2        A.  I don't remember the exact date, but it should

15:45  3    be somewhere in the discovery.  I believe on the Brady

15:45  4    compliance form, it should be dated.

15:45  5        Q.  Okay.  Thank you.  When you -- given everything

15:45  6    you knew about the case when you spoke with Mr. Ramirez

15:45  7    and he said go ahead and present to the grand jury, at

15:45  8    that point, did you believe there was probable cause

15:45  9    for a murder charge?

15:45  10       A.  With what I had, I -- I -- with the facts that

15:45  11   they had presented to me in person and on the phone,

15:45  12   without looking at the case, I thought there could be a

15:45  13   possible homicide charge.

15:45  14       Q.  Did you think there was probable cause?

15:45  15            MS. ALBIN:  Objection.  I -- probable

15:46  16   cause for what?  For the indictment or for --

15:46  17            MS. ROSENBLOOM:  For a murder charge.

15:46  18            MS. ALBIN:  I don't think that's what

15:46  19   probable cause use, but you can answer if you

15:46  20   understand the question.

15:46  21       A.  That would be a question for a grand jury or

15:46  22   law enforcement officer.

15:46  23       Q.  Did you have an opinion about it, whether there

15:46  24   was probable cause for an indictment for murder at that

15:46  25   point?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

15:46  1              MS. ALBIN:  Same objection.

15:46  2      A.  I presented the case with the facts that I had

15:46  3  and what -- what I believed the thought to be at the

15:46  4  time of the grand jury.

15:46  5      Q.  What in -- usual practice at your office, once

15:46  6  it is established that there is probable cause for a

15:46  7  murder charge, does law enforcement typically try to

15:46  8  arrest the person as quickly as possible?

15:46  9              MS. ALBIN:  Objection, compound; calls for

15:47  10  speculation.  I think it's misusing probable cause.

15:47  11              MS. JOHNSON:  Try to restrain from

15:47  12  speaking objections, please.

15:47  13              MS. ALBIN:  I'm required under the rules

15:47  14  to explain my objection so that it can be cured.

15:47  15              MS. JOHNSON:  You can answer the question.

15:47  16              MS. ALBIN:  Yeah.

15:47  17      A.  Can you repeat the question?

15:47  18      Q.  Once there is a determination that there is

15:47  19  probable cause for murder, does law enforcement

15:47  20  typically try to arrest the suspect as quickly as

15:47  21  possible?

15:47  22              MS. ALBIN:  Objection, compound; calls for

15:47  23  speculation.  It's misusing probable cause.

15:47  24      A.  I'm not sure what law enforcement does within

15:47  25  their own, you know, departments as to whether they try

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:47 1    fast enough or not.  I guess it just depends on each

15:47 2    case.

15:47 3        Q.  Well, in this case, when Mr. Ramirez gave you

15:47 4    the advice to go ahead and present to the grand jury

15:47 5    but don't get an arrest warrant at this point, would

15:48 6    that be typical for a case you were presenting to a

15:48 7    grand jury as a possible homicide?

15:48 8        A.  Yes.

15:48 9            MS. ALBIN:  Objection, vague; and calls --

15:48 10       Q.  Not to arrest --

15:48 11           MS. ALBIN:  -- for speculation.

15:48 12       Q.  -- the person who might have --

15:48 13       A.  I might have --

15:48 14           MS. ALBIN:  Please let me finish my

15:48 15    objection.

15:48 16           MS. ROSENBLOOM:  Sorry.

15:48 17           MS. ALBIN:  Sure.  The objection is vague

15:48 18    and calls for speculation.

15:48 19       Q.  Okay.  So if -- if your office believed it had

15:48 20    enough to go to a grand jury and present a homicide

15:48 21    case, any homicide case, would -- would it be typical

15:48 22    not to seek an arrest?

15:48 23           MS. ALBIN:  Objection, calls for

15:48 24    speculation.

15:48 25       A.  It's not uncommon.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                          ea909b08-9585-4819-a64a-b40fd23a510b

15:48  1      Q.  Even in a murder case?

15:48  2      A.  Yes, ma'am.

15:48  3      Q.  Would the office usually wait for an indictment

15:48  4  in order to arrest?

15:48  5      A.  It just depends on each case.  Each case is

15:48  6  different.  But it's not uncommon to present a homicide

15:48  7  case and make the arrest later.

15:49  8      Q.  During your time as assistant district

15:49  9  attorney, do you recall another case that was going to

15:49 10  be presented for possible charge of homicide where your

15:49 11  office advised the sheriff's office not to obtain an

15:49 12  arrest warrant?

15:49 13      A.  Personally that I know?

15:49 14      Q.  Yes.

15:49 15      A.  Not that -- not that we proceeded to the grand

15:49 16  jury.  We didn't end up proceeding to the grand jury at

15:49 17  that time.  We ended up waiting.  But no.

15:49 18      Q.  Why did the sheriff's office need direction

15:50 19  from the DA's office about whether or not to obtain an

15:50 20  arrest warrant?

15:50 21          MS. ALBIN:  Objection, calls for

15:50 22  speculation.

15:50 23      A.  I'm not sure.

15:50 24      Q.  What role -- normally, what role does the DA's

15:50 25  office play in the process of law enforcement getting

Electronically signed by Donna McCown (101-253-986-8079)          ea909b08-9585-4819-a64a-b40fd23a510b

15:50  1    an arrest warrant?

15:50  2        A.  Well, law enforcement will typically either

15:50  3    make an arrest, or they will submit the case as an

15:50  4    investigation so that a grand jury decides whether to

15:50  5    proceed or not.

15:51  6                MS. ALBIN:  Can we take a five-minute

15:51  7    break?

15:51  8                MS. ROSENBLOOM:  Can I ask two more

15:51  9    questions about this topic?

15:51 10                MS. ALBIN:  Sure.

15:51 11        Q.  Are you aware that a prosecutor must not

15:51 12    present a case to a grand jury unless the prosecutor

15:51 13    believes there is probable cause?

15:51 14        A.  I'm aware that we're supposed to seek justice

15:51 15    and supposed to be fair, yes, ma'am.

15:51 16        Q.  What's your understanding of what probable

15:51 17    cause means?

15:51 18        A.  That there is enough or could be enough

15:51 19    evidence to merit a criminal offense of being

15:51 20    committed.

15:51 21        Q.  Ethically, can you present a case to a grand

15:52 22    jury if you don't think there is sufficient evidence

15:52 23    that a crime might have been committed?

15:52 24        A.  If I don't believe there's sufficient evidence?

15:52 25        Q.  Right.

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

15:52 1      A.  I mean, ethically, I don't -- it's because -- I

15:52 2  mean, the way you phrase that question is a little hard

15:52 3  for me to answer.

15:52 4      Q.  I can try again.  If -- if you don't believe

15:52 5  there's sufficient evidence that a crime has been

15:52 6  committed, would you go to the grand jury and present

15:52 7  that case?

15:52 8      A.  I mean, it's -- it's hard, because sometimes we

15:52 9  have, like, child sex cases or sexual assault offenses

15:52 10  where it's just the victim saying what happened to her,

15:53 11  and we have nothing else.  And we present those cases

15:53 12  to a grand jury because a victim outcry statement is

15:53 13  some evidence.  Whether it's enough for a grand jury to

15:53 14  proceed, I mean, that's up to them.

15:53 15              MS. ROSENBLOOM:  Okay.  We can take that

15:53 16  short break.

15:53 17              MS. ALBIN:  Okay.

15:53 18              (Brief recess)

16:00 19      Q.  Okay.  Between the date of the incident and

16:01 20  your present -- the date of your presentation to the

16:01 21  grand jury on March 25th, did you have contact with any

16:01 22  witnesses in this case?

16:01 23      A.  No.

16:01 24      Q.  Did you have any contact with the hospital?

16:01 25      A.  No.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:01 1      Q.  Did you ask anyone else to contact potential

16:01 2  witnesses?

16:01 3      A.  No, ma'am.

16:01 4      Q.  Were you involved in issuing any subpoenas?

16:01 5      A.  No.

16:01 6      Q.  Did your office receive records from the

16:01 7  hospital in response to the subpoena signed by

16:01 8  Mr. Villarreal?

16:01 9      A.  Yes.  I believe that it was part of the packet,

16:01 10  the prosecution packet.

16:01 11      Q.  Did you look over those records before going to

16:01 12  the grand jury?

16:01 13      A.  I must have, yes.

16:01 14      Q.  Were there any -- any other documents that you

16:02 15  reviewed before going into the grand jury?

16:02 16      A.  No.  Just what was submitted to the DA's

16:02 17  office.

16:02 18      Q.  And that would have been what was submitted in

16:02 19  the -- the packet from the sheriff's office?

16:02 20      A.  Yes, ma'am.

16:02 21      Q.  Okay.  Did you have any contact during this

16:02 22  time with the funeral home where Ms. Gonzalez had the

16:02 23  fetal remains cremated?

16:02 24      A.  No, ma'am.

16:02 25      Q.  Did you have any contact with Daisy Perez, the

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:02 1    child protective worker?

16:02 2       A.  No.

16:02 3       Q.  When -- when your office made the decision to

16:02 4    go ahead and present this case to the grand jury, who

16:02 5    ultimately made that decision?

16:02 6       A.  Well, Mr. Ramirez let me know just to present

16:03 7    the case to grand jury.

16:03 8       Q.  Did he talk to you about what charges you would

16:03 9    present the grand jury to consider?

16:03 10      A.  I don't believe we discussed charges.

16:03 11      Q.  Okay.  Was he aware that you were presenting a

16:03 12   possible homicide?

16:03 13      A.  Yes.

16:03 14            MS. ROSENBLOOM:  I'd like to mark

16:03 15   Plaintiff's 17.

16:03 16      Q.  I'm showing you a copy of Plaintiff's 17, which

16:03 17   is the indictment in the case against Ms. Gonzalez; is

16:04 18   that correct?

16:04 19      A.  Yes, ma'am.

16:04 20      Q.  Looking at the end of the one-sentence

16:04 21   indictment, it ends with "That Lizelle Herrera,

16:04 22   defendant, on or about the 7th day of January 2022, and

16:04 23   before the presentment of this indictment, in Starr

16:04 24   County, Texas, did then and there intentionally and

16:04 25   knowingly cause the death of an individual, J.A.H., by

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:04  1    a self-induced abortion."

16:04  2                When you -- do you know why the grand jury

16:04  3    came back with an intentional and knowing homicide

16:05  4    charge?

16:05  5                MS. ALBIN:  Objection, calls for

16:05  6    speculation.

16:05  7        A.  I don't know what they discussed when they

16:05  8    deliberated.

16:05  9        Q.  Okay.  And that an intentional and knowing

16:05  10   homicide charge, does that have a particular degree?

16:05  11   Is it a first-degree murder, a second-degree murder,

16:05  12   anything like that in Texas?

16:05  13       A.  First-degree.

16:05  14       Q.  Okay.  Is that the highest level of murder

16:05  15   charge in Texas?

16:05  16       A.  There's capital.

16:05  17       Q.  Is first-degree the highest underneath a

16:05  18   death -- a capital case?

16:05  19       A.  Yes, ma'am.

16:05  20       Q.  The language here is -- at the end, "By a

16:05  21   self-induced abortion."  Is that language that you

16:05  22   presented the grand jury with an option to use that

16:05  23   language?

16:05  24               MS. ALBIN:  I'm going to instruct this

16:05  25   witness not to discuss any part of the presentation

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:06  1    before the grand jury.

16:06  2                MS. ROSENBLOOM:  Yes.  Thank you.  I'm

16:06  3    sorry about that.

16:06  4        Q.  Were you considering an intentional and knowing

16:06  5    charge before you went and presented to the grand jury?

16:06  6        A.  Was I considering it?

16:06  7        Q.  Yes.  As you prepared for your presentation.

16:06  8        A.  Well, it was brought in as a homicide case.

16:06  9    And, yes, that was a consideration that was given.

16:06  10       Q.  And did you think of this as an abortion case,

16:06  11   a self-induced abortion case?

16:06  12               MS. ALBIN:  Objection, vague.

16:06  13       A.  In what sense?

16:06  14       Q.  When you were considering the elements of the

16:06  15   crime and the facts of the case, did you think of this

16:07  16   as a case about self-induced abortion?

16:07  17       A.  I mean, I see it there as the reason of why the

16:07  18   death of the child was caused.  But to say that I

16:07  19   thought about it as an abortion case, no.

16:07  20       Q.  Was it the role of the grand jury to determine

16:07  21   the law -- which law applied to the facts?

16:07  22       A.  That is one of their roles.

16:07  23       Q.  Is it their role to determine the facts,

16:07  24   anything about the facts?

16:07  25       A.  They judge the -- the facts as presented.  I

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:07  1     mean, that's something that they can do.

16:07  2         Q.  Was Gocha Ramirez out of town when you met with

16:08  3     him about presenting this case as a homicide to the

16:08  4     grand jury, or was he in the office?

16:08  5         A.  No.  He was in the office.

16:08  6         Q.  Was he out of town shortly before that?

16:08  7         A.  I'm not sure.

16:08  8         Q.  Okay.  Was he out of town on the date you

16:08  9     presented this case at the grand jury, March 25th, if

16:08 10     you remember?

16:08 11         A.  Yes, he was out of town.  He was not in Starr

16:08 12     County.  He was in one of our other counties.

16:08 13         Q.  Was he working that day in one of the other

16:08 14     counties or on vacation?

16:08 15         A.  I believe he was at another grand jury in

16:08 16     another county.

16:08 17         Q.  Okay.  Does the DA himself still have job

16:08 18     responsibilities when he's outside of Starr County?

16:09 19             MS. ALBIN:  Objection, calls for

16:09 20     speculation.

16:09 21         A.  In -- in another county as like in Jim Hogg or

16:09 22     Duval Counties?

16:09 23         Q.  Yes.

16:09 24         A.  He's there as the DA, so, yes, I would assume

16:09 25     that he has responsibilities as DA in those counties.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:09  1        Q.  And with regard to the county where you work,

16:09  2   when he was out of town that day that you went to the

16:09  3   grand jury, was he still in charge of the office, or

16:09  4   were you in charge of the office that day?

16:09  5        A.  I mean, if I needed to go to him, I would reach

16:09  6   out to him or I could reach out to him.  But if there

16:09  7   was any staff members that needed to leave early or

16:09  8   anything like that, they would have probably asked Abel

16:09  9   or myself.

16:09 10        Q.  But on an important matter, he was reachable if

16:09 11   you needed something from him?

16:09 12        A.  I'm sure he would have been reachable.

16:10 13        Q.  And you testified earlier that -- that he was

16:10 14   the one who told you to go ahead and present this to

16:10 15   the grand jury; is that right?

16:10 16        A.  Well, he just let me know just go ahead and

16:10 17   present it to a grand jury, yes.

16:10 18        Q.  Okay.  Did you speak with Abel Villarreal at

16:10 19   all before -- while you were preparing for the grand

16:10 20   jury on this case?

16:10 21        A.  I did not.

16:10 22        Q.  Did you speak with anyone outside your office

16:10 23   about the grand jury proceedings before the

16:10 24   presentation?

16:10 25        A.  The only one would have been Investigator Muniz

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:10  1    as to when the grand jury would probably convene.

16:11  2        Q.  Do you -- knowing what you know now about

16:11  3    Section 19.06 of the Penal Code, do you believe the

16:11  4    charges were justified against Ms. Gonzalez?

16:11  5        A.  Knowing what I know now, no.

16:11  6        Q.  And are you aware now that that section of the

16:11  7    Texas Penal Code, 19.06, has been on the book since

16:11  8    2003?

16:11  9        A.  I'm not aware of when it was enacted into law.

16:11 10        Q.  Okay.  But it wasn't brand new in 2022, was it?

16:12 11            MS. ALBIN:  Objection, asked and answered.

16:12 12        A.  I didn't know about it in 2022.

16:12 13        Q.  Okay.  When you looked at it, did you see when

16:12 14    it was enacted?

16:12 15        A.  I -- I don't think I did.  I don't think I

16:12 16    looked to see when it was enacted.

16:12 17        Q.  Okay.  I'm showing you a copy of what's been

16:12 18    marked Defendant Exhibit 4.  This is just a different

16:12 19    printout of the same thing.  I'm sorry.  Those are the

16:13 20    copies I have.  And this is Penal Code Chapter 19.

16:13 21            Would you turn to the -- look at the

16:13 22    fourth and fifth pages where you'll see 19.06 at the

16:13 23    bottom there on page 4.  And then at the very end of

16:13 24    this printout, it says, "Added by Acts 2003, 78th Leg.,

16:13 25    effective September 1, 2003."

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:13  1            Have you -- were you aware of that before

16:13  2  today?

16:13  3      A.  About the enactment date or when it went into

16:13  4  effect, the statute?

16:13  5      Q.  Yes.

16:13  6      A.  No, ma'am.

16:13  7      Q.  Okay.  Are you familiar with several Texas

16:14  8  cases which each held a pregnant woman could not be

16:14  9  prosecuting -- prosecuted for terminating her own

16:14 10  pregnancy?

16:14 11      A.  I'm not aware of any specific cases.

16:14 12      Q.  Okay.  Are you -- does it refresh your memory

16:14 13  to talk about State versus Hunter, which was decided by

16:14 14  the Texas Court of Criminal Appeals in June 2021?

16:14 15      A.  I've never looked at that case.

16:14 16      Q.  Okay.

16:14 17      A.  And if I have, I don't recall.

16:14 18      Q.  Were you an ADA at that time, June of 2021?

16:14 19      A.  Yes, I was.

16:15 20      Q.  As part of your responsibility to know the

16:15 21  criminal law of Texas, you, I think, testified earlier

16:15 22  that you read opinions from the Texas Court of Criminal

16:15 23  Appeals; is that right?

16:15 24      A.  We're sent summaries of, I guess, cases TDCAA

16:15 25  wants to highlight on.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

140

16:15  1        Q.  But you don't remember being familiar with

16:15  2   State versus Hunter?

16:15  3        A.  I don't remember.

16:15  4        Q.  Did you see an update from the TDCAA from June

16:15  5   of 2022 entitled "Abortion-Related Crimes after Dobbs"?

16:15  6        A.  No.

16:15  7             MS. ROSENBLOOM:  I'm going to -- let me

16:16  8   mark that.  This will be Plaintiff 18.

16:16  9        Q.  Now, are you familiar with the Dobbs case which

16:16 10   overruled Roe versus Wade?

16:16 11        A.  I've heard of it, but I don't know -- I can't

16:16 12   say that I'm very familiar with it.

16:16 13        Q.  Okay.  And is this the type of update -- it's

16:16 14   called "interim update" -- that you've seen before from

16:16 15   the TDCAA?  Do they send updates on new jurisprudence

16:17 16   matters?

16:17 17             MS. ALBIN:  Objection, vague.

16:17 18        A.  I'm just looking at it because --

16:17 19        Q.  Oh, sure.  Take your time.

16:17 20        A.  Usually the way -- I mean, I don't know if

16:17 21   maybe they did this one differently or what.  But

16:17 22   usually this is not the way they're sent out, the

16:17 23   summaries.  This looks more as an article written by

16:17 24   somebody with TDCAA.

16:17 25        Q.  And I know you haven't seen it before, but it

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:17  1    is entitled, "Interim update:  Abortion-Related Crimes

16:17  2    after Dobbs."

16:17  3         A.  Yes, I see that.

16:17  4         Q.  And it talks about the supreme court decision

16:17  5    in Dobbs and its implications for Texas jurisprudence.

16:17  6    On page 3 there's a -- I'm sorry, on the third page

16:18  7    there's a line in bold that says, "Penal Code

16:18  8    Implications," and that reads, "As everyone was

16:18  9    reminded last month, there are no Penal Code charges

16:18  10   that can be brought against a woman whose conduct

16:18  11   results in the death of her unborn child, including by

16:18  12   submitting to or performing her own abortion."

16:18  13             And then it cites Penal Code 19.06 for

16:18  14   homicide, 22.12 for assaults, and 49.12 intoxication,

16:18  15   manslaughter, or assault.

16:18  16             Are you familiar with that reminder from

16:18  17   the previous month of May of 2022?

16:18  18             MS. ALBIN:  Objection, vague.  You can

16:18  19   answer if you know.

16:19  20        A.  No, ma'am.

16:19  21        Q.  Do you remember ever reading guidance from the

16:19  22   TDCAA about this topic, whether a pregnant woman could

16:19  23   be charged with a crime against her unborn child?

16:19  24        A.  I don't remember ever reading anything about

16:19  25   this topic from TDCAA.  This was after the indictment.

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:19  1    Q.  Yes.

16:19  2    A.  Okay.  No, I don't, ma'am.

16:19  3    Q.  Okay.  And this update also talks about a

16:19  4    trigger law in Texas that would go into effect 30 days

16:19  5    after the Dobbs final judgment and mandate adding

16:19  6    abortion-related criminal offenses.  Did you receive

16:20  7    from anyone information about new abortion-related

16:20  8    criminal offenses --

16:20  9            MS. ALBIN:  Objection --

16:20  10   Q.  -- around --

16:20  11           MS. ALBIN:  I'm sorry, go ahead.

16:20  12   Q.  -- around the summer of 2022?

16:20  13           MS. ALBIN:  Objection, relevance as to

16:20  14   anything that would have been published after the

16:20  15   indictment was dismissed.

16:20  16   A.  No, ma'am, I do not.

16:20  17   Q.  And are you aware that that law has now gone

16:20  18   into effect adding abortion-related criminal offenses

16:20  19   in Texas?

16:20  20   A.  I wasn't aware of the specifics.

16:20  21   Q.  Are you aware that there's currently a law

16:20  22   making certain abortion-related activity criminal

16:20  23   offenses?

16:20  24   A.  Well, I knew that Roe v. Wade had been

16:20  25   overturned.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                        ea909b08-9585-4819-a64a-b40fd23a510b

16:20  1          Q.  Okay.  Do you know that the law that was new in

16:21  2    August of 2022 had specific language saying, "Nothing

16:21  3    in this chapter can be used to impose criminal, civil,

16:21  4    or administrative liability upon a pregnant woman upon

16:21  5    whom an abortion is performed"?

16:21  6                Are you familiar with that?

16:21  7          A.  No.

16:21  8                MS. ALBIN:  Objection, relevance.

16:21  9          A.  No.

16:21  10         Q.  And before presenting the case against

16:21  11   Ms. Gonzalez to the grand jury, this was also true,

16:21  12   wasn't it, that criminal liability could not be imposed

16:21  13   on a pregnant woman who had an abortion; is that right?

16:21  14         A.  Under 19.06.

16:21  15         Q.  Yeah.  So that was true before Dobbs overruled

16:21  16   Roe and also after in Texas; is that right?

16:21  17         A.  I'm not sure what the -- what all of this says

16:22  18   right now.  If you give me time to read it, all of it,

16:22  19   I mean, I can -- but at the time, yes, 19.06 was in

16:22  20   effect.  I just did not know about it.

16:22  21         Q.  Okay.  Thanks.  We're finished with that one.

16:22  22   That's fine for that document.

16:22  23         A.  Yes, ma'am.

16:22  24         Q.  Have that one back.  Thank you.

16:22  25                How did you learn that the grand jury

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:22 1    returned an indictment charging Lizelle Gonzalez with

16:22 2    murder?

16:22 3        A.  I believe they in the grand jury book, their

16:22 4    vote was a true bill.

16:22 5        Q.  Okay.  And is the grand jury book something you

16:22 6    normally consult after you've made presentations?

16:22 7        A.  Usually I do inquire from my -- from Cindy

16:23 8    Garcia, which she's in charge of kind of organizing

16:23 9    the -- the grand jury for coming in, scheduling them.

16:23 10            I do inquire just so that I know which

16:23 11   indictments I need to draft and how I need to draft

16:23 12   them, because the ones that they no bill, I won't draft

16:23 13   an indictment.

16:23 14       Q.  So in this case, you learned there was a true

16:23 15   bill issued by the grand jury; is that right?

16:23 16       A.  For murder.

16:23 17            THE COURT REPORTER:  I'm sorry?

16:23 18       A.  For murder.

16:23 19       Q.  And did you draft the indictment?

16:23 20       A.  I did.

16:23 21       Q.  And does the actual indictment we looked at

16:23 22   earlier look like the one you drafted?

16:23 23       A.  That's the one I recall, yes, ma'am.

16:23 24       Q.  How was the sheriff's office informed that an

16:23 25   indictment had been returned?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:23  1        A.  I believe I informed Investigator Muniz that

16:23  2    the grand jury had indicted on murder.

16:23  3        Q.  Did you direct Investigator Muniz to take the

16:24  4    sealed indictment, pick up Ms. Gonzalez, and bring her

16:24  5    to the station, and then open and read the contents?

16:24  6        A.  No.

16:24  7        Q.  Who did?

16:24  8        A.  I'm not sure --

16:24  9            MS. ALBIN:  Objection, calls for

16:24 10    speculation.

16:24 11        Q.  If you know, who did?

16:24 12        A.  I'm not sure who directed her.

16:24 13        Q.  Okay.  Did you know that was happening on the

16:24 14    day it happened?

16:24 15        A.  I didn't know when she was going to execute the

16:24 16    arrest warrant.

16:24 17        Q.  Did you know that -- well, did your office --

16:24 18    did anyone in your office direct her to pick up

16:24 19    Ms. Gonzalez and open and read the contents of the

16:24 20    sealed envelope?

16:24 21        A.  I'm not sure if anybody from my office directed

16:24 22    her in a certain way.

16:24 23        Q.  Do you know that that happened?

16:24 24            MS. ALBIN:  Objection, vague; calls for

16:24 25    speculation.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:24  1          A.   I'm not sure.

16:24  2          Q.   Ms. Gonzalez was arrested after the indictment

16:25  3    issued; is that right?

16:25  4          A.   Yes.

16:25  5          Q.   Okay.  Was there any discussion that you were

16:25  6    involved in of a plan for her arrest?

16:25  7          A.   A plan?

16:25  8          Q.   Uh-huh.  Who would do it, when would it happen,

16:25  9    things like that?

16:25 10          A.   I believe Investigator Muniz inquired as to

16:25 11    what she needed to do because she had never dealt with

16:25 12    a sealed indictment.  And from what I recall, is that

16:25 13    usually the investigator knows what to do.

16:25 14                So I didn't even know what to do, because

16:25 15    I -- I don't handle that.  The investigator usually

16:25 16    handles that after there's a sealed indictment.  So I

16:25 17    would have probably directed her to speak to one of our

16:25 18    DA investigators --

16:25 19          Q.   Okay.

16:25 20          A.   -- for guidance.

16:25 21          Q.   Ms. Muniz testified that she was told to go

16:26 22    pick up Ms. Gonzalez after the indictment issued, bring

16:26 23    the sealed envelope with her, get her to the station,

16:26 24    and then open the envelope and read it.

16:26 25                Is that usually the way this happens, the

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:26  1    way someone is arrested or informed of -- of an
16:26  2    indictment?
16:26  3        A.  I don't know, because usually law enforcement
16:26  4    will be the one to handle that.  Whoever the
16:26  5    investigator is or the law enforcement agency, they're
16:26  6    the ones that handle the arrest.  So I don't know how
16:26  7    every person handles it.  I don't know.  I wouldn't
16:26  8    know.
16:26  9        Q.  So there was a -- a capias in this case,
16:26 10    correct?
16:26 11        A.  A capias?  Yeah.  Yes, ma'am.
16:26 12        Q.  Capias?  Sorry.  And who made the decision to
16:26 13    issue the capias?
16:26 14        A.  Well, when the grand jury true bills a case and
16:27 15    that person hasn't been arrested for that offense,
16:27 16    there's a capias issued.
16:27 17        Q.  Where does it come from?  There's a capias
16:27 18    issued, where -- who types it up?
16:27 19        A.  The district clerk.
16:27 20        Q.  Of the court?
16:27 21        A.  Of the court, yes.
16:27 22        Q.  Who ordered -- who arrested Ms. Gonzalez?
16:27 23        A.  I don't know if it was Investigator Muniz or
16:27 24    who specifically arrested her.
16:27 25        Q.  Okay.  Were you present for that arrest?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:27 1    A.  No, ma'am.

16:27 2    Q.  Do you know if anyone else was present for the

16:27 3  arrest?

16:27 4    A.  I wouldn't be able to tell you if anybody else

16:27 5  was present.

16:27 6    Q.  When did you first learn that she had been

16:27 7  arrested?

16:27 8    A.  I believe that day or soon thereafter.

16:27 9    Q.  And how did you learn of it?

16:27 10   A.  I believe Investigator Muniz let me know she

16:28 11  had been arrested.

16:28 12   Q.  Investigator Muniz testified that she was

16:28 13  confused about whether she was supposed to be arresting

16:28 14  Ms. Gonzalez or not, because she was just told to pick

16:28 15  her up and open the envelope and read it.  Were you

16:28 16  aware of that confusion that she had?  Did she contact

16:28 17  you about it?

16:28 18       MS. ALBIN:  Objection, calls for

16:28 19  speculation.

16:28 20   A.  No, I was not aware of that confusion.

16:28 21   Q.  Do you know if she called or texted anybody

16:28 22  else in your office about that confusion?

16:28 23   A.  No, I wouldn't know if she -- who she talked to

16:28 24  or who she called or texted.

16:29 25       MS. ROSENBLOOM:  Give me ten minutes, if

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

149

16:29  1    you don't mind, ten-minute break.

16:29  2                MS. ALBIN:  Okay.

16:29  3                (Brief recess)

16:44  4        Q.  You testified earlier that your office made no

16:44  5    recommendation about the bond for Ms. Gonzalez; is that

16:44  6    right?

16:44  7        A.  I didn't make a recommendation.

16:44  8        Q.  Are you aware that her bond was set at

16:44  9    $500,000?

16:44  10       A.  I believe I saw that on the indictment.

16:44  11       Q.  Did -- do you know that Ms. Gonzalez was

16:44  12   released from jail after posting bond two days after

16:45  13   she was arrested?

16:45  14                Do you know that Ms. Gonzalez was released

16:45  15   from jail after posting bond on April 9th after being

16:45  16   incarcerated for a couple days?

16:45  17       A.  I know that now.  I didn't at the time.

16:45  18       Q.  Did Mr. Ramirez have an opinion about whether

16:45  19   Ms. Gonzalez should be incarcerated or out pending the

16:45  20   resolution of the case?

16:45  21                MS. ALBIN:  Objection, calls for

16:45  22   speculation.

16:45  23       A.  I don't know what his opinion would have been.

16:45  24       Q.  Did you have any conversations with him about

16:45  25   whether your office wanted Ms. Gonzalez to be in jail

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:45 1    or out while the case was being handled?

16:45 2        A.  I did not have conversations with Mr. Ramirez

16:45 3    regarding those subject matters.

16:46 4        Q.  Were you aware that Ms. Gonzalez had cooperated

16:46 5    in the investigation voluntarily prior to the

16:46 6    indictment?

16:46 7        A.  Yes, I was aware that she had come in

16:46 8    voluntarily to the sheriff's office to give an

16:46 9    interview.

16:46 10       Q.  Was Mr. Ramirez aware that she had come in

16:46 11   voluntarily?

16:46 12            MS. ALBIN:  Objection, calls for

16:46 13   speculation.

16:46 14       A.  I'm not sure if I advised him of that when I

16:46 15   met with him before the grand jury presentation.

16:46 16       Q.  And the arrest took place about three months

16:46 17   after the -- the incident; is that right?

16:46 18       A.  Yes.

16:46 19       Q.  Is there any reason to believe Ms. Gonzalez

16:46 20   would have been a flight risk between the incident and

16:46 21   the arrest?

16:46 22       A.  There was no reason to believe that, not that I

16:46 23   knew of.

16:47 24       Q.  Okay.  I'd like to mark -- we're going to mark

16:47 25   some of the text messages between Ms. Herrera and

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:47  1    Bernice Garza.  They're labeled 1061 through 1066.  And

16:47  2    I only have a marked-up copy, so if you wouldn't mind

16:47  3    sharing the screen.

16:47  4               MS. ROSENBLOOM:  And this will be

16:47  5    Exhibit 19.

16:47  6         A.  Yeah, I'm good.

16:47  7         Q.  These documents are numbered 1061 to 1066.

16:47  8    They're not Bates-stamped.  And they were produced this

16:48  9    morning by defense counsel.  These are text messages

16:48 10    between you and Bernice Garza.  What -- who is Bernice

16:48 11    Garza?  What was her role?

16:48 12         A.  Bernice Garza was the crime victims coordinator

16:48 13    for the crime victims unit at the DA's office.

16:48 14         Q.  And you supervised the crime victims unit; is

16:48 15    that right?

16:48 16         A.  I don't know if at the time I was supervising

16:48 17    the crime victims unit at that time.

16:48 18         Q.  Okay.  Now, these texts are from April 9th,

16:48 19    2022.  And I believe the motion to dismiss the case was

16:48 20    April 10th.  They start with you telling Ms. Garza,

16:49 21    "This Herrera case is out of control," talking about

16:49 22    media attention, and then saying, "Most of these people

16:49 23    think we indicted her because she didn't know she was

16:49 24    pregnant and freaked and had the abortion early on.

16:49 25    They think we went under SB 8."

Electronically signed by Donna McCown (101-253-986-8079)                                                    ea909b08-9585-4819-a64a-b40fd23a510b

16:49  1              Why -- what did you mean when you said the

16:49  2    case was out of control?

16:49  3        A.  This was on April the 9th.

16:49  4        Q.  Yes, the --

16:49  5        A.  Well, this is at the time when everybody was

16:49  6    calling and e-mailing and posting on the Internet about

16:49  7    the case.

16:49  8        Q.  And what did you mean by "out of control"?

16:49  9        A.  That it was out of control, that there was a

16:49 10    lot of people calling and posting about the case, a lot

16:50 11    of attention on the case.

16:50 12        Q.  Were those people upset that the charges had

16:50 13    been brought?

16:50 14              MS. ALBIN:  Objection, calls for

16:50 15    speculation.

16:50 16        A.  There were some that were upset.

16:50 17        Q.  And I'll -- I'll note that the text messages on

16:50 18    this page and all of the following pages are marked as

16:50 19    deleted with the reason stated being user deleted and

16:50 20    the deletion date February 24th, 2025.  Do you recall

16:50 21    deleting this text exchange?

16:50 22        A.  I do not recall deleting these.

16:51 23        Q.  Okay.  But is there anyone else who deleted

16:51 24    them, to your knowledge, other than you?

16:51 25        A.  No.  I mean, I would have deleted them, but I

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:51 1   don't recall deleting these specific messages.

16:51 2       Q.  Okay.  Do you recall deleting messages from

16:51 3   your phone at the end of February of this year, about a

16:51 4   month ago?

16:51 5       A.  I delete messages quite often to clear up data

16:51 6   on my -- or storage on my phone.  They could have been

16:51 7   some of the ones that got deleted.

16:51 8       Q.  What was your concern that people thought --

16:51 9   as you said, people thought you had indicted

16:51 10  Ms. Gonzalez because she had the abortion early on, and

16:51 11  then you mentioned SB 8.  What -- what did you mean by

16:51 12  that?  What was -- what was the problem with that?

16:52 13      A.  I mean, I was just telling her that people

16:52 14  thought that the DA's office had proceeded under SB 8

16:52 15  for indictment.

16:52 16      Q.  Did you proceed under SB 8?

16:52 17      A.  I do not recall reviewing SB 8.

16:52 18      Q.  But did you know that SB 8 did not include the

16:52 19  creation of crimes?

16:52 20      A.  I didn't go based off SB 8.  I looked at the

16:52 21  facts as they were presented in the prosecution packet,

16:52 22  the homicide statute, and the definition of

16:52 23  "individual," and that's what I thought the law was at

16:52 24  the time.

16:52 25      Q.  On the next page, 1062, the message at the top

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:52  1    from Ms. Garza says, "Yeah, I knew it would."  And then
16:53  2    she says, "That's why I reached out yesterday."
16:53  3              Did she mean she knew it would -- it would
16:53  4    cause the case to be out of control, to use your words?
16:53  5              MS. ALBIN:  Objection, calls for
16:53  6    speculation.
16:53  7        A.  I don't know what she meant --
16:53  8        Q.  Okay.
16:53  9        A.  -- by that message.
16:53 10        Q.  And on the next page, 1063, in another text
16:53 11    mail deleted, it says from Ms. Garza to you, Bernice
16:53 12    Garza, "But once they hear the facts, they will all
16:53 13    freak."
16:53 14              And you answer, "Yeah.  Well, let's hope."
16:53 15    Which facts were you referring to?
16:53 16        A.  I believe that I was talking about the fact
16:53 17    that the baby was about 20 weeks and that it had lost
16:54 18    oxygen for about two hours and that that's what caused
16:54 19    the hemorrhaging and the death.
16:54 20        Q.  Okay.  And on the next page, 1064, Bernice
16:54 21    Garza says, "What I told Gocha was some of the facts
16:54 22    need to be released."
16:54 23              And you responded, "Yes, they do, and the
16:54 24    fact that we didn't go under abortion laws."  What did
16:54 25    you mean by that, that you didn't go under abortion

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:54  1    laws?

16:54  2        A.  That I went based off the Penal Code as I

16:54  3    thought the law was at the time, which would have been

16:54  4    the 19.01 and the definition of "individual," that I

16:54  5    wasn't even concerned about abortion laws.

16:54  6        Q.  And what -- what were you -- what did you mean

16:54  7    when you said "abortion laws"?  What laws?

16:54  8        A.  Well, at that time, everybody had started -- or

16:54  9    the people on -- online and in e-mails and stuff about

16:55  10   a woman's, you know, right to have an abortion.  And

16:55  11   that's what I meant by that, that I hadn't even

16:55  12   considered that.

16:55  13            It was a case that I looked at the facts

16:55  14   as they were brought in in the prosecution packet and

16:55  15   the law, the way I thought it applied, and that's what

16:55  16   I considered.

16:55  17       Q.  On the very last page of this exhibit, page

16:55  18   No. 1066, it's the next day.  It's April 10th, 2022

16:55  19   that you sent a text to Ms. Garza saying, "I woke up

16:55  20   feeling horrible.  I think I even had a panic attack

16:55  21   yesterday."

16:55  22            The 10th was the day your office filed a

16:55  23   motion to dismiss the case.  Was your panic attack

16:56  24   related to this case.

16:56  25       A.  Yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

156

16:56  1          Q.  Okay.  And what caused you to panic?

16:56  2          A.  I felt really bad for everything that had

16:56  3     happened and the fact that I had not seen or known

16:56  4     about 19.06.

16:56  5          Q.  Do you know what the attachment is in the next

16:56  6     text block there?

16:56  7          A.  I don't know what it is.

16:56  8          Q.  It was from Ms. Garza to you.

16:56  9          A.  Yeah.  I don't know what that is, but maybe

16:56  10    Kelly can click on the link later.  I don't know how

16:56  11    she can grab that.

16:56  12         Q.  That's okay.  Just wondering if you remember

16:56  13    what she sent you.

16:56  14         A.  I don't.

16:56  15         Q.  Thank you.  And why was Bernice Garza involved

16:57  16    with the Gonzalez case?

16:57  17                MS. ALBIN:  Objection, calls for

16:57  18    speculation.

16:57  19         Q.  Or was she involved?

16:57  20         A.  Well, this would have been around the time when

16:57  21    everybody knew about it already.  Because after the

16:57  22    indictment, she would have known about it.

16:57  23         Q.  Did she play a role in the case earlier in the

16:57  24    investigation?

16:57  25         A.  Not that I'm aware, no.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

16:57 1    Q.  And to be clear, these text messages we're

16:57 2    discussing were sent through regular messaging function

16:57 3    on your iPhone; is that right?

16:57 4    A.  I believe so.  It says "SMS," so yes.

16:57 5    Q.  Is there any reason we should dispute their

16:57 6    authenticity?

16:57 7    A.  No.

16:57 8    Q.  And when the -- the texts refer to user, is

16:58 9    that you?

16:58 10    A.  I don't -- I mean, I'm guessing that that's

16:58 11    what the -- it refers to.

16:58 12    Q.  You said the panic attack was related to you

16:58 13    feeling really bad.  Why did you feel bad?

16:58 14    A.  I felt bad because I was not aware of 19.06,

16:58 15    and I presented the case, and Ms. Herrera was jailed

16:58 16    for that.  But I was not aware of 19.06, and so I felt

16:59 17    really bad about everything.

16:59 18    Q.  And you presented it with the approval of -- of

16:59 19    Mr. Ramirez; is that correct?

16:59 20    A.  The approval?  I mean, he knew I was going to

16:59 21    present it, but he didn't review the case.

16:59 22    Q.  You told him about it and he told you to go

16:59 23    ahead, right?

16:59 24    A.  He told me to just -- that for it just to be

16:59 25    submitted to the office as an investigation for the

Electronically signed by Donna McCown (101-253-986-8079)                                        ea909b08-9585-4819-a64a-b40fd23a510b

16:59  1    grand jury to decide.

16:59  2        Q.  Show you another set of texts.  This is 120

16:59  3    through -- this is between Ms. Muniz and Ms. Barrera,

16:59  4    labeled 120 through 123.

17:00  5             This is marked Exhibit 20.  This is a set

17:00  6    of messages between you and Esmeralda Muniz, the

17:00  7    investigator at the Starr County Sheriff's Office.  And

17:00  8    they are dated April 9th, which is also -- same day,

17:00  9    the day before the motion to dismiss the case was

17:00 10    filed.

17:00 11        A.  Yes.

17:00 12        Q.  She is first saying to you, "The baby did not

17:00 13    have a heartbeat when she got to the hospital."

17:00 14             And you responded, "I just wanted to make

17:01 15    sure that I remembered the facts correctly.  LOL."

17:01 16             Do you know why she was telling you the

17:01 17    baby did not have a heartbeat when she got to the

17:01 18    hospital or what that had to do with?

17:01 19             MS. ALBIN:  Objection, speculation.

17:01 20        A.  Is there messages before this one?

17:01 21        Q.  I don't know.  We may need to look back.  If

17:01 22    you remember -- don't tell me if you don't remember,

17:01 23    but do you remember if you asked her that question,

17:01 24    whether the baby had a heartbeat before she got to the

17:01 25    hospital?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:01  1      A.  I don't recall my exact question.  But I do
17:01  2  think that there is a conversation before this message.
17:01  3      Q.  Okay.  And when you answered, "I just wanted to
17:01  4  make sure that I remembered the facts correctly.  LOL,"
17:01  5  what was the "laugh out loud" about?
17:02  6      A.  I don't know why I wrote that.
17:02  7              THE COURT REPORTER:  I'm sorry?
17:02  8      A.  I don't know why I wrote that.
17:02  9      Q.  Okay.  The next page, same day, Ms. Muniz is
17:02  10  saying to you, "Yes.  We are right on the facts."  Do
17:02  11  you know, was she referring to the facts about whether
17:02  12  the baby was alive or not when Ms. Gonzalez got to the
17:02  13  hospital?
17:02  14              MS. ALBIN:  Objection, speculation.
17:02  15      A.  I don't know.  I don't know what she was
17:02  16  referring to there.
17:02  17      Q.  Okay.  And I'll note that that one message
17:02  18  indicates user deleted.  The others do not.
17:03  19              The second text on that page, page 121,
17:03  20  you are asking Ms. Muniz, "Esmer, did doctors or nurses
17:03  21  ever say why they took a while to report?  Sorry for
17:03  22  the questions.  We are going to start working on a
17:03  23  press release on Monday.  My e-mail is blowing up.
17:03  24  Washington Post, NBC, BuzzFeed, and then the rest are
17:03  25  threats and nasty."

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

17:13  1    weekend?

17:13  2        A.  Not that I recall, no.

17:13  3        Q.  Did you agree it was legally appropriate to

17:14  4    seek dismissal of the case at that point?

17:14  5        A.  Yes.

17:14  6        Q.  Mr. Villarreal testified two weeks ago that he

17:14  7    and Mr. Ramirez had talked about Section 19.06 that

17:14  8    weekend and they were both of the opinion the case had

17:14  9    to be dismissed.  Did you know at the time about their

17:14  10   conversation?

17:14  11       A.  I didn't know about their conversation or what

17:14  12   it entailed.

17:14  13       Q.  Was -- did that seem unusual to you that you

17:15  14   were not kept in the loop by either of them given that

17:15  15   you had presented the case?

17:15  16       A.  No.

17:15  17            MS. ROSENBLOOM:  I'd like to mark

17:15  18   Exhibit 21.

17:15  19       Q.  I'm showing you what's been labeled Plaintiff's

17:15  20   Exhibit 21.  This is a copy of the motion to dismiss in

17:15  21   the case against Lizelle Herrera; is that right?

17:15  22       A.  Yes.

17:15  23       Q.  And this motion to dismiss is signed by

17:16  24   Mr. Ramirez himself, correct?

17:16  25       A.  Yes, ma'am.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:16  1          Q.  You recognize his signature?

17:16  2          A.  Yes.

17:16  3          Q.  Does the district attorney himself always sign

17:16  4    a motion to dismiss a case regardless of which

17:16  5    prosecutor is handling the case?

17:16  6          A.  He doesn't sign all dismissals, but he signs

17:16  7    dismissals.

17:16  8          Q.  Okay.  The motion is based on insufficient

17:16  9    evidence and in the interest of justice.  What do you

17:16  10   understand each of these reasons to mean?  Let's start

17:16  11   with the evidence is insufficient.

17:16  12         A.  I don't know why he -- well, the reasoning was

17:16  13   that he marked those specific two.

17:16  14         Q.  Okay.  Did you agree that there was

17:17  15   insufficient evidence?

17:17  16         A.  That's something I would agree with.

17:17  17         Q.  Okay.  And would you agree that it was in the

17:17  18   interest of justice to dismiss the case?

17:17  19         A.  Yes.

17:17  20         Q.  Did you know at the time that Attorney Brandy

17:17  21   Voss had texted Mr. Ramirez alerting him to

17:17  22   Section 19.06 on April 9th?

17:17  23         A.  At the time, I did not know who had texted him,

17:17  24   but he did tell me, "A friend just sent me Statute

17:17  25   19.06 -- Penal Code 19.06."  And he let me know that,

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

17:17 1    but he didn't go into specifics as to who.

17:17 2        Q.  On April 10th, that Sunday, the date of the

17:17 3    motion to dismiss, Mr. Ramirez met with Ms. Gonzalez

17:18 4    and her biological father.  I think you testified you

17:18 5    were not in that meeting; is that right?

17:18 6        A.  I was not.

17:18 7        Q.  Did Mr. Ramirez talk with you about that

17:18 8    meeting beforehand?

17:18 9        A.  No.

17:18 10        Q.  Did he talk with you about it afterwards?

17:18 11        A.  I believe he did let me know that he had spoken

17:18 12    to Ms. Gonzalez and apologized.

17:18 13        Q.  Did he tell you what he apologized for?

17:18 14        A.  I don't recall exactly what he said, but I do

17:18 15    recall him saying that he apologized.

17:18 16        Q.  I'm showing you what was previously marked

17:18 17    Exhibit 4.  I think you still have the attachment of

17:19 18    Villarreal exhibits.  And this is the press release

17:19 19    issued by your office on April 10th regarding the

17:19 20    motion to dismiss the indictment against Ms. Gonzalez.

17:19 21    And do you recognize this as the press release?

17:19 22        A.  Yes.

17:19 23        Q.  Who was involved in -- in writing or editing

17:19 24    this press release?

17:19 25        A.  I don't know.  I was not.

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

17:19  1     Q.   Okay.  And it's -- it has an electronic

17:19  2  signature of Mr. Ramirez at the bottom.  Did he approve

17:19  3  posting the press release and disseminating it?

17:19  4          MS. ALBIN:  Objection, calls for

17:19  5  speculation.

17:19  6     A.   I -- if it was posted.  It has his signature.

17:19  7     Q.   Then what?

17:19  8          MS. ALBIN:  Objection --

17:19  9     Q.   He must have approved it?

17:20  10          MS. ALBIN:  I'm sorry.  Calls for

17:20  11  speculation.

17:20  12     A.   That would be -- that would be a question for

17:20  13  him as to whether it was approved or if he has

17:20  14  objections to this release or not.

17:20  15     Q.   You knew that he was working on drafting a

17:20  16  press release; is that right?

17:20  17     A.   He let me know, yes, that he was going to work

17:20  18  on the press release.

17:20  19     Q.   And did you have discussions with anyone about

17:20  20  the content of the press release before it was issued?

17:20  21     A.   No, ma'am.

17:20  22     Q.   Did you speak with any members of the press

17:20  23  about the prosecution of Lizelle Gonzalez?

17:20  24     A.   No.

17:20  25     Q.   Did you speak with any members of the press

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:20  1    about the dismissal of the case?

17:20  2        A.   No.

17:20  3        Q.   Did you speak with any members of the public

17:20  4    that is not employees of the DA office about the

17:21  5    investigation, arrest, or prosecution, or dismissal?

17:21  6        A.   Afterwards?

17:21  7        Q.   At any time.

17:21  8        A.   I --

17:21  9            MS. ALBIN:  Objection, vague.

17:21 10        A.   I probably was asked about it afterwards, after

17:21 11    it was all over the media.  I'm pretty sure I talked to

17:21 12    people about it.

17:21 13        Q.   The press release is -- is very clear.  It

17:21 14    says, "It is not -- based on Texas law and the facts

17:21 15    presented, it is not a criminal matter."  It also says

17:21 16    at the end, "It is my hope that with the dismissal of

17:21 17    this case, it is made clear that Ms. Herrera did not

17:21 18    commit a criminal act under the laws of the state of

17:21 19    Texas."

17:21 20            Do you agree with those statements?

17:21 21        A.   Yes.

17:21 22        Q.   Were you aware of the extensive press coverage

17:21 23    of this prosecution before it was dismissed?

17:22 24            MS. ALBIN:  Objection, vague.

17:22 25        A.   Before it was dismissed, so after the

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

17:22  1    indictment?

17:22  2         Q.  Yes.

17:22  3         A.  Yes, I was aware.  I saw on social media.

17:22  4         Q.  Were you aware that many members of the public

17:22  5    contacted your office to advocate for dropping the

17:22  6    charges?

17:22  7         A.  I think this happened over the weekend, so I'm

17:22  8    not sure who was at the office that weekend and who

17:22  9    they spoke to.

17:22 10         Q.  Did you read any of the e-mails that came in

17:22 11    that you had described in one of the texts we looked at

17:22 12    earlier as -- as threatening?

17:22 13         A.  I know the e-mails that came to me.

17:22 14         Q.  Some e-mails came to you personally?

17:22 15         A.  E-mails regarding this case afterwards?

17:22 16         Q.  Yes.

17:22 17         A.  Yes.  They -- like the threatening e-mails and

17:23 18    stuff like that, yes.

17:23 19         Q.  Did you get e-mails from members of the public

17:23 20    before the dismissal?

17:23 21         A.  No.

17:23 22         Q.  Nobody e-mailed you to advocate dropping the

17:23 23    charges?

17:23 24         A.  Not me.

17:23 25         Q.  Okay.  But e-mails came to your office, is that

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

17:23 1    right, or to Mr. Ramirez?

17:23 2              MS. ALBIN:  Objection, speculation.

17:23 3        A.  I'm not sure what -- what type of e-mails he

17:23 4    received and when.

17:23 5        Q.  Okay.  Your counsel has produced quite a few

17:23 6    e-mails from interested members of the public

17:23 7    advocating for dropping of the charges.  Have you seen

17:23 8    any of those?

17:23 9              MS. ALBIN:  I'm going to object to the

17:23 10   characterization of them advocating.

17:23 11       Q.  Okay.  The -- back to the press release for a

17:23 12   moment.  The press release says in the second

17:23 13   paragraph, "It is clear that the Starr County Sheriff's

17:23 14   Office did their duty in investigating the incident

17:23 15   brought to their attention by the reporting hospital.

17:24 16   To ignore the incident would have been a dereliction of

17:24 17   their duty."

17:24 18              If -- if your office had already decided

17:24 19   that Ms. Gonzalez could not be prosecuted for the crime

17:24 20   of murder, why does the -- why should it -- why should

17:24 21   the sheriff's office have investigated something that

17:24 22   wasn't a crime?

17:24 23              MS. ALBIN:  Objection, calls for

17:24 24   speculation.

17:24 25       A.  The DA's office I don't think ever made the

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:24  1    decision that a crime had not been committed and that

17:24  2    the sheriff's office kept on investigating.

17:24  3        Q.  Well, right here in the press release it says,

17:24  4    "It is -- based on the law and the facts, it is not a

17:24  5    criminal matter," so that seems like a determination.

17:24  6        A.  After the fact.

17:24  7        Q.  After the fact.

17:24  8        A.  Yes.

17:24  9        Q.  So after the fact, Mr. Ramirez is still saying

17:24  10   in the press release that the sheriff's office -- it

17:24  11   would have been a dereliction of their duty not to

17:24  12   investigate this thing that you now knew was not a

17:25  13   crime.  Why would that be a dereliction of their duty?

17:25  14            MS. ALBIN:  Objection, speculation as to

17:25  15   what Ramirez meant by that statement.

17:25  16       A.  You would have to ask him what he meant by --

17:25  17   by that.

17:25  18       Q.  Okay.  Was there a -- a meeting among the DA's

17:25  19   office staff after the dismissal?

17:25  20           MS. ALBIN:  Objection, vague.

17:25  21       Q.  About this case.

17:25  22       A.  After the dismissal, yes, I do believe that

17:25  23   Mr. Ramirez spoke to us regarding a dismissal and the

17:25  24   events that had happened.

17:25  25       Q.  What events are you referring to?

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

17:38  1    like that that they had inquired about.  And any that
17:38  2    did pop up, I did send those over at the time --
17:38  3         Q.  Okay.
17:38  4         A.  -- prior to the extraction.
17:38  5         Q.  So you don't know if all of the text messages
17:38  6    that were turned over to plaintiff's counsel before the
17:38  7    extraction include all of the ones you gave to your
17:39  8    counsel?
17:39  9         A.  Well, I know that they're not all of them.
17:39 10    What the -- I've worked with Cellebrite before in cases
17:39 11    as a prosecutor, and it's a very good program in my
17:39 12    opinion.  It recovers a lot of messages that are in
17:39 13    clouds or hidden away in some places where one can't
17:39 14    find on their phone just by a simple search.
17:39 15              So I know that not all of these were
17:39 16    disclosed to the attorney -- or my attorneys because I
17:39 17    was not able to find them.  But Cellebrite was able to
17:39 18    find them.
17:39 19         Q.  Okay.  You were aware of the disciplinary
17:39 20    complaint to the Texas Bar against DA Ramirez related
17:39 21    to the investigation, arrest, and charging of
17:39 22    Ms. Gonzalez; is that correct?
17:39 23         A.  Yes.
17:39 24         Q.  When did you become aware of it?
17:39 25         A.  I became aware of it when a process server was

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:40  1    looking to serve me with a subpoena to appear before

17:40  2    the panel.

17:40  3        Q.  And you were, in fact, subpoenaed to testify in

17:40  4    front of the panel; is that right?

17:40  5        A.  Yes.

17:40  6        Q.  Okay.  The subpoena was for March 1st, 2023.

17:40  7    Did you testify on that date?

17:40  8        A.  I don't remember the date on my subpoena.

17:40  9        Q.  Okay.  There was that date March 1st, and then

17:40  10   there was another date on which the panel met which was

17:40  11   in October.  Do you remember on which date you

17:40  12   testified, March or October?

17:40  13       A.  If they only met twice, I must have -- I must

17:40  14   have testified in the beginning, the March one, the

17:40  15   first one.

17:40  16       Q.  Okay.  Did you prepare for that testimony?

17:40  17       A.  No.

17:40  18       Q.  Did you review any documents before that

17:40  19   testimony?

17:40  20       A.  No.

17:40  21       Q.  Did you create any notes or documents related

17:40  22   to your testimony?

17:40  23       A.  No.

17:40  24       Q.  Did you have an attorney representing you at

17:40  25   that grievance committee testimony?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:41 1   A. No.

17:41 2   Q. Did you consult an attorney before testifying?

17:41 3   A. No.

17:41 4   Q. Did -- were there any disciplinary charges

17:41 5 brought against you related to this case?

17:41 6   A. Not that I'm aware.

17:41 7   Q. Did Mr. Ramirez have an attorney representing

17:41 8 him in front of the grievance committee?

17:41 9   A. No.

17:41 10   Q. And what was your testimony for the grievance

17:41 11 committee?  What did you tell them?

17:41 12   A. They asked me questions about whether I knew

17:41 13 about 19.06, if I had discussed 19.06 with Mr. Ramirez

17:41 14 prior to the indictment, how I generally handle my

17:41 15 cases.  And other than that, it was just rude comments

17:42 16 or attacks.

17:42 17   Q. From members of the panel?

17:42 18   A. Yes.

17:42 19   Q. What type of comments and attacks?  Do you

17:42 20 remember any examples?

17:42 21   A. Just side remarks like, "You've been a

17:42 22 prosecutor for this long and you didn't know about

17:42 23 19.06," and things of that nature.

17:42 24   Q. Did they ask you about your role specifically

17:42 25 in the investigation and prosecution of Ms. Gonzalez?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755   McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)   ea909b08-9585-4819-a64a-b40fd23a510b

17:42  1          A.  I don't think they went into specifics about my

17:42  2     role with law enforcement or anything like that.  It

17:42  3     was just I was the prosecutor that had presented the

17:42  4     case and whether I knew about 19.06 is mostly what they

17:43  5     focused on.

17:43  6          Q.  Did they ask you about what was the extent of

17:43  7     Mr. Ramirez's involvement?

17:43  8          A.  Yes, we did talk about that.

17:43  9          Q.  And what did you tell them about that?

17:43 10          A.  The same thing I've testified here, which is

17:43 11     that I had advised him prior to the presentation of the

17:43 12     grand jury generally about the case and that the

17:43 13     sheriff's office was inquiring about whether to submit

17:43 14     the case for grand jury presentation or arrest.

17:43 15          Q.  What did you understand the committee to be

17:43 16     investigating?

17:43 17          A.  They were -- they were focused on certain roles

17:43 18     of the code of conduct.  I don't recall the exact roles

17:43 19     they were focused on.

17:43 20          Q.  And what did you understand to be the reason

17:43 21     they wanted your testimony?

17:44 22                MS. ALBIN:  Objection, speculation.

17:44 23          A.  I don't know.  I was called in as a witness.

17:44 24          Q.  Were you present for the testimony of Abel

17:44 25     Villarreal before that panel?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:44  1          A.  No.

17:44  2          Q.  Were you present for the testimony of Judith

17:44  3     Solis?

17:44  4          A.  No.

17:44  5          Q.  Were you asked to produce any documents to that

17:44  6     committee?

17:44  7          A.  I don't believe I was.

17:44  8          Q.  Okay.  I'm showing you what's been marked as

17:45  9     Plaintiff's Exhibit 24.  Look at Bates-stamp

17:45  10    Defendants' 14 and 15, and this is a letter from Gocha

17:45  11    Ramirez to Clayton Hackett, the assistant disciplinary

17:45  12    counsel, regarding the grievance we were just talking

17:45  13    about.  Have you seen this letter before?

17:45  14         A.  I believe I saw it after everything was over.

17:45  15         Q.  Okay.  Did Mr. Ramirez discuss it with you?

17:45  16         A.  I saw this letter when we had sent over

17:45  17    discovery to the -- to our attorneys in this case.

17:46  18         Q.  So at the time in 2022, you -- you didn't see

17:46  19    this letter?

17:46  20         A.  I don't know if I did or didn't.

17:46  21         Q.  Do you remember if you -- if Mr. Ramirez asked

17:46  22    you any questions related to the representations he

17:46  23    makes in this letter?

17:46  24         A.  He didn't discuss writing a letter with me or

17:46  25    that they inquired questions of him.  No, he did not.

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

17:46 1     Q.  Okay.  And this letter is dated July 14th,
17:46 2  2022, after the grievance had been filed.  In No. 2 --
17:46 3  this is Mr. Ramirez's response to six questions that
17:46 4  Mr. Hackett had asked.
17:46 5              In No. 2, he says, "On May 17th, 2022, the
17:46 6  file would have been turned in to our intake clerk."
17:47 7  It's his understanding that the ADA who took control of
17:47 8  the file was ADA Alexandria Barrera.
17:47 9              What does that mean, "take control of the
17:47 10 file"?  This is after the case had been dismissed.
17:47 11             MS. ALBIN:  Objection, calls for
17:47 12 speculation.
17:47 13    A.  I don't know what he meant by "take control of
17:47 14 the file."
17:47 15    Q.  Is it correct that you got the file after
17:47 16 May 17th from the intake clerk in some way?  Did you
17:47 17 have the file in your possession after that?
17:47 18    A.  May 17th, I don't -- it was prior to that,
17:47 19 because the indictment was in March, so I don't know --
17:47 20 I don't know what he's talking about on May 17th.
17:47 21    Q.  All right.  And in No. 3, Mr. Ramirez says that
17:47 22 you presented the case to the grand jury.  And he says,
17:48 23 "No other attorneys were involved in this
17:48 24 presentation."  Do you agree with that?
17:48 25    A.  On No. 3?

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:48  1        Q.  Do you agree that no other attorneys were

17:48  2    involved in the presentation to the grand jury?

17:48  3        A.  No other ADA, as far as I remember, was present

17:48  4    during the presentation of this case.

17:48  5        Q.  Was anybody involved in helping you prepare for

17:48  6    it?

17:48  7        A.  No.

17:48  8        Q.  His answer to No. 4 says that you handled the

17:48  9    case.  Is that correct?

17:48  10            MS. ALBIN:  Objection, vague; calls for

17:48  11    speculation.

17:48  12        Q.  Is it correct that you handled the case?

17:48  13        A.  I reviewed the case prior to the presentation

17:48  14    of the grand jury.

17:48  15        Q.  No. 5, Mr. Ramirez says, and I'm quoting --

17:48  16    this is on the next page -- his understanding of why

17:49  17    this investigation was presented to the grand jury is

17:49  18    obviously, ADA Barrera mistakenly believed that a crime

17:49  19    might have been committed by Ms. Herrera and wanted a

17:49  20    grand jury to consider the facts.

17:49  21            Do you agree that it was presented

17:49  22    obviously because of your mistaken belief?

17:49  23            MS. ALBIN:  Objection, calls for

17:49  24    speculation.

17:49  25        A.  Because I didn't know about 19.06.  And I

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

17:49  1    presented the facts the way that they were submitted

17:49  2    and the way I thought the law applied at the time.

17:49  3         Q.  Do you agree with this characterization that

17:49  4    you had a mistaken belief?

17:49  5         A.  I don't know what me means by "mistaken," but,

17:49  6    I mean, I didn't know about 19.06, if that's what

17:49  7    that -- that's what he means.  But you might have to

17:49  8    ask him what he means by "mistaken."

17:50  9         Q.  Okay.  And in this paragraph No. 5, you're the

17:50  10   only one who's listed here.  Was it your mistake alone

17:50  11   or your error alone?

17:50  12              MS. ALBIN:  Objection, calls for

17:50  13   speculation.

17:50  14        A.  I presented it to the grand jury, and I didn't

17:50  15   know about 19.06.  So yes, I mean, I -- I should have

17:50  16   known about 19.06, but I didn't.

17:50  17        Q.  And you -- we've gone over this, but in your

17:50  18   response to the fifth interrogatory, you stated that

17:50  19   Mr. Ramirez approved your presentation.  Do you -- do

17:50  20   you still believe it was your -- yours alone to take

17:50  21   this on and that he had no part of it?

17:50  22        A.  I mean, he didn't do the research on the case,

17:50  23   but he was not aware of 19.06 either, so there was no

17:51  24   way he could have even told me or advised me about it

17:51  25   because he didn't know about it either.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

17:51 1      Q.  Okay.  So in the paragraph after the numbered

17:51 2    paragraphs, the committee has asked about remedial

17:51 3    action.

17:51 4           And Mr. Ramirez answers, and then he says,

17:51 5    "It is my position that any action I would take in the

17:51 6    future with regard to ADA Barrera and her involvement

17:51 7    in this case would not be remedial but punitive in

17:51 8    nature as they would not afford remedy for the

17:51 9    situation involving Ms. Herrera."

17:51 10          Were any actions taken after this with

17:51 11   regard to you and your involvement in the case, any

17:51 12   punitive actions?

17:51 13     A.  No.

17:51 14     Q.  Do you think as the district attorney

17:52 15   Mr. Ramirez should have known about 19.06?

17:52 16     A.  I mean, he was district attorney for maybe a

17:52 17   year at that point.  But whether he should have known

17:52 18   or not known of it as DA, I mean, I don't -- I can't

17:52 19   answer that because I don't think that any DA knows

17:52 20   every single Penal Code by heart.

17:52 21     Q.  Okay.

17:52 22     A.  Or every single Penal Code at all by memory.

17:53 23     Q.  Showing you a document marked Plaintiff's

17:53 24   Exhibit No. 25 -- and we are close to the end.  Just

17:53 25   letting you know.

Electronically signed by Donna McCown (101-253-986-8079)                              ea909b08-9585-4819-a64a-b40fd23a510b

10:31  1          MR. JOHNSON:  Moving --

10:31  2          MS. ALBIN:   -- untrue allegations in the

10:31  3   lawsuit is what created that, not my questions.  Go

10:31  4   ahead.

10:31  5          MS. JOHNSON:  And I will move on.

10:31  6      Q.  (By Ms. Johnson) Do you believe it would be a

10:31  7   material omission to not present a relevant portion of

10:31  8   the law to the grand jury when you are presenting

10:31  9   evidence for a homicide case?

10:31 10      A.  If the prosecutor knew about it.

10:31 11      Q.  Why -- why is it a material omission if the

10:31 12   prosecutor knew about it?

10:31 13      A.  Because you're knowingly withholding something

10:31 14   from the grand jury.

10:31 15      Q.  And if the prosecutor does not know about it,

10:32 16   is -- do you -- would you consider that a material

10:32 17   omission?

10:32 18      A.  I wouldn't consider that a material omission.

10:32 19      Q.  Do you agree that under either scenario the

10:32 20   grand jury would still not be receiving that

10:32 21   information?

10:32 22          MS. ALBIN:  Objection, calls for

10:32 23   speculation.

10:32 24      A.  Knowingly or unknowingly?

10:32 25      Q.  Right.  That under either scenario, the grand

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

10:32  1    jury would not receive that information?

10:32  2        A.  Right.

10:32  3        Q.  Did you believe that the grand jury's job in

10:32  4    this case -- and by "this case," the presentation of

10:32  5    Lizelle Gonzalez -- was to decide the law and

10:32  6    whether -- let me restate that.

10:32  7            Did you believe that the grand jury's job

10:32  8    in Lizelle's case was to decide the legal question at

10:32  9    issue about whether homicide applied to this case?

10:33 10            MS. ALBIN:  I'm going to object and ask

10:33 11    this witness not to disclose specifics about what

10:33 12    occurred with the grand jury.

10:33 13            If the question is generally do grand

10:33 14    juries decide the law, I think that's an appropriate

10:33 15    question under Judge Tipton's prior instruction about

10:33 16    the grand jury here.

10:33 17        Q.  And just for clarity, I'm not asking about what

10:33 18    you said in the grand jury.  I'm asking about what you

10:33 19    believed was the grand jury's role with regard to

10:33 20    deciding the legal question.

10:33 21            MS. ALBIN:  And to the extent your answer

10:33 22    would require you to reveal any part of your

10:33 23    presentation to the grand jury, I'm going to instruct

10:33 24    you not to answer.  If it doesn't require you to reveal

10:33 25    that, then you can answer the question.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

242

10:33 1      A.  On the advice of counsel, I'm not going to

10:33 2    answer that question.

10:33 3      Q.  So just -- as I'm clear, it sounds like you're

10:33 4    refusing to answer on the basis that you cannot answer

10:33 5    about your belief without disclosing your presentation

10:34 6    to the grand jury?  Is that your position, Ms. Barrera?

10:34 7      A.  Part of my presentation, yes.

10:34 8      Q.  Can you disclose -- I'm sorry.  Is there any

10:34 9    part of your answer you can give without disclosing?

10:34 10     A.  I just wouldn't -- I don't feel comfortable

10:34 11   with that question in answering it, because it is a

10:34 12   violation in the criminal code, and I would be

10:34 13   committing a crime.

10:34 14     Q.  Do you think that it was the role -- it's the

10:34 15   role of the grand jury to decide factual questions?

10:34 16     A.  Yes.

10:34 17     Q.  And do you think it's the role of the

10:34 18   prosecutor to present accurate facts to the grand jury?

10:34 19     A.  Yes.

10:34 20     Q.  Do you think it's the role of the prosecutor to

10:34 21   present accurate law to the grand jury?

10:34 22     A.  Yes, as they believe the law is.

10:34 23     Q.  Do you think the -- that a prosecutor has an

10:34 24   obligation to know what the law is when they make a

10:34 25   presentation to the grand jury?

Electronically signed by Donna McCown (101-253-986-8079)                                    ea909b08-9585-4819-a64a-b40fd23a510b

10:35  1    A.  You should -- yeah, as a prosecutor, you should

10:35  2  know.

10:35  3    Q.  I want to ask you about a prior -- your prior

10:35  4  testimony with regard to kind of how you thought of

10:35  5  this case.  I believe you previously testified that you

10:35  6  did not consider this case to be an abortion case; is

10:35  7  that correct?

10:35  8    A.  It just -- I never thought of it as abortion.

10:35  9    Q.  But didn't you previously send a text to

10:35  10  DA Ramirez on February 1st, 2022, saying, "Sir, can you

10:35  11  let me know when you have time to speak," calling it an

10:35  12  abortion case?

10:35  13    A.  Can you show me the text message?  I don't

10:35  14  remember the exact text.

10:35  15    Q.  Yes.

10:35  16         MS. JOHNSON:  I'm going to pause here just

10:35  17  for a minute, because I am not tech savvy with Zoom,

10:36  18  and ask for some assistance from my colleagues.  Thank

10:36  19  you -- thank you, Sarah.

10:36  20         So for the record -- and, Donna, I

10:36  21  apologize, because I don't know what number we're on

10:36  22  for the exhibit number.

10:36  23         THE COURT REPORTER:  We left off -- 27 was

10:36  24  the last one.

10:36  25         MS. JOHNSON:  Thank you.  Okay.  So we're

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

10:36 1    going to call this Defense Exhibit 28, and we're

10:36 2    screen-sharing in just a moment.

10:36 3                    MS. ALBIN:  You're calling it Defendant's

10:36 4    28?

10:36 5                    MS. JOHNSON:  Maybe we'll just call it

10:36 6    Exhibit 28.  Whatever the number was before, I want to

10:36 7    continue.

10:36 8                    THE COURT REPORTER:  Plaintiff.

10:36 9                    MS. ALBIN:  I think they're plaintiff.

10:36 10                   MS. JOHNSON:  Sorry.  Plaintiff.  My

10:36 11   apologies.  Yeah.  Thank you.  Are folks able to see

10:36 12   that on their end, or is it still -- okay.  Sarah it's

10:36 13   not showing yet.  Thank you.

10:36 14       Q.  (By Ms. Johnson) So this is from the production

10:36 15   that was disclosed previously, and it's page 155 of the

10:36 16   text between DA Ramirez and Ms. Barrera.  Are you able

10:37 17   to see that Ms. Barrera?

10:37 18       A.  I am.

10:37 19                   MS. JOHNSON:  Kelly, are you able to see

10:37 20   it?

10:37 21                   MS. ALBIN:  I can see it, yes.  Thank you.

10:37 22       Q.  Okay.  And so do you see the text message

10:37 23   that's being sent from you to DA Barrera on

10:37 24   February 1st?  "Sir, can you let me know when you have

10:37 25   time to speak.  Abortion case"?

Electronically signed by Donna McCown (101-253-986-8079)                                          ea909b08-9585-4819-a64a-b40fd23a510b

10:37       A.  Yes, I see that.

10:37       Q.  And there you're referring to the case

10:37   regarding the investigation of Lizelle Gonzalez, right?

10:37       A.  I'm assuming, yes.  It was in February.  Yes.

10:37       Q.  So you did consider this to be an abortion

10:37   case?

10:37       A.  In that text message, I did, yes.  I hadn't

10:37   reviewed the entire case, but I didn't -- I didn't have

10:37   the case file at that point, but yes.

10:37           MS. JOHNSON:  Okay.  You can take it down.

10:37   Thank you, Sarah.

10:37       Q.  And so what did you understand to be the law on

10:37   abortion when you were referring to it as an abortion

10:37   case in your text to DA Ramirez?

10:38       A.  I didn't -- the way that I'm trying -- the way

10:38   that -- what I mean when I say I didn't see it as like

10:38   an abortion case, I saw it as the way the indictment

10:38   was written, an attempted abortion that caused the

10:38   death of an individual.

10:38           The way the indictment was written, that's

10:38   the way I saw this case.  I have to use the word

10:38   "abortion" because that was the cause of the death as

10:38   alleged in the indictment.

10:38       Q.  And the indictment used the word "abortion"?

10:38       A.  Yes.  Self-induced abortion.

Electronically signed by Donna McCown (101-253-986-8079)                    ea909b08-9585-4819-a64a-b40fd23a510b

249

```
              IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                      McALLEN DIVISION
LIZELLE GONZALEZ                  ) (
          Plaintiff               ) (
                                  ) (
VS.                               ) (    CIVIL ACTION NO.
                                  ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,              ) (
ALEXANDRIA LYNN BARRERA,          ) (
RENE FUENTES, and STARR           ) (
COUNTY, TEXAS                     ) (
          Defendants              ) (
```

                    REPORTER'S CERTIFICATE

        I, DONNA McCOWN, Certified Court Reporter,
certify that the witness, ALEXANDRIA BARRERA, was duly
sworn by me, and that the deposition transcript is a
true and correct record of the testimony given by the
witness in person on MARCH 27, 2025, and remotely on
APRIL 4, 2025, and that the deposition was reported by
me in stenograph and was subsequently transcribed under
my supervision.

        Pursuant to Federal Rule 30(e)(2), a review of
the transcript was requested.

        I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

        WITNESS MY HAND on this the _____ day
_____, 2025.


_____
DONNA McCOWN, Texas CSR 6625
Expiration Date: 01-31-26
Bryant & Stingley, Inc., CRN No. 41
P.O. Box 3420
Harlingen, Texas  78551
(956) 428-0755

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755      McAllen (956) 618-2366**