IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ                  ) (
          Plaintiff              ) (
                                 ) (
VS.                              ) (    CIVIL ACTION NO.
                                 ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,             ) (
ALEXANDRIA LYNN BARRERA,         ) (
RENE FUENTES, and STARR          ) (
COUNTY, TEXAS                    ) (
          Defendants             ) (

_____

ORAL AND VIDEOTAPED DEPOSITION OF
GOCHA ALLEN RAMIREZ
APRIL 7, 2025

_____

          ORAL AND VIDEOTAPED DEPOSITION OF GOCHA ALLEN

RAMIREZ, produced as a witness at the instance of the

PLAINTIFF, taken in the above-styled and numbered cause

on APRIL 7, 2025, between the hours of 10:08 a.m. and

5:26 p.m., reported stenographically by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at Bryant & Stingley, Inc., 701 East

Harrison, Suite 200, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

APPEARANCES

COUNSEL FOR PLAINTIFF:

        DAVID A. DONATTI
        AMERICAN CIVIL LIBERTIES UNION OF TEXAS
        P.O. Box 12905
        Austin, Texas  78711-2905

        SARAH CORNING
        ASHLEY HARRIS, via Zoom
        AMERICAN CIVIL LIBERTIES UNION TEXAS
        Staff Attorney
        P.O. Box 8306
        Houston, Texas  77288
        LAUREN JOHNSON
        AMERICAN CIVIL LIBERTIES UNION
        915 15th Street NW
        Washington, DC  20005

        JUNE (ANNIE) GERSH
        AMERICAN CIVIL LIBERTIES UNION
        125 Broad Street
        New York, New York  10004
        I. CECILIA GARZA
        GARZA MARTINEZ, PLLC
        202 East Sprague Street
        Edinburg, Texas  78539

        KIERA GODDU, via Zoom
        AMERICAN CIVIL LIBERTIES UNION
        SENIOR LITIGATION ADVISOR
        125 Broad Street
        New York, New York  10004

        ELIZABETH JARIT, via Zoom
        MARIANA (MOLLY) KOVEL, via Zoom
        AMERICAN CIVIL LIBERTIES UNION
        SENIOR STAFF ATTORNEY
        125 Broad Street, 18th Floor
        New York, NY  10004

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

```
 1       COUNSEL FOR DEFENDANTS:

 2            RICARDO J. NAVARRO
              DENTON NAVARRO RODRIGUEZ BERNAL
 3            SANTEE & ZECH, P.C.
              549 North Egret Bay Boulevard, Suite 200
 4            League City, Texas  78550

 5       ALSO PRESENT:
              David Saldana, Videographer
 6            Jorge Cruz, III
              Emily Mensing, via Zoom
 7            Julia Birnbach, via Zoom
              Lizelle Gonzalez, via Zoom

 8
                            INDEX
 9
```

```
                                                   PAGE
10   Appearances ..................................   2

11   GOCHA ALLEN RAMIREZ
     Examination by Mr. Donatti ....................   5
12
     Errata Sheet/Signature Page ................... 284
13
     Reporter's Certificate ....................... 286
14
     Attached to the end of the transcript:  Stipulations
15
```

```
16

17

18

19

20

21

22

23

24

25
```

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

EXHIBITS

NUMBER   DESCRIPTION                                    PAGE

29    Ad, Campaign Platform ...................   34

30    Article, The Monitor, 12-15-20 .........   45

31    Article, The Monitor, 10-9-21 ...........   63

32    Request for Open Records Letter Ruling ..  118

33    Text Messages, Mr. Villarreal and
      Mr. Ramirez ...........................  228

34    Text Messages, Ms. Solis and Mr. Ramirez  234

35    Text Messages, Mr. Ramirez and Members
      Of District Attorney's Office ...........  237

36    Text Messages, Mr. Ramirez and Sheriff
      Fuentes ................................  238

37    Affidavit of Becky Ann Rocha ...........  250

38    E-mails, Mr. Ramirez and Mr. Hackett ....  260

39    E-mail, Ms. Budd to Mr. Romero,
      Subpoena for Frost Bank Records .........  280

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

|       |    |                                                          |
|-------|----|----------------------------------------------------------|
| 10:08 | 1  | THE VIDEOGRAPHER:  It is April 7, 2025.                  |
| 10:08 | 2  | This is the deposition of Gocha Allen Ramirez.  It is    |
| 10:08 | 3  | 10:08 a.m.  We are on the record.                        |
| 10:08 | 4  | GOCHA ALLEN RAMIREZ,                                      |
| 10:08 | 5  | having been duly sworn, testified as follows:            |
| 10:08 | 6  | EXAMINATION                                               |
| 10:08 | 7  | BY MR. DONATTI:                                           |
| 10:08 | 8  | Q.  Good morning, Mr. Ramirez.                            |
| 10:09 | 9  | A.  Good morning.                                         |
| 10:09 | 10 | Q.  My name is David Donatti.  I'm one of the            |
| 10:09 | 11 | lawyers representing Lizelle Gonzalez in this case.      |
| 10:09 | 12 | You took an oath just now?                                |
| 10:09 | 13 | A.  Uh-huh.                                               |
| 10:09 | 14 | Q.  What does it mean to you to be under oath?           |
| 10:09 | 15 | A.  To tell the truth.                                    |
| 10:09 | 16 | Q.  The court reporter will prepare a transcript of     |
| 10:09 | 17 | everything that we say, so please make sure and provide  |
| 10:09 | 18 | verbal responses rather than nodding or hand gestures.  |
| 10:09 | 19 | Do you understand?                                        |
| 10:09 | 20 | A.  Yes, sir.                                             |
| 10:09 | 21 | Q.  For the benefit of the court reporter, please       |
| 10:09 | 22 | wait until I finish asking my question before you       |
| 10:09 | 23 | respond.  Do you understand?                              |
| 10:09 | 24 | A.  Yes, sir.                                             |
| 10:09 | 25 | Q.  If your attorney objects to a question, you         |

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

12:45  1          Q.  Now I'm just taking a look to make sure that I

12:45  2     have the right order.  So it looks like the earliest

12:45  3     message in the conversation is the one at the top of

12:45  4     the page.

12:45  5          A.  Yes, sir.

12:45  6          Q.  Is that your understanding as well?

12:45  7          A.  Yes, sir.

12:45  8                  MR. NAVARRO:  What page are you on?

12:45  9                  MR. DONATTI:  We're on 1065.

12:45 10                  MR. NAVARRO:  Right.

12:45 11                  MR. DONATTI:  So this -- the top message

12:45 12     here.

12:45 13          A.  The one with the arrow on it?

12:45 14          Q.  You have an arrow on yours?

12:45 15          A.  Yes.

12:45 16          Q.  You must have my copy.  That's okay.

12:45 17                  But it's a message from Ms. Garza to

12:45 18     Ms. Barrera, and it says, "Yes."

12:45 19          A.  Uh-huh.

12:45 20          Q.  Presumably she is confirming that you didn't go

12:45 21     under the abortion laws in the sequence of the

12:45 22     conversation?

12:45 23          A.  How -- how are you presuming that?

12:45 24          Q.  I'm just going in order from 1064 --

12:45 25          A.  Well, I can't make that presumption.  If you're

12:46  1    asking me a -- are you asking me a question?

12:46  2        Q.  I'm not.  I'm just going --

12:46  3        A.  So you're just presuming yourself?

12:46  4        Q.  Yes.

12:46  5        A.  Okay.

12:46  6        Q.  But it's not relevant to my line of

12:46  7    questioning.

12:46  8        A.  Okay.

12:46  9        Q.  Although I will observe that that message is

12:46  10   also deleted.

12:46  11           The next message has not been deleted.

12:46  12   It's a message from Ms. Barrera to Ms. Garza.  And she

12:46  13   says, "Are you at this meeting?"

12:46  14       A.  Okay.

12:46  15       Q.  What meeting is she referring to?

12:46  16       A.  I have no idea.

12:46  17       Q.  Did you host a meeting on April 9th, 2022?

12:46  18       A.  No, I did not.

12:46  19           MR. NAVARRO:  All right.  I -- what page

12:46  20   are you on now?

12:46  21           MR. DONATTI:  Still 1065.

12:46  22           THE WITNESS:  1065, the middle message.

12:46  23       Q.  Okay.  That's all I think we need from this.

12:46  24           MR. NAVARRO:  "Are you at this meeting?"

12:46  25           MR. DONATTI:  Oh, can I take back this?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

| | | |
|---|---|---|
| 12:46 | 1 | Appreciate it.  Thank you. |
| 12:46 | 2 | MR. NAVARRO:  All right. |
| 12:46 | 3 | Q.  Skip some of these things.  And have you ever |
| 12:47 | 4 | deleted messages related to this case? |
| 12:47 | 5 | A.  Yes, I have. |
| 12:47 | 6 | Q.  What messages have you deleted? |
| 12:47 | 7 | A.  I remember deleting one message with a defense |
| 12:47 | 8 | attorney who is a friend of mine by the name of Linda |
| 12:47 | 9 | Gonzalez. |
| 12:47 | 10 | Q.  And what was that message? |
| 12:47 | 11 | A.  I don't remember the exact message, because |
| 12:47 | 12 | it -- it was deleted not -- not after -- not long after |
| 12:47 | 13 | I sent it.  But it was a message where I had told her |
| 12:47 | 14 | that I didn't intend or want to hurt this young lady, |
| 12:48 | 15 | and she had then shared that.  It was a private message |
| 12:48 | 16 | to her. |
| 12:48 | 17 | I considered her a friend.  I still do |
| 12:48 | 18 | consider her a friend.  And she had shared it with some |
| 12:48 | 19 | other attorneys who then shared it with, I believe, one |
| 12:48 | 20 | of the national publications.  And I called her up and |
| 12:48 | 21 | spoke to her, and I told her, "Linda, that was a |
| 12:48 | 22 | message that was for you privately." |
| 12:48 | 23 | And she said she was sorry.  She told me |
| 12:48 | 24 | that people had read it over her shoulder.  And I don't |
| 12:48 | 25 | know if that's true or not.  And that's how it had |

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

12:48  1     gotten out.

12:48  2                So that's the one message I remember

12:48  3     deleting because I was upset with Linda.

12:48  4        Q.  And the message, you don't remember the exact

12:48  5     words that you used?

12:48  6        A.  No.  It was something to the effect of I -- you

12:48  7     know, I was distressed because this mistake had been

12:48  8     made, and I was trying to express to her that it was a

12:49  9     mistake and was not intentional.

12:49 10                And I thought she was somebody that I

12:49 11     could speak to privately who would understand and talk

12:49 12     to me about that.  And I was just upset that she had

12:49 13     shared it.

12:49 14        Q.  Was it part of a broader conversation you were

12:49 15     having about this case?

12:49 16        A.  No, no.

12:49 17        Q.  Did she send you something to solicit your --

12:49 18        A.  I don't --

12:49 19        Q.  -- response?

12:49 20        A.  I don't remember if she did or not.  I don't.

12:49 21        Q.  Uh-huh.  Then I think one of the last questions

12:49 22     I have -- this will actually be another exhibit, but

12:49 23     it's what I'll call physical media.

12:49 24                So you -- your office received a number of

12:49 25     Public Information Act requests after the -- the

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

12:49  1    publication of the case, and you requested an attorney

12:49  2    general's opinion?

12:49  3        A.   Yes, sir.

12:50  4        Q.   The exhibit I'm going to show you is that

12:50  5    request for the attorney general's opinion.

12:50  6        A.   Okay.

12:50  7            MR. DONATTI:  I believe we have to mark

12:50  8    this one.  We are marking Plaintiff's Exhibit 32.  If

12:50  9    we don't have an extra copy.

12:50 10            MR. NAVARRO:  Yeah, I'm --

12:50 11            MR. DONATTI:  It's marked as Plaintiff's

12:50 12    Exhibit 32.  You can keep it if you prefer.

12:50 13            MR. NAVARRO:  Yeah.

12:50 14        Q.   Mr. Ramirez, could I ask you to just read the

12:51 15    last paragraph of the first page for me?

12:51 16        A.   Out loud?

12:51 17        Q.   Yes, please.

12:51 18        A.   Okay.  "Lastly, request for information

12:51 19    includes a request for communications between the 229th

12:51 20    District Attorney's Office and the Starr County

12:51 21    Sheriff's Office and communications within the district

12:51 22    attorney's office.  In regards to the matter involving

12:51 23    Lizelle Herrera, all communications requested for are

12:51 24    subject to attorney-client privilege and work product.

12:51 25            "Moreover, some of these same

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                d10f10c7-aea9-490e-bd18-c18fbc0c327a

119

12:51  1    communications involve the request for grand jury

12:51  2    subpoenas to the district attorney's office as agents

12:51  3    of the grand jury and include medical and personal

12:51  4    information of Lizelle Herrera that is not subject to

12:51  5    public disclosure for reasons previously stated."

12:51  6         Q.  I'm hearing a few different categories of

12:51  7    documents that you're identifying there.  One is

12:51  8    communications between the district attorney's office

12:51  9    and the sheriff's office; is that correct?

12:52 10         A.  This -- yes.  But just to be clear, this was

12:52 11    written by Abel Villarreal.

12:52 12         Q.  Okay.  Did you review it before he --

12:52 13         A.  I'm sure I did.

12:52 14         Q.  -- submitted it?

12:52 15         A.  I'm sure I did.

12:52 16              MR. NAVARRO:  Did you review it before

12:52 17    testifying today or review it before something else?

12:52 18         Q.  Before it was shared with the attorney

12:52 19    general's office for an opinion?

12:52 20         A.  Yes, sir.

12:52 21              MR. NAVARRO:  Okay.

12:52 22         Q.  And does that paragraph accurately convey the

12:52 23    information that you -- or does that -- that paragraph

12:52 24    accurately characterize the documents about which you

12:52 25    are requesting the attorney general's opinion?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

12:59 1    we had at the time was the investigative file and the

13:00 2    medical records, including the grand jury subpoenas.

13:00 3    So that was -- that was what was sent to the AG's

13:00 4    office, and I believe all of that has been sent to you.

13:00 5        Q.  And do you still have that USB file?

13:00 6        A.  I don't know if we have the USB file.  I know

13:00 7    we still have the file.

13:00 8        Q.  And so your testimony is that that file is

13:00 9    simply the investigative file that doesn't include the

13:00 10   communications between your office and the district

13:00 11   attorney's office or your office and the sheriff's

13:00 12   office?

13:00 13       A.  Right.  At the time that we asked for this

13:00 14   attorney general's opinion, we had not gotten into

13:00 15   searching for text messages or e-mails or anything of

13:00 16   that sort.  We just knew what we had in our possession,

13:00 17   which was the investigative file and the medical

13:00 18   records, including the grand jury subpoena that the

13:00 19   medical records were produced under.

13:00 20           That's all we had, as far as I know.

13:00 21   That's what I saw in the physical file, so that's what

13:01 22   was sent to the AG's office.

13:01 23       Q.  Did you personally review the files that would

13:01 24   have been on the USB disc that you provided to the

13:01 25   attorney general's office?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:01  1          A.   No.   I picked up the file on April the 9th in

13:01  2    the morning from the DA's office.   I had never seen the

13:01  3    file before.   So I picked it up.   I reviewed it.

13:01  4               I believe there was a USB there in the

13:01  5    file, but I didn't look at the USB, because my

13:01  6    understanding was whatever was on the USB was in the

13:01  7    physical file.   I reviewed the physical file, the

13:01  8    paper.

13:01  9          Q.   And is it your understanding that you produced

13:01 10    a USB file that was contained within the prosecutor's

13:01 11    office file to the attorney general?

13:01 12          A.   No, I don't know if -- no.   I'm assuming that

13:01 13    we didn't send a physical file to the AG's office.   I'm

13:01 14    assuming that everything was put onto a USB and sent to

13:02 15    the AG's office.

13:02 16          Q.   But you don't know whether that's the case?

13:02 17          A.   No, I don't, because I didn't -- I didn't

13:02 18    handle that part of this.   That was handled by

13:02 19    Mr. Villarreal.

13:02 20          Q.   Okay.   I think we can move on.

13:02 21               Okay.   So we've talked a little bit about

13:02 22    your office's policies and practices, and that will

13:02 23    save us some time.   And we talked a little bit about

13:02 24    the trust you have for your assistants and the -- the

13:02 25    expectation is they're competent.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:02  1          What other expectations do you have of

13:02  2   your assistants?

13:02  3      A.   That they're going to work hard.

13:02  4      Q.   That they're going to work hard.  What about

13:03  5   that they're going to be ethical?

13:03  6      A.   Oh, yes, of course.

13:03  7      Q.   What about that they are going to keep updated

13:03  8   on the law?

13:03  9      A.   Yes.

13:03 10      Q.   They're going to do legal research?

13:03 11      A.   When necessary.

13:03 12      Q.   When would it not be necessary to do legal

13:03 13   research?

13:03 14      A.   You don't have to do a lot of research, legal

13:03 15   research when you have a possession of marijuana case

13:03 16   or a possession of cocaine case.  You don't need to do

13:03 17   much research on those.

13:03 18          There are cases that are quite simple in

13:03 19   nature, even if they are felonies, that you don't

13:03 20   really need to do a lot of research on.

13:03 21      Q.   Does the law change?

13:03 22      A.   Sometimes it does.  You know, if marijuana were

13:03 23   legalized in Texas, we'd all know.  We wouldn't have to

13:03 24   do much legal research on that.

13:03 25      Q.   And the Farm Bill of 2018 changed quite a lot.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:03 1       A.  The Farm Bill of 2018?

13:03 2       Q.  About our understanding of marijuana

13:03 3  legalization, for example.

13:03 4       A.  Oh, the THC you're talking about?

13:03 5       Q.  Yes.

13:03 6       A.  Okay.

13:04 7       Q.  Other criminal laws change.

13:04 8       A.  Actually, that's -- that's not a criminal law.

13:04 9       Q.  But you agree with my fundamental point that

13:04 10  the Texas legislature meets in session --

13:04 11      A.  Yes.

13:04 12      Q.  -- and they occasionally will pass laws that

13:04 13  are relevant to your responsibilities as district

13:04 14  attorneys?

13:04 15      A.  That's correct.

13:04 16      Q.  Do you have access to the Penal Code as a

13:04 17  district attorney?

13:04 18      A.  We do.

13:04 19      Q.  And your ADAs have access to the Penal Code?

13:04 20      A.  They do.

13:04 21      Q.  What resources do you consult when you're

13:04 22  researching the law?

13:04 23      A.  We use LexisNexis and then, of course, the

13:04 24  books that we have, the Penal Code and the Code of

13:04 25  Criminal Procedure, the evidence handbook and code.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:04  1    Those are all annotated.  And we can, of course,

13:04  2    research on the computer and see if those are -- if the

13:04  3    law has changed on certain things.

13:04  4        Q.  Do you use O'Connor's Texas guides?

13:04  5        A.  We do.

13:04  6        Q.  Texas District and County Association updates?

13:05  7        A.  Yes, sir.

13:05  8        Q.  As a prosecutor, you're expected to know the

13:05  9    elements of a crime that you are charging?

13:05 10        A.  You're expected to -- yes, you're expected to

13:05 11    know the elements of a crime you're charging.

13:05 12        Q.  Do you follow the legislative session?

13:05 13        A.  I don't.

13:05 14        Q.  Who does?

13:05 15        A.  We get briefed on it at different seminars, BPU

13:05 16    seminars and seminars like that.  They -- they give us

13:05 17    updates on the legislative sessions and the -- the new

13:05 18    laws that are being proposed or passed.

13:05 19        Q.  Is there a comprehensive guide to everything

13:05 20    that happens in the legislate session related to

13:05 21    criminal justice in the state of Texas?

13:05 22        A.  I don't know if there is a comprehensive guide.

13:05 23    There may be.  I -- if there is, I don't know what it's

13:05 24    called.

13:05 25        Q.  So what happens if a law changes and a member

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:06  1    of your team isn't aware of that change in the law?

13:06  2        A.  I don't know.  I mean, that's a very vague

13:06  3    question.  I don't know what would happen.  What do you

13:06  4    mean?

13:06  5        Q.  So there's a change in a statutory element.

13:06  6        A.  Okay.

13:06  7        Q.  For example, human smuggling, the mandatory

13:06  8    minimum penalty was increased in, I believe, 2023 --

13:06  9        A.  Yes.

13:06 10        Q.  -- to ten years.

13:06 11        A.  Yes.

13:06 12        Q.  One of the things that we mentioned when

13:06 13    determining what was a serious charge or not was the

13:06 14    length of the possible sentence.

13:06 15        A.  Yes, sir.

13:06 16        Q.  Would your staff be expected to keep up with

13:06 17    those changes?

13:06 18        A.  Yes.  We know -- we know about that change.  We

13:06 19    all know about that change.

13:06 20        Q.  And so --

13:06 21        A.  That was a very significant change.

13:06 22        Q.  Absolutely.  And in an example where they

13:06 23    missed it and they -- they charged a crime carrying a

13:06 24    possible mandatory minimum sentence of ten years, not

13:06 25    knowing that that was possible, would you characterize

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:06  1    that as a small mistake?

13:07  2        A.  Well, no, because you don't charge the penalty.

13:07  3    You charge the crime.  So the example that you're

13:07  4    giving me quite honestly doesn't make sense.  Because

13:07  5    you charge human smuggling.  Okay?  The penalty is what

13:07  6    changes.  So the charge is the same.  The penalty

13:07  7    changes.

13:07  8                Now, I expect the ADAs to know that the

13:07  9    penalty has changed, because it affects the

13:07  10   negotiations going forward on the charge.  But the

13:07  11   charge itself remains the same.

13:07  12       Q.  Is the ultimate penalty important to the

13:07  13   decision whether to charge?

13:07  14       A.  No.

13:07  15       Q.  Why not?

13:07  16       A.  Because it's a violation of a criminal statute.

13:07  17   You charge regardless of what the penalty is.

13:07  18       Q.  So you testified earlier that you don't have

13:08  19   sort of disciplinary procedures in place; is that

13:08  20   correct?

13:08  21       A.  Disciplinary procedures in writing?  No, we

13:08  22   don't.

13:08  23       Q.  What about remedial procedures in place?

13:08  24       A.  What do you mean by "remedial procedures"?

13:08  25       Q.  Someone has made a mistake.  How do you fix it?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:08 1      A.   We go back and fix it the best we can.

13:08 2      Q.   Has this ever happened before?

13:08 3      A.   That we've had to go back and fix it?  Yes, of

13:08 4  course.  We've had to amend indictments.  We've had to

13:08 5  do things like that before.  Yes, definitely.

13:08 6      Q.   And whose responsibility is that?

13:08 7      A.   Well, whoever catches it, normally.  But the

13:08 8  attorney in charge, whoever is handling that case

13:08 9  will -- will fix it.

13:08 10          Sometimes we have to change the name of

13:08 11  the defendant because the name is not properly on the

13:08 12  indictment.  There may be a different name, so we'll

13:08 13  add an a/k/a.  There's different things that are

13:09 14  changed as a case goes through the system sometimes.

13:09 15     Q.   Has a member of your team ever violated an

13:09 16  ethical responsibility?

13:09 17     A.   Not that I know of.

13:09 18     Q.   Has a member of your team ever committed a

13:09 19  crime?

13:09 20     A.   Well, no, let's -- let's go back, because

13:09 21  Bernice Garza definitely violated an ethical

13:09 22  responsibility.  Bernice Garza actually committed a

13:09 23  very serious federal crime, and she was a member of my

13:09 24  team.

13:09 25     Q.   And so what happened with Ms. Garza after she

Electronically signed by Donna McCown (101-253-986-8079)

13:09  1    allegedly committed a federal crime?

13:09  2        A.  Well, with -- I was part of that investigation.

13:09  3    We investigated that together with the federal team and

13:09  4    Texas Rangers, and ultimately, she was arrested.  And I

13:09  5    was there when she was arrested.

13:09  6            My investigators also participated in that

13:09  7    investigation.  And she's now facing -- she's pled

13:09  8    guilty to human smuggling and is facing a federal

13:10  9    sentence.  I believe she's going to be sentenced next

13:10  10   month.

13:10  11       Q.  And what were the -- what were the job

13:10  12   repercussions that --

13:10  13       A.  She was fired.  She was arrested and fired.

13:10  14       Q.  Was that a hard decision for you?

13:10  15       A.  No.

13:10  16       Q.  So let's scale that back.

13:10  17       A.  Okay.

13:10  18       Q.  Someone doesn't commit a crime but someone

13:10  19   violates an ethical responsibility incumbent on

13:10  20   attorneys.

13:10  21       A.  Okay.

13:10  22       Q.  Say they failed to disclose evidence and

13:10  23   violate a Brady obligation.

13:10  24       A.  Okay.

13:10  25       Q.  In addition to trying to fix it, would there be

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:10  1    any consequences for that?

13:10  2        A.  Yes.  If I knew that an attorney intentionally

13:10  3    violated Brady, then they would be fired.

13:10  4        Q.  What about unintentionally?

13:10  5        A.  Unintentionally, I'm not sure.  It would depend

13:10  6    on what was left out of the evidence that was produced

13:10  7    to the defense attorney.

13:10  8            We -- we have a situation in -- in our

13:11  9    smaller counties where many times we ask for a

13:11  10   prosecution packet, and we do our best to make sure

13:11  11   that prosecution packets are complete when they're

13:11  12   turned in by the investigating agency.

13:11  13           But there have been occasions where once

13:11  14   we're getting ready for trial, we'll find out that, you

13:11  15   know, the 911 call has been left out.  In the course of

13:11  16   preparing for trial, we'll find out, "Hey, there was a

13:11  17   911 call.  It's not in the prosecution packet.  Hasn't

13:11  18   been turned over to defense counsel."

13:11  19           What we do is we immediately contact the

13:11  20   investigating agency and say, "Hey, one of the reports

13:11  21   says there was a 911 call.  We don't have it in the

13:11  22   file you turned in."  And then their task is to get it

13:11  23   as quickly as possible so we can turn it over to

13:11  24   defense counsel.

13:11  25           Now, that's not a mistake that's made by

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:11  1    the ADA normally.  That's a mistake that's made by the

13:12  2    investigating agency.

13:12  3        Q.  What is a prosecution packet?

13:12  4        A.  A prosecution packet is a packet that is turned

13:12  5    over to us by an investigating agency when they're

13:12  6    investigating a possible crime that's been committed.

13:12  7              Before I took office, the policy was not

13:12  8    enforced -- the policy of having a complete prosecution

13:12  9    packet was not being enforced as vigorously as I

13:12  10   thought it should.  So now we have a checklist.  And

13:12  11   whenever -- and we have one person who's in charge of

13:12  12   accepting prosecution packets now instead of just

13:12  13   having the investigating agency come in and will

13:12  14   immediately give it to whoever is at the window.

13:12  15             We have one person that accepts the

13:12  16   prosecution packets.  She is supposed to go through

13:12  17   that prosecution packet, go through a checklist, make

13:13  18   sure body cam is in there, dash cam is in there, 911

13:13  19   call is in there, all the reports are in there.  And if

13:13  20   the prosecution packet is not complete, the

13:13  21   instructions are don't accept it and have them come

13:13  22   back with a complete prosecution packet.

13:13  23       Q.  And that's a decision made by this one person

13:13  24   whose job it is?

13:13  25       A.  It's not -- no, it's not a decision made by the

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:13 1    one person.  It's -- it's kind of like she's a

13:13 2    gatekeeper for that.  Now, sometimes things do -- you

13:13 3    know, the agency will tell us that's all we have, and

13:13 4    later on as we're preparing for trial, we'll find out

13:13 5    that, hey, there's some things missing here.

13:13 6              911 call is a very good example of

13:13 7    sometimes things that get left out.  A body cam, we'll

13:13 8    see a report where a body cam is referenced, or we'll

13:13 9    see an officer at the scene with a body cam, and we

13:14 10   look at the file, and the body cam is not in there.

13:14 11   So, you know, we'll ask for that body cam.

13:14 12       Q.  And who's in charge of catching those mistakes

13:14 13   if they're responsible --

13:14 14       A.  Well, I mean, the -- at the very -- the

13:14 15   gatekeeper is a young lady downstairs that works with

13:14 16   the investigators by the name of Alma Villarreal.  She

13:14 17   does the checklist for us, accepts the packets.

13:14 18              But even having a gatekeeper,

13:14 19   unfortunately, sometimes when we're getting ready for

13:14 20   trial, we will find that certain things are missing.

13:14 21   And so then the ADA who's handling that file will reach

13:14 22   out to the agency and try and get those -- those

13:14 23   things.

13:14 24       Q.  So it's the ADA's responsibility to identify

13:14 25   those?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:14  1          A.   It's everybody -- it's everybody's

13:14  2    responsibility going forward if you have connection to

13:14  3    the file.  You know, I mean, we try and -- we're not

13:14  4    going to just put it on one person.

13:14  5               But, you know, ultimately, the ones who

13:15  6    really read the reports and can identify that things

13:15  7    may be missing would be the ADAs, because -- you know,

13:15  8    I'll give you an example.

13:15  9               If you have a -- a body cam of a crime

13:15 10    scene and you see three officers there -- one from DPS,

13:15 11    a border patrol officer, and a sheriff's department

13:15 12    officer -- and you only have one report and that's from

13:15 13    the sheriff's department officer, then I think the

13:15 14    ADAs -- what they do at that point is they reach out to

13:15 15    the investigator in charge and say, "Hey, did border

13:15 16    patrol produce a report?  Did border patrol make a

13:15 17    report?  They were there.  Did DPS make a report,

13:15 18    because we saw a DPS officer at the scene.  Is there a

13:15 19    dash cam that DPS may have had that's not in the file."

13:16 20               And so that's the way that the ADAs will

13:16 21    usually try and make sure that we have everything in

13:16 22    the file.

13:16 23          Q.   Is it your responsibility as well?

13:16 24          A.   If I -- if I were handling the case, it would

13:16 25    be my responsibility.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

13:16  1        Q.   What do you mean "handling the case"?

13:16  2        A.   If I was actually going to prosecute the case

13:16  3   myself.  I mean, if I don't see the file, it's -- it's

13:16  4   impossible for me to do that.

13:16  5        Q.   Is it your responsibility if someone else will

13:16  6   be presenting it to a jury?

13:16  7        A.   Is what my --

13:16  8        Q.   Does it remain --

13:16  9        A.   -- responsibility?

13:16 10        Q.   Does it remain your responsibility to identify

13:16 11   mistakes even if someone else is the one presenting it

13:16 12   to a jury?

13:16 13        A.   Well, I'm not sure I understand your question.

13:16 14   Honestly, I mean, obviously, the buck stops with me on

13:16 15   everything because I'm the district attorney.  So

13:16 16   whatever mistakes are made, if there are mistakes that

13:16 17   are made in the presentation of a case or the trial of

13:16 18   a case, ultimately, I feel like the buck should stop

13:16 19   with me.  I've always taken that attitude.

13:17 20             But as far as me actually knowing what's

13:17 21   in the file if I don't handle the file itself, that

13:17 22   would be impossible.

13:17 23        Q.   Is this true pre-indictment as well, the buck

13:17 24   stops with you?

13:17 25        A.   Yes, that also is true pre-indictment.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:17 1     Q.  So I'd like to now talk about your

13:17 2  collaboration with the sheriff's office.

13:17 3     A.  Okay.

13:17 4           (Discussion)

13:17 5     Q.  What is your relationship with Sheriff Fuentes?

13:17 6     A.  We have a good working relationship, and he's a

13:17 7  friend.

13:17 8     Q.  Did you know him before assuming the district

13:17 9  attorney's position?

13:17 10    A.  Oh, yes.  Yes, sir.

13:17 11    Q.  How long have you known him?

13:17 12    A.  I've known him for as long as I've -- I don't

13:17 13  know exactly how long.  I knew before he was sheriff.

13:17 14    Q.  When did he become sheriff?

13:17 15    A.  I don't know.

13:17 16    Q.  He was sheriff before you were district

13:17 17  attorney?

13:17 18    A.  Oh, yes, long before I was district attorney.

13:18 19    Q.  How does your office collaborate with the

13:18 20  sheriff's office?

13:18 21    A.  We work very well together.

13:18 22    Q.  Uh-huh.  What does the term "staff with DAs"

13:18 23  mean?

13:18 24    A.  "Staff with DAs"?  It can mean basically

13:18 25  that's -- if you're asking me what a sheriff's office

13:18 1    term means, I wouldn't be able to tell you.

13:18 2                I know what the term "staff with the DA's

13:18 3    office" means, but I don't know what it would mean to

13:18 4    the sheriff's department.

13:18 5        Q.  Okay.  Let's see.  Before, we were talking a

13:18 6    little bit about subpoenas.

13:18 7        A.  Okay.

13:18 8        Q.  And you said in general you will defer to the

13:18 9    sheriff's office about their investigatory request?

13:18 10       A.  To any agency.

13:18 11       Q.  To any agency about their request.  When will

13:18 12   you get back to them and say, "Hey, we need something

13:18 13   else.  We need more information about why the subpoena

13:18 14   is important"?

13:18 15       A.  I've never -- I've never had the occasion to do

13:18 16   that.

13:18 17       Q.  So you've never turned away a subpoena request?

13:19 18       A.  I haven't, but I've never -- nobody has ever

13:19 19   requested subpoenas from me personally.

13:19 20       Q.  Has your team ever turned away a subpoena

13:19 21   request?

13:19 22       A.  I -- I don't know.  You'd have to ask them.

13:19 23       Q.  Does the DA have any policies or practices for

13:19 24   working with the sheriff's office?

13:19 25       A.  No.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:26 1      A.  No, sir.

13:26 2      Q.  -- to the sheriff's office?

13:26 3          Have you ever given insight to your team

13:26 4  about a legal question related to a sheriff's office

13:26 5  investigation?

13:26 6      A.  Not that I remember.

13:26 7      Q.  Okay.  And, lastly, how do you work with the

13:26 8  Starr County Memorial Hospital?

13:26 9      A.  I don't work with them at all.

13:26 10     Q.  How does your office work with the Starr County

13:26 11 Memorial Hospital?

13:26 12     A.  As far as I know, we don't work with them at

13:26 13 all.

13:26 14     Q.  Have you ever provided guidance to hospital

13:26 15 employees about when to report certain conduct?

13:26 16     A.  If we don't work with them at all, that would

13:26 17 make that question moot.  No.

13:26 18     Q.  Okay.  Have you ever attended meetings at the

13:26 19 hospital?

13:26 20     A.  I attended a meeting about a month ago where

13:26 21 there were -- a group of SANE nurses were giving a

13:26 22 presentation on their availability to do SANE exams in

13:27 23 Starr County instead of having to do them outside of

13:27 24 Starr County.

13:27 25          A SANE exam is a sexual assault exam.  And

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:27 1    so I attended that presentation, and that presentation

13:27 2    was at the hospital.

13:27 3         Q.  Have you attended other presentations at the

13:27 4    hospital?

13:27 5         A.  No, sir.

13:27 6         Q.  Have you given other presentations at the

13:27 7    hospital?

13:27 8         A.  I've never given a presentation at a hospital.

13:27 9         Q.  Has anyone on your team given a presentation at

13:27 10   the hospital?

13:27 11        A.  I -- no.  The presentation was given by the

13:27 12   SANE nurses.  That's the only one that I can think of

13:27 13   in the last five years.

13:27 14        Q.  Have you provided written guidance to any

13:27 15   hospital or hospital staff?

13:27 16        A.  No, sir.

13:27 17        Q.  Have you posted on the Internet any guidance

13:27 18   for hospital employees and staff?

13:27 19        A.  No, sir.

13:27 20        Q.  Was Ms. Gonzalez's case discussed at the

13:27 21   meeting at the hospital you just referred to?

13:27 22        A.  No.  No, no.  This was -- this was a

13:28 23   presentation about SANE exams.  SANE exams involve

13:28 24   sexual assaults of children.  So no, her case was

13:28 25   not -- this was a presentation to a large group of

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:28  1    people, not just hospital personnel.

13:28  2        Q.  Uh-huh.  Who was at this presentation?

13:28  3        A.  I don't know.  It was like 40 people.

13:28  4        Q.  Anyone else from your office at this?

13:28  5        A.  Yes.  Alex was there, Abel was there, I was

13:28  6    there, I think an investigator was there.  We're all

13:28  7    interested in SANE exams because of the number of

13:28  8    sexual assaults of children that we have.

13:28  9             And this was a group that was starting to

13:28 10    work -- or has started to work in Starr County

13:28 11    providing 24-7 access to sexual assault examinations of

13:28 12    children or of adults if they're sexually assaulted.

13:28 13        Q.  I understand that you're saying the

13:29 14    presentation was not about Ms. Gonzalez's case.  Did

13:29 15    anybody discuss Ms. Gonzalez's case --

13:29 16        A.  Not that I know of.

13:29 17        Q.  -- at the hospital?

13:29 18        A.  This was just a few weeks ago.

13:29 19        Q.  And then maybe stepping back, I just wanted to

13:29 20    tie one loop.  Have you ever instructed a member of

13:29 21    your team to present a case to a grand jury?

13:29 22        A.  Instructed them?  No, I don't think so.  I've

13:29 23    suggested -- usually I just suggest that they pull out

13:29 24    cases and present them to grand juries.  And sometimes

13:29 25    I am advised which cases they're going to present.  And

Electronically signed by Donna McCown (101-253-986-8079)                d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:29  1    most of the time I don't know which cases they're going

13:29  2    to present.

13:29  3        Q.  What is the difference between instructing and

13:29  4    suggesting?

13:29  5        A.  Well, the one that I can think of where I asked

13:29  6    Mr. Villarreal to present it was a death in custody

13:30  7    case.  And I think he presented that death in custody

13:30  8    case along with the Texas Rangers because he had done

13:30  9    that before.  He had presented a death in custody case.

13:30  10            So I suggested that he go ahead and

13:30  11   present that to the grand jury, and he did.

13:30  12       Q.  Have you ever suggested that someone present a

13:30  13   case to the grand jury and they didn't do it?

13:30  14       A.  No, because I really haven't made that many

13:30  15   suggestions.  Not that I know of, no, sir.

13:30  16       Q.  If you suggest to your team they do something,

13:30  17   do they do it?

13:30  18       A.  Normally they do, yes.

13:30  19       Q.  And what if they don't?

13:30  20       A.  I haven't had -- I haven't had that occasion

13:30  21   yet.  I mean, that would be alarming, but that hasn't

13:30  22   happened yet.

13:30  23       Q.  Did you suggest to Ms. Barrera that she present

13:30  24   Lizelle Gonzalez's case to a grand jury?

13:30  25       A.  Well, it wasn't a suggestion.  Alex told me

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:31 1     that -- basically asked me if she could present the

13:31 2     case to the grand jury, and I said, "Yeah, you can

13:31 3     present it to the grand jury."

13:31 4         Q.  So your testimony is that you approved the

13:31 5     request to present the case to the grand jury?

13:31 6         A.  Well, I knew she was going to present.

13:31 7         Q.  And if you had said no, what would have

13:31 8     happened?

13:31 9         A.  She probably wouldn't have presented it.

13:31 10        Q.  So -- let me take a moment.

13:31 11        A.  Okay.

13:31 12        Q.  When you propose a case is submitted to a grand

13:31 13    jury, is that often in lieu of arrest?

13:31 14        A.  No, no.  I mean, sometimes it's in lieu of

13:31 15    arrest, but most cases that are presented to the grand

13:32 16    jury an arrest has already been made.

13:32 17        Q.  Would you instruct your team not to issue an

13:32 18    arrest warrant?

13:32 19        A.  I don't -- I don't really instruct my team on

13:32 20    what to do.  They're pretty capable and seasoned

13:32 21    attorneys.  So the question -- what is the question

13:32 22    again now?

13:32 23        Q.  Would you suggest to your team that they not

13:32 24    issue an arrest warrant?

13:32 25        A.  Would I suggest to -- on what case?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:32  1          Q.  Have you ever done it before?

13:32  2          A.  No.  I think we've made decisions together that

13:32  3   a case should be presented prior to an arrest, and I

13:32  4   think many times that's because we're still trying to

13:33  5   find the person and we want it indicted but we want it

13:33  6   sealed.

13:33  7               So I don't think I've ever instructed an

13:33  8   ADA to do that, but I think we've reached decisions

13:33  9   collaboratively to do that sometimes.

13:33 10          Q.  What do those conversations look like?

13:33 11          A.  That's -- I don't understand the question, what

13:33 12   the conversations look like.

13:33 13          Q.  So you said, "We have decided collaboratively

13:33 14   on next steps."

13:33 15          A.  Yeah.  Well, let's say a person we've --

13:33 16   we've -- let's say we have a case where there have been

13:33 17   multiple seizures of drugs from a person but we don't

13:33 18   know where the person is and they haven't been able to

13:33 19   arrest the person.  Well, then we will suggest, "Hey,

13:33 20   it's time to go ahead and indict the person."

13:34 21               The person gets indicted.  And

13:34 22   collaboratively, we know that the indictment should be

13:34 23   sealed until the person is arrested.

13:34 24          Q.  And just for my own sake, who is the "we" that

13:34 25   you're talking about here?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:34  1          A.   The ADA --

13:34  2          Q.   ADA?

13:34  3          A.   -- that's presenting the case, yes.

13:34  4          Q.   You and the ADA?

13:34  5          A.   Yes.  Or the ADA on their own.  They know to do

13:34  6     that.

13:34  7                    MR. DONATTI:  I think now is a good time

13:34  8     for a break.

13:34  9                    THE WITNESS:  Okay.

13:34 10                    (Brief recess)

13:45 11          Q.   Mr. Ramirez, did you talk with your attorney

13:45 12     over our five-minute break?

13:45 13          A.   I did.

13:45 14          Q.   Great.  So just going back to some of what we

13:45 15     discussed earlier.  The first meeting at the hospital

13:45 16     two months ago, is it your testimony that you,

13:45 17     Mr. Villarreal, and Ms. Barrera did not discuss this

13:45 18     case?

13:45 19          A.   That's the truth.  That's my testimony.

13:45 20          Q.   And we discussed previously that you had

13:45 21     deleted at least one message or series of messages

13:45 22     related to this case?

13:45 23          A.   Yes, sir.

13:45 24          Q.   Are there any other communications that you

13:45 25     deleted related to this case?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:45 1     A.  Not that I remember.  I may have deleted some

13:46 2  requests from media, but I don't think I did.  I think

13:46 3  those were still in there.

13:46 4     Q.  Other than requests from media, are there any

13:46 5  messages that you deleted?

13:46 6     A.  No, sir.

13:46 7     Q.  Are there any messages that you might have

13:46 8  deleted?

13:46 9     A.  Not that I know of.

13:46 10    Q.  So now let's talk about the investigation of

13:46 11  Ms. Gonzalez.  When did your office become aware of the

13:46 12  investigation?

13:46 13    A.  I don't know.  I don't know.  I think it was

13:46 14  probably early on in the investigation, but I'm not --

13:46 15  I couldn't give you a date.

13:46 16    Q.  When did your office become involved in the

13:46 17  investigation?

13:46 18    A.  I don't know.

13:46 19    Q.  Were you working on January 11th, 2022?

13:46 20    A.  I don't know.  I had COVID the first couple of

13:46 21  weeks of 2022.  I think on the 11th I was still at

13:47 22  home.  But that was right around the time that I -- I

13:47 23  think I was still at home.  I think I still had COVID.

13:47 24    Q.  When you were at home, were you not working?

13:47 25    A.  I wasn't doing much work.  I -- I got hit

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:47  1    pretty hard with COVID.

13:47  2         Q.  And is it your testimony that you might have

13:47  3    had COVID or --

13:47  4         A.  No.  I had COVID.

13:47  5         Q.  And is it your testimony that you were out with

13:47  6    COVID on --

13:47  7         A.  Yes.

13:47  8         Q.  -- on January 11th?

13:47  9         A.  Well, I don't know about the 11th.  I know that

13:47 10    I contracted COVID when I was out during the holidays.

13:47 11    And so the 11th, I wouldn't be able to tell you whether

13:47 12    I had already just recovered or whether I was still

13:47 13    out, but I think I was still out with COVID on the

13:47 14    11th.

13:47 15         Q.  Uh-huh.  Who at the district attorney's office

13:47 16    worked on Ms. Gonzalez's case on January 11, 2022?

13:47 17         A.  I don't know that anybody worked on the case on

13:48 18    January 11th of 2022.

13:48 19         Q.  Was Ms. Barrera involved in the investigation

13:48 20    of Ms. Gonzalez on January 11th, 2022?

13:48 21         A.  I don't know.

13:48 22         Q.  Was Mr. Villarreal involved in the

13:48 23    investigation on January 11th, 2022?

13:48 24         A.  I don't know.

13:48 25         Q.  Other than Mr. Villarreal and Ms. Barrera, was

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:48 1    anyone at the district attorney's office working on

13:48 2    Ms. Gonzalez's case on January 11th, 2022?

13:48 3        A.  I don't know.  But if your question is whether

13:48 4    they were involved in the investigation, to the best of

13:48 5    my knowledge, none of the staff or ADAs were involved

13:48 6    in the investigation.

13:48 7                Now, whether or not they were aware of the

13:48 8    case, I can't tell you about whether or not they were

13:48 9    aware of the case on that date.  But if your question

13:48 10   is whether they were involved in the investigation, the

13:48 11   answer is no, they were not involved in the

13:48 12   investigation.

13:48 13       Q.  So they were not fielding questions from law

13:49 14   enforcement?

13:49 15       A.  If they -- I don't know if they fielded legal

13:49 16   questions, but they certainly were not involved in the

13:49 17   investigation.

13:49 18       Q.  Did they field investigatory questions from the

13:49 19   sheriff's office?

13:49 20       A.  I don't -- I don't think so.  It would -- I

13:49 21   don't think they did.

13:49 22       Q.  Did they tell the sheriff's office what steps

13:49 23   to take in the investigation?

13:49 24       A.  Not to my knowledge.

13:49 25       Q.  And is it your testimony that you do not know

Electronically signed by Donna McCown (101-253-986-8079)                              d10f10c7-aea9-490e-bd18-c18fbc0c327a

13:49 1    or that they in fact did not?

13:49 2        A.  It's my testimony that I do not know about

13:49 3    anything that happened on January 11th of 2022.

13:49 4        Q.  What about a broader date range, so early

13:49 5    January, or let's say all of January 2022?

13:49 6        A.  Okay.

13:49 7        Q.  What support did assistant district attorneys

13:49 8    give to the sheriff's office related to the

13:49 9    investigation of Ms. Gonzalez?

13:49 10       A.  I don't know.

13:49 11       Q.  Did they provide any support to the sheriff's

13:49 12   office in the investigation of Ms. Gonzalez?

13:49 13       A.  I don't know.

13:49 14       Q.  And did you forget or did you never know?

13:50 15       A.  No, I don't know.  I don't know now.

13:50 16       Q.  Did you know before?

13:50 17       A.  No, no.  I don't know.  I don't know, period.

13:50 18       Q.  What sources would you consult to find out?

13:50 19       A.  I would -- if I were to try and find out, I

13:50 20   would ask Ms. Barrera or I would ask Mr. Villarreal or

13:50 21   I would ask Ms. Solis or ask Mr. Garcia.

13:50 22       Q.  Did you ever ask them?

13:50 23       A.  No.

13:50 24       Q.  Why not?

13:50 25       A.  I had no reason to ask them.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

159

13:50  1        Q.  Who at the sheriff's office was working on the
13:50  2    investigation of Ms. Gonzalez?
13:50  3        A.  I know now from reading the file that there was
13:50  4    an Investigator Aguirre that was involved.  And then
13:50  5    there was a female investigator, and I don't remember
13:50  6    her last name.  Her first name is Esmer.
13:51  7        Q.  Who else?
13:51  8        A.  I think it's Muniz.
13:51  9        Q.  Anyone other than Mr. Aguirre and Ms. Muniz?
13:51 10        A.  Not -- not that I know of.
13:51 11        Q.  Who at the sheriff's office first established
13:51 12    contact with the district attorney's office?
13:51 13        A.  I don't know.
13:51 14        Q.  I'd like to show you what has previously been
13:51 15    introduced as Exhibit 16.
13:51 16              (Discussion.)
13:52 17        Q.  I'm trying to deduce the cryptography of the
13:52 18    way the messages are arranged before I show them to
13:52 19    you.
13:52 20        A.  That's fine.  We'll -- we'll get through it.
13:52 21        Q.  I suspect that this is something you can hang
13:52 22    onto for a little bit.
13:52 23        A.  Yes, sir.
13:52 24              (Discussion.)
13:52 25        Q.  Okay.  And you really have to forgive our

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:00 1      A.  Yes.

14:00 2      Q.  Just to refresh, Ms. Muniz had texted at

14:00 3  7:47 -- or 7:16 p.m., "Alex I came to take pictures of

14:00 4  the ashes because it's been cremated.  Do I allow the

14:00 5  funeral home to give the mom the ashes?"

14:00 6              Ms. Barrera says, "That's fine.  We have a

14:00 7  death certificate, I'm assuming.  Take pictures of the

14:00 8  ashes."

14:00 9      A.  Okay.

14:00 10     Q.  Is Alex providing legal advice there?

14:00 11     A.  I don't know.  I don't know if that would be

14:00 12 something that would play into the legal aspect of the

14:00 13 case.

14:00 14     Q.  How could it play in the legal --

14:01 15     A.  I don't know.  That's what I'm saying.

14:01 16     Q.  Okay.  Ms. Muniz responds, "Okay.  Thank you."

14:01 17             And then the next day, January 12th,

14:01 18 Ms. Muniz says, "Good morning.  Dr. Lozano is supposed

14:01 19 to be coming in around noon for an interview and told

14:01 20 the captain he was going to bring the entire file

14:01 21 history on patient/suspect.  If he voluntarily wants to

14:01 22 give me copies, do I get them?  I don't know if you

14:01 23 want to be here for the interview."

14:01 24     A.  Okay.

14:01 25     Q.  What is Ms. Muniz asking?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:01  1        A.   Whether or not Alex wants to be there for the

14:01  2   interview with Dr. Lozano, basically.

14:01  3        Q.   Is it -- has it ever happened in your

14:01  4   experience that a district attorney has been present at

14:01  5   a witness interview?

14:01  6        A.   No.  We try and stay away from that.

14:01  7        Q.   Okay.  What else is Ms. Muniz requesting here?

14:01  8        A.   Something about getting copies on the history

14:01  9   of the patient/suspect.  "Voluntarily wants to give me

14:01 10   copies."

14:02 11        Q.   "Do I get them?"

14:02 12        A.   Right.

14:02 13        Q.   Okay.  So if you go to the next page, page 81,

14:02 14   you have a message from Ms. Barrera to Ms. Muniz

14:02 15   January, 12th, 2022, at 8:53 a.m.  Ms. Barrera says, "I

14:02 16   mean, you can so we can take a preliminary look, but

14:02 17   still need to grand jury subpoena them."

14:02 18        A.   Okay.

14:02 19        Q.   Why do you still need a grand jury subpoena?

14:02 20        A.   Well, that's -- that definitely is legal

14:02 21   advice.  In order to have copies that are certified

14:02 22   copies, then you would need a grand jury subpoena.

14:02 23             So I think what Ms. Barrera is saying

14:02 24   there is basically giving her legal advice that, I

14:02 25   mean, if they turn them over to you, I guess you can

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:02  1    look at them, but in order to get certified copies, you

14:02  2    would need a grand jury subpoena.  So that's her giving

14:02  3    legal advice to Ms. Muniz.

14:02  4        Q.  And that's because of the admissibility of

14:03  5    evidence?

14:03  6        A.  No.  That's -- that's just to certify that

14:03  7    those are complete and correct copies of the medical

14:03  8    records.

14:03  9        Q.  Why is that important?

14:03 10        A.  Well, because it would be important in any case

14:03 11    that you have accurate medical records, full and

14:03 12    complete and accurate medical records, especially in a

14:03 13    case like this.

14:03 14        Q.  Okay.  And if I represent to you that on that

14:03 15    day, Mr. Villarreal issued the grand jury subpoenas, is

14:03 16    that consistent with your understanding of the

14:03 17    timeline?

14:03 18        A.  No, I don't know the timeline, quite honestly,

14:03 19    on the grand jury subpoenas.  But if you show me the

14:03 20    grand jury subpoena, then I can tell you whether it's

14:03 21    consistent or not.

14:03 22        Q.  Do you have a reason to doubt that they were

14:03 23    issued on the same day?

14:03 24        A.  I don't know when they were issued.

14:03 25        Q.  Okay.  We can go ahead, they've already been

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:03  1    introduced, I believe Plaintiff's Exhibits 1 and 2.

14:03  2              (Discussion)

14:04  3       Q.  Top one is Exhibit 1.

14:04  4       A.  Okay.

14:04  5       Q.  One of each.

14:04  6       A.  Okay.

14:04  7       Q.  No. 1 and 2.

14:04  8              MR. NAVARRO:  What numbers do they have?

14:04  9              MR. DONATTI:  So the Lozano subpoena is

14:04 10    No. 1.

14:04 11              THE WITNESS:  Okay.

14:04 12              MR. NAVARRO:  Plaintiff's Exhibit.

14:04 13              MR. DONATTI:  1 and 2.

14:04 14              MR. NAVARRO:  1 and 2.

14:04 15       A.  All right.

14:04 16       Q.  What dates are these?

14:04 17       A.  January 12th of 2022.

14:04 18       Q.  Okay.  And what are they?

14:05 19       A.  They -- they are applications for subpoenas.

14:05 20    The first one is an application for a subpoena of the

14:05 21    custodian of the records for Dr. Rodolfo Lozano.

14:05 22              And the second one is an application for

14:05 23    subpoena for the records of -- the custodian of records

14:05 24    of the Starr County Memorial Hospital.

14:05 25       Q.  What is the nature of the investigation at this

14:05  1      point?

14:05  2           A.  I don't know.

14:05  3           Q.  What charge or crime is listed on these

14:05  4      subpoenas, if any?

14:05  5           A.  Charge of crime?  I don't see a charge of crime

14:05  6      listed, but maybe I'm missing it.  I don't see one.

14:06  7      Let me make sure.

14:06  8                On the first page I don't see a charge of

14:06  9      crime.  Second page, I don't see a charge of crime

14:06 10      either, on either subpoena.  I think it just says

14:06 11      "investigation," I believe.

14:06 12           Q.  Okay.  Did Mr. Villarreal tell you that he was

14:06 13      requesting these subpoenas?

14:06 14           A.  No.

14:06 15           Q.  Did he tell you after the fact that he had

14:06 16      requested these subpoenas?

14:06 17           A.  No.

14:06 18           Q.  Did you speak with anybody in your office about

14:06 19      the investigation of Ms. Gonzalez at this point?

14:06 20           A.  No, sir.

14:06 21           Q.  If I represent to you that Ms. Barrera also had

14:07 22      a phone conversation with members of the sheriff's

14:07 23      office on that day, were you present for that

14:07 24      conversation?

14:07 25           A.  No, sir.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:27  1    the case, so...

14:27  2        Q.  Would you be interested in information about a

14:27  3    dead baby?

14:27  4        A.  It depends.  It depends on -- on what's going

14:27  5    on.  I mean, I'm the district attorney.  I let my ADAs

14:27  6    handle these cases.  If they have questions or they

14:27  7    want to let me know some information that they feel I

14:27  8    need to know, then I'm always interested in listening.

14:27  9            But it's not like I'm going to go digging

14:27 10    around asking specific questions about cases like this.

14:27 11        Q.  I'm going to -- to show you what has -- why

14:28 12    don't we jump ahead.

14:28 13            So you mentioned earlier that you do

14:28 14    recall discussing the case with Ms. Barrera in February

14:28 15    of 2022?

14:28 16        A.  No.  I remember she mentioned -- and I don't --

14:28 17    I don't even think it was -- I don't know when it was.

14:28 18    I think at some point before the presentation to the

14:28 19    grand jury we talked about the case, and I don't know

14:28 20    exactly when it was.

14:28 21        Q.  Okay.  When you talked to Ms. Barrera, was

14:28 22    there already a decision as to what charge --

14:28 23        A.  No.

14:28 24        Q.  -- to levy?

14:28 25        A.  Not that I know of.

Electronically signed by Donna McCown (101-253-986-8079)              d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:28  1          Q.  Okay.  And who else did you discuss
14:29  2     Ms. Gonzalez's case with other than Ms. Barrera?
14:29  3          A.  Before the indictment?
14:29  4          Q.  Yes.
14:29  5          A.  Just Ms. Barrera.
14:29  6          Q.  Just Ms. Barrera.  Did you discuss it in
14:29  7     person?
14:29  8          A.  Yes.
14:29  9          Q.  So I'd like to show you what has previously
14:29  10    been marked Plaintiff's Exhibit 28.
14:29  11              MR. NAVARRO:  28?
14:29  12              MR. DONATTI:  28.
14:29  13              (Discussion)
14:29  14         A.  Is it front and back?
14:29  15         Q.  This is a front and back.
14:29  16         A.  Okay.
14:29  17         Q.  There is a page 155.
14:29  18         A.  Okay.
14:29  19         Q.  And then the copy we received jumps to
14:29  20    page 167.
14:29  21         A.  Okay.
14:29  22         Q.  So we're assuming the pages were deleted, but
14:29  23    we cannot know.
14:29  24         A.  Okay.
14:29  25         Q.  So the message at the top of page 155, it's a

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:29  1    message from Alexandria Barrera to you, Mr. Ramirez.

14:30  2        A.  Yes.

14:30  3        Q.  February 1st, 2022, at 3:00 p.m.  Ms. Barrera

14:30  4    says, "Sir, can you let me know when you have time to

14:30  5    speak?  Abortion case."

14:30  6        A.  Yes.

14:30  7        Q.  What did you understand that message to -- to

14:30  8    be about?

14:30  9        A.  That she wanted me -- she wanted to talk to me

14:30  10   about the case involving the baby.

14:30  11       Q.  And so you had heard about this case before?

14:30  12       A.  Yes.  I think I had heard about it before.

14:30  13       Q.  Were you surprised when you received this

14:30  14   message?

14:30  15       A.  No.  Why would I be surprised?

14:30  16       Q.  And you were not surprised because you had

14:30  17   previously heard about an abortion case?

14:30  18       A.  Yeah.  I mean, now, I don't know what context

14:30  19   the word "abortion" was used.  I mean, I had heard

14:30  20   about a dead baby.  I don't know when -- if we ever had

14:30  21   this conversation in February or whether it was later

14:30  22   on that we actually had the conversation, but I don't

14:30  23   see an answer from me.  But I knew what case she was

14:31  24   referring to, basically.  I had heard about it.

14:31  25       Q.  And what -- what had you heard?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:31  1          A.   What I said earlier about the dead baby.

14:31  2          Q.   Is dead baby and abortion synonymous to you?

14:31  3          A.   They can be.

14:31  4          Q.   And what is the nonoverlap?

14:31  5          A.   Excuse me?

14:31  6          Q.   So is an abortion always a case about a dead

14:31  7   baby?

14:31  8          A.   No, no.  But you can have -- I'm assuming.  I

14:31  9   don't really know.  I'm not a doctor.  But I think you

14:31  10  can have an attempted abortion that results in the

14:31  11  death of a baby after birth.  So somebody could term

14:31  12  that an abortion, a botched abortion, you know.

14:31  13               I mean, she didn't put "botched abortion."

14:31  14  But I don't know whether it was an abortion.  I don't

14:31  15  know whether it was a baby that was born alive.  I

14:31  16  don't know whether it was baby that was born dead.  You

14:31  17  know, Ms. Barrera was basically directing me to that

14:31  18  case, but I don't know what she meant by "abortion."

14:32  19         Q.   Did your office have any other abortion cases?

14:32  20         A.   Not that I know of, no.

14:32  21         Q.   Did your office have any other dead baby cases?

14:32  22         A.   No, no.  I know she was referring to that case.

14:32  23         Q.   Okay.  And all that you knew about this case,

14:32  24  your testimony is that you had heard the words "dead

14:32  25  baby" in your office?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:32  1          A.  That's what I remember, yes, sir.

14:32  2          Q.  You were unfamiliar with any other details

14:32  3     about this case?

14:32  4          A.  Totally unfamiliar.

14:32  5          Q.  Okay.  So --

14:32  6          A.  Except the drug part.  I knew that drugs were

14:32  7     involved.

14:32  8          Q.  And you previously described a series of

14:32  9     circumstances someone fails to terminate a pregnancy.

14:32  10    So is -- was your reaction to receiving this message

14:32  11    you didn't have a whole lot of questions?

14:32  12         A.  No, I didn't.  I would be looking to talk to

14:32  13    her whenever she had time.  I don't know when we

14:32  14    actually spoke.  The message is sent in February, so I

14:32  15    don't know if we spoke later that week, later that

14:32  16    month.  There's no reply from me.

14:32  17              And, actually, we go on to talk about

14:33  18    something different completely.  So I don't know when

14:33  19    we had the consideration, but we did have a

14:33  20    conversation.

14:33  21         Q.  So let's put aside concerns about timeline.

14:33  22         A.  Okay.

14:33  23         Q.  What was the conversation you had?

14:33  24         A.  The conversation that I had with her I remember

14:33  25    is she was letting me know that she was going to

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:33  1    present this case to a grand jury.

14:33  2         Q.  What was "this case"?

14:33  3         A.  The case involving the dead baby.

14:33  4         Q.  So that's the only information you had?

14:33  5         A.  Yes.  Because when I remember Ms. Barrera

14:33  6    coming into my office, she didn't have a file with her.

14:33  7    She didn't have a file in her hands.  She sat down.

14:33  8    She told me that she was -- she wasn't asking

14:33  9    permission, but in a way she was just letting me know.

14:33 10         I mean, obviously, if I had said, "Don't

14:33 11    do it," she wouldn't have done it.  She was saying that

14:33 12    she was going to present this particular case to a

14:33 13    grand jury on a particular date.  And I remember her

14:33 14    giving me -- and I can't remember what facts she gave

14:34 15    me.  She gave me some facts about the drugs, I believe.

14:34 16         And I remember telling her that I was not

14:34 17    going to be here that day.  I was going to be in a

14:34 18    grand jury in Jim Hogg County on a cold case.

14:34 19         And I went ahead and told her, "Go ahead

14:34 20    and present it to a grand jury."  And I think I let her

14:34 21    know that I was not going to be there because I had to

14:34 22    be in Jim Hogg County in a case that I was very

14:34 23    interested in because we had -- that case in Jim Hogg

14:34 24    County had already been presented once to a grand jury

14:34 25    and passed, and the Ranger involved in that case wanted

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:34  1    to present it again.  So I had been there the first

14:34  2    time, and I wanted to make sure that I was there the

14:34  3    second time.

14:34  4        Q.  How did Ms. Barrera describe the case?

14:34  5        A.  I don't remember how she described it.  All I

14:34  6    remember is that there was a dead baby, there were

14:34  7    drugs involved, but I don't remember the description of

14:35  8    the case.

14:35  9        Q.  Do you remember any part of the description?

14:35 10        A.  No, sir.

14:35 11        Q.  What would you do if you wanted to recall what

14:35 12    she described to you?

14:35 13        A.  There's no way, because, I mean, we didn't

14:35 14    record the conversation.  So I would probably have to

14:35 15    go back and ask her what she told me.

14:35 16        Q.  So you'd talk to Ms. Barrera.  What else could

14:35 17    you do?

14:35 18        A.  To find out what she told me?

14:35 19        Q.  Yes.

14:35 20        A.  That would be the only thing is to ask her to

14:35 21    recall if she can recall what she told me.

14:35 22        Q.  Do you intend to refresh your recollection?

14:35 23            MR. NAVARRO:  Objection.

14:35 24            You don't have to answer that.

14:35 25        Q.  At any point between now and trial will you

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:35  1    follow up to learn more about this conversation that

14:35  2    you currently cannot remember?

14:35  3              MR. NAVARRO:  Objection.

14:35  4              You don't have to answer that question.

14:35  5              MR. DONATTI:  On what basis?

14:35  6              MR. NAVARRO:  You're asking him what he's

14:35  7    going to do in the future.  You're here to explore

14:35  8    facts.  So you're saying, "What are you going to do in

14:35  9    the future?"  I'm not going to let you do that.

14:35 10              And I'm instructing the witness not to

14:35 11    answer the question about what he's going to do to

14:36 12    prepare for trial or in talking to me or otherwise.  So

14:36 13    that's the objection.

14:36 14              MR. DONATTI:  Same objection if I ask,

14:36 15    "What is your present intention to learn more about

14:36 16    this conversation?"

14:36 17              MR. NAVARRO:  Same objection.

14:36 18         Q.  And are you not answering because your counsel

14:36 19    has instructed you not to answer?

14:36 20         A.  That's correct.

14:36 21         Q.  So your current testimony is that Ms. Barrera

14:36 22    told you that there was a dead baby, something about --

14:36 23         A.  No.  My -- that's -- you're misstating what I

14:36 24    said.

14:36 25         Q.  What did you say?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:46 1    gave to --

14:46 2        A.  No.

14:46 3        Q.  -- the investigator?

14:46 4        A.  No.

14:46 5        Q.  Do you agree with the advice that she gave to

14:46 6    the investigator?

14:46 7        A.  Definitely.

14:46 8        Q.  So it is your impression that Ms. Gonzalez was

14:46 9    not a flight risk?

14:46 10       A.  I don't -- I have -- I don't know Ms. Gonzalez,

14:46 11   but, you know, if that's what Ms. Barrera believed,

14:46 12   then I would agree with her.  I mean, Ms. Barrera is --

14:46 13   she must have known that the lady was not a flight

14:46 14   risk, so probably a U.S. citizen.

14:46 15       Q.  Okay.  So you spoke with Ms. Barrera after this

14:47 16   conversation on February 1st -- or rather, let's lay

14:47 17   that foundation first.  Ms. Barrera texted you on --

14:47 18       A.  Right.

14:47 19       Q.  -- February 1st, abortion case, that

14:47 20   conversation happened.  You testified previously you

14:47 21   didn't recall when that conversation had happened.

14:47 22       A.  Right.

14:47 23       Q.  Let's see if we can find it.  So you --

14:47 24       A.  Is that in the big packet?

14:47 25       Q.  It's in Plaintiff's Exhibit 16.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:47  1        A.  I don't think mine is marked.  Is it this one?

14:47  2             MS. JOHNSON:  It is the big packet.

14:47  3             THE WITNESS:  This one?

14:47  4        Q.  This is Sergeant Aguirre with the redaction.

14:47  5        A.  This one, the big packet.

14:47  6        Q.  This -- yeah, this is right.

14:47  7        A.  Okay.

14:47  8        Q.  If you go to page 85.

14:47  9        A.  Okay.  All right.

14:47 10        Q.  Well, actually, let's -- let's start at

14:48 11   page 84 -- or, rather, let's -- let's start at page 84.

14:48 12        A.  Okay.

14:48 13        Q.  So the messages go down in chronological order.

14:48 14   Ms. Muniz asked Ms. Barrera, "Is now a good time, or

14:48 15   let me know when."

14:48 16             Ms. Barrera responds, "Yes.  You can come

14:48 17   by.  I'm about to head back from lunch, but I'm here at

14:48 18   the courthouse."

14:48 19             The courthouse is your office; is that

14:48 20   correct?

14:48 21        A.  Yes, sir.

14:48 22        Q.  Ms. Muniz says, "Okay.  I'll see you in a bit."

14:48 23   Then we go over to page 85.

14:48 24        A.  Okay.

14:48 25        Q.  My impression is that Ms. Muniz met Ms. Barrera

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:48  1    in the courthouse.  And then Ms. Muniz sends a message,

14:48  2    "I forgot to mention I have a copy of the cremation

14:48  3    certificate with the baby's name."

14:48  4        A.  What?  Hold on.  Where is the words "the

14:48  5    impression."

14:48  6        Q.  No, no.  I'm sorry.  That's my impression.

14:48  7        A.  Oh, I'm sorry.  I'm sorry.

14:48  8        Q.  And, again, not relevant to my questioning.

14:48  9        A.  Okay.

14:48  10       Q.  I'm trying to make sense of the sequence.

14:49  11       A.  Okay.  Okay.

14:49  12       Q.  But they have a meeting in the courthouse.

14:49  13       A.  Okay.

14:49  14       Q.  And then on February 1st, 3:17:48 p.m.,

14:49  15   Ms. Barrera says, "Okay.  So spoke to Gocha.  Just

14:49  16   submit for grand jury review.  No arrest warrant."

14:49  17       A.  Right.  Okay.

14:49  18       Q.  Does that refresh --

14:49  19               MR. NAVARRO:  Where does it say they had a

14:49  20   meeting?

14:49  21               MR. DONATTI:  Who?

14:49  22               MR. NAVARRO:  You're saying your

14:49  23   impression is they had a meeting, and I'm not seeing

14:49  24   that here.

14:49  25               MR. DONATTI:  From pages 83 and 84 and 85,

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:49  1    they're coordinating a meeting on page 84, as we

14:49  2    discussed --

14:49  3            MR. NAVARRO:  They're talking about a

14:49  4    meeting, but they're not saying they had a meeting.

14:49  5            MR. DONATTI:  That's fine.  It's not

14:49  6    important to my question.

14:49  7            My question is Mr. Ramirez about his

14:49  8    conversation with Ms. Barrera.

14:49  9            MR. NAVARRO:  Okay.  So page 85 now,

14:49 10    right?

14:49 11            MR. DONATTI:  We're on page 85.

14:49 12        Q.  Does this refresh your recollection as to your

14:50 13    meeting with Ms. Barrera?

14:50 14        A.  No, it doesn't.

14:50 15        Q.  Do you recall where you met Ms. Barrera?

14:50 16        A.  I think in my -- in my office, I believe.

14:50 17        Q.  Were you in your office when Ms. Muniz came to

14:50 18    talk with Ms. Barrera?

14:50 19        A.  No.  I never spoke to Ms. Muniz.

14:50 20        Q.  Did you listen in on that conversation?

14:50 21        A.  No.  No, sir.

14:50 22        Q.  Did you overhear that conversation?

14:50 23        A.  No, sir.

14:50 24        Q.  So Ms. Barrera tells Ms. Muniz she spoke with

14:50 25    you.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:50  1        A.  Okay.

14:50  2        Q.  "Just submit for grand jury review.  No arrest

14:50  3    warrant."

14:50  4        A.  Okay.

14:50  5        Q.  Did you discuss the arrest warrant with

14:50  6    Ms. Barrera?

14:50  7        A.  I don't know if we discussed an arrest warrant.

14:50  8    I'm pretty sure that we discussed that we didn't have

14:50  9    enough facts to make an arrest.  I don't know that we

14:50 10    discussed an arrest warrant.

14:50 11              But if this was on February the 1st of

14:50 12    2022, we definitely didn't have enough facts.  So

14:50 13    that's what the discussion would have been about.

14:50 14        Q.  What didn't you have enough facts about?

14:50 15        A.  To charge anything.

14:50 16        Q.  So what does it mean "just submit for grand

14:51 17    jury review"?

14:51 18        A.  Basically, just tell her -- tell the

14:51 19    investigator, go about your business, complete your

14:51 20    investigation, submit your file, and then we'll take a

14:51 21    look at it.

14:51 22        Q.  So your -- your impression here is that the

14:51 23    district attorney's office would review the file once

14:51 24    it was complete?

14:51 25        A.  Yes, sir.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:51 1      Q.  What facts would you have needed?

14:51 2      A.  Well, depends on what the charges were going to

14:51 3  be.  But we would need more facts for any charge,

14:51 4  because, I mean, this was February the 1st of '22.  I

14:51 5  don't think we had seen anything in writing from the

14:51 6  sheriff's department in the form of a formal report,

14:51 7  the medical records.

14:51 8          I don't think Ms. Barrera had a clear

14:51 9  picture of what had happened at all.  So that's -- I'm

14:52 10  assuming that's what we discussed.  There was no clear

14:52 11  picture of what had happened.

14:52 12          And we just needed the sheriff's

14:52 13  department to do what they do, finish their

14:52 14  investigation, turn in the file, and then we could

14:52 15  decide whether to present it to a grand jury or not.

14:52 16      Q.  Did you tell Ms. Barrera what facts were

14:52 17  missing?

14:52 18      A.  No.  I think most of the facts were missing at

14:52 19  this date.  I didn't tell her what facts were missing.

14:52 20  But if it was on February 1st, almost all the facts

14:52 21  were missing, because we hadn't seen anything on that

14:52 22  case.  The way I understand it, from what I understand,

14:52 23  we had not seen anything at all.

14:52 24      Q.  And was it your understanding that the

14:52 25  sheriff's office investigation was complete?

Electronically signed by Donna McCown (101-253-986-8079)          d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:52  1          A.   Not on February the 1st.

14:52  2          Q.   So what are -- what is Ms. Barrera telling

14:53  3     Ms. Muniz to submit?

14:53  4          A.   The file whenever she's --

14:53  5          Q.   The file --

14:53  6          A.   -- done.

14:53  7          Q.   The file is what?

14:53  8          A.   It's all of the reports, the medical records,

14:53  9     the interviews, everything that should be in an

14:53  10    investigative file.  And I don't believe that was

14:53  11    turned in until -- I don't know.  I think it was over a

14:53  12    month later.

14:53  13         Q.   So what would have happened if the file had

14:53  14    been presented and incomplete?

14:53  15         A.   I don't know.  Hopefully, we would have caught

14:53  16    it, and we would have asked for whatever was missing.

14:53  17    But that's what ultimately and -- would have happened

14:53  18    if we lived in a perfect world.  We would have known

14:53  19    that something was missing and asked that we get it.

14:53  20         Q.   What if the file was incomplete not because it

14:53  21    lacked a body camera video or something but because

14:54  22    material evidence was missing from the elements of the

14:54  23    offense?

14:54  24         A.   Then, you know, what would have happened

14:54  25    normally is we would have advised that something was

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:54  1      missing.

14:54  2           Q.  Would you have sent it back to the sheriff's

14:54  3      office for further investigation?

14:54  4           A.  I don't know if we would have sent it back.  We

14:54  5      might have asked for more investigation.

14:54  6           Q.  And when the sheriff's office needs to

14:54  7      supplement, do they have to resubmit --

14:54  8           A.  No.

14:54  9           Q.  -- a prosecution packet?

14:54  10          A.  No.  They just -- they just submit supplements.

14:54  11     If they need to supplement, they'll just submit the

14:54  12     supplement.

14:54  13          Q.  Did Ms. Barrera tell you that she was pursuing

14:54  14     a murder charge?

14:54  15          A.  No, she did not.

14:54  16          Q.  Did she tell you that she did not know what

14:54  17     charge she was pursuing?

14:54  18          A.  I don't remember her telling me that either.

14:54  19          Q.  Did you know what the sheriff's office was

14:54  20     investigating the incident as?

14:54  21          A.  No, I don't, because that would have been -- I

14:54  22     would have needed to have spoken to an investigator or

14:55  23     seen the file.

14:55  24          Q.  Did you tell Ms. Barrera, "I'm going to need to

14:55  25     see the file again"?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:55  1    A.  No.

14:55  2    Q.  Did you tell her, "I'm going to need to talk to

14:55  3  you about this case again"?

14:55  4    A.  When?

14:55  5    Q.  On February 1st.

14:55  6    A.  I don't remember telling her that.  I don't

14:55  7  really remember what the conversation was about except

14:55  8  that we didn't have enough facts.

14:55  9    Q.  Uh-huh.  So it is your testimony that you

14:55  10  definitively did not have the facts to support probable

14:55  11  cause for a murder charge?

14:55  12    A.  We didn't have a file.  So you can't have a

14:55  13  case without a file.  In other words, Ms. Barrera

14:55  14  couldn't go to a grand jury on February the 2nd after

14:55  15  this conversation without a file, without a report,

14:55  16  without medical records, and present it to a grand jury

14:56  17  for their consideration.

14:56  18            The file I don't believe was turned in

14:56  19  until at least a month later.  So we had nothing except

14:56  20  what had been orally told to Ms. Barrera or

14:56  21  Mr. Villarreal.

14:56  22    Q.  How did you know you would be out of town when

14:56  23  you discussed the case on February 1st?

14:56  24    A.  Because we had already set -- well, I don't

14:56  25  know if that's when I told her we were going to be out

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:56 1   of town.  I told her I was going to be out of town

14:56 2   whenever -- right before she presented the case to the

14:56 3   grand jury.  And I don't know when that was.

14:56 4             But we had already had settings for grand

14:56 5   jury in Jim Hogg.  We know in advance, a month in

14:56 6   advance when we're going to have grand jury in Jim

14:56 7   Hogg.  And we know a month in advance, more or less,

14:56 8   when we're going to have grand jury in Starr County.

14:56 9   And it just so happened that those grand juries were on

14:56 10  the same day.  We have a grand jury in each county.

14:56 11       Q.  Why was your presence in the county relevant to

14:56 12  this conversation?

14:56 13       A.  Because I wasn't going to be there.

14:57 14       Q.  Where?

14:57 15       A.  In Starr.

14:57 16       Q.  For what?

14:57 17       A.  For a grand jury.

14:57 18       Q.  Is your understanding that you were scheduling

14:57 19  a grand jury presentation of this case on February 1st?

14:57 20       A.  No, no, no.  No, no.  I don't understand your

14:57 21  question.  I don't know that we talked about

14:57 22  presentation to a grand jury on February -- we talked

14:57 23  about getting more facts for a grand jury.

14:57 24             But I don't know that we had set this case

14:57 25  for presentation to a grand jury on February the 1st.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:57 1    I don't think it was presented to a grand jury until --

14:57 2    until March, but I could be wrong.

14:57 3        Q.  How could you know you were going to be

14:57 4    unavailable during the grand jury presentation date if

14:57 5    the plan was not to present the case to a grand jury?

14:57 6        A.  I don't understand your question.  When --

14:57 7    these -- I don't know that this is the same

14:57 8    conversation that we're talking about.

14:57 9            In other words, the conversation we're

14:57 10   having here with Ms. Barrera is -- she says, "Okay.

14:58 11   Just spoke to Gocha.  Just submit for grand jury

14:58 12   review."  We didn't have a date certain that we were

14:58 13   going to present this case to a grand jury at that

14:58 14   time.

14:58 15           Later on, after the file was turned in,

14:58 16   when Ms. Barrera decided to present it to a Starr

14:58 17   County grand jury is when I knew that I was not going

14:58 18   to be present.  Not on the 1st of February.  That would

14:58 19   have been later in time.

14:58 20       Q.  What facts did Ms. Barrera learn after

14:58 21   February 1st that closed the gap on probable cause?

14:58 22       A.  I don't know.  You'd have to ask her.

14:58 23       Q.  Are you aware of any facts that Ms. Barrera

14:58 24   learned that closed the gap on probable cause?

14:58 25       A.  No, I'm not aware of what facts Ms. Barrera

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

14:58  1    learned, because I didn't see the file until after the

14:58  2    indictment was returned.

14:58  3        Q.  Do you believe that your office ever had

14:59  4    sufficient facts to present this charge to a grand

14:59  5    jury?

14:59  6        A.  I don't know.  I don't know.  The case -- you

14:59  7    know, sometimes we present cases to grand juries

14:59  8    expecting no bills.  Sometimes we present them to grand

14:59  9    juries expecting true bills.  Sometimes grand juries

14:59 10    decide to charge something that we don't even -- we

14:59 11    don't even guess they're going to charge, they're going

14:59 12    to indict for.

14:59 13            So, no, I didn't -- I don't know whether

14:59 14    or not there was enough probable cause to present the

14:59 15    case to a grand jury for whatever charge.

14:59 16        Q.  Did you know on February 1st that the

14:59 17    prosecution packet had not been submitted?

14:59 18        A.  I can't say that I knew for sure.  I'm assuming

14:59 19    that that's why we asked for just no arrest, just

14:59 20    finish your investigation basically.

14:59 21        Q.  Do you always wait to make an arrest until

15:00 22    after a prosecution packet is submitted?

15:00 23        A.  We don't make -- we don't usually make arrests.

15:00 24    The investigative agency makes the arrest.

15:00 25        Q.  Do you often tell law enforcement officers to

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:00  1    hold off on arrests until a prosecution packet has been

15:00  2    submitted?

15:00  3         A.  No, sir.

15:00  4         Q.  Let's see where we are -- let's see where we

15:00  5    are on time.

15:00  6              Did you have any subsequent conversations

15:00  7    with Ms. Barrera between February 1st and when the case

15:00  8    was presented to the grand jury?

15:00  9         A.  Substantive just when she told me she was going

15:00 10    to present it.  I don't know what date that was.

15:00 11         Q.  Okay.

15:00 12         A.  That would have been -- I think would have been

15:00 13    March maybe.

15:00 14         Q.  I apologize.  My question was subsequent.

15:00 15         A.  Oh, I'm sorry.  Yes, I had a conversation with

15:01 16    her when we sat down -- she sat down with me and she

15:01 17    said she was going to present it or she wanted to

15:01 18    present it.

15:01 19              You know, it wasn't asking permission, but

15:01 20    it was kind of letting me know she was going to present

15:01 21    it and she wanted to present it.  And that's when I

15:01 22    told her that I was going to be in Jim Hogg County.

15:01 23         Q.  And this is --

15:01 24         A.  That would have been --

15:01 25         Q.  -- a separate conversation from --

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:01 1      A.   Yes.

15:01 2      Q.   -- the February 1st conversation?

15:01 3      A.   I'm -- yes.

15:01 4      Q.   And what did Ms. Barrera tell you she had

15:01 5   learned since February 1st?

15:01 6      A.   I don't remember what she told me she had

15:01 7   learned, if anything.

15:01 8      Q.   Do you remember that she had acquired new

15:01 9   facts?

15:01 10     A.   I don't know that she told me she had acquired

15:01 11   new facts.

15:01 12     Q.   So what did she -- what was your conversation

15:01 13   about?

15:01 14     A.   About her presenting the case to the grand

15:01 15   jury.

15:01 16     Q.   And what was the case?

15:01 17     A.   Ms. Herrera's case.

15:01 18     Q.   What was Ms. Herrera's case?

15:01 19     A.   It involved a dead baby.  That's all I knew.

15:01 20     Q.   Did you know that she was presenting a murder

15:02 21   charge to the grand jury?

15:02 22     A.   I don't know that she presented a murder

15:02 23   charge.  I don't know that she did that.  I know she

15:02 24   presented the case to the grand jury.  That's all I can

15:02 25   tell you.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:02 1      Q.  Did she discuss possible charges with you?

15:02 2      A.  No.

15:02 3      Q.  Did you ask --

15:02 4      A.  No.

15:02 5      Q.  -- what charges were available?

15:02 6      A.  No.

15:02 7      Q.  Did you ask what evidence was available?

15:02 8      A.  No.

15:02 9      Q.  Did she use the words "dead baby"?

15:02 10     A.  I don't remember.

15:02 11     Q.  Is it your testimony that she did not use the

15:02 12  word "dead baby"?

15:02 13     A.  No.  It can't be my testimony because I don't

15:02 14  remember.

15:02 15     Q.  Would it have made a difference to you?

15:02 16     A.  Not really.  I mean, that was my understanding

15:02 17  of the case to begin with, that it was a dead baby.

15:02 18     Q.  If your office presented this case to a grand

15:02 19  jury, you would have been the first office to prosecute

15:02 20  an abortion.  Is that your understanding?

15:03 21     A.  I don't know.  That's not my understanding.  I

15:03 22  don't know.  I don't even know what your question is.

15:03 23  First office where?

15:03 24     Q.  You had not previously been familiar with any

15:03 25  abortion prosecutions?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:03 1     A.  No.  No, I didn't.  That was not something that
15:03 2 interested me.
15:03 3     Q.  Your understanding was that abortion was legal
15:03 4 in the state of Texas?
15:03 5     A.  Yes, sir.
15:03 6     Q.  So if an abortion case was presented to a grand
15:03 7 jury, what did you expect would happen?
15:03 8     A.  Well, it depended on the facts.  Like as I told
15:03 9 you earlier, I don't know whether or not -- I didn't
15:03 10 know at the time whether or not the case involved a
15:03 11 botched abortion where the baby was born alive and then
15:03 12 died.  In that case, I don't know what would have
15:03 13 happened.  I don't know if that's been presented
15:03 14 before.  It may have been.  My impression was that the
15:03 15 baby was -- there was a dead baby, not that it was a
15:04 16 fetus.
15:04 17     Q.  Did you ask Ms. Barrera these questions?
15:04 18     A.  No, I did not.
15:04 19     Q.  Why not?
15:04 20     A.  Because I didn't think I needed to ask her
15:04 21 those questions.  I actually was much more interested
15:04 22 in the case that was being presented in Jim Hogg
15:04 23 County.
15:04 24     Q.  What were the potential consequences for
15:04 25 Ms. Gonzalez of an indictment in this case?

Electronically signed by Donna McCown (101-253-986-8079)                                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:04  1        A.  It depends on what she was indicted for.

15:04  2   Obviously, she was indicted for murder, and the

15:04  3   consequences were severe.

15:04  4        Q.  And are you not interested in those

15:04  5   consequences?

15:04  6        A.  I am interested now.  I mean, I didn't think

15:04  7   this was going to happen.  This obviously was a

15:04  8   mistake, so I didn't anticipate this.

15:04  9        Q.  You said the word "botched abortion" a few

15:05  10  times.  What is that?

15:05  11       A.  I don't know.  I mean, that's -- I would assume

15:05  12  that's when somebody tries to have an abortion.  My

15:05  13  understanding of a botched abortion would be, say,

15:05  14  somebody trying to abort a baby and the baby being born

15:05  15  alive and then dying as a result of those acts.

15:05  16       Q.  Was that your understanding of the facts?

15:05  17       A.  No.  No.  I just -- that's basically -- for

15:05  18  some reason, that's what I had imagined the case

15:05  19  involved when there was a mention of drugs and a dead

15:05  20  baby.  That's what I imagined.

15:05  21       Q.  Have you ever read Chapter 19 of the Texas

15:05  22  Penal Code?

15:05  23       A.  I'm sure I've looked at it.

15:05  24       Q.  When you work on criminal cases, do you

15:05  25  typically read through the full chapter?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:05 1      A.  No, not always.

15:05 2      Q.  What about a homicide case?

15:06 3      A.  No, not -- not always.  I mean, the homicide

15:06 4   statute is a fairly simple statute.  So that's

15:06 5   usually -- I mean, on all the homicide cases I've

15:06 6   worked on, the definition of homicide is right in the

15:06 7   first part of the statute.

15:06 8      Q.  How long is the homicide statute?

15:06 9      A.  I don't know.  It's several sections.

15:06 10      Q.  There are -- if I represent to you that there's

15:06 11   six sections, does that sound accurate to you?

15:06 12      A.  Sounds accurate.  Six or seven, yeah.

15:06 13      Q.  Is it important as a prosecutor to know the

15:06 14   law?

15:06 15      A.  It is important to know the law.

15:06 16      Q.  Is it important to read all of the statutory

15:06 17   elements of an offense?

15:06 18      A.  Sometimes it is.

15:06 19      Q.  When is it not important to read the elements

15:06 20   of a crime?

15:06 21      A.  Well, if you have a possession case of

15:06 22   possession of marijuana, possession of cocaine, those

15:06 23   kind of cases, I don't think you need to read through

15:07 24   the whole safety and health -- health and safety code

15:07 25   or read the whole statute about how marijuana is

222

15:07  1    defined, what the content has to be, et cetera.  I

15:07  2    don't think you need to read the whole statute there.

15:07  3        Q.  Apologies.  The homicide statute, when is it

15:07  4    not important to read the elements of a homicide

15:07  5    charge?

15:07  6        A.  I don't -- I don't know when it's not

15:07  7    important.

15:07  8        Q.  Were you familiar with Section 19.06?

15:07  9        A.  No.  I was -- well, no, I was not familiar with

15:07 10    that section.  That had never come up before.  And I

15:07 11    had been -- I had been an attorney for 40-some years.

15:07 12    I've been an attorney for 46 at this point.  And I

15:07 13    don't ever remember dealing with 19.06.

15:07 14        Q.  You understood abortion is not a crime --

15:07 15        A.  Yes.

15:07 16        Q.  -- is that correct?

15:07 17        A.  Yes, I did.

15:07 18        Q.  You're familiar with the case Roe versus Wade?

15:07 19        A.  Of course I am.

15:07 20        Q.  Do you follow updates from the Texas Court of

15:07 21    Criminal Appeals?

15:07 22        A.  I try to.

15:08 23        Q.  Has -- in your understanding, has the Texas

15:08 24    Court of Criminal Appeals ever held somebody liable for

15:08 25    an abortion?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:08  1        A.   Not to my understanding, no.

15:08  2        Q.   Has the Texas Court of Criminal Appeals ever

15:08  3   held somebody liable for assisting an abortion?

15:08  4        A.   Not to my -- well, not -- not in 2022.

15:08  5        Q.   2022?

15:08  6        A.   Yeah.

15:08  7        Q.   In 2022 would it have been a crime to assist an

15:08  8   abortion?

15:08  9        A.   Not that I know of, no.

15:08  10             MR. DONATTI:   I think now is a good time

15:08  11   for a break.

15:08  12             THE WITNESS:   Okay.

15:08  13             (Brief recess)

15:51  14        Q.   We just came back from a short break.   Did you

15:51  15   talk to your attorney during the break?

15:51  16        A.   I did.

15:51  17        Q.   Before we left, we were talking about the facts

15:51  18   of the case as you understood them.   That's correct,

15:51  19   yeah?

15:51  20        A.   Yes, sir.

15:51  21        Q.   And you made references to drugs, correct?

15:51  22        A.   Yes, sir.

15:51  23        Q.   And the drugs was the medication Misoprostol,

15:51  24   correct?

15:51  25        A.   Ultimately, that's what I found out.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:51 1    Q.  And Ms. Herrera never gave Misoprostol to her

15:51 2    unborn child, correct?

15:51 3    A.  I don't know.  I don't know how -- how they

15:51 4    were administered.

15:51 5    Q.  Ms. Herrera ingested Misoprostol vaginally,

15:52 6    correct?

15:52 7    A.  That's what I understand.

15:52 8    Q.  And the effect of taking that medication was to

15:52 9    terminate her own pregnancy; is that correct?

15:52 10   A.  That's what I understand.

15:52 11   Q.  And you understood abortion was legal in 2022;

15:52 12   is that correct?

15:52 13   A.  Yes.

15:52 14   Q.  And you had never heard of a case in which a

15:52 15   woman was prosecuted for terminating her own pregnancy;

15:52 16   is that correct?

15:52 17   A.  No, I had not.

15:52 18   Q.  You had never heard of a case in which a person

15:52 19   who assisted a consensual abortion was prosecuted for

15:52 20   murder; is that correct?

15:52 21   A.  I had not.

15:52 22   Q.  So assisting with an abortion is not a criminal

15:52 23   act, correct?

15:52 24   A.  In 2022, it was not.

15:52 25   Q.  And so you do not consider yourself as having

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:52  1    committed a criminal act by assisting Becky Rocha with

15:52  2    obtaining an abortion, correct?

15:52  3        A.   I don't know what you're talking about.

15:52  4        Q.   What conversations did you have with

15:52  5    Ms. Barrera after that second conversation where you

15:52  6    told her to present to the grand jury?

15:52  7        A.   The next time I spoke to her was after

15:53  8    Ms. Herrera had been arrested.

15:53  9        Q.   Did you help her prepare for the grand jury

15:53  10   presentation?

15:53  11       A.   No.

15:53  12       Q.   And did you ever review the prosecution packet?

15:53  13       A.   After -- after Ms. -- I'm sorry.

15:53  14       Q.   Before the indictment, did you ever review the

15:53  15   prosecution packet?

15:53  16       A.   No, sir.

15:53  17       Q.   Ms. Barrera presented the charge alone?

15:53  18       A.   I -- I believe she did, but I -- I can't say

15:53  19   for sure, because I wasn't there.

15:53  20       Q.   Where were you when the case was presented?

15:53  21       A.   I was in Hebbronville, Jim Hogg County.

15:53  22       Q.   You were working on that day?

15:53  23       A.   Yes, sir.

15:53  24       Q.   After the grand jury true billed the

15:53  25   indictment, Ms. Barrera drafted the indictment; is that

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:53 1    correct?

15:53 2        A.  I -- I believe she did.

15:53 3        Q.  Who helped her draft the indictment?

15:53 4        A.  I don't know.

15:53 5        Q.  I'd like to introduce Plaintiff's previously

15:54 6    introduced Exhibit 17, the indictment.

15:54 7                    MR. NAVARRO:  17?

15:54 8                    MR. DONATTI:  This is Plaintiff's

15:54 9    Exhibit 17.

15:54 10       Q.  This indictment was signed on March 30th, 2022.

15:54 11   The indictment nowhere mentions the crime of homicide,

15:54 12   correct?

15:54 13       A.  Not the word "homicide," no.

15:54 14       Q.  The indictment instead says that the Defendant,

15:54 15   Ms. Lizelle Herrera, then and there intentionally and

15:54 16   knowingly caused the death of an individual J.A.H. by

15:55 17   self-induced abortion; is that correct?

15:55 18       A.  That's correct.

15:55 19       Q.  Did you assist in preparing this indictment?

15:55 20       A.  I did not.

15:55 21       Q.  Did you review this indictment before it was

15:55 22   submitted?

15:55 23       A.  I did not.

15:55 24       Q.  Did you approve of this indictment?

15:55 25       A.  No, sir.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:55 1      Q.  Why does the indictment refer to a self-induced
15:55 2  abortion?
15:55 3      A.  I don't know.
15:55 4      Q.  Why does the indictment not refer to murder?
15:55 5      A.  I don't know.
15:55 6      Q.  On the back side of this page, what is this?
15:55 7      A.  This is part of the indictment.
15:55 8      Q.  Okay.  Great.  When was Ms. Herrera arrested?
15:55 9      A.  I don't remember the date.
15:55 10     Q.  Did you instruct your team to issue a sealed
15:55 11  indictment for Ms. Herrera's case?
15:55 12     A.  No, I did not instruct them to issue a sealed
15:55 13  indictment.
15:55 14     Q.  Did you know that the indictment would be
15:55 15  sealed?
15:55 16     A.  If she had been indicted for anything, it would
15:56 17  have been sealed because she had not been arrested.
15:56 18  All indictments of unarrested people are sealed.
15:56 19     Q.  When was Ms. Gonzalez's bail set?
15:56 20     A.  According to the indictment, the bail was set
15:56 21  on April the 1st of 2022.
15:56 22     Q.  Did you recommend the bail amount?
15:56 23     A.  No.
15:56 24     Q.  Did anyone in your office recommend the bail
15:56 25  amount?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

15:56  1        A.  No.  We don't recommend bail amounts.  Those

15:56  2    are set strictly by -- by the judge.

15:56  3        Q.  What was your office's role in the arrest of

15:56  4    Ms. Gonzalez?

15:56  5        A.  I don't believe we had any role in the arrest.

15:56  6        Q.  Did your office facilitate the planning of the

15:56  7    arrest?

15:56  8        A.  Not that I know of.

15:56  9        Q.  Did your office participate in the planning of

15:56 10    the arrest?

15:56 11        A.  No, sir.

15:56 12        Q.  Did you discuss the arrest with anyone?

15:56 13        A.  No.

15:56 14        Q.  Okay.  So I'd like to show you another exhibit.

15:56 15    This is a text between Mr. Ramirez and Abel Villarreal.

15:57 16                 Strike that.  We can move on.

15:58 17                 (Discussion)

15:58 18        A.  Okay.  Yes, sir.

15:59 19        Q.  So first we're going to be discussing what's

15:59 20    been marked as Plaintiff's Exhibit 33.  And those are

15:59 21    text messages between Abel Villarreal and Mr. Ramirez.

15:59 22        A.  Okay.

15:59 23                 (Discussion)

15:59 24        Q.  Do you have Exhibit 33 in front of you?

15:59 25        A.  Yes, sir.

Electronically signed by Donna McCown (101-253-986-8079)                d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:27  1          MR. DONATTI:  Yes.

16:27  2      Q.  And if you jump back to page 64, which is the

16:27  3  back.

16:27  4      A.  Okay.  Yes, sir.

16:27  5      Q.  At the very top at -- April 13th, 2022, at

16:27  6  12:45 p.m., you send a message to the district

16:27  7  attorney's office group chat, "Grand jury next Friday.

16:27  8  Please review cases you're going to present carefully.

16:27  9  Alex and I will hopefully be done with trial by then.

16:27  10  It's Balde, remember.  But I'll be there to speak to

16:27  11  the grand jury about the issue with Ms. Herrera's

16:27  12  indictment and answer any questions they may have."

16:27  13      A.  Okay.

16:27  14      Q.  Do you recall that presentation with the grand

16:27  15  jury?

16:27  16      A.  No, I don't.

16:27  17      Q.  Who else did you talk to following the

16:28  18  dismissal?

16:28  19      A.  Following the dismissal?

16:28  20      Q.  Yes.

16:28  21      A.  I -- I don't know who I spoke to.  I spoke to

16:28  22  my wife.  I might have spoken to my children.  I'm sure

16:28  23  I spoke to my ADAs.  I don't know if I spoke to each

16:28  24  and every one of them, but I'm sure I spoke to Alex and

16:28  25  Abel.  Might have talked to Judy.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:28  1        Q.  Did you talk to Becky Rocha?

16:28  2        A.  I don't think I spoke to her.  I think she sent

16:28  3   me a text.

16:28  4        Q.  Okay.  I'd like to add another exhibit in our

16:28  5   file, Exhibit Y.

16:29  6                MR. NAVARRO:  Which exhibit are you on?

16:29  7                MR. DONATTI:  Say again.  I'm sorry?

16:29  8                MR. NAVARRO:  What exhibit are you on?

16:29  9                MR. DONATTI:  This is going to be

16:29 10   Plaintiff's Exhibit 37.

16:29 11                (Discussion)

16:29 12        Q.  So this exhibit is the affidavit of Becky Ann

16:29 13   Rocha.

16:29 14        A.  Okay.

16:29 15        Q.  Which says she is in possession of text

16:29 16   messages between herself and Mr. Ramirez which she

16:29 17   produced to Ms. Gonzalez's attorneys.  And then the

16:29 18   second page -- second and third pages are a series of

16:30 19   messages.

16:30 20        A.  Okay.

16:30 21        Q.  At the beginning, Ms. Rocha says, "Good

16:30 22   morning.  I really hope you're doing very well.  With

16:30 23   all that backlash, you're probably getting take a deep

16:30 24   breath."  Prayer hands emoji.  That's April 12th 2022.

16:30 25                You responded, "Thank you.  It's very

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:30  1    possible that my career is over, but I will continue to

16:30  2    move forward.  I've been blessed with 43 years of work.

16:30  3    If it ends because of this, then so be it.  Thank you

16:30  4    for your support, Becky."

16:30  5              Did you send that message?

16:30  6        A.  I'm sure I did.

16:30  7        Q.  Why did you think your career might be over?

16:30  8        A.  I was really depressed about what had happened

16:30  9    at that point in time.  It was just -- I think

16:30 10    everybody involved, especially myself and Alex, we were

16:30 11    very depressed about the mistake that had been made.

16:30 12    And I didn't know how the -- what was going to happen

16:30 13    and how it would turn out.

16:30 14        Q.  Then Ms. Rocha says she's here if you need to

16:31 15    talk.  And you respond, "Thank you.  I will take you up

16:31 16    after my trial next week.  I need someone to talk to."

16:31 17    Do you see that message?

16:31 18        A.  Yeah.  I see some messages in between that,

16:31 19    but -- oh, you're going across the page?

16:31 20        Q.  You have to go across, yes.

16:31 21        A.  Okay.  Yes, I do see it.

16:31 22        Q.  What is your relationship with Becky Rocha?

16:31 23        A.  I don't have a relationship with her, no.

16:31 24        Q.  How long have you known Becky Rocha?

16:31 25        A.  I've known her for decades.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:31 1    Q.  And is she your friend?

16:31 2    A.  No.

16:31 3    Q.  So when you respond to, "No, my friend.  It's a

16:31 4  sexual assault to a child case," what do you mean?

16:31 5    A.  That's a term of -- a term of art.  I mean,

16:31 6  she's not a friend.  I don't consider her a friend.

16:31 7  She's an acquaintance.

16:31 8    Q.  Have you ever had a romantic relationship with

16:31 9  Ms. Rocha?

16:31 10    A.  Not a romantic one, no.

16:31 11    Q.  Have you ever had a sexual relationship with

16:31 12  Ms. Rocha?

16:31 13    A.  Yes.

16:31 14    Q.  The next message you say you're going to try

16:31 15  and start rehabilitating your reputation.  She says,

16:32 16  "You have a great reputation."  And then she asks you

16:32 17  if you think you made the right decision.

16:32 18    A.  Where is that on the page?

16:32 19    Q.  This is --

16:32 20    A.  Okay.  I got it.

16:32 21    Q.  You think you made the right decision in

16:32 22  regards to her inducing her own abortion.  It continues

16:32 23  on No. 4.

16:32 24    A.  All right.

16:32 25    Q.  You say what you said in the press release.  It

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:32 1    should not -- I should not have indicted her.

16:32 2         A.  Right.

16:32 3         Q.  Then on the next panel, there's a message from

16:32 4    you that says, "I'm not commenting because she hasn't

16:32 5    commented and she doesn't want to."  How did you know

16:32 6    she didn't want to comment?

16:32 7         A.  She had -- they had mentioned that when we had

16:32 8    had our meeting at the office.  And her attorney had

16:32 9    told me that she just didn't want to comment, that they

16:33 10   had been receiving calls also.  And she didn't want to

16:33 11   comment.  And at this point, neither did I.

16:33 12        Q.  So if she doesn't want to -- you said, "No le

16:33 13   conviene."

16:33 14        A.  Right.

16:33 15        Q.  That's Spanish for "doesn't convenience her"?

16:33 16        A.  Right.  It's not -- it's not something she

16:33 17   wants.  Yes, it's not to her advantage to comment.

16:33 18        Q.  Then you say, "Believe me, this is not her

16:33 19   first."

16:33 20        A.  Excuse me?

16:33 21        Q.  Here you're referring to Ms. Gonzalez, correct?

16:33 22        A.  Right.

16:33 23        Q.  You say, "Believe me, this is not her first."

16:33 24        A.  Right.

16:33 25        Q.  What do you mean?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:33  1        A.  I'm not sure what I meant by that.  I don't
16:33  2    know if wasn't her first brush with the law or whether
16:33  3    I had read that she had -- had terminated pregnancies
16:33  4    before.  I'm not -- I'm not sure exactly what that
16:33  5    meant.
16:33  6        Q.  Why would that have mattered?
16:33  7        A.  It didn't matter to me.  That was just a
16:33  8    comment I made.
16:34  9        Q.  Did you know Ms. Gonzalez before the
16:34 10    prosecution?
16:34 11        A.  No, sir.
16:34 12        Q.  Did you speak to her outside of the
16:34 13    conversation in your office?
16:34 14        A.  No, sir.
16:34 15        Q.  Why did you say, "Believe me, this is not her
16:34 16    first"?
16:34 17        A.  I'm not sure.  I'm really not sure if I had
16:34 18    read that she had a prior criminal record or whether or
16:34 19    not I read somewhere in the medical records that she
16:34 20    had terminated pregnancies before.  So I'm not sure
16:34 21    what I meant by "first."  You know, I can't tell you
16:34 22    for certain what I meant by that.
16:34 23        Q.  Do you have hard feelings towards Ms. Gonzalez?
16:34 24        A.  No, not at all.  I don't really know her.
16:34 25        Q.  Were you surprised by the public reaction to

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:34  1    the indictment?

16:34  2         A.  Well, at first I was because I didn't realize

16:35  3    what was going on.  But after I realized the mistake we

16:35  4    had made, then I was not surprised that it got that

16:35  5    much trash.

16:35  6         Q.  So after you realized that abortion was not a

16:35  7    crime in the state of Texas?

16:35  8         A.  No, that's not what I said.

16:35  9         Q.  What did you realize?

16:35 10         A.  I realized we had made a mistake.

16:35 11         Q.  And the mistake was?

16:35 12         A.  The mistake was indicting her, that she had

16:35 13    been indicted under my watch.

16:35 14         Q.  Okay.  So I'd like to jump -- well, two further

16:35 15    questions.  Would a prior criminal record have

16:35 16    justified her indictment for homicide here?

16:35 17         A.  Oh, no.  No.  And that's -- if that's what you

16:35 18    understood me to say, that's not what I meant.  I

16:35 19    thought I was talking about the text message with

16:35 20    Ms. Rocha.

16:35 21         Q.  Correct.

16:35 22         A.  That "No le conviene."  It has nothing to do

16:35 23    with justifying an indictment.

16:35 24         Q.  What --

16:35 25         A.  It had to do with speaking out to the press.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:35  1      Q.  Would a prior pregnancy termination have

16:36  2   justified her indictment?

16:36  3      A.  No, sir.

16:36  4      Q.  Okay.  Let's jump ahead to the grievance

16:36  5   procedure.  A grievance was initiated against you

16:36  6   shortly after the dismissal, correct?

16:36  7      A.  Yes, sir.  A few months afterwards.

16:36  8      Q.  And members of your team were subpoenaed to

16:36  9   testify, correct?

16:36 10      A.  Yes, sir.

16:36 11      Q.  ADA Barrera was subpoenaed to testify?

16:36 12      A.  Yes.

16:36 13      Q.  Judy Solis was subpoenaed to testify?

16:36 14      A.  Yes.

16:36 15      Q.  Abel Villarreal was subpoenaed to testify?

16:36 16      A.  Yes, sir.

16:36 17      Q.  Anyone else subpoenaed --

16:36 18      A.  Myself.

16:36 19      Q.  -- to testify?

16:36 20           Besides you and the three individuals I

16:36 21   mentioned, anyone else?

16:36 22      A.  I don't think so.  I think that was it.

16:36 23      Q.  And I realize I should jump back a little bit

16:36 24   back to the messages.  Are these messages between you

16:36 25   and Ms. Rocha on your phone?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:36  1        A.  I don't know.  I don't know.

16:37  2        Q.  Have you deleted these messages?

16:37  3        A.  I don't know.  They would still be on my phone

16:37  4    even if I had deleted them.

16:37  5        Q.  Did you search through these messages in

16:37  6    connection with this case?

16:37  7        A.  I didn't.

16:37  8        Q.  Did the extraction pull these messages from

16:37  9    your phone?

16:37 10        A.  I don't know.

16:37 11            MR. DONATTI:  Okay.  We are going

16:37 12    to request production of these messages to the extent

16:37 13    they're still on your phone.

16:37 14            MR. NAVARRO:  Let me be clear.  My

16:37 15    understanding is you've gotten the extraction from his

16:37 16    phone already is what I thought.

16:37 17            MR. DONATTI:  We haven't gotten every

16:37 18    person he's messaged with.  We've gotten a selection of

16:37 19    messages with certain individuals in a pretty narrow

16:37 20    date range.  But insofar --

16:37 21            MR. NAVARRO:  You're saying you don't

16:37 22    have -- you have the extraction, but they don't include

16:38 23    text messages with Becky Rocha?

16:38 24            MR. DONATTI:  Correct.

16:38 25            MR. NAVARRO:  Okay.  I'll follow up on

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:38  1    that.  I was under the impression you just -- you had

16:38  2    everything.  But I'll -- Kelly has been handling that

16:38  3    part of it, so I'll follow up with it.

16:38  4              MR. DONATTI:  Understood.

16:38  5        Q.  What was Ms. Barrera's testimony at the

16:38  6    grievance procedure?

16:38  7        A.  Oh, I wouldn't be able to tell you that.  At

16:38  8    the grievance procedure -- actually, it was in two

16:38  9    parts, and it was hours.  Almost as long as this

16:38 10    deposition.

16:38 11        Q.  And you requested transcripts and videos of the

16:38 12    grievance procedure?

16:38 13        A.  I did.  And they never -- I was not allowed to

16:38 14    get them.  I was told I couldn't have them.

16:38 15        Q.  Okay.  I'd like to walk through the agreed

16:38 16    judgment of probated suspension --

16:38 17        A.  Sure.

16:38 18        Q.  -- if we can show you what's previously been

16:38 19    marked as Plaintiff's Exhibit 26.  I don't think it

16:38 20    matters who gets what.

16:39 21        A.  Yes, sir.

16:39 22        Q.  So we are looking at what has previously been

16:39 23    marked as Plaintiff's Exhibit 26, the agreed judgment

16:39 24    of probated suspension in the matter of Gocha A.

16:39 25    Ramirez.  You made a series of admissions in connection

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:39  1     with the disciplinary procedure.

16:39  2          A.  No, I don't -- they were not admissions.  They

16:39  3     were agreed findings of fact?

16:39  4          Q.  Okay.  So you made a series of agreed findings

16:39  5     of fact --

16:39  6          A.  Yes.

16:39  7          Q.  -- with the disciplinary proceeding?

16:39  8          A.  Yes, sir.

16:39  9          Q.  Okay.  So the first three, you are an attorney

16:39 10     that's licensed to practice law in Texas and a member

16:39 11     of the State Bar of Texas.  Do you agree?

16:39 12          A.  Yes.

16:39 13          Q.  Your professional misconduct occurred in whole

16:39 14     or in part in Starr County, Texas.  Do you agree?

16:39 15          A.  That was the finding, that it was in Starr

16:40 16     County, Texas.

16:40 17          Q.  At all relevant times, you were the district

16:40 18     attorney of Starr County, Texas?

16:40 19          A.  Yes.  For this particular grievance, yes, I

16:40 20     was.

16:40 21          Q.  "No. 4, assistant district attorneys under

16:40 22     respondent's supervision sought to pursue criminal

16:40 23     homicide charges against an individual for acts clearly

16:40 24     not criminal pursuant to Texas Penal Code 19.06."

16:40 25          A.  That's correct.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

16:40   1        Q.  Why does it refer to plural assistant district

16:40   2   attorneys?

16:40   3        A.  I don't know.  I think that's a typo.  Because

16:40   4   we actually removed the plural from either 6 or 7 when

16:40   5   we were negotiating the language, so I -- I believe

16:40   6   that's just a typo.

16:40   7        Q.  And do you -- you negotiated the language on a

16:40   8   few of these agreed findings of fact, correct?

16:40   9        A.  Yeah.  We actually -- we actually went back and

16:41  10   forth for almost a month, maybe three weeks,

16:41  11   negotiating language on this.

16:41  12        Q.  Okay.

16:41  13        A.  Which I didn't know you could do, quite

16:41  14   honestly.

16:41  15        Q.  I would like to go ahead and show you a new

16:41  16   exhibit which we will mark as Plaintiff's Exhibit 38,

16:41  17   Exhibit U.

16:42  18                   (Discussion)

16:42  19        A.  Okay.

16:42  20        Q.  What was the testimony of Judy Solis at the

16:42  21   grievance hearings?

16:42  22        A.  I don't -- I don't remember what her

16:42  23   testimony -- her testimony.  Basically they were -- and

16:42  24   I'm not even sure why they went here, but they were

16:42  25   basically questioning her, if I remember correctly,

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:42  1    about her representation of the husband, which really

16:42  2    had nothing to do with the grievance against me.

16:42  3         Q.  Was that the first time you learned she had

16:42  4    represented --

16:42  5         A.  Yes.

16:42  6         Q.  -- Ms. Gonzalez's husband?

16:42  7         A.  Yes.

16:42  8         Q.  What was your response to --

16:42  9         A.  They didn't ask me questions about that.

16:42  10        Q.  What was your testimony at the grievance

16:42  11   proceeding?

16:42  12        A.  Oh, it was hours of testimony.  I wouldn't be

16:43  13   able to -- you'd have to be a little more specific with

16:43  14   your question.

16:43  15        Q.  Okay.  So let's talk about some of this

16:43  16   negotiation which is in Plaintiff's Exhibit 38.  It's a

16:43  17   series of messages in which you're going back and forth

16:43  18   about the language?

16:43  19        A.  Yes, sir.

16:43  20        Q.  So the first e-mail, you say -- the first

16:43  21   e-mail is on the last page, an e-mail thread going in

16:43  22   reverse chronological order.

16:43  23        A.  Okay.  That would not be the first e-mail.

16:43  24        Q.  This is the first e-mail in this thread.

16:43  25        A.  Well, we had -- I had exchanged -- you may --

Electronically signed by Donna McCown (101-253-986-8079)

16:43  1    and this exhibit may be the first e-mail, but you

16:43  2    actually left out several of the e-mails that went back

16:43  3    and forth between myself and Investigator Hackett.  And

16:43  4    that's fine.  If you don't want them included in the

16:44  5    exhibit for whatever reason, that's fine.  But this

16:44  6    would not be the first e-mail.

16:44  7        Q.  So when you're talking about additional e-mails

16:44  8    that are not included here, is that in regard to

16:44  9    negotiating the language of agreed findings of fact?

16:44  10       A.  I believe so.  I believe that -- I don't

16:44  11   believe my first e-mail was on January the 12th.

16:44  12       Q.  So I can represent to you that we have other

16:44  13   e-mails with Mr. Hackett, but none of them concern

16:44  14   negotiating proposed findings of fact.

16:44  15       A.  Okay.  But I had exchanged e-mails with him way

16:44  16   in advance, actually before the end of 2023, regarding

16:44  17   the sanction -- the proposed sanction.  But, okay, we

16:44  18   can go ahead and start with the one you want.

16:44  19       Q.  Did you produce those e-mails to your counsel?

16:44  20       A.  Yes, they were produced to you.

16:44  21       Q.  Okay.  We will go back.  And for the time

16:44  22   being, I'd like to request production of those.

16:44  23       A.  Those were produced to you.

16:44  24       Q.  Okay.  So the first e-mail that we have in this

16:44  25   thread --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:44  1          A.  Okay.

16:44  2          Q.  -- it says, "As for the findings of fact, I

16:45  3     have no dispute with the wording of findings Nos. 1, 2,

16:45  4     3, 4, 5, 6, 8, 9, and 10."  And you request a change to

16:45  5     No. 7.

16:45  6          A.  Okay.

16:45  7          Q.  This concerns the singular and plural as we

16:45  8     just described.

16:45  9          A.  Okay.  Yes, sir.

16:45 10          Q.  Why didn't you request a similar change with

16:45 11     the other findings where plural ADAs are spoken about?

16:45 12          A.  I probably didn't catch it.  And I'm assuming

16:45 13     Mr. Hackett didn't catch it either, because I think he

16:45 14     agreed to it right away.

16:45 15          Q.  Okay.  Next e-mail, Mr. Hackett agrees to the

16:45 16     change --

16:45 17          A.  Okay.

16:45 18          Q.  -- or, rather, five days later.

16:45 19          A.  Okay.

16:45 20          Q.  And then you respond and say, "I'd like to

16:45 21     change No. 4."

16:45 22          A.  Yes.  And what was happening, of course, is, as

16:45 23     we were exchanging these e-mails, I would reread the

16:46 24     proposed findings of fact, and I would find something

16:46 25     else that I wanted changed.  And I was learning very

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:46 1    quickly that I could at least make these requests.

16:46 2            And then I don't know if he was sending

16:46 3    them on to the panel.  I know that Mr. Hackett was not

16:46 4    the one making these decisions, because he would always

16:46 5    have to get back to me.  And he would -- it was very

16:46 6    clear that he had to consult with somebody, and I'm

16:46 7    assuming it was the panel chair.

16:46 8        Q.  And on No. 4, your request was to remove the

16:46 9    language concerning abortion.  And you say, "I

16:46 10   respectfully contend that the, quote, self-induced

16:46 11   abortion language is inflammatory."  What do you mean

16:46 12   by that?

16:46 13       A.  Because abortion was such a contentious -- is

16:46 14   such a contentious issue, was a contentious issue then.

16:46 15   And as I state further down in my e-mail, we were

16:46 16   getting -- at the very beginning, we were getting

16:47 17   hundreds of e-mails, some of them threatening, some of

16:47 18   them basically just asking me to -- to make it right.

16:47 19           I received a package at my office with

16:47 20   coat hangars in it.  I was worried about what I was

16:47 21   going to get into in my private mailbox at home.  In

16:47 22   fact, when I saw the lawsuit that was filed by you

16:47 23   guys, you actually put my home address on that lawsuit

16:47 24   on the original petition, which bothered me a lot,

16:47 25   because I was -- I was being threatened.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:47  1                    And I think Alex was getting some of those

16:47  2      threats also.  And that was surprising to me.  Because

16:47  3      I'm a democrat.  And I was just shocked at the level of

16:48  4      vitriol that was coming from people who just didn't

16:48  5      understand that a mistake had been made, who were -- in

16:48  6      fact, the -- the professor who filed the grievance

16:48  7      against me, Ms. Grossman -- who I don't know, doesn't

16:48  8      even live in the jurisdiction -- she basically in her

16:48  9      grievance said that I had indicted Ms. Gonzalez for

16:48  10     political or personal reasons.

16:48  11                    And that struck me as being so

16:48  12     presumptuous, because she didn't know me.  And if she

16:48  13     knew me and -- or she knew Ms. Barrera, it would be

16:48  14     clear to her that a mistake had been made and it had

16:48  15     not been for political or personal reasons.

16:48  16                    So putting abortion back into a finding of

16:48  17     facts was, I believe, not necessary and was just going

16:49  18     to result in more threats, more vitriol, and endanger

16:49  19     not only me and my family, but Alex and her family, and

16:49  20     people at the office.

16:49  21          Q.  Abortion had been present in this case from the

16:49  22     beginning?

16:49  23          A.  Abortion had been present in the case from the

16:49  24     beginning.  And it was something that was very

16:49  25     contentious.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:49  1      Q.  And Ms. Gonzalez didn't put abortion into the

16:49  2   case.

16:49  3      A.  No, I'm not saying she did.  I've never blamed

16:49  4   Ms. Gonzalez for what happened.  Not once have I blamed

16:49  5   Ms. Gonzalez.  Ms. Gonzalez was a victim.  But by the

16:49  6   same token, I know that this was a mistake.  It was not

16:49  7   done intentionally.

16:49  8          And, quite honestly, the allegations that

16:49  9   were made in your original petition were, in my

16:49  10  opinion, just crazy, unfounded allegations.  The

16:50  11  allegations of conspiracy, the allegations that we

16:50  12  conspired to do this to Ms. Herrera when I know and

16:50  13  Alex knows, we all know that this was a mistake.

16:50  14          And a lot of times, the simplest

16:50  15  explanation is the correct explanation.  And in this

16:50  16  case, the simplest explanation is it was a mistake and

16:50  17  that's the correct explanation.

16:50  18          So I was concerned about putting language

16:50  19  like this in a findings of fact.  And I think

16:50  20  Mr. Hackett agreed with me, or whoever made the

16:50  21  ultimate decision to remove that language agreed with

16:50  22  me.  Sorry for the long-winded answer.

16:50  23     Q.  That's okay.  I think maybe we can break for a

16:50  24  bit.

16:50  25     A.  Well, I'd like to also point out something

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755      McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

16:50  1    before we break for a little bit, because this I think
16:50  2    is real important.
16:50  3           In the same exhibit that you're talking
16:51  4    about, if you go up to the message -- the e-mail that I
16:51  5    sent him on January the 19th at 11:47 where I ask
16:51  6    for -- to change some of the language.  And I ask --
16:51  7    and I tell him basically that I wanted the proposed
16:51  8    language removed because the language that they were
16:51  9    trying to put in made it sound like I knew about 19.06
16:51 10    and that my assistant knew about 19.06 and purposely
16:51 11    ignored the statute.  That's in my e-mail, the one that
16:51 12    you've failed to mention on this exhibit.
16:51 13           And I believe Mr. Hackett agreed with me.
16:51 14    And he modified the language, because I did tell him
16:51 15    that neither one of us was aware of 19.06.
16:51 16    Q.  Thank you.
16:51 17    A.  You're welcome.
16:51 18           MR. NAVARRO:  This Exhibit 38 that you
16:51 19    handed me --
16:51 20           MR. DONATTI:  Yes.
16:52 21           MR. NAVARRO:  -- that is Bates-marked
16:52 22    Defendants' 197 through 2000 --
16:52 23           MR. DONATTI:  Are we still on the record?
16:52 24           MR. NAVARRO:  Yes, on the record. -- under
16:52 25    optional completeness on your exhibit, I would ask that

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

16:52  1    you go back to the production packet that we gave you,

16:52  2    because the exhibit includes -- the Outlook e-mails

16:52  3    start at 194, 195 --

16:52  4              MS. JOHNSON:  Let's go off record.

16:52  5              MR. NAVARRO:  -- 196.

16:52  6              MR. DONATTI:  I don't understand.

16:52  7              MR. NAVARRO:  Well, the exhibit is

16:52  8    incomplete.  So when he tells you this is incomplete,

16:52  9    it is incomplete.  And that this -- I was concerned

16:52  10   that we hadn't produced this to you, but you have these

16:52  11   additional pages.

16:52  12             THE WITNESS:  Yes.

16:52  13             MR. NAVARRO:  So I would ask that the

16:52  14   exhibit be complete under the rule of optional

16:53  15   completeness.

16:53  16             MR. DONATTI:  So what I will tell you is,

16:53  17   yes, the grievance file was shared with us.  The

16:53  18   grievance file does not contain the earlier exchange

16:53  19   about the original proposed findings of fact or the

16:53  20   earlier exchange about disagreements as to the earlier

16:53  21   proposed findings of fact.

16:53  22             That exhibit is hundreds of pages, so we

16:53  23   excerpted it so that we could go over the materials

16:53  24   that you provided.  But I stand by what I said, that

16:53  25   this does not include what Mr. Ramirez was referring to

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

269

16:53  1    specifically.

16:53  2              MR. NAVARRO:  Well, I do want him to read

16:53  3    and sign his depo.  So we'll go -- make sure he goes

16:53  4    through it.  But, I mean, you're right, the exhibit is

16:53  5    345 pages.

16:53  6              MR. DONATTI:  Yes.

16:53  7              MR. NAVARRO:  So I just wanted to make

16:53  8    sure, there are some pages that are -- appear to be

16:53  9    ahead of this one Exhibit 38.

16:53  10             MR. DONATTI:  I represent we extracted the

16:54  11   entire thread at issue here.

16:54  12             MR. NAVARRO:  But that's not what the

16:54  13   exhibit reflects.  It's not the entire thread.

16:54  14             MS. JOHNSON:  I'm sorry.  May we go off

16:54  15   the record?  And I want to make sure we get this right

16:54  16   for you, Ric, so it's not an issue, that we can do

16:54  17   that.

16:54  18             MR. NAVARRO:  I'm sorry, what?

16:54  19             MS. JOHNSON:  May we go off the record

16:54  20   because of time?

16:54  21             MR. NAVARRO:  Yeah, that's fine.

16:54  22             (Brief recess)

17:08  23        Q.  We are returning from the short break.

17:08  24   Mr. Ramirez, did you speak with your attorney over the

17:08  25   break?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

17:08 1      A.   I did.

17:08 2      Q.   Did you speak with anybody else?

17:08 3      A.   No.

17:08 4      Q.   Did you send messages to anybody else?

17:08 5      A.   No.

17:08 6      Q.   Why did you plead guilty to the grievance

17:08 7  findings?

17:08 8      A.   I didn't plead guilty.

17:08 9      Q.   Why did you agree to the findings of facts?

17:08 10      A.   I agreed to the findings of fact because I was

17:08 11  told by the investigator that I had two options:  I

17:08 12  could enter into an agreement on the findings of fact,

17:09 13  or if I didn't come to an agreement on the findings of

17:09 14  fact, I would -- the next step would be a trial in

17:09 15  Starr County.

17:09 16      Q.   You didn't want to go to trial?

17:09 17      A.   I did not want to go to trial.  That would have

17:09 18  been a total disruption of my office.

17:09 19      Q.   It would have been a destruction because you

17:09 20  would have had to --

17:09 21      A.   Not a destruction, a disruption.

17:09 22      Q.   It would have been a disruption because you

17:09 23  would have had to air out what happened in this case?

17:09 24      A.   No.  It would have been a disruption because it

17:09 25  would have continued the grievance procedure.  I would

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

17:09  1    have had to prepare for trial.  I would have had to put

17:09  2    all my energy into defending myself in a trial over a

17:09  3    period of months, if not a year.

17:09  4                    Whereas, if I agreed to a findings of fact

17:09  5    and a judgment, which I did, that would end it at that

17:09  6    point, and I would serve out whatever sanction was

17:10  7    issued, and it would be over with, which it is.  It was

17:10  8    the right decision to make for the office and for me

17:10  9    personally also.

17:10  10   Q.  You agree that you failed to refrain --

17:10  11   A.  Can I see the exhibit?

17:10  12   Q.  Of course.

17:10  13                    (Discussion).

17:10  14   Q.  You agree that you failed to refrain from

17:10  15   prosecuting a charge that was known not to be supported

17:10  16   by probable cause, correct?

17:10  17   A.  That is the fifth finding of fact.

17:10  18   Q.  And you still agreed to that?

17:10  19   A.  That we present -- that she was indicted for a

17:10  20   charge that was later known not to be supported by

17:11  21   probable cause -- that was not supported by probable

17:11  22   cause?  Yes.

17:11  23   Q.  You knew that the charge was not supported by

17:11  24   probable cause on February 1st, correct?

17:11  25   A.  No, I did not.

17:11  1        Q.  You told Ms. Barrera, "We do not have enough

17:11  2   evidence here" on February 1st; is that correct?

17:11  3        A.  No, I did not.

17:11  4        Q.  The next --

17:11  5        A.  In fact, where it says that I failed to

17:11  6   respond -- refrain from prosecuting a charge that was

17:11  7   known, I don't know who they're talking about that it

17:11  8   was known, because I made it very clear to Mr. Hackett,

17:11  9   and the e-mails reflect that I made it clear to

17:11 10   Mr. Hackett that neither Ms. Barrera or myself were

17:11 11   aware of 19.06, and neither was Mr. Villarreal.

17:11 12        Q.  And No. 8.

17:11 13        A.  Okay.

17:11 14        Q.  What were the violations of disciplinary rules

17:11 15   by your assistant district attorneys?

17:11 16        A.  No, no.  It's -- the violation of the

17:11 17   disciplinary rules I'm assuming was the presentation of

17:11 18   the case to a grand jury.  The failure to take remedial

17:12 19   action, I didn't understand that, because that finding

17:12 20   that I failed to take remedial action or mitigate

17:12 21   consequences, their -- their take -- the grievance

17:12 22   committee's take on that was that remedial action would

17:12 23   have been to discipline Ms. Barrera.

17:12 24             My understanding of that was that

17:12 25   Ms. Barrera was not going to -- my discipline --

17:12  1    disciplining Ms. Barrera was not going to remedy the
17:12  2    situation.  Remedial action in my opinion is action
17:12  3    that would correct the situation.
17:12  4              But I agreed to that finding of fact
17:12  5    because that was their interpretation that I had --
17:12  6    should have sanctioned or somehow disciplined
17:12  7    Ms. Barrera and I failed to do that.
17:12  8         Q.  No. 10, it says In connection with the
17:13  9    investigation made the basis of this disciplinary
17:13 10    matter, respondent, you, Mr. Ramirez, knowingly made a
17:13 11    false statement of material fact in your written
17:13 12    response to the complaint.  What was the false
17:13 13    statement of material fact?
17:13 14         A.  It was in the written -- my first written
17:13 15    response to the grievance.  I put in that response that
17:13 16    I was not aware of any of the facts of the case.  And
17:13 17    then when we had the actual investigatory hearing, I
17:13 18    told them that I had been briefed on some of the facts
17:13 19    by Ms. Barrera, which I had been.
17:13 20              So Mr. -- I told Mr. Hackett that -- he
17:13 21    said, Well -- he said, "It's not that big a deal."  He
17:13 22    said, "Your initial response to the grievance was not
17:13 23    under oath, and it's more of a technical issue, because
17:13 24    you've put down in your original answer that you had
17:14 25    not been briefed on any of the facts," when, in fact, I

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

17:14  1    had been briefed on some of the facts.

17:14  2        Q.  And you agreed to these findings of fact,

17:14  3    correct?

17:14  4        A.  I agreed to -- to these findings of fact to

17:14  5    resolve the case, yes, I did.

17:14  6        Q.  In fact, you negotiated back and forth on the

17:14  7    language to be used.

17:14  8        A.  I negotiated?

17:14  9        Q.  Correct.

17:14 10        A.  I negotiated on everything, including the --

17:14 11    the fees and expenses.  Even that was negotiated.

17:14 12        Q.  So going back to the aftermath of the -- well,

17:14 13    let's go back to early April of 2022.  Who else did you

17:14 14    talk to that we haven't discussed yet about the arrest

17:14 15    of Lizelle Gonzalez?

17:14 16        A.  Besides my family, I don't -- and the people

17:14 17    that we've discussed, I can't think of anybody else

17:15 18    that I discussed it with.

17:15 19        Q.  You spoke to Rosita Rocha about the arrest of

17:15 20    Lizelle Gonzalez?

17:15 21        A.  I don't remember talking to her about the

17:15 22    arrest of Lizelle Gonzalez.

17:15 23        Q.  What is your relationship with Ms. Rocha?

17:15 24        A.  She's also an acquaintance.  I know her.  She

17:15 25    used to work at the sheriff's department when I first

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

17:15  1    went to Starr County.

17:15  2        Q.  Have you ever had a romantic relation with

17:15  3    Ms. Rocha?

17:15  4        A.  I have.  Not a romantic relationship, a sexual

17:15  5    relationship.

17:15  6        Q.  You have invited Ms. Rocha to your office?

17:15  7        A.  No.

17:15  8        Q.  You have invited Ms. Rocha to your home?

17:15  9        A.  She's been to my home.  When I was single, she

17:15 10    came to the house.  I don't think she's ever been to my

17:15 11    office.  Her son has been to my office to borrow money.

17:15 12        Q.  Who else did you speak to about this case?

17:15 13        A.  I don't think I spoke to any friends about it.

17:15 14    I've spoken to my attorneys about -- oh, I spoke to the

17:16 15    county attorney about it because I had to get a defense

17:16 16    when you filed the lawsuit.  So the talk to -- if

17:16 17    you're talking about this case that we're taking the

17:16 18    depo on, that's -- I'm sorry.

17:16 19        Q.  I'm talking about Ms. Gonzalez's --

17:16 20        A.  Ms. Herrera's case?

17:16 21        Q.  Yes.

17:16 22        A.  I don't think I've had any in-depth

17:16 23    conversations with anybody except my family, and that

17:16 24    really hasn't been in-depth, and with the ADAs on the

17:16 25    date that -- that everything started to happen.

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

17:16  1    After -- after everything was done and the case was

17:16  2    dismissed, I don't believe that I had conversations

17:16  3    with anybody at length about the case.

17:16  4         Q.  In regard to this case, the civil litigation

17:16  5    against you, you spoke to Starr County Judge Roy Vela

17:16  6    about this case?

17:16  7         A.  No.  It's -- the Starr County judge is Eloy

17:16  8    Vera.

17:16  9         Q.  Eloy Vera.

17:17 10         A.  And I didn't talk to him about the case.  I

17:17 11    think I spoke to the county attorney who then spoke to

17:17 12    the judge about getting coverage -- or getting a

17:17 13    defense.

17:17 14         Q.  Earlier, we spoke about remediation, and you

17:17 15    said that remediation was making the situation right,

17:17 16    correct?

17:17 17         A.  That's correct.  I think that -- that was my

17:17 18    interpretation of what they -- their interpretation of

17:17 19    remedial action was I should have disciplined

17:17 20    Ms. Barrera.  My interpretation of remedial action with

17:17 21    reference to these findings of fact was that I did

17:17 22    everything that I could do to make it right by

17:17 23    dismissing the case.

17:17 24         Q.  Remedial action also could have been making

17:17 25    sure that this situation never happens again, correct?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

17:17  1        A.  I am positive that it will never happen again.

17:18  2        Q.  You never conducted an internal investigation

17:18  3    related to this case, correct?

17:18  4        A.  This -- there's not a -- no, I never conducted

17:18  5    an internal investigation regarding this case.  It's a

17:18  6    small office.  We -- we knew what happened.

17:18  7        Q.  You didn't talk to Ms. Barrera about what

17:18  8    happened?

17:18  9        A.  Yes, we did talk to -- I did talk to

17:18 10    Ms. Barrera.  Not about what happened, but about the

17:18 11    mistake that was made.  On the 9th, there were lots of

17:18 12    conversations going back and forth about what happened,

17:18 13    what happened, should it have happened, let's look at

17:18 14    this, let's look at that.  Yeah, there was -- there

17:18 15    were a lot of conversations going back and forth.

17:18 16        Q.  These conversations were with you in your

17:18 17    office?

17:18 18        A.  No.  They were -- it was a weekend, so I was at

17:18 19    home.  And I spoke to Ms. Barrera by phone.  I'm

17:18 20    positive.  The text messages you have.  I'm sure that

17:18 21    we spoke on the phone.  I spoke on the phone to Abel.

17:19 22    I may have spoken on the phone to Judy, although I'm

17:19 23    not positive about that.  I don't think I spoke to

17:19 24    Alfredo about it.  Didn't speak to anybody else from

17:19 25    the staff because none of them were actually involved.

Electronically signed by Donna McCown (101-253-986-8079)                                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

17:19  1          Q.  Have you spoken to Ms. Barrera about this case?

17:19  2          A.  No.  The only -- the only time I spoke to

17:19  3   Ms. Barrera about this case was when I was initially

17:19  4   served with the original complaint that you filed.  And

17:19  5   I was just flabbergasted by the allegations that were

17:19  6   being made totally unfounded without any evidence,

17:19  7   totally erroneous, alleging conspiracies right and

17:19  8   left.

17:19  9               So I'm sure that I mentioned that to her

17:19 10   and probably said something to the effect of this is

17:19 11   just kind of crazy what is being alleged here.  And

17:20 12   then she got served, and the language was the same and

17:20 13   it was -- it was actually pretty absurd.

17:20 14          Q.  You never talked to her again about this case?

17:20 15          A.  No, because I felt that it was better if we

17:20 16   just didn't talk about it.  That's why I haven't Zoomed

17:20 17   in on any of the depos except Ms. Herrera's deposition.

17:20 18   I felt that it would be wiser as an attorney -- I

17:20 19   thought it would be wiser to just let everybody have

17:20 20   their say without any influence from anybody else.  And

17:20 21   I'm very confident that the truth is going to come out,

17:20 22   has come out.

17:20 23          Q.  Have you changed your office's practices at

17:20 24   all?

17:20 25          A.  In what way?

Electronically signed by Donna McCown (101-253-986-8079)                    d10f10c7-aea9-490e-bd18-c18fbc0c327a

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ                )(
        Plaintiff               )(
                                )(
VS.                             )(    CIVIL ACTION NO.
                                )(    7:24-cv-00132
GOCHA ALLEN RAMIREZ,            )(
ALEXANDRIA LYNN BARRERA,        )(
RENE FUENTES, and STARR         )(
COUNTY, TEXAS                   )(
        Defendants              )(

REPORTER'S CERTIFICATE

I, DONNA McCOWN, Certified Court Reporter,
certify that the witness, GOCHA ALLEN RAMIREZ, was duly
sworn by me, and that the deposition transcript is a
true and correct record of the testimony given by the
witness in person on APRIL 7, 2025, and that the
deposition was reported by me in stenograph and was
subsequently transcribed under my supervision.

Pursuant to Federal Rule 30(e)(2), a review of
the transcript was requested.
I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

WITNESS MY HAND on this the _____ day
_____, 2025.

_____
DONNA McCOWN, Texas CSR 6625
Expiration Date:  01-31-26
Bryant & Stingley, Inc., CRN No. 41
P.O. Box 3420
Harlingen, Texas  78551
(956) 428-0755

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**