```
          IN THE UNITED STATES DISTRICT COURT
          FOR THE SOUTHERN DISTRICT OF TEXAS
                  McALLEN DIVISION

LIZELLE GONZALEZ              ) (
         Plaintiff            ) (
                              ) (
VS.                           ) (   CIVIL ACTION NO.
                              ) (   7:24-cv-00132
GOCHA ALLEN RAMIREZ,          ) (
ALEXANDRIA LYNN BARRERA,      ) (
RENE FUENTES, and STARR       ) (
COUNTY, TEXAS                 ) (
         Defendants           ) (
```

_____

ORAL AND VIDEOTAPED DEPOSITION OF
RAFAEL AGUIRRE
MAY 1, 2025

_____


        ORAL AND VIDEOTAPED DEPOSITION OF RAFAEL

AGUIRRE, produced as a witness at the instance of the

PLAINTIFF, taken in the above-styled and numbered cause

on MAY 1, 2025, between the hours of 10:02 a.m. and

3:33 p.m., reported stenographically by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at Bryant & Stingley, Inc., 701 East

Harrison, Suite 200, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached therein.


**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

APPEARANCES

COUNSEL FOR PLAINTIFF:
      ASHLEY HARRIS
      SARAH CORNING, via Zoom
      AMERICAN CIVIL LIBERTIES UNION TEXAS
      Staff Attorney
      P.O. Box 8306
      Houston, Texas   77288

      DAVID A. DONATTI
      AMERICAN CIVIL LIBERTIES UNION OF TEXAS
      P.O. Box 12905
      Austin, Texas   78711-2905
      I. CECILIA GARZA
      GARZA MARTINEZ, PLLC
      202 East Sprague Street
      Edinburg, Texas   78539

      ELIZABETH JARIT
      AMERICAN CIVIL LIBERTIES UNION
      SENIOR STAFF ATTORNEY
      125 Broad Street, 18th Floor
      New York, NY   10004

      LAUREN JOHNSON, via Zoom
      AMERICAN CIVIL LIBERTIES UNION
      915 15th Street NW
      Washington, DC   20005
      JUNE (ANNIE) GERSH, via Zoom
      AMERICAN CIVIL LIBERTIES UNION
      125 Broad Street
      New York, New York   10004

COUNSEL FOR DEFENDANTS:

      KELLY R. ALBIN
      DENTON NAVARRO RODRIGUEZ BERNAL
      SANTEE & ZECH, P.C.
      549 North Egret Bay Boulevard, Suite 200
      League City, Texas   78550

ALSO PRESENT:
      Rene Ortiz, Videographer

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

```
 1                        INDEX
 2                                              PAGE
       Appearances ...................................   2
 3
       RAFAEL AGUIRRE
 4     Examination by Ms. Ashley ......................   4
       Examination by Ms. Albin ...................... 162
 5     Examination by Ms. Ashley ..................... 173
       Examination by Ms. Albin ...................... 176
 6
       Errata Sheet/Signature Page ................... 177
 7
       Reporter's Certificate ........................ 179
 8
       Attached to the end of the transcript:  Stipulations
 9
                        EXHIBITS
10
       NUMBER  DESCRIPTION                           PAGE
11
         40     Investigative Report ..................  68
12
         41     Handwritten Notes .....................  72
13
         42     Text Messages, Mr. Aguirre and
14              Ms. Barrera ...........................  98
15
16
17
18
19
20
21
22
23
24
25
```

BRYANT & STINGLEY, INC.
Harlingen (956) 428-0755          McAllen (956) 618-2366

10:58  1      Q.  Ms. Gonzalez's hospital treatment at Starr

10:58  2  County Memorial Hospital was within Roma city, correct?

10:58  3      A.  The Starr County Memorial Hospital is in Rio

10:58  4  Grande City.

10:58  5      Q.  Oh, yeah, excuse me.  And Rio Grande City has

10:58  6  different police jurisdiction, correct?

10:58  7      A.  Yes.  They have their own police department.

10:58  8      Q.  So why wouldn't that police department have

10:59  9  jurisdiction if -- if the hospital was in the city?

10:59  10      A.  Because of her residence.  She resides in the

10:59  11  county jurisdiction.

10:59  12      Q.  And is it common that the person being

10:59  13  investigated's home is how jurisdiction is decided?

10:59  14      A.  Most of the time, yes.

10:59  15      Q.  What are the other times?

10:59  16          MS. ALBIN:  Objection, vague.

10:59  17      A.  When it's clear that the person resides in the

10:59  18  city jurisdiction.

10:59  19      Q.  So -- so home residence is what's used?

10:59  20      A.  Yes.

10:59  21      Q.  Okay.  How do calls come in to dispatch?

10:59  22      A.  Well, it could be by a landline or it could be

10:59  23  by 911.

10:59  24      Q.  How do -- is -- is the landline number

11:00  25  something that's publically available?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:00 1      A.   Yes.

11:00 2      Q.   So is it common to get calls through landline?

11:00 3      A.   I don't know.  You have to ask the -- the

11:00 4  communications supervisor about that.

11:00 5      Q.   Do you know how it's decided whether a call to

11:00 6  dispatch results in sending out a patrol officer?

11:00 7      A.   I don't.

11:00 8      Q.   After the patrol officer responds to a call,

11:00 9  they write an incident report, right?

11:00 10      A.   That is correct.

11:00 11      Q.   What is the purpose of that report?

11:00 12      A.   To document whatever happened and what they

11:00 13  were told and what's going to be the topic of that --

11:00 14  of that incident report.

11:00 15      Q.   Is a charge usually included in that report?

11:00 16           MS. ALBIN:  Again, I'm going to object.

11:00 17  You're asking general questions about general practices

11:00 18  and not about what happened in this case, which is the

11:00 19  only thing that the immunity question is focused on.

11:01 20           So I don't want to stop and leave.  We're

11:01 21  all here, but we're not going to sit here all day for

11:01 22  questions that are not about the incident and the

11:01 23  issues of immunity.

11:01 24      Q.   How would you describe the way that the

11:01 25  sheriff's office works with the Starr County DA's

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

11:02 1    office?

11:02 2        A.  The process or how we get along or --

11:02 3        Q.  How often do you reach out to the DA's office

11:02 4    during an investigation?

11:02 5        A.  It's very difficult for me to answer that

11:02 6    specifically because there are cases that we work in

11:02 7    which we don't consult with the DA's office because all

11:02 8    the elements are there.  It's clearcut.

11:02 9            And there will be times that we reach out

11:02 10   when we have a little bit extra questions and -- or

11:02 11   we're not up to date with procedures or anything like

11:02 12   that.  So it would be -- it's too -- too broad, too

11:02 13   many complexities to answer that specifically.

11:02 14       Q.  Are you familiar with the term "staff with

11:02 15   DAs"?

11:02 16       A.  Yes.

11:02 17       Q.  What does that mean?

11:02 18       A.  It means to -- exactly as it implies, to

11:02 19   discuss a case with assistant DAs, district attorneys.

11:03 20       Q.  And so when -- when you were a sergeant, it was

11:03 21   common for you to advise investigators that they should

11:03 22   reach out to the DA's office?

11:03 23            MS. ALBIN:  Objection.  Is that a

11:03 24   question?

11:03 25       Q.  Correct?

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

11:03  1          A.  Ma'am, as a supervisor, I try to do my best and

11:03  2    to be sure that the cases are worked on.  For me to

11:03  3    answer that, I cannot answer that.  You know, pretty

11:03  4    sure it happens.

11:03  5                But specifically amounts, like, no, I

11:03  6    cannot give you an amount of time.

11:03  7          Q.  So I think you testified that on -- on some

11:03  8    investigations where all the elements are clearcut, you

11:04  9    wouldn't reach out to the DA's office, correct?

11:04  10          A.  That is correct.

11:04  11          Q.  So in those situations, as a sergeant, you

11:04  12    wouldn't advise investigators to reach out to the DA's

11:04  13    office?

11:04  14          A.  I would not.

11:04  15          Q.  How often does the sheriff's office call the

11:04  16    DAs with questions about an investigation?

11:04  17                MS. ALBIN:  Objection, vague.

11:04  18          A.  I don't -- I cannot give you a specific number.

11:04  19          Q.  Would you estimate that it happens every week?

11:04  20                MS. ALBIN:  Objection.

11:04  21          A.  I cannot give you a specific number.  We

11:04  22    call -- sometimes we call, sometimes we don't.

11:04  23          Q.  So it could kind of vary week to week?

11:04  24          A.  Yes.

11:04  25          Q.  In those situations where you do call the DA's

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

11:04  1      office, is that helpful?

11:04  2                  MS. ALBIN:  Objection, vague.

11:04  3          A.  Well, that's the whole purpose of calling them.

11:05  4          Q.  I guess what is the purpose?

11:05  5          A.  To get, you know, extra guidance or answer

11:05  6      questions that we cannot answer.

11:05  7          Q.  And why do you want answers to those questions?

11:05  8          A.  To do our job, to make sure that we make a

11:05  9      case.

11:05 10          Q.  And when you say "make a case," what do you

11:05 11      mean?

11:05 12          A.  Make sure that all the elements are there for a

11:05 13      crime.

11:05 14          Q.  How is that communication usually done?  By

11:05 15      phone?  E-mail?  In person?

11:05 16          A.  Phone, person, e-mail.

11:05 17          Q.  Does one happen more than the other?

11:05 18          A.  Yes.

11:05 19          Q.  Which one?

11:05 20          A.  In person.

11:05 21          Q.  How far is your office from the DA's office?

11:05 22          A.  Walking distance.

11:05 23          Q.  Like next door?

11:05 24          A.  It's down the block.

11:05 25          Q.  So you'll -- you'll go visit there pretty

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

53

11:05  1    frequently?

11:05  2        A.  Yes.

11:06  3        Q.  Who in the DA's office do you usually reach out

11:06  4    to first?

11:06  5        A.  Ms. Barrera.

11:06  6        Q.  Why is that?

11:06  7        A.  I've known her for some time.

11:06  8        Q.  How long have you known her?

11:06  9        A.  Over five to ten years.

11:06  10       Q.  So you knew her while you were at the police

11:06  11   department?

11:06  12       A.  Yes.

11:06  13       Q.  Is there anyone from the sheriff's office --

11:06  14   well, I'll start over.

11:06  15               Does everyone from -- start again.

11:06  16               Do all the investigators reach out to the

11:06  17   DA's office the same amount?

11:06  18               MS. ALBIN:  Objection, calls for

11:06  19   speculation.

11:06  20       A.  I wouldn't know.

11:06  21       Q.  Is there anyone in the sheriff's office who's

11:06  22   tasked with that outreach specifically?

11:06  23       A.  No.

11:06  24       Q.  Is it kind of just whoever is working on a task

11:06  25   and has the question will reach out --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:06  1              MS. ALBIN:  Objection --

11:07  2         Q.  -- to the DA's office?

11:07  3              MS. ALBIN.  Sorry, didn't mean to

11:07  4    interrupt.  -- calls for speculation.

11:07  5         A.  That's a good assumption.

11:07  6         Q.  At what point does the sheriff's department

11:07  7    first talk to the DA's office about a case?

11:07  8              MS. ALBIN:  Objection, vague.

11:07  9         A.  It's -- I cannot answer that.  It's too -- you

11:07 10    know, different situation will dictate -- dictate

11:07 11    different course of action.

11:07 12         Q.  Is that usually as soon as you have a question?

11:07 13         A.  Can you throw that at me again?

11:07 14         Q.  So you said you'll often -- I think you

11:07 15    testified that you'll often reach out if there's a

11:07 16    question about the elements of the case, correct?

11:07 17         A.  Not often.  We will reach out when there's a

11:07 18    question.

11:07 19         Q.  Okay.  If you had a question about the elements

11:08 20    of the case, would you reach out pretty quickly to the

11:08 21    DA's office?

11:08 22         A.  Again, ma'am, that's requiring for me to be

11:08 23    very specific about something.  I mean, I don't time

11:08 24    myself whenever we call them.

11:08 25              You know, it's if a question arises, it's

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:08  1     in our best interest, you know, to get it resolved

11:08  2     quickly.  I mean, it's obvious.

11:08  3          Q.  And in those calls, the DA's office will try to

11:08  4     answer your questions, correct?

11:08  5               MS. ALBIN:  Objection, calls for

11:08  6     speculation.  It's vague.

11:08  7          A.  We usually do our discussions in person.

11:08  8          Q.  When -- when you talk to the DA's office,

11:08  9     they'll usually respond to your questions, correct?

11:08  10         A.  In person, yes.

11:08  11         Q.  The DA's office sometimes advises you about

11:08  12    what charge to proceed with investigating, correct?

11:09  13              MS. ALBIN:  Objection, leading.

11:09  14         A.  No.  That's inaccurate.

11:09  15         Q.  What's inaccurate about it?

11:09  16         A.  The -- your statement, the question.  We

11:09  17    usually know what we're looking at, and we just want

11:09  18    clarification.

11:09  19         Q.  What -- I'm just trying to understand.  So what

11:09  20    is an example of -- of what that looks like?

11:09  21         A.  Well, we can have different examples of that.

11:09  22    Whenever we have a case that we know we were leaning

11:09  23    towards a charge and we just want to make sure, we just

11:09  24    want to have everything in line, and that's why we go

11:09  25    over to the attorneys to discuss the case if it's

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

12:28 1      A.  Not specifically.  I do not remember, ma'am, if

12:28 2    I told anyone.  But the case was worked, was -- it

12:28 3    began.  We began the investigation.

12:28 4      Q.  Is it your testimony that someone else told

12:28 5    Investigator Muniz to work on this case?

12:28 6      A.  No, that is not my -- my testimony.  I don't

12:28 7    know how -- specifically how we got it going on, but

12:28 8    it -- like I think I did testify before that most of my

12:29 9    investigators did not wait until being told to do

12:29 10   something.  If they were on call, they knew they had to

12:29 11   respond.

12:29 12     Q.  I just want to clarify.  You -- you testified

12:29 13   that you had -- that it was -- okay.  Let me back up.

12:29 14          If someone is on call, do you tell them

12:29 15   they have to work on the case?

12:29 16     A.  Not unless I have to.

12:29 17     Q.  What does that mean?

12:29 18     A.  They will -- if they know they're on call, if

12:29 19   there's a call for service like this that requires

12:29 20   investigator response, they -- they do it on -- by

12:29 21   themselves.

12:29 22          I don't have to specifically tell them.

12:29 23   The only time I specifically tell them is when I assign

12:29 24   the case on paper.

12:29 25     Q.  So is it your testimony that the patrol

Electronically signed by Donna McCown (101-253-986-8079)                          944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:29  1       supervisor called Investigator Muniz?

12:30  2           A.   No.

12:30  3                   MS. ALBIN:  Objection, that

12:30  4       mischaracterizes his testimony.

12:30  5           A.   That is not.

12:30  6           Q.   Okay.  And I'm just trying to clarify.  So most

12:30  7       likely you testified that -- is this correct, that the

12:30  8       patrol investigator would have called the sergeant,

12:30  9       correct?

12:30 10                   MS. ALBIN:  Objection, calls for

12:30 11       speculation.

12:30 12           A.   Ma'am, with all due respect, ma'am, I don't

12:30 13       know why you're hung up on, you know, specifics of the

12:30 14       chronological order of things.  You know, we had a call

12:30 15       that day.  The patrol officer responded.

12:30 16                   And in most cases, the patrol supervisor

12:30 17       will let me know that there's a case going on, and we

12:30 18       usually get the ball rolling.

12:30 19                   On this case specifically, it's been more

12:30 20       than two years.  I don't remember who called me.  I

12:30 21       don't remember what -- who I told to do.  But if Esmer

12:30 22       Muniz worked it, she was probably on call, and that's

12:30 23       why she began the investigation, and I assisted in

12:31 24       whatever I could.

12:31 25           Q.   And we discussed earlier that -- so these text

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:31  1    messages on their face reflect text messages at

12:31  2    2:49 p.m. that day, correct?

12:31  3        A.  It does reflect --

12:31  4              MS. ALBIN:  Objection, calls for

12:31  5    speculation.

12:31  6        Q.  And -- and then we discussed earlier that you

12:31  7    and the captain met with Ms. Torres at 3:50 p.m. that

12:31  8    day, correct?

12:31  9        A.  As in my notes, yes, 3:50 p.m.

12:31  10       Q.  But you're not sure if you spoke to

12:31  11   Investigator Muniz before that?

12:31  12       A.  I'm pretty sure I talked to her, but I don't

12:31  13   have specific times or what was discussed.

12:31  14       Q.  Did you speak with ADA Barrera that day?

12:32  15       A.  I don't remember if I did.

12:32  16       Q.  Investigator Muniz testified during her

12:32  17   deposition that she spoke to ADA Barrera that day and

12:32  18   that you and the captain were there.  Does that sound

12:32  19   correct to you?

12:32  20             MS. ALBIN:  I'm going to object to

12:32  21   counsel's representation of what Ms. Muniz testified to

12:32  22   unless you have the transcript here to look at.

12:32  23             MS. HARRIS:  Sure.  We can come back to

12:32  24   it.

12:33  25       Q.  So looking at Plaintiff's Exhibit 16 again,

Electronically signed by Donna McCown (101-253-986-8079)                      944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:33 1    which are these text messages, on the same page,

12:33 2    page 79, the third text message, it says that it was

12:33 3    sent on January -- I will represent to you that on its

12:33 4    face it says it was sent on -- or it is dated January

12:33 5    11th, 2022, at 7:16 p.m.  And can you read to me what

12:33 6    it says, please?

12:33 7        A.  The third one or the last one?

12:33 8        Q.  Yes, please.

12:33 9        A.  "Alex, I came to take pictures of the ashes of

12:33 10   the baby because it's been cremated already...do I

12:33 11   allow the funeral home to give the mom the ashes?"

12:34 12       Q.  Were you aware that Investigator Muniz was

12:34 13   taking pictures of the ashes that day?

12:34 14       A.  I don't remember, ma'am.

12:34 15       Q.  Do you remember pictures of the ashes being

12:34 16   taken during the investigation?

12:34 17       A.  I don't, ma'am.  I don't.

12:34 18       Q.  Do you remember if you directed Investigator

12:34 19   Muniz to take those photos?

12:34 20       A.  I do not remember.

12:34 21       Q.  During her deposition testimony, Investigator

12:35 22   Muniz testified that yourself and the captain directed

12:35 23   her to take those photos.  Does that sound accurate to

12:35 24   you?

12:35 25       A.  I wouldn't know, ma'am.  I would not remember

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

95

| | | |
|---|---|---|
| 12:35 | 1 | if I did or not. |
| 12:35 | 2 | Q.  Going back to the discussion about being on |
| 12:35 | 3 | call.  When someone is on call and takes a case, are |
| 12:36 | 4 | they always the one that is later assigned the case? |
| 12:36 | 5 | A.  Yes. |
| 12:36 | 6 | Q.  At any point, did you talk to the ADA's office |
| 12:36 | 7 | about this case -- or the DA's office about this case? |
| 12:36 | 8 | A.  I'm pretty sure I did.  I don't remember |
| 12:36 | 9 | specifically when or where, but I'm pretty sure that I |
| 12:36 | 10 | did. |
| 12:36 | 11 | Q.  Why did you reach out to them? |
| 12:36 | 12 | A.  I believe I reached out to set up a meeting and |
| 12:36 | 13 | sit down to discuss the case.  It was along with |
| 12:36 | 14 | Ms. Muniz. |
| 12:36 | 15 | Q.  Ms. Muniz was at that meeting, correct? |
| 12:37 | 16 | A.  More than likely, yes.  More than likely. |
| 12:37 | 17 | Q.  Why did you reach out to set up that meeting? |
| 12:37 | 18 | A.  Why? |
| 12:37 | 19 | Q.  Yes. |
| 12:37 | 20 | A.  Because of the -- of the case itself.  I |
| 12:37 | 21 | previously mentioned before the -- the changes in the |
| 12:37 | 22 | law, and we just needed some more clarification in how |
| 12:37 | 23 | to proceed with the case. |
| 12:37 | 24 | Q.  What clarification were you looking for? |
| 12:37 | 25 | A.  To see if any change in the law would apply or |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:37 1    what was going to be happening with the case.

12:37 2        Q.  So was it your understanding that before SB 8,

12:37 3    no crime would have been committed here?

12:37 4        A.  Not exactly, ma'am.  I did not -- like I said

12:37 5    numerous times, I did not know the extent of the

12:37 6    changes.  I just knew there were going to be changes,

12:37 7    so I much rather have the attorneys look at it other

12:37 8    than us.

12:38 9        Q.  Uh-huh.  What did you think the changes -- or

12:38 10   how did you think changes would be relevant to this

12:38 11   case?

12:38 12       A.  Like in any situation, when there's a change to

12:38 13   a law, it could be either a crime or not a crime.  It

12:38 14   can be either leaning both ways, you know.

12:38 15           So like I said, that's why I wanted to

12:38 16   have the defense -- not the defense attorneys, but the

12:38 17   attorneys, you know, look at it before we committed

12:38 18   ourself to creating an affidavit or -- or making, you

12:38 19   know, an arrest that would probably be subject to

12:38 20   litigation in the future.

12:38 21           So that's why we wanted to do a grand jury

12:38 22   review.  That way the -- we would be covered in that --

12:39 23   in that aspect.

12:39 24       Q.  What do you mean covered in that aspect?

12:39 25       A.  In that we did not err, you know, away from the

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:39  1    law as a sheriff's department.

12:39  2        Q.  Why didn't you make an arrest in this case

12:39  3    before it went to the grand jury?

12:39  4        A.  Well, first of all, it wasn't my case, ma'am,

12:39  5    to decide to make an arrest.  I mean, an individual

12:39  6    investigator will -- will -- it's -- it's to their

12:39  7    discretion.

12:39  8            And like I said before, this case was

12:39  9    going to be subject to scrutiny because of the upcoming

12:39  10   changes, which I did not know what they were going to

12:39  11   be.  So that's why it was, you know, in the best

12:39  12   interest to have the grand jury or the district

12:39  13   attorneys review.

12:39  14       Q.  So investigator -- I think you testified just

12:40  15   now that Investigator Muniz would make that decision?

12:40  16       A.  Yes.

12:40  17       Q.  Why were you the one to reach out to

12:40  18   ADA Barrera to discuss this case?

12:40  19       A.  Why?  I mean, it's common practice.  As a

12:40  20   supervisor, I can coordinate meetings with the

12:40  21   prosecuting attorneys and defense attorneys.  And, you

12:40  22   know, I would be -- it would be part of my duties to

12:40  23   coordinate the meetings.

12:40  24       Q.  So at that meeting with ADA Barrera, what

12:41  25   advice did she give you about the law?

12:41  1      A.  I don't remember, ma'am.  It's been too long.
12:41  2      Q.  What happened -- did you -- well --
12:41  3            MS. HARRIS:  Can I see Plaintiff's
12:41  4  Exhibit 15, please.  And this exhibit is unmarked.  And
12:41  5  I lost track of what number it will be.
12:41  6            THE COURT REPORTER:  42.
12:42  7            MS. HARRIS:  Plaintiff's Exhibit 42.
12:42  8      Q.  I'm going to hand you a copy.  And I have
12:42  9  another copy.
12:42 10            Do you recognize what is depicted in this
12:42 11  document?
12:42 12      A.  It is my phone number and my name.
12:42 13      Q.  And is that your personal phone number?
12:42 14      A.  Yes, it is.
12:42 15      Q.  Okay.  And do you recognize ADA Barrera's
12:43 16  number?
12:43 17      A.  Not her number, but I recognize her name.
12:43 18      Q.  Okay.  Do you recognize these as text messages
12:43 19  exchanged between you two?
12:43 20      A.  Yes.
12:43 21      Q.  Okay.  So looking at the first page, which is
12:43 22  numbered page 2 at the bottom, can you read me what
12:43 23  that text message says, please.
12:43 24      A.  Okay.  The very last one?
12:43 25      Q.  Yes, please.

Electronically signed by Donna McCown (101-253-986-8079)                            944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:43  1      A.  It says, "Good morning, Ms. Barrera.  This is
12:43  2  Investigator Rafael Aguirre with the Starr County
12:43  3  Sheriff's Office.  Would you be available today to
12:43  4  discuss a case involving an abortion?"
12:43  5      Q.  And when is that text message from?
12:43  6      A.  That's on the 18th of January of 2022.
12:44  7      Q.  At 8:59 a.m., correct?
12:44  8      A.  At the bottom part, is that what it is?  8:59,
12:44  9  yes, it is.
12:44  10      Q.  Does -- is this text message setting up the
12:44  11  same meeting that we were just discussing with
12:44  12  ADA Barrera?
12:44  13      A.  I don't know specifically, but it could -- it
12:44  14  could be.
12:44  15      Q.  Okay.  And so was Investigator Muniz at the
12:44  16  meeting you set up in these text messages?
12:44  17      A.  I don't remember, ma'am.  I know we had
12:44  18  multiple meetings, but I -- well, it was more than one
12:44  19  meeting, but I don't remember who was there or what.
12:44  20  But I'm pretty sure it's somewhere in your records.
12:44  21      Q.  Were there any meetings where it was just you
12:44  22  meeting with ADA Barrera?
12:44  23      A.  No, not that I remember.
12:44  24      Q.  Were there meetings where other people were
12:45  25  there?

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:45 1      A.  I do not remember specifically.  More than

12:45 2  likely yes, but I do not remember specifically who.

12:45 3      Q.  Okay.  But you do remember Investigator Muniz

12:45 4  at one of those meetings, correct?

12:45 5      A.  It would be crucial that she was there, but

12:45 6  yes.

12:45 7      Q.  How many meetings did you have with ADA

12:45 8  Barrera?

12:45 9      A.  I don't remember.

12:45 10     Q.  Okay.  But you testified, correct, that it was

12:45 11 more than one?

12:45 12     A.  More than one.

12:45 13     Q.  Okay.  Would you estimate that it was more than

12:45 14 five?

12:45 15     A.  No, I would not be able to estimate.

12:45 16     Q.  So looking at page 3 -- or at page -- what is

12:45 17 numbered as page 4.

12:45 18     A.  Okay.

12:45 19     Q.  On the last text message, and can you read me

12:46 20 that text message, please?

12:46 21     A.  Okay.  Says, "Okay.  Awesome.  Thanks.  I'm

12:46 22 taking lunch at 1:00 p.m., and we -- and will be there

12:46 23 at 2:00."

12:46 24     Q.  And that's time-stamped January 18th, 2022, at

12:46 25 12:28 p.m.; is that correct?

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:46  1        A.   That's what it shows, yes.

12:46  2        Q.   Okay.  So is it your -- does it seem fair from

12:46  3    these text messages that you met with ADA Barrera

12:46  4    around 2:00 p.m. that day?

12:46  5        A.   It could be a possibility, yes.

12:46  6        Q.   And it appears from these text messages that

12:46  7    that was to discuss Ms. Gonzalez's case, correct?

12:46  8        A.   Specifically, yes.

12:46  9        Q.   Who else was present at this meeting?

12:46 10        A.   I don't remember, ma'am.

12:46 11        Q.   What was the purpose of this meeting?

12:47 12             MS. ALBIN:   Objection, asked and answered.

12:47 13        A.   To discuss the case about Ms. Herrera.

12:47 14        Q.   But what more specifically?  To discuss what?

12:47 15        A.   To lay out what we had so far and to see how to

12:47 16    proceed with this case, how we were supposed to go,

12:47 17    either arrest warrant or grand jury subpoena with grand

12:47 18    jury indictment or...

12:47 19        Q.   Did ADA Barrera give you an answer to that

12:47 20    question during this meeting?

12:47 21        A.   I don't remember, ma'am.

12:47 22        Q.   Did you discuss the change in the abortion law?

12:47 23        A.   I do not remember.

12:47 24        Q.   Looking to the next page, which is numbered

12:48 25    page 5, can you read me the second text message on that

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:48  1    page, please.

12:48  2         A.  Yes.  It says, "Rafa, let's hold off on teje

12:48  3    arrest warrant.  Let's talk to the lady that gave her

12:48  4    the drugs first.  Interview her."

12:48  5         Q.  Why did you understand that ADA Barrera was

12:48  6    texting you that?

12:48  7              MS. ALBIN:  Objection, calls for

12:49  8    speculation.

12:49  9         A.  I don't know.

12:49  10        Q.  Were you surprised that she texted you that?

12:49  11        A.  I don't remember if I was surprised or not.

12:49  12        Q.  Did you hold off on the arrest warrant after

12:49  13   this text message?

12:49  14        A.  It wasn't my case, ma'am, but I'm pretty sure

12:49  15   Ms. Muniz did.

12:49  16        Q.  So did you communicate this to Investigator

12:49  17   Muniz?

12:49  18        A.  I'm pretty sure I did.

12:49  19        Q.  Okay.  And -- and why -- why would ADA Barrera

12:49  20   text you this instead of Investigator Muniz?

12:49  21        A.  I don't know, ma'am.

12:49  22        Q.  Okay.  Looking at page 6, the next page, can

12:49  23   you read for me -- well, actually -- actually, on

12:50  24   page 5, can you read the -- the third text message.

12:50  25   It's numbered as page 5.

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:50  1       A.   "I don't think she's a flight risk...so let's

12:50  2   gather everything we can before."

12:50  3       Q.   And that is from -- the text message is to you,

12:50  4   correct?

12:50  5       A.   It is to me, yes.

12:50  6       Q.   And it's time-stamped January 18th, 2022, at

12:50  7   2:47 p.m.?

12:50  8       A.   2:47.

12:50  9       Q.   What did you understand that text message to

12:50  10  mean?

12:50  11      A.   Well, in conjunction with the previous one, I

12:50  12  guess she was telling us not to proceed yet until

12:50  13  clarification.

12:50  14      Q.   And based on these text messages, did you

12:50  15  decide not to proceed?

12:51  16      A.   Not only based on the messages, based on the

12:51  17  facts, we didn't proceed with an arrest warrant.

12:51  18      Q.   And before these text messages, had you already

12:51  19  decided to do that?

12:51  20      A.   I would not remember, ma'am.

12:51  21      Q.   Okay.  And what facts were you basing that off

12:51  22  of?

12:51  23      A.   The fact that Ms. Herrera was arrested through

12:51  24  a sealed indictment and not an arrest warrant.

12:51  25      Q.   That -- that happened later, correct?

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:51  1        A.  Yes.

12:51  2        Q.  I believe you testified that the decision to

12:51  3   not make the arrest at this point was -- was based on

12:51  4   the facts, correct?

12:51  5        A.  The -- after the facts of how Ms. Herrera was

12:51  6   arrested, not on what we had at that time.

12:51  7        Q.  Oh, yeah.  You're just saying you know that you

12:51  8   didn't arrest her?

12:51  9        A.  Yes.

12:51 10        Q.  Are there any other reasons you remember from

12:52 11   this time around January 18th of why you didn't arrest

12:52 12   Ms. Gonzalez?

12:52 13        A.  I do not.

12:52 14        Q.  And turning to the next page, which is numbered

12:52 15   as page 6, can you read that text message, please.

12:52 16        A.  "Okay.  Will do."

12:52 17        Q.  And that is sent by you, correct?

12:52 18        A.  Yes.

12:52 19        Q.  And that is time-stamped January 18th, 2022, at

12:52 20   2:48 p.m.?

12:52 21        A.  2:48 p.m.

12:52 22        Q.  And why did you respond with that text?

12:52 23        A.  I don't remember specifically what -- what that

12:52 24   meant, was it holding off or, like, agreeing that she

12:52 25   was not a flight risk or -- I don't know what it was.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:52  1    I don't remember.

12:52  2        Q.  It says, "Will do," correct?  Does that -- did

12:52  3    that mean you were going to take some action?

12:52  4        A.  I don't -- I don't know, ma'am.  I don't know

12:53  5    what -- what specifically -- what was our -- our

12:53  6    thought process at that specific time.  You know, it's

12:53  7    been two years.  Like I said, I don't want to assume.

12:53  8    I don't want to, you know, speculate.

12:53  9                But it was basically talking about the

12:53 10    case, so I guess whatever she was telling us, we were

12:53 11    agreeing with her, whatever she told us specifically on

12:53 12    page 5 or...

12:53 13        Q.  Were you ever present when Investigator Muniz

12:53 14    called ADA Barrera?

12:53 15        A.  I would not remember.

12:53 16        Q.  Did you ever speak with ADA Villarreal about

12:54 17    this case?

12:54 18        A.  I'm pretty sure I did, but specifically when

12:54 19    and where and about, no.

12:54 20        Q.  Do you ever remember asking him if this

12:54 21    investigation should proceed?

12:54 22        A.  I don't remember.

12:54 23        Q.  You testified earlier that you would review the

12:55 24    Penal Code in investigations, correct?

12:55 25        A.  That is correct.

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:55 1        Q.  At what point did you review the Penal Code in

12:55 2    this investigation?

12:55 3        A.  It would be safe to assume at the beginning of

12:55 4    the -- of the case, as soon as we learned that there

12:55 5    was going to be a case.  And you always want to -- it's

12:55 6    a good practice to go to the Penal Code and see if the

12:55 7    elements match or if they don't.

12:55 8        Q.  And -- and what did you look up in the Penal

12:55 9    Code?

12:55 10        A.  I looked -- looked up specific statutes like

12:55 11    for the -- the homicide, murder, and other things like

12:55 12    definitions and stuff.

12:55 13        Q.  And why did you think this was a homicide case?

12:55 14        A.  Because there was a death of an individual.

12:55 15        Q.  Did you -- who did you talk to about whether it

12:56 16    was a homicide?

12:56 17            MS. ALBIN:  Objection, vague.

12:56 18        A.  Can you be more specific at what time, or can

12:56 19    you give me more?

12:56 20        Q.  Sure.  Did you talk to Investigator Muniz about

12:56 21    whether it was a homicide?

12:56 22        A.  I'm pretty sure I did.

12:56 23        Q.  And do you remember anything about those

12:56 24    conversations?

12:56 25        A.  No, ma'am.  It's -- I'm pushing 52 already, so

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:56  1    my memory is not that good.

12:56  2         Q.  Did you ever speak with the captain about

12:56  3    whether this was a homicide?

12:56  4         A.  I'm -- more than likely I did.

12:56  5         Q.  Did you ever speak with the major about whether

12:56  6    this was a homicide?

12:56  7         A.  I don't recall.  I don't know if I did.

12:56  8         Q.  Did you ever speak to the chief about whether

12:57  9    this was a homicide?

12:57 10         A.  I don't recall.

12:57 11         Q.  Did you ever speak to the sheriff about whether

12:57 12    this was a homicide?

12:57 13         A.  I do not recall.

12:57 14         Q.  Was this a case that would have been discussed

12:57 15    in the CID WhatsApp group?

12:57 16         A.  It could have been.  That's the purpose of the

12:57 17    group.  I do not recall if it was or if it wasn't, but

12:57 18    it's a possibility.

12:57 19         Q.  You said that you looked up the homicide

12:57 20    statute in the Penal Code, correct?

12:57 21         A.  That is correct.

12:57 22         Q.  Who did you look that up with?

12:57 23         A.  Just myself, ma'am.  I mean, it's one book, so

12:58 24    yes.

12:58 25         Q.  And did you talk to anyone about that

Electronically signed by Donna McCown (101-253-986-8079)                                        944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

12:58  1     afterwards?

12:58  2          A.   I'm pretty sure I did.

12:58  3          Q.   Who?

12:58  4                 MS. ALBIN:  Objection, asked and answered.

12:58  5          A.   The rest of the investigators.

12:58  6          Q.   And did you talk about the homicide statute

12:58  7     with anyone in the ADA's office?

12:58  8          A.   I'm certain that I did.  I mean, it's part of

12:58  9     the -- it was part of the meeting.

12:58 10          Q.   What -- what meeting?

12:58 11          A.   The meeting that I had called for that I had

12:58 12     scheduled.

12:58 13          Q.   And what did ADA Barrera tell you about the

12:58 14     statute?

12:58 15          A.   I don't remember specifically.  I don't

12:58 16     remember.  It's been -- like I said, you know, sound

12:58 17     like a broken record, it's been too long.  I don't

12:59 18     remember what was discussed.

12:59 19                 But I know at the end it was decided to go

12:59 20     through grand jury instead.

12:59 21          Q.   After discussing the homicide statute?

12:59 22          A.   After discussing everything in the case.

12:59 23          Q.   And -- and just to clarify, so that discussion

12:59 24     was about whether it was a homicide?

12:59 25                 MS. ALBIN:  Objection, mischaracterizes

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:59  1    previous testimony.

12:59  2         A.  We were there to discuss the case about the --

12:59  3    the abortion.

12:59  4              MS. ALBIN:  We're coming up on 1:00.

12:59  5    Whenever you're at a good stopping place.

12:59  6         Q.  Did you discuss the definition of "individual"

13:00  7    in the criminal code?

13:00  8         A.  Who did I discuss it with?

13:00  9         Q.  With anybody?

13:00 10         A.  I don't remember.

13:00 11         Q.  And to be clear, that's in connection with this

13:00 12    investigation.

13:00 13         A.  Yes.

13:00 14         Q.  Okay.  Is it your testimony that you just never

13:00 15    discussed the definition of "individual" in connection

13:00 16    with this investigation?

13:00 17         A.  I don't remember, ma'am.

13:00 18         Q.  But at the end of your meeting with ADA Barrera

13:01 19    on the 18th, which we discussed those text messages,

13:01 20    you decide -- or it was decided by somebody that the

13:01 21    case would go to a grand jury?

13:01 22         A.  That is my understanding.

13:01 23         Q.  Okay.  Who do you understand made that

13:01 24    decision?

13:01 25         A.  As -- as a group, I guess, a department.  I

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

13:01 1    don't know.  I didn't -- I don't remember who

13:01 2    specifically said, "Let's do it through the grand

13:01 3    jury."

13:01 4        Q.  Is that because it was being discussed as a

13:01 5    group by the office?

13:01 6        A.  That's a possibility.  Through the investigator

13:01 7    office, yes.

13:01 8        Q.  And is that because it was such a big case, to

13:01 9    use words you used earlier?

13:01 10        A.  It was a big case.  It was going to be a case

13:01 11    that was going to require, you know, extra scrutiny.

13:01 12        Q.  Why is that?

13:01 13        A.  Because of the upcoming changes in the law.

13:02 14        Q.  Did you -- when --

13:02 15            MS. HARRIS:  Okay.  Yeah, I think now is a

13:02 16    good time to take a break.

13:02 17            MS. ALBIN:  Sure.

13:02 18            (Brief recess)

13:35 19        Q.  Mr. Aguirre, did you speak with your attorney

13:36 20    during the break?

13:36 21        A.  No.

13:36 22        Q.  Okay.  I'm just going to go back and just ask

13:36 23    some follow-up questions on some -- some things we

13:36 24    discussed.

13:36 25            We talked earlier about the initial report

Electronically signed by Donna McCown (101-253-986-8079)                                944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

13:36  1    that came in from Officer Rosa.  What would you

13:36  2    normally do if an initial report didn't show that a

13:36  3    crime had been committed?

13:36  4         A.  I wouldn't do anything.  The -- it would be the

13:36  5    patrol sergeant that would approve it and then put it

13:37  6    into the -- into the CID bin, then I would pick it up.

13:37  7         Q.  So if someone makes a call that's just a prank

13:37  8    call and is -- is certainly not a crime, does that ever

13:37  9    make it to CID?

13:37 10         A.  As a matter of practice, all reports get

13:37 11    reviewed by the CID supervisor after the patrol

13:37 12    supervisor.

13:37 13         Q.  So the patrol supervisor will send everything

13:37 14    to CID?

13:37 15         A.  Yes.

13:37 16         Q.  Okay.  What happens when the patrol supervisor

13:37 17    sends a report where no crime has been committed?

13:37 18         A.  Basically, the patrol -- the CID supervisor

13:37 19    will review that -- those reports, and if there are

13:37 20    those reports among them that do not have any merit for

13:37 21    investigation or any further action, they will be

13:38 22    turned in to the records, and then they'll be filed.

13:38 23         Q.  Why didn't that happen here?

13:38 24         A.  The -- this was -- this report, like I said

13:38 25    before, this was after the fact.  We already knew that

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:38  1    this was going to be earmarked for investigation.

13:38  2              And -- and reason that it happened like

13:38  3    that is because we knew -- on that day of this report

13:38  4    when this report was dispatched, we already knew that

13:38  5    there was going to be an investigation.

13:38  6    Q.  How did you know that?

13:38  7    A.  Because of the circumstances, the death of an

13:38  8    individual.

13:38  9    Q.  So -- so any report of an abortion would have

13:38 10    warranted an open investigation?

13:39 11              MS. ALBIN:  Objection, mischaracterizes

13:39 12    testimony.

13:39 13    A.  Not necessarily an abortion.  Anything

13:39 14    involving a death of an individual.  Could be suicide,

13:39 15    it could be elderly, anything -- accidents, anything.

13:39 16    It's -- it's going to be an investigation for sure.

13:39 17    Q.  And so what made this case the death of an

13:39 18    individual?

13:39 19              MS. ALBIN:  Objection, vague.

13:39 20    A.  Can you be more specific?

13:39 21    Q.  Sure.  So I'm -- I guess my question is would

13:39 22    you consider, then, all abortions the death of an

13:39 23    individual for purposes of -- of work in the sheriff's

13:39 24    office?

13:39 25              MS. ALBIN:  Objection, vague.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

13:39 1    A.  An investigation involving the death of an

13:40 2    individual is going to be part of our duties.  We are

13:40 3    going to investigate whenever an individual loses their

13:40 4    life or is not -- is unalive.

13:40 5    Q.  Does that include any call regarding an

13:40 6    abortion?

13:40 7    A.  Not specifically abortion, but individuals,

13:40 8    yes.

13:40 9    Q.  So what made this case -- well, was this case

13:40 10   about an abortion?

13:40 11        MS. ALBIN:  I'm sorry.  What was the

13:40 12   question?

13:40 13   Q.  Did you at the time understand this case to be

13:40 14   about an abortion?

13:40 15   A.  It was investigated because it was a death of

13:40 16   an individual.  By means, it doesn't really matter.

13:40 17   It's just the death of an individual.

13:40 18        Like the report says, it says, "Death

13:40 19   investigation."  It's labeled as a death investigation.

13:40 20   So that can comprise anything, any death.

13:41 21   Q.  I'm trying to understand whether -- let me just

13:41 22   ask the question.  Would any case of an abortion have

13:41 23   been treated as the death of an individual?

13:41 24        MS. ALBIN:  Objection, asked and answered.

13:41 25   A.  Yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

14:42  1          Q.  What if you disagree with an action they're

14:42  2     taking?

14:42  3          A.  You asking me to speculate what would happen

14:42  4     like if I disagree?

14:42  5          Q.  I guess I can back up.  As a -- as a sergeant

14:42  6     when you were in these daily meetings, did you ever

14:42  7     disagree with an action an investigator was taking?

14:42  8          A.  I'm pretty sure I did at one point or another.

14:42  9          Q.  And how would you handle those situations?

14:42 10          A.  Well, you go back to letting them know what the

14:42 11     law is and what you need to do and if there's anything

14:43 12     lacking.

14:43 13               If I'm being honest, I don't think I have

14:43 14     ever disagreed with anybody -- any one of my

14:43 15     investigators about doing something.  It would be not a

14:43 16     disagreement, but reminding them, "Hey, you need to

14:43 17     do -- you need to collect this.  You need to collect

14:43 18     that," you know.  Helping them augment their case.  But

14:43 19     not in -- I don't recall any time disagreeing with them

14:43 20     what to do or not to do.

14:43 21          Q.  So in this case, did you remind Investigator

14:43 22     Muniz about evidence that needed to be collected?

14:43 23          A.  I'm pretty sure I did in one way or another.

14:43 24          Q.  Okay.  And was there disagreement between you

14:43 25     and Investigator Muniz about whether you should issue

14:43 1    an arrest warrant?

14:43 2        A.  I don't remember anything like that.

14:43 3        Q.  Was there -- so were you aware of when

14:44 4    Ms. Gonzalez was arrested?

14:44 5        A.  Yes, I was.

14:44 6        Q.  And what were you aware of?

14:44 7        A.  That I was part of the arrest team.

14:44 8        Q.  Can you tell me about that.

14:44 9        A.  I believe that the arrest was effected at a

14:44 10   parking lot, and that's about how much -- how much I

14:44 11   can remember.

14:44 12       Q.  What was that parking lot?

14:44 13       A.  I think it was Hospital Road in Rio Grande.

14:45 14       Q.  And how did you know Ms. Gonzalez would be

14:45 15   there?

14:45 16       A.  I do not recall the details, but I think the

14:45 17   vehicle, her vehicle.

14:45 18       Q.  So you -- you recognized her vehicle?

14:45 19       A.  It should be somewhere in the arrest report.  I

14:45 20   don't recall specific -- I know that I was there, and

14:45 21   she was taken into custody.  But specific as to how we

14:45 22   got there, I don't -- I don't remember.

14:45 23       Q.  And do -- are arrest reports always made after

14:45 24   an arrest?

14:45 25       A.  Yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:45  1          Q.  And was an arrest report made in this case?

14:45  2          A.  I'm not aware if there was one or not.

14:45  3          Q.  Was this a sealed indictment when you carried

14:45  4     out this arrest?

14:45  5          A.  I don't recall, ma'am.  I'm pretty sure it was.

14:45  6     I'm not -- I'm not sure exactly.

14:46  7          Q.  Okay.  How do you -- how do you carry out an

14:46  8     arrest if the warrant -- if the -- if the indictment is

14:46  9     sealed?

14:46 10          A.  The same way as a regular arrest warrant.

14:46 11     The -- the -- the only thing that changes is the

14:46 12     procedure after the fact, the filling out.

14:46 13               Whenever we have a regular arrest warrant,

14:46 14     you fill out the service part in the back, and it stays

14:46 15     there at the jail.  And with a sealed indictment, it

14:46 16     does also have a service part, but it goes straight to,

14:46 17     I don't know, I think to the judge or -- or back to the

14:46 18     grand jury.  I'm not -- I'm not sure of the exact

14:46 19     procedure.

14:46 20          Q.  Okay.  I might have to suffer through a little

14:46 21     bit because I don't understand this procedure at all,

14:46 22     unfortunately.  But how did you get -- how do you get

14:46 23     the sealed indictment?

14:47 24          A.  It's usually -- we're usually notified by

14:47 25     the -- the district attorney's office, the

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

14:47  1    investigators, that there's a sealed indictment.

14:47  2         Q.  Okay.  And who -- who was notified in this

14:47  3    case?

14:47  4              MS. ALBIN:  Objection.  He already

14:47  5    testified he doesn't know if this was a sealed

14:47  6    indictment.

14:47  7         A.  I don't know.

14:47  8         Q.  So how did you know that you would be carrying

14:47  9    out this arrest?

14:47 10         A.  I was there at the office, and they advised us

14:47 11    that there was an indictment.  I don't know

14:47 12    specifically who, but that the -- the case was

14:47 13    presented and there was an indictment.  And we set out

14:47 14    to, you know, make our plan to take this person into

14:47 15    custody.

14:47 16         Q.  The -- the people that advised you were from

14:47 17    the sheriff's office or the DA's office?

14:47 18         A.  I don't remember specifically who.

14:47 19         Q.  Okay.  And how many people were on the arrest

14:47 20    team?

14:47 21         A.  I don't remember.

14:47 22         Q.  Was Investigator Muniz there?

14:47 23         A.  She should have been, yes.  I believe so.

14:48 24         Q.  Okay.  And who was leading the arrest?

14:48 25         A.  Ms. Muniz.

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

14:48  1        Q.  And what were the charges?

14:48  2        A.  I don't -- I don't know specifically which

14:48  3   ones -- what the charges were.  It was a sealed

14:48  4   indictment.

14:48  5        Q.  Did you learn what the charges were at some

14:48  6   point?

14:48  7        A.  Looking at the report, it says "murder."

14:48  8        Q.  Is today the first time you learned the charges

14:48  9   were murder?

14:48 10        A.  No.  I had seen the report before.

14:48 11        Q.  And -- and which report are you referring to?

14:48 12        A.  The investigator reports, says "murder."

14:48 13        Q.  And so you're pointing at Investigator

14:48 14   Muniz's --

14:48 15        A.  Yes.

14:48 16        Q.  -- report?

14:48 17            And -- and your report also says "murder,"

14:48 18   correct?

14:48 19        A.  Yes.

14:48 20        Q.  Why is that?

14:48 21        A.  Because this is a supplement to Ms. Muniz's --

14:49 22   Muniz's report.  So I will not change what she put

14:49 23   there.  I would not put another charge.  I would put

14:49 24   exactly what she put.

14:49 25        Q.  So you -- you copied that part from

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:49 1    Investigator Muniz's report?

14:49 2        A.  No.

14:49 3        Q.  Okay.  How did -- how did your report come to

14:49 4    say murder?

14:49 5        A.  I -- we usually consult with each other in what

14:49 6    is it that's going to be on the report.  That way we

14:49 7    are on the same page when we do this.  Do -- I do my

14:49 8    supplement based on whatever she tells me.

14:49 9        Q.  Okay.  At any point between finishing your

14:49 10   report and being on the arrest team did you understand

14:49 11   the charges to have changed?

14:49 12       A.  Can you be more specific?

14:49 13       Q.  Was the -- did you always understand the charge

14:49 14   to be murder?

14:49 15       A.  From the beginning?  From the beginning, we had

14:49 16   our doubts.  We had our doubts of what -- I mean, what

14:49 17   it was.  That's why all this is going back to the same

14:49 18   thing what I've testified before.  It was best for us

14:50 19   to have a grand jury review this.  Right.

14:50 20            After the grand jury reviewed it and they

14:50 21   issued an indictment, that's when we took further

14:50 22   action as law enforcement.  I lost track of myself.

14:50 23   What was the question again?

14:50 24       Q.  Yeah.  So -- okay.  So you had -- you just

14:50 25   testified that you -- you had some questions at the

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

14:50 1   beginning about what the charge was.  At some point,
14:50 2   your report came to say murder, correct?
14:50 3       A.  Yes.
14:50 4       Q.  Why was that?
14:50 5       A.  Based on what Ms. Muniz would be classifying it
14:50 6   as.
14:50 7       Q.  And -- and why did you understand that that
14:50 8   classification happened?
14:50 9           MS. ALBIN:  Objection, speculation.
14:50 10      A.  Well, there was the death of an individual.
14:50 11      Q.  So at the -- so at the beginning, you testified
14:50 12  that you had your doubts.  Why was that?
14:51 13          MS. ALBIN:  Hold on.  I'm going to object
14:51 14  to the -- you only stated part of what he testified to.
14:51 15  I think he said he had his doubts about what the
14:51 16  charges would be.
14:51 17      Q.  Yes.  I can offer completeness.  You testified
14:51 18  earlier that you had some doubts about what the charges
14:51 19  would be.  What were those doubts?
14:51 20      A.  Whether or not we should proceed with -- with
14:51 21  charges because of the new law changing.  And, again, I
14:51 22  did not know specifics of the law.  It was just
14:51 23  something that there might be a change to it, either
14:51 24  for or against.  So let's have the attorneys review
14:51 25  this case and present it to the grand jury.

14:52  1          MS. ALBIN:  Can we pause for a break just
14:52  2    whenever you get to a stopping point?
14:52  3          MS. HARRIS:  Sure.
14:52  4      Q.  Did you still have any of those doubts when you
14:52  5    wrote your investigative report?
14:52  6      A.  Ma'am, my state of mind is not something that I
14:52  7    put into my reports.  My reports are based on whatever
14:52  8    I see with my facts and whatever I witness.
14:52  9      Q.  If -- is there a minimum -- let me start over.
14:53  10         What do you understand probable cause to
14:53  11   mean?
14:53  12     A.  Probable cause is the compilation of different
14:53  13   facts and events that will lead you to believe that a
14:53  14   crime has been committed.
14:53  15     Q.  And do you continue investigating crimes where
14:53  16   you think there's not probable cause?
14:53  17     A.  No.  That would be a waste of resources.
14:53  18     Q.  At any point did you discuss whether this case
14:53  19   should be dismissed?
14:53  20     A.  I do not recall having that conversation.
14:54  21     Q.  At the time you were carrying out the arrest of
14:54  22   Ms. Gonzalez, did you think there was probable cause?
14:54  23     A.  It was not up to me to decide that, ma'am.  We
14:54  24   had a sealed indictment in hand.
14:54  25         THE COURT REPORTER:  You had what?

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

14:54  1              THE WITNESS:  A sealed indictment in hand.

14:54  2              MS. HARRIS:  I think we can take a break.

14:54  3              MS. ALBIN:  Okay.

14:54  4          (Brief recess)

15:04  5      Q.  Mr. Aguirre, did you speak with your attorney

15:04  6  during this break?

15:04  7      A.  Briefly.

15:04  8      Q.  So going back to the discussion about

15:04  9  Ms. Gonzalez's arrest, who else was on the arrest team?

15:05 10      A.  I don't -- I don't remember.  It would have

15:05 11  been investigators, but I don't know which ones

15:05 12  specifically.

15:05 13      Q.  How many investigators were on the team?

15:05 14      A.  I don't remember.

15:05 15      Q.  Do you remember if it was more than two?

15:05 16      A.  It was myself and Muniz at least.

15:05 17      Q.  Do you remember if there was -- was it -- is it

15:05 18  possible it was just the two of you?

15:05 19      A.  No.

15:05 20      Q.  Okay.  Is it possible that there was just one

15:05 21  more person?

15:05 22              MS. ALBIN:  Objection.  The witness

15:05 23  already said he doesn't remember.

15:05 24      A.  I don't know.

15:05 25      Q.  How did Ms. Gonzalez get to the sheriff's

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

15:05  1     office from that parking lot you were discussing?

15:05  2         A.  She would have had to be transported in a unit

15:06  3     to the sheriff's office.

15:06  4         Q.  And who was in that unit?

15:06  5         A.  Specific deputy?

15:06  6         Q.  Yes.

15:06  7         A.  I don't recall, ma'am.

15:06  8         Q.  Were you in that unit?

15:06  9         A.  No.

15:06  10        Q.  Was it Investigator Muniz?

15:06  11        A.  I don't know, ma'am.

15:06  12        Q.  What role does the sheriff's office play in

15:06  13    releasing people from jail?

15:06  14        A.  The sheriff's office will not have any role

15:06  15    releasing persons from the jail.  It would be the

15:06  16    actual detention center, the detention center's part of

15:06  17    the sheriff's office, but they run their own operation.

15:06  18        Q.  And is the detention center a part of the

15:06  19    sheriff's office?

15:06  20        A.  Yes.

15:06  21        Q.  Okay.  Who, generally speaking, makes those

15:07  22    decisions?

15:07  23        A.  The person in charge of the detention center is

15:07  24    Chief Jailer Roberto Molina.

15:07  25        Q.  And -- and was that also true in January 2022?

Electronically signed by Donna McCown (101-253-986-8079)                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

15:07 1      A.  Yes.

15:07 2      Q.  Are you aware that Sheriff Fuentes himself

15:07 3  approved the bail bond after Ms. Gonzalez was arrested

15:07 4  and put in jail?

15:07 5      A.  I would not be aware of that.

15:07 6      Q.  Is that typical?

15:07 7      A.  Yes.

15:07 8      Q.  It's typical for Sheriff Fuentes to approve

15:07 9  bail bonds?

15:07 10     A.  It's part of his duties.

15:07 11     Q.  There was a lot of media coverage about

15:07 12 Ms. Gonzalez's case, right?

15:07 13     A.  I saw there was media coverage.

15:07 14     Q.  Did you speak with your coworkers about this

15:08 15 coverage?

15:08 16     A.  I'm pretty sure I did.

15:08 17     Q.  Do you remember speaking to anyone in

15:08 18 particular?

15:08 19     A.  No, I don't.

15:08 20     Q.  Do you remember speaking about this at the

15:08 21 daily meeting with investigators?

15:08 22     A.  I'm pretty sure we did.

15:08 23     Q.  Why are you pretty sure about that?

15:08 24     A.  It would be something that would be a hot

15:08 25 topic, you know, during that week or that month or that

Electronically signed by Donna McCown (101-253-986-8079)                                    944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

15:08 1    day.

15:08 2        Q.  Did you speak with the captain about it?

15:08 3        A.  I'm pretty sure we did.

15:08 4        Q.  Did you speak with the sheriff about it?

15:08 5        A.  We're still talking about the media coverage,

15:08 6    right?

15:08 7        Q.  Yes.

15:08 8        A.  Yes.  I mean, not to the sheriff.  I don't --

15:08 9    we don't -- I usually don't talk to the sheriff.

15:08 10       Q.  Did you hear Sheriff Fuentes speak about it,

15:09 11   the media coverage?

15:09 12       A.  No.

15:09 13       Q.  Are you aware of anyone else that spoke to

15:09 14   Sheriff Fuentes about it?

15:09 15       A.  I would not be aware.

15:09 16       Q.  At some point, did you think there might be

15:09 17   protests?

15:09 18       A.  I saw there were protests.

15:09 19       Q.  What did you think about those protests?

15:09 20           MS. ALBIN:  I'm going to object to the

15:09 21   relevance of anything that happened after the

15:09 22   dismissal.  I'm not sure how that's relevant to what

15:09 23   the individual defendants did leading up to the arrest

15:09 24   and dismissal.

15:09 25       Q.  Just a few more questions about the dismissal,

15:09  1    just to -- to get some context around it.  Are you

15:09  2    aware that the charges against Ms. Gonzalez were

15:09  3    dismissed?

15:09  4         A.  Yes, I am aware of that.

15:09  5         Q.  When did you first learn that?

15:09  6         A.  It was -- specifically, I don't remember, but

15:10  7    it was a few days after the arrest.  I could be wrong,

15:10  8    could be mistaken.  Could be one, two, three.  I don't

15:10  9    know exactly.

15:10 10         Q.  Did you discuss that dismissal in the sheriff's

15:10 11    office?

15:10 12         A.  I'm pretty sure we did talk amongst ourselves

15:10 13    about that.

15:10 14         Q.  Were you surprised about the dismissal?

15:10 15         A.  Again, my emotions or feelings are not part of

15:10 16    our -- of our work.

15:10 17         Q.  But you have emotions and feelings, right?

15:10 18         A.  Yes.  But we -- we don't need to check them

15:10 19    into our -- our cases.  At least I don't.

15:10 20         Q.  Were you surprised about the dismissal?

15:10 21              MS. ALBIN:  Asked and answered.

15:10 22         A.  Again, ma'am, I was aware of the dismissal.

15:10 23    And, you know, I just took it as -- as it is.  You

15:10 24    know, it was a dismissal.  We -- the grand jury issued

15:10 25    an indictment.  This was later.  That's beyond my

Electronically signed by Donna McCown (101-253-986-8079)                                   944fc1d0-9a93-4677-a37a-b69c4f8f7ab9

15:11 1   control.

15:11 2       Q.  Are you familiar with the press release issued

15:11 3   by District Attorney Ramirez concerning the dismissal

15:11 4   of Ms. Gonzalez's indictment?

15:11 5       A.  I think I had the opportunity to read it at one

15:11 6   point or another.

15:11 7       Q.  When did you read it?

15:11 8       A.  Specifically, I don't recall, but it was after

15:11 9   it was issued.

15:11 10      Q.  And what was your reaction to that press

15:11 11  release?

15:11 12      A.  It was just outlining the facts -- or not the

15:11 13  facts, but the -- saying it was from the district

15:11 14  attorney's office in regards to the arrest of

15:11 15  Ms. Herrera and that it -- the charge was going to be

15:11 16  dismissed.

15:11 17      Q.  Sitting here today, what is your understanding

15:12 18  about why it was dismissed?

15:12 19          MS. ALBIN:  Objection, calls for

15:12 20  speculation.

15:12 21      A.  Can you rephrase that, or what specifically

15:12 22  you're looking out of me, the answer?

15:12 23      Q.  I can -- I can try a different way.  If similar

15:12 24  facts came before you today, would you proceed with

15:12 25  investigating the case?

15:12  1          A.  Today?

15:12  2          Q.  Yes.

15:12  3          A.  After -- yes.  In my -- in my assessment of the

15:12  4    case, yes, it would be the same exact steps:

15:12  5    investigate, accumulate, obtain, and submit for grand

15:12  6    jury review.

15:12  7          Q.  And submit to the -- the DA's office?

15:12  8          A.  Yes.

15:12  9          Q.  Is that still the sheriff's office policy?

15:13 10          A.  That's my -- that's my -- that would be my

15:13 11    actions that I would take.  I don't know about the

15:13 12    sheriff's office policy.

15:13 13          Q.  And if you were to take that action today, who

15:13 14    would be your supervisor in that decision?

15:13 15               MS. ALBIN:  Objection, vague.

15:13 16          A.  There's no supervisor right now -- direct

15:13 17    supervisor for CID right now.

15:13 18          Q.  Okay.  Having looked at all these documents

15:14 19    today, do you remember any other text messages that you

15:14 20    exchanged about this case?

15:14 21          A.  I don't, ma'am.

15:14 22          Q.  Did you ever talk to the sheriff about this

15:14 23    case?

15:14 24          A.  No, ma'am.  Above my pay grade.

15:14 25          Q.  Did you -- but -- well, did you talk to the

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:14  1    captain about this case?

15:14  2        A.  More than likely, yes.

15:14  3        Q.  And did you ever text Sheriff Fuentes about

15:14  4    this case?

15:14  5        A.  No, ma'am.  I would have no reason to text the

15:14  6    sheriff about this case.

15:14  7        Q.  Have you ever spoken to the district attorney

15:15  8    about this case?

15:15  9        A.  Not me specifically, no.

15:15  10       Q.  Do you know anyone else who has spoken to the

15:15  11   district attorney about this case?

15:15  12       A.  I wouldn't know, ma'am.

15:15  13           MS. HARRIS:  Okay.  I don't have anything

15:15  14   else.  I think we can pass the witness.

15:15  15           MS. ALBIN:  Okay.

15:15  16                       EXAMINATION

15:15  17   BY MS. ALBIN:

15:15  18       Q.  Investigator Aguirre, have you ever gotten a

15:15  19   report of a death of an individual and decided not to

15:15  20   investigate?

15:15  21       A.  Yes.

15:15  22       Q.  When was that?

15:15  23       A.  It's in certain cases where we know -- not that

15:15  24   we know, but we have reason to believe it will be

15:15  25   natural cause.  Deaths like elderly.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ              ) (
            Plaintiff          ) (
                               ) (
VS.                            ) (    CIVIL ACTION NO.
                               ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,          ) (
ALEXANDRIA LYNN BARRERA,      ) (
RENE FUENTES, and STARR       ) (
COUNTY, TEXAS                  ) (
            Defendants         ) (

REPORTER'S CERTIFICATE

        I, DONNA McCOWN, Certified Court Reporter,
certify that the witness, RAFAEL AGUIRRE, was duly
sworn by me, and that the deposition transcript is a
true and correct record of the testimony given by the
witness in person on MAY 1, 2025, and that the
deposition was reported by me in stenograph and was
subsequently transcribed under my supervision.

        Pursuant to Federal Rule 30(e)(2), a review of
the transcript was requested.
        I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

        WITNESS MY HAND on this the _____ day
_____, 2025.


        _____
        DONNA McCOWN, Texas CSR 6625
        Expiration Date:  01-31-26
        Bryant & Stingley, Inc., CRN No. 41
        P.O. Box 3420
        Harlingen, Texas   78551
        (956) 428-0755


**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**