IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ          ) (
      Plaintiff          ) (
                        ) (
VS.          ) (    CIVIL ACTION NO.
                        ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,          ) (
ALEXANDRIA LYNN BARRERA,          ) (
RENE FUENTES, and STARR          ) (
COUNTY, TEXAS          ) (
      Defendants          ) (

_____

ORAL AND VIDEOTAPED DEPOSITION OF
LENARD FUENTES
MAY 2, 2025

_____

      ORAL AND VIDEOTAPED DEPOSITION OF LENARD

FUENTES, produced as a witness at the instance of the

PLAINTIFF, taken in the above-styled and numbered cause

on MAY 2, 2025, between the hours of 10:04 a.m. and

4:07 p.m., reported stenographically by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at Bryant & Stingley, Inc., 701 East

Harrison, Suite 200, Harlingen, Texas, pursuant to the

Federal Rules of Civil Procedure and any provisions

stated on the record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

APPEARANCES

COUNSEL FOR PLAINTIFF:

    I. CECILIA GARZA
    GARZA MARTINEZ, PLLC
    202 East Sprague Street
    Edinburg, Texas  78539

    DAVID A. DONATTI
    AMERICAN CIVIL LIBERTIES UNION OF TEXAS
    P.O. Box 12905
    Austin, Texas  78711-2905

    ELIZABETH JARIT
    AMERICAN CIVIL LIBERTIES UNION
    SENIOR STAFF ATTORNEY
    125 Broad Street, 18th Floor
    New York, NY  10004

    SARAH CORNING, via Zoom
    AMERICAN CIVIL LIBERTIES UNION TEXAS
    Staff Attorney
    P.O. Box 8306
    Houston, Texas  77288

    JUNE (ANNIE) GERSH, via Zoom
    KIERA GODDU, via Zoom
    AMERICAN CIVIL LIBERTIES UNION
    125 Broad Street
    New York, New York  10004

    MARIANA (MOLLY) KOVEL, via Zoom
    AMERICAN CIVIL LIBERTIES UNION
    SENIOR STAFF ATTORNEY
    125 Broad Street, 18th Floor
    New York, NY  10004

COUNSEL FOR DEFENDANTS:

    KELLY R. ALBIN
    DENTON NAVARRO RODRIGUEZ BERNAL
    SANTEE & ZECH, P.C.
    549 North Egret Bay Boulevard, Suite 200
    League City, Texas  78550

ALSO PRESENT:
    Rene Ortiz, Videographer
    Julia Birnbach, via Zoom

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

```
 1                          INDEX

 2                                                        PAGE
      Appearances ................................... 2
 3
      LENARD FUENTES
 4    Examination by Ms. Garza .......................  4
      Examination by Ms. Albin ..................... 223
 5    Examination by Ms. Garza ..................... 237

 6    Errata Sheet/Signature Page .................. 242

 7    Reporter's Certificate ....................... 244

 8    Attached to the end of the transcript:  Stipulations

 9                         EXHIBITS

10    NUMBER  DESCRIPTION                             PAGE

11      43    Penal Code Chapter 19 .................. 116

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755      McAllen (956) 618-2366**

54

11:06  1          Q.  When did you report it to Major Delgado?

11:06  2          A.  I believe it was when Esmer came back with the

11:06  3     information.

11:06  4          Q.  Okay.  Do you recall what information that was?

11:06  5          A.  Whatever Martha Torres had -- had told her.

11:06  6          Q.  Okay.  Did you -- would you have reported it

11:06  7     to -- to Larry, to Chief?

11:07  8          A.  Not -- not at that time.

11:07  9          Q.  Okay.  When would you have reported it to the

11:07 10     chief deputy?

11:07 11          A.  When we got more information.  I've learned

11:07 12     that my brother asked for a lot of details, so...

11:07 13          Q.  Okay.  So he asked for a lot of details.  Was

11:07 14     that very early on or after some of the interviews

11:07 15     and -- and reports?

11:07 16          A.  Very early on, after Esmer.

11:07 17          Q.  Okay.  Did you have any discussions, or did you

11:07 18     report immediately to Sheriff Fuentes about this

11:07 19     particular investigation?

11:07 20          A.  Not right then and there, no.

11:07 21          Q.  When would you have talked to Sheriff Fuentes

11:07 22     about it?

11:07 23          A.  I'm not exactly sure when I did, but I know it

11:07 24     would have been when I had more information.

11:07 25          Q.  Okay.  And, again, would that have been still

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:07  1    maybe in the January time frame, or would it have been

11:07  2    closer to wrapping up the investigation?

11:07  3        A.  I'm going to -- to venture to say that it was

11:07  4    probably after the interview with Dr. Lozano.

11:07  5        Q.  Okay.  Was the interview with Dr. Lozano a key

11:08  6    part of this investigation?

11:08  7        A.  Well, it -- it -- I wouldn't say a key part,

11:08  8    but just gave us more of -- of an idea of what was

11:08  9    going on.

11:08  10       Q.  Okay.

11:08  11       A.  And I know you mentioned you're on Exhibit 6,

11:08  12   but I've got Exhibit 1.

11:08  13       Q.  Yeah.  It's marked differently.  It's just for

11:08  14   the purposes of -- of the deposition.  You can ignore

11:08  15   that.

11:08  16            All right.  So I know you've had an

11:08  17   opportunity to read Officer Rosa's narrative.  Is it

11:08  18   your understanding that Officer Rosa spoke with Martha

11:09  19   Torres, or did he get the information from Roy Pena?

11:09  20       A.  I do not know, ma'am.

11:09  21       Q.  Okay.  When -- when Deputy Rosa reached out to

11:09  22   you around that time period, did he tell you that this

11:09  23   was an abortion case, or did he just -- what did he

11:09  24   tell you?

11:09  25       A.  I'm trying to remember exactly -- exactly

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

56

11:09  1    what -- what he said.  But I know he was like, hey --

11:09  2    and not in these exact words.  Right?

11:09  3              I know he was like, hey -- how was it that

11:09  4    he said it?  Oh, my God.  Kind of like confused, like,

11:09  5    "Hey, I got this information.  This is what's going

11:09  6    on."  He goes -- kind of like I don't know.

11:10  7              I said, "Okay.  Let me send Esmer."

11:10  8         Q.  Okay.

11:10  9         A.  Again, not in those words, exact words, but

11:10 10    something to that effect.

11:10 11         Q.  Right.  So he's got in his narrative that he

11:10 12    basically got a report from a nurse -- a charge nurse

11:10 13    about an abortion.  And he specifically says "with

11:10 14    regard to SB 8."  Did he use "SB 8" when he spoke with

11:10 15    you?

11:10 16         A.  I don't believe so.

11:10 17         Q.  Okay.  But he did use the term "abortion"?

11:10 18         A.  I don't know.  I don't remember.

11:10 19         Q.  Okay.  You just remember him getting some

11:10 20    information and basically like "What do I do with

11:10 21    this?"

11:10 22         A.  Yeah.  That was -- that was my take on it.

11:10 23         Q.  Okay.  When you assigned Esmer to the case,

11:10 24    what information did you have?

11:10 25              MS. ALBIN:  Objection, vague.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:10  1          A.  I'm sorry?

11:10  2          Q.  If you -- you can still answer if you

11:10  3     understand the question.

11:10  4          A.  Can you repeat --

11:10  5          Q.  Yes, of course.

11:10  6          A.  -- the question?

11:10  7          Q.  So you got the call from Rosa, and he gave you

11:11  8     some information and your -- and you assigned it to

11:11  9     Esmer.

11:11  10               When you made the assignment to Esmer,

11:11  11    what was your -- what was your understanding of the

11:11  12    assignment?

11:11  13         A.  For her to go and gather more information.  I

11:11  14    guess she would know more questions to ask.

11:11  15         Q.  Okay.  So what to ask of Martha Torres?

11:11  16         A.  Yes.

11:11  17         Q.  Okay.  Did you tell Esmer that this case

11:11  18    involved an abortion?

11:11  19         A.  Not in -- I don't think I used those words.

11:11  20    But, I mean, told her that it involved a death or an

11:11  21    infant or something like that.  Again, I don't know

11:11  22    exact -- the exact words I used.

11:11  23         Q.  Okay.  Well, after you got the impression from

11:11  24    Deputy Rosa that he was just kind of confused with this

11:11  25    particular report, were you also confused with the

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:11  1    report based on the information he gave you?

11:11  2        A.  I wasn't confused, but I did get a little,

11:12  3    like, okay, here we go.  I think we're going to fall

11:12  4    into this whole thing that was going on at the time

11:12  5    about, you know, life, what -- what is it?  The my

11:12  6    choice, my body and pro-life.  I said, "Okay.  Here we

11:12  7    go."

11:12  8        Q.  Did Investigator Muniz ever use those words to

11:12  9    you during this investigation, "My body, my choice"?

11:12 10        A.  Not that I recall.

11:12 11        Q.  Okay.  All right.  So from the outset, you knew

11:12 12    this was something different?

11:12 13        A.  Yes.

11:12 14        Q.  Okay.  And you were aware of SB 8, my body, my

11:12 15    choice.  You were kind of aware of the climate?

11:12 16        A.  Of what was going on, yes, climate.

11:12 17        Q.  Right.  To your understanding, at that time on

11:12 18    January 11th of 2022, abortion was still legal in

11:13 19    Texas, correct?

11:13 20        A.  I didn't know.  And until right now, I still

11:13 21    don't know if it was at the time or not.  That's --

11:13 22    that's why when I mentioned earlier that I haven't read

11:13 23    the law on it because I wanted to come in with the same

11:13 24    knowledge I had back then.  I didn't know.  I was

11:13 25    confused about it.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:13  1        Q.  Okay.  At any time during the investigation,
11:13  2   did you look anywhere or speak to anyone to determine
11:13  3   whether abortion was a criminal offense?
11:13  4        A.  No.
11:13  5        Q.  Why not?
11:13  6        A.  I just didn't at the time.
11:13  7        Q.  Okay.  Did you ask any of the -- anybody in the
11:13  8   DA's office if abortion was illegal?
11:13  9        A.  We had a call with DA Alex.
11:13 10        Q.  And that would be Barrera?
11:13 11        A.  Yes.
11:13 12        Q.  Okay.  And when did you have that call with ADA
11:13 13   Barrera?
11:13 14        A.  I think it was after Esmer came back with some
11:14 15   of the information from the hospital and briefed there
11:14 16   in the investigations room.  And I want to say that's
11:14 17   when the phone call to Alex happened, and she was on
11:14 18   speaker at the time.
11:14 19        Q.  Okay.  So you guys were in the investigations
11:14 20   room and Alex was on speaker in the DA's office?
11:14 21        A.  Yes.
11:14 22        Q.  Okay.  Who else was in the investigation room
11:14 23   during that briefing?
11:14 24        A.  I don't recall, ma'am.
11:14 25        Q.  Okay.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:14  1        A.  I don't know who.  But for sure me and Esmer.
11:14  2        Q.  Yeah.  Sorry.  I think that is me that's going
11:14  3    to be guilty of talking over, not you.
11:14  4             Okay.  Definitely you and Esmer, maybe
11:14  5    someone else?
11:14  6        A.  Yes.
11:14  7        Q.  Okay.  And did you specifically ask DA Barrera
11:14  8    if abortion was a -- a crime?
11:14  9        A.  No, I did not.
11:14 10        Q.  Okay.  Did she volunteer any information to you
11:14 11    as to whether abortion was a crime?
11:14 12        A.  I don't remember what the -- like how that
11:14 13    phone call went.  But I didn't talk to her.  Esmer was
11:15 14    the one who was talking to her.  I was just listening.
11:15 15        Q.  Okay.  Did they discuss -- was there any
11:15 16    information during that particular phone call between
11:15 17    Esmer and ADA Barrera regarding this death was an
11:15 18    abortion?
11:15 19        A.  I don't -- I don't recall.  I don't know.
11:15 20        Q.  Okay.  And fair to say that from the outset,
11:15 21    everybody was aware that this was an abortion case?
11:15 22             MS. ALBIN:  Objection, mischaracterizes
11:15 23    his prior testimony.
11:15 24        A.  Aware that it was?  No.  Because we didn't know
11:15 25    what we were dealing with.

11:15  1          Q.  Okay.

11:15  2          A.  And I'll be very honest with you.  I didn't

11:15  3    know what we were dealing with.  That's why we decided

11:15  4    to call the DA's office.

11:15  5          Q.  Okay.  Well, I'm going to go back to that time.

11:15  6    You know, Deputy Rosa gives you a call and says, you

11:15  7    know, "We've got this going on.  I had a report.  This

11:15  8    nurse thinks it's SB 8.  I don't know what to do

11:15  9    with" -- and, again, I'm just summarizing.

11:16 10               Did -- trying -- I'm trying to figure out

11:16 11    how to rephrase this question.  Did you at any point

11:16 12    read Deputy Rosa's narrative?

11:16 13          A.  No, ma'am.  This is the first time I read it.

11:16 14          Q.  Okay.  Well, you -- you looked at it, and I

11:16 15    want to state here, if you'll follow along, the second

11:16 16    paragraph.  Ranell Rosa, "I later spoke with Starr

11:16 17    County Memorial Hospital charge nurse Martha Torres.

11:16 18    Martha stated she wishes to document a report in

11:16 19    regards to Texas abortion restriction law."  Do you see

11:16 20    that?

11:16 21          A.  Uh-huh.

11:16 22          Q.  Okay.  I'm going to skip a little bit to go

11:17 23    down.  A couple of lines later, it says, "Lizelle later

11:17 24    stated to the physician she had inserted an unknown

11:17 25    pill into her vaginal cavity which she purchased in the

11:17  1    country of Mexico in effort to induce the labor of the

11:17  2    unborn child."

11:17  3                  Is that information that you knew from the

11:17  4    outset?

11:17  5        A.  I don't recall if that was exactly what -- what

11:17  6    he told me or -- I don't think I knew about the pills

11:17  7    at that time.

11:17  8        Q.  Okay.  All right.  At the time of this

11:17  9    investigation, Rafael Aguirre was the sergeant?

11:17 10        A.  I believe he still was the sergeant.

11:17 11        Q.  Okay.  And he was -- so he would have been --

11:17 12    in the chain of command, he would have been above the

11:17 13    investigators under you?

11:17 14        A.  The immediate supervisor for the investigators.

11:17 15        Q.  Okay.  Do you know why Deputy Rosa called you

11:17 16    instead of Aguirre?

11:18 17        A.  Because it -- I was still the one who would

11:18 18    send out the investigators.  Aguirre is in charge of

11:18 19    the investigators but like what's going on inside.

11:18 20    I'm -- I just oversee the outside, I guess you could

11:18 21    say.

11:18 22        Q.  Kind of like a department?

11:18 23        A.  Yes.

11:18 24        Q.  Okay.  So -- and currently, there is no

11:18 25    sergeant over the investigators, correct?

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:18  1       A.  No.

11:18  2       Q.  You were basically doing all the work.  So they

11:18  3   just --

11:18  4       A.  No, no, no.  It's not -- not at all like that.

11:18  5       Q.  They didn't even give you a raise?

11:18  6       A.  No.

11:18  7       Q.  Let me see.  Sorry.  Jumping around.  Since

11:18  8   we're discussing kind of the roles that everybody plays

11:18  9   in the sheriff's department, can you please describe

11:18 10   the organizational structure, excuse me, of the

11:19 11   sheriff's office in January of 2022.

11:19 12       A.  Okay.  Sheriff Fuentes, Chief Deputy Larry

11:19 13   Fuentes, Major Carlos Delgado, myself.  And then I'm

11:19 14   not sure if Lieutenant Rios was still there or if it

11:19 15   was already Lieutenant Alvarez that was there.

11:19 16       Q.  Okay.

11:19 17       A.  And then Sergeant Aguirre, as far as for

11:19 18   investigators.  The lieutenant doesn't oversee the

11:19 19   investigators.

11:19 20       Q.  Okay.  Is -- would -- when you mentioned the

11:19 21   sheriff, the chief, major, yourself, and lieutenant, is

11:19 22   that referred to as the administration?  The brass?

11:19 23   How do you refer to that category?

11:19 24       A.  Administration.

11:19 25       Q.  Okay.  And Leonel Alvarez is currently the

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:19  1    lieutenant?

11:19  2        A.  Yes.

11:19  3        Q.  He may or may not have been at the time?

11:19  4        A.  Yeah.  I'm -- I'm not sure when he was

11:20  5    promoted, because he used to be the sergeant for CID,

11:20  6    for -- for the investigators.

11:20  7        Q.  Okay.

11:20  8        A.  So I don't remember when he was promoted.  And

11:20  9    then Aguirre was promoted to CID sergeant.

11:20  10       Q.  So when we're talking about case investigations

11:20  11   or we'll just -- you know, when a report comes in,

11:20  12   which of these individuals are involved in the case

11:20  13   investigation, the individuals that you mentioned?

11:20  14       A.  Involved in actual -- the actual investigation?

11:20  15       Q.  Right.  The actual investigation, hands on.

11:20  16       A.  It would have been from Sergeant Aguirre to the

11:20  17   investigators, the hands-on investigators.

11:20  18       Q.  Okay.  And then what about involvement in terms

11:20  19   of knowledge of the investigation?

11:20  20       A.  Me.

11:20  21       Q.  Okay.  Direction of the investigation?

11:20  22       A.  No.

11:20  23       Q.  Guidance over the investigation?

11:20  24       A.  I offer it.

11:20  25       Q.  Okay.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:20  1          A.  Sometimes.

11:21  2          Q.  And then you would brief it up to the major?

11:21  3          A.  Yes.

11:21  4          Q.  Correct?  And then the chief and the sheriff?

11:21  5          A.  If need be to the sheriff.

11:21  6          Q.  Okay.  You mentioned earlier that in major

11:21  7   investigations you would have included the upper

11:21  8   administration including the sheriff.

11:21  9          A.  Some -- something that's going to grab

11:21 10   community attention.

11:21 11          Q.  Did you know this case was going to grab

11:21 12   community attention right away?

11:21 13          A.  From the beginning, yes, I did.

11:21 14          Q.  And Aguirre mentioned along the same lines that

11:21 15   this case would have required some extra scrutiny

11:21 16   or -- I guess he called it a big case.  Would you agree

11:21 17   with him this was a big case?

11:21 18          A.  Yes.

11:21 19          Q.  And I believe the way Muniz described it was a

11:21 20   serious case.  Okay.  So you knew from the outset that

11:21 21   this one had to be done right?

11:21 22          A.  Well, we needed to get some help with it.

11:21 23          Q.  Okay.  Where would you go for help?

11:22 24          A.  To our DA's office.

11:22 25          Q.  And what kind of help would the DA's office

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:22 1    provide?

11:22 2        A.  We usually use, like, for guidance.  I don't

11:22 3    want to say direction, but, you know, kind of like,

11:22 4    "Hey, we have a question.  This is what we've got."

11:22 5    You know -- I'm at a loss for words with that.

11:22 6        Q.  Okay.  Would the DA's office provide legal

11:22 7    advice?

11:22 8        A.  Yes.

11:22 9        Q.  Was there a specific, like, liaison with the

11:22 10   DA's office and the sheriff's office?

11:22 11       A.  No.

11:22 12       Q.  So, you know, is it -- was there anybody in the

11:22 13   sheriff's office, whether it was in the investigations

11:22 14   or in the administration, that just maybe had a better

11:23 15   relationship with the DA's office that you would just

11:23 16   feel more comfortable or maybe you could get an answer

11:23 17   more quickly?

11:23 18       A.  I think they all do.  They all had a

11:23 19   relationship with -- they have their DA that they reach

11:23 20   out to.

11:23 21       Q.  They're favorites?

11:23 22       A.  You were there.  You know.

11:23 23       Q.  Exactly.  I was everybody's favorite.  Okay.

11:23 24   So --

11:23 25       A.  Who you can talk to, who you can't.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:23  1          Q.  Right.  Well, let me ask you this:  Do you

11:23  2     have -- how often do you reach out to the DA's office

11:23  3     for guidance or for help?

11:23  4          A.  I don't, because I don't do investigations.

11:23  5          Q.  Okay.  But you were directly involved in

11:23  6     Lizelle's investigation.

11:23  7          A.  Like directly directly involved in it?  I

11:23  8     wasn't doing hands on.

11:23  9          Q.  Okay.  But you were -- you were not

11:23  10    investigating, you were not doing hands on, but you

11:23  11    were involved in discussions and conversations --

11:23  12         A.  Yes.

11:23  13         Q.  -- right?  You weren't interviewing witnesses,

11:23  14    correct?

11:23  15         A.  I did.

11:23  16         Q.  Which -- which witness did you interview?

11:23  17         A.  Doctor -- well, I sat in with Dr. Lozano and

11:24  18    with Martha Torres.

11:24  19         Q.  And that's where I was going with -- with that

11:24  20    question.  You hit the nail on the head.  You did not

11:24  21    interview, ask the questions of Dr. Lozano?

11:24  22         A.  I asked him a couple questions, three or four

11:24  23    questions.

11:24  24         Q.  Okay.  All right.  You asked a few questions.

11:24  25    And your role was to observe, to listen in --

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:24   1          A.  Yes.

11:24   2          Q.  -- right?  Okay.  Same with Torres?

11:24   3          A.  Yes.

11:24   4          Q.  Okay.  And those conversations with the DA's

11:24   5     office, were they led by you, the questions, or was it

11:24   6     the same role, you were listening in?

11:24   7          A.  It --

11:24   8               MS. ALBIN:  Hold on.  I'm going to object.

11:24   9     I don't think he's talked about conversations.  I think

11:24  10     he described a conversation with the DA's office.  Is

11:24  11     that the one you're referring to?

11:24  12               MS. GARZA:  Okay.  Sure.  I'll rephrase.

11:24  13          Q.  Did you have multiple conversations with the

11:24  14     DA's office regarding Lizelle's investigation?

11:24  15          A.  I know I had one for sure.

11:24  16          Q.  Okay.  In that conversation, were you leading

11:24  17     the conversation or just -- you know, as listening in

11:24  18     and kind of following up?

11:24  19          A.  Listening in and -- but mainly it was

11:24  20     Esmeralda, because she had the information.  She was

11:25  21     explaining it to -- to the DA, to Alex, and I was

11:25  22     listening.  And I guess at the end -- well, go ahead.

11:25  23          Q.  No, no.  That's fine.  Go ahead.  At the end?

11:25  24          A.  Because at the end, the take was we're just

11:25  25     going to gather the information, everything that we

Electronically signed by Donna McCown (101-253-986-8079)                                        2561a1ea-cb01-4e31-a726-7688565f89c9

11:25 1    could get that Esmer was tasked to do, and submit it

11:25 2    for review for the DA's office.

11:25 3        Q.  Okay.  Who tasked Esmer with certain -- or who

11:25 4    gave Esmer the tasks?

11:25 5        A.  It -- it would have been me.  I -- I was the

11:25 6    one who had already assigned the case to her, so she

11:25 7    needed to continue to conduct the interviews.

11:25 8        Q.  Okay.  Did you tell Esmer which interviews to

11:25 9    conduct?

11:25 10       A.  No, ma'am.

11:25 11       Q.  Did she ask you for advice as to "Should I

11:25 12   interview this person?"

11:25 13       A.  No, ma'am.  They normally don't.

11:25 14       Q.  Did ADA Barrera give Esmer advice on which

11:26 15   interviews to conduct?

11:26 16               MS. ALBIN:  Object --

11:26 17       A.  Not that I know of.

11:26 18               MS. ALBIN:  Objection, calls for

11:26 19   speculation.

11:26 20       Q.  Did -- how often -- I know this case -- would

11:26 21   you agree with me that this -- this case is an outlier?

11:26 22   Like in other words, this is not the usual case for the

11:26 23   sheriff's office?

11:26 24       A.  Yes, it's not.

11:26 25       Q.  It's not.  Correct.  How often does that occur

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:26  1    where you get a case that's just kind of like this

11:26  2    isn't our usual thing?

11:26  3         A.   This has been the one -- the only one that I

11:26  4    can remember in my tenure there.

11:26  5         Q.   The gift that keeps on giving.

11:26  6              Okay.  So would you -- how often -- other

11:26  7    than this case, how often would you require the

11:26  8    assistance of the DA's office for help with regard to

11:27  9    the charge, the crime, the law?

11:27  10        A.   We -- we have a good working relationship with

11:27  11   them.  And I know that my investigators do -- do reach

11:27  12   out when they have questions, especially with

11:27  13   electronic devices as far as search warrants for that.

11:27  14   That's very -- you have to be real detailed and stuff

11:27  15   like that.  So I know they do reach out a lot.

11:27  16             As to what types of cases every time, I

11:27  17   can't tell, because I do tell them, "If you have

11:27  18   questions, reach out.  That's what they're there for is

11:27  19   to help us out."  Right?

11:27  20        Q.   Okay.  And Esmer Muniz also testified to that

11:27  21   fact that, you know, it was from the outset, if you

11:27  22   have questions, go to the DA's office.  So you would

11:27  23   agree with that advice?

11:27  24        A.   Yes.

11:27  25        Q.   Okay.  And was Esmer told as soon as she was

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                              2561a1ea-cb01-4e31-a726-7688565f89c9

11:27 1    assigned this case, "Get with the DA on it"?

11:27 2        A.   When she brought back the information, we sat

11:28 3    down.  She said what does she need.  I said like,

11:28 4    "Let's call the DA's office.  Let's involve the DA's

11:28 5    office" --

11:28 6        Q.   Okay.

11:28 7        A.   -- "because I honestly don't know."  I didn't

11:28 8    have an answer to that.

11:28 9        Q.   Okay.  Did you have any electronic

11:28 10   communication with the DA's office about Lizelle's

11:28 11   investigation?

11:28 12       A.   No, ma'am.

11:28 13       Q.   Okay.  And by "electronic," I mean either

11:28 14   e-mail, WhatsApp, or phone messages?

11:28 15       A.   No, ma'am.

11:28 16       Q.   Okay.  Who is -- who do you -- if you have to

11:28 17   make contact in the DA's office, who is your comfort

11:28 18   contact?

11:28 19       A.   I call Mr. Ramirez.

11:28 20       Q.   You call the DA directly?

11:28 21       A.   But it's never because of a case.  It's always

11:28 22   because of something that they need from one of my

11:28 23   investigators or something, if there's an issue.  If

11:28 24   there's not an issue, then -- then no.

11:29 25       Q.   Okay.  And when -- what was it that Esmer

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:29  1    reported back to you when you made the decision to --

11:29  2    to have her reach out to the DA's office?

11:29  3         A.  I don't recall exact words, but I remember her

11:29  4    saying what the nurse had explained to her, that the

11:29  5    girl Lizelle had -- what she had done, explained what

11:29  6    she had done.  Right?

11:29  7              And, again, it was like, okay.  What are

11:29  8    we dealing with?  Because I know this is all over the

11:29  9    news right now, and there's people on this side, people

11:29 10    on this side about it.  We -- like I'm telling you, I

11:29 11    didn't know.  I didn't have an answer for her.

11:29 12              I said, "You know what?  Let's call the

11:29 13    DA's office, because if anybody can clarify this for

11:29 14    us, it would be the DA's office.  You know, they're

11:29 15    going to have that knowledge as far as for these

11:30 16    type -- types of cases.  They'll be the ones to tell

11:30 17    us, 'Hey, yes, it's good,' 'It's not good,' or what."

11:30 18         Q.  Okay.  And when you -- I want to break down a

11:30 19    little bit of what you just said.  You said Esmer gave

11:30 20    you the facts about what Lizelle had done, what

11:30 21    happened.  What, to the best of your recollection, did

11:30 22    Esmer tell you about what had happened, what Lizelle

11:30 23    did?

11:30 24         A.  It's kind of unfair to answer that, and I'll be

11:30 25    honest with you, after reading this report, because it

**BRYANT & STINGLEY, INC.**

**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:30 1    says what she did.

11:30 2        Q.  Okay.

11:30 3        A.  Right?  So I don't -- I do not recall exactly

11:30 4    what Esmer told me, but I would venture to say some of

11:30 5    this information had been in there.  Right?  But I --

11:30 6    in all fairness, you know, I can't -- I can't tell you

11:30 7    exactly what she told me.

11:30 8        Q.  Okay.  And that's -- I appreciate your answer.

11:30 9    And I don't -- I don't want an exact conversation.  But

11:30 10   generally, Esmer told you that Lizelle had done

11:31 11   something?

11:31 12       A.  She could have.

11:31 13       Q.  Okay.  Because, I mean, because you testified

11:31 14   earlier that, you know, Lizelle -- I'm sorry, Esmer

11:31 15   says Lizelle did this, or is that after we found out

11:31 16   what happened and what Lizelle did, you kind of said,

11:31 17   "I don't know what to do.  Let's call the DA's office."

11:31 18              So I kind of want to get a grasp.  To the

11:31 19   best of your recollection, what details did Esmer give

11:31 20   you that left you unsure?

11:31 21              MS. ALBIN:  Objection, asked and answered.

11:31 22       A.  To be honest with you, I don't know exactly

11:31 23   what she told me.

11:31 24       Q.  Okay.  Did she -- do you recall her mentioning

11:31 25   the word "abortion"?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:31 1      A.  I don't.

11:31 2      Q.  Okay.  When did you and Esmer have -- at what

11:31 3  point during the investigation did you and Esmer have

11:31 4  that conversation?

11:31 5      A.  As soon as she came back from the hospital.

11:31 6      Q.  That first day?

11:31 7      A.  Yes.

11:31 8      Q.  Okay.

11:32 9      A.  I believe so.

11:32 10     Q.  Okay.  Let me show you -- I want to go through

11:32 11 things here -- Plaintiff's Exhibit No. 16, which has

11:32 12 previously been marked.  I'll give you a nice one,

11:32 13 because my printer started going out early this

11:32 14 morning.

11:32 15             MS. ALBIN:  Are these text messages from

11:32 16 yesterday?

11:32 17             MS. GARZA:  Yes.

11:32 18             MS. ALBIN:  Okay.  No, I've got it.

11:32 19             MS. GARZA:  Yeah, unless you want a nice

11:32 20 colored one.

11:32 21             MS. ALBIN:  No.

11:32 22     Q.  Okay.  These -- this is Plaintiff's Exhibit 16.

11:32 23 Have you ever seen these messages before?

11:32 24     A.  I can't say that I have, but I'm having a hard

11:32 25 time seeing them now, but...

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:32  1          Q.  I actually have them on my computer.  Would it
11:32  2     help if I showed them --
11:32  3          A.  Yes.
11:32  4          Q.  -- to you and made them bigger?
11:32  5              Let me do that.  How old are you, Lenard?
11:33  6          A.  I'm 51.
11:33  7          Q.  Yeah.  I'm turning 50, and I'm having that same
11:33  8     problem now, so I feel you.
11:33  9          A.  But I'm thinking if I have a pair of readers in
11:33 10     my truck, but I don't think I do.
11:33 11          Q.  I can show them to you on my computer if you
11:33 12     promise not to read some strange text message that
11:33 13     might pop up from time to time.
11:33 14              MS. GARZA:  Okay.  Do you mind if I
11:33 15     approach the witness?
11:33 16              MS. ALBIN:  Sure.
11:33 17          Q.  I'm going to take this off, that way you can
11:33 18     tell me how large you want it.  Are you familiar with
11:33 19     MacBook?
11:33 20          A.  I am not.  But that's better.
11:33 21          Q.  You can see that?
11:33 22          A.  Yeah, I can read that.
11:33 23          Q.  Okay.  Now you took my screen.
11:33 24              I just want to start with this -- okay.
11:33 25     You see the very first -- on page -- which is marked

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

11:34  1    page 79, but it's the first page.  I want you to just

11:34  2    take a quick minute to read that and let me know what

11:34  3    do you believe that to be.

11:34  4                MS. ALBIN:  And I'm going to object to any

11:34  5    questions that you're going to ask the witness about

11:34  6    these text messages that he's clearly not a party to.

11:34  7                MS. GARZA:  Okay.

11:34  8        A.  Okay.

11:34  9        Q.  Okay.  So, yes, let's just look at the very

11:34  10   first one.  Do you have any -- I mean, do you have an

11:34  11   idea what -- what that first writing or picture is?

11:34  12               MS. ALBIN:  Objection, calls for

11:34  13   speculation.

11:34  14       A.  It's a picture of a text message from Esmeralda

11:34  15   to Alex, I think.

11:34  16       Q.  Okay.

11:34  17       A.  From, to, yes.

11:34  18       Q.  Right.  Okay.  So this is -- your understanding

11:34  19   is it's a text message from Esmer to ADA Barrera.  And

11:34  20   it's asking for time to discuss a case, correct?

11:35  21       A.  But she mentions like the particular.

11:35  22       Q.  Right.  Yes.  Absolutely.

11:35  23       A.  Yes.

11:35  24       Q.  Okay.  And she -- so for -- it says "A mother

11:35  25   self-induced La or on a 20-week fetus by putting some

Electronically signed by Donna McCown (101-253-986-8079)                2561a1ea-cb01-4e31-a726-7688565f89c9

13:33 1     A.  That's okay.

13:33 2     Q.  Are you ready to proceed?

13:33 3     A.  Yes, ma'am.

13:33 4     Q.  Okay.  As I mentioned before, I'm trying to get

13:33 5 us all out of here as quickly as possible.  So I'm --

13:33 6 because I've been -- we've been jumping around, I'm

13:33 7 able to take out a few areas.

13:33 8          Are you -- did you discuss your deposition

13:33 9 with your attorney during the break?

13:33 10    A.  Yes.

13:33 11    Q.  Okay.  Is there anything that you would like to

13:33 12 go back and address or correct before we get started?

13:33 13    A.  No, ma'am.

13:33 14    Q.  Okay.  We were talking about the 19.06 --

13:34 15 Section 19, I'm sorry, of the Penal Code.  And you

13:34 16 indicated right before the break that your

13:34 17 investigators were basically on their computers next to

13:34 18 each other in the -- in the CID room, right?

13:34 19    A.  Well, not next to each other, because they

13:34 20 actually sat across the room from each other, but in

13:34 21 there.

13:34 22    Q.  In there.  Okay.  Did you -- did you as -- as

13:34 23 captain, did you have occasion to look up any statutes

13:34 24 in the Penal Code?

13:34 25    A.  No, ma'am, I did not.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:35  1     pills to abort on her vagina...we need guidance,

11:35  2     please."

11:35  3         A.  Yes.

11:35  4         Q.  Did you ask -- was -- do you know if this text

11:35  5     message was sent after you told Esmer to reach out to

11:35  6     the DA's office?

11:35  7         A.  More than likely that's probably how the call

11:35  8     was initiated.

11:35  9         Q.  Did you -- were you present when Esmer was

11:35  10    texting ADA Barrera?

11:35  11        A.  I'm not sure.  I don't remember.

11:35  12        Q.  Okay.  Do you see at the bottom of that message

11:35  13    it has a date and a time?

11:35  14        A.  Yes.

11:35  15        Q.  Okay.  Do you -- do you see that to be

11:36  16    January 11th, 2022, at 2:49 p.m.?

11:36  17        A.  Yes.

11:36  18        Q.  Left out the seconds.

11:36  19        A.  Yes, ma'am.

11:36  20        Q.  Okay.  And is -- do you know whether this is to

11:36  21    set up a phone conversation or an in-person

11:36  22    conversation?

11:36  23            MS. ALBIN:  Objection, speculation.

11:36  24        A.  I'm not sure, ma'am.  And if she sent her the

11:36  25    message while I was there -- if, because I don't

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:34 1     Q.  Okay.  Have you ever?

13:34 2     A.  No.

13:34 3     Q.  Okay.

13:34 4     A.  Not to this particular case.

13:34 5     Q.  Just in general, have you ever looked up

13:34 6  sections of the Penal Code?

13:34 7     A.  For other cases.

13:34 8     Q.  For other cases, yeah.

13:34 9     A.  Especially, with estray cases.  I'll be honest

13:34 10  with you too, because estray laws, I deal with that too

13:34 11  with the office.

13:34 12     Q.  Yeah.  Okay.  Yeah.  That is kind of funky.

13:34 13     A.  Yes.

13:34 14     Q.  Do you use a book, or do you use the computers?

13:34 15     A.  No, I -- online.

13:34 16     Q.  You do online.  What do you use?

13:34 17     A.  I just type in "Texas estray laws," and it will

13:35 18  start giving me --

13:35 19     Q.  Okay.

13:35 20     A.  -- where to find it.

13:35 21     Q.  So you don't have access to, like, Lexis or

13:35 22  Westlaw, any of that, online?

13:35 23     A.  I do not.

13:35 24     Q.  Okay.  How many -- and this is just in your

13:35 25  role in the sheriff's department.  How many murder

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:35  1    investigations have you participated in, whether it's

13:35  2    hands on or, you know, on the out -- on the outside

13:35  3    just kind of watching?

13:35  4        A.  For sure during my time there, I would follow

13:35  5    the CID guys, so I was always looking at what they were

13:35  6    doing.  I wasn't an investigator.  I was just a

13:35  7    patrolman, but I would follow and I would see them.

13:35  8    Right?  But --

13:35  9        Q.  Then, you know what?  Let me go ahead and limit

13:35  10   it.  In an investigate -- in an investigation or

13:36  11   captain capacity or lieutenant capacity, how many

13:36  12   murder investigations have you worked on?

13:36  13       A.  Going to say one, two, maybe -- maybe three.

13:36  14       Q.  And what were the -- when was the most recent?

13:36  15       A.  We -- one of them is the BB Garcia case --

13:36  16       Q.  Okay.

13:36  17       A.  -- where he and his son were murdered.  The

13:36  18   other one is the one with the two ladies that were

13:36  19   murdered, but that one was transferred over to the

13:36  20   Texas Rangers.

13:36  21           And the other one was -- I don't recall

13:36  22   the victim's name, but the suspect's name, Mares --

13:36  23   what's his first name?  Oh, I know his name.  Polon

13:37  24   Mares.  Ismael Mares.  Ismael Mares, Jr., or the third,

13:37  25   I think.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:37  1          Q.  And were those all murder cases, or were some
13:37  2     of them capital murder or manslaughter?
13:37  3          A.  I think two of them were capital murders.  I'm
13:37  4     not sure what the Mares case ended up being, because
13:37  5     that one consisted of a burglary and -- and homicide.
13:37  6          Q.  Okay.  Have you ever worked on a manslaughter
13:37  7     case or investigation?
13:37  8          A.  Yes, I believe so.  We had a -- well, my
13:37  9     investigators worked on it.  Right?  This is me just
13:37 10     there.  We had a juvenile that was killed in a UTV
13:37 11     accident.
13:37 12          Q.  Oh, wow.  Okay.  And have you ever worked on a
13:37 13     criminally negligent homicide?
13:37 14          A.  Not -- not to my knowledge, ma'am.
13:37 15          Q.  Okay.  And so when you work on those type of
13:38 16     cases, if you needed information on the elements, you
13:38 17     would go online and search?
13:38 18          A.  Well, what -- what we do in a case like that,
13:38 19     from the very beginning, we do involve the DA's office.
13:38 20          Q.  Okay.
13:38 21          A.  We do.  The sheriff has always liked for us to
13:38 22     work well with them.  And if they're -- they're cases
13:38 23     like that, he wants us to involve the DA's office.
13:38 24     That way we know -- they know what we're working on
13:38 25     from the beginning.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:38 1    Q.  And you testified earlier that you usually

13:38 2    have -- if you need to contact the DA's office, you

13:38 3    will contact DA Ramirez directly?

13:38 4    A.  For the most part.  I mean, because I -- I --

13:38 5    since I'm not working cases, I don't have to call them.

13:38 6    Right?  Now, unless they -- they call me, "Hey, we're

13:38 7    looking for this prosecution package."  Right?

13:38 8         Okay.  "Well, let me get the investigator

13:38 9    that's in charge of it to get it to you," things like

13:38 10    that.

13:38 11    Q.  I apologize.  You did say that earlier, and

13:39 12    I just -- I can't -- unfortunately, I wish I could

13:39 13    remember everything so I wouldn't have to re-ask

13:39 14    questions.

13:39 15    A.  Me too.

13:39 16    Q.  But, yes, thank you for that reminder.  You

13:39 17    mentioned the prosecution packet.  That's what you turn

13:39 18    over when the case file is -- when the investigation is

13:39 19    complete?

13:39 20    A.  It -- it would depend.  Yeah, well, for the

13:39 21    most part, yes, when an investigation is complete, yes.

13:39 22    Q.  Okay.  And what goes into the prosecution

13:39 23    packet?

13:39 24    A.  The prosecution package has the -- the Brady

13:39 25    form, and there's a checklist of what's being turned

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:39 1   in -- the DVD, CDs or pictures or USB of -- everything

13:39 2   that's being in that file.  Right?  And along with

13:39 3   booking information if an arrest has already been made.

13:39 4              And I want to say, I'm not sure, maybe

13:39 5   even the bond information, if he's bonded out already.

13:39 6   I'm not sure.  Because sometimes people go in, bond out

13:40 7   the -- you know.  So I think it includes that in there.

13:40 8       Q.  Okay.  And who created that -- the form or the

13:40 9   cover sheet?

13:40 10      A.  The cover sheet -- because there's two.

13:40 11  There's the Brady one and then there's the other one.

13:40 12  Right?  So the Brady one -- the newest one that I've

13:40 13  seen, because I just learned about the Heath law, me,

13:40 14  was created by the DA's office, but I think it's like

13:40 15  the policy that they -- that they implemented from --

13:40 16  from -- from about a month ago.

13:40 17      Q.  Right.

13:40 18      A.  Right.

13:40 19      Q.  I know there's some changes in that.

13:40 20      A.  Yeah.  So they created one.  And then we

13:40 21  already had one that we had been using for a long time.

13:40 22  But it's not a Brady form.  It's just a checklist of --

13:40 23  it's a receipt.  Right?

13:40 24      Q.  Okay.

13:40 25      A.  So between the DA's office and us, "Hey, you

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:40  1     know what?  Well, let's include this, let's include

13:40  2     that," you know, whatever, and the signatures who's --

13:40  3     who's getting it and who's going to submit it or

13:40  4     something like that.

13:40  5          Q.  Okay.  And -- and to -- is the Brady form,

13:41  6     that's more of kind of a checklist with regard to

13:41  7     what's required for the criminal case?  And the

13:41  8     checklist is just this is what we have and we're giving

13:41  9     it to you?  Is that how you make a distinction

13:41 10     between --

13:41 11          A.  No.  I think it goes both in the prosecution

13:41 12     package.

13:41 13          Q.  Okay.  You mentioned that the sheriff likes to

13:41 14     involve the DA's office in -- in questionable cases or

13:41 15     major cases or cases that need legal advice.  What

13:41 16     instructions has the sheriff provided with regard to

13:41 17     that preference?

13:41 18          A.  Since I'm always the one on call, I -- if

13:41 19     there's something that happens at night -- aggravated

13:41 20     assault, there's shots that are fired, somebody is

13:41 21     injured -- I'm just giving an example, right -- shots

13:41 22     that are fired, somebody is injured, there's a

13:41 23     hospital -- guy is in the hospital, so I call up my

13:42 24     chain, "Hey, this is what we've got.  The investigators

13:42 25     are on their way out there.  They're going to go do

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:42  1    this, this, this, and this."

13:42  2                So the next day -- depending on what time

13:42  3    it is, right?  I don't call the sheriff in the middle

13:42  4    of the night unless it's a homicide.  So the next day,

13:42  5    "Hey, Sheriff, this is what -- what happened last

13:42  6    night.  This is where they're at.  This is who they've

13:42  7    talked to" or whatever.

13:42  8                He goes, "Okay."  Being that it's -- it's

13:42  9    a big case, he goes, "Okay.  Just make sure that the

13:42 10    DA's office is involved."

13:42 11                For the most part, I call out the DA

13:42 12    investigators at night.  When it's something major,

13:42 13    I'll give them a call -- I'll call either Trini or Rick

13:42 14    Saenz, tell them, "Hey, we're working on this.  You

13:42 15    know, can y'all come out and help us?"  Because they're

13:42 16    very good with -- with search warrants and subpoenas.

13:42 17    And if we have to do -- what are they called?  For the

13:43 18    Facebook accounts.  Oh, my God.

13:43 19        Q.  Just searches, the electronic searches?

13:43 20        A.  But it's a -- preservation letters.

13:43 21        Q.  Oh.

13:43 22        A.  Right?  So I like to involve people, because if

13:43 23    you're the case agent and you're taking pictures, you

13:43 24    know, doing this, so you're there assisting, "Hey, you

13:43 25    know what?  There's a witness over here.  Hey, can

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:43 1    you -- can you go do the interview?"  So everybody

13:43 2    starts doing something.  Right?

13:43 3            So the investigator -- the DAs that we

13:43 4    include in there also, they'll help us with that kind

13:43 5    of -- with the paperwork stuff.

13:43 6        Q.  Okay.

13:43 7        A.  You know.

13:43 8        Q.  Okay.  And were any DA investigators involved

13:43 9    in Lizelle's investigation?

13:43 10        A.  Not to my knowledge.  Like called at that time,

13:43 11    no.  Maybe got involved later on, maybe.  I don't know.

13:43 12        Q.  Were they -- you don't -- do you -- let me just

13:43 13    clarify your last answer.  Do you know whether the DA

13:44 14    investigators got involved in the investigation at any

13:44 15    point?

13:44 16        A.  I don't know.

13:44 17        Q.  Okay.  And did Sheriff Fuentes provide -- well,

13:44 18    does Sheriff Fuentes ever provide any type of guidance

13:44 19    or instructions with regard to investigations?

13:44 20        A.  Like can you be more clear on that?

13:44 21        Q.  Like -- yeah.  If you say, you know, sometimes

13:44 22    this is -- like this is -- we're kind of confused about

13:44 23    that or we're not sure, I'm going to call the DA's

13:44 24    office.  Hey, Sheriff Fuentes, do you know the answer

13:44 25    to this before I call the DA's office?  That's kind of

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:44 1    an example.

13:44 2        A.  No, not with me.  And I don't go looking for

13:44 3    answers from him.  I just let him know what I've done.

13:44 4    And he will be like, "Okay.  Or just make sure you talk

13:45 5    to the DA, okay, or that the DA's office knows what's

13:45 6    going on."

13:45 7        Q.  And that's kind of just a theme is get with the

13:45 8    DA, you know, when you're talking about a major -- a

13:45 9    major investigation or a questionable investigation?

13:45 10       A.  Yes.

13:45 11       Q.  Okay.  Did -- did you -- what -- did you speak

13:45 12   with -- or did you get any guidance from Sheriff

13:45 13   Fuentes specifically with respect to Lizelle or this

13:45 14   investigation?

13:45 15       A.  No.

13:45 16       Q.  Do you know whether discussions were had

13:45 17   between the major and the chief and Sheriff Fuentes

13:45 18   about Lizelle's investigation?

13:45 19       A.  No, I don't.

13:45 20       Q.  Okay.  There were, however, some discussions

13:45 21   between the four of you about Lizelle's case?

13:45 22       A.  Not all at one time.  Like I said, it --

13:45 23       Q.  Okay.

13:45 24       A.  -- maybe would have been two of us or one of

13:45 25   us, whatever.  Not like we're meeting here, no.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:46  1      Q.  During the entire investigation, not just the
13:46  2  first of couple days that we've been talking about, but
13:46  3  during the entire investigation, what information was
13:46  4  shared or what discussions were had with Sheriff
13:46  5  Fuentes about Lizelle?
13:46  6      A.  As interviews were being done and I would brief
13:46  7  with Esmer, she would tell me just little details of
13:46  8  the interviews.  Then I would take that back to my
13:46  9  admin.
13:46  10         "Hey, you know what?  We interviewed
13:46  11  so-and-so, and this is what they said," in a nutshell.
13:46  12  Right.  Go to the chief deputy.  "Hey, just let you
13:46  13  know; Sheriff, just let you know we interviewed this
13:46  14  person.  This is what" -- and he says okay.
13:46  15      Q.  Did -- did Sheriff Fuentes ever have any
13:46  16  questions -- follow-up questions?  Like when you said,
13:46  17  for instance, "Hey, we interviewed this particular
13:46  18  witness and this is the information we gleaned," did he
13:46  19  ever have any follow-up questions for you about any of
13:46  20  the witness interviews?
13:46  21      A.  No, ma'am.
13:46  22      Q.  Okay.  What about Chief Larry?
13:46  23      A.  No.
13:46  24      Q.  And did Major Delgado have any follow-up
13:47  25  questions with regard to your updates on the witness

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:47 1  interviews?

13:47 2       A.  Not -- not that I can recall, no, ma'am.

13:47 3       Q.  What about after your -- we know that there was

13:47 4  one conversation for certain with -- with ADA Barrera.

13:47 5  Did you go back and brief the admin about the

13:47 6  discussion with ADA Barrera and proceeding with the

13:47 7  investigation?

13:47 8       A.  I -- I know I did tell them, "We've already

13:47 9  contacted the DA's office, so they're on board."  Okay.

13:47 10  You know, so -- so pretty much -- it's not a

13:47 11  word-for-word thing that I tell them, but it's the

13:47 12  things that you expect me to do are already being done.

13:47 13       Q.  Okay.  And why is it important to keep the

13:47 14  sheriff informed of these major investigations or

13:47 15  specifically Lizelle's investigation?

13:47 16       A.  Because I've learned in my years of being with

13:47 17  him he doesn't like to find out things from the public

13:47 18  if we know about it first.  So he wants us to -- if we

13:48 19  know about it first, he wants to know before someone

13:48 20  from the public tells him, "Hey, have you heard about

13:48 21  this, this, this, this?"

13:48 22                "No."

13:48 23                "Well, you're investigating, and you ought

13:48 24  to know," right?

13:48 25                So that's why for us it's important to let

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:48  1    him know what cases we're working on.  Especially, like

13:48  2    I said in the beginning, if it's going to catch the

13:48  3    community's eye or the ear, we make sure that he knows.

13:48  4        Q.  Okay.  And I apologize if I already asked you

13:48  5    this question, so when -- do you recall how soon after

13:48  6    you got the call from -- from Rosa did you inform the

13:48  7    sheriff about Lizelle's investigation?

13:48  8        A.  I -- I think I had answered that with it was

13:48  9    after Esmer came back.

13:48  10       Q.  Okay.

13:48  11       A.  And then we contacted Alex.  And then after

13:48  12   that is when I started going to the major, the chief,

13:48  13   and then the sheriff.

13:48  14       Q.  Okay.  And I apologize.  I just -- I'm not

13:48  15   writing everything down.  So it was after Muniz came

13:49  16   back, then you spoke with ADA Barrera, and then that's

13:49  17   when you went up the chain of command at the sheriff's

13:49  18   office?

13:49  19       A.  It could -- it could have been, or could also

13:49  20   have been Esmer came back, we talked, did this

13:49  21   interview with Martha once we had information with

13:49  22   Barrera and stuff and then the sheriff -- it was, like

13:49  23   I say, within a day or two.

13:49  24       Q.  I won't hold you to the exact order, but I

13:49  25   do -- you know, from looking at some of these things, I

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:49  1     did see things were moving very quickly on the

13:49  2     afternoon of January 11th.  Is that a fair statement?

13:49  3          A.  Yes.

13:49  4          Q.  Okay.  And somewhere in there were a

13:49  5     conversation between the sheriff's office, the DA's

13:49  6     office, and then up the chain of command to Sheriff

13:49  7     Fuentes.

13:49  8          A.  Yeah.  Just again, to let him know what was

13:49  9     going on and, you know, the type of case that we just

13:49 10     got our hands on.

13:49 11          Q.  Did he have any -- any comments about the type

13:49 12     of case when you advised him what was going on?

13:49 13          A.  He -- he just kind of went like, okay.  He

13:50 14     goes -- kind of like the same expression that I had.

13:50 15     He's, "Okay, but you've -- you've contacted the DA's

13:50 16     office."

13:50 17                "Yes, we've already talked to Alex, so we

13:50 18     already know what we need to do."

13:50 19                He goes, "Okay.  Just keep me in the loop

13:50 20     if something else changes."

13:50 21          Q.  Okay.

13:50 22          A.  Okay.

13:50 23          Q.  There was some testimony in this case that --

13:50 24     some of it was by my client -- that even before she was

13:50 25     interviewed, there had kind of been some talk in the

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:50  1    community about an -- her investigation.  Were you ever
13:50  2    made aware of any kind of leak from the sheriff's
13:50  3    office or --
13:50  4        A.  I believe it was Esmer.  Esmer had, I think,
13:50  5    mentioned that maybe one of our deputies may have
13:50  6    leaked out some information, because his wife worked
13:50  7    for -- I don't know if it was for CPS or something.
13:51  8    And maybe that's how information had leaked.  But I
13:51  9    want to say she told the major that.
13:51  10       Q.  Okay.  And did -- did you do anything with
13:51  11   regard to addressing that leak, or was that up to the
13:51  12   major?
13:51  13       A.  I -- I did not do that.  I believe the major is
13:51  14   the one who looked into that.
13:51  15       Q.  Okay.  Is it one of the roles of the sheriff to
13:51  16   supervise major investigations?
13:51  17            MS. ALBIN:  Objection, calls for
13:51  18   speculation.
13:51  19       A.  Of -- of the sheriff?
13:51  20       Q.  Yes.
13:51  21       A.  Is it a what?
13:51  22       Q.  Okay.  Is it one of the sheriff's -- or one of
13:51  23   Sheriff Fuentes' roles to supervise major
13:51  24   investigations?
13:51  25            MS. ALBIN:  Objection, calls for

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

13:51 1    speculation.

13:51 2         A.  I don't know if that's written down somewhere

13:51 3    or anywhere.  But as far as I've seen, no.

13:51 4         Q.  Okay.  Is it his practice to look over major

13:51 5    investigations?

13:51 6              MS. ALBIN:  Objection, calls for

13:51 7    speculation.

13:51 8         A.  No.

13:51 9         Q.  What about arrests in major investigations?  Is

13:52 10   it the sheriff's role to sign off on arrests or to --

13:52 11        A.  No.

13:52 12        Q.  But is it his -- is it practice that he is

13:52 13   aware of arrests --

13:52 14        A.  Yes.

13:52 15        Q.  -- in major investigations?

13:52 16        A.  Yes.

13:52 17        Q.  And a murder investigation is a major

13:52 18   investigation, correct?

13:52 19        A.  Yes.

13:52 20        Q.  Okay.  And how many murder investigations did

13:52 21   Starr County Sheriff's Office handle in 2021?

13:52 22        A.  I'm not aware of the numbers, ma'am.  I don't

13:52 23   have the numbers.

13:52 24        Q.  It would be pretty low, though, right?

13:52 25        A.  Yeah, because we've -- we've been good.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

13:52  1          Q.   Yeah, I'm glad.  And the same -- do you know in
13:52  2     2022 how many murder investigations were handled by the
13:52  3     sheriff's office?
13:52  4          A.   No, I don't, ma'am, off the top of my head, no.
13:52  5          Q.   As head of the Starr County Sheriff's Office,
13:52  6     is Sheriff Fuentes responsible for the decisions made
13:53  7     by his staff?
13:53  8               MS. ALBIN:  Objection, calls for
13:53  9     speculation.  Question for the sheriff.
13:53 10          A.   I don't know, ma'am.
13:53 11          Q.   Okay.  Does Sheriff Fuentes set office policy?
13:53 12          A.   Does he set office policy?  No.
13:53 13          Q.   Did you say no or I don't know?
13:53 14          A.   No.
13:53 15          Q.   Okay.  Who would set the office policy if not
13:53 16     the sheriff?
13:53 17          A.   We have our TAC.  And then we have two policy
13:53 18     books, one from the County and one from the TAC.  So I
13:53 19     don't know if they talk to the sheriff about it or not.
13:53 20     I honestly don't know.
13:53 21          Q.   Okay.  Well, what about when we're talking
13:53 22     about, like, practices, recommended practices or
13:53 23     preferences?  Is it Sheriff Fuentes that does that?
13:53 24               MS. ALBIN:  Objection, calls for
13:53 25     speculation; it's vague.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:23 1   today, Lenard.  And I know this has come out one way or

14:23 2   another, but just to kind of get a general overview,

14:23 3   can you please describe your involvement with the

14:23 4   investigation into the charge of murder against

14:23 5   Lizelle.

14:23 6              MS. ALBIN:  Objection, vague.

14:23 7        Q.  How were you involved in Lizelle -- the

14:23 8   investigation as to Lizelle?

14:23 9        A.  I told -- instructed Esmer, right, after the

14:23 10  phone call with ADA Alex, right, gather the information

14:23 11  like she asked, and then we submit it.  That's

14:23 12  basically it.

14:23 13       Q.  Okay.  Well, to be more -- I guess to be a

14:23 14  little bit more specific, you were involved in

14:24 15  interviews -- some interviews?

14:24 16       A.  Yes.

14:24 17       Q.  Okay.  Did you review any documents, any

14:24 18  medical records?

14:24 19       A.  No.

14:24 20       Q.  And you were involved in some briefings with

14:24 21  CID?

14:24 22       A.  Yes.

14:24 23       Q.  Okay.  Were you provided some guidance as to

14:24 24  take a picture, get this document --

14:24 25       A.  Yes.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:24  1     Q.   -- interview this person?

14:24  2     A.   Well, as far as the interviews, not really.

14:24  3  But I did about the pictures to the -- for the ashes,

14:24  4  yes.

14:24  5     Q.   Okay.  And did you -- for the most part, were

14:24  6  you aware of the investigation between January 22 --

14:24  7  that's a terrible question.

14:24  8            Between January 22 and the day the

14:24  9  prosecution packet was turned in to the DA's office,

14:24 10  you were aware of the status of the investigation.  Is

14:24 11  that a fair statement?

14:24 12     A.   I was aware of the investigation.  I just was

14:25 13  not aware about this.

14:25 14     Q.   What is "this"?

14:25 15     A.   The murder.

14:25 16     Q.   Okay.

14:25 17     A.   And prosecution packages.  My understanding

14:25 18  throughout the whole thing was gather the information,

14:25 19  turn in the information to the DA's office.  That's

14:25 20  what was supposed to happen.

14:25 21     Q.   When you're gathering -- or when your

14:25 22  investigators are gathering, under your supervision,

14:25 23  the information, how did they know what information to

14:25 24  look for if they didn't have a specific charge in mind?

14:25 25     A.   No.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:25  1        MS. ALBIN:  Objection -- hold on.

14:25  2  Objection, vague.  It calls for speculation as to what

14:25  3  the investigators would know and not know.

14:25  4     A.  They just needed to interview who was involved,

14:25  5  the parties involved, and get an idea from -- from

14:25  6  there.  That's what they needed to do.

14:25  7           Take the -- the pictures of the ashes,

14:25  8  interview the nurses that are mentioned here or

14:26  9  wherever.  I think you mentioned another nurse, Paola

14:26 10  or something like that.  You interview them, see what

14:26 11  they give you, put it together, here you go.

14:26 12     Q.  Were they -- the investigators -- because I

14:26 13  know it was at least Muniz and Aguirre.  After the

14:26 14  interview was completed, would they come to you and

14:26 15  give you an update?

14:26 16     A.  Not like right then and there, no.

14:26 17     Q.  Okay.  But at some point after the interview --

14:26 18     A.  At one point, I -- I would go and tell them

14:26 19  "Hey, okay, so -- so where are we at?"

14:26 20     Q.  Gotcha.  So it's not they're coming to you to

14:26 21  report.

14:26 22     A.  No.

14:26 23     Q.  You're going to them and saying, "What have we

14:26 24  got?"

14:26 25     A.  Yes, because I'm going to get asked from the

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:26  1    major.

14:26  2         Q.  Right.  You're going to get asked by the chief

14:26  3    who's going to get asked by the sheriff.

14:26  4         A.  Well, I don't know the chief --

14:26  5              MS. ALBIN:  Hold on.  Objection.  I'm not

14:26  6    sure if that was a question, but that's not what he

14:26  7    said.  He said the major.

14:26  8         Q.  And then the major will likely give information

14:26  9    upwards, whether it's to the chief --

14:26 10         A.  Yes.

14:26 11         Q.  -- or the sheriff.

14:26 12              MS. ALBIN:  Objection, calls for

14:26 13    speculation as to what the major would do.

14:26 14         Q.  And we've been going back and forth about this,

14:26 15    but I don't think I specifically asked you this, but

14:26 16    when during the investigation did you first learn that

14:27 17    Ms. Gonzalez had an abortion?

14:27 18         A.  It wasn't until after it was turned in and then

14:27 19    the -- the DA dismissed the charges and put it out on

14:27 20    Facebook.

14:27 21         Q.  Okay.

14:27 22         A.  I think it was on Facebook.

14:27 23         Q.  At no time during the investigation did you

14:27 24    just come across a document or a statement that she had

14:27 25    an abortion?

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:27 1      A.  Not me, ma'am.  No, ma'am.  Now, just to

14:27 2  clarify, when you say "abortion," like a abortion like

14:27 3  done by doctors --

14:27 4      Q.  In other words, she -- no, that's not what I

14:27 5  mean.

14:27 6      A.  Okay.

14:27 7      Q.  So thank you for -- for -- for clarifying that.

14:27 8  When I say "abortion" is, I guess, when was the first

14:28 9  time that you as the captain realized that this was the

14:28 10  death of an unborn child by Lizelle -- committed by

14:28 11  Lizelle?

14:28 12      A.  It's -- because it's -- it's hard to answer --

14:28 13  to answer that -- that question because it's right in

14:28 14  the initial report.  It says there that it was

14:28 15  self-initiated.  Right?

14:28 16              So -- and the way he puts it there, it was

14:28 17  an abortion.  So did I hear the word "abortion"?  Yeah,

14:28 18  I heard it from the very beginning.  Did I know if it

14:28 19  was an abortion or not?  No, I don't know.

14:28 20      Q.  Okay.

14:28 21      A.  I don't know what constitutes an abortion.

14:28 22      Q.  Okay.  And I appreciate -- I appreciate your

14:28 23  honesty, because that helps me with my questioning.  So

14:29 24  at what point -- is it still your testimony that you

14:29 25  didn't realize what she had done was an abortion until

Electronically signed by Donna McCown (101-253-986-8079)                              2561a1ea-cb01-4e31-a726-7688565f89c9

14:29  1    after the case was dismissed?

14:29  2         A.  Yeah, until they started saying, "Hey, it

14:29  3    was" -- they dismissed it because it was -- it was an

14:29  4    abortion.  It was -- she could do that.

14:29  5         Q.  She could do that?

14:29  6         A.  Her body, her choice.  Right?

14:29  7         Q.  Okay.

14:29  8         A.  So, oh, hey, it is what it is.  That's what the

14:29  9    DA's office -- whatever.

14:29 10         Q.  Okay.  But you understood that it was alleged

14:29 11    that she had an abortion?

14:29 12         A.  Well --

14:29 13              MS. ALBIN:  Hold on.  Objection, asked and

14:29 14    answered.  He's already explained his understanding of

14:29 15    the abortion.

14:29 16         Q.  Okay.  But you understood from the beginning

14:29 17    that Lizelle caused the death of the unborn child?

14:29 18         A.  Could have -- could have possibly caused, yes.

14:29 19         Q.  Okay.  Perfect.  Thank you for the

14:29 20    clarification.  And some of these I already asked you,

14:30 21    so.

14:30 22              What was your understanding as to why

14:30 23    Martha Torres reported the case to law enforcement?

14:30 24              MS. ALBIN:  Objection, calls for

14:30 25    speculation.

14:30  1          A.  I don't know, ma'am.

14:30  2          Q.  Well, you -- after your interview with Martha

14:30  3    Torres, what did you take away from the interview as to

14:30  4    why she reported the case?

14:30  5          A.  I think it's because they were worried about

14:30  6    the -- that the laws that were coming in and were being

14:30  7    talked about, I guess they didn't want to be at fault.

14:30  8    Like if, I guess, at the time, if the doctors assisted

14:30  9    in something, they could get in trouble or something

14:30 10    like that.  I'm assuming.  Right?  I guess that's what

14:30 11    it was.

14:30 12          Q.  After your discussions with Dr. Lozano, is --

14:30 13    did he confirm that?  Was he also concerned with his

14:30 14    care and treatment in an abortion?

14:30 15          A.  I believe --

14:30 16              MS. ALBIN:  Hold on.  Objection, calls for

14:30 17    speculation.

14:30 18          A.  I -- I think he mentioned that in -- in -- in

14:31 19    the interview.  I think he mentioned that.

14:31 20          Q.  Has Martha Torres reported any other abortions

14:31 21    to law enforcement?

14:31 22          A.  Not that I'm aware of.

14:31 23          Q.  Lenard, yesterday, Investigator Aguirre

14:31 24    testified that if the same facts as Lizelle's were

14:31 25    reported today, he would do the same investigation and

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:31  1    send the case to the DA's office for presentation.

14:31  2    Would you do the same?

14:31  3        A.  I would actually read more into the law first.

14:31  4    But everything would be done the same.  We'd still have

14:31  5    to interview everybody, get all the information.  Still

14:31  6    consult with -- with the DA's office.  Even though we

14:31  7    read it or whatever, still consult, "Hey, this is what

14:31  8    we have."

14:31  9        Q.  Would you -- would you think it was murder

14:31  10   based on what you know now?

14:31  11       A.  I'd be even more confused.  I'll be honest with

14:32  12   you.

14:32  13       Q.  Okay.  So you would -- you would do the same

14:32  14   investigation, gather all of the information, and you

14:32  15   would still come to --

14:32  16       A.  Right now, because --

14:32  17           MS. ALBIN:  Hold on.  Hold on.  Let her

14:32  18   finish the question, and then just answer the question

14:32  19   you're asked, please.

14:32  20       Q.  Okay.  So the question was, sitting here today,

14:32  21   getting a report from the hospital of an abortion, you

14:32  22   would gather the same facts, do the same interviews,

14:32  23   and look at the Penal Code, and still present it to the

14:32  24   DA's office?

14:32  25       A.  With what I know right now?  Yes, because I

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:32 1    have not read the law.  I don't know what the law

14:32 2    states right now.

14:32 3        Q.  Okay.  Well, you have it there, 19 -- which one

14:32 4    was it?  Exhibit --

14:32 5        A.  Is it the --

14:32 6        Q.  -- 43?

14:32 7        A.  -- like the one specifically for -- for that,

14:32 8    that if they, like, self-induce or something?

14:33 9            MS. ALBIN:  Hold on.  He's testified he

14:33 10    doesn't know what the law is.  So...

14:33 11        Q.  Can you read Section 19.06 of Exhibit 43.

14:33 12        A.  19.06 you said?

14:33 13        Q.  Yes.  End of the last page.

14:34 14        A.  Okay.

14:34 15        Q.  Okay.  After reading Section 19.06 of the Texas

14:34 16    Penal Code and you got a call from the hospital about

14:34 17    an abortion, would you still investigate the same

14:34 18    manner that you investigated Lizelle's case?

14:34 19            MS. ALBIN:  Objection, vague.

14:34 20        A.  What was the objection?  I'm sorry.

14:34 21        Q.  Vague.

14:34 22        A.  Okay.  Yes.

14:34 23        Q.  Why would you do that?

14:34 24        A.  To make sure -- you know, in a case like --

14:34 25    like this, it would always be good to get a second

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:35 1    opinion.  And somebody that understands the law better

14:35 2    than we do is the State.

14:35 3        Q.  And could you just call the DA's office for an

14:35 4    opinion rather than working it up and doing a

14:35 5    prosecution packet, submitting it for grand jury?

14:35 6        A.  Well, I wouldn't say a prosecution packet, but

14:35 7    gathering the information.  Once we had all the

14:35 8    information together and depending what was said, then

14:35 9    we could contact the DA, "Hey, this is what we got.

14:35 10   This is what was said.  This is what the witnesses say.

14:35 11   This is what the doctor said.  What -- what do you

14:35 12   think?"

14:35 13            Because I can go just based on the initial

14:35 14   report that the officer would have caused, but not all

14:35 15   the information is there.  Maybe some -- somebody else

14:35 16   has information that, you know, she did something else

14:35 17   or something else happened that does not fall

14:35 18   completely under this -- the 19.06.  We want to make

14:35 19   sure that all the information is there gathered and

14:35 20   that everybody who needed to be talked to has been

14:35 21   talked to, you know.

14:36 22       Q.  Okay.

14:36 23       A.  And I would still do it.  I would still do it.

14:36 24       Q.  Okay.  And I'm going to kind of clarify the

14:36 25   question a little bit.  With regards to some of the

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:36  1    testimony that has been elicited in this case, there

14:36  2    was just an understanding that the investigation was to

14:36  3    be completed, information was to be gathered, and this

14:36  4    would be submitted to the grand jury.

14:36  5        A.  Not to the grand jury --

14:36  6            MS. ALBIN:  Hold on.  Hold on.

14:36  7            THE WITNESS:  I'm sorry.

14:36  8        Q.  Is that your understanding?

14:36  9            MS. ALBIN:  And -- and you're referring to

14:36  10   what testimony has been elicited?

14:36  11           MS. GARZA:  Aguirre yesterday.

14:36  12           MS. ALBIN:  Okay.  So you're asking him if

14:36  13   based on what Aguirre testified to yesterday, that's

14:36  14   the process that is supposed to happen?

14:36  15           MS. GARZA:  Right.

14:36  16       Q.  Is it your understanding that the investigation

14:36  17   was going to end up for grand jury determination?

14:36  18       A.  My understanding was for review.

14:36  19       Q.  Okay.  Well, then, that -- let me change my

14:36  20   question, then.

14:37  21           Do you think that these facts today would

14:37  22   be appropriate for presentation to the grand jury?

14:37  23           MS. ALBIN:  Objection, calls for

14:37  24   speculation.

14:37  25       A.  And I go back.  I would still call and ask

14:37 1  for -- for advice and turn in for review, not for grand

14:37 2  jury.

14:37 3      Q.  Okay.

14:37 4      A.  There's like nothing else would be included in

14:37 5  there for prosecution.  Just like, "Hey, we have this

14:37 6  information.  You know, what do you think?"  They tell

14:37 7  me no, there's nothing there, okay, there's nothing

14:37 8  there.

14:37 9      Q.  Okay.  And now you know that a mother cannot be

14:37 10 prosecuted for the death of her unborn child?

14:37 11     A.  Now I know.

14:37 12     Q.  Okay.  Has the DA's office ever referred a case

14:37 13 to the sheriff's office for investigation?

14:37 14     A.  Not that I'm aware of.

14:37 15     Q.  Are there investigative tools that require the

14:38 16 assistance of the DA's office?

14:38 17          MS. ALBIN:  Objection, vague.

14:38 18     A.  Tools like what?

14:38 19     Q.  Do you sometimes need the help of the DA's

14:38 20 office to gather information?

14:38 21     A.  Yes.

14:38 22          MS. ALBIN:  Objection, vague.

14:38 23     Q.  And what -- what -- when would you need the

14:38 24 DA's office to --

14:38 25     A.  Drones.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:38 1     Q.  -- gather information?

14:38 2     A.  We ask for their drones.  They have drones.

14:38 3     Q.  Okay.  What about subpoenas?

14:38 4     A.  Yes.

14:38 5     Q.  Yes, you need the help of the DA's office?

14:38 6     A.  Yes, we ask them for assistance with that too.

14:38 7     Q.  And I think you mentioned earlier that the DA

14:38 8  investigators have more experience with that than the

14:38 9  sheriff's office?

14:38 10     A.  Yes.  Especially with, like, the medical

14:38 11  subpoenas and cell phone subpoenas and stuff like that.

14:38 12     Q.  Are sheriff officers able to obtain a grand

14:38 13  jury subpoena without the coordination from an attorney

14:38 14  in the DA's office?

14:38 15     A.  I don't know.

14:38 16     Q.  Do you know what the process is for obtaining a

14:38 17  grand jury subpoena?

14:38 18     A.  No, ma'am.

14:38 19     Q.  Have you ever had to do that?

14:39 20     A.  I've been in the grand jury, but I don't

14:39 21  know -- like, I've testified in the grand jury before,

14:39 22  but I don't know what the whole process is.

14:39 23     Q.  You don't know how you got there?

14:39 24     A.  Yeah.  I know how I got there.  I just don't

14:39 25  know how -- how -- how they put it in or what's next

Electronically signed by Donna McCown (101-253-986-8079)     2561a1ea-cb01-4e31-a726-7688565f89c9

14:39  1    when they set it up and, you know, things like that.

14:39  2    No.

14:39  3        Q.  Okay.  Do you know what information is shared

14:39  4    with the DA's office in order to obtain a grand jury

14:39  5    subpoena?

14:39  6        A.  No, I don't.

14:39  7            MS. ALBIN:  Objection, vague.

14:39  8        Q.  Is there anybody in the DA's office that makes

14:39  9    the final decision as to when a case is ready to be

14:39 10    transferred with the prosecution packet to the DA's

14:39 11    office?

14:39 12        A.  How is that question again?

14:39 13        Q.  Is there someone in the -- in the sheriff's

14:39 14    office that makes the determination the investigation

14:39 15    is complete and this is ready to be turned over to the

14:39 16    DA's office?

14:39 17        A.  No.  The investigator himself.

14:39 18        Q.  Does the DA's office ever review the evidence

14:40 19    that has been collected to determine whether an

14:40 20    additional investigation is needed before an arrest or

14:40 21    referral to grand jury?

14:40 22        A.  Yes.

14:40 23        Q.  How often?

14:40 24        A.  Not very, but it's happened.

14:40 25        Q.  And do they tell you what investigation is

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

14:40  1    needed?

14:40  2         A.  Well, what's missing in the file or whatever.

14:40  3         Q.  Generally speaking, coordination and

14:40  4    cooperation between the DA's office and the sheriff's

14:40  5    office is essential to being able to investigate

14:40  6    crimes, correct?

14:40  7              MS. ALBIN:  Objection, vague; calls for

14:40  8    speculation; compound.

14:40  9         A.  Can you repeat the question?

14:40 10         Q.  Sure.  Is cooperation and coordination between

14:40 11    your office and the DA's office essential to

14:40 12    investigate crimes?

14:40 13         A.  Yes.

14:40 14              MS. ALBIN:  Same objection.

14:40 15         Q.  And it is common for you to call the DA's

14:40 16    office to rely on their guidance about the law,

14:40 17    correct?

14:40 18              MS. ALBIN:  Objection.  Are you talking

14:40 19    about him personally or the sheriff's office?

14:40 20              MS. GARZA:  The sheriff's office.

14:40 21              MS. ALBIN:  Objection, calls for

14:41 22    speculation about what other employees of the sheriff's

14:41 23    office do.

14:41 24         A.  I don't know what all the employees do, but I

14:41 25    know what my investigators do.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:41 1      Q.  Right.  And it is common for your investigators

14:41 2  to reach out?

14:41 3      A.  Yes.

14:41 4      Q.  And in fact, in this case, they were encouraged

14:41 5  to reach out?

14:41 6      A.  Yes.

14:41 7      Q.  You -- you were present for -- were you present

14:41 8  for Dr. Lozano's interview on January 12th?

14:41 9      A.  Yes.  If it's the one that I'm in there.

14:41 10      Q.  Yes.

14:41 11      A.  Dates, I can't testify to dates.

14:41 12      Q.  Okay.  And I'll take the date out.  But you --

14:41 13  if we can assume Dr. Lozano was only interviewed once,

14:41 14  you were there, correct?

14:41 15      A.  Yes.

14:41 16      Q.  Okay.  Who else from the sheriff's office was

14:41 17  present during Lozano's interview?

14:41 18      A.  I think Investigator Muniz and Investigator

14:42 19  Aguirre -- Sergeant Aguirre.

14:42 20      Q.  And where was -- where did the interview take

14:42 21  place?

14:42 22      A.  At the sheriff's office.

14:42 23      Q.  Okay.  And did you -- you -- did you schedule

14:42 24  the interview with Dr. Lozano?

14:42 25      A.  I think I did.  I think I was the one who

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:42  1      called him.

14:42  2          Q.  Why -- why would you have called?

14:42  3          A.  Because I have his number.

14:42  4          Q.  Okay.  You know him like --

14:42  5          A.  Yes, he's --

14:42  6          Q.  -- a personal level or social level?

14:42  7          A.  Yes.

14:42  8          Q.  Okay.  And when did you first make contact with

14:42  9      Dr. Lozano about Lizelle's abortion?

14:42  10         A.  When I walked into the interview room.

14:42  11         Q.  Well, you -- you called him to set up --

14:42  12         A.  I --

14:42  13         Q.  -- an interview?

14:42  14         A.  -- called him, yes, you know, in reference to

14:42  15     what was going on.  Right.  So he said, oh, okay.  And

14:42  16     I'm not sure if it was the same day or the next day

14:42  17     that he came in.

14:42  18         Q.  Okay.  Tell me about that call to Lozano.  Did

14:42  19     you call him to get information or did you call him to

14:42  20     set up --

14:42  21         A.  No, just to set it up.

14:42  22         Q.  Okay.  So that it would be a formal interview?

14:43  23         A.  Yes.

14:43  24         Q.  And who made the decision to interview

14:43  25     Dr. Lozano?

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:43  1       A.  I think it was all -- Esmer, myself.  Like it's

14:43  2  no-brainer, you have to interview the doctor who was

14:43  3  there, you know.  It's like -- so I don't -- but I

14:43  4  know -- I know I called him.  I know I was the one who

14:43  5  called him.  But I don't know how it came out, "Don't

14:43  6  worry.  I'll call him.  I'll get him here."

14:43  7       Q.  Just because it would be easy for you to call

14:43  8  him --

14:43  9       A.  Yes --

14:43  10       Q.  -- it would be --

14:43  11       A.  -- instead of going through the office and

14:43  12  getting -- and leaving a message.  By the time he got

14:43  13  the message, you know, it would take a little longer.

14:43  14  So I just called him to his personal phone.

14:43  15       Q.  Okay.  Do you recall Dr. Lozano saying during

14:43  16  his interview that under the law, she cannot induce

14:43  17  herself of an abortion after six weeks?

14:43  18       A.  I know he mentioned something like that.  Not

14:43  19  exactly sure as to what he said.

14:43  20       Q.  Do you know if Dr. Lozano was the one who made

14:44  21  the decision for Martha Torres to call the police?

14:44  22            MS. ALBIN:  Objection --

14:44  23       A.  I don't know.

14:44  24            MS. ALBIN:  -- calls for speculation.

14:44  25       A.  I don't know.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

14:44  1     Q.  Okay.

14:44  2         MS. ALBIN:  Can we take a break whenever

14:44  3  you're at a stopping point?

14:44  4         MS. GARZA:  Yeah.  Go ahead.

14:44  5         (Brief recess)

14:53  6     Q.  All right.  Lenard, we're in the homestretch

14:53  7  now, so I promise.  We just had a quick break.  Did you

14:53  8  speak with your attorney during the break?

14:53  9     A.  Yes.

14:53 10     Q.  Okay.  Is there anything that we need to go

14:53 11  back and correct or modify before we continue?

14:53 12     A.  No, ma'am.

14:53 13     Q.  Okay.  So you -- you just -- you were able to

14:53 14  read -- yes, the report of Martha Torres today.  Have

14:53 15  you been -- and I believe you told me earlier that you

14:54 16  did review the report pertaining to Dr. Lozano's

14:54 17  interview?

14:54 18     A.  Not the report.  The video.

14:54 19     Q.  Oh, the video.  I'm sorry.  Yes, the video.

14:54 20  What -- was there anything -- and I'm talking about at

14:54 21  the time back in January of 2022, was there anything

14:54 22  about Dr. Lozano's report that -- that you felt

14:54 23  justified continuing this investigation against

14:54 24  Lizelle?

14:54 25     A.  No, ma'am.

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:54  1      Q.  Okay.  After Dr. Lozano's interview, what was
14:54  2   your -- what was your impression of how the
14:54  3   investigation would proceed?
14:54  4      A.  Just to continue gathering more information.
14:54  5   And -- and I believe you mentioned another nurse in
14:55  6   there, so...
14:55  7      Q.  Someone else too.  That would have been someone
14:55  8   else --
14:55  9      A.  To interview.
14:55  10      Q.  Okay.  During his interview, Dr. Lozano spoke
14:55  11   about a new law that the -- pertaining to abortions.
14:55  12   Do -- do you recall him talking about that?
14:55  13      A.  I -- I recall him saying something about that.
14:55  14      Q.  Did you do anything at that time or did -- did
14:55  15   you do anything at that time to research or look into
14:55  16   what that new law was that Dr. Lozano was referring to?
14:55  17      A.  No, I did not.
14:55  18      Q.  Okay.  Did you ask your investigators to do
14:55  19   research about that law that Dr. Lozano was talking
14:55  20   about?
14:55  21      A.  I don't think I did, ma'am.  No, I didn't.
14:55  22      Q.  Did you -- or did your interviewers -- did your
14:55  23   investigators in your presence have any conversations
14:55  24   with ADA Barrera regarding this new law that Dr. Lozano
14:55  25   mentioned?

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:55  1       A.  I don't recall the extent of the conversations

14:56  2  to word for word what was said, but it was towards this

14:56  3  case.

14:56  4       Q.  Okay.  Were there specific questions or

14:56  5  discussions about this new law with ADA Barrera?

14:56  6       A.  I believe so.

14:56  7       Q.  And that would have been during that

14:56  8  conversation that you and Esmer had early on?

14:56  9       A.  Yes.

14:56  10      Q.  Okay.  Was there anything about Dr. Lozano's

14:56  11 statement that stood out to you with regard to the

14:56  12 charges or the investigation of Lizelle?

14:56  13      A.  No, ma'am.

14:56  14      Q.  Did you review any of the reports of the

14:56  15 statements of Dr. Luis Ramirez?

14:56  16      A.  No, ma'am.

14:56  17      Q.  And you were not present, correct?

14:56  18      A.  No.

14:56  19      Q.  Yes?

14:56  20      A.  Yes, you're correct.

14:56  21      Q.  Okay.  And you were not present for Nurse Norma

14:56  22 Aguirre's interview?

14:56  23      A.  No, ma'am, I wasn't.

14:56  24      Q.  Okay.  And have you read any of the findings

14:56  25 report or notes?

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:56  1          A.  No, ma'am.

14:57  2          Q.  And you were not present for the interview of

14:57  3      CPS caseworker Daisy Perez?

14:57  4          A.  No, ma'am.

14:57  5          Q.  Okay.  Did you review any findings or reports

14:57  6      pertaining to that interview?

14:57  7          A.  No, ma'am.

14:57  8          Q.  What about nurse Paola Arrambide?

14:57  9          A.  No, ma'am.

14:57 10          Q.  Okay.  You didn't -- you were not present and

14:57 11      you did not review any notes --

14:57 12          A.  No, I did not.

14:57 13          Q.  -- or reports?

14:57 14              Okay.  Were some of these interviews done

14:57 15      at the request of ADA Barrera?

14:57 16          A.  I don't know.

14:57 17          Q.  All right.  And were you present for Lizelle's

14:57 18      interview?

14:57 19          A.  No, ma'am, I was not.

14:57 20          Q.  Okay.  Do you know why you chose not to be

14:57 21      there?

14:57 22          A.  I just didn't need to be there anymore, I

14:57 23      guess.

14:57 24          Q.  Okay.  And that is -- you -- it seems as though

14:57 25      you were very involved in witness interviews and kind

Electronically signed by Donna McCown (101-253-986-8079)                              2561a1ea-cb01-4e31-a726-7688565f89c9

14:58  1   of navigating this investigation in the first few days.

14:58  2   Is that fair to say?

14:58  3       A.  I would say the first day.

14:58  4       Q.  Okay.  Yeah, first day.  Day one, day two

14:58  5   maybe, or you tell me.

14:58  6           MS. ALBIN:  I'm going to object.  He just

14:58  7   said the first day.

14:58  8       Q.  You -- do you believe that the majority of your

14:58  9   involvement was limited to that first day?

14:58 10       A.  Yes.

14:58 11       Q.  Okay.  After that first day, your involve --

14:58 12   was your involvement requesting status or getting

14:58 13   status?

14:58 14       A.  Yes, just to see what's been done.

14:58 15       Q.  Okay.  And then after you see what's been done,

14:58 16   you would take it up to -- further up the chain of

14:58 17   command to give them status on --

14:58 18       A.  Yes.

14:58 19       Q.  -- what's been done.

14:58 20           Okay.  There was -- I'm going to see

14:58 21   something real quick.  Are you aware of a meeting

14:58 22   between -- or a meeting with -- let me rephrase.

14:59 23           Are you aware of a meeting that took place

14:59 24   between Sergeant Rafael Aguirre and ADA Barrera?

14:59 25       A.  No, ma'am.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

14:59  1     Q.  Okay.  Were you present for any in-person

14:59  2  meetings with ADA Barrera pertaining to Lizelle's

14:59  3  investigation?

14:59  4     A.  No, ma'am.

14:59  5     Q.  Do you know who made the decision to bring in

14:59  6  Lizelle for interrogation?

14:59  7     A.  No, ma'am.

14:59  8     Q.  Did you know she was coming in for an

14:59  9  interrogation prior?

14:59  10     A.  I don't recall, but I'm sure Esmer would have

14:59  11  told me.

14:59  12     Q.  At the time of Lizelle's interview, she was

15:00  13  already a suspect for murder, correct?

15:00  14     A.  I don't -- no.

15:00  15     Q.  Why wasn't Lizelle arrested immediately

15:00  16  following her interview?

15:00  17     A.  Because we were just gathering the information.

15:00  18     Q.  Do you know what additional information was

15:00  19  gathered between January 31st and March 30th?

15:00  20     A.  No, I don't.

15:00  21     Q.  Okay.  At the time -- on January 3rd following

15:00  22  Lizelle's interview, there was no probable cause to

15:00  23  arrest her; is that correct?

15:00  24     A.  I don't think so, no.

15:00  25     Q.  You don't think there was probable cause to

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

15:00 1    arrest her?

15:00 2        A.  On what day?  I'm sorry.

15:00 3        Q.  Sure.  Let me -- let me rephrase.

15:01 4             Following her interview on January 31st,

15:01 5    do you believe there was probable cause to arrest her?

15:01 6        A.  I don't know, because I wasn't in the

15:01 7    interview, so I don't know what she said.  And as

15:01 8    stated, as to now, I don't -- I haven't seen any of

15:01 9    those statements.

15:01 10        Q.  Are you aware of any conversations between the

15:01 11    investigators and the DA's office regarding whether or

15:01 12    not to arrest Lizelle?

15:01 13        A.  No.

15:01 14        Q.  Were there any conversations between you and

15:01 15    the DA's office regarding whether or not to arrest

15:01 16    Lizelle?

15:01 17        A.  No, ma'am.

15:01 18        Q.  Are you aware at the conclusion of the

15:01 19    interview, Investigator Muniz indicated that she needed

15:01 20    to discuss the case with the DA's office?

15:01 21        A.  What was that again?

15:01 22        Q.  Did you know that at the conclusion of

15:01 23    Lizelle's interview, Investigator Muniz informed

15:01 24    Lizelle that she needed to discuss the case with the

15:01 25    DA's office?

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

220

15:42  1        A.  Not -- not that I know of, ma'am, no.

15:42  2        Q.  What is your sheriff -- your e-mail address at

15:42  3   the sheriff's office?

15:42  4        A.  Mine is lenardfuentes@starrcountyso.org.

15:42  5        Q.  Do you ever use your personal e-mail to discuss

15:42  6   sheriff's office cases?

15:42  7        A.  No, ma'am.

15:42  8        Q.  Did you ever use your personal e-mail to

15:42  9   discuss Lizelle?

15:42 10        A.  No, ma'am.

15:43 11        Q.  Do you have administrative access to the

15:43 12   sheriff's county social media -- the Starr County

15:43 13   Sheriff's Office social media accounts?

15:43 14        A.  No, ma'am.

15:43 15        Q.  Do you know who has access to post or edit?

15:43 16        A.  On the Facebook, I believe it's Brenda Martinez

15:43 17   and Carla --

15:43 18        Q.  Do --

15:43 19        A.  -- dispatchers.

15:43 20        Q.  I'm sorry.  Do the posts have to be approved by

15:43 21   anyone?

15:43 22        A.  I believe so, through the sheriff.

15:43 23        Q.  Now, we talked earlier about, you know, taking

15:43 24   notes.  Do you have -- do you have any notes,

15:43 25   handwritten notes taken pertaining to Lizelle's

Electronically signed by Donna McCown (101-253-986-8079)                                    2561a1ea-cb01-4e31-a726-7688565f89c9

15:43 1    investigation?

15:43 2        A.  No, ma'am, I do not.

15:43 3        Q.  Okay.  We talked a little bit earlier about

15:44 4    that particular Rosa's report that was done under a

15:44 5    prior software or program.  Would you happen to know

15:44 6    what system that was or what it was called?

15:44 7        A.  I believe that one is called COPsync.

15:44 8        Q.  And what do you currently use for report

15:44 9    writing?

15:44 10       A.  I don't know what the name of it is.  I don't

15:44 11   know what -- we've been, like, through two different

15:44 12   ones after that.  I don't know.  I'm going to learn it.

15:44 13       Q.  When did you switch?

15:44 14       A.  I'm not sure, ma'am.  Maybe about a year ago,

15:44 15   year and a half ago.

15:44 16       Q.  Would the sheriff's office have one main file

15:44 17   where all of the notes, reports, documents you --

15:44 18   recordings, statements, pertaining -- USBs pertaining

15:44 19   to Lizelle's investigation be stored?

15:44 20       A.  Like one specific place?

15:44 21       Q.  Uh-huh.

15:44 22       A.  The only thing that's there is the file that

15:44 23   Esmer left behind.

15:44 24       Q.  Okay.

15:45 25       A.  Which is what Major Delgado has turned over to

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

15:45  1    y'all.

15:45  2        Q.  Okay.  Now, you indicated that you did bring

15:45  3    your -- your cell phone with you today to your

15:45  4    deposition?

15:45  5        A.  Yes.

15:45  6        Q.  Okay.  Would you be willing to kind of go

15:45  7    through it and -- and point out the screenshots or the

15:45  8    messaging or the apps that you were able to locate

15:45  9    pertaining to this case?

15:45 10              MS. ALBIN:  Objection.

15:45 11              Don't answer that.

15:45 12              If you want to make a discovery request,

15:45 13    you can propound on it on the -- go through that

15:45 14    process.

15:45 15              MS. GARZA:  Okay.

15:45 16        Q.  Do you understand my question, Lenard?

15:45 17        A.  Yes.

15:45 18        Q.  Okay.  Are you refusing to answer?

15:45 19        A.  No, but --

15:45 20              MS. ALBIN:  He's not going to give you his

15:45 21    cell phone to rummage through right now.

15:45 22        Q.  I'm not asking to rummage through your cell

15:45 23    phone.  I'm wondering if you would be willing to, you

15:45 24    personally, find the messages that you referred to

15:45 25    earlier so that we could look at.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

15:45  1         A.  I did provide the -- those messages.

15:45  2         Q.  To whom?

15:45  3         A.  To the -- our attorneys.

15:45  4         Q.  Okay.

15:46  5               MS. GARZA:  When was that production?

15:46  6               MS. ALBIN:  Yesterday.

15:46  7               MS. GARZA:  Did you upload it?

15:46  8               MS. ALBIN:  I'm not sure that we have a

15:46  9    specific request for it.  We can --

15:46  10              MS. GARZA:  Okay.  No.  I'm just -- I'm

15:46  11   asking because I haven't seen it.

15:46  12              MS. ALBIN:  No.  I have not even looked at

15:46  13   it.  I know it came in, but I haven't looked at it.

15:46  14              MS. GARZA:  Okay.  Do you have a few

15:46  15   questions?

15:46  16              MS. ALBIN:  Uh-huh.

15:46  17              MS. GARZA:  Okay.  Well, then I'll go

15:46  18   ahead and pass the witness so I can look over things,

15:46  19   and you can go ahead.

15:46  20                         EXAMINATION

15:46  21   BY MS. ALBIN:

15:46  22         Q.  Captain Fuentes, how long have you known the

15:46  23   plaintiff's lawyer?

15:46  24         A.  Don't know exactly how many years.  I know she

15:46  25   worked at the DA's office back when I was still there.

Electronically signed by Donna McCown (101-253-986-8079)                          2561a1ea-cb01-4e31-a726-7688565f89c9

15:46  1    2000s maybe.  I'm not -- I'm not sure what the number

15:46  2    is, but I've known her for a while.

15:46  3        Q.  And have you ever interacted socially?

15:46  4        A.  No.

15:46  5        Q.  You've never seen the plaintiff's lawyer

15:46  6    outside of work?

15:46  7        A.  Yes.

15:46  8        Q.  Yes, you have?

15:46  9        A.  Yes.

15:46  10       Q.  Okay.  Recently?

15:46  11       A.  No, not recent, no.  No.

15:47  12       Q.  Okay.  Do you know of any direct action that

15:47  13   Sheriff Fuentes took to investigate Ms. Herrera?

15:47  14       A.  Direct action?

15:47  15       Q.  Yes.

15:47  16       A.  No.

15:47  17       Q.  Did he direct you at any point to take any

15:47  18   specific steps with regard to the investigation?

15:47  19       A.  No, ma'am.

15:47  20       Q.  Did he ever direct you on what witnesses to go

15:47  21   interview?

15:47  22       A.  No, ma'am.

15:47  23       Q.  Did he ever direct you on what evidence to

15:47  24   collect?

15:47  25       A.  No.

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

15:47  1          Q.  Did he ever direct you about what charges could
15:47  2     be brought against Ms. Herrera?
15:47  3          A.  No, ma'am.
15:47  4          Q.  Do you have any reason to believe that he
15:47  5     directed either Sergeant Aguirre or Investigator Muniz
15:47  6     about what steps to take in the investigation?
15:47  7          A.  No, ma'am.
15:47  8          Q.  Do you have any reason to believe that he ever
15:47  9     spoke directly to Investigator Muniz or Sergeant
15:47 10     Aguirre at all about Ms. Herrera's case?
15:47 11          A.  No.  I don't know, ma'am, no.
15:47 12          Q.  Did either Investigator Muniz or Sergeant
15:48 13     Aguirre at any time tell you that they had gotten
15:48 14     directions from Sheriff Fuentes about what to do in the
15:48 15     investigation?
15:48 16          A.  No, ma'am.
15:48 17          Q.  You had a lot of questions today that were
15:48 18     presented as does -- did -- would somebody call the
15:48 19     DA's office.
15:48 20               When the plaintiff's lawyer referred to
15:48 21     the DA's office, can you tell me everybody that that
15:48 22     could have included.
15:48 23          A.  At the DA's office?  Like who called or who was
15:48 24     at the office?
15:48 25          Q.  If there was a reference to some communication

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

15:48 1    with the DA's office, who all could that have included?

15:48 2        A.  Any DA, either investigator, a secretary, an

15:48 3    attorney that worked there in the office.

15:48 4        Q.  Okay.  So when you gave your answers today

15:48 5    about communications with the DA's office, it could

15:48 6    have been any of those people you just described?

15:48 7        A.  Yes.  But I think in the beginning she

15:48 8    mentioned that DA would either be Mr. Ramirez, Alex,

15:49 9    and/or Abel, I think.

15:49 10       Q.  Okay.  So --

15:49 11       A.  Could be wrong.

15:49 12       Q.  I just want to be clear.  There were times when

15:49 13   you were asked questions about a communication with ADA

15:49 14   Barrera, for example.  Do you recall those questions?

15:49 15       A.  Yes.

15:49 16       Q.  Okay.  And in those questions, it was clear if

15:49 17   you were giving a response, you were talking about

15:49 18   ADA Barrera.  Do you agree?

15:49 19       A.  Yes.

15:49 20       Q.  All right.  And questions where you were just

15:49 21   asked about the DA's office and you gave an answer,

15:49 22   could that have included somebody in addition to

15:49 23   ADA Barrera or DA Ramirez?

15:49 24       A.  Yes.

15:49 25       Q.  All right.  You were only present for one call

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

15:49 1    that Investigator Muniz had with ADA Barrera, correct?

15:49 2        A.  Yes.

15:49 3        Q.  You testified that about a few times today,

15:50 4    right?

15:50 5        A.  Yes, ma'am.

15:50 6        Q.  So you don't actually know for certain and

15:50 7    cannot testify under oath about how many other times

15:50 8    Investigator Muniz did or did not speak to ADA Barrera,

15:50 9    can you?

15:50 10       A.  No --

15:50 11            MS. GARZA:  Objection, leading.

15:50 12       A.  -- I can't.

15:50 13       Q.  You can't testify to that, can you?

15:50 14            MS. GARZA:  Objection, leading.

15:50 15       A.  No, ma'am, I can't.

15:50 16       Q.  All right.  And, similarly, you were never

15:50 17   present for a conversation that you recall with ADA

15:50 18   Villarreal, correct?

15:50 19       A.  I don't recall that conversation, ma'am.

15:50 20       Q.  Okay.  And so you wouldn't be able to testify

15:50 21   under oath how many times ADA Villarreal may have

15:50 22   spoken to somebody in your office, right?

15:50 23            MS. GARZA:  Objection, leading.

15:50 24       A.  Correct.

15:50 25       Q.  So when you were asked questions like, "Well,

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

15:50  1      Investigator Muniz would have spoke to -- to ADA

15:51  2      Barrera often," you actually can't testify whether that

15:51  3      happened, can you?

15:51  4              MS. GARZA:  Objection, leading.

15:51  5      Objection, vague.

15:51  6        A.  Not how many times or how often.

15:51  7        Q.  Okay.  Because really, the only time that

15:51  8      you're able to testify for sure happened is the

15:51  9      conversation that you were present for, right?

15:51  10              MS. GARZA:  Objection, leading.

15:51  11        A.  Yes.

15:51  12        Q.  In the conversation -- the only conversation

15:51  13      that ADA Barrera had with Investigator Muniz that you

15:51  14      witnessed, did ADA Barrera tell Investigator Muniz what

15:51  15      evidence she needed to collect?

15:51  16        A.  I don't recall what was exactly said during

15:51  17      that -- that conversation.  Like I can't...

15:51  18        Q.  Okay.  You gave an answer earlier that in that

15:51  19      call, I think you said the DA's office was on board,

15:52  20      something to that effect.

15:52  21              Is it your testimony that ADA Barrera

15:52  22      actually used those words in the conversation that you

15:52  23      overheard, that the DA's office was on board?

15:52  24        A.  No.  I used that as a -- as a, like, okay.

15:52  25      They're on board, you know.  They're -- they're going

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

15:52  1    to help us with this case.  You know, not -- I don't

15:52  2    know -- make sense what I said.

15:52  3        Q.  Yeah.  I just wanted to know if your testimony

15:52  4    was that ADA Barrera specifically said, "Hey, we're on

15:52  5    board," and she used that phrase, or if that's just how

15:52  6    you're describing the conversation.

15:52  7        A.  That's how I'm describing us working together.

15:52  8        Q.  Okay.  And that help that you just described

15:52  9    was in trying to figure out whether Jasiel Herrera,

15:52 10    who's listed on the front of Exhibit 40, Lizelle's son,

15:52 11    was an individual for the purpose of the homicide

15:53 12    statute, right?

15:53 13                MS. GARZA:  Objection --

15:53 14        A.  Yes.

15:53 15                MS. GARZA:  Objection, leading.

15:53 16    Objection, mischaracterizes prior testimony; assumes

15:53 17    facts not in evidence.

15:53 18        A.  Well, it was to -- to figure out if -- you

15:53 19    know, about the fetus, and yes, no, you know, the

15:53 20    living person.  So the name there, yes.

15:53 21        Q.  That was what you were calling ADA Barrera for

15:53 22    help on, right?

15:53 23        A.  Yes.

15:53 24                MS. GARZA:  Same objections.

15:53 25        Q.  Do you understand that Ms. Gonzalez has accused

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

230

15:53 1  the sheriff of conspiring with the district attorney

15:53 2  and assistant district attorney to prosecute

15:53 3  Ms. Herrera because she had an abortion?  Do you

15:53 4  understand that?

15:53 5      A.  Yes.

15:53 6      Q.  Okay.  At any point during the investigation

15:53 7  between January 2022 and the end of March of 2022, did

15:53 8  you observe anything that makes you believe in fact

15:54 9  that Sheriff Fuentes was conspiring with the ADA and

15:54 10 the DA to prosecute Ms. Herrera because she had an

15:54 11 abortion?

15:54 12     A.  No, ma'am.

15:54 13     Q.  Have you ever heard Sheriff Fuentes -- Sheriff

15:54 14 Fuentes direct anybody in the sheriff's office to find

15:54 15 out from the hospital who has had an abortion so that

15:54 16 they could be investigated?

15:54 17     A.  No, ma'am.

15:54 18     Q.  Does the sheriff's office have an agreement

15:54 19 with the Starr County Memorial Hospital to seek out

15:54 20 women who have had abortions to be criminally

15:54 21 investigated?

15:54 22     A.  No, ma'am.

15:54 23     Q.  Has that ever happened?

15:54 24     A.  Not to my knowledge.

15:54 25     Q.  And how long have you been with the sheriff's

Electronically signed by Donna McCown (101-253-986-8079)                    2561a1ea-cb01-4e31-a726-7688565f89c9

244

```
            IN THE UNITED STATES DISTRICT COURT
           FOR THE SOUTHERN DISTRICT OF TEXAS
                    McALLEN DIVISION
LIZELLE GONZALEZ                )(
        Plaintiff               )(
                                )(
VS.                             )(    CIVIL ACTION NO.
                                )(    7:24-cv-00132
GOCHA ALLEN RAMIREZ,            )(
ALEXANDRIA LYNN BARRERA,        )(
RENE FUENTES, and STARR         )(
COUNTY, TEXAS                   )(
        Defendants              )(
```

### REPORTER'S CERTIFICATE

        I, DONNA McCOWN, Certified Court Reporter,
certify that the witness, LENARD FUENTES, was duly
sworn by me, and that the deposition transcript is a
true and correct record of the testimony given by the
witness in person on MAY 2, 2025, and that the
deposition was reported by me in stenograph and was
subsequently transcribed under my supervision.

        Pursuant to Federal Rule 30(e)(2), a review of
the transcript was requested.
        I FURTHER CERTIFY that I am not a relative,
employee, attorney or counsel of any of the parties,
nor a relative or employee of such attorney or counsel,
nor am I financially interested in the action.

        WITNESS MY HAND on this the _____ day
_____, 2025.


_____
DONNA McCOWN, Texas CSR 6625
Expiration Date:  01-31-26
Bryant & Stingley, Inc., CRN No. 41
P.O. Box 3420
Harlingen, Texas  78551
(956) 428-0755

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**