IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ              ) (
      Plaintiff              ) (
                        ) (
VS.                           ) (   CIVIL ACTION NO.
                        ) (   7:24-cv-00132
GOCHA ALLEN RAMIREZ,          ) (
ALEXANDRIA LYNN BARRERA,       ) (
RENE FUENTES, and STARR       ) (
COUNTY, TEXAS                 ) (
      Defendants             ) (

_____

ORAL AND VIDEOTAPED DEPOSITION OF
JUDITH SOLIS
JUNE 6, 2025

_____


      ORAL AND VIDEOTAPED DEPOSITION OF JUDITH SOLIS,

produced as a witness at the instance of the PLAINTIFF,

taken in the above-styled and numbered cause on

JUNE 6, 2025, between the hours of 10:09 a.m. and

1:58 p.m., reported stenographically by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at Denton Navarro Rodriguez Bernal

Santee & Zech, PC, 701 East Harrison, Suite 100,

Harlingen, Texas, pursuant to the Federal Rules of

Civil Procedure and any provisions stated on the

record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

```
                        APPEARANCES
        COUNSEL FOR PLAINTIFF:
              ELIZABETH JARIT
              AMERICAN CIVIL LIBERTIES UNION
              SENIOR STAFF ATTORNEY
              125 Broad Street, 18th Floor
              New York, NY  10004
              SARAH CORNING
              AMERICAN CIVIL LIBERTIES UNION TEXAS
              Staff Attorney
              P.O. Box 8306
              Houston, Texas  77288
              DAVID A. DONATTI, via Zoom
              AMERICAN CIVIL LIBERTIES UNION OF TEXAS
              P.O. Box 12905
              Austin, Texas  78711-2905

              JUNE (ANNIE) GERSH, via Zoom
              KIERA GODDU, via Zoom
              AMERICAN CIVIL LIBERTIES UNION
              125 Broad Street
              New York, New York  10004

              MARIANA (MOLLY) KOVEL, via Zoom
              AMERICAN CIVIL LIBERTIES UNION
              SENIOR STAFF ATTORNEY
              125 Broad Street, 18th Floor
              New York, NY  10004

              LAUREN JOHNSON, via Zoom
              AMERICAN CIVIL LIBERTIES UNION
              915 15th Street NW
              Washington, DC  20005
        COUNSEL FOR DEFENDANTS:
              RICARDO J. NAVARRO
              DENTON NAVARRO RODRIGUEZ BERNAL
              SANTEE & ZECH, P.C.
              549 North Egret Bay Boulevard, Suite 200
              League City, Texas  78550
        ALSO PRESENT:
              Rene Ortiz, Videographer
              Emma Gray, via Zoom
```

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

3

```
1                            INDEX

2                                                   PAGE
     Appearances ...................................   2
3
     JUDITH SOLIS
4    Examination by Ms. Jarit ......................   4

5    Errata Sheet/Signature Page ................... 133

6    Reporter's Certificate ........................ 135

7    Attached to the end of the transcript:  Stipulations

8                          EXHIBITS

9    NUMBER  DESCRIPTION                             PAGE

10     44    E-mail from Ms. Garcia .................  73

11     45    E-mail from Ms. Solis ..................  77

12     46    WhatsApp Messages ......................  93

13     47    Petition for Divorce, Ismael Herrera .... 108

14     48    Texas Disciplinary Rules of Professional
             Conduct ............................... 118
15
       49    Text Messages, Ms. Muniz and Ms. Barrera  129
16

17

18

19

20

21

22

23

24

25
```

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

4

| | | |
|---|---|---|
| 10:09 | 1 | THE VIDEOGRAPHER:  Today is June 6, 2025. |
| 10:09 | 2 | This is the deposition of Judith Solis.  It is |
| 10:09 | 3 | 10:09 a.m.  We're on the record. |
| 10:09 | 4 | JUDITH SOLIS, |
| 10:09 | 5 | having been duly sworn, testified as follows: |
| 10:09 | 6 | EXAMINATION |
| 10:09 | 7 | BY MS. JARIT: |
| 10:09 | 8 | Q.  Good morning, Ms. Solis. |
| 10:09 | 9 | A.  Good morning. |
| 10:09 | 10 | Q.  My name is Elizabeth Jarit.  We represent |
| 10:10 | 11 | Plaintiff Lizelle Gonzalez in her civil lawsuit against |
| 10:10 | 12 | District Attorney Gocha Allen Ramirez, Assistant |
| 10:10 | 13 | District Attorney Alexandria Barrera, Sheriff Rene |
| 10:10 | 14 | Fuentes, and Starr County. |
| 10:10 | 15 | Thank you for coming in today.  Are you |
| 10:10 | 16 | represented by counsel for today's deposition? |
| 10:10 | 17 | A.  I guess technically yes as a County employee. |
| 10:10 | 18 | MR. NAVARRO:  Yes.  I mean, she's |
| 10:10 | 19 | currently assistant district attorney, so in her |
| 10:10 | 20 | official capacity, she is represented.  She's not a |
| 10:10 | 21 | party to the lawsuit. |
| 10:10 | 22 | MS. JARIT:  Right.  Of course.  Of course. |
| 10:10 | 23 | MR. NAVARRO:  So, yeah, the practical |
| 10:10 | 24 | matter is she is represented by us. |
| 10:10 | 25 | MS. JARIT:  Okay.  Thank you very much. |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                84353a2f-0706-4d39-b642-91c972629fbe

| | | |
|---|---|---|
| 10:18 | 1 | She was a stay-at-home mom until very recently. |
| 10:18 | 2 | Q.  Okay.  We're going to switch talking about your |
| 10:18 | 3 | employment. |
| 10:18 | 4 | A.  Okay. |
| 10:18 | 5 | Q.  So where do you currently work? |
| 10:18 | 6 | A.  I'm assistant district attorney for the Starr |
| 10:18 | 7 | County DA -- or the 229th Judicial District Attorney's |
| 10:18 | 8 | Office. |
| 10:18 | 9 | Q.  Okay.  How long have you been an ADA? |
| 10:18 | 10 | A.  This is my fifth year there.  When Gocha got |
| 10:18 | 11 | elected, I went in with him that January. |
| 10:18 | 12 | Q.  And that would be January 2020? |
| 10:18 | 13 | A.  Correct. |
| 10:18 | 14 | Q.  And before -- before that, where were you |
| 10:19 | 15 | employed? |
| 10:19 | 16 | A.  Before that, I was self-employed.  I had my own |
| 10:19 | 17 | private law firm.  I did that for approximately eight |
| 10:19 | 18 | or nine years. |
| 10:19 | 19 | Before that, I was a misdemeanor |
| 10:19 | 20 | prosecutor at the county attorney's office.  I was an |
| 10:19 | 21 | assistant county attorney.  Did that for about eight or |
| 10:19 | 22 | nine years. |
| 10:19 | 23 | Q.  Okay.  And before that? |
| 10:19 | 24 | A.  So I worked for Gocha and Ana Lisa Garza |
| 10:19 | 25 | roughly a year.  That was like right out of law school, |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

10:19 1    and then I became the assistant county attorney.

10:19 2        Q.  When you say you worked for Gocha, was that in

10:19 3    private practice?

10:19 4        A.  Correct.  He and Ana Lisa Garza owned a law

10:19 5    firm.

10:19 6        Q.  And what kind of practice was that?

10:19 7        A.  Civil mostly.  Well, I mostly did civil.  I

10:19 8    mean, I guess they did everything.  They did personal

10:20 9    injury.  They did criminal.  Mostly Gocha did criminal.

10:20 10   Mostly Ana Lisa did personal injury.  And then I

10:20 11   basically did divorces there.

10:20 12       Q.  And how long was that for?

10:20 13       A.  I don't really remember.  I mean, at least a

10:20 14   year.

10:20 15       Q.  Yeah.  Was that your first job out of law

10:20 16   school?

10:20 17       A.  Yeah.

10:20 18       Q.  So going back to your employment at the DA's

10:20 19   office, who's your supervisor?

10:20 20       A.  I would say Gocha.

10:20 21       Q.  And just to clarify, when we say "Gocha," we're

10:20 22   talking about the DA, right?

10:20 23       A.  Correct.

10:20 24       Q.  That's okay.  That's fine.  You can continue to

10:20 25   call him Gocha.  That's totally fine.

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

10:20  1        A.  Okay.

10:20  2        Q.  Are you in a particular department --

10:20  3        A.  I am assigned to the 381st, so Alex is first

10:20  4   chair there at the 381st, and then I'm under her.

10:21  5        Q.  Okay.  So just to clarify, if Alex is first

10:21  6   chair, but -- do you report to her or do you report to

10:21  7   Gocha?

10:21  8        A.  I guess to Alex, because, I mean, to the extent

10:21  9   that I do.  I would say I don't go bother the boss

10:21  10  with, like, hey, you know, defense counsel is bugging

10:21  11  me about this or that.  I would bring it up to her.

10:21  12       Q.  And when you say "the 381st," what does that

10:21  13  mean?

10:21  14       A.  The court, the judicial district court.  Okay.

10:21  15  Jose Luis Garza's court.

10:21  16       Q.  Okay.

10:21  17       A.  Okay.  Sorry.

10:21  18       Q.  That's okay.  What are the scope of your

10:21  19  responsibilities as an ADA?

10:21  20       A.  To prepare for grand jury, present to grand

10:21  21  jury, and then to handle the weekly docket.  So there's

10:21  22  two courts that we -- well, there's other courts,

10:21  23  right, because there's Jim Hogg, and there's Duval, but

10:21  24  I don't go over there.  Abel -- Abel and the boss

10:22  25  mostly do that.

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

10:22 1          There's a 229th, and Abel and the boss and

10:22 2    Alfredo handle that.  So then the 381st is Alex's and

10:22 3    mine, and that's a weekly docket.  So preparing for

10:22 4    docket basically, and that's criminal and civil,

10:22 5    because we also do forfeitures as a DA's office.

10:22 6          So preparing for that and making sure that

10:22 7    we resolve cases or prep for trial if they have to go

10:22 8    to trial and things to that -- things of that nature.

10:22 9    Q.  Okay.  What's your highest degree of education?

10:22 10   A.  I have a juris doctorate.

10:22 11   Q.  From which school?

10:22 12   A.  St. Mary's School of Law San Antonio.

10:22 13   Q.  What year did you graduate?

10:22 14   A.  2001.

10:22 15   Q.  And do you have a practice of law outside of

10:22 16   the DA's office as well?

10:22 17   A.  Yes, I do.

10:22 18   Q.  How long have you had that practice?

10:22 19   A.  Since before I joined the DA's office.

10:23 20   Q.  So you've -- you've kept the practice --

10:23 21   A.  Correct.

10:23 22   Q.  -- that you were talking about before.  You

10:23 23   just kept it on --

10:23 24   A.  The civil, correct.

10:23 25   Q.  And I think you said it's a civil practice,

Electronically signed by Donna McCown (101-253-986-8079)                                84353a2f-0706-4d39-b642-91c972629fbe

10:23  1    correct?

10:23  2          A.   Correct.

10:23  3          Q.   Okay.  And what kinds of cases do you primarily

10:23  4    work on?

10:23  5          A.   Divorces, family law, and some personal injury.

10:23  6          Q.   And when do you work on your private firm

10:23  7    obligations?

10:23  8          A.   Usually after 5:00, right, like, say, 5:00 to

10:23  9    9:00, or during lunch, or sometimes I also walk out

10:23 10    there if I have to go out there.  I have two assistants

10:23 11    that are there, but basically, you know, it's after

10:23 12    work.

10:23 13          Q.   Okay.  If it's during the day, do you have to

10:23 14    take time off from your ADA job in order to work in

10:24 15    your private practice?

10:24 16          A.   I do if, like, let's say I have a contested

10:24 17    hearing, right, on a Thursday -- and I say a Thursday,

10:24 18    because usually county court at law, we only have one,

10:24 19    the County of Starr.  All divorces by default have to

10:24 20    go to that court.

10:24 21                So, you know, I may tell the girls, "Hey,

10:24 22    I'm going to be out in the morning."  But that's if I

10:24 23    have a contested, but for the most part, no.

10:24 24          Q.   Okay.  Is that --

10:24 25          A.   Or sometimes yes, I've taken off before.  I

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

10:24 1   rarely do anything in Hidalgo, but I have remembered

10:24 2   having to take off a morning to go take care of

10:24 3   something in Hidalgo.  That was my own private

10:24 4   business.

10:24 5        Q.  And would that be -- would you have to ask

10:24 6   permission to do that from anyone at the DA's office?

10:24 7        A.  Not really.

10:24 8        Q.  Okay.

10:24 9        A.  I mean.

10:24 10       Q.  Would it be recorded anywhere like in a time

10:25 11  sheet?

10:25 12       A.  Not really.  I don't know.  You know, I mean,

10:25 13  sometimes it may.  I do take time off, but like I don't

10:25 14  really ask anyone.  If anything, I'll just tell the

10:25 15  main secretary Yadi, like, "Hey, I'm going to be out

10:25 16  this morning."  Sometimes, you know, I'll tell her.

10:25 17       Q.  So tell me a little bit -- going back to the

10:25 18  DA's office.  Where is it located?

10:25 19       A.  401 North Britton Avenue, Rio Grande City,

10:25 20  Texas, third floor.

10:25 21       Q.  And do you go into the office in person?

10:25 22       A.  Yes.  Every day.

10:25 23       Q.  Every day.  And what are your hours?

10:25 24       A.  It varies.  Usually about 9:00 to 4:00 is when

10:25 25  I'm there typically.

Electronically signed by Donna McCown (101-253-986-8079)                                84353a2f-0706-4d39-b642-91c972629fbe

19

10:25  1        Q.  And at the DA's office, do you have your own

10:25  2    personal office?

10:25  3        A.  Yes.

10:25  4        Q.  With a door?

10:25  5        A.  Yes.

10:25  6        Q.  And where is that office located in relation to

10:25  7    Alex's office?

10:26  8        A.  Next door to Alex's.

10:26  9        Q.  And how about Abel's?

10:26  10       A.  So, I mean, it's really small in there.  So

10:26  11   it's -- Abel has, like, I guess what we would consider

10:26  12   the bigger office with the nice window.  And then if

10:26  13   you open the door and you cross, here's Alex.

10:26  14              And then I'm in front of her.  And then

10:26  15   there's -- it's the hall and the coffee break room, and

10:26  16   then you walk a little more, and it's the cubicles,

10:26  17   or -- or as you enter, that's what you first see is the

10:26  18   girls, the cubicles and the girls there.  They don't

10:26  19   have their own private offices.  Well, two do, but for

10:26  20   the most part, they have cubicles.

10:26  21       Q.  When you say "the girls," do you mean like --

10:26  22   who do you mean?

10:26  23       A.  I don't -- the other staff that we have who are

10:26  24   like clerks, receptionists, our paralegals.  I say

10:26  25   girls because they happen to all be female.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

10:26 1     Q. Yeah. And where's Gocha office in relation to

10:26 2  everyone else?

10:26 3     A. So if you -- you know, you keep walking. You

10:27 4  enter the office, right. You go to the right to come

10:27 5  to our office, but then there's the cubicles, and then

10:27 6  you go left.

10:27 7          We have another ADA, Alfredo, and he has

10:27 8  his own office with a door, and then Yadi, and they

10:27 9  have their offices with doors. And then it's the other

10:27 10  girls that are, again, like paralegals, right, or

10:27 11  intake clerks. And then it's the boss. And he's got

10:27 12  the big office with all the windows.

10:27 13     Q. And do you folks keep -- typically keep their

10:27 14  doors open while they're working?

10:27 15     A. No, huh-uh. I always keep mine closed.

10:27 16     Q. Closed?

10:27 17     A. Yeah. I tend to keep it closed.

10:27 18     Q. So from January to April of 2022, how many ADAs

10:27 19  worked at the DA's office?

10:27 20     A. For sure three: Abel, Alex, and I. And then I

10:28 21  don't remember if Alfredo was already with us. Fred

10:28 22  came in later. He may have been there. Yeah. No, he

10:28 23  was there. He was already there.

10:28 24     Q. And how many investigators were working for the

10:28 25  DA's office at that time?

Electronically signed by Donna McCown (101-253-986-8079)         84353a2f-0706-4d39-b642-91c972629fbe

10:28  1      A.   Probably I would say three.  We tend to have

10:28  2  three.

10:28  3      Q.   Do you recall who they were?

10:28  4      A.   For sure Trinidad, Trini, Lopez, and for sure

10:28  5  Rick Saenz.

10:28  6      Q.   And then maybe someone else?

10:28  7      A.   Right.  Probably Chavo, Santiago Alaniz.  If

10:28  8  not, then Uvaldo Ramirez, Juan.

10:28  9      Q.   Who do the investigators report to in the

10:28 10  office?

10:28 11      A.   I guess the boss.

10:28 12      Q.   Meaning Gocha?

10:28 13      A.   Sorry.  Yes.  They refer to Gocha.

10:28 14      Q.   What are their responsibilities, the

10:29 15  investigators I'm talking about?

10:29 16      A.   Sometimes they'll work up cases or they'll

10:29 17  work, I guess, in conjunction with, like, our local law

10:29 18  enforcement agencies.

10:29 19      Q.   What does it mean to work up a case?

10:29 20      A.   Like maybe they have, like, a case that they're

10:29 21  working, like, with HIDTA, because we're also -- we

10:29 22  have HIDTA agents, the High Intensity Drug Trafficking

10:29 23  Agency, which is like we have partners with other

10:29 24  agencies, like our local, right?

10:29 25           Well, not just our local, because I guess

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

10:29 1   BP as well.  So like Rio, Roma, the sheriff's office --

10:29 2   Rio PD I should say, Roma PD, Starr County Sheriff's

10:29 3   Office.  And so then they work in conjunction.

10:29 4           So sometimes, like, they might work up a

10:29 5   case like a drug trafficking case or whatnot.  Mostly,

10:29 6   it's drug trafficking.  I don't think they've done

10:29 7   any -- mostly drug trafficking.

10:29 8       Q.  And when you say "work up a case," do you mean

10:29 9   like investigate that case?

10:29 10      A.  Right, yes.

10:30 11      Q.  Okay.  And is that sometimes preindictment?

10:30 12      A.  Yes.

10:30 13      Q.  How do the investigators get assigned tasks

10:30 14   related to a case?

10:30 15      A.  I don't know.  I mean, I don't know for sure.

10:30 16      Q.  Have you ever asked an investigator to do

10:30 17   anything on one of your cases?

10:30 18      A.  Yes.  Yes, I have.

10:30 19      Q.  What kinds of things?

10:30 20      A.  Let's say we're going to go to trial.  And then

10:30 21   it's like, "Hey, make sure that, you know, we have

10:30 22   these witnesses.  Make sure you have their phone

10:30 23   numbers.  Make sure you have their e-mail addresses.

10:30 24   Make sure they know, like call them.  Subpoena this

10:30 25   guy.  We're having a motion to revoke.  I need the

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

10:30  1    officer here.  If he can't be here, let me know why.
10:30  2    Please put it in writing so that we can have that for
10:30  3    the judge."
10:30  4            Most of my interaction with our
10:30  5    investigators, that's what it is, asking them to locate
10:30  6    people if we're going to have contested hearings.  I
10:30  7    rarely go to trial, but mostly I will have contested
10:30  8    hearings, like motions to revoke, motions to
10:31  9    adjudicate, stuff like that, and they'll -- they'll
10:31  10   help with that.
10:31  11       Q.  Do the investigators -- when the investigators
10:31  12   are doing any of those tasks that you mentioned, they
10:31  13   would have -- they get their assignment from an
10:31  14   attorney working at the office?
10:31  15       A.  Again, I'm not sure it's exclusively, but for
10:31  16   sure when I've dealt with, like, Trini or Rick, that's
10:31  17   my interaction with them.  I'll just ask them to help
10:31  18   me in that way.
10:31  19       Q.  Can they decide on their own to, like, tell
10:31  20   members of the sheriff's office to do something without
10:31  21   attorney approval?
10:31  22       A.  I would think so.
10:31  23            MR. NAVARRO:  Can you clarify what
10:31  24   investigators we're talking about?
10:31  25            MS. JARIT:  Sure.  I'm sorry.

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

10:31  1          Q.  The DA's office investigators.

10:31  2          A.  Okay.

10:31  3          Q.  Can they on their own decide to direct members

10:32  4    of the sheriff's office to do something?

10:32  5          A.  I guess I'm not really sure.

10:32  6          Q.  Do -- have you ever spoken with the

10:32  7    investigators about cases they are investigating

10:32  8    preindictment?

10:32  9          A.  Yes.

10:32  10         Q.  Do they sometimes ask the attorneys, like,

10:32  11   legal questions?

10:32  12         A.  Yes.

10:32  13         Q.  And do the attorneys give them guidance, legal

10:32  14   guidance for their investigation?

10:32  15         A.  I know I have, yes.

10:32  16         Q.  So in January of 2022, both ADA Barrera and

10:33  17   ADA Villarreal were first assistants, correct?

10:33  18         A.  I think so.

10:33  19         Q.  Okay.  What supervisory responsibilities did

10:33  20   ADA Barrera have?

10:33  21         A.  She has a lot to do with crime victims, the

10:33  22   crime victims unit.  I forgot to mention them.  We also

10:33  23   have a crime victims unit, but they're not really

10:33  24   housed with us.

10:33  25         Q.  What does that mean?

Electronically signed by Donna McCown (101-253-986-8079)                                        84353a2f-0706-4d39-b642-91c972629fbe

10:44 1    handle those, because, I mean, they're -- they're the

10:44 2    first chairs.  And so I guess they will, because I've

10:44 3    never prepped one, like I've never prepped a murder

10:44 4    case or a sexual assault of a child.

10:44 5            But, like, if they're helping, like

10:44 6    they're -- they're advising, like a state jail felony,

10:44 7    because they're not going to -- they -- I don't know if

10:44 8    they -- they may.  It would be like, "Hey, Judy, look

10:44 9    at this one."

10:44 10    Q.  It would be in their discretion, though, to

10:44 11    kind of like take that case or not?

10:45 12    A.  Yeah, I would say so.

10:45 13    Q.  Do you have -- do the attorneys have regular

10:45 14    meetings in the office to talk about their cases?

10:45 15    A.  No.  Usually, if we have a meeting, it's

10:45 16    because somebody is going to go trial, and it's like

10:45 17    all hands on deck, even if -- let's say it's in the

10:45 18    229th.

10:45 19            Abel would be like, "I don't want you

10:45 20    going on vacation or anything," like "I want all hands

10:45 21    on deck," because if, like, him and the boss or him and

10:45 22    Alex are going to present the case, he's like, "You

10:45 23    know, y'all are going to be here to handle the rest of

10:45 24    the docket," or, for example, like, "If I'm going to go

10:45 25    t Jim Hogg," or he -- I don't know whether -- if Abel

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

| | | |
|---|---|---|
| 10:45 | 1 | is going to be in Jim Hogg and Duval, so maybe Alex and |
| 10:45 | 2 | the boss are going to help over there.  Then it's "Hey, |
| 10:45 | 3 | Judy and Fred, you know, make sure y'all are here in |
| 10:46 | 4 | the office here." |
| 10:46 | 5 | That's -- that's usually what our meetings |
| 10:46 | 6 | are about, like make sure -- when we've had them, |
| 10:46 | 7 | that's what it's been about, like, "Hey, you know, |
| 10:46 | 8 | we're about to go to trial," or "Hey, you know, we're |
| 10:46 | 9 | about to go to trial, and you and Fred should sit in |
| 10:46 | 10 | and learn." |
| 10:46 | 11 | So those tend to be our meetings.  Usually |
| 10:46 | 12 | trial, that's when I can really remember we're going to |
| 10:46 | 13 | have, like, a meeting, all hands on deck. |
| 10:46 | 14 | Q.  How do the ADAs keep each other updated on the |
| 10:46 | 15 | progress of their cases? |
| 10:46 | 16 | MR. NAVARRO:  I'm sorry.  I didn't hear |
| 10:46 | 17 | you. |
| 10:46 | 18 | Q.  Sorry.  How do the ADAs keep each other updated |
| 10:46 | 19 | about, like, the status or progress of the cases |
| 10:46 | 20 | they're working on? |
| 10:46 | 21 | A.  Usually, like my docket, for the most part, |
| 10:46 | 22 | again, we have autonomy, but every once in a while, |
| 10:46 | 23 | I'll walk over to the boss' office and be like, "Hey, |
| 10:46 | 24 | you know, this is what I'm doing this week," you know |
| 10:46 | 25 | "And these are the cases I'm handling.  This is how I'm |

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

10:47  1     going to resolve them."

10:47  2               But for the most part, we don't.  I mean,

10:47  3     again, like if it's going to go to trial, yes.  Again,

10:47  4     I've only taken one to trial myself personally, me and

10:47  5     Fred.  And then we definitely are advising them --

10:47  6     mostly asking for advice, but other than that, I'm

10:47  7     going to get my cases, you know, in the 381st, I'm

10:47  8     going to see the docket, see what I can handle, and

10:47  9     take care of them.

10:47 10          Q.  When you do talk to the other ADAs or Gocha

10:47 11     about your cases, do the conversations involve

10:47 12     sometimes asking about, like, legal questions?

10:47 13          A.  Oh, yes.

10:47 14          Q.  What kinds of legal questions would you go to a

10:48 15     colleague about?

10:48 16          A.  I mean, usually it's about, like, procedure.  I

10:48 17     would say that's what I mostly go about.  Procedure,

10:48 18     how to handle, like, motions to suppress where he would

10:48 19     advise me, you know, or "Hey, you've gone up against

10:48 20     'x' defense counsel.  What should I expect?  How do I

10:48 21     best counter his argument?"

10:48 22               A lot of, "Hey, what's your case law on,

10:48 23     you know, motion to suppress or warrantless searches?

10:48 24     What is your case law?  Give me your" -- Alex and Abel

10:48 25     are real good about having case law or they remember,

Electronically signed by Donna McCown (101-253-986-8079)                                84353a2f-0706-4d39-b642-91c972629fbe

10:48  1  you know, you've got to go look at this case for -- you
10:48  2  know, you've got to go -- the smuggling, right?  That,
10:48  3  like, recently updated.  It's like, "Don't forget.  You
10:48  4  know, now it's this."
10:48  5          So that tends to be -- I guess I tend to
10:48  6  ask -- those are the questions that I ask.  I can only
10:48  7  answer, right, for myself.  But I tend to -- "How do I
10:48  8  counter?  How do I prep?  What should I expect from
10:49  9  this one?  What's your best argument?  What argument
10:49 10  would you use?  What case law would you use?  What do
10:49 11  you think I should argue?"
10:49 12          And it tends to be evidence.  Like things
10:49 13  like that, like pretrial stuff, sentencing.  Again, the
10:49 14  one time I went to trial, I hadn't done a jury charge,
10:49 15  so I definitely was like, "Hey, guys, help me out, you
10:49 16  know, with that," and they did.
10:49 17      Q.  Would it be more common to go to your
10:49 18  colleagues when the charge is more serious?
10:49 19      A.  I mean, I guess, yes.  I would.  If I was
10:49 20  handling something real serious, I definitely, I think,
10:49 21  I would be picking their brains, like, "Help me out,"
10:49 22  because I don't tend to do those.  I haven't done,
10:49 23  like, a murder.  I haven't done any of those.
10:50 24      Q.  Do you often have informal conversations, like
10:50 25  at lunch or in the pantry, about your cases?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

10:50 1    A.  I mean, yeah.  Sometimes.  Sometimes we'll have

10:50 2    informal talks, yeah.

10:50 3    Q.  Perhaps if it's an interesting -- more

10:50 4    interesting case?

10:50 5    A.  Sometimes like it's a defendant that we know,

10:50 6    right, or it's a defendant that we -- has been through

10:50 7    it before, or, "Hey, you know, defense counsel brought

10:50 8    up this argument," you know, or "Hey, the judge yelled

10:50 9    at me, and that was on your -- or on your strategy on

10:50 10   how to handle that."  That tends to be mostly.

10:50 11   Q.  Okay.  So DA Ramirez is the top of the chain of

10:51 12   command in the office, correct?

10:51 13   A.  Yes.

10:51 14   Q.  Okay.  He supervises all of the prosecutions

10:51 15   occurring in the office, right?

10:51 16   A.  At the end of day, yes, I would say so.

10:51 17   Q.  Does he get briefed on prosecutions for major

10:51 18   crimes?

10:51 19   A.  I would think so, yes.

10:51 20   Q.  If there's a murder investigation, would the

10:51 21   ADAs make sure the DA knows about it?

10:51 22   A.  I don't know.  I've never done a murder

10:51 23   investigation.  I've never done a -- I haven't handled,

10:51 24   like, one of those really egregious ones.  I would --

10:51 25   if I did, if I get assigned one, I would -- I think I

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

10:51  1    would, I mean, yeah.  I'm sure he would want to know,

10:51  2    "Are you doing -- who's helping you?"

10:51  3        Q.  Do you know how many murder cases the office

10:51  4    handles in a given year?

10:51  5        A.  Not too many, thank God.

10:51  6        Q.  Is the district attorney also aware of major

10:51  7    arrests on, for example, murder charges?

10:52  8        A.  I would think so, but I don't know for sure.

10:52  9        Q.  Are there any decisions that require

10:52 10    consultation with the district attorney himself?

10:52 11        A.  Require?

10:52 12        Q.  Or approval by him?

10:52 13        A.  I haven't had that situation arise, maybe

10:52 14    because I handle the less egregious.  He always says,

10:52 15    "I trust your instinct.  You know these cases.  You

10:52 16    know what's going on.  You know more.  Trust your --

10:52 17    trust yourself, your instinct," and -- or "You know

10:52 18    more about it.  If you think that's a fair offer, then

10:52 19    go ahead."

10:52 20            But like a requirement, like, "Hey, Judy,

10:52 21    you better run that by me," no.  I haven't had that

10:53 22    experience yet.

10:53 23        Q.  Are there written policies in the office?

10:53 24        A.  Yes.  We have.  Yeah, definitely when we --

10:53 25    there's some from the County, right, and then there's

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

10:53  1    definitely some from the office.

10:53  2        Q.  What are they?  Let's -- let's start with the

10:53  3    County.

10:53  4        A.  I was going to say.  I'm not -- I mean -- I

10:53  5    mean the -- both of them, like there's general, like,

10:53  6    hey, you know, you can't commit a crime.  You can't

10:53  7    break the law.  You said start with the County?

10:53  8        Q.  Yeah.  So does the County have a -- any written

10:53  9    policies?

10:53 10        A.  Yeah.  They definitely have a lot of them.  I

10:53 11    mean, a lot of them is like if you have -- if you have

10:53 12    a vehicle that the County owns, there's just like a

10:53 13    lot, but I don't.  I used to, and then I was like, I

10:53 14    don't want that responsibility.

10:53 15            And then there's like -- so again, with

10:53 16    that comes, like, a lot.  I remember that, because I

10:53 17    once, like a hot minute, drove a vehicle, and then

10:53 18    they're like, "Don't forget this, and the mileage and

10:53 19    all that."  So I was like, no.  I'll drive my own car.

10:54 20    I mean, they do have a lot of policies.  I wish I could

10:54 21    tell you I knew them.

10:54 22        Q.  Do you recall getting them electronically or

10:54 23    like a hard copy?

10:54 24        A.  A hard copy for sure, and it is in my desk.

10:54 25            MR. NAVARRO:  What are we talking about

Electronically signed by Donna McCown (101-253-986-8079)                84353a2f-0706-4d39-b642-91c972629fbe

41

```
10:54  1    now?
10:54  2              MS. JARIT:  County policies.
10:54  3              THE WITNESS:  The County policies, written
10:54  4    policies.
10:54  5              MR. NAVARRO:  Starr County?
10:54  6              MS. JARIT:  Starr County, yes.
10:54  7              THE WITNESS:  Yeah.
10:54  8              MR. NAVARRO:  What kind of policies?
10:54  9              MS. JARIT:  That was my question.
10:54 10              THE WITNESS:  Right.
10:54 11              MR. NAVARRO:  You're just talking about
10:54 12    policies in general?
10:54 13              THE WITNESS:  Yeah, right.
10:54 14              MS. JARIT:  I was asking if she had
10:54 15    received any written policies at work.
10:54 16              MR. NAVARRO:  Okay.
10:54 17        A.  For sure.  And there's a lot on, like, safety,
10:54 18    picking up stuff.  Some of it doesn't apply to us.
10:54 19        Q.  That's the County policies.  In terms of the
10:55 20    district attorney's office, written policies?
10:55 21        A.  Yeah, we have some.
10:55 22        Q.  What are those?  Is it like one -- one book of
10:55 23    policies or multiple books of policies?
10:55 24        A.  No.  It's -- we were given one.  I'm -- just
10:55 25    like your conduct and your -- don't break the law,
```

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                84353a2f-0706-4d39-b642-91c972629fbe

10:55  1    confidentiality, time stamp, time sheets.  There's a
10:55  2    lot -- there's a lot that sometimes don't involve us,
10:55  3    again, because within our own department, like the
10:55  4    actual DA's office versus the County, a lot of people
10:55  5    drive vehicles for their -- for work, right?  Or
10:55  6    they're issued -- some of them are issued phones.  Some
10:55  7    of them are issued -- obviously, our investigators are
10:55  8    issued weapons.
10:55  9           So there are -- I think there's written
10:55 10    policies about that, but I -- I can't remember them
10:55 11    offhand.  I apologize.
10:55 12       Q.  Again, do you recall if you received them
10:55 13    electronically or hard copy?
10:55 14       A.  I don't recall.
10:56 15       Q.  If the case poses an ethical question, how is
10:56 16    that handled?
10:56 17       A.  If it poses an ethical question, like in what
10:56 18    way?
10:56 19       Q.  So let's -- let's talk specifically about,
10:56 20    like, conflicts of interest.
10:56 21       A.  Okay.
10:56 22       Q.  If the case might pose a conflict of interest,
10:56 23    what would you do?
10:56 24       A.  I notify usually the boss and then the girls,
10:56 25    the clerks, the intake clerks.

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

12:42  1    probably make sure that it's something that is not

12:42  2    going to -- that it will meet the elements.

12:42  3         Q.  That it will meet the elements.  Okay.

12:42  4              Are you aware that DA Ramirez faced a

12:42  5    disciplinary action by the State Bar, correct?

12:42  6         A.  Yes, I'm aware.

12:42  7         Q.  And the grievance committee subpoenaed you to

12:43  8    testify --

12:43  9         A.  Yes.

12:43 10         Q.  -- correct?  Just let me -- I'm sorry.

12:43 11         A.  I'm sorry.

12:43 12         Q.  Just for the record.  I know.  It's hard.

12:43 13              The grievance committee subpoenaed you to

12:43 14    testify regarding the grievance filed against the DA

12:43 15    concerning Lizelle's case, correct?

12:43 16         A.  That is correct.

12:43 17         Q.  Okay.  Did you testify?

12:43 18         A.  Yes.

12:43 19         Q.  Was that by Zoom?

12:43 20         A.  Yes.

12:43 21         Q.  How -- how many times -- like how many dates

12:43 22    did you testify?

12:43 23         A.  Just one time.

12:43 24         Q.  How did you prepare -- without revealing any

12:43 25    confidences that -- or communications you may have had

Electronically signed by Donna McCown (101-253-986-8079)                                      84353a2f-0706-4d39-b642-91c972629fbe

12:43  1    with an attorney representing you, how did you prepare

12:43  2    for that testimony?

12:43  3        A.  I did not.

12:43  4        Q.  Did you review any documents?

12:43  5        A.  No.

12:43  6        Q.  Did you create any documents --

12:43  7        A.  No.

12:43  8        Q.  -- in preparation?

12:43  9            Did the grievance committee interview you

12:43 10    about Lizelle's investigation, like preindictment

12:44 11    investigation?

12:44 12        A.  I don't remember if that was -- if they asked

12:44 13    me that.

12:44 14        Q.  Did they ask you -- did the grievance committee

12:44 15    ask you questions about the decision to charge Lizelle?

12:44 16        A.  I don't think so.

12:44 17        Q.  Did they ask you -- did the grievance committee

12:44 18    ask you about Lizelle's grand jury proceedings?

12:44 19        A.  I don't remember that.

12:44 20        Q.  Did the grievance committee ask you about the

12:44 21    dismissal of her charges?

12:44 22        A.  I don't remember that.

12:44 23        Q.  Were you asked to produce documents to the

12:44 24    committee?

12:44 25        A.  No, not that I remember, no.  No, not that I

Electronically signed by Donna McCown (101-253-986-8079)                                                84353a2f-0706-4d39-b642-91c972629fbe

12:44  1    remember, huh-uh.

12:44  2        Q.  What did the grievance committee ask you about?

12:44  3        A.  My representation of Ismael Herrera.

12:44  4        Q.  Okay.  Did you have -- did you -- did you have

12:45  5    communications with DA Ramirez concerning his

12:45  6    disciplinary proceeding?

12:45  7        A.  No.  I don't remember.  I mean, aside from

12:45  8    getting an e-mail.  No, it wasn't from him.  I think it

12:45  9    was from the Bar saying, "Hey, you're going to testify

12:45 10    on such date."  I don't remember.

12:45 11        Q.  Okay.  Did the DA's office conduct any internal

12:45 12    investigations concerning Lizelle's investigation,

12:45 13    prosecution?

12:45 14        A.  I don't think so.

12:45 15        Q.  Was ADA Barrera disciplined internally within

12:45 16    the DA's office?

12:45 17        A.  I don't know.

12:45 18        Q.  Were there any changes made within the DA's

12:45 19    office to ensure that this sort of thing didn't happen

12:46 20    again?

12:46 21        A.  I don't think so.

12:46 22        Q.  Okay.  Are you familiar with the homicide

12:46 23    chapter of the Penal Code?

12:46 24        A.  Somewhat.

12:46 25        Q.  What do you mean by "somewhat"?

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

12:46  1          A.  I mean, I'm sure I've looked at it.  I'm sure I
12:46  2    had to, not just with my job, but in general, like --
12:46  3    but I don't know it by heart, but I'm familiar with it.
12:46  4          Q.  Each chapter of the Penal Code has -- each
12:46  5    chapter concerns a different category of crimes,
12:46  6    correct?  Like there's a weapons chapter, there's a
12:46  7    homicide chapter --
12:46  8          A.  Oh, yes.
12:46  9          Q.  -- there's --
12:46 10          A.  Yes, correct.
12:46 11          Q.  -- a fraud chapter.
12:46 12          A.  Correct.  Drugs.
12:46 13          Q.  Okay.  Drugs.
12:46 14          A.  Smuggling.
12:46 15          Q.  And in the homicide chapter, there are
12:46 16    different sections within that chapter, correct?
12:47 17          A.  Yes.
12:47 18          Q.  Each section is a different -- each -- each
12:47 19    section lays out a different kind of homicide, correct?
12:47 20          A.  A different kind of -- like degrees?
12:47 21          Q.  Like the first chapter --
12:47 22          A.  Like manslaughter?
12:47 23          Q.  -- is for murder.  Right, correct.
12:47 24          A.  Okay.  Yes.
12:47 25          Q.  Yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                                84353a2f-0706-4d39-b642-91c972629fbe

12:47  1          A.  I'm sorry.  Yes.

12:47  2          Q.  Okay.  So to figure out which section of the

12:47  3    Code applies -- of the chapter applies, you would need

12:47  4    to look at each section of the chapter to see which

12:47  5    elements fit which crime, correct?

12:47  6          A.  Correct.

12:47  7          Q.  Okay.  When did you first learn about SB 8?

12:47  8          A.  Senate Bill 8.

12:48  9          Q.  Huh?

12:48  10         A.  Senate Bill 8.

12:48  11         Q.  Senate Bill 8, yes.

12:48  12         A.  I have no idea.

12:48  13         Q.  Do you know what Senate Bill 8 is?

12:48  14         A.  Not offhand.

12:48  15         Q.  Okay.

12:48  16         A.  Sorry.

12:48  17         Q.  Were you ever trained on it?

12:48  18         A.  I don't think so, no.

12:48  19         Q.  Did you ever read any news coverage about it?

12:48  20         A.  Maybe, yes.

12:48  21         Q.  Were you ever asked to research how SB 8

12:48  22    impacted your work at the DA's office?

12:48  23         A.  No.

12:48  24         Q.  Were there ever any e-mail communications about

12:48  25    this change in the law?

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

12:48  1          A.  I don't remember.

12:48  2          Q.  Are you familiar with the United States Supreme

12:49  3    Court case Roe v. Wade?

12:49  4          A.  Yes.

12:49  5          Q.  What do you understand that case stood for?

12:49  6          A.  Well, that was when women were given the right

12:49  7    to choose.

12:49  8          Q.  To choose to have an abortion, correct?

12:49  9          A.  Yes.

12:49 10          Q.  Yes.  And did you know that in January of 2022

12:49 11    Roe v. Wade was still the law?

12:49 12          A.  Yes.

12:49 13          Q.  And during the time the DA's office was

12:49 14    investigating and prosecuting Lizelle, were there any

12:49 15    conversations about how she could be charged with

12:49 16    murder when Roe was still the law?

12:49 17          A.  I don't remember anything like that.

12:49 18          Q.  Before Lizelle had been charged, had you ever

12:49 19    heard of another person being charged with murder for

12:49 20    their own abortion in Texas?

12:49 21          A.  I don't -- I don't recall.

12:49 22          Q.  Did Lizelle's murder charge make sense to you?

12:50 23          A.  I don't -- I don't really know what happened

12:50 24    there.  I wasn't privy to a lot, so I don't know.

12:50 25          Q.  Did it make sense to you under the law, like,

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

12:50  1    legally?

12:50  2        A.  Under the law that indictment should have been

12:50  3    dismissed, and it was by the boss.

12:50  4        Q.  Under the law, should the indictment have --

12:50  5    should her case have been presented to the grand jury?

12:50  6        A.  No.

12:50  7        Q.  Okay.  Do you need to take a break?

12:50  8        A.  I could go to the bathroom again.

12:50  9            MS. JARIT:  Let's do that.  Let's take

12:51 10    like a -- do you want to take a 15-minute break this

12:51 11    time?

12:51 12            MR. NAVARRO:  How ever long she needs.

12:51 13            THE WITNESS:  15 is more than enough.

12:51 14            (Brief recess)

13:06 15        Q.  We just had a break, correct?

13:07 16        A.  Correct.

13:07 17        Q.  Did you speak to your attorney during the

13:07 18    break?

13:07 19        A.  Yes.

13:07 20        Q.  And did you speak to anyone else during the

13:07 21    break?

13:07 22        A.  My secretary, but not about anything here.

13:07 23        Q.  Okay.  When did you take on Ismael Herrera as a

13:07 24    client?

13:07 25        A.  I don't remember.

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

13:07  1          Q.  Did you represent him in his divorce against
13:07  2    Lizelle?
13:07  3          A.  Yes.
13:07  4          Q.  Did he approach you about becoming his
13:07  5    attorney?
13:07  6          A.  Yes.
13:07  7          Q.  Was that the first time you represented him?
13:07  8          A.  Yes.
13:07  9          Q.  When he -- at the time he approached you, was
13:08 10    your office involved in the investigation and
13:08 11    prosecution of Lizelle?
13:08 12          A.  No, or I don't know.  I wouldn't know.
13:08 13          Q.  You don't know?  Did he approach you before you
13:08 14    filed his petition for divorce?
13:08 15          A.  Yes.
13:08 16          Q.  How long before did he approach you?
13:08 17          A.  Before I filed his petition for divorce?
13:08 18          Q.  Yes, yes.
13:08 19          A.  I don't know.  I don't remember.
13:08 20          Q.  Would it have been days?
13:08 21          A.  It may have been.  Many times I'll consult, and
13:08 22    then they'll say, okay, I'm going to go get paperwork
13:08 23    or the money or I'm going to go talk to other attorneys
13:08 24    first, see what the prices are and all that.  I don't
13:08 25    know.

Electronically signed by Donna McCown (101-253-986-8079)                                          84353a2f-0706-4d39-b642-91c972629fbe

13:08 1      Q.  How long does it take you to prepare a petition

13:08 2  for a divorce?

13:08 3      A.  Not long.  Normally, my assistant will prepare

13:08 4  it.  I'll just review it.

13:08 5      Q.  Earlier, you testified you first learned about

13:09 6  Lizelle's abortion from the media.  Do you recall that?

13:09 7      A.  Yes.  I believe that's how I learned about it.

13:09 8      Q.  You were also -- you -- but you were also

13:09 9  representing Ismael Herrera at least days prior to when

13:09 10  he filed his petition, correct?

13:09 11      A.  I don't know.  I don't remember.  Maybe he

13:09 12  hired that day, right?  I don't remember.  And if he

13:09 13  did hire, I don't know if I filed the petition that

13:09 14  day.  Did I file it a week later.  I don't -- I don't

13:09 15  remember.

13:09 16      Q.  Do you recall that you filed his divorce

13:10 17  petition on April 7th, 2022?

13:10 18      A.  I don't recall that.

13:10 19      Q.  Would it help to refresh your recollection if

13:10 20  you saw the divorce petition?

13:10 21      A.  Right.  If you're telling me it's that day,

13:10 22  probably.  I believe you.

13:10 23      Q.  Okay.  Let's just --

13:10 24          MR. NAVARRO:  You should review the

13:10 25  document.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

13:10  1          A.  Okay.  Yes.  Sorry.  Yes, please.

13:10  2          Q.  Sure.  Okay.  So this is going to be

13:10  3    Plaintiff's Exhibit 47.  I'll give you a moment to read

13:10  4    it over.

13:10  5          A.  Okay.  I see the date.

13:11  6          Q.  Let me know when you're ready.

13:11  7          A.  I'm ready.

13:11  8          Q.  Okay.  Do you recognize this document as the

13:11  9    petition for divorce that you filed on behalf of Ismael

13:11 10    Herrera against Lizelle Gonzalez?

13:11 11          A.  Yes.

13:11 12          Q.  And do you see that it's stamp filed April 7th,

13:12 13    2022, at 1:45 p.m., correct, on the top, right?

13:12 14          A.  Excuse me.

13:12 15          Q.  No problem.

13:12 16          A.  Yes.  I -- I see that.

13:12 17          Q.  Do you have any reason to believe that that's

13:12 18    not accurate?

13:12 19          A.  I have no reason to think that's not accurate.

13:12 20          Q.  And so is it your testimony that you began your

13:12 21    representation of Mr. Herrera sometime before

13:12 22    April 7th, 2022?

13:12 23          A.  Yes.

13:12 24          Q.  But you don't recall if it was days or weeks or

13:12 25    months before that date?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:12  1      A.  I don't.

13:12  2      Q.  It could have been any of those time frames?

13:12  3      A.  Anytime before April 7th, 2022, at 1:45 for

13:12  4  sure.

13:12  5      Q.  Okay.  Is there --

13:12  6      A.  I don't remember how long.

13:12  7      Q.  Is there anything that would help you refresh

13:12  8  your recollection about when you --

13:12  9      A.  No.

13:12 10      Q.  -- started representing Mr. Herrera?

13:13 11      A.  No.

13:13 12      Q.  Was there a retainer agreement from

13:13 13  Mr. Herrera?

13:13 14      A.  I would imagine.

13:13 15      Q.  And do you keep those -- do you keep those

13:13 16  retainer agreements on file in your office?

13:13 17      A.  No.

13:13 18      Q.  Are they stored anywhere?

13:13 19      A.  That was three years ago.  No.

13:13 20      Q.  On page 2 under No. 7, it says, "Grounds for

13:14 21  divorce," and it says, "Respondent has committed

13:14 22  adultery," correct?

13:14 23      A.  Correct.

13:14 24      Q.  So Mr. Herrera was alleging that Lizelle had

13:14 25  committed adultery and that was grounds to grant the

13:14 1    divorce, correct?

13:14 2        A.  Correct.

13:14 3        Q.  But you did not learn about the abortion

13:14 4    until -- the first time you heard about the abortion

13:14 5    was from the media is what you testified.

13:14 6        A.  To the best of my recollection, yes.

13:14 7        Q.  Are you aware -- do you have a practice of

13:15 8    deleting the retainers for your clients?

13:15 9        A.  Well, I don't necessarily have, like, a great

13:15 10   filing system, so I wouldn't say I deleted it.  I'm

13:15 11   just saying three years later I doubt I have it.

13:15 12       Q.  Do you have a practice of deleting your

13:15 13   e-mails?

13:15 14       A.  Yeah.  I do.  Yeah.  After about two years, I

13:15 15   clean them out.

13:15 16       Q.  After about two years you go through and delete

13:15 17   all your e-mails?

13:15 18       A.  Not all of them.  Sometimes.

13:15 19       Q.  Do you have any documentation about your past

13:15 20   representation of Mr. Herrera?

13:15 21       A.  I don't know.

13:15 22       Q.  Okay.  Were your colleagues in the DA's office

13:16 23   aware that you were representing Mr. Herrera as a

13:16 24   client in his divorce proceeding?

13:16 25       A.  I doubt it.

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

13:16  1     Q.  Did you tell any of them that you were

13:16  2  representing Mr. Herrera?

13:16  3     A.  When?

13:16  4     Q.  Prior to her indictment.

13:16  5     A.  No.

13:16  6     Q.  Did you -- at some point, did you tell any

13:16  7  member of the DA's office that you were representing

13:16  8  Mr. Herrera?

13:16  9     A.  Yes.

13:16  10     Q.  When was that?

13:16  11     A.  Post everything.

13:16  12     Q.  What do you mean by "everything"?

13:16  13     A.  After the indictment.

13:16  14     Q.  Can you be more specific?

13:16  15     A.  Well, I mean, whenever that happened, there was

13:16  16  an indictment, you know, the name came out and whatnot.

13:17  17  Sometime after that, I realized, oh, Lizelle Gonzalez

13:17  18  is a respondent on a -- and I represent the husband,

13:17  19  and so at some point I know I told them.

13:17  20     Q.  Who is them?

13:17  21     A.  Any -- the office, anyone in the office.

13:17  22     Q.  Did you tell Alex?

13:17  23     A.  Probably.

13:17  24     Q.  Did you tell Gocha?

13:17  25     A.  Probably.

13:17 1      Q.  Why did you feel you needed to tell them?

13:17 2      A.  Well, because I think that's something that

13:17 3  they should know that I was representing the husband,

13:17 4  just so they know.  "Hey, you know, don't involve me in

13:17 5  any of this."

13:17 6      Q.  So just to clarify, after Lizelle was indicted,

13:17 7  you -- sometime after Lizelle was indicted, you

13:17 8  realized that you were representing her husband in the

13:17 9  divorce proceeding, correct?

13:17 10     A.  That is correct.

13:17 11     Q.  Did you know that -- as part of your

13:18 12  representation of Mr. Herrera, were you aware that

13:18 13  Lizelle had been indicted?

13:18 14     A.  What?

13:18 15     Q.  Did -- as part of your representation of

13:18 16  Mr. Herrera in the divorce proceedings, let me -- let

13:18 17  me -- I'm sorry.  Strike that.

13:18 18          The petition was filed on April 7th, 2022,

13:18 19  correct?

13:18 20     A.  Yes.

13:18 21     Q.  And that was after Lizelle had been indicted,

13:18 22  correct?

13:18 23     A.  I don't remember.

13:18 24     Q.  If I represent she was indicted on March 25th?

13:18 25     A.  Okay.  Yes.

13:18  1        Q.  The petition was filed the same day she was
13:18  2    arrested.  Are you aware of that?
13:19  3        A.  No.  I don't think so.  I don't know.
13:19  4        Q.  You don't?  Are you aware what day Lizelle was
13:19  5    arrested?
13:19  6        A.  I'm not.
13:19  7        Q.  Were you ever made aware of what day she was
13:19  8    arrested?
13:19  9        A.  Right.  Yes.
13:19 10        Q.  Okay.  After you told Alex and DA Ramirez that
13:19 11    you were representing Lizelle's husband, what -- were
13:19 12    you -- how did they react?
13:19 13        A.  I don't remember.
13:19 14        Q.  What was the purpose of telling them that
13:19 15    information?
13:19 16        A.  I thought it was relevant.
13:19 17        Q.  Relevant to what?
13:19 18        A.  The fact that there had been an indictment and
13:19 19    it had been dismissed, and I wanted them to know, "Hey,
13:20 20    I represent the husband.  There was a divorce -- there
13:20 21    is a divorce."
13:20 22        Q.  So did you tell them after the charges had been
13:20 23    dismissed?
13:20 24        A.  It had to have been, because they were
13:20 25    dismissed immediately.

Electronically signed by Donna McCown (101-253-986-8079)                84353a2f-0706-4d39-b642-91c972629fbe

13:20  1          Q.  It wasn't before the charges had been dismissed

13:20  2      you told them?

13:20  3          A.  I think -- no.  I don't think so.  No.  They

13:20  4      were -- they were dismissed -- from what I remember,

13:20  5      they were dismissed immediately after she got indicted.

13:20  6          Q.  Do you recall who told you about Lizelle's

13:20  7      arrest?

13:20  8          A.  No.  I think I got -- learned it from the

13:20  9      media.

13:20 10          Q.  So this document indicates that you filed this

13:21 11      petition at 1:45 in the afternoon, correct?

13:21 12          A.  It was filed at -- it was filed at 1:45 p.m.

13:21 13      That is correct.

13:21 14          Q.  And was that during your working hours as an

13:21 15      ADA?

13:21 16          A.  Yes.

13:21 17          Q.  Was that inconsistent with office policy?

13:21 18          A.  Well, first of all, I don't e-file, so my -- I

13:21 19      have an assistant who does that.

13:21 20          Q.  Okay.  So some -- someone else filed this

13:21 21      you're saying?

13:21 22          A.  Right.  And I don't know how long, because I'm

13:21 23      not very familiar with e-filing.  I don't know how long

13:21 24      it takes to, like, queue it up.  I think it takes a

13:21 25      while, because I'm always like, "Hey, I haven't seen

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                        84353a2f-0706-4d39-b642-91c972629fbe

13:21  1    this.  I haven't seen that."

13:21  2            She'll be like, "It was filed."  So I --

13:21  3    I'm not real familiar with the workings of e-filing and

13:21  4    how long it takes to queue up to Mr. Velasquez's

13:21  5    office, so I can't say it was filed right then at 1:40

13:21  6    or the day before, night before.  I have no idea.

13:22  7        Q.  Did you draft this petition?

13:22  8        A.  Probably not.

13:22  9        Q.  Did you review it?

13:22 10        A.  Yes.

13:22 11        Q.  Did you ever make public statements regarding

13:22 12    Lizelle's criminal case while representing Mr. Herrera

13:22 13    in his divorce?

13:22 14        A.  I don't think so.

13:22 15        Q.  Did you ever make statements in court on behalf

13:22 16    of Mr. Herrera regarding Lizelle's criminal case?

13:22 17        A.  No.

13:22 18        Q.  Did you ever make public statements regarding

13:22 19    Lizelle's character or reputation?

13:22 20        A.  No, I don't think so.

13:22 21        Q.  Did you ever make statements in court regarding

13:23 22    Lizelle's character or reputation?

13:23 23        A.  No, I don't think so.

13:23 24        Q.  Did you ever make public statements regarding

13:23 25    Lizelle's credibility?

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

13:23  1          A.  No.

13:23  2          Q.  Did you ever make statements in court regarding

13:23  3     Lizelle's credibility?  Did I ask that already?

13:23  4          A.  Yeah, you already asked that.

13:23  5          Q.  I'm sorry.  Did you represent Mr. Herrera in

13:23  6     any other proceedings?

13:23  7          A.  Not that I remember.

13:23  8          Q.  Did you ever make any statements in court about

13:23  9     Lizelle's abortion?

13:23 10          A.  No.

13:23 11          Q.  How do you direct your assistants to file your

13:23 12     court filings?

13:23 13          A.  I probably just -- once it's been reviewed, I

13:24 14     probably just tell them, "Hey, go ahead and file it if

13:24 15     they paid court costs."

13:24 16          Q.  Would that be in an e-mail?

13:24 17          A.  Probably not.

13:24 18          Q.  Okay.  Then how, if not by e-mail, would you

13:24 19     tell them?

13:24 20          A.  Probably just drop by on my, like, lunch or

13:24 21     after 5:00.  "Hey, what's ready to file?"  They'll do

13:24 22     it.

13:24 23               Or I might call them.  They may tell me,

13:24 24     "Hey, this guy already paid court costs.  I'm going to

13:24 25     file it."

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    84353a2f-0706-4d39-b642-91c972629fbe

13:24  1        "All right."

13:24  2        Q.  How long would you have met with Mr. Herrera in

13:24  3    order to get the information necessary to file the

13:24  4    petition?

13:24  5        A.  I don't know.  I may meet with him, consult

13:25  6    with him, and then information is brought to the girls,

13:25  7    and they'll fill out an information sheet or something.

13:25  8    But I don't remember.  Maybe I did it.  I don't

13:25  9    remember.

13:25 10        Q.  Would that have been in person?

13:25 11        A.  Yes.  Well, I would imagine.

13:25 12    Sometimes probably.  Sometimes defendants -- clients

13:25 13    will call in and say, "Hey, I -- this is the date of

13:25 14    marriage.  This is the day of separation."  Or "Hey, I

13:25 15    just remembered the kid's birthday is" -- whatever --

13:25 16    "July 19th not July 18th," so on and so forth, but

13:25 17    mostly in person.

13:25 18        Q.  Are you familiar with the Texas Disciplinary

13:25 19    Rules of Professional Conduct regarding conflicts of

13:25 20    interest?

13:25 21        A.  Somewhat.

13:25 22        Q.  Rule 1.06 states that -- it limits an

13:26 23    attorney's ability to represent a client.  If -- and

13:26 24    I'm quoting from it, and if -- if you'd like, I have a

13:26 25    copy of it if you prefer.

13:26 1      A.  Okay.

13:26 2      Q.  Yes?

13:26 3      A.  Yes.

13:26 4      Q.  Okay.  This is going to be Plaintiff's

13:26 5  Exhibit 48.  This is -- it's not the entire

13:26 6  professional conduct book.  It's relevant chapters of

13:27 7  it.  So you can turn to Rule 1.06.

13:27 8      A.  Yes.

13:27 9      Q.  Which is -- it's the fourth page of this

13:27 10 packet.  It says "Page 28" on the bottom of it.

13:27 11     A.  Okay.

13:27 12     Q.  Okay.  So it says, (b) -- I'm going to read

13:27 13 (b)(2), "A lawyer shall not represent a person if the

13:27 14 representation of that person" -- then go to (2) --

13:27 15 "reasonably appears to be -- to be or become adversely

13:27 16 limited by the lawyer's or the law firm's

13:27 17 responsibilities to another client or to a third person

13:27 18 or by the lawyer's or the law firm's own interest."

13:28 19 That's what it says, right?

13:28 20     A.  Yes.

13:28 21     Q.  Didn't this rule prohibit your representation

13:28 22 of Mr. Herrera in this case?

13:28 23     A.  I don't believe so.

13:28 24     Q.  Why?

13:28 25     A.  I wasn't representing -- "reasonably appears --

Electronically signed by Donna McCown (101-253-986-8079)                                84353a2f-0706-4d39-b642-91c972629fbe

13:28  1    lawyer or law firm's responsibilities to another

13:28  2    client."  I didn't have responsibilities to another

13:28  3    client.  "Or to a third person or to the law firm's own

13:28  4    interest."  I don't believe so.

13:28  5        Q.  Why?

13:28  6        A.  I don't think there was a conflict.

13:28  7        Q.  You did -- if you didn't think there was a

13:28  8    conflict, why did you feel the need to tell Alex and

13:28  9    Gocha that you were representing Mr. Herrera?

13:28  10        A.  I thought it was important to tell them.

13:28  11        Q.  But not because there was a conflict?

13:28  12        A.  If -- if there had been a case against Lizelle

13:28  13    that went through the DA's office, yes, there would

13:28  14    have been a conflict, right, for sure.  I would have

13:28  15    had a conflict in that I could not be involved at the

13:28  16    DA level in anything involving her.

13:29  17        Q.  We're going to go also to Rule 1.11, which

13:29  18    is -- it's a little ways.

13:29  19            MR. NAVARRO:  Which one?

13:29  20            MS. JARIT:  I'll get the page.  I'll get

13:29  21    the page number.  1.11.

13:29  22        Q.  It's page -- it starts on the bottom of

13:29  23    page 42, although we are looking at 11 (c), so actually

13:29  24    on page 43.

13:30  25        A.  Okay.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:30 1      Q.  Okay.  So 1.11 (c) says that a lawyer having

13:30 2   information that the lawyer knows or should know is

13:30 3   confidential government information about a person or

13:30 4   other legal entity acquired when the lawyer was a

13:30 5   public officer or employee may not represent a private

13:30 6   client whose interests are adverse to that person or

13:30 7   legal entity.

13:30 8      A.  Adverse.  Okay.

13:30 9      Q.  That's -- that's accurate, right?

13:30 10     A.  Yes.

13:30 11     Q.  Didn't this rule apply to your representation

13:30 12  of Mr. Herrera?

13:30 13     A.  No.

13:30 14     Q.  Why?

13:30 15     A.  I did not have confidential government

13:30 16  information.

13:30 17     Q.  Did your office have confidential government

13:30 18  information?

13:30 19     A.  Possibly, but I didn't.

13:30 20     Q.  Do you -- DA Ramirez, ADA Barrera, and

13:31 21  ADA Villarreal were all aware of Lizelle's

13:31 22  investigation before her indictment, correct?

13:31 23     A.  I don't know.

13:31 24     Q.  The prosecution packet had been delivered to

13:31 25  your office prior to your filing for her divorce,

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

13:32  1    correct?

13:32  2        A.  I don't know.

13:32  3        Q.  Were any steps taken in the DA's office to

13:32  4    prevent this type of conflict from happening again?

13:32  5        A.  What type of conflict?

13:32  6        Q.  I'll rephrase.

13:32  7        A.  Okay.

13:32  8        Q.  Were any steps taken in the DA's office to

13:32  9    prevent this kind of potential conflict from happening

13:32  10   again?

13:32  11       A.  I guess I don't know what you mean.

13:32  12       Q.  Did the DA's office refresh their conflict

13:33  13   policies following the dismissal of Lizelle's case?

13:33  14       A.  Not that I remember, no.

13:33  15       Q.  Was there any meetings concerning conflicts in

13:33  16   the DA's office after Lizelle's case?

13:33  17       A.  Not that I recall.

13:33  18       Q.  Were you disciplined for representing

13:33  19   Mr. Herrera?

13:33  20       A.  No.  Wait.  By who?  Do you mean by the boss or

13:33  21   by the Bar?

13:33  22       Q.  Let's do both.

13:33  23       A.  Okay.

13:33  24       Q.  Were you disciplined by the Bar?

13:33  25       A.  No.

Electronically signed by Donna McCown (101-253-986-8079)                                      84353a2f-0706-4d39-b642-91c972629fbe

13:33  1          Q.  Were you disciplined by Gocha?

13:33  2          A.  No.

13:33  3          Q.  Okay.  Were you disciplined by anyone at the

13:33  4     DA's office?

13:33  5          A.  No.

13:33  6          Q.  Were there any repercussions in the DA's office

13:33  7     due to your representation of Mr. Herrera?

13:33  8          A.  Not that I know of.

13:33  9          Q.  I'm almost done with my questions.

13:34 10          A.  Thank you.  I'm sorry if I sighed.

13:34 11          Q.  That's okay.  I'm also sighing.

13:34 12          A.  I'm sorry.

13:34 13          Q.  Were you given a DA's -- were you given a --

13:34 14     did the DA's office give you a phone for work?

13:34 15          A.  No.

13:34 16          Q.  Did they give you a computer for work?

13:34 17          A.  Yes.  We have computers there at the office.

13:34 18          Q.  Do they provide you any other communication

13:34 19     devices for your work?

13:34 20          A.  No.

13:34 21          Q.  Did you receive a notice to preserve evidence

13:34 22     associated with this lawsuit?

13:34 23          A.  No.

13:34 24          Q.  Was your phone or e-mail searched for

13:34 25     communications pertaining to this lawsuit?

Electronically signed by Donna McCown (101-253-986-8079)                    84353a2f-0706-4d39-b642-91c972629fbe

```
                IN THE UNITED STATES DISTRICT COURT
                FOR THE SOUTHERN DISTRICT OF TEXAS
                        McALLEN DIVISION
LIZELLE GONZALEZ                    ) (
        Plaintiff                   ) (
                                    ) (
VS.                                 ) (    CIVIL ACTION NO.
                                    ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,                ) (
ALEXANDRIA LYNN BARRERA,            ) (
RENE FUENTES, and STARR             ) (
COUNTY, TEXAS                       ) (
        Defendants                  ) (
```

REPORTER'S CERTIFICATE

I, DONNA McCOWN, Certified Court Reporter, certify that the witness, JUDITH SOLIS, was duly sworn by me, and that the deposition transcript is a true and correct record of the testimony given by the witness in person on JUNE 6, 2025, and that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

Pursuant to Federal Rule 30(e)(2), a review of the transcript was requested.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the _____ day _____, 2025.

_____
DONNA McCOWN, Texas CSR 6625
Expiration Date:  01-31-26
Bryant & Stingley, Inc., CRN No. 41
P.O. Box 3420
Harlingen, Texas  78551
(956) 428-0755

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**