1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
McALLEN DIVISION

LIZELLE GONZALEZ            ) (
      Plaintiff          ) (
                     ) (
VS.                        ) (    CIVIL ACTION NO.
                     ) (    7:24-cv-00132
GOCHA ALLEN RAMIREZ,        ) (
ALEXANDRIA LYNN BARRERA,     ) (
RENE FUENTES, and STARR      ) (
COUNTY, TEXAS               ) (
      Defendants          ) (

_____

ORAL AND VIDEOTAPED DEPOSITION OF
RENE FUENTES
JUNE 12, 2025

_____

      ORAL AND VIDEOTAPED DEPOSITION OF RENE FUENTES,

produced as a witness at the instance of the PLAINTIFF,

taken in the above-styled and numbered cause on

JUNE 12, 2025, between the hours of 10:10 a.m. and

1:14 p.m., reported stenographically by DONNA McCOWN,

Certified Court Reporter No. 6625, in and for the State

of Texas, at Denton Navarro Rodriguez Bernal

Santee & Zech, PC, 701 East Harrison, Suite 100,

Harlingen, Texas, pursuant to the Federal Rules of

Civil Procedure and any provisions stated on the

record or attached therein.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

                         APPEARANCES

COUNSEL FOR PLAINTIFF:

        I. CECILIA GARZA
        VERONICA SEPULVEDA MARTINEZ, via Zoom
        GARZA MARTINEZ, PLLC
        202 East Sprague Street
        Edinburg, Texas  78539

        SARAH CORNING
        AMERICAN CIVIL LIBERTIES UNION TEXAS
        Staff Attorney
        P.O. Box 8306
        Houston, Texas  77288

        JUNE (ANNIE) GERSH, via Zoom
        KIERA GODDU, via Zoom
        AMERICAN CIVIL LIBERTIES UNION
        125 Broad Street
        New York, New York  10004

        MARIANA (MOLLY) KOVEL, via Zoom
        NANCY ROSENBLOOM, via Zoom
        ELIZABETH JARIT, via Zoom
        AMERICAN CIVIL LIBERTIES UNION
        125 Broad Street, 18th Floor
        New York, NY  10004

        LAUREN JOHNSON, via Zoom
        AMERICAN CIVIL LIBERTIES UNION
        915 15th Street NW
        Washington, DC  20005

COUNSEL FOR DEFENDANTS:

        RICARDO J. NAVARRO
        DENTON NAVARRO RODRIGUEZ BERNAL
        SANTEE & ZECH, P.C.
        549 North Egret Bay Boulevard, Suite 200
        League City, Texas  78550

ALSO PRESENT:
        Rene Ortiz, Videographer
        Emma Gray, via Zoom
        Naraya Price, via Zoom
        Zoe Ades, via Zoom

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

3

INDEX

PAGE

Appearances ..................................... 2

RENE FUENTES
Examination by Ms. Garza ........................ 4

Errata Sheet/Signature Page .................... 134

Reporter's Certificate ......................... 136

Attached to the end of the transcript:  Stipulations

EXHIBITS

NUMBER  DESCRIPTION                            PAGE

   50     E-mails ................................ 121

10:24  1    has been filed?

10:24  2        A.  WhatsApp messages from whom?

10:24  3        Q.  Anything that would be regarding Lizelle's

10:24  4    investigation.

10:24  5        A.  No, ma'am.

10:24  6        Q.  Okay.  Sheriff Fuentes, what is your

10:24  7    understanding of -- of the lawsuit filed by Lizelle

10:24  8    Gonzalez?

10:24  9        A.  My understanding?

10:25 10        Q.  Yes.  Of this lawsuit.

10:25 11        A.  That she was arrested because of the complaint

10:25 12    made by the hospital.  We investigated, and we

10:25 13    presented the case to the grand jury, and the grand

10:25 14    jury, I believe, came out with an indictment, and we

10:25 15    arrested Ms. Gonzalez, but we didn't file any charges.

10:25 16        Q.  Explain to me what you mean by that, "We didn't

10:25 17    file any charges," when you say that.

10:25 18        A.  We usually file charges on an individual when

10:25 19    we -- if we -- if we have -- we think we have evidence,

10:25 20    more evidence than beyond a reasonable doubt.

10:25 21        Q.  Okay.  I'm going to kind of take that apart a

10:25 22    little bit, and I'm just writing notes so I don't

10:26 23    forget what you say.

10:26 24        A.  Okay.

10:26 25        Q.  When you say "we," you're referring to --

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:26  1        A.   The sheriff's office.

10:26  2        Q.   Sheriff's office.  Okay.  So you said the

10:26  3   sheriff's office usually files charges when you have

10:26  4   evidence in your mind that's beyond a reasonable doubt

10:26  5   of a crime?

10:26  6        A.   Yes.

10:26  7        Q.   Okay.  When you say "file charges," just tell

10:26  8   me what -- in technical -- you know, in people, regular

10:26  9   people language, what does that mean to file a charge?

10:26 10        A.   Okay.  No, no.  Okay.  We -- we do an

10:26 11   affidavit, then we go before a judge -- the

10:26 12   investigators go before a judge and file a complaint,

10:26 13   and the judge will issue an arrest warrant.

10:26 14        Q.   Okay.  So is that like a probable cause

10:26 15   affidavit, something like that?

10:26 16        A.   Yes, ma'am.

10:26 17        Q.   Okay.  You can -- you can tell me if I'm wrong,

10:26 18   because I have had very little criminal experience.

10:26 19             So when you feel you have enough, you do a

10:26 20   probable cause affidavit.  You get the judge to sign

10:26 21   it, and then you'll get an arrest warrant?

10:26 22        A.   Yes.

10:26 23        Q.   Okay.  That did not happen in this case, in

10:27 24   Lizelle's -- in the -- I'm sorry.  That did not happen

10:27 25   in the criminal case for Lizelle?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:27  1          A.  No, ma'am.  My investigator prepared the case

10:27  2     and turned it over to the DA's office.

10:27  3          Q.  Do you know why they didn't go to the judge for

10:27  4     an arrest warrant as they would --

10:27  5          A.  Because they were -- I believe my investigator

10:27  6     was working together with the DAs on this case.

10:27  7          Q.  Do your investigators normally work together

10:27  8     with the DAs on cases?

10:27  9          A.  Yes, ma'am, yes, in all cases.

10:27 10          Q.  When did you first become aware of the

10:27 11     hospital's complaint?

10:27 12          A.  I believe the captain advised me, Captain

10:28 13     Fuentes advised me about the hospital had a complaint.

10:28 14          Q.  Do you recall what Captain Fuentes advised you

10:28 15     as to the nature of the complaint?

10:28 16          A.  The hospital had called that there was an

10:28 17     individual there that had -- had taken some pills for

10:28 18     an abortion.

10:28 19          Q.  For an abortion?

10:28 20          A.  Yes.

10:28 21          Q.  Okay.  So from the outset, you knew that this

10:28 22     complaint initiated by the hospital was due to an

10:28 23     abortion?

10:28 24          A.  Right.

10:28 25          Q.  An abortion as a result of taking pills?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

22

10:28  1         A.  Right.

10:28  2         Q.  Okay.  Do you know when Captain Fuentes advised

10:28  3    you?

10:28  4         A.  I don't remember, ma'am.  No, I don't remember.

10:28  5         Q.  Okay.  Did he call you?  Did he talk to you

10:28  6    personally?  Send you a text message?  Do you recall

10:28  7    how he would have advised you?

10:28  8         A.  In person.

10:28  9         Q.  Okay.  And what were your initial thoughts

10:29  10   about that?

10:29  11        A.  I advised Captain Fuentes to advise the

10:29  12   investigator to document everything and prepare the

10:29  13   case, and when they were done, to contact the district

10:29  14   attorney's office.

10:29  15        Q.  Okay.  Did you advise -- I believe Captain

10:29  16   Fuentes testified that you, from the outset, said, "You

10:29  17   need to get with the DA's office on this one"?

10:29  18        A.  Yes.

10:29  19        Q.  Okay.  So that was at the very beginning

10:29  20   shortly after the hospital complaint?

10:29  21        A.  Yes.

10:29  22        Q.  Okay.  At that time, when you -- when Captain

10:29  23   Fuentes advised you of the hospital complaint, were you

10:29  24   aware that an abortion was legal in Texas?

10:29  25        A.  No, ma'am.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

10:29  1          Q.   Okay.  You were not aware.  You thought
10:29  2     abortion was illegal at the time?
10:29  3          A.   No, ma'am.  I didn't -- that's the reason I
10:30  4     advised Captain Fuentes to contact the district
10:30  5     attorney's office.
10:30  6          Q.   Okay.  Were you -- were you confused or
10:30  7     surprised at all about the complaint that she -- about
10:30  8     a criminal complaint about an abortion?
10:30  9          A.   Confused?
10:30 10          Q.   Yeah.  In other words, was it out of the
10:30 11     ordinary that you would get a complaint from the
10:30 12     hospital about an abortion?
10:30 13          A.   We haven't worked an abortion in a long time,
10:30 14     so -- but I wasn't confused.  I wasn't -- that's the
10:30 15     reason I advised Captain Fuentes to contact the
10:30 16     district attorney's office.
10:30 17          Q.   Okay.  All right.  And then as far as -- you
10:30 18     said we -- the sheriff's office investigated the case.
10:30 19     What was the sheriff's office or what were you and your
10:30 20     office investigating?
10:30 21          A.   Me, nothing.
10:30 22          Q.   Okay.  You didn't -- you did not play an
10:30 23     investigative role?
10:30 24          A.   Not at all, ma'am.
10:30 25          Q.   Okay.  What was your office investigating?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

10:31  1    What crime were they investigating?

10:31  2        A.  At the time, no crime, just -- just following

10:31  3    up with the complaint from the hospital and talking to

10:31  4    everyone.

10:31  5        Q.  So you were just following up on the

10:31  6    complaint -- your office -- let me rephrase that -- was

10:31  7    following up on a complaint.  Your office did not -- as

10:31  8    far as you know, your office did not have a specific

10:31  9    charge in mind or --

10:31 10        A.  No.

10:31 11        Q.  Okay.  At what point did -- did the charge

10:31 12    against Lizelle become a murder charge or a murder

10:31 13    investigation?

10:31 14        A.  From my office?

10:31 15        Q.  Right.

10:31 16        A.  Never.

10:31 17        Q.  As far as you know, your investigators were

10:31 18    advised by the DA's office to -- to proceed with a

10:31 19    murder investigation?

10:31 20        A.  To proceed in a murder investigation?  I don't

10:32 21    know.  I really don't know.  We -- the only thing my

10:32 22    investigators did, they document -- they documented

10:32 23    everything and presented the case to them.

10:32 24        Q.  Them being the DA's office?

10:32 25        A.  Yes.  The district attorney's office.

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:32  1      Q.  But -- and throughout the investigation, your

10:32  2  investigators were in contact with the DA's office?

10:32  3      A.  Yes, ma'am.

10:32  4      Q.  Okay.  And were you aware of that at the time?

10:32  5      A.  Yes.

10:32  6      Q.  Okay.  Your investigators were keeping you

10:32  7  advised?

10:32  8      A.  No.

10:32  9      Q.  No?

10:32 10      A.  No.

10:32 11      Q.  Okay.  You indicated a minute ago that you had

10:32 12  not investigated an abortion case in a very long time.

10:32 13  When was the last time that you investigated an

10:32 14  abortion case in Starr County?

10:32 15      A.  I don't remember.

10:32 16      Q.  Was it --

10:32 17      A.  I don't know.

10:32 18      Q.  Okay.  But do you believe there was an -- there

10:32 19  was a prior investigation of an abortion case?

10:32 20      A.  I don't know.

10:32 21      Q.  Okay.  So earlier when you said, "We hadn't

10:32 22  done one in a long time," what did you mean by that?

10:32 23      A.  In a long time, what I meant was that -- I

10:33 24  don't remember working an abortion case.

10:33 25      Q.  Okay.  Let me go back.  You said several times

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:33  1    today that -- or you've testified already a couple of

10:33  2    times that you advised Captain Fuentes to reach out to

10:33  3    the DA's office.

10:33  4              Why did you -- why did you advise him to

10:33  5    do that or any of your investigators to do that?

10:33  6        A.  Because it's a procedure that any time it's a

10:33  7    big -- there's a crime like that to contact the DA's

10:33  8    office, because they are the prosecutor.  They're

10:34  9    attorneys, and they'll give legal advice.

10:34 10        Q.  Okay.  You testified earlier also that at the

10:34 11    time you were not -- your investigators were not

10:34 12    investigating a crime, they were just investigating a

10:34 13    complaint.

10:34 14        A.  Yes.

10:34 15        Q.  Okay.  But right now you just testified that

10:34 16    anytime they're investigating a crime, they would

10:34 17    contact the DA's office.  So can you kind of explain

10:34 18    the difference there?

10:34 19        A.  A case.  What I meant was a case.

10:34 20        Q.  Okay.  Would your -- your investigators

10:34 21    wouldn't investigate a complaint unless there was a

10:34 22    possible crime, correct?

10:34 23        A.  Actually, they have to document every -- every

10:34 24    complaint, every report, and if they feel it's a

10:34 25    criminal act, they contact the district attorney's

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:34  1    office for advice.

10:34  2        Q.  Okay.  And with regard to the investigation

10:35  3    into Lizelle, it was the DA's office that advised your

10:35  4    sheriff investigators that this was a murder case; is

10:35  5    that true?

10:35  6        A.  I don't know, Miss.

10:35  7        Q.  Okay.  When did you become aware that -- that

10:35  8    the investigation against Lizelle was for murder?

10:35  9        A.  After the indictment.

10:35 10        Q.  And who advised you that she was indicted for

10:35 11    murder?

10:35 12        A.  I don't remember.  I believe it was

10:35 13    Captain Fuentes.

10:35 14        Q.  Did you and Captain Fuentes ever have any

10:35 15    discussions, while the investigation was pending, about

10:35 16    Lizelle's investigation?

10:35 17        A.  I don't remember.  I don't -- no.

10:35 18        Q.  Okay.  Did you have any discussions with

10:36 19    either -- and I apologize, because I don't know their

10:36 20    titles -- but with Larry Fuentes or Major Delgado about

10:36 21    Lizelle's investigation?

10:36 22        A.  No, ma'am.

10:36 23        Q.  I want to go back.  We kind of jumped ahead a

10:36 24    little bit, but I want to go back and ask some

10:36 25    questions just about your background in law

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

|       |    |                                                           |
|-------|----|-----------------------------------------------------------|
| 10:50 | 1  | I wish it was in the National League.  I don't like       |
| 10:50 | 2  | change.                                                   |
| 10:50 | 3  |             Okay.  So personal stuff.  Would you ever      |
| 10:50 | 4  | have reason -- okay.  You -- you've been sheriff for      |
| 10:50 | 5  | 17 years, and Mr. Ramirez has been DA for about five --   |
| 10:51 | 6  | A.  Four and a half.  Four and a half years.              |
| 10:51 | 7  | Q.  Four and a half.  Okay.  Do you -- in the four        |
| 10:51 | 8  | and a half years, have you had any reason to have         |
| 10:51 | 9  | discussions with DA himself about investigations or       |
| 10:51 | 10 | cases?                                                    |
| 10:51 | 11 | A.  I don't remember.                                     |
| 10:51 | 12 | Q.  Okay.  Did you have any discussions about the        |
| 10:51 | 13 | investigation of Lizelle with DA Ramirez?                 |
| 10:51 | 14 | A.  Not at all.                                           |
| 10:51 | 15 | Q.  What about do you -- if you do have to have a        |
| 10:51 | 16 | discussion -- or when you have discussions about cases    |
| 10:51 | 17 | with the DA's office, you personally, is it always        |
| 10:51 | 18 | going to be with DA Ramirez, or would you have contact    |
| 10:51 | 19 | with any of the ADAs?                                     |
| 10:51 | 20 | A.  DA Ramirez.                                           |
| 10:51 | 21 | Q.  Okay.  And your investigators would have             |
| 10:51 | 22 | contact with --                                           |
| 10:51 | 23 | A.  Whoever.                                              |
| 10:51 | 24 | Q.  Whoever.  Okay.  It could be the ADAs.  It           |
| 10:51 | 25 | could be DA Ramirez?                                      |

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:51  1         A.  Yes.

10:51  2         Q.  Okay.  As sheriff, is it important to provide

10:52  3    guidance to the investigators and other deputies in the

10:52  4    chain of command?

10:52  5         A.  The guidance is done by -- by the supervisors.

10:52  6         Q.  Okay.  And who provides guidance to your

10:52  7    supervisors?

10:52  8         A.  Can you repeat the question again?

10:53  9         Q.  Of course.  Of course.  So the supervisors,

10:53  10   which they -- whether the lieutenants or the captain --

10:53  11        A.  Captains, yes.

10:53  12        Q.  -- provide guidance to their departments.  Who

10:53  13   provides guidance to them, to the captains and to the

10:53  14   lieutenants?

10:53  15        A.  The major and the chief deputy.

10:53  16        Q.  Okay.  Were -- and major is Larry Fuentes,

10:53  17   correct?

10:53  18        A.  No, ma'am.

10:53  19        Q.  Oh, no.  That's Delgado?

10:53  20        A.  Yes, ma'am.

10:53  21        Q.  And the chief deputy?

10:53  22        A.  Larry Fuentes.

10:53  23        Q.  Okay.  But that's the title, right, chief

10:53  24   deputy?

10:53  25        A.  Yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

42

10:53  1          Q.  Okay.

10:53  2          A.  Under sheriff.

10:53  3          Q.  Right.  And then Larry Fuentes and Lenard

10:53  4    Fuentes are brothers, correct?

10:53  5          A.  Yes.

10:53  6          Q.  And they're your nephews or cousins?

10:53  7          A.  My cousins.

10:54  8          Q.  Okay.  Are you aware of what guidance either

10:54  9    Major Delgado or Chief Deputy Fuentes provided to

10:54 10    Captain Fuentes regarding the investigation of Lizelle?

10:54 11          A.  No, ma'am.

10:54 12          Q.  Did you have any discussions with Major Delgado

10:54 13    about the investigation into Lizelle?

10:54 14          A.  No, ma'am.

10:54 15          Q.  At any time?

10:54 16          A.  No, ma'am.

10:54 17          Q.  Did you have any discussions with Major Delgado

10:54 18    after Lizelle was indicted?

10:54 19          A.  No, ma'am.

10:54 20          Q.  Did you have any discussions with Chief Deputy

10:54 21    Larry Fuentes about the investigation into Lizelle?

10:54 22          A.  No, ma'am.

10:54 23          Q.  Okay.  And did you have any discussions with

10:54 24    Chief Deputy Fuentes after she was indicted?

10:54 25          A.  No, ma'am.

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:54  1        Q.  Did you have any discussions with any of your

10:54  2    brass after Lizelle was arrested?

10:54  3                MR. NAVARRO:  His brass?

10:55  4                MS. GARZA:  His brass being -- I'm sorry.

10:55  5    I'm using that word because that's kind of what come --

10:55  6    has come out in other depositions.

10:55  7        Q.  So to be clear, the brass would be, like, the

10:55  8    supervisors, the captains, and the lieutenants.

10:55  9        A.  Okay.

10:55 10        Q.  Right?

10:55 11                MR. NAVARRO:  Okay.

10:55 12        Q.  You tell me.  Am I -- am I using that word

10:55 13    correctly?

10:55 14        A.  I'm sorry?

10:55 15        Q.  Am I using that word "brass" correctly?

10:55 16        A.  Yes.

10:55 17        Q.  Okay.

10:55 18        A.  Brass is like the supervisors.

10:55 19        Q.  The supervisors.

10:55 20        A.  Or the lieutenant, major.  I don't remember.

10:55 21        Q.  Okay.

10:55 22                MR. NAVARRO:  I had not heard that term

10:55 23    used before in the sheriff's office.

10:55 24                MS. GARZA:  It's come out in some of

10:55 25    the --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:55  1          MR. NAVARRO:  Has it?

10:55  2          MS. GARZA:  Yeah.  So I would never have

10:55  3    thought about using it, but --

10:55  4          MR. NAVARRO:  Yeah.  It's like a military

10:55  5    term from World War II.

10:55  6          MS. GARZA:  From World War II.

10:55  7      Q.  Are you brass?  You're at the top.

10:55  8      A.  Because of brass knuckles.  No.

10:55  9      Q.  You're at the top.  You're not brass.  You're

10:55 10    like platinum or something up there.

10:56 11          Okay.  And you've already indicated that

10:56 12    you -- your -- I'll just call them supervisors.  The

10:56 13    supervisors under you keep you aware of big cases that

10:56 14    your office is handling?

10:56 15      A.  That's correct.

10:56 16      Q.  Okay.  And why is it necessary that you be

10:56 17    included in discussions regarding the big cases?

10:56 18      A.  For the media purposes.

10:56 19      Q.  Do you do the media?  Do you answer -- do you

10:56 20    do interviews with the press, or is that one of your

10:56 21    roles as sheriff, or do you have someone in your office

10:56 22    that takes care of that?

10:56 23      A.  I have someone, and we have -- we do press

10:56 24    releases.

10:56 25      Q.  Is that you that does the press releases, or is

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:56  1    that Major Delgado?

10:56  2         A.  Major Delgado.

10:56  3         Q.  Okay.  Major Delgado did a press release with

10:56  4    regard to the -- I guess dropping the charges against

10:56  5    or the dismissal of the case of Lizelle's criminal

10:56  6    case.  Do you recall that?

10:56  7         A.  I don't remember.  I don't recall.

10:57  8         Q.  Okay.  Let me see.

10:57  9         A.  I believe it was Gocha Ramirez.

10:57  10        Q.  Let me check to see.  Were you aware about --

10:57  11   aware of the e-mails coming into the sheriff's office

10:57  12   from the press regarding Lizelle's arrest?

10:57  13        A.  Yes, I was.  Yeah.

10:57  14        Q.  Okay.  And were you responding to any of those

10:57  15   e-mails?

10:57  16        A.  No, ma'am.

10:57  17        Q.  Was that Major Delgado that was responding to

10:57  18   e-mails?

10:57  19        A.  I don't know if he did or not.

10:57  20        Q.  Okay.  So if we have certain e-mails that

10:57  21   indicate Major Delgado was responding to the press with

10:57  22   regard to some questions, would he have discussed his

10:57  23   response with you prior to sending it out?

10:58  24        A.  Yes, he would have.

10:58  25        Q.  Okay.  You just don't remember the exact

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:58  1    specifics?

10:58  2         A.  Right.

10:58  3         Q.  Right.  Because he wouldn't send anything out

10:58  4    on behalf of the sheriff's office without the sheriff

10:58  5    knowing?

10:58  6         A.  Right.

10:58  7         Q.  That would be bad.

10:58  8         A.  Yes.

10:58  9         Q.  As a sheriff, is it important to communicate

10:58 10    with the DA's office about cases?

10:58 11         A.  I'm sorry.  Can you -- can you -- I didn't hear

10:58 12    you.

10:58 13         Q.  Of course.  I'm sorry.  As sheriff, is it

10:58 14    important to communicate with the DA's office about

10:58 15    cases?

10:58 16         A.  Yes, ma'am.

10:58 17         Q.  Why is that?

10:58 18         A.  As the sheriff or the sheriff's office?

10:58 19         Q.  As the sheriff himself, you.

10:58 20         A.  For me to -- I'm sorry.

10:58 21         Q.  Yeah.  Is it important for you, for the

10:59 22    sheriff, to communicate with the DA's office regarding

10:59 23    cases?

10:59 24         A.  Oh, yes.  Yes.  Because --

10:59 25         Q.  Tell me, yeah, why is that?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

10:59  1      A.  Because we need to work together, and we need
10:59  2  to be on the same page.
10:59  3      Q.  Okay.  Was the sheriff's office and the DA's
10:59  4  office on the same page with regard to Lizelle's case?
10:59  5      A.  My investigators?
10:59  6      Q.  Yes.
10:59  7      A.  Well, they turned in everything to them, so I
10:59  8  think they were -- they were working together.
10:59  9      Q.  Do you know what type of guidance was provided
10:59 10  by the DA's office to your investigators?
10:59 11      A.  No, ma'am.
10:59 12      Q.  Which -- do you recall which investigator was
10:59 13  working on this case?
10:59 14      A.  I think you mentioned Muniz and Aguirre.
10:59 15      Q.  Okay.  Did you have anything to do with
10:59 16  assigning Investigator Muniz to this particular case?
11:00 17      A.  No, ma'am.
11:00 18      Q.  How are assignments made for investigations?
11:00 19      A.  Captain -- Captain Fuentes makes those
11:00 20  assignments.
11:00 21      Q.  Okay.  Do you know how your investigators
11:00 22  contact or -- no.  Do you know how your investigators
11:00 23  communicate with the attorneys at the DA's office?
11:00 24      A.  No, ma'am.
11:00 25      Q.  Okay.  Whether -- are you aware that there's --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:00  1    there are phone calls between the attorneys at the DA's

11:00  2    office and your investigators?

11:00  3        A.  I'm sure there is.

11:00  4        Q.  Okay.  And are you aware that there are

11:00  5    in-person meetings between your investigators and the

11:00  6    attorneys at the DA's office?

11:00  7        A.  I'm sure there is.

11:00  8        Q.  And are you aware that there are text messaging

11:00  9    between your investigators and the attorneys at the

11:00  10   DA's office?

11:00  11       A.  I don't know.

11:00  12       Q.  Okay.  Do -- does -- do you know if your

11:00  13   investigators communicate with the attorneys at the

11:01  14   DA's office using WhatsApp or Facebook messenger, any

11:01  15   of those other types of communications?

11:01  16       A.  No, ma'am.

11:01  17       Q.  There's been some testimony in this -- in this

11:01  18   case that WhatsApp is kind of an official method of

11:01  19   communication within the County.  Would you agree with

11:01  20   that?

11:01  21               MR. NAVARRO:  Official or unofficial?

11:01  22               MS. GARZA:  Official.  About everyone uses

11:01  23   it within the departments.

11:01  24               MR. NAVARRO:  Well, that's different from

11:01  25   everyone uses it versus official, so what do you mean?

**BRYANT & STINGLEY, INC.**

**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

49

11:01  1          MS. GARZA:  I'll rephrase.

11:01  2          MR. NAVARRO:  Yeah.

11:01  3     Q.  Are you aware or is it your understanding that

11:01  4  WhatsApp is the preferred method of communication

11:01  5  within the sheriff's office?

11:01  6     A.  I know that my investigators have a chat group

11:01  7  among themselves.

11:01  8     Q.  Okay.  Are you a member of any WhatsApp chat

11:01  9  groups?

11:01 10     A.  I think I am, but I'm not too -- I'm old

11:01 11  school.

11:01 12     Q.  Okay.  How -- how often do you -- do you check

11:02 13  WhatsApp?

11:02 14     A.  Often, yes, I do.  I read them.  I don't

11:02 15  respond.

11:02 16     Q.  Okay.  So you -- you read them.  You know

11:02 17  basically what they're putting in there.  It's very

11:02 18  unlikely that you're going to respond via WhatsApp?

11:02 19     A.  Right.

11:02 20     Q.  Okay.  I too am old school.  So is it -- is it

11:02 21  common for you, you know, if you read something that's

11:02 22  in WhatsApp that maybe you feel needs attention that

11:02 23  you might pick up the phone and call or talk to them in

11:02 24  person?

11:02 25     A.  I call my supervisors and ask them.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:43 1   go because the address of the young lady was from

11:43 2   Escobares or county jurisdiction.

11:43 3       Q.  It was county jurisdiction?

11:43 4       A.  Yeah.

11:43 5       Q.  Okay.  So in that particular case, how would

11:43 6   Rio Grande City PD communicate to the sheriff's office?

11:43 7   Would they call the captain directly?  Would they call

11:43 8   the office?

11:43 9           How -- when -- when the PD decides, hey,

11:43 10  this is not our jurisdiction, how do they connect with

11:43 11  you, with your office?

11:43 12      A.  I want to say by phone.

11:43 13      Q.  Okay.  If necessary, would you be able to

11:43 14  investigate a homicide case?

11:43 15      A.  Me?

11:43 16      Q.  Yes.

11:43 17      A.  If I know how to investigate a homicide case?

11:44 18      Q.  Yes.

11:44 19      A.  Yes, I can.

11:44 20      Q.  Okay.  But you leave that to the seven or eight

11:44 21  guys?

11:44 22      A.  Definitely.

11:44 23      Q.  And -- and women.

11:44 24          Do you have any decision-making authority

11:44 25  on what cases your office investigates or does not

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:44  1    investigate.

11:44  2         A.  We do all County cases.

11:44  3         Q.  Okay.

11:44  4         A.  We have to investigate all County cases.

11:44  5         Q.  So if at any point during an investigation, if

11:44  6    you determine -- do you ever make the determination

11:44  7    that this is not going anywhere.  You guys need to

11:44  8    stop?  Is that something that you do?

11:44  9         A.  No, ma'am.

11:44  10        Q.  Okay.  Is that something that Captain Fuentes

11:44  11   may do?

11:44  12        A.  Maybe, yes.

11:44  13        Q.  Okay.  But then you said earlier that he would

11:44  14   have to discuss with the DA's office?

11:44  15        A.  Right.

11:44  16        Q.  How does your office investigate or evaluate

11:45  17   whether a law has been broken?

11:45  18        A.  How do they determine a law has been broken?

11:45  19        Q.  Right.  Like in this -- let's talk about

11:45  20   Lizelle's investigation.  There was certain interviews

11:45  21   that were conducted and reports that were made.

11:45  22              Is it the sheriff's office's role to

11:45  23   determine whether a law was broken after investigating?

11:45  24        A.  If they're in doubt, they contact the county

11:45  25   attorney or the district attorney, depending on the --

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:45  1    on the case.

11:45  2        Q.  And then the DA's office or the county

11:45  3    attorney's office would advise them?

11:45  4        A.  Advise -- advise us, yes.

11:45  5        Q.  Okay.  Are there cases -- well, I'm sure there

11:45  6    are cases that are very clearcut that your office

11:46  7    already knows which crime was committed?

11:46  8        A.  Yes.

11:46  9        Q.  For example, like a robbery.  Something was

11:46  10   stolen, a burglary, robbery, I don't know.  Something

11:46  11   was stolen over a certain value.  It's on camera.  It's

11:46  12   pretty easy for your investigators to say, "That's

11:46  13   burglary," correct?

11:46  14       A.  Yes, that's correct.

11:46  15       Q.  All right.  And then there are some cases --

11:46  16   would that case require DA guidance as to what the

11:46  17   charge is?

11:46  18       A.  No.  My investigators should know the charge.

11:46  19       Q.  Okay.  But in this particular case, your

11:46  20   investigators -- you're testifying that your

11:46  21   investigators did not know the charge?

11:46  22       A.  That's correct.

11:46  23       Q.  Okay.  So they sought the guidance of the DA's

11:46  24   office?

11:46  25       A.  Yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:46  1       Q.  Do you know what type of guidance the DA's

11:46  2  office provided to your investigators?

11:46  3       A.  No, ma'am.

11:46  4       Q.  Can you tell me about when the case is

11:47  5  transferred to the DA's office, what exactly is

11:47  6  transferred?  What is -- what is done?

11:47  7       A.  The packet -- we call it a packet, the report,

11:47  8  that -- the initial contact report and investigation

11:47  9  report, any photographs, if any, any evidence.

11:47 10       Q.  It's all turned over to the DA's office?

11:47 11       A.  That's correct.

11:47 12       Q.  Okay.  Everything and anything that has

11:47 13  happened in that particular investigation goes into the

11:47 14  packet?

11:47 15       A.  Yes.

11:47 16       Q.  And it all goes to the DA's office?

11:47 17       A.  Everything.

11:47 18       Q.  Okay.  Do you keep the file in the sheriff's

11:47 19  department as well?  So basically, there's a matching

11:47 20  file in the sheriff's office and the DA's office?

11:47 21       A.  I'm sure they do.

11:47 22       Q.  Does your file use electronic records or paper

11:47 23  records?

11:47 24       A.  I think they do electronic.

11:47 25       Q.  Or a little bit of both?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

| | | |
|---|---|---|
| 11:47 | 1 | A.  I'm not too sure.  I'm not sure, ma'am. |
| 11:48 | 2 | Q.  Okay.  Is that a recent change? |
| 11:48 | 3 | A.  No. |
| 11:48 | 4 | Q.  Are arrests usually made before or after the |
| 11:48 | 5 | transfer to the DA's office? |
| 11:48 | 6 | A.  The arrest? |
| 11:48 | 7 | Q.  Yes. |
| 11:48 | 8 | A.  What do you mean "the arrest"? |
| 11:48 | 9 | Q.  Well, when you decide to -- when your -- when |
| 11:48 | 10 | a -- |
| 11:48 | 11 | A.  Open-shut case or what? |
| 11:48 | 12 | Q.  Sure.  I mean, normally, are -- what are the -- |
| 11:48 | 13 | what's the word I'm looking for -- suspect.  My brain |
| 11:48 | 14 | is not working.  When you have a suspect -- |
| 11:48 | 15 | A.  Yes. |
| 11:48 | 16 | Q.  -- can you tell me is it more likely that a |
| 11:48 | 17 | suspect is arrested before turning the file over to the |
| 11:49 | 18 | DA's office? |
| 11:49 | 19 | A.  Like a burglary or like an assault -- |
| 11:49 | 20 | Q.  Any suspect, yeah, any -- yeah, any kind of -- |
| 11:49 | 21 | I guess you tell me, like how often -- if you -- if you |
| 11:49 | 22 | take into account your -- your caseloads, your |
| 11:49 | 23 | investigations, how often is an arrest made before |
| 11:49 | 24 | taking the case to the grand jury -- I mean to the DA's |
| 11:49 | 25 | office? |

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:49  1          A.   There's some cases before that they're

11:49  2     investigated, the affidavit, they have witnesses, and

11:49  3     they go before a judge, get a warrant, arrest them, and

11:49  4     then -- and then take the whole case file to the DA,

11:49  5     and they present it to the grand jury again and get an

11:49  6     indictment or not indictment, so --

11:49  7          Q.   Is that usually the way it happens?

11:49  8          A.   When they -- when they do have enough evidence,

11:49  9     yes.

11:49  10          Q.   Okay.  When -- with regard to murder or

11:49  11     homicide investigations, are those suspects usually

11:50  12     taken into custody right away, or is that usually

11:50  13     they're not taken into custody until after the DA's

11:50  14     office has gotten involved?

11:50  15          A.   You got me confused.

11:50  16          Q.   Okay.  I'm probably confusing myself.  When you

11:50  17     have a homicide --

11:50  18          A.   Oh, a homicide.  Okay.

11:50  19          Q.   -- a murder suspect -- we'll just call it a

11:50  20     homicide because --

11:50  21          A.   Suspect.

11:50  22          Q.   Suspect.  If you have a homicide suspect, which

11:50  23     I know is rare in Starr County, are they normally -- do

11:50  24     you get an arrest warrant before the case is

11:50  25     transferred to the DA's office?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

11:50 1     A.  If we have enough evidence, like witnesses,

11:50 2   like eyewitnesses, we've got the weapon, we've got

11:50 3   ballistics, and everything.

11:50 4     Q.  Does the DA's office ever review the evidence

11:50 5   to determine whether more investigation is needed?

11:50 6     A.  Yes, they do.

11:50 7     Q.  Okay.  How often?  Tell me about that.

11:50 8     A.  In every case.  Every case.  Every case that we

11:50 9   submit, they review the file before going to grand

11:51 10  jury.

11:51 11    Q.  Has the DA's office ever gone back to the

11:51 12  sheriff's office and said, "You need to investigate

11:51 13  more," you need to look into a certain aspect of the

11:51 14  case?

11:51 15    A.  Sometimes they have, yes.

11:51 16    Q.  Okay.

11:51 17    A.  And they have their own investigator to do

11:51 18  that.

11:51 19    Q.  Okay.  Does the DA's office provide direction

11:51 20  or guidance about how -- what should be investigated or

11:51 21  what evidence is necessary?

11:51 22    A.  We turn in all the evidence.  We give them all

11:51 23  the evidence.

11:51 24    Q.  But -- okay.  And I apologize.  I mean during

11:51 25  the investigation before -- before the packet is ready

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:51 1    when your investigators are speaking with the DA's
11:51 2    office --
11:51 3         A.  Yes.
11:51 4         Q.  -- to your knowledge, does the DA's office
11:51 5    provide direction or instruction to the investigators
11:51 6    with regard to what evidence they need to find or what
11:51 7    they need to do next in the investigation?
11:51 8         A.  Yes, they do.  They do.
11:51 9         Q.  Okay.  And in fact, in this case, we had some
11:52 10   text messages between ADA Barrera and Investigator
11:52 11   Muniz, and if you -- I want to pull them up, so I don't
11:52 12   want to get it wrong.
11:52 13              And in the messages, ADA Barrera advised
11:52 14   Investigator Muniz to take a picture of -- of the
11:52 15   ashes.  Are you aware of that?
11:52 16        A.  Of the what?
11:52 17        Q.  Of the ashes because the child was cremated.
11:52 18        A.  Okay.
11:52 19        Q.  Are you aware of that?
11:52 20        A.  No, I'm not.
11:52 21        Q.  Okay.  And when -- when a -- when she,
11:52 22   ADA Barrera, advised Investigator Muniz to take
11:52 23   pictures of the ashes, is that guiding or directing the
11:52 24   investigation, in your opinion?
11:52 25        A.  Guiding?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:52  1          Q.  Yes.

11:52  2          A.  The DA, yeah.

11:52  3          Q.  Yes.  Okay.  And -- so we have a text message,

11:53  4    and this is Plaintiff's what exhibit?

11:53  5                    MR. CORNING:  16.

11:53  6          Q.  16, from Esmer Muniz on January 11th of 2022.

11:53  7    "Alex, I came to take pictures of the ashes of the baby

11:53  8    because -- cuz it's been cremated already.  Do I allow

11:53  9    the funeral home to give the mom the ashes?"

11:53 10                    Is that -- is that Ms. Muniz asking for

11:53 11    direction in the investigation?

11:53 12          A.  Yes.

11:53 13          Q.  And then Alex's response is, "That's fine.  We

11:53 14    will have a death certificate, I'm assuming.  Take

11:53 15    pictures of the ashes."

11:53 16                    You would agree that ADA Barrera is

11:53 17    directing her -- directing Ms. -- Investigator Muniz as

11:53 18    to what to do?

11:53 19          A.  She's a prosecutor, yes.

11:53 20          Q.  And are you aware that Investigator Muniz and

11:54 21    ADA Barrera were discussing the ongoing investigation

11:54 22    and the findings during -- during the process of the

11:54 23    investigation?

11:54 24          A.  No, ma'am.

11:54 25          Q.  Does it surprise you that they were, or was

Electronically signed by Donna McCown (101-253-986-8079)                                          7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:54 1    that -- you would expect that?  You would have expected

11:54 2    that to be happening in this particular case, correct?

11:54 3        A.  I'm sorry, ma'am.  You asked --

11:54 4        Q.  Yes.  I'm sorry.  You would expect that

11:54 5    ADA Barrera or one of the attorneys in the DA's office

11:54 6    was advising the investigator throughout the

11:54 7    investigation?

11:54 8        A.  I'm sorry.  I just can't -- I'm sorry.

11:54 9        Q.  Sure.  Okay.  Let me -- let me go back and

11:54 10   rephrase the question.

11:54 11       A.  You're asking about the text messages or

11:55 12   something else?

11:55 13       Q.  Right.  So base -- yeah, kind of -- yes.  Based

11:55 14   on the text messages between January 11th and

11:55 15   January 31st and then continuing, there's text messages

11:55 16   regarding questions, meetings, interviews.

11:55 17           That's what you would have expected of

11:55 18   communication and advice between the DA's office and

11:55 19   the sheriff's office during that time period, correct?

11:55 20       A.  Yes.  Okay.

11:55 21       Q.  Are you aware that on February 1st of 2022,

11:55 22   ADA Barrera advised via text message that she had

11:55 23   spoken to Gocha and was advising Investigator Muniz to

11:55 24   submit to the grand jury review no -- without an arrest

11:55 25   warrant?

11:56 1      A.  No, I did not.

11:56 2      Q.  But you are aware that this case or this packet

11:56 3  was presented to the grand jury for review without an

11:56 4  arrest warrant?  You do know that?

11:56 5      A.  Yes.

11:56 6      Q.  At any point during the investigation, were

11:56 7  your investigators confident that they could get a

11:56 8  probable cause affidavit and arrest warrant of Lizelle

11:56 9  Herrera Gonzalez?

11:56 10      A.  No, I don't know.

11:56 11      Q.  Generally speaking, cooperation and

11:56 12  coordination between your office and the DA's office is

11:56 13  essential to investigating crimes, correct?

11:56 14      A.  That's correct.

11:56 15      Q.  And it is common for your office to rely on the

11:56 16  DA's office's guidance about the law?

11:56 17      A.  Definitely.

11:57 18      Q.  Are sheriff's officers able to obtain grand

11:57 19  jury subpoenas without coordination from an attorney in

11:57 20  the DA's office?

11:57 21      A.  No, ma'am.

11:57 22      Q.  Who makes the determination that there are

11:57 23  sufficient grounds to justify obtaining a subpoena?

11:57 24      A.  The district attorney.

11:57 25      Q.  Do you have any role in that process?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:57  1        A.  No, ma'am.

11:57  2        Q.  Do you review the packet, the investigation

11:57  3   packet prior to it being submitted to the DA's office?

11:57  4        A.  No, I don't, ma'am.

11:57  5        Q.  But you are provided with a general

11:57  6   understanding of what has happened during the

11:57  7   investigation?

11:57  8        A.  Sometimes.

11:57  9        Q.  In Lizelle's case specifically?

11:57 10        A.  No, ma'am, no.

11:57 11        Q.  No?  Did you -- you were -- is it your

11:57 12   testimony that you didn't know about Lizelle's case

11:57 13   going to the grand jury?

11:57 14        A.  No.  I knew that the case was going to the

11:57 15   grand jury, yes.

11:57 16        Q.  Okay.  Did you -- prior to it going to the

11:58 17   grand jury, were you aware that it was going to be

11:58 18   presented as a murder case?

11:58 19        A.  No, ma'am.

11:58 20        Q.  Prior to this case going to the grand jury, as

11:58 21   sheriff of Starr County, did you believe that Lizelle

11:58 22   Gonzalez committed murder in the abortion of her child?

11:58 23        A.  No.

11:58 24        Q.  Are you familiar with the term "staffing" with

11:58 25   the DA's office?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

11:58  1        A.  Staffing?  No, ma'am.

11:58  2        Q.  Staffing, the word "staff."  Okay.  I'll give

11:58  3    you a context.  There were some notes that

11:58  4    Investigator Muniz shared, and it said, "I'm going to

11:58  5    staff with the DAs."

11:58  6            Do you know what she would have meant by

11:58  7    that, or is that a term that you would have ever used?

11:58  8        A.  No, ma'am, I don't.

11:58  9        Q.  Okay.  Is there a specific person in the DA's

11:59  10   office that is contacted by the sheriff's office or the

11:59  11   investigators with questions?

11:59  12       A.  With questions?  No, ma'am.

11:59  13       Q.  So like --

11:59  14       A.  Whoever -- whoever answered the phone or

11:59  15   whoever you called.

11:59  16       Q.  Okay.  And when Captain Fuentes, when -- when

11:59  17   you advised Captain Fuentes to seek the guidance of the

11:59  18   DA's office, you would have expected that he seek the

11:59  19   advise from an attorney in the DA's office, correct?

11:59  20       A.  Yes.

11:59  21       Q.  Earlier, you testified that you didn't think

11:59  22   she committed murder.  So was it sent to the grand jury

11:59  23   based on the district attorney's opinion of the case?

12:00  24       A.  Yes.

12:00  25       Q.  So do you have a policy in your office that

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:00 1    when your investigators or you or your office is unsure

12:00 2    if the conduct is criminal you follow the guidance of

12:00 3    the DA's office?

12:00 4        A.  Policy, we have no policy to contact the DA's

12:00 5    office.  They do that on their own for guidance.

12:00 6        Q.  Okay.  Well, then, instead of policy, is it the

12:00 7    practice of the DA's office to -- when your

12:00 8    investigators are unsure if the conduct is criminal, is

12:00 9    it the practice to follow the guidance of the DA's

12:00 10   office?

12:00 11       A.  Like I testified earlier, the investigators in

12:00 12   the DA's office should be on the same page.

12:00 13       Q.  What happens when they're not?

12:01 14       A.  What do you mean --

12:01 15       Q.  Does that happen?  I mean, does the sheriff's

12:01 16   office ever have any conflict with the DA's office as

12:01 17   to whether the investigation reveals that a crime has

12:01 18   been committed?

12:01 19       A.  Even if you do, they have to help you.  They're

12:01 20   the prosecutors.

12:01 21       Q.  Okay.  So at the end of the day, the

12:01 22   prosecutors have the say?

12:01 23       A.  That's correct.

12:01 24       Q.  How does the sheriff's office determine the

12:01 25   charge for a crime?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:01  1          MR. NAVARRO:  Objection.  That's pretty

12:01  2     broad.  It's vague.

12:01  3          Q.  Are you familiar with the charging manual?

12:02  4          A.  A charging manual?

12:02  5          Q.  Yes.

12:02  6          A.  We used to have one when I was an investigator.

12:02  7          Q.  Okay.

12:02  8          A.  I don't know if an investigator could -- a

12:02  9     burglary -- a burglary -- they look for the charge.

12:02  10         Q.  Okay.  Explain -- explain to me or someone like

12:02  11    me who doesn't really have any law enforcement

12:02  12    experience.  What is a charging manual?  What is the

12:02  13    purpose of it and what does it contain?

12:02  14         A.  The Penal Code, the charge -- the charge like

12:02  15    for burglary and the -- and the number.

12:02  16         Q.  Okay.  And so is it fair to say that your

12:02  17    investigators would look to a charging manual to

12:02  18    determine what the crime is that is being investigated?

12:02  19         A.  Yes.

12:02  20         Q.  Prior to sending the case file to the DA's

12:03  21    office, the sheriff's office determines what elements

12:03  22    of the crime are, correct?

12:03  23         A.  When the case was turned over to the DA's

12:03  24    office?

12:03  25         Q.  Before sending it to the DA's office.

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:03  1      A.  Which -- which -- which case?

12:03  2      Q.  All cases.

12:03  3      A.  Most of the cases, like I testified earlier,

12:03  4  you asked me -- you asked me earlier that if they have

12:03  5  enough evidence, they go before a judge and get a

12:03  6  warrant, and they have to do an affidavit.

12:03  7      Q.  Okay.  So then I guess if I'm -- and I

12:03  8  apologize if I'm being repetitive.  I'm not trying to.

12:03  9          So I guess, based on your testimony, when

12:03  10  the investigators don't have enough to go before and

12:03  11  get an arrest warrant, that's when they turn the case

12:03  12  file over or seek the advice of the DA's office?

12:03  13      A.  That's correct.

12:03  14      Q.  Okay.  I will try not to ask that question

12:03  15  again.

12:03  16          Does your office have access to, like, the

12:03  17  Texas Penal Code or online search tools to determine

12:04  18  the elements of a crime?

12:04  19      A.  Yes.

12:04  20      Q.  Do you know at what stage of a case the

12:04  21  prosecuting attorney gets assigned?

12:04  22      A.  No, ma'am.

12:04  23      Q.  When your -- when your investigators are

12:04  24  contacting the DA's office, do they have -- is there a

12:04  25  policy or a practice as to who at the DA's office they

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:04  1    speak to regarding a particular investigation?

12:04  2        A.  No, ma'am.

12:04  3        Q.  How would your investigators know which ADA is

12:04  4    assigned to a specific investigation?

12:04  5        A.  They don't.

12:04  6        Q.  Okay.  So basically, whoever answers the phone?

12:04  7        A.  Whoever is there.

12:04  8        Q.  Whoever is there.  Okay.

12:05  9            Is there a particular ADA that you

12:05  10   personally feel more comfortably working with when you

12:05  11   have questions or --

12:05  12       A.  No, ma'am.

12:05  13       Q.  Okay.  We talked about the probable cause and

12:05  14   getting an arrest warrant.

12:05  15           Once the sheriff's office determines that

12:05  16   there is probable cause, how long does your staff wait

12:05  17   to arrest someone?

12:05  18       A.  Once they get the warrant?

12:05  19       Q.  Right.

12:05  20       A.  As soon as possible.

12:05  21       Q.  Okay.  And why is it important that they be

12:05  22   arrested as soon as possible?

12:05  23       A.  To case -- to close the case.

12:05  24       Q.  And to get them off the street?

12:05  25       A.  Yes, ma'am.

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

88

12:05  1          Q.  Especially if we're talking about a violent

12:05  2      crime?

12:05  3          A.  Of course.

12:05  4          Q.  What's the difference between getting an arrest

12:05  5      warrant and arresting someone on a capias?

12:06  6          A.  The arrest warrant you -- like you do -- the

12:06  7      office make -- does a probable cause affidavit.  He --

12:06  8      he needs to go before the judge, and the judge signs

12:06  9      the warrant.  If the judge thinks there's enough

12:06  10     evidence or -- enough evidence for a warrant, he signs

12:06  11     the warrant.  And the grand jury, the same thing.  The

12:06  12     district judge sends the warrant.

12:06  13         Q.  So that's what a capias is, is when the

12:06  14     district judge signs a warrant?

12:06  15         A.  After the grand jury indictment.

12:06  16         Q.  After the indictment.  Okay.

12:06  17              Have there been occasions that your

12:06  18     investigators go to a judge with a probable cause

12:06  19     affidavit and the judge doesn't sign, says that it

12:06  20     needs more?

12:06  21         A.  I don't know, Miss.

12:06  22         Q.  Okay.  Does the Starr County Sheriff's Office

12:06  23     need to consult with the DA's office in order to obtain

12:07  24     an arrest warrant -- in order to go to the judge for an

12:07  25     arrest warrant?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**

12:07  1      A.  They usually just for guidance, for advice,

12:07  2   but most of the time, they go on their own, but it's

12:07  3   recommended for you to go through the DA's office

12:07  4   first.

12:07  5      Q.  Okay.  To your knowledge, has the DA's office

12:07  6   ever advised your office not to get an arrest warrant

12:07  7   if there's probable cause?

12:07  8      A.  I don't remember.  I can't remember.

12:07  9      Q.  How are bonds set?

12:07 10      A.  Like a surety bond, like when you get arrested?

12:07 11      Q.  Yes, sir.

12:07 12      A.  Okay.  The judge goes and arraign them, and he

12:07 13   or she set the bond for that person or individual.

12:07 14      Q.  And when bonds are set preindictment, is there

12:08 15   any guidance from the sheriff's office as to the amount

12:08 16   to set?

12:08 17      A.  No, not at all.

12:08 18      Q.  Any requests from the sheriff's office?

12:08 19      A.  Not at all.

12:08 20      Q.  Okay.  So how is your office involved in the

12:08 21   process of bond, setting bonds?

12:08 22      A.  Getting bonds or setting bonds?

12:08 23      Q.  Setting bonds, right.

12:08 24      A.  (Moving head side to side.)

12:08 25      Q.  No involvement?

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:34 1    A.  Because I trust Chief Molina.

12:34 2    Q.  How often do you go to the jail just to kind of

12:34 3  make rounds to see what's going on over there?

12:34 4    A.  I go often.  Once a month, because I trust

12:34 5  Chief Molina and his captains.

12:34 6    Q.  The jail in Rio Grande City, is that -- that's

12:34 7  right next to the --

12:34 8    A.  -- the sheriff --

12:34 9    Q.  -- sheriff's office?

12:34 10   A.  The sheriff's office, yes.

12:34 11   Q.  Yeah.  It's like the building next to it?

12:34 12   A.  Yes.

12:34 13   Q.  Did DA Ramirez contact you before Lizelle was

12:34 14 in jail, was arrested?

12:34 15   A.  Before?

12:34 16   Q.  Yes.

12:34 17   A.  No.

12:35 18   Q.  Did DA Ramirez contact you while Lizelle was in

12:35 19 custody?

12:35 20   A.  He -- I think, yes, he did.  When she posted

12:35 21 bond, Mr. Ramirez called me -- I mean, text me, I

12:35 22 believe, if Lizelle was already bond out.  I said,

12:35 23 "Yes.  She'll be out in a few minutes."  That's it.

12:35 24   Q.  Okay.  And we do have some of those text

12:35 25 messages that were produced from Mr. Ramirez's phone.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755       McAllen (956) 618-2366**

12:35 1    I'll go ahead and show you.  This was previously

12:35 2    labeled Plaintiff's Exhibit 36.

12:35 3              Are those the text messages that you're

12:35 4    referring to, Sheriff?

12:35 5        A.  The one in green?

12:35 6        Q.  Yes.

12:35 7        A.  Okay.  "Good morning, Sheriff.  Did Ms. Herrera

12:36 8    bond out" -- yes.

12:36 9        Q.  Okay.  And then you advised that she was still

12:36 10   in custody as of April 9th at 8 --

12:36 11       A.  No.  I advised him that she'll be out any

12:36 12   minute.

12:36 13       Q.  Okay.  Well, looking at that next text, it

12:36 14   says, "No.  She's still in custody," correct?

12:36 15       A.  Okay.  Yes.

12:36 16       Q.  Okay.  And then I believe on the next page,

12:36 17   it's a little bit later, you indicated that bond had

12:36 18   been posted and she would be out in the next 15 minutes

12:36 19   or so.

12:36 20       A.  Okay.  Yes.  That's right.

12:36 21       Q.  Okay.  You just didn't remember all of them.

12:36 22       A.  Yeah.

12:36 23       Q.  No problem.  Do you -- did you have any phone

12:36 24   calls or discussions with DA Ramirez about Lizelle's

12:36 25   arrest and bond being set?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:36 1     A.  The bond, no, ma'am, no discussion.

12:36 2     Q.  Do you know what he meant by, "It seems that

12:36 3  we've stirred up a hornet's nest"?

12:36 4     A.  No.  What -- what my -- my thoughts were that

12:37 5  because after the arrest, I received a lot -- I was

12:37 6  receiving calls, calls, calls, calls, threats and all

12:37 7  that.  And I had to literally change the number for the

12:37 8  sheriff's office for three days, because -- you know,

12:37 9  let the local people know, because people were calling

12:37 10  and calling me and --

12:37 11     Q.  What -- what types of calls were you receiving?

12:37 12     A.  People from out of town.  Like that they were

12:37 13  going to do a riot in front of my jail on Saturday

12:37 14  morning.

12:37 15     Q.  Okay.  And then you said you also received

12:37 16  threats via phone?

12:37 17     A.  Yes.

12:37 18     Q.  What kinds -- what kinds of threats are --

12:37 19     A.  My -- my secretary would pick up the calls.  I

12:37 20  never pick up any calls.  E-mails, I got a lot of

12:37 21  e-mails, people get upset, I guess.

12:37 22     Q.  Okay.  So you do recall receiving e-mails, and

12:37 23  at least your secretary was giving you updates or

12:37 24  messages about what was coming in?

12:37 25     A.  Because we had to change -- we had to change

Electronically signed by Donna McCown (101-253-986-8079)                                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:38  1    the number every day because people were just calling

12:38  2    and calling.

12:38  3        Q.  Okay.  What other -- what other changes were

12:38  4    made during that temporary time at the jail?

12:38  5        A.  Changes?

12:38  6        Q.  Yeah.  With regard to all of this, I guess the

12:38  7    messages and the calls and -- and all of the, I guess,

12:38  8    attention that her arrest received, other than changing

12:38  9    the phone, did you have to do anything else in the

12:38 10    jail?

12:38 11        A.  No.  No, ma'am.

12:38 12        Q.  Okay.  Did you do anything -- did you go to the

12:38 13    jail while Lizelle was detained?

12:38 14        A.  No, ma'am.

12:38 15        Q.  Okay.  Did you -- were you in contact with

12:38 16    Chief Molina about Lizelle's arrest during that time?

12:38 17        A.  Contact?  What do you mean "contact"?

12:38 18        Q.  Well, with regard to all of these --

12:38 19        A.  Asking about her or what?

12:38 20        Q.  -- concern -- right.

12:38 21        A.  No, ma'am.

12:38 22        Q.  Yeah.  So when you were getting these threats

12:38 23    and these e-mails and phone calls and threats of riots,

12:38 24    did you reach out to the jail to see what was going on?

12:38 25        A.  No.

Electronically signed by Donna McCown (101-253-986-8079)                7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:38 1    Q.  Okay.  Were you given any information from the

12:39 2    jail about Lizelle and her condition during --

12:39 3    A.  There were no threats at the jail.  Everything

12:39 4    was calm at the jail.

12:39 5    Q.  Okay.  That's what I was wondering is was there

12:39 6    any changes made at the jail or --

12:39 7    A.  No, ma'am.

12:39 8    Q.  -- or was there anything --

12:39 9    A.  Not at all.

12:39 10    Q.  -- going on?

12:39 11    A.  Not at all.

12:39 12    Q.  Okay.  This was just your office that was

12:39 13    receiving this?

12:39 14    A.  Yes.

12:39 15    Q.  Okay.  After this short thread of text messages

12:39 16    that indicated Lizelle was going to -- had posted bond

12:39 17    and was going to be released, any other conversations

12:39 18    with DA Ramirez regarding the dismissal, the release,

12:39 19    anything about Lizelle's criminal case?

12:39 20    A.  No.  She posted bond, I believe, real quick,

12:39 21    the next day I believe.  I'm not too sure.  And then

12:40 22    that's it, and then -- and then Mr. -- Mr. Ramirez

12:40 23    posted something on social media.

12:40 24    Q.  Did you continue to get calls after the press

12:40 25    release that she had been dismissed -- or she had

Electronically signed by Donna McCown (101-253-986-8079)                7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:40  1    been -- the charges were dismissed and she had been

12:40  2    released from jail?

12:40  3         A.  Mostly e-mails.

12:40  4         Q.  Okay.  And the e-mails were still threatening

12:40  5    e-mails or more like press-related e-mails?

12:40  6         A.  No, not press-related.  They were, like, people

12:40  7    upset, like groups of -- some type of group.  A group.

12:40  8         Q.  Did you get any -- what were they upset about?

12:40  9         A.  About the arrest.

12:40 10         Q.  Did they indicate what about the arrest they

12:40 11    were upset, like --

12:40 12         A.  I wouldn't pay attention to them, ma'am.

12:40 13         Q.  Okay.  I'm going to show you what's been

12:40 14    previously marked as Plaintiff's Exhibit No. 17.  This

12:40 15    one is an easy question.  This one is an easy question,

12:41 16    I promise.  On the second page on the top for the bond

12:41 17    amount --

12:41 18         A.  Yes.

12:41 19         Q.  -- that's a $500,000 bond, right?

12:41 20         A.  Yes.

12:41 21         Q.  And SB, is that surety bond?

12:41 22         A.  Surety bond, yes.

12:41 23         Q.  Just making sure.  And do you recognize the

12:41 24    signature on this bond paperwork up where it says

12:41 25    "April 1, 2022"?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

12:41 1     A.  On the first page or second page?

12:41 2     Q.  Second page, I'm sorry.  There's a signature on

12:41 3  the very top.

12:41 4     A.  Here?

12:41 5     Q.  Yeah.  Do you recognize that signature?

12:41 6     A.  No, ma'am.

12:41 7     Q.  Okay.  Do you know if that would be a judge's

12:41 8  signature?

12:41 9     A.  I have no idea.

12:41 10    Q.  Okay.  Are you involved in any way in approving

12:41 11 bonds?

12:41 12    A.  Yes.

12:41 13    Q.  Okay.  Tell me -- tell me what your role is

12:41 14 with regard to approving bonds.  What does that mean?

12:41 15    A.  Like if you want to post bond for someone, a

12:41 16 surety bond, either -- either you contact a bondsman,

12:42 17 or if you have property that's worth double the amount,

12:42 18 I have to verify it, you bring me paperwork, and you

12:42 19 could cosign for him, for the -- or for the person.

12:42 20    Q.  Okay.  And so with regards to Ms. Gonzalez's

12:42 21 bail, did you approve that or did --

12:42 22    A.  Yes.

12:42 23    Q.  Okay.  And what was -- what do you recall about

12:42 24 that bond and bail process with Ms. Gonzalez?

12:42 25    A.  They called me from the jail that Mr. -- I

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:42  1    believe it was Gonzalez, Ramiro Gonzalez was going to

12:42  2    post bond, and I just said okay.  I approved it.

12:42  3        Q.  Oh, that's it?

12:42  4        A.  That's it.

12:42  5        Q.  Okay.

12:42  6        A.  Because -- because he's a bondsman.

12:42  7        Q.  Okay.

12:42  8        A.  And I know -- and I know he's worth the amount.

12:42  9        Q.  Okay.  So you didn't receive any paperwork or

12:42 10    anything like that?

12:42 11        A.  No, not at all.  Not at all.

12:42 12        Q.  Okay.  It was --

12:42 13        A.  It took about -- not even a minute to -- I just

12:42 14    approved it.

12:42 15        Q.  So Ramiro Gonzalez is a bondsman.  You're

12:42 16    familiar with him, and you approved it?

12:42 17        A.  That's correct.

12:42 18        Q.  Does the DA's office typically inquire as to

12:43 19    whether someone has bonded out of jail?

12:43 20        A.  If they what?  If they bond -- if they bonded

12:43 21    out?

12:43 22        Q.  Yeah.

12:43 23        A.  If they know?

12:43 24        Q.  Does the DA's office call you or call your

12:43 25    office to inquire or to ask if anyone has been bonded

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:43  1    out of jail, a particular --

12:43  2        A.  They don't call me.  I don't know if they call

12:43  3    the office, the jail.  They usually -- if they do, they

12:43  4    call the jail.

12:43  5        Q.  Do you know why DA Ramirez texted you inquiring

12:43  6    as to whether Ms. Gonzalez had bonded out yet or not?

12:43  7        A.  No, ma'am.

12:43  8        Q.  Did you have any information from either the

12:43  9    jail or the DA's office or -- or your staff with regard

12:43 10    to releasing her from jail quickly once bond had been

12:44 11    posted?

12:44 12        A.  No.

12:44 13        Q.  Was there any pressure from all of that

12:44 14    attention, whether it was individual groups or media,

12:44 15    to get Lizelle out of jail quickly?

12:44 16        A.  I treat everybody the same.

12:44 17            THE COURT REPORTER:  Say that one more

12:44 18    time.

12:44 19        A.  I treat everyone equally, the same.

12:44 20        Q.  Do you -- has that ever happened on any other

12:44 21    arrests where you get an influx of calls or threats of

12:44 22    protests or riot following an arrest?

12:44 23        A.  I can't remember.

12:44 24        Q.  Okay.  This was rather unusual.

12:44 25        A.  Yes, yes.

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:44  1    Q.  Probably something that you're not going to

12:44  2  forget.

12:44  3              I just want to go through a few things.

12:44  4  Are you getting tired?

12:44  5    A.  A little.

12:45  6    Q.  Me too.

12:45  7    A.  Have to go to a wake.

12:45  8    Q.  Does the sheriff have a separate duty from the

12:45  9  DA's office or the grand jury when it comes to arrests

12:45  10  and probable cause?

12:45  11    A.  I'm sorry, ma'am.  What's the first --

12:45  12    Q.  Bad question.  I know in this particular case

12:45  13  the grand jury indicted Lizelle for murder.

12:45  14    A.  Yes.

12:45  15    Q.  Okay.  Does the sheriff have a separate duty to

12:45  16  determine whether there is probable cause that a crime

12:45  17  has been committed?

12:45  18    A.  No, ma'am.

12:45  19    Q.  No?  So whatever the grand jury decides, you're

12:45  20  bound by that?

12:45  21    A.  Yes.

12:45  22              MS. GARZA:  Mr. Navarro, do you want to

12:45  23  take a lunch break or --

12:46  24              THE WITNESS:  I want to go -- I want to go

12:46  25  through it.

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:46  1          MS. GARZA:  You want to go through it.

12:46  2          THE WITNESS:  I need to go to a wake -- a

12:46  3      wake this afternoon.

12:46  4          MS. GARZA:  Oh, no.  Okay.

12:46  5          MS. CORNING:  Oh, I'm sorry.  What time?

12:46  6          THE WITNESS:  It's from 1:00 to 5:00.

12:46  7          MS. GARZA:  Okay.  Well, we'll -- we'll

12:46  8      try to get you out of here.  You know, if you -- if we

12:46  9      can take another quick break, I'll cut out a lot of

12:46  10     stuff so we can get you out of here.

12:46  11         MR. NAVARRO:  Let's take a short break.

12:46  12         (Brief recess)

12:58  13     Q.  All right.  We had -- we had talked earlier in

12:58  14     your deposition and you said that you -- the text from

12:58  15     Gocha was the only one that you received once she was

12:58  16     in jail, the one we've marked -- or we've marked as an

12:58  17     exhibit, right?

12:58  18     A.  The bond, yes.

12:58  19     Q.  Okay.  But just to be certain, did DA Ramirez

12:58  20     call you or talk to you in person about Lizelle's case

12:58  21     at any time?

12:58  22     A.  After the arrest or before?

12:59  23     Q.  At any time.

12:59  24     A.  I don't remember.

12:59  25     Q.  Okay.  When did you first learn that

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

12:59 1    Ms. Gonzalez's charges would be dismissed?

12:59 2         A.  I want to say on a Sunday or Saturday

12:59 3    afternoon, Saturday.  After -- after she was released.

12:59 4         Q.  After she was released, but before the press

12:59 5    release?

12:59 6         A.  Let me remember.  I think Gocha called me.

12:59 7    After -- after she was released, Mr. Ramirez called and

12:59 8    told me because he was going to -- he was going to do a

12:59 9    press release.

12:59 10        Q.  Did -- and he told you he was going to dismiss

12:59 11   the charges?

12:59 12        A.  Yes.

12:59 13        Q.  Did you have -- did he tell you why he was

12:59 14   going to dismiss the charges?

12:59 15        A.  No, no.

12:59 16        Q.  Did you ask him why?

12:59 17        A.  No.

12:59 18        Q.  And what was your reaction when you -- when he

12:59 19   told you that the charges were going to be dismissed?

12:59 20        A.  He's the DA, so he's the prosecutor, so he --

13:00 21   he has the final say-so.

13:00 22        Q.  Okay.  You didn't have negative or positive one

13:00 23   way or the other?

13:00 24        A.  No, ma'am.

13:00 25        Q.  Did you speak with anyone in your office about

Electronically signed by Donna McCown (101-253-986-8079)                7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

121

13:00  1    the upcoming dismissal?

13:00  2         A.  I don't remember.

13:00  3         Q.  Is it possible that you spoke with Captain

13:00  4    Fuentes that the case was going to be dismissed?

13:00  5         A.  Possible.

13:00  6         Q.  No recollection?

13:00  7         A.  No, ma'am.

13:00  8         Q.  Did you have any meetings within your office

13:00  9    following the dismissal?

13:00  10        A.  No, ma'am.

13:00  11        Q.  Okay.  Did you have any updates or -- to your

13:00  12   procedures or policies regarding investigating

13:00  13   abortions following this case?

13:00  14        A.  No, ma'am.

13:00  15        Q.  You testified earlier that you were getting

13:00  16   e-mails, several e-mails, threats, and inquiries

13:00  17   following -- following the press release and following

13:01  18   her arrest.

13:01  19             I'm going to show you what has been --

13:01  20   what I will mark as Plaintiff's 50.  And this is --

13:01  21   this is documents that your attorney has produced to us

13:01  22   as e-mails.  There you go.  And if you just take --

13:01  23   take a quick look.  I'm not going to go through each

13:01  24   one.

13:01  25             But I want you to look at them and

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

13:01  1    determine is this -- are these all of the e-mails that
13:01  2    you received pertaining to Lizelle's investigation and
13:01  3    arrest?
13:01  4         A.  The e-mails?  Where are the e-mails?
13:01  5         Q.  There -- there -- those are copies of the
13:01  6    e-mails.
13:02  7         A.  I don't -- I don't understand it.
13:02  8              MR. NAVARRO:  Those are -- those are --
13:02  9              THE WITNESS:  These are e-mails from --
13:02 10              MR. NAVARRO:  -- e-mails to you.
13:02 11         Q.  To you.
13:02 12              MR. NAVARRO:  See where it says down
13:02 13    below, "Rene Fuentes incoming."
13:02 14              THE WITNESS:  Okay.
13:02 15              MR. NAVARRO:  Okay.  Those came from IT.
13:02 16              THE WITNESS:  Okay.
13:02 17              MR. NAVARRO:  And they're -- they're
13:02 18    printed, so they don't look the way they look --
13:02 19         Q.  Right.  They would look different than on the
13:02 20    screen.
13:02 21              MR. NAVARRO:  They would look different,
13:02 22    but --
13:02 23         A.  But they're different e-mails from -- they're
13:02 24    from different people or --
13:02 25         Q.  Yes.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

13:02  1              MR. NAVARRO:  They're e-mails to your

13:02  2    account.

13:02  3        Q.  And I know that you -- let me -- let me kind of

13:03  4    restate the question.  I know that you -- you testified

13:03  5    earlier that e-mail is not your preferred method of

13:03  6    communication.

13:03  7        A.  Yes, yes.

13:03  8        Q.  But these were produced by -- by your attorneys

13:03  9    with regard to e-mails during the time period of

13:03 10    Lizelle's investigation and arrest.

13:03 11              Does this look like a complete -- copies

13:03 12    of all of the e-mails that you would have received

13:03 13    during that time period, or would there have been more?

13:03 14        A.  Because I don't -- I don't -- I can't -- I

13:03 15    cannot -- I don't -- I don't know.

13:03 16        Q.  Okay.  Did you talk to anyone in the DA's

13:03 17    office about the e-mails and how to respond?  I know

13:03 18    that first e-mail is, you know, basically insulting you

13:03 19    and -- and putting quotes and things like that.

13:03 20        A.  No, I did not.

13:03 21        Q.  Okay.  Following the DA's press release and

13:04 22    dismissal, were you aware that it was likely that a

13:04 23    lawsuit would be filed by Lizelle with regard to the

13:04 24    investigation and prosecution?

13:04 25        A.  No, ma'am.

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

13:04  1        Q.  We talked about you use your County cell phone
13:04  2    for work.  What type of device?  Is it an Apple or a
13:04  3    Google or a Samsung?
13:04  4        A.  I don't know.  Apple I guess.
13:04  5        Q.  It looks like an Apple.
13:04  6        A.  I don't know.
13:04  7        Q.  Okay.
13:04  8        A.  I'm not -- I just get -- get the phone.
13:04  9        Q.  No problem.  And you've had the same number
13:04  10   that you gave us now back in April of -- January
13:04  11   through April of '22?
13:04  12       A.  When we get this phone, yes.
13:04  13       Q.  Okay.  Number hasn't changed?
13:04  14       A.  No.
13:04  15       Q.  How long have you had the same number?
13:04  16       A.  This one?
13:04  17       Q.  Yes.
13:04  18       A.  Ever since I got it.
13:04  19       Q.  That would have been how long ago?
13:04  20       A.  No.  The work phone, when the law changed --
13:04  21   when the law came in that we -- that we needed two
13:04  22   phones.
13:04  23       Q.  Okay.
13:04  24       A.  I don't remember the exact date.
13:05  25       Q.  But it's been a few years?

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755        McAllen (956) 618-2366**

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

13:05 1     A.  Yes.

13:05 2     Q.  Do you back up your County-issued phone, or

13:05 3  does anybody from IT back it up for you?

13:05 4     A.  No.

13:05 5     Q.  Do you know what that means to back up a phone?

13:05 6     A.  No.

13:05 7     Q.  I don't either.  I get notifications sometimes.

13:05 8  Do you know if your phone has the same settings as

13:05 9  everyone else in the sheriff's office?

13:05 10     A.  Settings?

13:05 11     Q.  Yes.

13:05 12     A.  What do you mean "settings"?

13:05 13     Q.  With regard to how often it's backed up or --

13:05 14     A.  No, ma'am.

13:05 15     Q.  Okay.  Have you ever deleted any text messaging

13:05 16  from your County phone?

13:05 17     A.  I might have.

13:05 18     Q.  Okay.  Do you have a practice or what you

13:05 19  regularly do with regards to text messages?

13:05 20     A.  Huh-uh.

13:05 21     Q.  Why would -- why do you think you deleted some?

13:06 22     A.  Because like some that -- people that send me

13:06 23  Merry Christmas, Happy New Year.

13:06 24     Q.  Okay.  What about case-related or

13:06 25  investigation --

Electronically signed by Donna McCown (101-253-986-8079)                                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

13:06  1      A.   No.

13:06  2      Q.   -- related?

13:06  3      A.   No.

13:06  4      Q.   Never get deleted?

13:06  5      A.   No.

13:06  6      Q.   Okay.  Were you advised not to delete any

13:06  7  messages after this lawsuit was filed?

13:06  8      A.   No, ma'am.

13:06  9      Q.   Was your device searched by the IT person?

13:06  10     A.   I'm sorry?

13:06  11     Q.   Your phone, was it searched by the IT person?

13:06  12     A.   They took it to -- to dump it.

13:06  13     Q.   Okay.

13:06  14     A.   Yes, ma'am.

13:06  15     Q.   Do you have a County-issued laptop or computer?

13:06  16     A.   The computer at the office, but I don't use it.

13:06  17     Q.   Okay.  But that's like a desktop, right?  It's

13:06  18  not a -- okay.  Is that a yes?

13:06  19     A.   No.  Yes, I do have a computer.

13:06  20     Q.   Okay.  Have you performed a search of your cell

13:07  21  phone messages pertaining to this lawsuit?

13:07  22     A.   Myself?

13:07  23     Q.   Yes.

13:07  24     A.   No, ma'am.

13:07  25     Q.   Have you conducted a search on your phone

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

13:07  1    pertaining to Lizelle's criminal case?

13:07  2         A.  No, ma'am.

13:07  3         Q.  Has anyone asked you to delete information or

13:07  4    messages from your County-issued phone relating to

13:07  5    Lizelle Gonzalez?

13:07  6         A.  No, ma'am.

13:07  7         Q.  Were you directed by anyone at the DA's office

13:07  8    to save messages on your County-issued phone regarding

13:07  9    Lizelle Gonzalez?

13:07 10         A.  No, ma'am.

13:07 11         Q.  And just to be absolutely clear, Sheriff

13:07 12    Fuentes, do you have any text messages on your personal

13:07 13    phone pertaining to Lizelle Gonzalez?

13:07 14         A.  Not at all.

13:07 15         Q.  Okay.  We talked about the WhatsApp chats that

13:07 16    you have within the sheriff's department.  Are there

13:08 17    any WhatsApp chats or groups that contain members from

13:08 18    the sheriff's office and the DA's office?

13:08 19         A.  No, ma'am.

13:08 20         Q.  Okay.  Are you in any group text messaging

13:08 21    between members of the sheriff's office and the DA's

13:08 22    office?

13:08 23         A.  I could be in one that the chief investigator

13:08 24    from the DA's office and all the -- and myself and all

13:08 25    the police chiefs in the county in case of meetings --

Electronically signed by Donna McCown (101-253-986-8079)                    7e702ac7-fa7d-40f6-8aa2-72e7b7517c40

```
                IN THE UNITED STATES DISTRICT COURT
              FOR THE SOUTHERN DISTRICT OF TEXAS
                      McALLEN DIVISION
LIZELLE GONZALEZ                )(
          Plaintiff             )(
                                )(
VS.                             )(    CIVIL ACTION NO.
                                )(    7:24-cv-00132
GOCHA ALLEN RAMIREZ,            )(
ALEXANDRIA LYNN BARRERA,        )(
RENE FUENTES, and STARR         )(
COUNTY, TEXAS                   )(
          Defendants            )(
```

REPORTER'S CERTIFICATE

I, DONNA McCOWN, Certified Court Reporter, certify that the witness, RENE FUENTES, was duly sworn by me, and that the deposition transcript is a true and correct record of the testimony given by the witness in person on JUNE 12, 2025, and that the deposition was reported by me in stenograph and was subsequently transcribed under my supervision.

Pursuant to Federal Rule 30(e)(2), a review of the transcript was requested.

I FURTHER CERTIFY that I am not a relative, employee, attorney or counsel of any of the parties, nor a relative or employee of such attorney or counsel, nor am I financially interested in the action.

WITNESS MY HAND on this the _____ day _____, 2025.

_____
DONNA McCOWN, Texas CSR 6625
Expiration Date:  01-31-26
Bryant & Stingley, Inc., CRN No. 41
P.O. Box 3420
Harlingen, Texas  78551
(956) 428-0755

**BRYANT & STINGLEY, INC.**
**Harlingen (956) 428-0755          McAllen (956) 618-2366**