**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**MCALLEN DIVISION**

| | | |
|---|---|---|
| **LIZELLE GONZALEZ** | § | |
| **Plaintiff** | § | |
| | § | |
| **Vs.** | § | **CIVIL ACTION 7: 24-CV-00132** |
| | § | |
| **GOCHA ALLEN RAMIREZ, et al.** | § | |
| **Defendants** | § | |

# MOTION FOR SUMMARY JUDGMENT OF STARR COUNTY AND SHERIFF RENE FUENTES IN HIS OFFICIAL CAPACITY AND BRIEF IN SUPPORT THEREOF

MAY IT PLEASE THE COURT:

DEFENDANT STARR COUNTY AND SHERIFF FUENTES IN HIS OFFICIAL CAPACITY hereby move the Court to find that they are entitled to summary judgment and respectfully submit this brief in support of its Motion.[1]

## I. SUMMARY OF THE ARGUMENT

Plaintiff Lizelle Gonzalez falsely alleged that Starr County's District Attorney Gocha Ramirez and Sheriff Rene Fuentes directly participated in her indictment and arrest in March 2022. This Court has determined that the evidence does not support her claims.

[1] This Motion for Summary Judgment is based on the First Amended Complaint (Doc. 7) and the legal theories that it pleads. Plaintiff previously filed an Opposed Motion for Leave to File a Second Amended Complaint, which remains pending before the Court (Doc. 126). If the Court grants the Motion for Leave to Amend, Starr County would ask for the opportunity to file a renewed Motion for Summary Judgment, addressing the legal theories raised in that pleading. Starr County adds that Plaintiff is attempting to use the Court as a quality control mechanism. After losing three summary judgment motions (Docs. 79, 81, 88) based on untenable legal theories in the First Amended Complaint, Plaintiff seeks to amend her complaint to raise completely new theories of municipal liability against Starr County. "[P]laintiffs cannot be allowed to continue to amend or supplement their pleadings until they stumble upon a formula that carries them over the threshold." *Jacquez v. Procunier*, 801 F.2d 789, 792 (5th Cir. 1986).

Gonzalez also made a baseless assertion that District Attorney Ramirez and Sheriff Fuentes implemented an official policy of persecuting abortion seekers in Starr County causing her arrest. There is no evidence to support this claim. It simply did not happen.

Gonzalez's remaining claim against the County under *Monell* is bound to the actions of the policymakers and whether they, in fact, directly participated in her arrest and/or promulgated the alleged policy of persecution. Because the District Attorney and Sheriff neither participated in her indictment and prosecution nor did they enact a policy directing same, Gonzalez's claim against the County fails.

## II. STATEMENT OF THE FACTS.

### A. On September 1, 2021, Senate Bill 8 Takes Effect In Texas.

On September 1, 2021, Texas' Heartbeat Act—also known as Senate Bill 8 or S.B. 8—became effective, making it illegal for an abortion to be induced or performed in Texas by a physician where the physician has "detected a fetal heartbeat of the unborn child." Texas Health & Safety C. § 171.204. The law was immediately challenged, winding its way through the courts and receiving significant media coverage along the way. [2] *See Whole Woman's Health v. Jackson 595 U.S.* ----, 141 S.Ct. 2494 (2021); *Whole Woman's Health v. Jackson*, 595 U.S. 30 (2021); *Whole Woman's Health v. Jackson*, 23 F.4th 380, 389 (5th Cir. 2022).

[2] *See, e.g.*, *Local pro-abortion advocates protest state enactment of state abortion ban*, Berenice Garcia, September 1, 2021, available at https://myrgv.com/local-news/2021/09/01/local-pro-abortion-advocates-protest-state-enactment-of-state-abortion-ban/; *Window of uncertainty as SB 8 turns Texas reproductive health care upside down*, Staff Writer, September 26, 2021, available at https://www.expressnews.com/news/local/article/Window-of-uncertainty-SB-8-turns-Texas-16486217.php; *Supreme Court issues ruling on Texas abortion law*, Aditi Sangal, Adrienne Vogt, Melissa Macaya and Melissa Mahtani, December 10, 2021, available at https://www.cnn.com/politics/live-news/supreme-court-texas-abortion-law/index.html;

**B. On January 7, 2022, Plaintiff Attempted To Self-Induce An Abortion At 19-20 Weeks Of Pregnancy.**

With the public fight over Senate Bill 8 raging, Plaintiff went to Starr County Memorial Hospital reporting abdominal pain from an attempted abortion on January 7, 2022. Doc. 79–4 (SCMH records); Doc. 79–6 (Muniz Inv. pp. 1-2.). Plaintiff was between 19-20 weeks pregnant. Her medical records note that, "Upon SVE by MD, 2 pills said to be cytotec[3] in an attempt to have an abortion…Advised that abortions are illegal in TX." Doc. 79–4 (SCMH records)

Plaintiff's contractions were stopped at the hospital and Plaintiff was discharged on January 8, 2022, at which time "the unborn child that was later classified as 'Boy Herrera' had a steady heartbeat." Doc. 79–4 (SCMH records); Doc. 79–5, p. 1–2, Rosa Inv. pp.1-2). Shortly after leaving the hospital, Plaintiff returned to the hospital and doctors discovered that "Boy Herrera" no longer had a heartbeat. Doc. 79–3, p. 9, 40, 42; Doc. 79–7, p. 5. After Plaintiff underwent a C-section, Jasiel Alessandro Herrera's ("JAH") body was taken to the nursery and then cremated. Doc. 79–3, p. 21; *see also* Doc. 79–6, p. 1; Doc. 79–7, p. 6.

**C. Nurse Martha Torres Reports Plaintiff To Law Enforcement.**

On January 11, 2022, Nurse Martha Torres, who tended to Plaintiff while she was at the Hospital called the police to report what had happened because she was concerned about Texas' "new law." Doc. 79–5, Doc. 79–13. Because the Cyotec drug had been used at Plaintiff's home in Starr County, Starr County Sheriff's Office was notified. Doc. 79–16, 169:5-171:1. There was no agreement between the Sheriff's Office and Starr County Hospital to report abortions. (Muniz Dep.[4] 63:1-9, 77:3-6, 110:12-12, 176:12-14; Aguirre Dep[5]. 167:9-168:5; L. Fuentes Dep.[6] 154:19-

[3] Cytotec is another name for the generic drug misoprostol. *See Planned Parenthood of Greater Tex. Surgical Health Svcs. v. Abbott*, 951 F. Supp. 891, 902 (W.D.T.X. 2013) (discussing Cytotec) (reversed on other grounds by *Planned Parenthood of Greater Tex. v. Abbott*, 748 F.3d 583 (5th Cir. 2014)).
[4] The Muniz Deposition can be found at Doc. 79–15.
[5] The Aguirre Deposition can be found at Doc. 79–16.
[6] The L. Fuentes Deposition can be found at Doc. 79–17.

155:6; R. Fuentes Dep[7]. 93:20-94:3, 96:19-22, 97:4-8; Villarreal Dep.[8] 211:8-11, 211:21-23; Barrera Dep.[9] 81:6-16, 213:2-7; Ramirez Dep.[10] 148:7-150:17).

The Sheriff's office investigates all reports that they receive about crimes having possibly been committed to determine whether a crime has occurred. (L. Fuentes Dep. 202:12-17; R. Fuentes Dep. 26:20-27:1, 68:2-23).

Nurse Torres reported to deputies that Plaintiff had been treated at the hospital and discharged and that the "baby was still alive" when she left. Nurse Torres stated that Plaintiff returned about an hour later with "pains again…and the baby died." Nurse Torres said she did not know if what had happened was "murder" because of the "new law"—Senate Bill 8. Doc. 79–5, Doc. 79–13, Muniz Dep. 66:19-67:5, 71:6-72:18.

The Starr County Sheriff's Office (SCSO) was notified of the complaint. Sheriff Rene Fuentes is the Starr County Sheriff and was elected in 2008. (R. Fuentes Dep. 31:11-12). He oversees multiple departments and supervises more than 100 employees. (R. Fuentes Dep. 33:20-34:19, 54:20-55:13). Sheriff Fuentes' captains and lieutenants regularly meet with deputies and investigators about what is going on day-to-day in the Sheriff's Office. Sheriff Fuentes, in turn, meets with the captain and lieutenant as needed for updates. (R. Fuentes Dep. 36:16-37:11). The Sheriff also receives general updates in the SCSO through WhatsApp. (R. Fuentes Dep. 92:19-93:13). Sheriff Fuentes does not conduct investigations or interfere with his investigators' work. (L. Fuentes 128:21-129:6; R. Fuentes Dep. 37:22-38:11, 72:5-9).

When Nurse Torres' report was taken by Deputy Rosa, he immediately notified his chain of command, and the case was assigned to SCSO Investigator Muniz, who was the investigator in

---

[7] The R. Fuentes Deposition can be found at Doc. 79–18.
[8] The Villarreal Deposition can be found at Doc. 79–20.
[9] The Barrera Deposition can be found at Doc. 79–21.
[10] The Ramirez Deposition can be found at Doc. 79–22.

the office that day. (L. Fuentes Dep. 50:8-20). Sergeant Rafael Aguirre went to the hospital and assisted Muniz with interviewing witnesses. (Aguirre Dep. 61:10-63:2, 164:23-25 ). No one from the Hospital spoke to the District Attorney about Plaintiff's case. (Ramirez Dep. 148:7-150:17). Sheriff Fuentes did not play any part in deciding who would investigate the case. (R. Fuentes Dep. 47:12-17, 102:11-15).

Captain Fuentes notified Sheriff Fuentes at the office about the hospital making a call to report that someone had "taken some pills for an abortion." (R. Fuentes 21:16-20, 98:21-99:5). Sheriff Fuentes did not know whether abortion was legal in Texas at that time and he did not have any discussions with his staff about the issue. (R. Fuentes 22:22-25, 69:3-11). Sheriff Fuentes did not know who Plaintiff was and did not know any of her family members. (R. Fuentes 98:8-17). Sheriff Fuentes "advised Captain Fuentes to direct investigators to document everything and prepare the case, and when they were done, to contact the district attorney's office." (R. Fuentes Dep. 22:11-14).

**D. Starr County Sheriff's Office Investigates But Investigators Never Discuss The Case With Sheriff Fuentes or DA Ramirez.**

During the investigation, neither Investigator Muniz nor Sergeant Aguirre ever spoke with Sheriff Fuentes and do not know what information, if any, he received about the investigation. (Muniz Dep. 162:15-163:15; Aguirre Dep. 162:3-6, 164:1-16, 165:6-9, 167:6-8 ; L. Fuentes Dep. 224:12-225:16; R. Fuentes Dep. 23:17-24, 25:6-10, 69:12-17). Sheriff Fuentes did not read any reports related to the case or participate in the investigation in any way. *Id*. For example, Sheriff Fuentes was not aware when interviews were conducted or who the investigators were in contact with at the hospital. (R. Fuentes Dep. 99:11-100:10). He was not involved in having the grand jury subpoenas issued. (R. Fuentes Dep. 81:22-82:4). Sheriff Fuentes was not involved in determining what charge would apply to Plaintiff. (R. Fuentes Dep. 101:14-23).

Early on, there were questions amongst the SCSO investigators about the case, including whether JAH was legally an "individual" such that causing his death would be a criminal offense and how the changing law came into play. (Aguirre Dep. 174:12-175:9; L. Fuentes Dep. 61:2-12, 106:5-109:13). *See* TEX. PENAL CODE § 19.02 (b)(1) ("A person commits [murder] if the person: [] intentionally or knowingly causes the death of an individual."). Captain Fuentes directed his team to contact the District Attorney's office to resolve the question. (L. Fuentes Dep. 188:2-189:1, 190:5-10). Sheriff Fuentes was aware that investigators had contacted the District Attorney's Office but he did not know specifics about those conversations, or even who the investigators spoke with, because he did not participate in those discussions. (Fuentes Dep. 24:20-25:5, 27:2-6, 47:3-24, 74:1-3, 78:13-20, 79:20-24, 80:21-81:1; Barrera Dep. 212:16-18). During the investigation, Captain Fuentes occasionally provided the Sheriff with updates during in-person conversations, as he did with all cases, but Sheriff Fuentes did not provide feedback or direction about how the investigation should be conducted. (L. Fuentes Dep. 54:17-55:4, 130:1-133:21, 196:5-22; R. Fuentes Dep. 42:8-25, 82:5-19, 102:19-105:5).

At all relevant times, the attorneys in the District Attorney's office were ADA Alexandria Barrera, ADA Abel Villarreal, ADA Judy Solis, ADA Alfredo Garcia, and District Attorney Gocha Ramirez. On January 11, 2022, Investigator Muniz reached out to ADA Barrera to ask questions, but ADA Barrera was unavailable. (Muniz Dep. 89:1-18; Barrera Dep. 86:9-88:23;). Members of the SCSO then reached out to Assistant District Attorney Abel Villarreal, who told them that he needed more information to determine whether there was a viable criminal offense. (Villarreal Dep. 114:20-119:16). ADA Villarreal signed the grand jury subpoena for Plaintiff's medical records. Doc. 79–9, 10, 11.

When ADA Barrera returned Investigator Muniz's call, ADA Barrera understood that the investigators had already spoken to ADA Villarreal. (Barrera Dep. 92:5-94:21). ADA Barrera confirmed during that call that an "individual" under the Texas Penal Code § 1.07 is "a human being who is alive, including an unborn child at every stage of gestation from fertilization until birth." (Muniz Dep. 168:9-171:12, 196:21-197:1; Aguirre Dep. 173:20-174:5; Barrera Dep. 87:16-88:22, 92:5-94:21); *see also* TEX. PENAL CODE § 1.07.

At no time did anyone from the Sheriff's office, including Sheriff Fuentes, communicate with District Attorney Ramirez about the case while it was being investigated. (Muniz Dep. 57:23, 111:21-24, 162:4-14; Aguirre Dep. 162:7-12, 164:11-165:13, 166:7-9; L. Fuentes Dep. 210:19-21; R. Fuentes 39:12-24, 105:6-8, 109:13-111:1, Ex. 36; Ramirez Dep. 163:18-20). Sheriff Fuentes also had no discussions with Assistant District Attorney Barrera or any other ADA about the case. (R. Fuentes Dep. 105:6-8, 128:5-11; L. Fuentes Dep. 230:6-233:1).

**E. DA Ramirez Directs ADA Barrera To Let The Grand Jury Review The Case.**

On February 1, 2022, District Attorney Ramirez discussed the case with ADA Barrera for the first time. District Attorney Ramirez's understanding of the case at that time was that it involved a "dead baby and drugs being used that resulted in the death of a baby." (Ramirez Dep. 184:10-15). The two discussed ADA Barrera submitting the case for grand jury review to determine whether a crime had been committed:

Q. *So what did she -- what was your conversation about?*
A. *About her presenting the case to the grand jury.*
Q. *And what was the case?*
A. *Ms. Herrera's case.*
Q. *What was Ms. Herrera's case?*
A. *It involved a dead baby. That's all I knew*
….
*A. My impression was that the baby was -- there was a dead baby, not that it was a fetus.*

(Barrera Dep. 116:20-118:18; Ramirez Dep. 161-65, 209:1-214:19, 217:2-19, 219:14-16; Plf's Dep. Ex. 16, p. 85).

DA Ramirez did not discuss possible charges in Plaintiff's case—only that it should be reviewed by the grand jury. (Ramirez Dep. 211:13-219:15). DA Ramirez spoke with ADA Barrera on one other occasion sometime in March, when ADA Barrera notified DA Ramirez that she was presenting the case to the grand jury on March 25, 2022. (Ramirez Dep. 216:6-217:15). DA Ramirez reminded ADA Barrera that he would be in a grand jury in another county at that time. (Ramirez Dep. 225:4-23; Doc. 79–27, Moreno Aff.). DA Ramirez did not see Plaintiff's investigative file in advance of the grand jury presentation and does not have a policy requiring that ADA's allow him to review files before grand jury presentations. (Solis Dep. 39:9-22; Villarreal Dep. 211:17-20; Ramirez Dep. 196:14-16). DA Ramirez did not instruct or direct ADA Barrera to lie or make misrepresentations to the grand jury. (Barrera Dep. 212:2-213:22).

**F. The Starr County Grand Jury Indicts Plaintiff And She Is Arrested On April 7, 2022.**

On March 25, 2022, ADA Barrera presented the case to the grand jury. (Barrera Dep. 68:6-16; Ramirez Dep. 225:4-23, 238:2-7). Sheriff Fuentes was not present and did not testify during the grand jury presentation. (R. Fuentes Dep. 90:7-16). DA Ramirez was in a different county presenting to the grand jury there when ADA Barrera presented Plaintiff's case to the grand jury in Starr County. (Ramirez Dep. 225:4-23; Doc. 79–27, Moreno Aff.).

On March 30, 2025, the grand jury foreman signed an indictment for Plaintiff "intentionally and knowingly caus[ing] the death of an individual J.A.H[.], by a self-induced abortion…." Doc. 79–**1**. On April 5, 2022, the capias was issued by the Deputy District Clerk and sent to the Sheriff's Office. Doc. 79–14; *see also* TEX. CODE. CRIM P. 23.03-.031 ("A capias shall be issued by the district clerk upon each indictment for felony presented, after bail has been set or denied by the judge of the court."). On April 7, 2022, Investigator Muniz and Sergeant Aguirre arrested Plaintiff. (Muniz Dep. 103:4-109:8; Aguirre Dep. 148:3-7). DA Ramirez did not review the indictment, set the bond amount, or order the capias to be issued. (Ramirez Dep. 226:19-228:13).

When Plaintiff was arrested, it set off a "firestorm" about abortion rights. Thereafter, DA Ramirez reviewed the full case file for the first time. (Ramirez Depo. 230:14-233:12). Neither DA Ramirez nor anyone in the DA's Office had ever handled a case like Plaintiff's prior to January 2022 (or any time since). (Solis Dep. 104:18-21, Barrera Dep. 225:25-226:5; Ramirez Dep. 197:8-16).

**G. DA Ramierz Immediately Seeks Dismissal Of The Indictment After Learning About Penal Code § 19.06.**

When the "firestorm," commenced DA Ramirez "picked up the file on Saturday, I believe it was April 9th, Saturday morning…And I started looking at the file. And as I was looking at the file, I started getting phone calls and messages that ultimately convinced me that I needed to dismiss the indictment." (Ramirez Dep. 236:10-25, Ex. 33-36).

Specifically, on April 9, 2022, at 4:32 p.m., DA Ramirez received a text from Attorney Brandy Voss asking "*Do you have time for a quick call? It's Brandy Wingate Voss…Kind of urgent.*" Doc. 79–24. At 5:18 p.m., Voss sent DA Ramirez a screen shot of Section 19.06. *Id*. This was the first time that DA Ramirez was aware of the full facts of the case and of Section 19.06, which exempts a mother who causes the death of her unborn child from prosecution. DA Ramirez told Voss, "*Thank you for your call. I hardly know you but I am surely indebted to you*." *Id*. After discussing Section 19.06 with his team for the first time, DA Ramirez decided to issue a press release indicating that the charges should not have been brought and that he would seek immediate dismissal. (Villarreal Dep., Ex. 4; Ramirez Dep. 248:7-18, 236:18-25).

On April 9, 2022, two days after her arrest, Plaintiff made the bond that was set by the judge and was released from jail. Doc. 79–12. Sheriff Fuentes approved the request from the bondsman to bond Plaintiff out of jail. (R. Fuentes Dep. 115:10-116:17). The only discussions Sheriff Fuentes had with District Attorney about Plaintiff was after Plaintiff posted bond, at which

time District Attorney Ramirez asked the Sheriff whether Plaintiff was still in custody and, later, when Ramirez notified Fuentes that he was going to issue a press release about Plaintiff's charge being dismissed. (R. Fuentes Dep. 109:13-111:1, 120:6-15).

On Sunday, April 10, 2022, DA Ramirez met with Plaintiff, her attorney, and her parents. Plaintiff's defense attorney never raised Section 19.06. (Barrera Dep. 214:2-215:1). DA Ramirez apologized to Plaintiff and told her that "it had been a mistake. It had fallen out of his hands, and he didn't know what happened…[and] He was out of town, and he didn't know what happened…." (Ramirez Dep. 239:2-240:18; Plf.'s Dep.[11] 18:7-25; Ramirez Dep., Exs. 33-36; Doc. 79–24). On April 11, 2025, District Attorney Ramirez filed a Motion to Dismiss Plaintiff's indictment. Doc. 79–2.

On April 12, 2022, DA Ramirez sent a text message to Becky Rocha stating that "I should never have indicted her. Because its not Murder in Texas. Actually I wasn't even in town when one of my assistants presented the case. But I'm the boss so I need to take the fallout. I'm not going to blame my assistant." (Ramirez Dep. Ex. 37).

### H. Plaintiff Admits During Discovery That She Has No Actual Knowledge Of Any Of The DA's Actions In Her Case.

During her deposition, Plaintiff admitted that she did not know of any facts directly supporting the allegations contained her First Amended Complaint, including the facts she alleged about DA Ramirez personally investigating her and lying to the grand jury, which were specifically alleged to avoid a Rule 12 dismissal based on absolute immunity.

---

[11] Plaintiff's Deposition can be found at Doc. 79–23.

1. **Plaintiff has no knowledge of the DA taking investigatory actions.**

First, despite claiming that DA Ramirez participated in investigating her, Plaintiff testified that she has no knowledge of any action the District Attorney took in the criminal investigation conducted by the Starr County Sheriff's Office:

> **Q.** *And you don't know if [Investigator Muniz] ever spoke to Mr. Ramirez directly?*
> **A.** *I don't know.*

….

> **Q.** *And as you sit here today, can you describe any actions that you believe Mr. Ramirez takes in these investigations?*
> **A**. *No.*
> …
> **Q.** *Do you know whether he ever had any communications with any investigators in the sheriff's office about your case?*
> **A.** *No.*

….

> **Q.** *And you also don't know whether anybody at the hospital contacted Defendant Ramirez directly about your case, do you?*
> **A.** *No.*

(Plf.'s Dep. 40:2-13, 41:6-21, 80:12-15; 84:24-85:25).

2. **Plaintiff has no knowledge of the DA directing the Sheriff's Office investigation or working with investigators.**

Second, despite claiming that DA Ramirez directed the investigation conducted by Starr County Sheriff's Office, Plaintiff testified that she has no knowledge of any action taken by the DA to direct the Starr County Sheriff's Office investigators on how to perform their investigation:

> Q. *Do you have any reason to believe that District Attorney Ramirez directed the investigators to investigate you for murder?*
> A. *No, no.*

**….**

> Q. *You don't know whether the -- the district attorney, the assistant district attorney, investigators in the DA's office, or the sheriff's office, or the sheriff actually worked together on case, do you?*
> A. *No, I don't.*

Plf.'s Dep. 43:19-22, 69:12-17; 43:6-10, 65:25-68:16).

3. **Plaintiff Has No Knowledge Of Any Of The Sheriff's Actions In Her Case.**

Third, during her deposition, Plaintiff testified that she sued Sheriff Fuentes because she believes, "as an acting sheriff, I can tell you that he should have had a knowledge of my arrest," and she believes Sheriff Fuentes "has involvement in every arrest." (Plf.'s Dep. 12:13-16:22, 33:17-24, 41:6-44:12, 47:25-49:16). Plaintiff could not testify about any actions taken by Sheriff Fuentes, however, despite having pleaded in her First Amended Complaint details about what the Sheriff supposedly did during her investigation and how he conspired with District Attorney Ramirez and Assistant District Attorney Barrera and Starr County Hospital:

> Q. *Do you know of any information, other than the fact that he's the sheriff, that makes you believe he even knew that the investigation was going on prior to you being arrested?*
> …
> A. No.

(Plf.'s Dep. 42:17-25).

> Q. *You don't know whether the -- the district attorney, the assistant district attorney, investigators in the DA's office, or the sheriff's office, or the sheriff actually worked together on your case, do you?*
> A. *No, I don't.*

(Plf.'s Dep. 69:12-17).

> Q. *Okay. And you don't know whether anybody at the hospital ever contacted Sheriff Fuentes directly about your case, do you?*
> A. *I wouldn't know.*

(Plf.'s Dep. 80:8-11).

> Q. *And can you testify about any conversations or statements exchanged between the district attorney and the sheriff about your case?*
> A. *Between them, no.*

(Plf.'s Dep. 115:9-24).

4. **Plaintiff has no knowledge of the DA's direction to ADA Barrera.**

Fourth, despite claiming in her lawsuit that the District Attorney directed ADA Barrera to mislead or lie to the grand jury, Plaintiff testified that she has no knowledge of what, if any, direction DA Ramirez gave to ADA Barrera:

> Q. *[A]nd you don't know if [Ramirez and Barrera] had any conversations before it went to the grand jury, do you?*
> A. *No.*

….

> Q. *...Do you know of specifically anything that Defendant Ramirez did to direct Ms. Barrera to provide false information to the grand jury*?
> A. *Specifically, no. I mean, other than his sanction -- than his sanction, no*.

….

> Q. *Do you have any information about what it is you believe he did to direct Ms. Barrera in concealing that exception?*
> A. *Not that I know of.*
> Q. *In fact, do you know whether he talked to her at all about the case before it went to the grand jury?*
> A. *No.*

….

> *Q. ...Do you know if Defendant Ramirez required Assistant District Attorney Barrera to seek his approval prior to going to the grand jury on your case?*
> *A. I wouldn't be able to tell you yes or no. Like I wouldn't know.*

(Plf.'s Dep. 50:15-51:9, 73:9-74:17, 76:6-8).

5. **Plaintiff has no knowledge of what was presented to the grand jury.**

Fifth, despite claiming in her lawsuit that DA Ramirez "made misrepresentations of the facts and the law," to the grand jury, Plaintiff has no knowledge of what was actually presented to the grand jury:

> Q. *You don't know what was said by Assistant District Attorney Barrera to the grand jury, do you?*
> A. *No.*

….

> **Q**: *Do you believe District Attorney Ramirez made any presentations to the grand jury about your case?*
> **A.** *Not that I know of.*

….

> **A.** *I don't know what was taken to the grand jury.*
> .

(Plf.'s Dep. 34:10-35:11, 35:9-15, 36:4-17).

6. **Plaintiff has no knowledge of the DA taking actions to "conspire" with the other Defendants.**

Sixth, despite claiming in her lawsuit that DA Ramirez conspired to prosecute her, Plaintiff testified that she did not know whether that actually occurred; she only knew that the DA's office and Sheriff's office have made statements about working , generally:

> Q. *So you don't have any reason to believe that they were conspiring to do something in front of the grand jury related to your case, do you*?
> A. *Well, they were -- I know that they were working together during the investigation… I mentioned prior to that -- I know that somewhere I mentioned that they -- they publically speak on working together.*
> Q. *Did they ever publically speak about working together on your case?*
> A. *No.*

….

> **Q.** *Do you know whether [District Attorney Ramirez] ever talked to Sheriff Fuentes about your case?*
> **A.** *No.*

(Plf.'s Dep. 41:6-21, 47:1-23).

7. **Plaintiff has no knowledge of whether the DA knew there was an exception to murder in the penal code that applied to her.**

Finally, despite repeatedly claiming that before her indictment, DA Ramirez was aware of the penal code exception for mothers who cause the death of their unborn child, Plaintiff testified that she had no knowledge of actions of the District Attorney supporting her claim. She also admitted that her accusation was based on nothing more than a conversation she had with Attorney Marty Garcia-Vela (not an employee of the DA's office), who supposedly heard from Attorney Hilda Garza (also not an employee of the DA's office), who heard from some unknown person in the DA's office, that DA Ramirez knew about the exception in the penal code before the indictment. Both Garcia-Vela and Garza, however, deny that they knew anything about Plaintiff's case. (Plf.'s Dep. 22:17-22, 24:5-11; Doc. 79–26; Doc. 79–25).

Plaintiff sued District Attorney Ramirez, Assistant District Attorney Barrera, Sheriff Fuentes and Starr County. Ramirez, Barrera and Fuentes each moved for summary judgment.

(Dkts. 79, 81, 88). On March 31, 2026, the Court granted each motion for summary judgment. (Doc. 123).

As to Sheriff Fuentes, the Court found that he did not "personally arrest," "personally investigate" or "direct [the] arrest" of Plaintiff. (Doc. 123, 15–16) It also found that "[t]he summary-judgment record contains no evidence that Sheriff Fuentes directed investigators to arrest Gonzalez without probable cause," negating any claim for supervisory liability. (*Id*. at 21). It also noted that there was no evidence that Sheriff Fuentes had any malicious intent, negating the malicious prosecution claim. (Id. at 23–26).

As to District Attorney Ramirez, the Court similarly found that there was no evidence of his involvement in her arrest, either directly or as a supervisor. (Doc. 123, 31–34). As to the malicious prosecution claim, it also found no evidence of malice. (*Id*. at 38)

## IV. ARGUMENTS AND AUTHORITIES

Plaintiff brings claims under Section 1983 against Starr County for false arrest and malicious prosecution. She has alleged that District Attorney Ramirez and Sheriff Fuentes personally directed those constitutional violations as policymakers for Starr County, subjecting the County to *Monell* liability. Because the Court has already found that neither Ramirez nor Fuentes personally directed any violations of Plaintiff's constitutional rights, her *Monell* claim must necessarily fail.

### A. Summary Judgment Standard.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). Parties seeking summary judgment bear the initial burden of informing the Court of the basis for the motion and identifying those portions of the pleadings, depositions,

answers to interrogatories and admissions on file together with the affidavits, which the party believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 327 (1986).

Once the movant fulfills the burden set forth under *Celotex*, the burden shifts to the non-movant to show that summary judgment should not be granted. FED. R. CIV. P. 56. The party opposing a properly support motion for summary judgment may not rest on mere allegation or denial of pleadings but must set forth specific fact showing the existence of a genuine issue for trial. *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 256-57 (1986).

"A dispute about a material fact is 'genuine' if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Bodenheimer v. PPG Indus., Inc*., 5 F.3d 955, 956 (5th Cir. 1993) (citation omitted). Unsubstantiated assertions that a fact issue exists will not suffice. *Krim v. Banc Texas Group, Inc*., 989 F.3d 1435, 1442 (5th Cir. 1993).

**B. *Monell* Liability Requires A Policymaker's Involvement**

In this case, Plaintiff is proceeding under a theory that Sheriff Fuentes and District Attorney Ramirez personally directed the constitutional harms she suffered. The Fifth Circuit has recognized that "plaintiffs can hold municipalities liable for single instances of conduct perpetrated by the policymakers themselves; such one-time conduct can represent official 'policy' even though it does not necessarily form part of a plan or rule developed to govern all like occasions." *Milam v. City of San Antonio*, 113 Fed. Appx. 622, 626 (5th Cir. 2004) (emphasis added); *see also Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986) ("it is plain that municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances."). In *Pembaur*, the County Prosecutor personally ordered the Deputy Sheriff's to serve capiases at a local clinic. Courts later found that this search violated the clinic owner's Fourth Amendment rights. The clinic owner sued the City under Section 1983, arguing that the County Prosecutor was the final

policymaker for that particular decision, subjecting the City to liability. The Supreme Court agreed, finding that by "ordering the Deputy Sheriffs to enter petitioner's clinic the County Prosecutor was acting as the final decisionmaker for the county, and the county may therefore be held liable under § 1983." *Pembaur*, 475 U.S. at 485.

This type of liability requires evidence of the policymaker's "personal involvement or some other form of causation to connect the supervisor to the violation." *Marks v. Hudson*, 933 F.3d 481, 490 (5th Cir. 2019).

As an initial matter, District Attorney Ramirez is not a policymaker for Starr County as a matter of law. The Fifth Circuit has repeatedly held that when an elected district attorney in Texas acts in his prosecutorial capacity–as opposed to his administrative or managerial capacities–he is acting as an agent of the state, enforcing state law. *Brown v. Lyford*, 243 F.3d 185, 192 (5th Cir. 2001); *Esteves v. Brock*, 106 F.3d 674, 678 (5th Cir. 1997); *see also Echols v. Parker*, 909 F.2d 795, 801 (5th Cir. 1990) ("A county official pursues his duties as a state agent when he is enforcing state law or policy."). All of Ramirez's actions were taken in his prosecutorial capacity to enforce state law, defeating any claim that he was a policymaker for Starr County. Even if he was considered a policymaker, the claim still fails.

The Court has already found that there is no evidence that Sheriff Fuentes or District Attorney Ramirez directed the arrest or prosecution of Plaintiff, other than general supervisory knowledge. Doc. 123. Neither man arrested Plaintiff nor ordered others to arrest her. District Attorney Ramirez had brief conversations with ADA Barrera where she told him that she would be presenting a case about a dead baby to a grand jury. The only evidence in the record shows that Sheriff Fuentes merely instructed his deputies to "document everything and prepare the case, and

when they were done, to contact the district attorney's office." Neither man had the type of direct personal involvement necessary to subject Starr County to municipal liability under *Monell*.

C. **Official Capacity Defendant/Claims**

Plaintiff's Complaint names and sues Sheriff Fuentes in his official capacity. Dkt. 7, p. 1. Official-capacity suits "generally represent only another way of pleading an action against an entity of which an officer is an agent." *Monell,* 436 U.S. 658, 690, n. 55. An official-capacity suit is, in all respects other than name, to be treated as a suit against the entity. *Kentucky v. Graham*, 473 U.S. 159, 165–66 (1985).

Consequently, the official capacity claims as to Defendant Sheriff Fuentes are merely claims against the County; and should be dismissed for all the reasons identified herein.

**CONCLUSION AND PRAYER**

Therefore, Defendant Starr County respectfully request that the Court enter summary judgment in its favor and issue a take-nothing judgment as well as any other relief to which it is justly entitled.

SIGNED on the 9th day of October 2026.

Respectfully submitted,

By: /s/ Robert L. Drinkard

ROBERT L. DRINKARD
Lead Counsel / Attorney In Charge
Federal ID No.: 29288
State Bar No. 24007138
rldrinkard@rampagelaw.com
CRAIG P. SMITH
So. Dist. ID No. 3986659
State Bar No. 24105193
cpsmith@rampagelaw.com

**DENTON NAVARRO RODRIGUEZ**
**BERNAL SANTEE & ZECH, P.C.**
A Professional Corporation
701 E. Harrison Avenue, Ste. 100
Harlingen, TX 78550
(956) 421-4904
(956) 421-3621 (Fax)

By: /s/ Kelly R. Albin
Kelly R. Albin
State Bar No. 24086079
So. Dist. ID No. 3792304
kralbin@rampagelaw.com
DENTON NAVARRO RODRIGUEZ
BERNAL SANTEE & ZECH, P.C.
549 N. Egret Bay, Suite 200
League City, TX 77573
(832) 632-2102
(832) 632-2132 (fax)
**ATTORNEYS FOR DEFENDANT STARR COUNTY**

## CERTIFICATE OF SERVICE

I certify that a true copy of this document has been served in accordance with one or more of the authorized methods for service of process contained in the Federal Rules of Civil Procedure on the persons or parties identified below on this the 9th day of October 2026.

I. Cecilia Garza — **Via E-Filing Notification**
Veronica Sepulveda Martinez — **Via E-Filing Notification**
GARZA MARTINEZ, PLLC
202 E. Sprague Street
Edinburg, TX 78539
COUNSEL FOR PLAINTIFFS

Lauren Alicia Johnson — **Via E-Filing Notification**
AMERICAN CIVIL LIBERTIES UNION FOUNDATION
915 15th Street NW
Washington DC 20005
COUNSEL FOR PLAINTIFFS

| | |
|---|---|
| David A. Donatti | **Via E-Filing Notification** |
| Adriana Piñon | **Via E-Filing Notification** |
| AMERICAN CIVIL LIBERTIES UNION OF TEXAS | |
| P.O. Box 12905 | |
| Austin, TX 78711-2905 | |
| COUNSEL FOR PLAINTIFFS | |
| Nancy Rosenbloom | **Via E-Filing Notification** |
| Mariana Kovel | **Via E-Filing Notification** |
| AMERICAN CIVIL LIBERTIES UNION FOUNDATION | |
| 125 Broad St. | |
| New York, NY 10004 | |
| COUNSEL FOR PLAINTIFFS | |

By: /s/ Robert L. Drinkard
ROBERT L. DRINKARD
CRAIG P. SMITH
KELLY R. ALBIN